Mark A. Broude
Annemarie V. Reilly
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Tervita Corporation, *et al.*,[1] | Case No. 16-12920 |
| Debtors in a Foreign Proceeding | (Joint Administration Requested) |

### DECLARATION OF ROB VAN WALLEGHEM IN SUPPORT OF VERIFIED PETITION FOR ENTRY OF AN ORDER RECOGNIZING FOREIGN MAIN PROCEEDINGS AND GRANTING ADDITIONAL RELIEF

I, Rob Van Walleghem, hereby declare:

1.    I am the Executive Vice President, Health, Safety and Environment, and General Counsel and Corporate Secretary of Tervita Corporation ("**Tervita**"), and the Executive Vice President, Legal and Corporate Secretary of ARKLA Disposal Services, Inc. ("**ARKLA**"), and the authorized foreign representative (the "**Foreign Representative**") of the above-captioned debtors (the "**Debtors**"), which are the subject of jointly-administered proceedings under the Canada Business Corporations Acts, R.S.C. 1985, c. C-44 (as amended, the "**CBCA**") in the

---

[1]    The Debtors in this and the Canadian Proceedings, together with the last four digits of each Debtor's United States Tax Identification Number or Canadian Business Number, are as follows: ARKLA Disposal Services, Inc. (1990); Tervita Corporation (9886 USA/5469 Canada); CCS Canada (Canadian Holdings) Inc. (8811); CCS International Holdings Inc. (2967); HAZCO Industrial Services Ltd. (4059); Red Sky Holdings 1 Inc. (2758); Red Sky Holdings 2 Inc. (4419); Red Sky Holdings 3 Inc. (0417); Tervita Environmental Services Ltd. (1079); Tervita Equipment Rentals Ltd. (1611); Tervita Metal Services Ltd. (7725); Tervita Production Services Ltd. (7956); and Tervita Waste Processing Ltd. (6510). The location of Tervita Corporation's corporate headquarters is 500, 140-10th Avenue SE, Calgary, Alberta. The service address for the Debtors is 3400, 350-7th Avenue SW, Calgary, Alberta.

Alberta Court of Queen's Bench, in Alberta, Canada (the "**Canadian Proceedings**" and such court, the "**Canadian Court**").

2.      On September 14, 2016, the Canadian Court entered the Preliminary Interim Order, a certified copy of which is attached hereto as Exhibit A (the "**Preliminary Interim CBCA Order**"), commencing the Canadian Proceedings and, among other things, (a) appointing a senior officer of Tervita Corporation as the Foreign Representative and (b) authorizing the filing of these chapter 15 cases (the "**Chapter 15 Cases**").  Preliminary Interim CBCA Order, §12.  Attached hereto as Exhibit B is a true and correct copy of the Affidavit of Stephen Kersley, the Chief Financial Officer of Tervita Corporation, submitted to the Canadian Court in support of the Preliminary Interim CBCA Order (the "**First Kersley Affidavit**").  On October 17, 2016, the Canadian Court entered the Interim Order (the "**Interim CBCA Order**"), a certified copy of which is attached hereto as Exhibit C, extending the stay of proceedings and setting forth the procedures for approval of the Plan of Arrangement, among other things.  Attached hereto as Exhibit D is a true and correct copy of the Affidavit of Stephen Kersley submitted to the Canadian Court in support of the Interim CBCA Order (the "**Second Kersley Affidavit**").

3.      I submit this declaration in support of: (i) the official form chapter 15 petitions for the Debtors (the "**Chapter 15 Petitions**"); (ii) the *Verified Petition for Entry of Order Recognizing Foreign Main Proceeding and Granting Additional Requested Relief* (the "**Verified Petition**"); (iii) the *Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code* (the "**Motion for Provisional Relief**"); (iv) the *Motion for Order Pursuant to Bankruptcy Rule 1015(b) Directing Joint Administration of Chapter 15 Cases* (the "**Motion for Joint Administration**"); and (v) the *Motion for Order Scheduling Recognition Hearing and Specifying Form and Manner of Service of Notice* (the "**Notice Procedures Motion**").

US-DOCS\71421332

4.      I have been employed by Tervita since 2008.  As a result, I have become familiar

with the Debtors' history, day-to-day operations, assets, financial condition, business affairs and

books and records.  All facts set forth in this Declaration are based upon: (a) my personal

knowledge; (b) my review of relevant documents including, among other things, the Kersley

Affidavit and any and all documents prepared and/or filed in connection with the Canadian

Proceedings and the Chapter 15 Cases; (c) information supplied to me by other employees of the

Tervita Group,[2] the officers, directors and employees of the Tervita Group or other professionals

retained by the Tervita Group; or (d) my opinion based upon my experience and knowledge of

the Tervita Group's operations and financial condition.  I am an individual over the age of

eighteen and, if I were called upon to testify, I could and would testify competently to the facts

set forth herein.

## BACKGROUND

### A.      The Debtors' Business and Corporate Structure

5.      Tervita is an environmentally focused company based in Calgary that primarily

serves the oil and gas industry and natural resource sectors in Western Canada.  The Tervita

Group's largest line of business is "midstream services."  The Tervita Group delivers waste

processing and management solutions for fluids and solid waste used in and generated by oil and

gas drilling and production.  This includes, among many other services: (i) processing and

disposing of waste by-products created by resource extraction and (ii) managing the sale of oil

and condensate processed and recovered through the Tervita Group's waste processing facilities.

The Tervita Group also has other lines of business, including environmental services.  The

---

[2]      The Tervita Group includes the following entities:  Tervita, ARKLA Disposal Services, Inc., 9894942
Canada Ltd., CCS Canada (Canadian Holdings) Inc., CCS International Holdings Inc., HAZCO Industrial Services
Ltd., Tervita Equipment Rentals Ltd., Tervita Environmental Services Ltd., Tervita Metal Services Ltd., Tervita
Production Services Ltd., Tervita Waste Processing Ltd., Red Sky Finance LP, Red Sky Holdings 1 Inc., Red Sky
Holdings 2 Inc., and Red Sky Holdings 3 Inc.

3

Tervita Group performs complex projects such as remediation, environmental construction and de-commissioning projects, and other services such as bioremediation and water management services.   The Tervita Group has a diversified customer base of more than 1,500 clients, including many of Canada's largest oil and gas companies.

6.    Tervita is a private company continued under the laws of Canada with its registered office and head office located in Calgary, Alberta.  Alberta is Tervita's principal place of business. The vast majority of the Tervita Group's approximately 1,270 current employees work in Alberta, with the remainder working in other Canadian provinces.  All five of Tervita's senior executives, including me, and all ten of the members of Tervita's upper management work in Alberta.  The vast majority of Tervita's assets are located in Alberta, the vast majority of Tervita's revenues are earned in Alberta, and the vast majority of Tervita's operations are undertaken in Alberta (although Tervita also operates throughout the other Western Canadian provinces, Ontario, and Nova Scotia, and is registered to carry on business in all Canadian provinces and territories, except Quebec).

7.    Tervita owns one hundred percent (100%) of the equity of its Canadian subsidiary Debtors.  Each of the Canadian Debtors is incorporated pursuant to the laws of Alberta and has its registered office in Calgary.  Substantially all (if not all) of the Canadian Debtors' operations are located in Canada.  Tervita also indirectly owns one hundred percent (100%) of a Debtor organized under U.S. law, ARKLA, which is a guarantor on Tervita's Term Loan Facility, Revolving Credit Facility, Secured Notes, Unsecured Notes, and Subordinated Notes (each as defined below).  ARKLA maintains no operations or business in the United States and holds no property of realizable value.

8.    Four of Tervita's direct and indirect parent companies—Debtors Red Sky Holdings 1 Inc. ("**RSH 1**"), Red Sky Holdings 2 Inc. ("**RSH 2**"), and Red Sky Holdings 3

4

("**RSH 3**"), and non-Debtor Red Sky Finance LP ("**Finance LP**")—are also guarantors on Tervita's Term Loan Facility, Revolving Credit Facility, Secured Notes, Unsecured Notes, and Subordinated Notes (each as defined below) (collectively, the "**Parent Guarantors**" and, together with the Debtors, the "**Guarantors**").  Red Sky Holdings LP, a limited partnership, is the direct parent and owner of one hundred percent (100%) of the limited partnership interests of Finance LP and one hundred percent (100%) of the common stock of RSH 1.  Finance LP, a limited partnership, owns percent (100%) of the preferred shares of RSH 3 and one hundred percent (100%) of the preferred shares of Tervita.  RSH 1 is the owner of one hundred percent (100%) of the common stock of RSH 2.  RSH 2, in turn, is the owner of one hundred percent (100%) of the common stock of RSH 3, which is the owner of one hundred percent (100%) of the common stock of Tervita.

9.       It is my understanding that as of August 31, 2016, the Tervita Group had total consolidated assets with a net book value of approximately CAD $1.7 billion.  Approximately CAD $26.7 million of such amount is attributable to the book value of Tervita's wholly-owned non-Debtor U.S. subsidiaries.

**B.**       **The Debtors' Capital Structure**

10.       Revolver.  As of September 14, 2016, (the "**Canadian Commencement Date**"), Tervita was the borrower under, and each Debtor was a guarantor of, a revolving credit facility (the "**Revolving Credit Facility**") under that certain credit agreement, dated as of February 14, 2013 (the "**Revolving Credit Agreement**"), among Tervita, as borrower, the loan guarantors from time to time party thereto, the lenders from time to time party thereto, and the Toronto-Dominion Bank, as administrative agent (as amended, modified, restated or supplemented from time to time) in the principal amount of CAD $325.0 million (plus a swingline facility in the maximum principal amount of CAD $25.0 million).

US-DOCS\71421332

11.     In order to finance the Tervita Group's working capital requirements and other general corporate purposes and capital expenditures throughout the Canadian Proceedings, Tervita and the Toronto-Dominion Bank executed an accommodation agreement (the "**Accommodation Agreement**"). The Accommodation Agreement provides the Tervita Group with continued availability to letters of credit under the Revolving Credit Facility, including the issuance and renewal thereof.

12.     Secured Debt. As of the Canadian Commencement Date, Tervita was the borrower under, and each Debtor was a guarantor of, the following secured debt facilities (collectively, the "**Secured Debt**"): (i) a term loan (the "**Term Loan Facility**" and the lenders thereunder, the "**Term Loan Lenders**") under that certain amended and restated credit agreement, dated as of February 14, 2013 (the "**Term Loan Credit Agreement**"), among Tervita, as borrower, the loan guarantors from time to time party thereto, the lenders from time to time party thereto, and Cortland Capital Market Services LLC, as successor administrative agent (as amended, modified, restated or supplemented from time to time) in the principal amount of USD $750 million,[3] and (ii) those 8.00% senior secured notes due 2018 (the "**8% Secured Notes**") in an aggregate principal amount of USD $650.0 million and those 9.00% senior secured notes due 2018 (the "**9% Secured Notes**" and, together with the 8% Secured Notes, the "**Secured Notes**" and holders thereof the "**Secured Noteholders**")[4] in an aggregate principal amount of CAD $200.0 million, each issued by Tervita pursuant to a Secured Notes Indenture, dated as of February 14, 2013, among Tervita, the guarantors from time to time party thereto, Wells Fargo Bank, National Association ("**Wells Fargo**"), as the U.S. Trustee, and TSX Trust Company, as the Canadian Trustee.

---

[3]     It is my understanding that, as of August 31, 2016, the balance owing on the Term Loan Facility was approximately USD $247.7 million.

[4]     It is my understanding that, as of August 31, 2016, the balances outstanding under the Secured Notes were approximately USD $669.0 million and CAD $205.3 million, respectively.

US-DOCS\71421332

13.     Tervita's secured obligations under the Revolving Credit Agreement, the Term Loan Credit Agreement, and the Secured Notes are subject to a collateral trust agreement dated February 14, 2013 (the "**Collateral Trust Agreement**")[5], among Tervita, the Guarantors, the administrative agent under the Revolving Credit Agreement, the trustees under the Secured Notes Indenture and Wilmington Trust, National Association as Canadian and U.S. collateral trustee (the "**Collateral Trustee**").    Pursuant to the Collateral Trust Agreement, the security granted under the applicable Security Documents is held by the Collateral Trustee for the benefit of the lenders under the Revolving Credit Agreement, the Term Loan Credit Agreement and the Secured Notes (collectively, the "**Secured Creditors**").    Proceeds realized by the Collateral Trustee with respect to the secured assets are paid (i) first, to satisfy the amounts owing under the Revolving Credit Agreement, including the undrawn amount of letters of credit up to the aggregate principal amount of CAD $400 million, and (ii) second, ratably, to satisfy the amounts owed under the Term Loan Credit Agreement and the Secured Notes.

14.     Unsecured Debt.    As of the Canadian Commencement Date, Tervita was the issuer and each Debtor subsidiary was a guarantor of the following unsecured debt facilities (the "**Unsecured Debt**"): (i) those 9.75% senior unsecured notes due 2019 (the "**9.75% Unsecured Notes**") in an aggregate principal amount of USD $290.0 million,[6] issued by Tervita pursuant to

---

[5]        In addition to the Collateral Trust Agreement, the Revolving Credit Agreement, the Term Loan Credit Agreement and the Secured Notes are subject to (i) an amended and restated pledge and security agreement dated as of February 14, 2013, among Tervita, the Guarantors and the Collateral Trustee, whereby each of Tervita and the Guarantors reaffirm and re-grant in favor of the Collateral Trustee a security interest in their respective present and after acquired personal property and a floating charge over their respective real property, (ii) an amended and restated pledge and security agreement dated as of February 14, 2013, among Tervita, Finance LP, RSH 3 and the Collateral Trustee, whereby each of Tervita, Finance LP and RSH 3 reaffirm and re-grant in favor of the Collateral Trustee a security interest in their respective present and after acquired personal property, (iii) a grant of security in patents, dated February 14, 2013, between Tervita and the Collateral Trustee, whereby Tervita grants to the Collateral Trustee a security interest in all of its patents as set forth therein, (iv) an amended and restated intellectual property security agreement, dated February 14, 2013, whereby Tervita grants to the Collateral Trustee a security interest in all of its intellectual property as set forth therein, and (v) certain additional documents relating to the grant of security in the foregoing agreements (collectively, the "**Security Documents**").

[6]        It is my understanding that, as of August 31, 2016, the balance outstanding under the 9.75% Unsecured Notes was approximately USD $299.4 million.

the 9.75% Unsecured Notes Indenture, dated as of October 23, 2012, among Tervita, the guarantors from time to time party thereto, and Delaware Trust Company ("**Delaware Trust**"), as successor trustee, and (ii) those 10.875% senior unsecured notes due 2018 (the "**10.875% Unsecured Notes**" and, together with the 9.75% Unsecured Notes, the "**Unsecured Notes**" and holders thereof the "**Unsecured Noteholders**") in an aggregate principal amount of USD $335.0 million,[7] issued by Tervita pursuant to the 10.875% Unsecured Notes Indenture, dated as of December 3, 2013, among Tervita, the guarantors from time to time party thereto, and Delaware Trust, as successor trustee.

15.    _Subordinated Debt_. As of the Canadian Commencement Date, Tervita was the borrower under, and each Debtor subsidiary was a guarantor of, those 11.875% senior unsecured subordinated notes due 2018 (the "**Subordinated Notes**" or "**Subordinated Debt**" and holders thereof the "**Subordinated Noteholders**") in an aggregate principal amount of USD $307.6 million,[8] issued by Tervita pursuant to the Subordinated Notes Indenture, dated as of May 9, 2008 (as amended), among Tervita, the guarantors from time to time party thereto, and Wilmington Savings Fund Society, FSB, as successor trustee.

16.    _Intercompany Note_. On or about November 14, 2007, Tervita issued a note with a principal amount of CAD $849.0 million[9] to Finance LP (the "**Intercompany Note**"). Interest accrues on the Intercompany Note at the rate of 13% per annum.

---

[7]    It is my understanding that, as of August 31, 2016, the balance outstanding under the 10.875% Unsecured Notes was approximately USD $354.8 million.

[8]    It is my understanding that, as of August 31, 2016, the balance outstanding under the Subordinated Notes was approximately USD $336.6 million.

[9]    It is my understanding that, as of August 31, 2016, approximately CAD $ 1.1 billion was owing by Tervita under the Intercompany Loan. Repayment of the amounts owing under the Intercompany Loan are subordinate to the repayment of the Unsecured Notes and the Subordinated Notes.

US-DOCS\71421332

### C.    Events Preceding Commencement of the Canadian Proceedings

17.    The industry in which the Debtors operate, providing integrated oil and gas environmental services to companies involved in the exploration and production of oil and natural gas, is dependent upon sustained success and growth in the E&P sector.  In recent years, the oil and gas industry has faced a dramatic drop in commodity prices.  The sustained uncertainty and volatility in the E&P sector caused by falling oil prices has translated into lower investment, drilling and completions activity by E&P companies, which, consequently, adversely impacted the Tervita Group's revenues and profits.

18.    In 2014, in response to declining oil prices, the Tervita Group began implementing a reduction in force initiative aimed at cutting costs by centralizing internal services and minimizing redundancies in its operations, as well as a "fit-for-purpose" organizational effectiveness review aimed at implementing effective ways to share support services between different service divisions.  Further, in February 2015, Tervita disposed of its interests in Tervita, LLC, resulting in the sale of substantially all of its U.S. based corporations for approximately USD $469.0 million, and on August 31, 2016, Tervita sold its "Production Services" assets for net cash proceeds of approximately CAD $ 42.8 million.

19.    In the fall of 2015, Tervita engaged Barclays Capital Inc. ("**Barclays**") as their financial advisor to consider strategic alternatives.  Some of the alternatives considered were paying down some or all of the debt, obtaining covenant relief, raising new financing, unwinding Tervita's hedges and other liability management alternatives.  Barclays also analyzed, among other things, the potential sale of a portion of Tervita.  Barclays contacted 16 potentially interested parties regarding a sale of Tervita or its assets.  It is my understanding that one party signed a confidentiality agreement and made an indicative proposal which was not commercially attractive.

9

20.    In December 2015, Barclays began to assist the Tervita Group in considering the possibility of a consensual restructuring.  From January 2016 onwards, the Tervita Group and its advisors were in contact with various debtholders to discuss possible covenant relief and other potential solutions.  During March and April of 2016, the Tervita Group and Barclays engaged with the Secured Noteholders, the Unsecured Noteholders, the Subordinated Noteholders, and their respective advisors with the goal of entering into a consensual restructuring transaction.

21.    During this period, Tervita was also exploring options to address its liquidity issues and ways to mitigate the risk of a breach of the Term Loan Facility debt ratio covenants. With the assistance of Barclays, Tervita unwound certain "in the money" currency hedges and was able to monetize its secured and unsecured swaps, which resulted in gross proceeds of approximately USD $174.0 million and USD $52.0 million, respectively.

22.    On May 15, 2016, after extensive consultation with its board and advisors, Tervita elected not to make the USD $18.3 million interest payment due on the Subordinated Notes, resulting in a default under the Subordinated Notes Indenture, which had a 30-day grace period. On June 15, 2016, the 30-day grace period expired.  However, Tervita was able to obtain a waiver from the lenders under the Revolving Credit Facility and the Term Loan Facility, as well as an agreement whereby Subordinated Noteholders agreed to forbear until September 15, 2016 from enforcement of the interest payment default under the Subordinated Notes Indenture (the "**Subordinated Noteholder Forbearance Period**").

23.    On August 15, 2016, Tervita elected not to make the USD $18.2 million interest payment on its 10.875% Unsecured Notes.  Under the 10.875% Unsecured Notes Indenture, Tervita had a 30-day grace period (the "**August Interest Payment Grace Period**").

24.    On September 14, 2016, Tervita commenced the Canadian Proceedings and was granted a stay of proceedings by the Canadian Court pursuant to the Preliminary CBCA Interim

US-DOCS\71421332

Order prior to the expiry of the Subordinated Noteholder Forbearance Period and the August Interest Payment Grace Period. If the Canadian Proceedings were not commenced on such date and such periods were allowed to expire without Tervita making the subject interest payments, "Events of Default" would have occurred under the Subordinated Notes Indenture, the 10.875% Unsecured Notes Indenture, the Revolving Credit Agreement and the Term Loan Credit Agreement, which would have allowed the requisite holders thereof to accelerate their respective indebtedness.

25.    Starting in March and April 2016, Tervita and its advisors engaged in negotiations with various ad hoc committees (collectively, the "**Ad Hoc Committees**") and their respective legal counsel and advisors in an effort to negotiate a recapitalization transaction that would recapitalize Tervita's capital structure and allow the business to continue as a going concern. The Ad Hoc Committees include the following: (i) a group of holders that are primarily holding a material portion of the debt under the Term Loan Facility and a material portion of the Secured Notes (the "**Secured Creditor Ad Hoc Committee**"); (ii) a group of holders that are primarily holding a material portion of the Unsecured Notes, as well as a material portion of the debt under the Term Loan Facility and a material portion of the Secured Notes (the "**Unsecured Noteholder Ad Hoc Committee**"); and (iii) a group of holders that are primarily holding a material portion of the Subordinated Notes (the "**Subordinated Noteholder Ad Hoc Committee**").

26.    The negotiations with the Ad Hoc Committees ultimately culminated in the formulation of a term sheet forming the basis of the Plan. On September 14, 2016, Tervita entered into separate Plan support agreements with (i) a material portion of the Unsecured Noteholders (the "**Unsecured Noteholder Support Agreement**"), (ii) a material portion of the Subordinated Noteholders (the "**Subordinated Noteholder Support Agreement**"), and (iii) the RSAC Shareholders (the "**Shareholder Support Agreement**"). Additionally, Tervita and

11

certain members of the Unsecured Noteholders Ad Hoc Committee (the "**Plan Sponsors**") also reached an agreement in principal on the terms of a backstop commitment in an amount of up to CAD $372.0 million (the "**New Investment**") (which amount may be reduced, such that Tervita's cash balance at closing is CAD $75 million).

## D.    The Plan of Arrangement

27.    The Plan is a traditional debt for equity conversion.  The Plan provides for, among other things:

    a.    the payment of the principal outstanding on all of the Secured Debt and accrued and unpaid interest thereon through the effective date of the Plan, other than the Secured Debt held by the Plan Sponsors as of September 14, 2016, and the accrued and unpaid interest thereon;

    b.    the creation of a new class of common shares of Tervita (the "**New Common Shares**") and the creation of a new class of preferred shares of Tervita (the "**New Preferred Shares**"), which shares shall have substantially similar rights;

    c.    the exchange of all of the existing equity of Tervita in consideration for 20% of the net proceeds actually received by Tervita from the determination or settlement of certain litigation by Tervita against a third party in the Canadian Court;

    d.    the issuance of new preferred shares by Tervita to eligible Unsecured Noteholders that have elected to participate in the New Investment on a pro rata basis in accordance with the terms thereof;

    e.    the issuance of new preferred shares by Tervita in consideration for the irrevocable exchange and transfer of all of the Secured Debt held by the Plan Sponsors as of September 14, 2016 and the accrued and unpaid interest thereon;

    f.    the issuance of new common shares by Tervita that in the aggregate will represent 2.0% of pro forma equity, in consideration for the irrevocable exchange and transfer of all the Unsecured Notes;

    g.    the issuance of new common shares by Tervita that in the aggregate will represent 0.5% of pro forma equity to those Unsecured Noteholders that execute the Unsecured Noteholder Support Agreement on or before October 21, 2016;

    h.    the irrevocable exchange of all of the Subordinated Notes in consideration for the payment of CAD $20.0 million by Tervita;

    i.    the further payment of CAD $5.0 million by Tervita to those Subordinated Noteholders that execute the Subordinated Noteholder Support Agreement on or

US-DOCS\71421332

before October 14, 2016;

j.  the transfer of the Intercompany Loan debt to a subsidiary of Tervita; and

k.  the funding of a new debt in an amount of CAD $475.0 million and the reinstatement or replacement of the Revolving Credit Facility, each on terms and conditions acceptable to Tervita and the Plan Sponsors.

28.    It is my understanding that, the Term Loan Facility and the Secured Notes will be unimpaired by the Plan because the principal and interest on the Term Loan Facility and the Secured Notes will be repaid in full (other than the holdings of such Term Loan Facility and Secured Notes as of the Canadian Commencement Date held by the Plan Sponsors). The Revolving Credit Facility will also be unaffected by the Plan. In addition, Tervita's trade debt, other non-financial claims and obligations to its employees will generally continue to be paid or otherwise satisfied in the ordinary course of business.

## E.    The Canadian Proceedings

29.    On September 14, 2016, the Tervita Group commenced the Canadian Proceedings with the goal of effecting a recapitalization transaction pursuant to the Plan of Arrangement while continuing normal operations under the protections offered by the CBCA. On that same date, the Canadian Court entered the Preliminary Interim CBCA Order evidencing the commencement of the Canadian Proceedings and granting further related relief.

30.    The Preliminary Interim CBCA Order provides for a limited stay. Section 3 of the Preliminary Interim CBCA Order provides as follows:

> From and including the date of this Preliminary Interim Order until and including October 14, 2016 (the "Stay Period"), no person, including, without limitation, the Noteholders, the trustees under the Indentures, the Term Loan Administrative Agent, the Term Loan Facility Lenders or any other administrative agent, collateral agent, indenture trustee or similar person, (i) shall have any right to terminate, accelerate, amend or declare a default or event of default or make any demand or take any step to enforce any guarantee or any security interest granted by any member of the Tervita Group in respect of the Notes, the Term Loan Facility, or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor, and (ii) may refer to, rely on or otherwise

13

claim any rights against any member of the Tervita Group under any contract, debt instrument or any other agreement with any member of the Tervita Group in respect of any alleged breach, default or event of default under the Notes, the Term Loan Facility or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor; in each case, by reason of: (A) the Applicants having commenced this proceeding, (B) any member of the Tervita Group taking any steps in furtherance thereof, (C) any member of the Tervita Group being a party to these proceedings or being party to an Arrangement, or (D) any default or cross-default arising under any of the Notes or the Term Loan Credit Agreement, without further order of this Honourable Court.

Preliminary Interim CBCA Order, § 3.

31.    Also, as noted above, on October 17, 2016, the Canadian Court entered the Interim CBCA Order.  The Interim CBCA Order is attached hereto as Exhibit C.  The Interim CBCA Order further provides for a limited stay.  Section 43 of the Interim CBCA Order provides as follows:

From 12:01 a.m. on the date of this Interim Order until and including the earlier of: (a) the effective date; (b) seven days after the termination of the Unsecured Noteholders Support Agreement; or (c) seven days after the termination of the Backstop Commitment Letter, no person, including, without limitation, the Noteholders, the trustees under the Indentures, the Term Loan Administrative Agent, the Term Loan Facility Lenders or any other administrative agent, collateral agent, indenture trustee or similar person, (i) shall have any right to terminate, accelerate, amend or declare a default or event of default or make any demand or take any step to enforce any guarantee or any security interest granted by any member of the Tervita Group in respect of the Notes, the Term Loan Facility, or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor, and (ii) may refer to, rely on or otherwise claim any rights against any member of the Tervita Group under any contract, debt instrument or any other agreement with any member of the Tervita Group in respect of any alleged breach, default or event of default under the Notes, the Term Loan Facility or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor; in each case, by reason of: (A) the Applicants having commenced this proceeding, (B) any member of the Tervita Group taking any steps in furtherance thereof, (C) any of member of the Tervita Group being a party to these proceedings or being party to an Arrangement, or (D) any default or cross-default arising under any of the Notes or the Term Loan Credit Agreement, without further order of this [Honourable] Court.

Interim CBCA Order, § 43.

14

32.     In addition, the Preliminary Interim CBCA Order and the Interim CBCA Order each expressly requests that courts in the United States recognize the Canadian Proceedings and the Preliminary Interim CBCA Order and the Interim CBCA Order, respectively.  Section 11 of the Preliminary Interim CBCA Order and Section 50 of the Interim CBCA Order provide, in relevant part:

> This [Honourable] Court requests the aid and recognition of  . . . any court or any judicial, regulatory or administrative body of the United States, any state thereof or any other country in the aid of and to assist this [Honourable] Court in carrying out the terms of this Preliminary Interim Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants as may be necessary or desirable to give effect to this Preliminary Interim Order, to grant representative status to the Applicants in any foreign proceedings, or to assist the Applicants and their respective agents in carrying out the terms of this Preliminary Interim Order.

Preliminary Interim CBCA Order, § 11; Interim CBCA Order, § 50.

33.     Finally, the Preliminary Interim CBCA Order and the Interim CBCA Order each appoints a senior officer of Tervita as foreign representative for the express purpose of seeking recognition of the Canadian Proceedings in jurisdictions outside of Canada.  Section 12 of the Preliminary Interim CBCA Order and Section 51 of the and the Interim CBCA Order each provides:

> A senior officer of one or more of the Applicants, as necessary, is authorized to act as the representative or foreign representative (the "Foreign Representative") of any of the Applicants or any other member of the Tervita Group in connection with these proceedings and with carrying out the terms of this Preliminary Interim Order, for, among other things, the purpose of having these proceedings recognized in any other jurisdiction whether in or outside of Canada, as necessary. The Foreign Representative is hereby authorized to apply for foreign recognition of these proceedings, as necessary, in any jurisdiction outside of Canada.

Preliminary Interim CBCA Order, § 12; Interim CBCA Order, § 51.  In accordance with the Preliminary Interim CBCA Order and the Interim CBCA Order, I was appointed the Foreign Representative by Tervita in my capacity as the Executive Vice President, Health, Safety and

15

Environment, General Counsel and Corporate Secretary of Tervita and the Executive Vice President, Legal and Corporate Secretary of ARKLA.

34.    The Interim CBCA Order sets out a proposed timeline under which the Plan is to be approved.    Pursuant to the Interim CBCA Order, the Unsecured Noteholders, the Subordinated Noteholders and the RSAC Shareholders will hold separate meetings to consider authorizing and approving the Plan of Arrangement, among other things, on November 30, 2016. Upon approval by the requisite stakeholders (i.e., the Unsecured Noteholders, the Subordinated Noteholders, and the RSAC Shareholders), the Canadian Court will hold a hearing to consider entry of a final order approving the Plan on December 6, 2016 at 10:00 a.m. (Calgary time) or soon thereafter. *See* Interim CBCA Order, § 38.

35.    Although each Debtor's respective management and board of directors remains in place, I have been informed that each Debtor's assets and affairs are subject to the supervision of the Canadian Court during the pendency of the Canadian Proceedings.

## PLEADINGS

**A.    The Verified Petition**

36.    Concurrently herewith, through my advisors, I have filed the Verified Petition, which seeks final relief in aid of the Canadian Proceedings and recognition and enforcement in full of the Preliminary Interim CBCA Order and the Interim CBCA Order in the United States. As set forth in the Verified Petition, it is my understanding that this Court should recognize the Canadian Proceedings as "foreign main proceedings," as defined in Section 1502(4) of Title 11 of the United States Code (the "**Bankruptcy Code**").  I have been informed that the Bankruptcy Code provides for recognition of a foreign proceeding as a "foreign main proceeding" if such foreign proceeding is a "foreign proceeding" pending in the country where the debtor has its "center of main interests." See 11 U.S.C. § 1517(b)(1).

US-DOCS\71421332

37.     I have been informed that the Canadian Proceedings are "foreign proceedings" as they are a collective judicial proceeding authorized and supervised by the Canadian Court under the CBCA and pursuant to the Preliminary Interim CBCA Order and the Interim CBCA Order. It is my understanding that for these reasons, the Canadian Proceedings qualify as "foreign proceedings" as that term is defined in Section 101(23) of the Bankruptcy Code. In compliance with Section 1515(b) of the Bankruptcy Code, a certified copy of the Preliminary Interim CBCA Order, which commenced the Canadian Proceedings, is attached hereto as Exhibit A.

38.     In addition, I believe that the Debtors' "center of main interest" is in Canada as (i) all but one of the Debtors (including the parent, Tervita) are incorporated in Canada, and all but one of the Debtors' registered offices are located in Canada, (ii) all of the Debtors' operations take place in Canada, (iii) all of the Debtors' revenue is generated in Canada, (iv) substantially all of the Debtors' major customers are located in Canada, (v) the Debtors have approximately 1,270 employees located in Canada and pay payroll taxes to the Canadian government (and have no employees located outside of Canada); and (vi) all of the members of the Debtors' senior management are located in Canada.

39.     Finally, the Preliminary Interim CBCA Order and the Interim CBCA Order, among other things, (a) authorized the appointment of a senior officer of the Applicants (including Tervita) as Foreign Representative, (B) authorized the Foreign Representative to apply for foreign recognition of the Canadian Proceedings through the commencement of these Chapter 15 Cases, and (c) requested the aid and recognition of all courts in aid of and to assist the Canadian Court in carrying out the terms of the Preliminary Interim CBCA Order and the Interim CBCA Order. *See* Preliminary Interim CBCA Order, §§ 11, 12; Interim CBCA Order, §§ 54, 55.  Pursuant to the Preliminary Interim CBCA Order and the Interim CBCA Order, I was appointed Foreign Representative in my capacity as a senior officer of Tervita and ARKLA.  It is

17

my understanding that for these reasons, I satisfy the definition of a "foreign representative" as that term is defined in Section 101(24) of the Bankruptcy Code.

40.      Based on these facts, I believe that recognition of the Canadian Proceedings as foreign main proceedings is warranted.

**B.      Motion for Provisional Relief**

41.      Through my advisors, I commenced these Chapter 15 Cases in order to prevent certain of the Debtors' stakeholders, many of whom have contacts with the United States and are subject to personal jurisdiction of this Court, from commencing actions in the United States that are more properly the subject of the Canadian Proceedings.

42.      To prevent such actions and to maintain the *status quo* pending the Court's recognition of the Canadian Proceedings, I filed the Motion for Provisional Relief seeking certain provisional relief, including the limited application of the automatic stay under Section 362 of the Bankruptcy Code to only the Provisional Relief Parties set forth in the Motion for Provisional Relief.   I believe that without the limited application of Section 362 to the Provisional Relief Parties, there is a real and significant risk that certain of the Debtors' stakeholders will commence actions in the United States to interfere with the Canadian Court's ability to adjudicate the Plan.   I believe that if such issues are permitted to be litigated or interfered with in the United States while the Canadian Court is simultaneously adjudicating all other issues surrounding the Plan of Arrangement, it would not only hinder the orderly administration of the Tervita Group's affairs, but threaten to unravel the majority-supported recapitalization transaction that the Tervita Group seeks to implement pursuant to the Canadian Proceedings.   Any disruption in the  reorganization could cause significant harm to the Debtors, their stakeholders, and other parties in interest.   Accordingly, I believe that the provisional relief

US-DOCS\71421332

requested in the Motion for Provisional Relief is necessary and appropriate under the circumstances.

**C.    Motion for Joint Administration**

43.    I believe that joint Administration is warranted in these Chapter 15 Cases. The Debtors are affiliated entities with closely related financial affairs and business operations, and joint administration will ease the administrative burden on the parties and this Court and its personnel.  I anticipate that various notices, applications, motions, other pleadings, hearings and orders in these Chapter 15 Cases will affect each of the Debtors.  The failure to administer these Chapter 15 Cases jointly would result in duplicative pleadings and service.  Such duplication would impose unnecessary expenses on all parties.

44.    Joint administration will permit this Court to use a single docket for the jointly administered cases and combine notices to creditors and other parties in interest. Joint administration will protect parties in interest by ensuring that they will be apprised of all matters. Accordingly, I believe entry of an order granting the relief requested in the Motion for Joint Administration is in the best interest of the Debtors and all parties in interest.

**D.    Notice Procedures Motion**

45.    Through my advisors, I have filed the Notice Procedures Motion seeking an order: (a) scheduling a deadline for the filing of objections to the Verified Petition (the "**Objection Deadline**"), (b) setting the date for the hearing on the relief sought in the Verified Petition (the "**Recognition Hearing**"), (c) approving the form of notice of the Recognition Hearing and the Objection Deadline (the "**Hearing Notice**"), and (d) approving the manner of service of the Hearing Notice.  I believe that the relief sought in the Notice Procedures Motion is warranted in these Chapter 15 Cases.  The Debtors have a significant number of creditors and other parties in interest that will need to be provided with notice of, among other things, (i) the

19

Recognition Hearing, (ii) the Chapter 15 Petitions, (iii) the Verified Petition (including the proposed form of order attached thereto), (iv) the *Order Granting Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code*, (v) the *Order Pursuant to Bankruptcy Rule 1015(b) Directing Joint Administration of Chapter 15 Cases*, (vi) this Declaration, and (vii) the *Declaration of Marc Wasserman in Support of Verified Petition for Recognition and Chapter 15 Relief*. I believe the notice procedures set forth in the Notice Procedures Motion represent a cost-effective method for the Foreign Representative to effectively handle service in these Chapter 15 Cases. Accordingly, I believe entry of an order granting the relief requested in the Notice Procedures Motion is in the best interest of the Debtors and all parties in interest.

## STATEMENT PURSUANT TO BANKRUPTCY CODE SECTION 1515(c)

46.     I have been informed that Section 1515(c) of the Bankruptcy Code provides that "[a] petition for recognition shall . . . be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative." Thus, in accordance with Section 1515(c), I hereby declare that the only foreign proceedings, as I understand such term is defined in Section 101(23) of the Bankruptcy Code, pending with respect to the Debtors, that are known to the Debtors, are the Canadian Proceedings.

## INFORMATION PURSUANT TO BANKRUPTCY RULE 1007(a)(4)

47.     I have been informed that Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure provides that "[i]n addition to the documents required under § 1515 of the Code, a foreign representative filing a petition for recognition . . . shall file with the petition: (A) a corporate ownership statement containing the information described in Rule 7007.1; and (B) unless the court orders otherwise, a list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and all

20

entities against whom provisional relief is sought under § 1519 of the Code." Thus, in accordance with Bankruptcy Rule 1007(a)(4), I hereby provide the following information:

48.    Corporate Ownership Statement.    In accordance with Rule 7007.1, the below chart lists each entity that directly or indirectly owns 10% or more of the equity interests of the Debtors:

| Debtor | Name and Mailing Address of Holder | Kind of Interest | Percentage of Ownership |
|---|---|---|---|
| Red Sky Holdings 1 Inc. | Red Sky Holdings LP 140-10th Avenue SE Suite 500 Calgary, Alberta T2G 0R1 | Common Stock | 100% |
| Red Sky Holdings 2 Inc. | Red Sky Holdings 1 Inc. 140-10th Avenue SE Suite 500 Calgary, Alberta T2G 0R1 | Common Stock | 100% |
| Red Sky Holdings 3 Inc. | Red Sky Holdings 2 Inc. 140-10th Avenue SE Suite 500 Calgary, Alberta T2G 0R1 | Common Stock[10] | 100% |
| | Red Sky Finance LP 140-10th Avenue SE Suite 500 Calgary, Alberta T2G 0R1 | Preferred Stock | 100% |
| | CCS Employee Trust 140-10th Avenue SE Suite 500 Calgary, Alberta T2G 0R1 | Non-Voting Common Stock<br><br>Non-Voting Preferred Stock | 100%<br><br>100% |
| Tervita Corporation | Red Sky Holdings 3 Inc. 140-10th Avenue SE Suite 500 Calgary, Alberta T2G 0R1 | Common Stock | 100% |
| | Red Sky Finance LP 140-10th Avenue SE Suite 500 Calgary, Alberta T2G 0R1 | Preferred Stock | 100% |
| ARKLA Disposal Services, Inc. | Tervita (USA Holdings) LLC | Common Stock | 100% |

---

[10]    Additionally, CCS Management Inc., a subsidiary of Red Sky Holdings 2 Inc., holds options to acquire non-voting common and preferred shares of Red Sky Holdings 3 Inc.

US-DOCS\71421332

| | 140-10th Avenue SE Suite 500 Calgary, Alberta T2G 0R1 | | |
|---|---|---|---|
| CCS Canada (Canadian Holdings) Inc. | Tervita Corporation 140-10th Avenue SE Suite 500 Calgary, Alberta T2G 0R1 | Common Stock | 100% |
| CCS International Holdings Inc. | Tervita Corporation 140-10th Avenue SE Suite 500 Calgary, Alberta T2G 0R1 | Common Stock | 100% |
| HAZCO Industrial Services Ltd. | Tervita Corporation 140-10th Avenue SE Suite 500 Calgary, Alberta T2G 0R1 | Common Stock | 100% |
| Tervita Environmental Services Ltd. | Tervita Corporation 140-10th Avenue SE Suite 500 Calgary, Alberta T2G 0R1 | Common Stock | 100% |
| Tervita Equipment Rentals Ltd. | Tervita Corporation 140-10th Avenue SE Suite 500 Calgary, Alberta T2G 0R1 | Common Stock | 100% |
| Tervita Metal Services Ltd. | Tervita Corporation 140-10th Avenue SE Suite 500 Calgary, Alberta T2G 0R1 | Common Stock | 100% |
| Tervita Production Services Ltd. | Tervita Corporation 140-10th Avenue SE Suite 500 Calgary, Alberta T2G 0R1 | Common Stock | 100% |
| Tervita Waste Processing Ltd. | Tervita Corporation 140-10th Avenue SE Suite 500 Calgary, Alberta T2G 0R1 | Common Stock | 100% |

49.    Persons/Bodies Authorized to Administer the Foreign Proceedings.    The Preliminary Interim CBCA Order and the Interim CBCA Order authorized Tervita to appoint a senior officer as the Foreign Representative.  Pursuant to the Preliminary Interim CBCA Order and the Interim CBCA Order, Tervita appointed me as the Foreign Representative.  My office address is: 500, 140 10th Avenue SE, Calgary, Alberta T2G 0R1.

US-DOCS\71421332

50.    <u>Pending Litigation</u>.  Below is a list of all litigation pending in the United States against the Debtors.  A list of the names and addresses of all known parties to the below litigation proceedings is attached hereto as <u>Exhibit E</u>.

| Debtor | Case Caption | Court |
|---|---|---|
| ARKLA Disposal Services, Inc. | *Caddo-Bossier Parishes Port Commission v. ARKLA Disposal et al; CCS Energy Services LLC; John Tuma; American International Specialty Lines Insurance Company*, Case No. 509, 871-A | Division A, First Judicial District of Caddo Parish, Louisiana |
| | *City of Shreveport v. ARKLA Disposal et al; Specialty Lines Insurance Company, and CCS Energy Services LLC*, Case No. 509, 862-A | First Judicial District Court of Caddo Parish, Louisiana |
| | *Franks Investment Company v. ARKLA Disposal et al. and CCS Energy Services LLC*, Case No. 509, 860-B | Division B, First Judicial District of Caddo Parish, Louisiana |
| | *Mike Sanders v. ARKLA Disposal et al. and the City of Shreveport*, Case No. 509, 126-A | First Judicial District of Caddo Parish, Louisiana |

51.    <u>Provisional Relief</u>.  Through the Motion for Provisional Relief, provisional relief is sought with respect to each of the Debtors against each of the Provisional Relief Parties, including the following parties: (i) the Term Loan Lenders, (ii) Cortland Capital Market Services LLC (in its capacity as administrative agent under the Term Loan Facility), (iii) the Secured Noteholders, (iv) the Unsecured Noteholders, (v) the Subordinated Noteholders, (vi) Wells Fargo (in its capacity as trustee in connection with the Secured Notes and the Subordinated Notes), (vii) TSX Trust Company (in its capacity as Canadian trustee in connection with the Secured Notes), (viii) Delaware Trust (in its capacity as trustee in connection with the Unsecured Notes), and any other administrative agent, collateral agent, indenture trustee, or similar person in connection with the Term Loan Facility, the Secured Notes, the Unsecured Notes, and/or the Subordinated

23

Notes.  A list of the names and addresses of all known Provisional Relief Parties is attached

hereto as Exhibit F.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge.

Dated: October 18, 2016

/s/

By: Rob Van Walleghem
Title: Foreign Representative

## **EXHIBIT A**

**Certified Copy of the Preliminary Interim CBCA Order**

| | |
|---|---|
| COURT FILE NUMBER | 1601- 12176 |
| COURT | COURT OF QUEEN'S BENCH OF ALBERTA |
| JUDICIAL CENTRE | CALGARY |
| MATTER | IN THE MATTER OF SECTION 192 OF THE *CANADA BUSINESS CORPORATIONS ACT*, R.S.C. 1985, C. C-44, AS AMENDED

AND IN THE MATTER OF A PROPOSED ARRANGEMENT IN RESPECT OF TERVITA CORPORATION, 9894942 CANADA LTD., RED SKY HOLDINGS 1 INC., RED SKY HOLDINGS 2 INC., RED SKY HOLDINGS 3 INC., CCS CANADA (CANADIAN HOLDINGS) INC., CCS INTERNATIONAL HOLDINGS INC., HAZCO INDUSTRIAL SERVICES LTD., TERVITA EQUIPMENT RENTALS LTD., TERVITA ENVIRONMENTAL SERVICES LTD., TERVITA METAL SERVICES LTD., TERVITA PRODUCTION SERVICES LTD., AND TERVITA WASTE PROCESSING LTD. |
| APPLICANTS | 9894942 CANADA LTD. AND TERVITA CORPORATION |
| RESPONDENT | Not Applicable |
| DOCUMENT | **PRELIMINARY INTERIM ORDER** |
| ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT | **OSLER, HOSKIN & HARCOURT LLP**
Suite 2500, TransCanada Tower
450 – 1st Street SW
Calgary, AB T2P 5H1 |

| | |
|---|---|
| Solicitor: | Colin Feasby / Marc Wasserman / Michael De Lellis |
| Telephone: | (403) 260-7067 / (416) 862-4908 / (416) 862-5997 |
| Facsimile: | (403) 260-7024 / (416) 862-6666 |
| Email: | cfeasby@osler.com / mwasserman@osler.com / mdelellis@osler.com |
| File Number: | 1172771 |

**FASKEN MARTINEAU DUMOULIN LLP**
First Canadian Centre
350 7th Avenue SW, Suite 3400
Calgary, AB T2P 3N9

| | |
|---|---|
| Solicitor: | John Grieve / Travis Lysak |
| Telephone: | 403 261 5350 |
| Facsimile: | 403-261-5351 |
| Email: | jgrieve@fasken.com / tlysak@fasken.com |
| File Number: | 285302.00311 |





I hereby certify this to be a true copy of the original _____ order dated this 14 day of Sept 20 16

for Clerk of the Court

Clerk's Stamp

FILED
SEP 14 2016

DATE ON WHICH ORDER WAS PRONOUNCED: SEPTEMBER 14, 2016

NAME OF JUDGE WHO MADE THIS ORDER:      JUSTICE A.D. MACLEOD

LOCATION OF HEARING:                                   CALGARY, ALBERTA

UPON the Originating Application (the "**Originating Application**") of 9894942 Canada Ltd. ("**ArrangeCo**") and Tervita Corporation ("**Tervita**", together with ArrangeCo, the "**Applicants**") for an Order (the "**Preliminary Interim Order**") pursuant to Section 192(4) of the *Canada Business Corporations Act*, RSC 1985, c. C-44, as amended (the "**CBCA**") in connection with a proposed plan of arrangement under Section 192 of the CBCA (the "**Arrangement**"), including a stay of proceedings;

AND UPON reading the Originating Application, the affidavit of Stephen Kersley, affirmed September 14, 2016 (the "**Kersley Affidavit**") and the documents referred to therein, and the affidavit of Justin Sherman, sworn September 14, 2016 (the "**Sherman Affidavit**") and the documents referred to therein;

AND UPON hearing submissions from counsel for the Tervita Group (as defined below) and counsel for an ad hoc group of Unsecured Noteholders (as defined below);

AND UPON being advised that notice of the Originating Application has been given to the Director appointed under Section 260 of the CBCA (the "**Director**") and that the Director does not consider it necessary to appear;

AND UPON being advised that the Applicants intend to bring an application on or before October 14, 2016 (the "**Interim Order Hearing Date**") putting forth an Arrangement to this Honourable Court and that if any proceedings or steps are taken to enforce security or otherwise interfere with the Applicants' ordinary business operations prior to the Interim Order Hearing Date, the Applicants' ability to present and implement an Arrangement will be jeopardized;

**FOR THE PURPOSES OF THIS ORDER:**

(a)    "**8.00% Secured Notes**" means the 8.00% senior secured notes issued by Tervita pursuant to the Secured Notes Indenture in an aggregate principal amount of US$650 million and due November 15, 2018;

(b)    "**9.00% Secured Notes**" means the 9.00% senior secured notes issued by Tervita pursuant to the Secured Notes Indenture in an aggregate principal amount of C$200 million and due November 15, 2018;

- 3 -

(c) "**9.75% Unsecured Notes**" means the 9.75% senior unsecured notes issued by Tervita pursuant to the 9.75% Unsecured Notes Indenture in an aggregate principal amount of US$290 million and due November 1, 2019;

(d) "**9.75% Unsecured Notes Indenture**" means the indenture dated as of October 24, 2012 among Tervita, the guarantors from time to time party thereto and Delaware Trust Company (as successor to Wells Fargo Bank, National Association), as trustee, governing the 9.75% Unsecured Notes, as amended, modified, restated or supplemented from time to time;

(e) "**10.875% Unsecured Notes**" means the 10.875% senior unsecured notes issued by Tervita pursuant to the 10.875% Unsecured Notes Indenture in an aggregate principal amount of US$335 million and due February 15, 2018;

(f) "**10.875% Unsecured Notes Indenture**" means the indenture dated as of December 3, 2013 among Tervita, the guarantors from time to time party thereto and Delaware Trust Company (as successor to Wells Fargo Bank, National Association), as trustee, governing the 10.875% Unsecured Notes, as amended, modified, restated or supplemented from time to time;

(g) "**Accommodation Agreement**" means the accommodation agreement dated as of September 14, 2016 between the Tervita, the guarantors party thereto, the lenders party thereto, and the Revolver Administrative Agent.

(h) "**Indentures**" means, collectively, the Secured Notes Indenture, the 9.75% Unsecured Notes Indenture, the 10.875% Unsecured Notes Indenture and the Subordinated Notes Indenture;

(i) "**Noteholders**" means, collectively, the Secured Noteholders, the Unsecured Noteholders and the Subordinated Noteholders;

(j) "**Notes**" means, collectively, the Secured Notes, the Unsecured Notes and the Subordinated Notes;

(k) "**Revolver Administrative Agent**" means The Toronto-Dominion Bank, in its capacity as administrative agent under the Revolver Credit Agreement;

- 4 -

(l)    **"Revolver Credit Agreement"** means the credit agreement dated as of February 14, 2013 among Tervita, as borrower, the loan guarantors from time to time party thereto, the lenders from time to time party thereto and the Revolver Administrative Agent, as amended, modified, restated or supplemented from time to time;

(m)    **"Revolving Credit Facility Lenders"** means "Lenders" under and as defined in the Revolver Credit Agreement;

(n)    **"Secured Noteholders"** mean holders of Secured Notes;

(o)    **"Secured Notes"** means, collectively, (i) the 8.00% Secured Notes; and (ii) the 9.00% Secured Notes;

(p)    **"Secured Notes Indenture"** means the indenture dated as of February 14, 2013 among Tervita, the guarantors from time to time party thereto and Wells Fargo Bank, National Association, as the U.S. trustee and Equity Financial Trust Company as the Canadian trustee, governing the Secured Notes, as amended, modified, restated or supplemented from time to time;

(q)    **"Subordinated Noteholders"** means holders of Subordinated Notes;

(r)    **"Subordinated Notes"** means the 11.875% senior unsecured subordinated notes issued by Tervita pursuant to the Subordinated Notes Indenture in an aggregate principal amount of US$308 million and due November 15, 2018;

(s)    **"Subordinated Notes Indenture"** means the indenture dated as of May 9, 2008, as amended by the first supplemental indenture dated as of February 1, 2010, and by the second supplemental indenture dated as of February 14, 2013, among Tervita, the guarantors from time to time party thereto and Wells Fargo Bank, National Association, as trustee, governing the Subordinated Notes, as amended, modified, restated or supplemented from time to time;

(t)    **"Term Loan Administrative Agent"** means Cortland Capital Market Services LLC (as successor to Royal Bank of Canada), in its capacity as administrative agent under the Term Loan Credit Agreement;

(u)    **"Term Loan Credit Agreement"** means the credit agreement dated as of February 14, 2013 among Tervita, as borrower, the loan guarantors from time to time party thereto, the

lenders from time to time party thereto and the Term Loan Administrative Agent, as amended, modified, restated or supplemented from time to time;

(v)     **"Term Loan Facility Lenders"** means "Lenders" under and as defined in the Term Loan Credit Agreement;

(w)     **"Tervita Group"** means Tervita and its affiliates and subsidiaries listed on Schedule "A" hereto;

(x)     **"Unsecured Noteholders"** means holders of Unsecured Notes; and

(y)     **"Unsecured Notes"** means, collectively, (i) the 9.75% Unsecured Notes; and (ii) 10.875% Unsecured Notes.

## IT IS HEREBY ORDERED AND DECLARED THAT:

### SERVICE

1.     The time for service of the Originating Application for this Preliminary Interim Order is hereby abridged and deemed good and sufficient and this Originating Application is properly returnable today.

### INTERIM ORDER HEARING

2.     The Applicants are authorized to apply to this Honourable Court on or before the Interim Order Hearing Date for an interim order (the **"Interim Order"**) permitting the Applicants to, among others things, (i) call, hold and conduct special meetings of Unsecured Noteholders and Subordinated Noteholders to consider the Arrangement and related relief and (ii) providing directions relating to the approval of the Arrangement by shareholders.

### STAY OF PROCEEDINGS

3.     From and including the date of this Preliminary Interim Order until and including October 14, 2016 (the **"Stay Period"**), no person, including, without limitation, the Noteholders, the trustees under the Indentures, the Term Loan Administrative Agent, the Term Loan Facility Lenders or any other administrative agent, collateral agent, indenture trustee or similar person, (i) shall have any right to terminate, accelerate, amend or declare a default or event of default or make any demand or take any step to enforce any guarantee or any security interest granted by any member of the Tervita Group in respect of the Notes, the Term Loan Facility, or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor, and (ii) may refer to, rely on or otherwise claim any rights against any member of the Tervita Group under any contract, debt

instrument or any other agreement with any member of the Tervita Group in respect of any alleged breach, default or event of default under the Notes, the Term Loan Facility or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor; in each case, by reason of: (A) the Applicants having commenced this proceeding, (B) any member of the Tervita Group taking any steps in furtherance thereof, (C) any of member of the Tervita Group being a party to these proceedings or being party to an Arrangement, or (D) any default or cross-default arising under any of the Notes or the Term Loan Credit Agreement, without further order of this Honourable Court.

4.      Subject to the terms of the Accommodation Agreement, the Revolving Credit Facility Lenders shall be treated as unaffected in any plan of arrangement filed by the Applicants in the within proceedings and shall not be subject to any stay of proceedings in the within proceedings, and nothing in this Preliminary Interim Order shall prevent the filing of any registration to preserve or perfect any security interest.

## NOTICE AND SERVICE

5.      Unless otherwise ordered by this Honourable Court, the only persons entitled to notice of and to appear and to be heard at subsequent applications within these proceedings, including the application for the Interim Order, shall be:

(a)      the Tervita Group and their counsel;

(b)      counsel to the Revolver Administrative Agent;

(c)      counsel to the ad hoc group of Unsecured Noteholders;

(d)      counsel to any holder of equity of any member of the Tervita Group who has delivered counsel to the Applicants with a written request to be provided with notice in the proceedings;

(e)      any collateral agent, indenture trustee or similar person in respect of any of the Notes, and counsel thereto;

(f)      the Director; and

(g)      any interested person who has delivered counsel to the Applicants with a written request to be provided with notice in the proceedings.

6.    The Applicants shall be at liberty to serve this Preliminary Interim Order and any other materials and orders in these proceedings, including any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery, facsimile transmission or e-mail and any such service or notice by courier, personal delivery, facsimile transmission or e-mail shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

**OTHER MATTERS**

7.    To the extent of any inconsistency between this Preliminary Interim Order and the terms of the Revolver Credit Agreement, the Term Loan Credit Agreement, the Notes, the Indentures, or any guarantees, security agreements or other documents related thereto, this Preliminary Interim Order shall govern.

8.    Leave is granted to file this Preliminary Interim Order, a true copy of the Kersley Affidavit, the Sherman Affidavit, Originating Application, and the Bench Brief in support of this Originating Application on the same day.

9.    The Applicants, and any parties affected by the stay of proceedings described in paragraph 3 herein, are entitled to seek leave to vary this Preliminary Interim Order upon the giving of five (5) days' notice or such notice as this Honourable Court may direct.

10.   This Preliminary Interim Order shall have full force and effect in all other Provinces and Territories of Canada and shall be enforced in the courts of each of the Provinces and Territories of Canada in the same manner in all respects as if this Preliminary Interim Order had been made by the Court enforcing it.

11.   This Honourable Court requests the aid and recognition of any court or any judicial, regulatory or administrative body in any province in Canada and any judicial, regulatory or administrative tribunal or body or other court constituted pursuant to the Parliament of Canada, the legislature of any province and any court or any judicial, regulatory or administrative body of the United States, any state thereof or any other country in the aid of and to assist this Honourable Court in carrying out the terms of this Preliminary Interim Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants as may be necessary or desirable to give effect to this Preliminary Interim Order, to grant representative status to the Applicants in any foreign proceedings, or to assist the Applicants and their respective agents in carrying out the terms of this Preliminary Interim Order.

12.   A senior officer of one or more of the Applicants, as necessary, is authorized to act as the representative or foreign representative (the "**Foreign Representative**") of any of the Applicants or any other member of the Tervita Group in connection with these proceedings and with carrying out the terms of this Preliminary Interim Order, for, among other things, the purpose of having these proceedings recognized in any other jurisdiction whether in or outside of Canada, as necessary. The Foreign Representative is hereby authorized to apply for foreign recognition of these proceedings, as necessary, in any jurisdiction outside of Canada.

13.   This Preliminary Interim Order and all of its provisions are effective as of 12:01 a.m. Mountain Standard Time on the date of this Preliminary Interim Order.

_____
**Justice of the Court of Queen's Bench of Alberta**

## SCHEDULE "A"

9894942 Canada Ltd.
Red Sky Holdings 1 Inc.
Red Sky Holdings 2 Inc.
Red Sky Holdings 3 Inc.
Hazco Industrial Services Ltd.
CCS International Holdings Inc.
Tervita Production Services Ltd.
Tervita Waste Processing Ltd.
Tervita Environmental Services Ltd.
Tervita Equipment Rentals Ltd.
Tervita Metal Services Ltd.
CCS Canada (Canadian Holdings) Inc.
Red Sky Finance LP

## **EXHIBIT B**

**First Kersley Affidavit**

| | |
|---|---|
| COURT FILE NUMBER | 1601 – 1217 ⁶ |
| COURT | COURT OF QUEEN'S BENCH OF ALBERTA |
| JUDICIAL CENTRE | CALGARY |

CLERK OF THE COURT
FILED

SEP 1 4 2016

JUDICIAL CENTRE
OF CALGARY

| | |
|---|---|
| MATTER | IN THE MATTER OF SECTION 192 OF THE *CANADA BUSINESS CORPORATIONS ACT*, R.S.C. 1985, C. C-44, AS AMENDED |
| | AND IN THE MATTER OF A PROPOSED ARRANGEMENT IN RESPECT OF TERVITA CORPORATION, 9894942 CANADA LTD., RED SKY HOLDINGS 1 INC., RED SKY HOLDINGS 2 INC., RED SKY HOLDINGS 3 INC., CCS CANADA (CANADIAN HOLDINGS) INC., CCS INTERNATIONAL HOLDINGS INC., HAZCO INDUSTRIAL SERVICES LTD., TERVITA EQUIPMENT RENTALS LTD., TERVITA ENVIRONMENTAL SERVICES LTD., TERVITA METAL SERVICES LTD., TERVITA PRODUCTION SERVICES LTD., AND TERVITA WASTE PROCESSING LTD. |
| APPLICANTS | 9894942 CANADA LTD. AND TERVITA CORPORATION |
| RESPONDENT | Not Applicable |
| DOCUMENT | **AFFIDAVIT** |
| ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT | **OSLER, HOSKIN & HARCOURT LLP**<br>Suite 2500, TransCanada Tower<br>450 – 1st Street SW<br>Calgary, AB T2P 5H1 |

| | |
|---|---|
| Solicitor: | Colin Feasby / Marc Wasserman / Michael De Lellis |
| Telephone: | (403) 260-7067 / (416) 862-4908 / (416) 862-5997 |
| Facsimile: | (403) 260-7024 / (416) 862-6666 |
| Email: | cfeasby@osler.com / mwasserman@osler.com / mdelellis@osler.com |
| File Number: | 1172771 |

**FASKEN MARTINEAU DUMOULIN LLP**
First Canadian Centre
350 7th Avenue SW, Suite 3400
Calgary, AB T2P 3N9

| | |
|---|---|
| Solicitor: | John Grieve / Travis Lysak |
| Telephone: | 403-261-5350 |
| Facsimile: | 403-261-5351 |
| Email: | jgrieve@fasken.com / tlysak@fasken.com |
| File Number: | 285302.00311 |

**AFFIDAVIT OF STEPHEN KERSLEY**

- 2 -

Affirmed on September 14, 2016

I, Stephen Kersley, of the City of Calgary, in the Province of Alberta, AFFIRM AND SAY
THAT:

1.         I am the Chief Financial Officer of Tervita Corporation ("**Tervita**"), a position that I have
held since August 2015.  I swear this Affidavit in my capacity as an officer of Tervita. Except as otherwise
expressly stated, I have personal knowledge of the matters to which I depose in this Affidavit. Where facts
deposed to are stated to be based on information and belief, I believe such information to be true.  I am
authorized to swear this Affidavit on behalf of Tervita.  In preparing this Affidavit, I have relied on various
advisors of Tervita and other members of the senior management of Tervita.

2.         I have worked in the oil and gas industries in Canada and internationally for over 30 years.
Prior to joining Tervita, I was the Chief Financial Officer at TAQA, a diversified international energy
company.  I also spent two decades as an executive with Royal Dutch Shell.  I have a law degree from the
University of Birmingham, England and I am also a chartered accountant.

3.         9894942 Canada Ltd. ("**ArrangeCo**") and Tervita (together with ArrangeCo, the
"**Applicants**") bring an application (the "**Application**") seeking relief under Section 192(4) of the *Canada
Business Corporations Act*, RSC 1985, c C-44, as amended (the "**CBCA**"), as set out in greater detail below.

4.         This Affidavit will review the following matters:

    (a)      The Relief Requested;

    (b)      Overview;

    (c)      Tervita's Corporate Structure;

    (d)      Tervita's Business;

    (e)      Tervita's Circumstances and Events Leading to this Application;

    (f)       The Proposed Arrangement and Recapitalization; and

    (g)      Tervita's Need for Relief under the *CBCA* and Preliminary Interim Order.

## I.    RELIEF REQUESTED

5.        I swear this Affidavit in support of the Application and in support of the Applicants'
application for an order (the "**Preliminary Interim Order**") pursuant to the *CBCA*, substantially in the
form attached as Schedule "A" to the Originating Application, among other things:

(a)    authorizing the Applicants to bring an application before the Court on or before October
14, 2016 for an interim order (the "**Interim Order**"), permitting the Applicants to, among
other things, call, hold and conduct special meetings of Unsecured Noteholders (as defined
below) and Subordinated Noteholders (as defined below) to consider and vote on the
proposed Arrangement (as defined below);

(b)    staying any person from: (i) terminating, accelerating, amending or declaring a default or
event of default or making any demand or taking any step to enforce any guarantee or any
security interest granted by Tervita or any of the Guarantors (as defined below) in respect
of the Notes (as defined below), the Term Loan Facility (as defined below), or any other
contract or agreement to which any member of the Tervita Group is a party, borrower, or
guarantor, and (ii) referring to, relying on or otherwise claiming any rights against any
member of the Tervita Group under any contract, debt instrument or any other agreement
with any member of the Tervita Group in respect of any alleged breach, default or event of
default under the Notes, the Term Loan Facility, or any other contract or agreement to
which any member of the Tervita Group is a party, borrower, or guarantor, in each case,
by reason of:

(i)    the Applicants having commenced this proceeding;

(ii)    any member of the Tervita Group taking any steps in furtherance
thereof;

(iii)    any member of the Tervita Group being a party to these
proceedings or being party to an Arrangement; or

(iv)    any default or cross-default arising under any of the Notes or the
Term Loan Credit Agreement;

(c)    deeming service of the application for the Preliminary Interim Order to be good and
sufficient;

- 4 -

(d)    setting out the persons entitled to notice of, and to appear and be heard in, the Arrangement proceedings;

(e)    requesting the aid, recognition and assistance of any court, tribunal, regulatory or administrative body having jurisdiction in Canada to give effect to the Preliminary Interim Order; and

(f)    such further and other relief as this Court deems just.

## II.    OVERVIEW

6.        As described in greater detail below, Tervita is an environmentally focused company based in Calgary that primarily serves the oil and gas industry and natural resource sectors in Western Canada. Tervita has ten wholly-owned subsidiaries in Canada, among which, the following have guaranteed Tervita's obligations under the Credit Agreements (as defined below) and the Indentures (as defined below): CCS Canada (Canadian Holdings) Inc. - an inactive holding company ("**CCS Canada**"), CCS International Holdings Inc. - an inactive holding company ("**CCS International**"), HAZCO Industrial Services Ltd. - an inactive company ("**Hazco**"), Tervita Equipment Rentals Ltd. – holds transportation licenses ("**TER**"), Tervita Environmental Services Ltd. – holds transportation licenses ("**TES**"), Tervita Metal Services Ltd. – holds transportation licenses ("**TMS**"), Tervita Production Services Ltd. – holds transportation licenses ("**TPS**"), and Tervita Waste Processing Ltd. - holds transportation licenses ("**TWP**") (these subsidiaries are collectively referred to as the "**Canadian Subsidiary Guarantors**" and together with Tervita, ArrangeCo, and the Parent Guarantors (as defined below), the "**Tervita Group**").

7.        The Tervita Group's largest line of business is "midstream services": The Tervita Group delivers waste processing and management solutions for fluids and solid waste used in and generated by oil and gas drilling and production. This includes, among many other services: (i) processing and disposing of waste by-products created by resource extraction; and (ii) managing the sale of oil and condensate processed and recovered through the Tervita Group's waste processing facilities.

8.        The Tervita Group has other lines of business, including environmental services. The Tervita Group performs complex projects such as remediation, environmental construction and de-commissioning projects, and other services such as bioremediation and water management services.

9.        The Tervita Group has a diversified customer base of more than 1,500 clients, including many of Canada's largest oil and gas companies.

10.        At its largest, the Tervita Group employed approximately 4,500 people and provided work for thousands of subcontractors. The vast majority of Tervita's employees work in Alberta.

11.        The Tervita Group's revenue was approximately CAD $5.527 billion in 2013 and approximately CAD $5.757 billion in 2014. Revenue fell to approximately CAD $2.823 billion in 2015 and is projected to fall to approximately CAD $2.040 billion in 2016. Despite the Tervita Group's efforts to cut costs as described below, its earnings before interest, taxes, depreciation and amortization ("**EBITDA**") has also fallen approximately three-fold since 2014, and Tervita has suffered losses of more than CAD $482 million since the start of 2014, after taking into account interest on long-term debt and depreciation. The Tervita Group estimates that, by the end of 2016, it will have suffered losses of approximately CAD $550 million since the start of 2014. For 2014, the Tervita Group's reported EBITDA was approximately CAD $292 million. For 2015, the Tervita Group's reported EBITDA was approximately CAD $178 million. For 2016, the Tervita Group's EBITDA is anticipated to be approximately CAD $110 million.

12.        Because the Tervita Group serves the oil and gas industry, the decline in oil and gas prices and the resulting slowdown in the industry has materially reduced the Tervita Group's revenues. In the second half of 2013, the Tervita Group recognized the effect that the plummeting market could have on its business and engaged a consulting firm that specializes in internal operational restructurings to assist and advise the Tervita Group on cutting costs and improving operations. As the slowdown increased, the Tervita Group sought to cut costs through a material downsizing and centralization of its business, including significant workforce reductions (the Tervita Group now employs approximately 1,270 people) and other cost-cutting measures.

13.        Although Tervita has significantly decreased its operating expenditures, the immediate problem is that its reduced revenue cannot support Tervita's long-term debt obligations. As described in further detail below, Tervita has approximately CAD $2.5 billion of total long-term debt.

14.        This Application is made in support of a proposed arrangement (the "**Arrangement**") pursuant to section 192 of the *CBCA* in respect of the Tervita Group.

15.        The Recapitalization (as defined below) involves, as set out in detail in this Affidavit, the holders (the "**Unsecured Noteholders**") of Tervita's 9.75% senior unsecured notes due 2019 (the "**9.75% Unsecured Notes**"), 10.875% senior unsecured notes due 2018 (the "**10.875% Unsecured Notes**" and together with the 9.75% Unsecured Notes, the "**Unsecured Notes**"), the holders (the "**Subordinated Noteholders**" and together with the Unsecured Noteholders, the "**Unsecured/Subordinated Noteholders**") of Tervita's 11.875% senior unsecured subordinated notes due 2018 (the "**Subordinated**

- 6 -

Notes" and together with the Unsecured Notes, the "**Unsecured/Subordinated Notes**"), the holders (the "**Secured Noteholders**") of Tervita's 8.00% senior secured notes due 2018 (the "**8.00% Secured Notes**"), 9.00% senior secured notes due 2018 (the "**9.00% Secured Notes**" and together with the 8.00% Secured Notes, the "**Secured Notes**") and certain of Tervita's lenders (the "**Term Loan Lenders**" and together with the Unsecured Noteholders, the Subordinated Noteholders, and the Secured Noteholders, the "**Debtholders**") of its term loan facility due 2018 (the "**Term Loan Facility**" and together with the Secured Notes, the "**Secured Debt**").

16.      The Arrangement is part of a proposed recapitalization of Tervita's capital structure, as described below (the "**Recapitalization**"), and is structured to significantly reduce Tervita's debt load and accompanying annual interest payments which, as described below, its reduced revenue cannot continue to support.

17.      Tervita is close to finalizing a Support Agreement (the "**Unsecured Noteholder Support Agreement**") with certain Unsecured Noteholders (the "**Unsecured Noteholder Ad Hoc Committee**"), which will attach the Term Sheet (as defined below), outlining the terms of a proposed plan of arrangement (the "**Plan**") pursuant to section 192 of the *CBCA* in respect of Tervita, as well as a Backstop Commitment Letter (the "**Backstop Letter**").  A copy of the near final version of Term Sheet is attached as **Exhibit "A"** (as the terms have not yet been finalized, the names of the applicable debt and equity holders, as well as the value and number of securities held by those debt and equity holders have been redacted from this and all applicable exhibits).

18.      Tervita is also negotiating a support agreement (the "**Subordinated Noteholder Support Agreements**") with certain Subordinated Noteholders (the "**Subordinated Noteholder Ad Hoc Committee**", and together with the Unsecured Noteholder Ad Hoc Committee, the "**Ad Hoc Committees**"), as well as with the shareholders of Red Sky Acquisition Corp. ("**Acquisition Corp.**") and unitholders of Red Sky Holdings LP ("**Holdings LP**") as described in greater detail herein (the "**Shareholder Consent and Support Agreement**", and together with the Unsecured Noteholder Support Agreement and the Subordinated Noteholder Support Agreement, the "**Support Agreements**").

19.      I anticipate that the Subordinated Noteholder Support Agreement and the Shareholder Consent and Support Agreement will be executed before the application for the Preliminary Interim Order and will be provided to the Court in advance of that hearing.  I also anticipate that additional parties will execute joinders to the Unsecured Noteholder Support Agreement.

- 7 -

20.        The Support Agreements and the Term Sheet (**Exhibit "A"**) (the "**Term Sheet**") set out the principal terms upon which the Applicants will seek to restructure the debt outstanding under the Unsecured Notes and the Subordinated Notes. The Term Loan Facility and the Secured Notes will be unaffected as the principal and interest will be paid in full.

21.        As described in greater detail below, on September 15, 2016, the 30 day grace period that Tervita elected to utilize in connection with the USD $18.2 million interest payment on the 10.875% Unsecured Notes due on August 15, 2016 expires, and the forbearance period provided to Tervita pursuant to the Forbearance Agreement (as defined below) between Tervita and the Subordinated Noteholders dated as of June 15, 2016, in connection with the missed USD $18.3 million interest payment on the Subordinated Notes due on June 15, 2016, expires. Even if Tervita were to cure these two interest payments, Tervita will be faced with significant interest payments in November 2016 totalling approximately USD $58.4 million and CAD $9 million under the Secured Notes, the 9.75% Unsecured Notes, and the Subordinated Notes. As such, Tervita requires the relief sough in these proceedings in order to implement the Arrangement and the Recapitalization and correct its balance sheet moving forward.

22.        The Applicants are continuing to negotiate the final documentation of the proposed Arrangement with the Ad Hoc Committees and are actively engaged in finalizing and executing additional and definitive documentation that is necessary to bring an application for an Interim Order, implement the proposed Arrangement (which will qualify as a plan of Arrangement under section 192 of the *CBCA*) and effect the proposed Recapitalization.

23.        This application for the Preliminary Interim Order is scheduled to be heard on September 14, 2016. Tervita is in the process of preparing a draft of the management information circular of Tervita in respect of the meeting to be held in connection with the Arrangement, together with the notice of meeting, form of proxy, a draft of the plan of arrangement and other ancillary documents to be appended to the Information Circular (the "**Information Circular**"). In order to preserve the status quo while Tervita and its advisors finalize the Information Circular and other documents, Tervita is seeking the Preliminary Interim Order.

**III.    TERVITA'S CORPORATE STRUCTURE**

24.        Attached hereto as **Exhibit "B"** is a current organizational chart of the Tervita Group's corporate structure. This does not include ArrangeCo, which is a wholly owned subsidiary of Tervita.

- 8 -

**Tervita**

25.        Tervita is a private company continued under the laws of Canada with its registered office at 3400, 350-7[th] Avenue SW, Calgary, Alberta. Tervita's head office is located at 500, 140-10[th] Avenue SE, Calgary, Alberta. It previously operated as "CCS Inc." and "CCS Corporation".

26.        Alberta is Tervita's chief place of business. The vast majority of the Tervita Group's approximately 1,270 current employees work in Alberta. All five of Tervita's senior executives, and nine of the ten members of Tervita's upper management, work in the head office in Calgary (the "**Calgary Head Office**"). (The remaining member works at a regional office in Central Alberta.) The vast majority of Tervita's assets are located in Alberta. The vast majority of Tervita's revenues are earned in Alberta, and the vast majority of Tervita's operations are undertaken in Alberta.

27.        Tervita also operates throughout the other Western Canadian provinces, Ontario, and Nova Scotia, and is extra-provincially registered to carry on business in all Canadian provinces and territories, except Quebec.

28.        As shown in the attached organizational chart, Tervita has direct and indirect subsidiary companies in Canada and the United States.

**Parent Guarantors**

29.        As shown in the following chart, Tervita is owned by a series of holding entities:



30.        The entities sitting above Tervita in the Tervita Group's organizational structure are not involved in Tervita's business operations. However, as described below, the three holding companies have all guaranteed Tervita's obligations under the Credit Agreements and the Indentures (as those terms are defined below).

Red Sky Holdings 1 Inc.

31.          Red Sky Holdings 1 Inc. ("**RSH 1**") is a company incorporated pursuant to the laws of Alberta, with a registered office located at 4300 Bankers Wall West, 888 - 3rd Street S.W., Calgary, Alberta. RSH 1 is a holding company and owns 100% of the common voting shares of Red Sky Holdings 2 Inc. ("**RSH 2**").

Red Sky Holdings 2 Inc.

32.          RSH 2 is a company incorporated pursuant to the laws of Alberta, with a registered office located at 4300 Bankers Wall West, 888 - 3rd Street S.W., Calgary, Alberta.  RSH 2 is a holding company and owns 100% of the common voting shares of RSH 3.

Red Sky Holdings 3 Inc.

33.          RSH 3 is a company incorporated pursuant to the laws of Alberta, with a registered office located at 4300 Bankers Wall West, 888 - 3rd Street S.W., Calgary, Alberta.  RSH 3 is a holding company and owns 100% of the common voting shares of Tervita.

34.          The CCS Employee Trust holds certain non-voting common and preferred shares of RSH3. Additionally, CCS Management Inc., a subsidiary of RSH2, holds options to acquire non-voting common and preferred shares of RSH3.

Red Sky Finance LP

35.          Red Sky Finance LP ("**Finance LP**") is a limited partnership existing under the laws of the province of Alberta.  RSH 1 is Finance LP's general partner.

36.          Finance LP owns preferred shares of RSH 3 and 100% of the preferred shares of Tervita.

37.          Red Sky, RSH 1, RSH 2 and RSH 3 are collectively referred to in this affidavit as the "**Parent Guarantors**".

**Canadian Subsidiary Guarantors**

38.          As shown in the following chart and noted above, Tervita directly owns several of the other entities in the Tervita Group and has ten wholly-owned Canadian subsidiaries, eight of which are the Canadian Subsidiary Guarantors:



39.     Each of the Canadian Subsidiary Guarantors is incorporated pursuant to the laws of Alberta and have its registered office located at 3400, 350-7th Avenue SW in Calgary.

40.     None of the Canadian Subsidiary Guarantors has any operations in the United States.

41.     TES is extra-provincially registered to carry on business in British Columbia, Saskatchewan, Manitoba and Ontario.  TWP is extra-provincially registered to carry on business in British Columbia and Saskatchewan.

42.     The Parent Guarantors and the Canadian Subsidiary Guarantors are together referred to in this Affidavit as the "**Guarantors**".

**U.S. Subsidiary Companies**

43.     As shown on the attached organizational chart, Tervita also has directly and indirectly owned subsidiary companies based in the United States. Of these companies, only ARKLA Disposal Services, Inc. ("**ARKLA**") is a guarantor under the Credit Agreements and the Indentures. No relief is

- 11 -

sought in respect of ARKLA as it is not operating and has no realizable assets. The remaining subsidiaries include Tervita (USA Holdings) LLC, Westmoreland Sanitary Landfill LLC, PennOhio Waste LLC and Tervita (US Operations) LLC (collectively, excluding ARKLA, the "**U.S. Subsidiaries**").

44.        Tervita (USA Holdings) LLC is a holding company with no active operations. Its only assets are the shares of the U.S. Subsidiaries. As at August 31, 2016, the book value of these shares was approximately CAD $26.7 million. The operating U.S. Subsidiaries are Westmoreland Sanitary Landfill LLC and Tervita (US Operations) LLC. Westmoreland Sanitary Landfill LLC owns and operates the Westmoreland facility in Pennsylvania, where it also operates a county haulage business. Tervita (US Operations) LLC has some limited operations in California related to millwork. PennOhio Waste LLC owns a landfill in Ohio, which has never been in operation. Collectively the U.S. Subsidiaries have 16 employees.

45.        The U.S. Subsidiaries have not guaranteed Tervita's obligations under the Credit Agreements and the Indentures. The U.S. Subsidiaries' obligations are limited to trade debt and an inter-company loan owed to Tervita. As at August 31, 2016, the amount owing on this intercompany loan was approximately CAD $9.2 million. These funds were advanced on an unsecured basis to recapitalize the U.S. Subsidiaries following the sale of substantially all of Tervita's U.S. assets in February 2015.

**ArrangeCo**

46.        ArrangeCo is a corporation incorporated pursuant to the laws of Canada and has its registered office located at 3400, 350-7th Avenue SW in Calgary.

47.        ArrangeCo is a direct wholly owned subsidiary of Tervita and does not carry on any operations or have any liabilities.

48.        Christopher Synek and Rob Van Walleghem are the directors of ArrangeCo.

**IV.    OVERVIEW OF TERVITA'S BUSINESS**

49.        The Tervita Group is a leading, environmentally focused mid-stream and waste management service provider, primarily servicing the oil and gas industry, as well as the industrial and natural resource sectors. The Tervita Group provides a broad and integrated array of services and environmental management solutions for its customers including, among other things, treatment, recovery and disposal of materials, landfill construction, waste management, oil terminalling, energy marketing, metals recycling, equipment rental, demolition, and decommissioning.

50.        The scope of the Tervita Group's business and operations is extensive. For 2014, the Tervita Group's reported EBITDA was approximately CAD $292 million. For 2015, the Tervita Group's reported EBITDA was approximately CAD $178 million. For 2016, the Tervita Group's EBITDA is anticipated to be approximately CAD $110 million.

**Corporate Overview**

51.        The Tervita Group was formed in November 2007 when RSH 3 acquired all the assets of CCS Income Trust, including the equity interests of CCS Corporation, the predecessor to Tervita. The acquisition was financed, in part, by a consortium of equity investors and by third-party debt financing. The financing agreements have been amended and restated from time to time and Tervita has also raised funds through the issuance of notes pursuant to various indentures, all of which is further described below. The most recent round of financing took place in February 2013.

52.        In 2012, a number of companies formally under the CCS company umbrella and operating under various trade names were united and rebranded as "Tervita Corporation", and the operations and administration of the Tervita Group was consolidated. Starting in 2014, the Tervita Group implemented initiatives to centralize internal services that resulted in materially reduced overhead and a much leaner and more efficient organization. In conjunction with these efforts to streamline its business, in 2015 the Tervita Group sold the majority of its U.S. based operations. The purchaser chose not to purchase the remaining assets.

53.        The operations of the Tervita Group are now fully integrated and are managed from the Calgary Head Office. All of the senior executives of the Tervita Group work at the Calgary Head Office. In addition to me, the senior executives include:

(a)        Chris Synek, President and Chief Executive Officer;

(b)        Rob Van Walleghem, Executive Vice President, Health, Safety and Environment and General Counsel;

(c)        Steve Foster, Executive Vice President, Corporate Services; and

(d)        Brad Dlouhy, President of the Midstream Services Division,

(collectively, the "**Executive Committee**").

- 13 -

54.        In addition to the Executive Committee, there are approximately ten employees acting in upper management type roles (i.e. vice presidents) (together with the Executive Committee, the "**Management Team**"). Nine of these employees are based in the Calgary Head Office and one employee is based at a regional office in Central Alberta.

**Service Divisions**

55.        The operations of the Tervita Group are managed through two operating segments described as "Environmental Services Divisions" and "Midstream Services Division". The Tervita Group's energy marketing business, which is a significant component of the Tervita Group's business, conducts its operations through the Midstream Services Division. The Tervita Group also has a non-operational "Corporate Division", which includes the following departments and corporate services: health, safety and environment, legal, finance, tax, treasury, commercial finance, human resources, information technology, supply chain, real estate, communications, pricing and yield management, business development and sales.

*Production Services Division*

56.        Until recently, the Tervita Group had a Productions Services Division that operated in Alberta and provided complex contract oilfield services to large oil and gas producers. These services included well completions, well maintenance, well abandonment and decommissioning services, and equipment rentals.

57.        The Tervita Group was consistently ranked as one of the top well-service providers in Canada. The Production Services Division owned and operated a fleet of over 70 service rigs and had a number of very large and established customers. However, competition in this service area was intense and the Productions Services Division only accounted for approximately 10% of the Tervita Group's net revenue in 2015.

58.        Since the recession in the oil and gas industry arose, the Tervita Group has endeavoured to divest the non-core aspects of its business, such as Production Services. On August 31, 2016, Tervita completed the sale of its Production Services assets to High Arctic Energy Services Inc. ("**High Arctic**") for net cash proceeds of approximately CAD $42.8 million. Following the sale, Tervita issued a "reinvestment notice" pursuant to the Credit Agreements. Tervita now has one year, post-closing, to reinvest these proceeds into its operations, or otherwise use the funds to pay down the Term Loan Facility. The sale also reduced the Tervita Group's workforce by approximately 300. Nearly all of these employees were offered employment by High Arctic and have accepted those offers and thus, the termination costs

incurred by the Tervita Group were not substantial. As noted above, it is anticipated that the Term Loan Facility will be paid in full as part of the Recapitalization.

*Environmental Services Division*

59.         The Environmental Services Division of the Tervita Group has a total of 12 bioremediation facilities and 7 field offices, located across British Columbia, Alberta, Saskatchewan, Manitoba and Ontario. Through this division, the Tervita Group offers a variety of services including:

   (a)      remediation and environmental construction;

   (b)      demolition and decommission;

   (c)      mill services;

   (d)      bioremediation, which is a form of waste management that uses organisms to remove or neutralize pollutants; and

   (e)      services dealing with natural by-products of the oil refining process, including water services and sulphur services.

60.         The Environmental Services Division encompasses the core services on which the Tervita Group's business was built and the Tervita Group, through its predecessors, has been operating in many of these service areas for approximately 27 years. Accordingly, the Tervita Group has extensive technical and operational expertise in these areas and many long-standing customer relationships.

61.         The Environmental Services Division accounted for approximately 21% of the Tervita Group's net revenue in 2015.

*Midstream Services Division*

62.         The Tervita Group's Midstream Services Division provides both fluid and solid waste management services to the oil and gas and industrial sectors. The fluid waste management services include the processing, recovery and disposal of fluids used in, and generated by, oil and gas drilling and production activities. The solid waste management services include processing, recovering and disposing or recycling of metals and other solid industrial waste at engineered landfill facilities.

63.         The Tervita Group operates the Midstream Services Division through a network of over 50 treatment, recovery and disposal facilities, landfills (the "**TRD Facilities**"), and waste transfer stations,

which it owns and operates, and which are located primarily in Alberta, with a few facilities in British Columbia, Saskatchewan, Manitoba and Ontario.

64.         The Midstream Services Division accounted for approximately 69% of the Tervita Group's net revenue in 2015, a significant portion of which was generated by the Tervita Group's energy marketing business.

Energy Marketing Business

65.         The energy marketing business involves the sale of oil processed through the TRD Facilities and seeks to leverage economic opportunities through the close proximity between the Tervita Group's 15 pipeline connected TRD Facilities and producing oil fields.  The majority of oil processed through the TRD Facilities is delivered by roughly 40 oil and gas producers (collectively, the "**Energy Marketing Counterparties**") and for the majority of these producers the TRD Facilities are the closest and most economically attractive access point to the pipeline grid for their oil production.

66.         Upon the onsite delivery of oil at the TRD Facilities, the Tervita Group purchases the oil and blends the oil with lower density hydrocarbons to improve the value of the product.  The blended oil is then transported to the delivery point for sale and is delivered to the Energy Marketing Counterparty in a volume equal to the volume of product initially received from the Energy Marketing Counterparty.  The buying and selling of the product between the Tervita Group and the Energy Marketing Counterparty occurs more or less simultaneously, and the Tervita Group earns a portion of the increase in the value of the products as revenue.

67.         The energy marketing business requires little capital investment and is very cost efficient to operate. The business is overseen by a staff of six, requires no additional storage capacity, and utilizes the TRD Facility infrastructure and pipelines already in place from the Tervita Group's waste management operations.  The energy marketing division also has a number of other revenue streams, including: profits generated via purchases from producer customers, profits earned in diluent sourcing, and profits realized on hydrocarbon recycling of oil based fracturing fluids.

68.         The energy marketing business also carries considerably less risk than other oil and gas related operations.  In the normal course, product is bought from and sold to the Energy Marketing Counterparties in the same month with pricing based on the monthly average commodity prices.  This minimizes exposure to commodity price movements and limits working capital requirements.  Further, the Tervita Group is not subject to any long term commitments to producers, and only enters into transactions that it thinks are in the Tervita Group's best interest.  The energy marketing operational sector is not in a

speculative physical or financial trading business; the Tervita Group strictly adheres to the risk and credit policies established by Tervita's board of directors (the "**Board**") and substantially all transactions are backed by physical products.

69.    The energy marketing business is a vital component of the Tervita Group's ongoing business and operations. To the best of its knowledge, the Management Team believes the Tervita Group's energy marking business has not lost money in any quarter since it was established in 2004.  In 2014, the EBITDA for the energy marketing business was CAD $90 million (approximately 31% of the Tervita Group's consolidated EBITDA) and in 2015, the EBITDA for the energy marketing business was CAD $67 million (approximately 38% of the Tervita Group's consolidated EBITDA).

**Employees**

70.    As of September 8, 2016, the Tervita Group employs approximately 1,269 people in the following provinces:

| Province | Approximate number of active employees |
|---|---|
| Alberta | 887 |
| British Columbia | 169 |
| Manitoba | 82 |
| Nova Scotia | 17 |
| Ontario | 56 |
| Saskatchewan | 58 |

71.    The Tervita Group also contracts with various contractors and consultants from time to time and currently has approximately 51 individuals working under contract.

**Financial Statements**

72.    Attached as **Exhibits "C"** and **"D"** to this Affidavit are copies of the following financial statements (together, the "**Financial Statements**"):

(a)     the 2015 audited financial statements, which are prepared on a combined consolidated basis for the Tervita Group; and

(b)     the 2016 interim unaudited financial statements for the period ending June 30, 2016, which are prepared on a combined consolidated basis for the Tervita Group.

**Tervita's Assets**

73.     As of August 31, 2016, the Tervita Group had total consolidated assets with a net book value of approximately CAD $1.7 billion.

*Real property and infrastructure*

74.     The Tervita Group owns real property in British Columbia, Alberta and Saskatchewan. Most of this real property includes extensive infrastructure development used by the Tervita Group in carrying out its operations.  As of August 31, 2016, the book value of this real property was approximately CAD $253 million.  The Tervita Group does not have comprehensive appraisals for these properties that reflect current market conditions.

*Equipment*

75.     The Tervita Group owns a significant amount of equipment.  As at August 31, 2016, the book value of this equipment was approximately CAD $68 million, of which approximately CAD $40 million was "yellow iron" equipment.

*Inventory*

76.     The Tervita Group's inventory consists of crude oil, scrap metal, drilling fluids and supplies, sulphur, consumables and chemicals.  As at August 31, 2016, the Tervita Group values this inventory at approximately CAD $8 million, subject to fluctuations in commodities pricing.

*Intellectual property*

77.     The Tervita Group owns a number of patents, trade names and trademarks registered, or pending registration, with the U.S. Patent and Trademark Office and the Canadian Intellectual Property Office.  The value of this property is related to the "Tervita" brand.

*Accounts Receivable*

78.        As at August 31, 2016, the Tervita Group's accounts receivable totalled approximately CAD $103 million, net of an allowance for doubtful accounts of CAD $4 million.

*Shareholdings*

79.        Tervita wholly owns the U.S. Subsidiaries, which have a book value of approximately CAD $26.7 million. The U.S. Subsidiaries are currently for sale. If sold, the majority of the sale proceeds will be payable to Tervita as a dividend, or as repayment of inter-company loans that were advanced to the U.S. Subsidiaries by Tervita.

*Cash and cash equivalents*

80.        As at August 31, 2016, the Tervita Group had cash and cash equivalents totalling approximately CAD $36 million and USD $239 million.

**Tervita's Liabilities - Revolving Credit Facility, Term Loan Facility, Secured Notes and Unsecured/Subordinated Notes**

81.        Attached hereto as **Exhibit "E"** is a chart summarizing, in order of priority for repayment, the amounts owing by the Tervita Group under the Credit Agreements, the Indentures and the Intercompany Loan as at August 31, 2016.

Revolving Credit Facility

82.        Pursuant to a credit agreement dated February 14, 2013, as amended by agreements dated October 30, 2013, May 11, 2014 and January 23, 2015 (as amended, the "**Revolving Credit Agreement**"), Tervita, as borrower, entered into a credit facility with various lenders (the "**Revolving Credit Lenders**"), and with The Toronto-Dominion Bank as administrative agent. Attached hereto as **Exhibit "F"** is a copy of the Revolving Credit Agreement.

83.        The Revolving Credit Agreement provides for two facilities:

(a)        a revolving credit facility in the maximum principal amount of CAD $325 million of which CAD $200 million can be in the form of letters of credit (the "**Revolving Credit Facility**"). As at August 31, 2016, Tervita had outstanding letters of credit totalling approximately CAD $144.7 million and USD $9 million. No additional amounts were owing under the Revolving Credit Facility; and

- 19 -

(b)    a swingline credit facility in the maximum principal amount of CAD $25 million (the "**Swingline Credit Facility**"), of which no amounts have been drawn.

84.    The facilities under the Revolving Credit Agreement mature in February 2018.  Pursuant to the terms of the Revolving Credit Agreement, Tervita's obligations thereunder are jointly and severally guaranteed by each of the Guarantors.

<u>Term Loan Facility</u>

85.    Pursuant to an amended and restated credit agreement dated February 14, 2013 (the "**Term Credit Agreement**" and together with the Revolving Credit Agreement, the "**Credit Agreements**"), Tervita, as borrower, entered into the Term Loan Facility with the Term Loan Lenders, and originally with Royal Bank of Canada ("**RBC**") as administrative agent of the Term Credit Agreement.  By notice dated April 14, 2016, RBC exercised its rights under the Term Credit Agreement and gave notice of its resignation as administrative agent under the agreement effective no later than May 14, 2016. On May 16, 2016, Cortland Capital Market Services LLC succeeded RBC as administrative agent of the Term Credit Agreement.  Attached hereto as **Exhibit "G"** is a copy of the Term Credit Agreement.

86.    The Term Credit Agreement provides for the non-revolving Term Loan Facility in the maximum principal amount of USD $750 million with interest accruing thereon at the London Interbank Offered Rate ("**LIBOR**"), plus 5.0% per annum, with a minimum rate of 6.25% per annum. As at August 31, 2016, the balance owing on the Term Loan Facility was approximately USD $247 million and annual interest payments totalled approximately USD $15.4 million.

87.    Pursuant to the terms of the Term Credit Agreement, payments of accrued interest and a percentage of the original principal balance are due quarterly. The principal balance payments are, however, currently suspended for two years following a CAD $71 million repayment made by Tervita on the Term Loan Facility on April 1, 2016. The Term Loan Facility matures on May 15, 2018.

88.    Pursuant to the terms of the Term Credit Agreement, Tervita's obligations thereunder are jointly and severally guaranteed by each of the Guarantors.

<u>Secured Notes</u>

89.    By indenture dated February 14, 2013 among Tervita, the Guarantors, Wells Fargo Bank, National Associate ("**Wells Fargo**") as the U.S. Trustee, and Equity Financial Trust Company as the Canadian Trustee  (the "**Secured Indenture**"), Tervita issued two tranches of the Secured Notes:

- 20 -

(a)    The 8.00% Secured Notes - notes in an aggregate principal amount of USD $650 million, with an interest rate of 8.0% per annum; and

(b)    The 9.00% Secured Notes - notes in an aggregate principal amount of CAD $200 million, with an interest rate of 9.0% per annum.

90.    Attached hereto as **Exhibit "H"** is a copy of the Secured Indenture.

91.    Interest on the Secured Notes is payable semi-annually on May 15 and November 15 of each year. Current annual interest payments are approximately USD $52 million on the 8.00% Secured Notes and CAD $18 million on the 9.00% Secured Notes. Tervita has made all interest payments on the Secured Notes to date. The Secured Notes mature on November 15, 2018.

92.    Pursuant to the terms of the Secured Indenture, all of Tervita's obligations thereunder are jointly and severally guaranteed by each of the Guarantors.

93.    As at August 31, 2016, the balances outstanding under the Secured Notes, including accrued interest and other costs, were USD $665.2 million and CAD $205.3 million.

*Security for obligations under the Credit Agreements and Secured Notes*

94.    Tervita's obligations to the Revolving Credit Lenders, the Term Loan Lenders and the Secured Noteholders (collectively, the "**Secured Creditors**") under the Credit Agreements and the Secured Indenture are secured, among other things, by the following (collectively, the "**Security Documents**"):

(a)    a collateral trust agreement dated February 14, 2013, among Tervita, the Guarantors, the administrative agent under the Term Credit Agreement, the administrative agent under the Revolving Credit Agreement, the trustees under the Secured Indenture and Wilmington Trust, National Association as Canadian and U.S. collateral trustee (the "**Collateral Trustee**") (the "**Collateral Trust Agreement**"). Attached hereto as **Exhibit "I"** is a copy of the Collateral Trust Agreement;

(b)    an amended and restated pledge and security agreement dated February 14, 2013, among, Tervita, the Guarantors and the Collateral Trustee whereby each of Tervita and the Guarantors reaffirm and re-grant in favour of the Collateral Trustee a security interest in their respective present and after acquired personal property and a floating charge over their respective real property;

(c)     an amended and restated pledge and security agreement dated February 14, 2013, among Tervita, Finance LP, RSH 3 and the Collateral Trustee, whereby each of Tervita, Finance LP and RSH 3 reaffirm and re-grant to the Collateral Trustee a security interest in their respective present and after acquired personal property;

(d)     a grant of security interest in patents dated February 14, 2013, between Tervita and the Collateral Trustee, whereby Tervita grants to the Collateral Trustee a security interest in all of its patents as set forth therein;

(e)     an amended and restated intellectual property security agreement, dated February 14, 2013, whereby Tervita grants to the Collateral Trustee a security interest in all of its intellectual property as set forth therein; and

(f)     certain additional documents relating to the grant of security in the foregoing agreements.

95.         Pursuant to the Collateral Trust Agreement, the security granted under the Security Documents is held by the Collateral Trustee for the benefit of the Secured Creditors. The Security Documents secure repayment of all amounts owing under the Credit Agreements and repayment of the Secured Notes. Proceeds realized by the Collateral Trustee with respect to the secured assets are paid (i) first, to satisfy the amounts owing under Revolving Credit Agreement, including the undrawn amount of letters of credit, up to the aggregate principal amount of CAD $400 million, and (ii) second, rateably, to satisfy the amounts owing under the Term Credit Agreement and the Secured Notes.

Unsecured/Subordinated Notes

*9.75% Unsecured Notes*

96.         By indenture dated October 24, 2012, among Tervita, the Guarantors and Wells Fargo as trustee (the "**9.75% Indenture**"), Tervita issued the 9.75% Unsecured Notes in an aggregate principal amount of USD $290 million, with an interest rate of 9.75% per annum. Interest on the 9.75% Unsecured Notes is payable semi-annually on May 1 and November 1 of each year. Current annual interest payments are approximately USD $28.2 million. The 9.75% Unsecured Notes mature on November 1, 2019. Tervita has made all interest payments on the 9.75% Unsecured Notes to date. On June 20, 2016, Delaware Trust Company ("**Delaware Trust**") succeeded Wells Fargo as administrative agent of the 9.75% Indenture.

97.         Attached hereto as **Exhibit "J"** is a copy of the 9.75% Indenture.

98.        As at August 31, 2016, the balance outstanding under the 9.75% Unsecured Notes, including accrued interest and other costs, was approximately USD $299.3 million.

*10.875% Unsecured Notes*

99.        By indenture dated December 3, 2013, among Tervita, the Guarantors and Wells Fargo as trustee (the "**10.875% Indenture**"), Tervita issued the 10.875% Unsecured Notes in an aggregate principal amount of USD $335 million, with an interest rate of 10.875% per annum. Interest on the 10.875% Unsecured Notes is payable semi-annually on February 15 and August 15 of each year. Current annual interest payments are approximately USD $36.4 million. The 10.875% Unsecured Notes mature on February 15, 2018. As described below, Tervita elected not to make the interest payment that was due on August 15, 2016.  On June 20, 2016, Delaware Trust succeeded Wells Fargo as administrative agent of the 10.75% Indenture.

100.      Attached hereto as **Exhibit "K"** is a copy of the 10.875% Indenture.

101.      As at August 31, 2016 the balance outstanding under the 10.875% Unsecured Notes, including accrued interest and other costs, was approximately USD $354.7 million.

*Subordinated Notes*

102.      By indenture dated May 9, 2008, as supplemented by indentures dated July 9, 2008, June 15, 2011, September 30, 2011, October 1, 2011, February 1, 2013 and February 14, 2013, among Tervita, the Guarantors and Wells Fargo as trustee (as supplemented, the "**11.875% Indenture**" and together with the Secured Indenture, the 9.75% Indenture and 10.875% Indenture, the "**Indentures**"), Tervita issued the Subordinated Notes (and together with the Secured Notes and the Unsecured Notes, the "**Notes**") in an aggregate principal amount of USD $307.5 million with an interest rate of 11.875% per annum.  Interest on the Subordinated Notes is payable semi-annually on May 15 and November 15 of each year.  Current annual interest payments are approximately USD $36.5 million.  The Subordinated Notes mature on November 15, 2018. As described below, Tervita elected not to make the interest payment that was due on May 15, 2016.

103.      Attached hereto as **Exhibit "L"** is a copy of the 11.875% Indenture.

104.      As at August 31, 2016, the balance outstanding under the Subordinated Notes, including accrued interest and other costs, was approximately USD $328.5 million.

105.        The Guarantors have jointly and severally guaranteed all of Tervita's obligations under the 11.875% Indenture, the 9.75% Indenture and the 10.875% Indenture, however, no security has been granted by Tervita or any of the Guarantors with respect to these obligations.

***Tervita's Debt Obligations***

106.        In total, as at August 31, 2016, Tervita owes approximately:

    (a)        USD $247 million under the Term Loan Facility;

    (b)        USD $665 million and CAD $205 million under the Secured Notes;

    (c)        USD $654.1 million under the Unsecured Notes; and

    (d)        US $328.5 million under the Subordinated Notes.

107.        As described above, Tervita also owes amounts under the Revolving Credit Facility.

108.        Additionally, on or about November 14, 2007, in connection with the acquisition of CCS Income Trust, Tervita issued a note with a principal amount of CAD $849 million to Finance LP (the **"Intercompany Loan"**). Interest accrues on the note at the rate of 13% per annum, of which a percentage is paid in cash and the balance paid in debt or equity. Finance LP has currently waived interest on the loan until October 2016. The Intercompany Loan has a maturity date of November 14, 2022. Repayment of the amounts owing under the Intercompany Loan are subordinate to the repayment of the Unsecured/Subordinated Notes.

109.        Attached hereto as **Exhibit "M"** is a copy of the Intercompany Loan.

110.        As at August 31, 2016, approximately CAD $1.1 billion was owing by Tervita under the Intercompany Loan.

## V.        BACKGROUND TO THE ARRANGEMENT AND RECAPITALIZATION TRANSACTION

### Decline in oil and gas prices

111.        Starting in July 2014, the benchmark West Texas Intermediate crude oil price dropped from approximately USD $100/bbl to a low of approximately USD $25/bbl in February 2016, and is now at approximately USD $46/bbl. During the same period, the benchmark Henry Hub natural gas price also

- 24 -

dropped from approximately USD $4.05/MMbtu to a low of approximately USD $1.73/MMbtu in March 2016 and is now at approximately USD $2.88/MMbtu. This prolonged period of depressed commodity prices has resulted in significant reductions in production and capital investment in Alberta, the Tervita Group's primary market, as many oil and gas exploration and production companies have ceased or have materially reduced operations until commodity prices recover. By way of example, the Canadian Association of Petroleum Producers statistics show a 49.7% decrease in drilling and completion activity from 2014 to 2015.

112.        Like many service providers in the oil and gas industry, Tervita's business suffered significantly from the recent and dramatic decline in oil and gas prices.

**Steps Taken to Reduce Debt and Expenditures**

113.        In or around the latter half of 2013, Tervita determined that its operational costs were not viable in a deteriorating market and that steps needed to be taken to reduce operational redundancies and streamline Tervita's operations. Tervita engaged a consulting firm that specializes in internal operational restructurings to assist it in and advise on this task.

114.        Working with the consulting firm, Tervita identified strategies to reduce costs and improve its operations and in 2014 Tervita began implementing reduction in force initiatives ("**RIFs**") aimed at centralizing internal services and minimizing redundancies in its operations. The RIFs primarily focused on overhead, and general and administrative positions across the organization. The RIFs, combined with the sales of certain, non-core business divisions, has significantly reduced the number of Tervita's employees from approximately 3,250 in January 2014, to the current amount of approximately 1,270.

115.        Following up on the RIFs initiative, in the first quarter of 2015, Tervita initiated a fit-for-purpose ("**FFP**") organizational effectiveness review with the goal of designing and implementing an effective way to share corporate and support services between the different service divisions. The FFP initiative has been successful in reducing costs and increasing efficiencies in key areas such as billing and collections.

116.        The RIFs and FFP initiatives translated into cost reductions totalling approximately CAD $71.3 million. In the short term, some of the gains realized by these reductions have been offset by the payment of termination benefits, which totalled approximately CAD $30 million. These are primarily onetime costs and overall the employee reductions will have a lasting and positive effect on Tervita's cash flow.

117.        Starting in 2014, the Tervita Group has also endeavoured to centralize operations and divest the non-core aspects of its business.  The most significant of these divestures includes:

(a)    In February 2015, Tervita sold its interest in Tervita LLC, a former wholly-owned subsidiary of Tervita through which the Tervita Group carried out much of its U.S. based operations, for approximately USD $469 million; and

(b)    On August 31, 2016, Tervita sold its Production Services assets to High Arctic for net cash proceeds of approximately CAD $42.8 million.

**Consultation Process with Creditors**

118.        Given the decreased level of activity in the oil and gas industry and the drastically reduced commodities pricing, in the latter half of 2015, the Executive Committee and the Board determined that it was unlikely the Tervita Group could continue to indefinitely service its significant debt obligations and comply with certain financial covenants contained in the Credit Agreements over the long term under current market conditions.

119.        Tervita does not generate enough earnings to continue supporting the approximately USD $1.6 billion and CAD $200 million of securities related debt and annual interest payments of approximately USD $153 million and CAD $18 million (described above).  If any of Tervita's long-term indebtedness were to be accelerated, Tervita would not be able to repay the obligations on the debt in the short term. Further, although Tervita maintains a significant asset base which has a current book value of approximately $1.7 billion, in a liquidation scenario, certain members of Tervita's capital structure would suffer a shortfall on the amounts owing to them by Tervita.

120.        In the fall of 2015, in light of the continued slowdown in the oil and gas industry, Tervita solicited proposals from various financial institutions and engaged Barclays Capital Inc. ("**Barclays**") as its financial advisor to consider strategic alternatives. The financial advisor analyzed Tervita's alternatives with respect to its capital structure, which included paying down some or all of the debt, obtaining covenant relief, raising new financing, unwinding Tervita's foreign exchange hedges and other liability management alternatives. The financial advisor also analyzed, among other things, the potential for a sale of the entire company (for a total value exceeding the existing debt levels) or the sale of individual parts of the company (and using the proceeds to pay down debt).

121.        In late 2015, Tervita and its financial advisor began preparing for a potential sales process. Oil prices, however, continued to weaken and natural gas prices remained low and by year end Tervita and

- 26 -

its advisors had determined it was not an opportune or appropriate time to commence a formal sales process. In early 2016, Tervita and its financial advisor reached out to sixteen potentially interested parties on an informal basis to seek interest in a potential transaction. The parties included companies in both the environmental services and oil field services sectors. Of the sixteen parties, only one party signed an NDA but declined to proceed in the process after further evaluating the situation. One party (which did not sign an NDA) provided an expression of interest to acquire certain assets but at valuations that were not deemed attractive. It quickly became apparent, based on the lack of interest coupled with the depressed oil and gas prices and the company's financial projections, that the company could not be sold – at least, not at that time, at a valuation that would exceed its debt levels.

122.        Tervita continued to have discussions with interested parties regarding the sale of certain aspects of its business. (Tervita is continuing its efforts to sell its remaining U.S. assets, as well as its non-core Canadian assets.)

123.        By or around late 2015, it became clear that a sale process outside of a Court proceeding was unlikely to be viable.  In December 2015, Barclays as a financial advisor began to assist Tervita in considering the possibility of a consensual restructuring with the members of its capital structure.

124.        In early 2016, Tervita and its financial and legal advisors began discussions with Tervita's secured and unsecured lenders and noteholders regarding solutions to mitigate the risk of defaulting on the Term Credit Debt Ratio Covenants (as defined below) and enhance liquidity.

125.        From January 2016 onwards, Tervita and its advisors were in contact with various Debtholders to discuss possible covenant relief and other possible solutions.

126.        Starting in March and April, 2016, Tervita and its advisors were in contact with various Ad Hoc Committees and their respective legal counsel and advisors as the parties sought to negotiate a recapitalization transaction that would restructure Tervita's capital structure and allow the business of Tervita to continue.  Tervita and Barclays engaged with:

    (a)    a group of holders that: (i) are collectively owed a material portion of the Term Credit Debt; (ii) collectively, hold a material portion of the Secured Notes; (iii) collectively hold a material portion of the Unsecured Notes; and (iv) collectively, hold a material portion of the Subordinated Notes (the "**Secured Creditor Ad Hoc Committee**") and their legal counsel, Goodmans LLP and Paul, Weiss, Rifkind, Wharton & Garrison LLP and their advisor, Houlihan Lokey Capital, Inc.;

(b)     the Unsecured Noteholder Ad Hoc Committee – a group of holders that: (i) are collectively owed a material portion of the Term Credit Debt; (ii) collectively hold a material portion of the Secured Notes; (iii) collectively hold a material portion of the Unsecured Notes; and (iv) collectively hold a material portion of the Subordinated Notes – and their legal counsel, Bennett Jones LLP and Davis Polk & Wardwell LLP and their advisors, Moelis & Company LLC and Peters & Co. Limited; and

(c)     the Subordinated Noteholder Ad Hoc Committee – a group of holders that: (i) are collectively owed a material portion of the Term Credit Debt; (ii) collectively hold a material portion of the Secured Notes; (iii) collectively hold a material portion of the Unsecured Notes; and (iv) collectively hold a material portion of the Subordinated Notes – and their legal counsel, Fried, Frank, Harris, Shriver & Jacobson LLP and Davies Ward Phillips & Vineberg LLP and their advisor, PJT Partners.

**Negotiations with the Ad Hoc Committees**

127.     In late January 2016 representatives of Barclays, Chris Synek (President and Chief Executive Officer of Tervita) and I attended meetings in New York with a majority of the Term Loan Lenders and majority holder within the Subordinated Noteholder Ad Hoc Committee in order to discuss mitigating risk around a default and enhancing liquidity, and potential solutions including either a reduction of long-term debt or relief with respect to pending interest payments by making some form of payment in kind in lieu of a cash payment. In February 2016, Tervita made a proposal to a majority of the Term Loan Lenders, which included a reduction of the indebtedness under the Term Credit Agreement in exchange for relief in respect of the 5.75 to 1.00 debt ratio covenant contained in the Term Credit Agreement (the "**Term Credit Debt Ratio Covenant**"). The Term Loan Lenders were unwilling to provide covenant relief without a comprehensive long-term solution to Tervita's capital structure.

128.     Tervita concurrently made a proposal to a majority holder of the Subordinated Notes seeking relief with respect to pending interest payments by making some form of payment in kind in lieu of a cash payment. Ultimately, Tervita was unable to reach a consensual resolution with the majority holder of the Subordinated Notes.

129.     During this period, Tervita was also exploring solutions to its liquidity problem and ways to mitigate the risk of a breach of the Term Credit Debt Ratio Covenants. With the assistance of Barclays, Tervita evaluated unwinding certain foreign exchange instruments (the "**Swaps**") it had taken out for

currency hedging. The Swaps were significantly "in the money" because of the recent and significant decline in value of the Canadian Dollar.

130.        After negotiating with the counterparties to the Swaps and paying a fee, Tervita was able to unwind all of its secured and unsecured Swaps, which resulted in the receipt of cash payments of approximately USD $174 million on or about February 27, 2016 and USD $52.1 million on or about March 23, 2016. Although this significantly improved Tervita's liquidity, it did not provide a comprehensive long-term solution to help manage Tervita's debt obligations. Accordingly, in March and April 2016 Tervita continued discussions with groups representing all of its lenders and noteholders about potential recapitalization transactions and other relief in respect of its long-term debt obligations. Despite these efforts, the parties were unable to reach a consensual resolution.

**Defaults under the Credit Agreements, the 11.875% Indenture and the 10.875% Indenture**

131.        On May 15, 2016, and after extensive consultation with its Board and advisors, Tervita elected not to make the USD $18.3 million interest payment due on the Subordinated Notes, which resulted in a "Default" under the 11.875% Indenture. Under the terms of the 11.875% Indenture, Tervita had a 30-day interest payment grace period to remedy this Default.

132.        During this grace period, Tervita and its financial advisor continued discussions with the Ad Hoc Committees. The majority holder within the Subordinated Noteholder Ad Hoc Committee with which we had discussed a "payment in kind" alternative informed the Company that it would not consent to accepting additional bonds in lieu of payment and that it required the missed payment in cash.

133.        Certain Secured Creditors were opposed to Tervita making any payment, including the missed interest payment, to the Subordinated Noteholders and preferred that the funds remain with the Tervita Group to support its ongoing operations, or be used to repay amounts owing to the Secured Creditors.

134.        On June 15, 2016, the 30-day grace period expired without Tervita making the missed interest payment. This resulted in an "Event of Default" under the 11.875% Indenture, which would have resulted in a corresponding "Event of Default" under the Revolving Credit Agreement and the Term Credit Agreement, and would have given the Revolving Credit Lenders, the Term Loan Lenders and the Subordinated Noteholders the right to accelerate their respective indebtedness. However, Tervita was able to negotiate the following relief:

(a)    in a Waiver dated May 13, 2016, the requisite majority of the Revolving Credit Lenders waived the "Defaults" and "Events of Default" under the Revolving Credit Agreement relating to the missed interest payment on the Subordinated Notes. Attached hereto as **Exhibit "N"** is a copy of this waiver agreement;

(b)    in a Waiver dated June 13, 2016, the requisite majority of the Term Loan Lenders waived the "Defaults" and "Events of Default" under the Term Credit Agreement relating to the missed interest payment on the Subordinated Notes. Attached hereto as **Exhibit "O"** is a copy of this waiver agreement; and

(c)    in an Agreement Regarding Interest Payment Default (the "**Forbearance Agreement**") dated June 15, 2016, the Subordinated Noteholders agreed to forbear from enforcement in connection with the Event of Default under the 11.875% Indenture until September 15, 2016 (Tervita elected not to extend the forbearance to November 15, 2016, pursuant to the terms of the Forbearance Agreement, which extension would have cost an additional USD $1 million). Attached hereto as **Exhibit "P"** is a copy of the Forbearance Agreement.

135.    Attached hereto collectively as **Exhibit "Q"** are copies of Tervita press releases from May 16, 2016 and June 16, 2016, relating to the missed May interest payment and the subsequent agreement with the Subordinated Noteholders.

136.    On August 15, 2016, Tervita elected not to make the USD $18.2 million interest payment due on the 10.875% Unsecured Notes, which resulted in a "Default" under the 10.875% Indenture. The terms of the 10.875% Indenture similarly gave Tervita a 30-day interest payment grace period to remedy this Default.

137.    In a Waiver dated August 15, 2016, the requisite majority of the Revolving Credit Lenders waived the "Defaults" under the Revolving Credit Agreement relating to the missed interest payment on the 10.875% Unsecured Notes. Attached hereto as **Exhibit "R"** is a copy of this waiver agreement.

138.    Attached hereto as **Exhibit "S"** is a copy of Tervita's press release from August 15, 2016, relating to the missed August interest payment.

139.    On September 15, 2016, the 30-day grace period will expire for the USD $18.2 million interest payment on the 10.875% Unsecured Notes, which will result in an "Event of Default" under the 10.875% Indenture, the Revolving Credit Agreement and the Term Credit Agreement, and will give the Revolving Credit Lenders, Term Loan Lenders and the 10.875% Unsecured Noteholders the right to

accelerate their respective indebtedness. In addition, the forbearance period provided by the Forbearance Agreement will also expire on such date, and the related "Event of Default" under the 11.875% Indenture will give the Subordinated Noteholders the right to accelerate their indebtedness.

**Negotiations Leading to the Recapitalization Transaction**

140.       In order to finance the Tervita Group's working capital requirements and other general corporate purposes and capital expenditures throughout these *CBCA* proceedings, Tervita and the Toronto-Dominion Bank as administrative agent under the Revolving Credit Agreement are finalizing the terms of an Accommodation Agreement (the "**Accommodation Agreement**"). The Accommodation Agreement will provide the Tervita Group with continued availability to letters of credit under the Revolving Credit Facility, including the issuance and renewal thereof. Attached hereto as **Exhibit "T"** is a copy of the near final version of the Accommodation Agreement.

141.       Tervita, through its advisors, continued discussions with the Ad Hoc Committees in respect of a potential restructuring of the indebtedness owing under the various debt instruments. These negotiations will ultimately culminate in the Term Sheet, Support Agreements, and Backstop Letter, the details of which are set out below.

**Term Sheet**

142.       Tervita and certain members of the Unsecured Noteholders Ad Hoc Committee (the "**Plan Sponsors**") are developing the Term Sheet, which will articulate the terms for the proposed Recapitalization.

**The Support Agreements**

143.       Once executed, pursuant to the Support Agreements, each counterparty thereto will agree to support and vote in favour of the Arrangement.

*Unsecured Noteholder Support Agreement*

144.       It is expected that, a material portion of the certain Unsecured Noteholders, including the Plan Sponsors, will enter into a Unsecured Noteholder Support Agreement which will append the Term Sheet as a schedule  pursuant to which, among other things, each such Debtholder (individually, an "**Unsecured Noteholder Support Group Member**", and all of the Debtholders party to the Support Agreement, collectively, the "**Unsecured Noteholder Support Group**") will commit that each Unsecured

Noteholder Support Group Member will, subject to the terms of the Unsecured Noteholder Support Agreement, support the Recapitalization by, among other things:

    (a)    Voting in favour of the Arrangement;

    (b)    Supporting the approval of the Arrangement as promptly as practicable by the Court; and

    (c)    Not settling or assigning any securities other than to persons who agree to be bound by the terms of the Unsecured Noteholder Support Agreement.

145.        A copy of the near final and redacted Unsecured Noteholder Support Agreement is attached as **Exhibit "U"**.

*Subordinated Noteholder Support Agreement*

146.        It is also expected that, a material portion of the Subordinated Noteholders will enter into a Subordinated Noteholder Support Agreement which will append the Term Sheet as a schedule pursuant to which, among other things, each such Debtholder (individually, a "**Subordinated Noteholder Support Group Member**", and all of the Debtholders party to the Support Agreement, collectively, the "**Subordinated Noteholder Support Group**") will commit that each Subordinated Noteholder Support Group Member will, subject to the terms of the Subordinated Noteholder Support Agreement, support the Recapitalization by, among other things:

    (a)    Voting in favour of the Arrangement;

    (b)    Supporting the approval of the Arrangement as promptly as practicable by the Court; and

    (c)    Not settling or assigning any securities other than to persons who agree to be bound by the terms of the Subordinated Noteholder Support Agreement.

A copy of the near final and redacted Subordinated Noteholder Support Agreement is attached as **Exhibit "V"**.

*Backstop Commitment Letter*

147.        Tervita and the Plan Sponsors are finalizing the Backstop Letter pursuant to which, among other things, each Plan Sponsor shall *pro rata*, based on its respective share of the Plan Sponsors' claims for principal and accrued and unpaid interest in respect of their Unsecured Notes as of a certain record date,

- 32 -

severally backstop the funding of a new investment in an amount up to CAD $372 million (the "**New Investment**") on terms mutually agreed between Tervita and the Plan Sponsors (the "**Commitment**"). The near final and redacted Backstop Letter is attached as **Exhibit "Z"**.

148.         It is expected that the Backstop Letter will include a "Break Fee" provision where, in the event that Tervita accepts, enters into, and consummates a Superior Proposal (as defined in the Support Agreement), Tervita will pay a Break Fee to the Backstop Parties (as defined in the Backstop Letter) (other than any Backstop Party that is in breach of the Backstop Letter or the Support Agreement).

*Shareholder Consent and Support Agreement*

149.         Acquisition Corp., a corporation incorporated under the laws of the Province of Alberta is the general partner of Holdings LP, a limited partnership formed under the laws of the Province of Alberta. As shown in the organizational chart set out in Part II above, Holdings LP owns 100% of RSH 1 and 100% of the limited partnership interests in Finance LP. RSH1 is the general partner of Finance LP. As such, the limited partners of Holdings LP are the indirect owners of 100% of the common shares and 100% of the preferred shares of Tervita.

150.         A unanimous security holders' agreement dated November 14, 2007 among Acquisition Corp. and its shareholders, as amended (the "**Unanimous Security Holders' Agreement**"), a copy of which is attached as **Exhibit "W"**, includes provisions regarding the governance of Holdings LP, Acquisition Corp. and their subsidiaries, including Tervita.

151.         It is anticipated that shareholders of Acquisition Corp. will enter into the Shareholder Support Agreement which will append the Term Sheet as a schedule pursuant to which, among other things, each such shareholder, among other things:

     (a)     Will consent to the Arrangement substantially on the terms set out in the Term Sheet;

     (b)     Will covenant and agree to vote in favour of the Arrangement, in the event that a vote of such shareholders is required in connection with the Arrangement; and

     (c)     Will covenant and agree not to, directly or indirectly, exercise any rights of dissent or appraisal with respect to the Arrangement.

152.         Copies of the near final and redacted version Shareholder Support Agreement is  attached as **Exhibit "X"**.

153.        The Company expects to obtain approval from 100% of its Acquisition Corp. shareholders.

## VI.    SUMMARY OF THE PROPOSED ARRANGEMENT AND RECAPITALIZATION

154.        The Applicants have been working to best maximize value for all stakeholders in the circumstances and have developed the following proposed Arrangement and Recapitalization which, it is anticipated, will include a series of interrelated steps, including, among other things:

(a)        a Plan of Arrangement under Section 192 of the *CBCA* pursuant to which, among other things, the following steps will occur:

(i)        the payment in full all of the Secured Debt held by Secured Debtholders that are not Plan Sponsors (without any early redemption payments or similar payments). I have been advised Osler, Hoskin & Harcourt LLP ("**Osler**") that while Debtholders with Secured Debt (other than the Plan Sponsors) will be paid their respective principal and interest thereunder, in the circumstances, the redemption price provided for by the Secured Indenture is not triggered and, therefore, will not be payable;

(ii)        the creation of a new class of common shares of Tervita (the "**New Common Shares**") and the creation of a new class of preferred shares of Tervita (the "**New Preferred Shares**", and together with the New Common Shares, the "**New Shares**");

(iii)        the exchange of all of the equity of the Tervita Group existing immediately prior to the effective time of the Plan (the "**Existing Equity**") in consideration for 20% of the net proceeds actually received by Tervita (after certain deductions) from the full and final determination of, or settlement of, litigation by Tervita against a third party in Alberta Court of Queen's Bench Action No. 0701-13328;

(iv)        the issuance of 48,360,000 New Preferred Shares by Tervita in consideration for the New Investment in the aggregate amount of up to CAD $372 million;

(v)        the issuance of 47,283,277 New Preferred Shares by Tervita in consideration for the irrevocable exchange and transfer of all of the

- 34 -

Secured Debt held by the Plan Sponsors and all of the Plan Sponsors' rights under their Secured Debt;

(vi)    the issuance of the number of New Common Shares by Tervita required to be issued such that such New Common Shares will represent 80% of the New Common Shares (which will represent 2.0% of the New Shares) as at the date on which the Plan is implemented (the "**Effective Date**") in consideration for the irrevocable exchange and transfer of all of the Unsecured Notes and all of the Unsecured Noteholders' rights under the Unsecured Notes and the related Indentures;

(vii)    the issuance of a further number of New Common Shares required to be issued such that such New Common Shares will represent 20% of the New Common Shares (which will represent 0.5% of the New Shares) as at the Effective Date to those Unsecured Noteholders that execute the Unsecured Noteholder Support Agreement (as defined below) on or before October 14, 2016;

(viii)    the irrevocable exchange and transfer of all of the Subordinated Notes and all of the Subordinated Noteholders' rights under the Subordinated Notes and the related Indenture in consideration for the payment of CAD $20 million by Tervita;

(ix)    the further payment of CAD $5 million by Tervita to those Subordinated Noteholders that execute the Subordinated Noteholder Support Agreement on or before October 14, 2016

(x)    the transfer of the Intercompany Loan debt to a subsidiary of Tervita (the "**Intercompany Debt Subsidiary**") as part of an "ATR 66" transaction, with the Intercompany Debt Subsidiary being wound up into Tervita if a favourable tax ruling is obtained from the Canada Revenue Agency prior to the Effective Date or, if such a favourable ruling is not obtained prior to the Effective Date, the Intercompany Debt Subsidiary and the Intercompany Loan debt will remain in place at the Implementation Date;

(xi)    except for the purpose of facilitating the distributions under the Plan of Arrangement, the cancellation of the Existing Equity, the Notes, the Indentures governing such notes and the Term Loan Facility and the irrevocable extinguishment and elimination of all of the Debtholders' entitlements with respect to the Notes, the Indentures and the Term Loan Facility;

(xii)    any new directors, if any, to be appointed to the board of directors of Tervita upon implementation of the Plan shall be deemed to have been appointed; and

(xiii)    Tervita or a subsidiary of Tervita and ArrangeCo shall be amalgamated and continued as one corporation; and

(b)    the funding of a new debt in an amount of $475 million on terms and conditions acceptable to Tervita and the Plan Sponsors.

**Effect of the Arrangement on Tervita**

155.    As a result of the Recapitalization, Tervita will reduce both its total long term debt and its annual interest payments. The Recapitalization will improve Tervita's financial strength and reduce its financial risk.

## VII.    APPLICATION OF THE CBCA

156.    I am advised by Osler that Tervita and ArrangeCo are permitted to apply to this Court under section 192 of the *CBCA* for granting of the Preliminary Interim Order as the proposed Arrangement will involve (i) a continuance of Tervita as a *CBCA* corporation and amalgamation of Tervita and ArrangeCo, qualifying as an arrangement within the meaning of subsection 192(1)(c) of the *CBCA*, and (ii) an exchange of securities for cash and/or other securities, qualifying as an arrangement within the meaning of subsection 192(1)(f) of the *CBCA*.

**Notice to the CBCA Director**

157.    I understand that, pursuant to subsection 192(5) of the *CBCA*, the Director under the CBCA is to be provided with notice of the Application for a Preliminary Interim Order herein in accordance with the *CBCA*. I am advised by Osler that the Director has been so notified and has indicated its intention not

- 36 -

to appear at the Application for a Preliminary Interim Order.  Attached as **Exhibit "Y"** is a letter from Karim Mikaël, Arrangements and Exemptions Officer, Corporations Canada, dated September 13, 2016.

158.          I have been advised by Osler that the Information Circular, which is in the process of being drafted, will contain materials and documents consistent with the practice and disclosure requirements relating to matters of this type to be provided to the Noteholders and is in conformity with the Indentures and the Policy Statement 15.1.

**Unaffected Obligations**

159.          If the Arrangement proceeds as expected, the Revolving Credit Facility will be unaffected by, and will not be involved in, the Arrangement.

160.          If the Arrangement proceeds as expected, the Term Loan Facility and the Secured Notes will be unaffected by the Arrangement. The principal and interest on the Term Loan Facility and the Secured Notes will be repaid in full (other than the holdings of such Term Loan Facility and Secured Notes held by the Plan Sponsors).

161.          If the Arrangement proceeds as expected, trade debt and obligations to employees generally will all continue to be paid or satisfied in the ordinary course.

## VIII.    ALTERNATIVE PROCEEDINGS

162.          If Tervita is unable to proceed with the Arrangement and complete the Recapitalization through the *CBCA* process, Tervita will have to seek some other form of relief which could include relief under the *Companies' Creditors Arrangement Act*.

## IX.     TERVITA'S NEED FOR RELIEF AND PRELIMINARY INTERIM ORDER

163.          On September 15, 2016:

(a)      The 30-day grace period that Tervita elected to utilize in connection with the USD $18.2 million interest payment on the 10.875% Unsecured Notes due on August 15, 2016, will expire and, in the absence of making such interest payment, will result in an "Event of Default" under the 10.875% Indenture, the Revolving Credit Facility and the Term Loan Facility, which will give the 10.875% Unsecured Noteholders, the Revolving Credit Lenders and the Term Loan Lenders, respectively, the right to accelerate their respective indebtedness;

- 37 -

(b)     The forbearance period provided to Tervita pursuant to the Forbearance Agreement between Tervita and the Subordinated Noteholders in connection with the missed USD $18.3 million interest payment on the Subordinated Notes due on June 15, 2016, will  in respect of a missed interest payment on the Subordinated Notes pursuant to the Forbearance Agreement expire  and, in the absence of making such interest payment, the  Subordinated Noteholders will have the right to accelerate their indebtedness; and may, in the absence of payment, declare an event of default, which will give the Revolving Credit Lenders, the Term Loan Lenders and the 10.875% Unsecured Noteholders the right to accelerate their respective indebtedness; and

(c)     Upon any acceleration of indebtedness by the Revolving Credit Lenders, the Term Loan Lenders, the 10.875% Unsecured Noteholders or the Subordinated Noteholders in accordance with either (a) or (b) above, as applicable, an "Event of Default" will occur under the each of Tervita's other long-term debt instruments (the Revolving Credit Agreement, the Term Loan Credit Agreement and the Indentures), and all holders of such debt instruments will have the right to accelerate their respective indebtedness.

164.     In addition, even if Tervita were to cure these two interest payments, Tervita will be faced with significant interest payments in November 2016 totalling approximately USD $58.4 million and CAD $9 million under the Secured Notes, 9.75% Unsecured Notes, and the Subordinated Notes.

165.     As a result, Tervita requires a limited stay (as described below) to allow it to formally propose the Arrangement and to have it duly considered and voted on by the Unsecured Noteholders and the Subordinated Noteholders.  The proposed Arrangement is critical to the survival and long-term viability of Tervita.  Without this relief, there is no guarantee that the Arrangement will be considered and voted upon by the Unsecured Noteholders and the Subordinated Noteholders.  I believe that the Arrangement is significantly better for Tervita and its stakeholders, including employees, customers and trade creditors, than a liquidation scenario or alternative scenarios under insolvency legislation.  I believe that Tervita and its stakeholders, including employees, customers and trade creditors, will be irreparably harmed if the limited stay is not granted.  Moreover, I do not believe that the limited stay causes any hardship or material inconvenience to any party as any affected parties may apply to this Court as described below and the limited stay will expire in the event that an Interim Order application is not brought forward to the Court on or before October 14, 2016.

- 38 -

166.          The Preliminary Interim Order contains a limited stay provision (the "**Stay**"), whereby no person shall have any right to terminate, accelerate, amend or declare a default or event of default or make any demand or take any step to enforce any guarantee or any security interest granted by any member of the Tervita Group in respect of the Notes, the Term Loan Facility,  or any contract or other agreement to which any member of the Tervita Group is a party, borrower, or guarantor, and no person may refer to, rely on or otherwise claim any rights against any member of the Tervita Group under any contract, debt instrument or any other agreement with any member of the Tervita Group  in respect of any alleged breach, default or event of default under the Notes, the Term Loan Facility,  or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor, in each case, by reason of:

(a)          the Applicants having commenced this proceeding;

(b)          any member of the Tervita Group taking any steps in furtherance thereof;

(c)          any member of the Tervita Group being a party to these proceedings or being party to an Arrangement; or

(d)          any default or cross-default arising under any of the Notes or the Term Loan Credit Agreement.

167.          I believe that it is necessary for the Stay to extend to Tervita's Guarantors in order for the Recapitalization and Arrangement to succeed.

168.          In the absence of the Stay, Tervita will be in default of its obligations under various its debt instruments and an acceleration of such debt could have a devastating effect on Tervita's business. Given that the intention of the Recapitalization is to pay the principal and interest owed to the Term Loan Lenders and the Secured Noteholders, in full, staying those creditors should not prejudice them.

169.          The Applicants have attempted to minimize the impact on, and material prejudice to, affected parties to no more than is necessary to achieve the objectives of the proposed Arrangement.  The Applicants have sufficient cash to continue to pay all trade debts throughout the proposed Arrangement.

170.          To further minimize any negative impact and prejudice on affected parties, the following safeguards have been built into the Preliminary Interim Order: (i) the Stay expires on October 14, 2016, unless extended by further order of the Court, and (ii) any party that objects to the Stay may appear at the application for the Interim Order to argue against the extension of the Stay.

- 39 -

## X.    CONCLUSION

171.        After careful consideration, the Board has approved seeking the interim stay and, subject to the receipt of customary fairness opinions and finalizing the detailed terms of the Plan of Arrangement, supports the proposed Recapitalization as being in the best interests of Tervita.

172.        I make this Affidavit in support of an application by Tervita for approval of the Preliminary Interim Order requested in the Originating Application, and for such other matters as may be appropriate and proper in the circumstances which this Honourable Court may grant.

I, Stephen Kersley of 500, 140 10th Avenue S.E., Calgary, Alberta, Canada, do solemnly and sincerely affirm that this is my name and handwriting and that the contents of this my affidavit are true and that these are the exhibits referred to.

_____

Stephen Kersley

Affirmed at 125 Old Broad Street, 15th Floor, London, EC2N 1AR

on 14 September 2016

Before me:

Signed ......................................

Commissioner for oaths

Oghenobruche Ibironke Heinanen
Solicitor
McCarthy Tétrault
26th Floor, 125 Old Broad Street
London EC2N 1AR

## Exhibit A to the First Kersley Affidavit

**Recapitalization Term Sheet**

THIS IS EXHIBIT "A"

Referred to in the Affidavit of

**Stephen Kersley**

Affirmed before me this 14th

day of September, 2016

A Commissioner for Oaths

Oghenobruche Ibironke Heinanen
Solicitor

McCarthy Tétrault
26th Floor, 125 Old Broad Street
London EC2N 1AR

**PRIVATE AND CONFIDENTIAL**
**WITHOUT PREJUDICE**

**TERVITA CORPORATION**

**RECAPITALIZATION TERM SHEET**

**RE:** Tervita Corporation ("**Tervita**"), 9894942 Canada Ltd. ("**ArrangeCo**"), Red Sky Holdings 1 Inc., Red Sky Holdings 2 Inc., Red Sky Holdings 3 Inc., Red Sky Finance LP, Hazco Industrial Services Ltd., CCS International Holdings Inc., Tervita Production Services Ltd., Tervita Waste Processing Ltd., Tervita Environmental Services Ltd., Tervita Equipment Rentals Ltd., Tervita Metal Services Ltd. and CCS Canada (Canadian Holdings) Inc. (collectively, the "**Tervita Entities**"); 11.875% Subordinated Unsecured Notes due 2018 (the "**Subordinated Notes**") issued by Tervita; 9.75% Senior Notes due 2019 (the "**9.75% Unsecured Notes**") and 10.875% Senior Notes due 2018 (the "**10.875% Unsecured Notes**") issued by Tervita (the 9.75% Unsecured Notes and the 10.875% Unsecured Notes are collectively referred to as the "**Unsecured Notes**"); 8.00% Senior Secured Notes due 2018 (the "**8.00% Secured Notes**") and 9.00% Senior Secured Notes due 2018 (the "**9.00% Secured Notes**") issued by Tervita (the 8.00% Secured Notes and the 9.00% Secured Notes are collectively referred to as the "**Secured Notes**", and the Subordinated Notes, Unsecured Notes and the Secured Notes are collectively referred to as the "**Notes**"); obligations under that certain Amended and Restated Credit Agreement dated as of February 14, 2013, as amended, providing for a term credit facility (the "**Secured Term Facility Debt**", and together with the Secured Notes, the "**Secured Debt**"); the holders of the Subordinated Notes (the "**Subordinated Noteholders**"); the holders of the Unsecured Notes (the "**Unsecured Noteholders**"); the holders of the Secured Debt (the "**Secured Debtholders**", and collectively with the Subordinated Noteholders and the Unsecured Noteholders, the "**Debtholders**"); the indentures under which the Subordinated Notes, Unsecured Notes and Secured Notes were issued by Tervita, as amended, modified or supplemented prior to the date hereof (collectively the "**Indentures**"); the credit agreement under which the Secured Term Facility Debt was issued by Tervita, as amended, modified or supplemented prior to the date hereof (the "**Term Credit Agreement**"); and ███████████ ███, █████████████████████████, **and** ██████████ █(█████████████████████████████, the "**Plan Sponsors**" and individually, a "**Plan Sponsor**").

**The purpose of this term sheet (the "Term Sheet") is to set out the principal commercial terms of a proposed Recapitalization (as defined below) of the Tervita Entities. This Term Sheet does not create any obligations on the part of any Tervita Entity, any Debtholder (including any Plan Sponsor) or any other person, until such party has executed a support agreement attaching this Term Sheet and such support agreement has become effective and binding on such party in accordance with its terms.**

2

**This Term Sheet is a summary of the terms and conditions of the Recapitalization and is subject to the negotiation, execution and delivery of definitive documentation.**

**This Term Sheet is proffered in furtherance of settlement discussions, and is entitled to the protections of Federal Rule of Evidence 408 and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions.**

3

## A.      RECAPITALIZATION

## 1.      Recapitalization[1]

The Tervita Entities shall be recapitalized in accordance with the following transactions (collectively, the "**Recapitalization**"), which are described in greater detail below and which shall be effected pursuant to a plan of arrangement (the "**Plan**") under the *Canada Business Corporations Act* (the "**CBCA**"), or pursuant to an Alternative Proceeding (as defined below), in either case to be approved pursuant to a court order (the "**Approval Order**"):

   (i)      the Secured Debt held by Secured Debtholders that are not Plan Sponsors will be repaid in full without any early redemption payments or similar payments. Accrued interest on the Secured Debt shall be paid in cash except that accrued interest on the Secured Debt held by the Plan Sponsors shall be paid by the issuance of notes (the "**Secured Interest Notes**");

   (ii)     the creation of a new class of common shares of Tervita (the "**New Common Shares**") and a new class of preferred shares[2] of Tervita (the "**New Preferred Shares**", and together with the New Common Shares, the "**New Shares**");

   (iii)    the exchange of all of the equity of Tervita existing immediately prior to the effective time of the Plan, including, without limitation, (i) all of the common shares of Tervita, (ii) any preferred shares or other classes of shares of Tervita, and (iii) any options, warrants, conversion privileges, calls, subscriptions, exchangeable securities or other rights, agreements, arrangements or commitments (pre-emptive, contingent or otherwise) obligating Tervita to issue or sell shares in the capital of Tervita or any securities or obligations of any kind convertible into or exchangeable for such shares (collectively, the "**Existing Equity**") for 20% of the net proceeds actually received by Tervita from the full and final determination or settlement of the litigation by Tervita against Secure Energy Services Inc., among others, in the Court of Queen's Bench Action No. 0701-13328 (the "**Secure Litigation**") after deduction of (A) all costs and expenses incurred by or on behalf of Tervita relating to the Secure Litigation, including, without limitation, all fees and expenses of legal counsel, advisors, and experts, and all out-of-pocket travel, filing, reproduction, and other costs, whenever incurred, (B) any cash taxes payable in respect of such proceeds (or that would have been payable but for available sheltering as a result of Tervita's tax pools at the relevant time), and (C) any amounts that may be payable by Tervita to

---

[1] The Recapitalization steps set forth in Section 1 are subject to the last sentence of the first paragraph of Section 11 hereof.

[2] The New Preferred Shares will have substantially similar rights as the New Common Shares, and each New Preferred Share will be convertible into 1 New Common Share as at the Effective Date. The New Preferred Shares will be mandatorily converted into New Common Shares upon a liquidity event which, for greater certainty, shall be set out in the share terms (for the avoidance of doubt, the New Common Shares and the New Preferred Shares shall have the same economic terms).

4

any other party as a result of a counterclaim or otherwise in the Secure Litigation[3];

(iv)    the issuance of 48,360,000[4] New Preferred Shares by Tervita in consideration for a new investment (the "**New Investment**") in the aggregate amount of up to CDN\$372 million[5] (the New Preferred Shares issued pursuant to the New Investment being the "**New Investment Shares**"), to be allocated in accordance with Section 2 below;

(v)    the issuance of 47,283,277[6] New Preferred Shares by Tervita in consideration for the irrevocable exchange and transfer of all the Secured Debt (including any Secured Interest Notes issuable pursuant to (i) above) held by the Plan Sponsors (including, without limitation, principal amounts of ███████████ of Secured Term Facility Debt, ███████████ of 8.00% Secured Notes and ███████████ of 9.00% Secured Notes, and the Secured Interest Notes) and all of the Plan Sponsors' rights under their Secured Debt (the New Preferred Shares issued in exchange for the Plan Sponsor's Secured Debt being the "**Secured Exchange Shares**"), to be allocated in accordance with Section 2 below;

(vi)    the issuance of the number of New Common Shares required to be issued such that such New Common Shares will represent 80% of the New Common Shares (which will represent 2.0% of the New Shares) as at the Effective Date (the New Common Shares issued in exchange for the Unsecured Notes being the "**Unsecured Exchange Shares**") by Tervita in consideration for the irrevocable exchange and transfer of all of the Unsecured Notes and all of the Unsecured Noteholders' rights under the Unsecured Notes and the indentures relating to the Unsecured Notes, to be allocated in accordance with Section 2 below. In addition, holders of Unsecured Notes will be entitled to subscribe for New Investment Shares as set out herein;

---

[3] Tervita will have complete and unfettered control over the carriage, investigation, prosecution, abandonment and settlement of the Secure Litigation as it determines in its business judgment and in the sole interest of Tervita. Without limiting the generality of the foregoing, Tervita will not be required to consult with or provide any information in respect of the Secure Litigation or its status to any holder of Existing Equity or any representative thereof, nor shall Tervita owe any due whatsoever to any such persons with respect to the Secure Litigation.

[4] For every \$1,000,000 reduction in the size of the New Investment (as defined below) in accordance with footnote 5 herein, there will be a 125,000 reduction in the number of New Investment Shares issued.

[5] To the extent Tervita completes any additional asset sales and/or has more cash on hand than is currently estimated, the amount of the New Investment will be reduced to achieve a CDN\$75 million cash balance upon the Effective Date.

[6] This accounts for accrued and unpaid interest up to and including September 14, 2016. For every \$1,000,000 of accrued and unpaid interest on the Secured Debt owing on the Effective Date that has accrued since September 14, 2016, an additional 125,000 Secured Exchange Shares will be issued in exchange for such accrued and unpaid interest.

5

(vii)    as additional consideration for the irrevocable exchange and transfer of all of the Unsecured Notes and all of the Unsecured Noteholders' rights under the Unsecured Notes and the indentures relating to the Unsecured Notes, Tervita will also issue the number of New Common Shares required to be issued such that such New Common Shares will represent 20% of the New Common Shares (which will represent 0.5% of the New Shares) as at the Effective Date to Unsecured Noteholders that execute the Unsecured Noteholder Support Agreement (as defined below) on or before October 14, 2016 (the "**Early Consenting Unsecured Noteholders**", and such New Common Shares issued to the Early Consenting Unsecured Noteholders being the "**Early Consent Shares**"), to be allocated in accordance with Section 2 below;

(viii)   the payment of CDN$20 million (the "**Cash Payment**") by Tervita to the Subordinated Noteholders in consideration for the irrevocable exchange and transfer of all of the Subordinated Notes and all of the Subordinated Noteholders' rights under the Subordinated Notes and the indenture relating to the Subordinated Notes, to be allocated in accordance with Section 2 below;

(ix)     as additional consideration for the irrevocable exchange and transfer of all of the Subordinated Notes and all of the Subordinated Noteholders' rights under the Subordinated Notes and the indenture relating to the Subordinated Notes, Tervita will also pay CDN$5 million to Subordinated Noteholders that execute the Junior Support Agreement (as defined below) on or before October 14, 2016 (the "**Early Consenting Subordinated Noteholders**", and such cash paid to the Early Consenting Subordinated Noteholders being the "**Early Consent Cash Payment**"), to be allocated in accordance with Section 2 below;

(x)      the intercompany PIK debt held by Red Sky Finance LP under the Subordinated Note dated November 14, 2007, as amended (the "**PIK Debt**"), will be transferred to a subsidiary of Tervita (the "**PIK Debt Subsidiary**") as part of an "ATR 66" transaction, with the PIK Debt Subsidiary being wound up into Tervita if a favourable tax ruling is obtained from the Canada Revenue Agency prior to the Effective Date or, if such a favourable ruling is not obtained prior to the Effective Date, the PIK Debt Subsidiary and the PIK Debt will remain in place at the Effective Date;

(xi)     except for the purpose of facilitating the distributions under the Plan, the cancellation of the Existing Equity, the Notes, the Indentures and the Term Credit Agreement and the irrevocable extinguishment and elimination of all of the Debtholders' entitlements with respect to the Notes, the Indentures and the Term Credit Agreement;

(xii)    any new directors, if any, to be appointed to the board of directors of Tervita upon implementation of the Plan shall be deemed to have been appointed; and

6

(i)    Tervita or a subsidiary of Tervita and ArrangeCo shall be amalgamated and continued as one corporation.

The implementation of the Plan shall be subject to and conditional upon all required court, creditor, and other approvals. Subject to the ability of Tervita, with the consent of the Plan Sponsors[7], to reclassify as it deems necessary or advisable, the Existing Equity, the Unsecured Noteholders and the Subordinated Noteholders shall each form a separate class for the purpose of voting on the Plan. The Secured Debtholders shall be unaffected by the Plan and shall accordingly not be entitled to vote thereon.

The record date (the "**Voting Record Date**") for determining holders of Existing Equity, Unsecured Noteholders and Subordinated Noteholders that are entitled to vote at the meetings to approve the Plan shall be a date to be set in the Interim Order (as defined in the Unsecured Noteholder Support Agreement), such date to be acceptable to Tervita and the Plan Sponsors.

The Tervita Entities shall work cooperatively with the legal and financial advisors to the Plan Sponsors, and use reasonable commercial efforts, in respect of matters provided for in this Term Sheet, to (a) obtain the Interim Order as soon as reasonably practicable and in any event no later than October 14, 2016, (b) obtain the Secured Notes Order (as defined below) as soon as reasonably practicable and in any event no later than December 15, 2016, (c) obtain the Approval Order as soon as reasonably practicable and in any event no later than December 15, 2016, and (d) implement the Plan as soon as reasonably practicable after November 15, 2016, and in any event no later than December 31, 2016, or such other date as otherwise agreed in accordance with the terms of the Unsecured Noteholder Support Agreement (the date on which the Plan is implemented being the "**Effective Date**").

The record date for the purpose of calculating the claims of all Debtholders shall be a date to be set in the Interim Order, such date to be acceptable to Tervita and the Plan Sponsors (the "**Claims Record Date**").

The aggregate amount of all Subordinated Noteholders' claims for principal and any accrued and unpaid interest as of the Claims Record Date is referred to herein as the "**Subordinated Notes Claim Amount**". The aggregate amount of all Unsecured Noteholders' claims for principal and any accrued and unpaid interest as of the Claims Record Date is referred to herein as the "**Unsecured Noteholders' Claim Amount**". The aggregate amount of all Secured Debtholders' claims for principal and any accrued and unpaid interest as of the Claims Record Date is referred to herein as the "**Secured Debtholders' Claim Amount**". The aggregate amount of all Early Consenting Unsecured Noteholders' claims for principal and any accrued and unpaid interest as of the Claims Record Date is referred to herein as the "**Early Consenting Unsecured**

---

[7] Where this Term Sheet references the consent of the Plan Sponsors or that a document or other matter must be acceptable or satisfactory to the Plan Sponsors, the consent must be obtained from, or the document or matter must be acceptable or satisfactory to, Plan Sponsors holding at least 66.67% of aggregate amount of Secured Debt and Unsecured Notes held by all of the Plan Sponsors.

**Noteholders' Claim Amount**". The aggregate amount of all Early Consenting Subordinated Noteholders' claims for principal and any accrued and unpaid interest as of the Claims Record Date is referred to herein as the "**Early Consenting Subordinated Noteholders' Claim Amount**".

The "**Distribution Record Date**" shall be a date set by Tervita in consultation with the Plan Sponsors for the purposes of distributing the Cash Payment, the Unsecured Exchange Shares and the Secured Exchange Shares under the Plan.

**2.       Allocation of New Shares and Cash**

The New Investment Shares and the Secured Exchange Shares constitute all of the New Preferred Shares.  The Unsecured Exchange Shares and the Early Consent Shares shall constitute all of the New Common Shares.

The New Shares shall be allocated as follows:

(i)      the Secured Exchange Shares shall be allocated pro rata to all Plan Sponsors as of the Distribution Record Date based on each Plan Sponsor's respective share of the Secured Debtholders' Claim Amount;

(ii)     the Unsecured Exchange Shares shall be allocated pro rata to the Unsecured Noteholders based on each such Unsecured Noteholder's respective share of the Unsecured Noteholders' Claim Amount;

(iii)    the Early Consent Shares shall be allocated pro rata to the Early Consenting Unsecured Noteholders based on each such Early Consenting Unsecured Noteholder's respective share of the Early Consenting Unsecured Noteholders' Claim Amount; and

(iv)     the New Investment Shares shall be allocated as follows:

(A)     1,860,000 of the New Investment Shares shall be allocated to the Plan Sponsors pro rata as a backstop fee in accordance with the terms of the Commitment; and

(B)     all of the other New Investment Shares shall be allocated pro rata to the Electing New Investors (as defined below) who participate in the New Investment in accordance with the terms of the New Investment and the Commitment (as defined below).

No fractional shares will be issued in respect of the New Shares.

The Cash Payment and the Early Consent Cash Payment shall be allocated as follows:

8

(v)     the Cash Payment shall be allocated pro rata to all Subordinated Noteholders as of the Distribution Record Date based on each Subordinated Noteholder's respective share of the Subordinated Notes Claim Amount; and

(vi)    the Early Consent Cash Payment shall be allocated pro rata to all Early Consenting Subordinated Noteholders as of the Distribution Record Date based on each Early Consenting Subordinated Noteholder's respective share of the Early Consenting Subordinated Noteholders' Claim Amount.

## 3.     Issuance of New Preferred Shares for New Investment

The Plan shall provide that an election form ("**Election Form**") shall be delivered to each Unsecured Noteholder (including the Plan Sponsors) as of the Voting Record Date pursuant to which each of the foregoing security holders that is an "Accredited Investor" as defined under Section 501 of Regulation D of the United States *Securities Act of 1933*, as amended, and National Instrument 45-106 Prospectus and Registration Exemptions, and who is otherwise authorized to participate in the New Investment under applicable securities laws (each, an "**Eligible New Investor**") shall have the right, but not the obligation, to elect to participate in the New Investment. Each Eligible New Investor that is an Unsecured Noteholder (including a Plan Sponsor) shall have the right, but not the obligation, to participate in its pro rata share of the New Investment based on its respective share of the Unsecured Noteholders' Claim Amount. Each Eligible New Investor, whether a Plan Sponsor or not, that elects to participate in the New Investment by submitting an Election Form is referred to as an "**Electing New Investor**".

## 4.     New Debt

The New Debt (the "**New Debt**") shall be in an amount equal to CDN$475 million and shall be on terms and conditions acceptable to Tervita and the Plan Sponsors.

## 5.     Revolving Credit Facility

That certain Credit Agreement dated as of February 14, 2013, as amended, providing Tervita with revolving credit facilities (the "**Revolver Credit Agreement**"), shall be either reinstated or replaced on market terms acceptable to Tervita and the Plan Sponsors.

## 6.     Treatment of Trade Debt

Tervita's trade debt shall remain unaffected by the Recapitalization and shall be paid or satisfied in the ordinary course by Tervita; provided that, if Tervita institutes an Alternative Proceeding, any unfavourable leases and/or other executory contracts may be affected.

## 7.     Treatment of Current Employee Obligations

Tervita's obligations to its employees shall remain unaffected by the Recapitalization.

9

## 8.    Support Agreements

Certain Unsecured Noteholders, including each of the Plan Sponsors, shall enter into a support agreement attaching this Term Sheet as a Schedule (the "**Unsecured Noteholder Support Agreement**") pursuant to which, among other things, each such Unsecured Noteholder (individually, an "**Unsecured Noteholder Support Group Member**", and all of the Unsecured Noteholders party to the Unsecured Noteholder Support Agreement, collectively, the "**Unsecured Noteholder Support Group**") will commit that such Unsecured Noteholder Support Group Member will support the Recapitalization by, among other things: (i) voting in favour of the Plan all of its claims against and interests in the Tervita Entities, (ii) supporting the approval of the Plan as promptly as practicable by the court and (iii) not selling or assigning any claims against or interests in the Tervita Entities other than to persons who agree to be bound by the terms of the Unsecured Noteholder Support Agreement. The foregoing is a summary only, and in the event of any conflict between this summary and the Unsecured Noteholder Support Agreement, the terms of the Unsecured Noteholder Support Agreement shall govern.

Certain Subordinated Noteholders and shareholders shall enter into separate support agreements, in form and substance satisfactory to Tervita and the Plan Sponsors, each acting reasonably, attaching this Term Sheet as a Schedule (the "**Junior Support Agreements**") pursuant to which, among other things, each such security-holder (individually, a "**Junior Support Group Member**", and all of the security-holders party to the Junior Support Agreement, collectively, the "**Junior Support Group**") will commit that such Junior Support Group Member will support the Recapitalization by, among other things: (i) voting in favour of the Plan all of its claims against and interests in the Tervita Entities, (ii) supporting the approval of the Plan as promptly as practicable by the court and (iii) not selling or assigning any claims against or interests in the Tervita Entities other than to persons who agree to be bound by the terms of the Junior Support Agreement. The foregoing is a summary only, and in the event of any conflict between this summary and the Junior Support Agreement, the terms of the Junior Support Agreement shall govern.

## 9.    Interest on Unsecured Notes and Subordinated Notes

Tervita shall not make any interest payments on the Unsecured Notes or the Subordinated Notes prior to the Effective Date, provided that interest shall continue to accrue on the Unsecured Notes and the Subordinated Notes pursuant to the terms and conditions thereof.

## 10.    Conditions to Recapitalization

The Recapitalization shall be subject to conditions mutually agreed upon by the Tervita Entities and the Plan Sponsors, including the following:

(i)    Tervita shall have not less than $75 million, or such lesser amount as Tervita and the Plan Sponsors agree to, in cash on hand immediately following the implementation of the Plan;

(ii)     the Plan, Secured Notes Order, the Approval Order, the new (or amended) articles, by-laws and other constating documents, and all definitive legal documentation in connection with all of the foregoing (including all corporate governance agreements/shareholder agreements), shall be satisfactory to Tervita and the Plan Sponsors, each acting reasonably;

(iii)    there shall have been no Material Adverse Effect (as defined in the Unsecured Noteholder Support Agreement) from the date of the Unsecured Noteholder Support Agreement;

(iv)    payment of all fees and expenses of the Tervita Entities' legal and financial advisors, including Osler, Hoskin & Harcourt LLP, Fasken Martineau DuMoulin LLP, Lathan and Watkins LLP, and Barclays Capital Inc., as well as of Stikeman Elliott LLP, legal counsel to Tervita's board of directors;

(v)     payment of all fees and expenses of the Plan Sponsors' legal and financial advisors, including Bennett Jones LLP, Davis Polk & Wardwell LLP, Moelis & Company LLC and Peters & Co. Limited;

(vi)    payment of all fees and expenses of Davies Ward Phillips & Vineberg LLP, Fried, Frank, Harris, Shriver & Jacobson LLP and PJT Partners, Inc.;

(vii)   timely satisfaction by the Tervita Entities in all material respects of each obligation referred to in this Term Sheet and in the Unsecured Noteholder Support Agreement that is to be performed on or before the Effective Date; and

(viii)  the Approval Order being granted and in full force and effect.

## 11.    Other

The Tervita Entities shall work cooperatively with the legal and financial advisors to the Plan Sponsors to prepare and finalize all documentation (including, without limitation, the court documents and the Plan) utilized to effect the Recapitalization. All such documentation shall be acceptable to the Plan Sponsors, acting reasonably. The Tervita Entities shall provide the legal and financial advisors to the Plan Sponsors on an ongoing and expeditious basis with all information related to the Tervita Entities and Tervita's subsidiaries or their business necessary for the preparation of such documentation, as well as the drafts of such documentation. In addition, the Tervita Entities shall work cooperatively with the legal and financial advisors to the Plan Sponsors, and shall use their best efforts to structure and complete the Recapitalization in the most tax effective manner to Tervita and the Debtholders, which could include transferring substantially all of Tervita's assets to a newly incorporated entity.

The Plan shall provide that the Tervita Entities, the Unsecured Noteholder Support Group Members, the Junior Support Group Members, the Plan Sponsors, and any of the foregoing persons' respective officers, directors (other than ████████████ and ████████████), employees, auditors, financial advisors, legal counsel and agents, shall be released and

discharged from any liabilities or claims (other than liabilities or claims attributable to any of such persons' gross negligence, fraud or wilful misconduct as determined by the final, non-appealable judgment of a court of competent jurisdiction) arising on or prior to the Effective Date in connection with the Existing Equity, the Notes, the Secured Term Facility Debt, the Indentures, the Term Credit Agreement, the Recapitalization, the New Investment, any proceedings commenced with respect to the Plan and the Recapitalization, any claim that any director of a Tervita Entity may have against any Tervita Entity solely in respect of any diminution in value or any other loss suffered (i) by such director in respect of any equity they own (directly or indirectly) in the Tervita Entities; or (ii) by the shareholder that appointed such director, and any other actions or matters related directly or indirectly to the foregoing; provided that nothing in this paragraph will release or discharge any of the Tervita Entities, the Unsecured Noteholder Support Group Members, the Junior Support Group Members, the Plan Sponsors or any other person that may obtain a release from or in respect of their respective obligations under the Plan or in respect of the New Investment.

12.    **Alternative Proceeding**

If (a) determined necessary or advisable by Tervita, or (b) Tervita and ArrangeCo (the "**Applicants**") have not obtained a final order from the court in form and substance satisfactory to Tervita and the Plan Sponsors that confirms that no early payment premium (or similar type of payment) is payable in connection with the Recapitalization (the "**Secured Notes Order**") by December 15, 2016, then, in either case, with the consent of the Plan Sponsors, acting reasonably, the Applicants will forthwith convert the CBCA proceeding to a proceeding under the *Companies' Creditors Arrangement Act* (or any such other proceeding under any corporate arrangement, reorganization, restructuring, insolvency or similar law of any jurisdiction now or hereafter in effect, for the relief from or otherwise affecting creditors, including without limitation, under the *Bankruptcy and Insolvency Act (Canada)* or the *United States Bankruptcy Code*) in order to implement the Recapitalization, *mutatis mutandis* (an "**Alternative Proceeding**"). The Interim Order to be sought by the Applicants in the CBCA proceeding shall provide that votes cast at the meetings in respect of the Recapitalization under the CBCA may count as votes cast in respect of the Recapitalization implemented pursuant to an Alternative Proceeding.

B.    **BACKSTOP PROVISIONS**

13.    **Backstop Commitment**

Tervita and the Plan Sponsors shall enter into an agreement (the "**Backstop Commitment Letter**") pursuant to which, among other things, each Plan Sponsor shall pro rata, based on its respective share of the Plan Sponsors' Unsecured Noteholders' Claim Amount, severally backstop the funding of the entire New Investment on terms to be mutually agreed between Tervita and the Plan Sponsors (the "**Commitment**"). The Plan Sponsors shall be obligated to consummate their Commitment with respect to unsubscribed New Investment Shares otherwise issuable under the New Investment on the terms and subject to the conditions set forth in the Backstop Commitment Letter.

12

## C.    CORPORATE GOVERNANCE

### 14.    New Board

The board of directors of Tervita upon implementation of the Plan will be comprised of up to 7 directors, one of which will be the Chief Executive Officer of Tervita. Each of the directors will be acceptable to the Plan Sponsors.

**<u>Exhibit B to the First Kersley Affidavit</u>**

**Debtors' Organizational Chart**

THIS IS EXHIBIT "**B**"

Referred to in the Affidavit of

**Stephen Kersley**

Affirmed before me this 14th

day of September, 2016

_Herdren Oi_

A Commissioner for Oaths

Oghenobruche Ibironke Heinanen
Solicitor

McCarthy Tétrault
26th Floor, 125 Old Broad Street
London EC2N 1AR

# TERVITA ORGANIZATION STRUCTURE

Investors (Limited Partners)

Investors

Red Sky Acquisition Corp.

GP

Red Sky Holdings LP

Red Sky Finance LP

GP

LP

LP

100% Voting Common

Red Sky Holdings 1 Inc.

100% Voting Common

Red Sky Holdings 2 Inc.

100% Voting Common

Red Sky Holdings 3 Inc.

100% Voting Common

100% Class A Voting Common

CCS Management Inc. ("Stock Option Co.")

100% Non-Voting Commons & Preferreds

Options

Options

Employees

CCS Employee Trust

100% Preferreds

100% Preferreds

PIK debt owing to LP

Tervita Corporation

CBCA  AB  BC  SK  MB  ON  NS  NT  YT  NB  NU  NL  PE

## Foreign Subsidiaries

### MEXICO

CCS Energy & Environmental S.A.P.I de C.V.
Mexico

## Unrestricted Subsidiaries

### USA

Tervita (USA Holdings) LLC
Delaware

WESTMORELAND SANITARY LANDFILL LLC
Delaware  Pennsylvania

PennOhio Waste LLC
Delaware  Ohio

Tervita (US Operations) LLC
Delaware  California  Louisiana  Texas  Colorado  Oregon  North-Carolina  Washington

### Subsidiary Guarantors

ARKLA Disposal Services, Inc.
Arkansas  Louisiana

## Subsidiary Guarantors

Hazco Industrial Services Ltd.
AB

Tervita Production Services Ltd.
AB

Tervita Waste Processing Ltd.
AB  BC  SK

Tervita Environmental Services Ltd
AB  BC  SK  MB  ON

Tervita Equipment Rentals Ltd.
AB

Tervita Metal Services Ltd.
AB

CCS Canada (Canadian Holdings) Inc.
AB

CCS International Holdings Inc.
AB

## Non-subsidiaries
(Tervita does not own more than 50% of voting stock)

49%

CRE – Tervita Corporation
AB

### CANADA

## Unrestricted Subsidiaries

CCS Sulphur Projects Ltd.
AB

1495741 Alberta Ltd.
AB

Alberta Sulphur Terminals Inc.
AB

Babkirk Land Services Inc.
BC

9894942 Canada Ltd.
CBCA

80%

80%

As of September 12, 2016

2016 Legal Department

**<u>Exhibit C to the First Kersley Affidavit</u>**

**Consolidated Audited Financial Statements for 2015**

*Due to its voluminous nature, this document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

**Exhibit D to the First Kersley Affidavit**

**Interim Consolidated Unaudited Financial Statements for 2016**

*This document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

**<u>Exhibit E to the First Kersley Affidavit</u>**

**Debt Summary Chart**

THIS IS EXHIBIT "**E**"

Referred to in the Affidavit of

**Stephen Kersley**

Affirmed before me this 14th

day of  September, 2016


A Commissioner for Oaths

Oghenobruche Ibironke Heinanen
Solicitor
**McCarthy Tétrault**
**26th Floor, 125 Old Broad Street**
**London EC2N 1AR**

**Debt Summary** (at August 31, 2016)

| | Maturity Date | Interest Rate | Approximate Balance Owing as at August 31, 2016 |
|---|---|---|---|
| **Secured Debt** | | | |
| Revolving Credit Facility | Feb 14, 2018 | 4.25% (LCS 4.5%) | CAD $144.7 million USD $9.0 million |
| Term Loan Facility* | May 15, 2018 | L+5% (1.25% floor) | USD $247 million |
| Secured Notes* | Nov 15, 2018 | 8% | USD $665.2 million |
| | Nov 15, 2018 | 9% | CAD $205.3 million |
| **Unsecured Debt** | | | |
| 10.875% Unsecured Notes** | Feb 15, 2018 | 10.875% | USD $354.7 million |
| 9.75% Unsecured Notes** | Nov 1, 2019 | 9.75% | USD $299.3 million |
| 11.875% Subordinated Note | Nov 15, 2018 | 11.875% | USD $328.5 million |
| Intercompany Loan | Nov. 14, 2022 | 13% | CAD $1.1 billion |

*The debt owing under the Term Loan Facility and Secured Notes ranks *pari passu*

**The debt owing under the 10.875% Unsecured Notes and the 9.75% Unsecured Notes ranks *pari passu*

**Exhibit F to the First Kersley Affidavit**

**Revolving Credit Facility**

*Due to its voluminous nature, this document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

**Exhibit G to the First Kersley Affidavit**

**Term Credit Agreement**

*Due to its voluminous nature, this document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

## Exhibit H to the First Kersley Affidavit

**Secured Indenture**

*Due to its voluminous nature, this document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

**<u>Exhibit I to the First Kersley Affidavit</u>**

**Collateral Trust Agreement**

*Due to its voluminous nature, this document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

**Exhibit J to the First Kersley Affidavit**

**9.75% Indenture**

*Due to its voluminous nature, this document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

## Exhibit K to the First Kersley Affidavit

**10.875% Indenture**

*Due to its voluminous nature, this document has been omitted.  Copies of this document are available upon request to counsel to the Foreign Representative.*

## **Exhibit L to the First Kersley Affidavit**

### Subordinated Indenture

*Due to its voluminous nature, this document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

**Exhibit M to the First Kersley Affidavit**

**Intercompany Note**

*Due to its voluminous nature, this document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

**Exhibit N to the First Kersley Affidavit**

**May 13, 2016 Waiver Agreement to the Revolving Credit Agreement**

*This document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

**<u>Exhibit O to the First Kersley Affidavit</u>**

**Waiver Agreement to the Term Credit Agreement**

*This document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

**Exhibit P to the First Kersley Affidavit**

**Forbearance Agreement**

*Due to its voluminous nature, this document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

**<u>Exhibit Q to the First Kersley Affidavit</u>**

**May 16, 2016 and June 16, 2016 Press Releases**

*This document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

**Exhibit R to the First Kersley Affidavit**

**August 15, 2016 Waiver Agreement to the Revolving Credit Agreement**

*This document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

**<u>Exhibit S to the First Kersley Affidavit</u>**

**August 15, 2016 Press Release**

*This document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

**<u>Exhibit T to the First Kersley Affidavit</u>**

**Accommodation Agreement (Near Final Version)**

*Due to its voluminous nature, this document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

**Exhibit U to the First Kersley Affidavit**

**Unsecured Noteholder Support Agreement (Near Final Version)**

*Due to its voluminous nature, this document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

**Exhibit V to the First Kersley Affidavit**

**Subordinated Noteholder Support Agreement (Near Final Version)**

*This document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

**Exhibit W to the First Kersley Affidavit**

**Unanimous Security Holders' Agreement**

*Due to its voluminous nature, this document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

**<u>Exhibit X to the First Kersley Affidavit</u>**

**Shareholder Support Agreement (near final version)**

*This document has been omitted.  Copies of this document are available upon request to counsel to the Foreign Representative.*

**Exhibit Y to the First Kersley Affidavit**

**September 13, 2016 Letter**

*This document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

**<u>Exhibit Z to the First Kersley Affidavit</u>**

**Backstop Letter (near final version)**

*Due to its voluminous nature, this document has been omitted. Copies of this document are available upon request to counsel to the Foreign Representative.*

## EXHIBIT C

**Certified Copy of Interim CBCA Order**

US-DOCS\71421332

| | |
|---|---|
| COURT FILE NUMBER | 1601-12176 |
| COURT | COURT OF QUEEN'S BENCH OF ALBERTA |
| JUDICIAL CENTRE | CALGARY |
| MATTER | IN THE MATTER OF SECTION 192 OF THE CANADA BUSINESS CORPORATIONS ACT, R.S.C. 1985, C. C-44, AS AMENDED |
| | AND IN THE MATTER OF A PROPOSED ARRANGEMENT IN RESPECT OF TERVITA CORPORATION, 9894942 CANADA LTD., RED SKY HOLDINGS 1 INC., RED SKY HOLDINGS 2 INC., RED SKY HOLDINGS 3 INC., CCS CANADA (CANADIAN HOLDINGS) INC., CCS INTERNATIONAL HOLDINGS INC., HAZCO INDUSTRIAL SERVICES LTD., TERVITA EQUIPMENT RENTALS LTD., TERVITA ENVIRONMENTAL SERVICES LTD., TERVITA METAL SERVICES LTD., TERVITA PRODUCTION SERVICES LTD., TERVITA WASTE PROCESSING LTD., AND ARKLA DISPOSAL SERVICES INC. |
| APPLICANT | 9894942 CANADA LTD. AND TERVITA CORPORATION |
| RESPONDENT | Not Applicable |
| DOCUMENT | **INTERIM ORDER** |
| ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT | **OSLER, HOSKIN & HARCOURT LLP**<br>Suite 2500, TransCanada Tower<br>450 – 1st Street SW<br>Calgary, AB T2P 5H1 |

| | |
|---|---|
| Solicitor: | Colin Feasby / Marc Wasserman / Michael De Lellis |
| Telephone: | (403) 260-7067 / (416) 862-4908 / (416) 862-5997 |
| Facsimile: | (403) 260-7024 / (416) 862-6666 |
| Email: | cfeasby@osler.com / mwasserman@osler.com / mdelellis@osler.com |
| File Number: | 1172771 |

**FASKEN MARTINEAU DUMOULIN LLP**
First Canadian Centre
350 7th Avenue SW, Suite 3400
Calgary, AB T2P 3N9

| | |
|---|---|
| Solicitor: | John Grieve / Travis Lysak |

*I hereby certify this to be a true copy of the original ~~order~~*

*Dated this 18 day of October 2016*

_____

*for Clerk of the Court*

FILED
OCT 18 2016
JUDICIAL CENTRE OF CALGARY
CLERK OF THE COURT

Telephone:      403-261-5350
Facsimile:      403-261-5351
Email:          jgrieve@fasken.com / tlysak@fasken.com
File Number:    285302.00311

**DATE ON WHICH ORDER WAS PRONOUNCED: MONDAY, OCTOBER 17, 2016**

**NAME OF JUDGE WHO MADE THIS ORDER:      JUSTICE ROMAINE**

**LOCATION OF HEARING:            CALGARY, ALBERTA**

UPON the Originating Application (the "**Application**") of 9894942 Canada Ltd. ("**ArrangeCo**") and Tervita Corporation ("**Tervita**", together with ArrangeCo, the "**Applicants**") for an Order (the "**Interim Order**") pursuant to Section 192 of the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44, as amended (the "**CBCA**") in connection with a proposed arrangement under Section 192 of the CBCA involving the Applicants;

AND UPON reading the Application, the affidavit of Stephen Kersley, Chief Financial Officer of Tervita, affirmed on September 14, 2016 (the "**First Kersley Affidavit**"), and the documents referred to therein, and the affidavit of Justin Sherman, sworn on September 14, 2016, and the documents referred to therein;

AND UPON reading the Application, the affidavit of Stephen Kersley, Chief Financial Officer of Tervita, affirmed on October 7, 2016 (the "**Second Kersley Affidavit**") and the documents referred to therein;

AND UPON being advised that notice of the Application has been given to the Director (the "**Director**") appointed under section 260 of the CBCA and that the Director does not consider it necessary to appear;

AND UPON HEARING counsel for the Tervita Group (as defined below) and counsel to certain of Tervita's debtholders and noteholders, including counsel for the Ad Hoc Committee of Secured Debtholders and the Catalyst Capital Group Inc. ("**Catalyst**");

**FOR THE PURPOSES OF THIS ORDER:**

(a)     the capitalized terms not defined in this Interim Order shall have the meanings attributed to them in the draft information circular of Tervita (the "**Information Circular**"), which is attached as Exhibit **"C-1"** to the Second Kersley Affidavit;

(b)     all references to "**Arrangement**" used herein mean the arrangement as set forth in the plan of arrangement attached as Appendix "D" to the Information Circular (the "**Plan of Arrangement**") and attached as Schedule "B" hereto; and

(c)     all reference to the "**Tervita Group**" shall mean Tervita and its affiliates and subsidiaries listed on Schedule "A" hereto.

**IT IS HEREBY ORDERED AND DECLARED THAT:**

**Service**

1.      Service of Notice of this Application is hereby deemed to be good and sufficient.

**The Meetings**

2.      The Applicants are permitted to call, hold and conduct a separate meeting for each of: (i) the Unsecured Noteholders; (ii) the Subordinated Noteholders; and (iii) the RSAC Shareholders, to be held at the offices of Osler, Hoskin & Harcourt LLP, Suite 2500, TransCanada Tower, 450 – 1st Street SW, Calgary, AB T2P 5H1, as follows:

(a)      the meeting of the Unsecured Noteholders (the "**Unsecured Noteholders' Meeting**") shall be held at 10 a.m. (Calgary time) on November 30, 2016, in order for the Unsecured Noteholders to consider and, if determined advisable, pass a resolution authorizing, adopting and approving with or without variation, the Arrangement and the Plan of Arrangement and such other business as may properly be brought before the Unsecured Noteholders' Meeting or any adjournment or postponement thereof, all as more particularly described in the Information Circular (the "**Unsecured Noteholders' Arrangement Resolution**");

(b)      the meeting of the Subordinated Noteholders (the "**Subordinated Noteholders' Meeting**" and, together with the Unsecured Noteholders' Meeting, the "**Noteholder Meetings**") shall be held at 10:30 a.m. (Calgary time) on November 30, 2016, in order for the Subordinated Noteholders to consider and, if determined advisable, pass a resolution authorizing, adopting and approving with or without variation, the Arrangement and the Plan of Arrangement and such other business as may properly be brought before the Subordinated Noteholders' Meeting or any adjournment or postponement thereof, all as more particularly described in the Information Circular (the "**Subordinated Noteholders' Arrangement Resolution**", and together with the Unsecured Noteholders' Arrangement Resolution, the "**Noteholders' Arrangement Resolutions**"); and

(c)      the meeting of the RSAC Shareholders (the "**RSAC Shareholders' Meeting**" and together with the Noteholder Meetings, the "**Meetings**") shall be held at 11 a.m. (Calgary time) on November 30, 2016, in order for the RSAC Shareholders to consider and, if determined advisable, pass a resolution authorizing, adopting and approving with or without variation,

the Arrangement and the Plan of Arrangement and such other business as may properly be brought before the RSAC Shareholders' Meeting or any adjournment or postponement thereof, all as more particularly described in the Information Circular (the "**RSAC Shareholders' Arrangement Resolution**" and together with the Noteholders' Arrangement Resolutions, the "**Arrangement Resolutions**").

3.   The Meetings shall be called, held and conducted in accordance with the Information Circular (and in respect of the RSAC Shareholders' Meeting, the *Business Corporations Act* (Alberta), R.S.A. 2000, c. B-9, as amended (the "**ABCA**")), the rulings and directions of the Chair, as well as, as applicable, the Unsecured Notes Indentures, the Subordinated Notes Indenture or the articles and by-laws of RSAC, in each case, subject to this Interim Order and any further Order of this Court.

4.   The Information Circular is hereby deemed to represent sufficient and adequate disclosure to the Unsecured Noteholders, the Subordinated Noteholders and the RSAC Shareholders in relation to the Arrangement and the Plan of Arrangement, including for the purpose of Section 192 of the CBCA (and the ABCA with respect to RSAC Shareholders), and the Applicants shall not be required to send to the Unsecured Noteholders, the Subordinated Noteholders or the RSAC Shareholders any further or additional disclosure, whether pursuant to Section 192 of the CBCA, the ABCA or otherwise.

5.   The President and Chief Executive Officer of Tervita or a designate of such person shall preside as the chair of the Meetings (the "**Chair**") and, subject to this Interim Order and any further order of the Court, shall decide all matters relating to the conduct of the Meetings.

6.   The record date (the "**Voting Record Date**") for determination of the Registered Unsecured Noteholders, the Registered Subordinated Noteholders and the RSAC Shareholders entitled to notice of, and to vote at, the Meetings shall be 5 p.m. (Calgary time) on October 14, 2016.

7.   The only persons entitled to attend or speak at the Unsecured Noteholders' Meeting shall be:

   (a)   the registered and beneficial Unsecured Noteholders as of the Voting Record Date, or their authorized proxyholders, and their respective advisors;

   (b)   the officers, directors, auditors and advisors of the Tervita Group;

   (c)   the Unsecured Notes Trustee and its legal counsel;

- 6 -

(d)     the Director; and

(e)     other persons who may receive the permission of the Chair of the Unsecured Noteholders' Meeting

and the Initial Supporting Parties and their respective advisors shall be entitled to attend and observe at the Unsecured Noteholders' Meeting.

8.     The only persons entitled to attend or speak at the Subordinated Noteholders' Meeting shall be:

(a)     the registered and beneficial Subordinated Noteholders as of the Voting Record Date, or their authorized proxyholders, and their respective advisors;

(b)     the officers, directors, auditors and advisors of the Tervita Group;

(c)     the Subordinated Notes Trustee and its legal counsel;

(d)     the Director; and

(e)     other persons who may receive the permission of the Chair of the Subordinated Noteholders' Meeting,

and the Initial Supporting Parties and their respective advisors shall be entitled to attend and observe at the Subordinated Noteholders' Meeting.

9.     The only persons entitled to attend or speak at the RSAC Shareholders' Meeting shall be:

(a)     the registered and beneficial RSAC Shareholders as of the Voting Record Date, or their authorized proxyholders, and their respective advisors;

(b)     the officers, directors, auditors and advisors of the Tervita Group;

(c)     the Director; and

(d)     other persons who may receive the permission of the Chair of the RSAC Shareholders' Meeting,

and the Initial Supporting Parties, their respective advisors and the legal advisors to the officers and directors of the Tervita Group shall be entitled to attend and observe at the RSAC Shareholders' Meeting.

10.     The Applicants may transact such other business at the Meetings as is contemplated in the Information Circular, or as may otherwise be properly before the Meetings.

**Quorum**

11.     A quorum at: (a) each of the Noteholder Meetings shall be satisfied if two or more persons holding at least 25% of the principal amount of the applicable Notes and entitled to vote at such Noteholder Meetings are present, in person or represented by proxy, at the outset of such Noteholder Meetings. If a quorum shall not be present within 30 minutes from the time fixed for holding a Noteholder Meeting, such Noteholder Meeting shall be adjourned to the same day in the next week (unless such day is not a Business Day in which case it shall be adjourned to the next following Business Day thereafter) at the same time and place and no notice shall be required to be given in respect of such adjourned meeting. At the adjourned meeting, the Unsecured Noteholders or Subordinated Noteholders, as applicable, present in person or represented by proxy shall constitute a quorum and may transact the business for which the meeting was originally convened notwithstanding that the Unsecured Noteholders or Subordinated Noteholders, as applicable, may not represent 25% of the principal amount of the Unsecured Notes or Subordinated Notes, as applicable, present in person or represented by proxy; and (b) the RSAC Shareholders' Meeting shall be satisfied if one or more persons entitled to vote at the RSAC Shareholders' Meeting, holding not less than 50% of outstanding RSAC Shares as at the Voting Record Date, are present, in person or represented by proxy, at the outset of the RSAC Shareholders' Meeting. Despite the previous sentence, if proper notice of the RSAC Shareholders' Meeting is given and a quorum of RSAC Shareholders is not present, a second RSAC Shareholders' Meeting may be held on 48 hours written notice to transact the business specified in the original notice. Subject to the ABCA, any RSAC Shareholders present at the second meeting constitute a quorum and the business specified in the original notice may be transacted by a majority vote of RSAC Shares represented at the second meeting.

**Amendments to the Arrangement and Plan of Arrangement**

12.     Subject to the terms hereof and the Arrangement, the Unsecured Noteholder Support Agreement, the Backstop Commitment Letter, the Subordinated Noteholder Support Agreement and the Securityholder Consent and Support Agreements and, except as provided therein, without any

additional notice to the Unsecured Noteholders, the Subordinated Noteholders, the RSAC Shareholders or others entitled to notice hereunder, any amendment, modification, supplement or restatement to the Arrangement and the Plan of Arrangement may be:

(a)     proposed by the Applicants in writing at any time prior to or at the Meetings, and if so proposed and accepted at such Meetings pursuant to the Arrangement Resolutions, shall be filed with the Court and become part of the Arrangement and the Plan of Arrangement for all purposes. Any such amendment, modification, supplement or restatement to the Arrangement and the Plan of Arrangement shall be communicated to Noteholders and RSAC Shareholders as follows: (i) if made prior to the Meetings, by press release, and if Tervita and the Plan Sponsors consider it appropriate, through an electronic portal or Tervita's website; or (ii) if made at the Meetings, by announcement at the Meetings;

(b)     except as provided in Section 17(c) below, made in writing following the Meetings in circumstances where the Arrangement Resolutions have been passed:

(i)      if it is acceptable to Tervita and the Majority Initial Supporting Parties;

(ii)     filed with the Court prior to the hearing for the Final Order and approved by the Court at the hearing; and

(iii)    communicated to the Unsecured Noteholders, the Subordinated Noteholders and the RSAC Shareholders if and as required by the Court and in the manner directed by the Court;

(c)     made by the Applicants at any time and from time to time, provided that such amendment, modification or supplement concerns a matter which, in the reasonable opinion of the Applicants, is solely of an administrative nature required to better give effect to the implementation of the Arrangement and the Final Order, or to cure any errors, omissions or ambiguities, and is not adverse to the financial or economic interests of the Tervita Group, the Unsecured Noteholders, the Subordinated Noteholders and the RSAC Shareholders; and

(d)     made at any time if it is acceptable to the Applicants and the Majority Initial Supporting Parties, with the approval of the Court.

**Amendments to Meeting Materials**

13.    Subject to the terms of the Unsecured Noteholder Support Agreement, the Backstop Commitment Letter, the Subordinated Noteholder Support Agreement and the Securityholder Consent and Support Agreements, the Applicants are authorized to make such amendments, revisions or supplements to the Meeting Materials (including for greater certainty the Information Supplement) and related documents as they may determine, and the Applicants may disclose such amendments, revisions or supplements, including material changes, by the method and in the time most reasonably practicable in the circumstances as determined by the Applicants; provided that in addition to any other disclosure made by Tervita, Tervita shall communicate such amendments, revisions or supplements to the Unsecured Noteholders, the Subordinated Noteholders and RSAC Shareholders by press release and if Tervita and the Plan Sponsors consider it appropriate, through an electronic portal or Tervita's website. Without limiting the generality of the foregoing, and subject to the terms of the Unsecured Noteholder Support Agreement, the Backstop Commitment Letter, the Subordinated Noteholder Support Agreement and the Securityholder Consent and Support Agreements, if any material change or material fact arises between the date of this Interim Order and the date of the Meetings, which change or fact, if known prior to mailing of the Information Circular, would have been disclosed in the Information Circular, then:

(a)    the Applicants shall advise the Unsecured Noteholders, the Subordinated Noteholders and the RSAC Shareholders of the material change or material fact by disseminating a news release through a widely-circulated news service in North America and by providing notice through, if Tervita and the Plan Sponsors consider it appropriate, an electronic portal or Tervita's website and such other methods customarily used by Tervita (collectively, a "**News Release**"); and

(b)    provided that the News Release describes the applicable material change or material fact in reasonable detail, the Applicants shall not be required to deliver an amendment to the Information Circular to the Unsecured Noteholders, the Subordinated Noteholders and the RSAC Shareholders or otherwise give notice to the Unsecured Noteholders, the Subordinated Noteholders and the RSAC Shareholders of the material change or material fact other than dissemination and filing of the News Release as aforesaid.

**Adjournments and Postponements**

14.    The Applicants or the Chair, if they deem advisable after consultation with the Initial Supporting Parties, are authorized to adjourn or postpone one or more of the Meetings (whether or not a quorum is present, if applicable) and for such period or periods of time as the Applicants or the Chair deem advisable, without the necessity of first convening such Meetings or first obtaining any vote of the Unsecured Noteholders, the Subordinated Noteholders or the RSAC Shareholders, as applicable, respecting the adjournment or postponement, and notice of any such adjournment or postponement shall be given by such method as the Applicants or the Chair may deem is appropriate in the circumstances. This provision shall not limit the authority of the respective Chair of each of the Meetings in respect of the adjournments and postponements.

15.    Any adjournment or postponement of one or more of the Meetings shall not have the effect of modifying the Voting Record Date for persons entitled to receive notice of or vote at such Meetings. At any subsequent reconvening of an adjourned or postponed Meeting, all proxies will be voted in the same manner as the proxies would have been voted at the original convened Meeting, except for any proxies that have been effectively revoked or withdrawn prior to the subsequent reconvening of such adjourned or postponed Meeting.

**Notice of Meetings**

16.    The Information Circular, substantially in the form attached as **Exhibit "C-1"** to the Second Kersley Affidavit, including the Notices of Meetings, the form of proxies for the Unsecured Noteholders' Meeting, the Subordinated Noteholders' Meeting and the RSAC Shareholders' Meeting, as applicable, the letters of transmittal for the Unsecured Noteholders' meeting and the Subordinated Noteholders' Meeting, as applicable, and the Participation Form for Unsecured Noteholders, together with any other communications or documents determined by the Applicants, as necessary or advisable (excluding, for greater certainty, the Information Supplement which shall be delivered in accordance with paragraph 13 hereof), shall be sent to those Unsecured Noteholders who hold Unsecured Notes, those Subordinated Noteholders who hold Subordinated Notes and RSAC Shareholders, as of the Voting Record Date, counsel to the Initial Supporting Parties, the directors of the Tervita Group, the auditors of the Tervita Group, the Unsecured Notes Trustee, the Subordinated Notes Trustee and the Director, by one or more of the following methods:

(a)    in the case of registered Unsecured Noteholders, registered Subordinated Noteholders and RSAC Shareholders as of the Voting Record Date, by pre-paid first class or ordinary mail,

by courier or by delivery in person, addressed to each such holder at his, her or its address, as shown on the books and records of Unsecured Notes Trustee, Subordinated Notes Trustee or the Tervita Group, respectively, as of the Voting Record Date, not later than 21 days prior to the date of the Meetings;

(b)     in the case of non-registered Unsecured Noteholders and Subordinated Noteholders, generally in accordance with the provisions of National Instrument 54-101 – *Communications With Beneficial Owners of Securities of a Reporting Issuer* of the Canadian Securities Administrators, notwithstanding that Tervita is not subject to the requirements of such instrument;

(c)     in the case of directors and auditors of the Tervita Group, and counsel to the Initial Supporting Parties, by email, pre-paid first class or ordinary mail, by courier or by delivery in person, addressed to the individual directors or firm of auditors, as applicable, not later than 21 days prior to the date of the Meetings; and

(d)     in the case of the Unsecured Notes Trustee, the Subordinated Notes Trustee and the Director, by facsimile or other electronic means, by courier or by delivery in person, addressed to the Unsecured Notes Trustee, the Subordinated Notes Trustee and the Director, as applicable, not later than 21 days prior to the date of the Meetings.

17.     Delivery of the Meeting Materials in the manner directed by this Interim Order shall be deemed to be good and sufficient service upon and notice to (including for the purpose of Section 192 of the CBCA) the Unsecured Noteholders, the Subordinated Noteholders, the RSAC Shareholders, the directors and auditors of the Tervita Group, the Unsecured Notes Trustee, the Subordinated Notes Trustee, and the Director of:

(a)     the Application;

(b)     this Interim Order;

(c)     the Procedural Order; and

(d)     the Notices of Meetings;

and no other form of service need be made and no other material need be served on such persons in respect of these proceedings, and service of the Application and Second Kersley Affidavit is

dispensed with. For the avoidance of doubt all Meeting Materials and all other communications or documents to be sent pursuant to this Interim Order shall be distributed by or on behalf of the Applicants.

18.    The accidental omission to give notice of the Meetings or the Arrangement, the failure to give notice of the Meetings or the Arrangement for reasons beyond the reasonable control of the Applicants, or the non-receipt of the notice by any Interested Party (as defined below) shall not constitute a breach of this Interim Order or invalidate any resolution passed in respect of the Arrangement or any proceedings taken at the Meetings. If any such failure or omission shall come to the attention of the Applicants, they shall use commercially reasonable efforts to rectify it by the method and in the time most reasonably practical in the circumstances.

19.    In the event of a postal strike, lockout or event that prevents, delays, or otherwise interrupts mailing or delivery of the Meeting Materials provided in paragraph 16 hereof, the issuance of a press release containing details of the date, time and place of the Meetings, steps that may be taken by Unsecured Noteholders, Subordinated Noteholders and RSAC Shareholders, as applicable, to deliver or transmit proxies by delivery, internet voting or telephone and that the Information Circular will be provided by electronic mail or by courier upon request made by a Unsecured Noteholder, Subordinated Noteholder and RSAC Shareholder, will be deemed good and sufficient service upon the Unsecured Noteholders, Subordinated Noteholders and RSAC Shareholders of the Information Circular and shall be deemed to satisfy the requirements of Section 135 of the CBCA and Section 134 of the ABCA, as applicable.

**Solicitation of Proxies**

20.    The Applicants are authorized to use the forms of proxy substantially in the form of the drafts enclosed with the Information Circular. The Applicants are authorized, at their expense, to solicit proxies, directly and through their officers, directors and employees, and through such agents or representatives as they may retain for that purpose, and by mail or such other forms of personal and electronic communication as it may determine.

21.    To be valid, a proxy must be deposited with the scrutineer(s) for the Meetings, appointed by the Chair in the manner described in the Information Circular no later than 5 p.m. (Calgary time) on the day that is two (2) Business Days before the Meetings (or, with the consent of the Chair, at any time prior to commencement of the applicable Meeting) or two (2) Business Days preceding the date of any adjournment of the Meetings (or, with the consent of the Chair, at any time prior to

commencement of the applicable adjourned Meeting). Notwithstanding the foregoing, the Chair shall have the discretion to accept proxies received after such deadline.

22.    Subject to the terms of the Unsecured Noteholder Support Agreement, the Backstop Commitment Letter, the Subordinated Noteholder Support Agreement and the Securityholder Consent and Support Agreements, Unsecured Noteholders, Subordinated Noteholders and RSAC Shareholders shall be entitled to revoke a proxy at any time prior to the exercise thereof at the Meetings by:

(a)    depositing with the scrutineer(s) (in the same manner as it may deposit a proxy) an instrument in writing executed by such party or by an attorney authorized in writing, or, if the party is a corporation, by a duly authorizer officer or attorney thereof, at any time prior to the exercise thereof at the Meetings, or with the Chair on the day of the Meetings; or

(b)    depositing with the scrutineer(s) a further proxy which is dated subsequent to the date of the original proxy; or

(c)    in any manner permitted by law.

**Voting**

23.    Only the Registered Unsecured Noteholders and the Registered Subordinated Noteholders as at the close of business on the Voting Record Date will be entitled to receive notice of and to vote at the applicable Noteholder Meeting.

24.    Only the RSAC Shareholders as at the close of business on the Voting Record Date will be entitled to receive notice of and to vote at the RSAC Shareholders' Meeting.

25.    Each Unsecured Noteholder and Subordinated Noteholder entitled to vote at the Noteholder Meetings shall be entitled to one vote on the applicable Noteholder Arrangement Resolution for each U.S.$1,000 principal amount of Unsecured Notes or Subordinated Notes, as applicable, held by such holder as at the Voting Record Date, with no fractional votes permitted, provided that the Tervita Group, which may hold Unsecured Notes or Subordinated Notes, will not be permitted to vote.

26.    Each RSAC Shareholder entitled to vote at the RSAC Shareholders' Meeting shall be entitled to one vote on the RSAC Shareholders' Arrangement Resolution on the basis of one vote per share, as applicable, as at the Voting Record Date.

- 14 -

27.    Illegible votes, spoiled votes, defective votes and abstentions shall be deemed to be votes not cast. Proxies that are properly signed and dated but which do not contain voting instructions shall be voted in favour of the Arrangement Resolutions.

28.    The Unsecured Noteholders' Arrangement Resolution shall have been passed if it receives the affirmative vote of Unsecured Noteholders representing at least two-thirds (66⅔%) of the votes cast in respect of the Unsecured Noteholders' Arrangement Resolution at the Unsecured Noteholders' Meeting in person or by proxy by the Unsecured Noteholders.

29.    The Subordinated Noteholders' Arrangement Resolution shall have been passed if it receives the affirmative vote of Subordinated Noteholders representing at least two-thirds (66⅔%) of the votes cast in respect of the Subordinated Noteholders' Arrangement Resolution at the Subordinated Noteholders' Meeting in person or by proxy by the Subordinated Noteholders.

30.    The RSAC Shareholders' Resolution shall have been passed if it receives the affirmative vote of RSAC Shareholders representing at least 53.6% of the votes cast in respect of the RSAC Shareholders' Arrangement Resolution and the RSAC Shareholders' Meeting in person or by proxy by the RSAC Shareholders.

31.    The approval of the Arrangement Resolutions shall be sufficient to authorize the Applicants to do all such acts and things as are necessary and desirable to give effect to the Arrangement on a basis consistent with what is described in the Information Circular, subject to the terms of the Plan of Arrangement, the Unsecured Noteholder Support Agreement, the Backstop Commitment Letter, the Subordinated Noteholder Support Agreement, the Securityholder Consent and Support Agreements and final approval of the Arrangement by this Court.

32.    Subject to the terms of the Unsecured Noteholder Support Agreement, any votes cast in favour of the Arrangement Resolutions (whether in person or by proxy) may be counted as votes in favour of a plan of compromise or arrangement of the Applicants in a proceeding under the *Companies' Creditors Arrangement Act*, RSC 1985, c C-36, as amended.

**New Investment Offering**

33.    Only Eligible Unsecured Noteholders shall be entitled to participate in the New Investment Offering.

34.     Subject to the terms of the Backstop Commitment Letter, each Initial Backstop Party shall be deemed to have subscribed for its Commitments of the New Investment Shares without any need to complete and return the Participation Form.

35.     Eligible Unsecured Noteholders (other than the Initial Backstop Parties) that are interested in participating in the New Investment Offering will be required to:

    (a)     properly complete and duly execute their Participation Form;

    (b)     ensure that their Intermediary receives such properly completed and duly executed Participation Form in order for such intermediary to guarantee the Participation Form by affixing the Intermediary's brokerage or medallion stamp to the Participation Form; and

    (c)     provide such completed, duly executed and medallion stamp or signature guaranteed Participation Form to Tervita in accordance with the instructions set forth in the Participation Form such that the completed, duly executed and medallion stamp or signature guaranteed Participation Form is received on or prior to 5:00 p.m. (Calgary time) on November 28, 2016 (the "**Participation Deadline**"). If the completed, duly executed and medallion stamp or signature guaranteed Participation Form is initially delivered by e-mail or fax, the original must follow by registered mail, hand delivery or courier to Tervita in accordance with the instructions in the Participation Form prior to 5:00 p.m. (Calgary time) on November 30, 2016 in order to constitute valid delivery.

36.     Eligible Unsecured Noteholders (other than the Initial Backstop Parties) intending to participate in the New Investment Offering will not be accepted if Tervita has not received their properly completed, duly executed and medallion or signature guaranteed Participation Forms by the Participation Deadline, subject to paragraph 37 of this Interim Order.

**Time Periods**

37.     Subject to the terms of the Unsecured Noteholder Support Agreement, the Backstop Commitment Letter, the Subordinated Noteholder Support Agreement and the Securityholder Consent and Support Agreements, the Applicants may with the consent of the Initial Supporting Parties waive or extend the time limits set out herein or in the Information Circular and the Participation Form for the deposit or revocation of proxies and/or delivery of completed Participation Forms, as applicable, if the Applicants deem it advisable to do so.

**Final Application**

38.   Subject to further order of this Court, and provided that the Unsecured Noteholders, the Subordinated Noteholders and the RSAC Shareholders have approved the Arrangement in the manner directed by this Court, the Applicants may apply to this Court, on such notice as is practicable to the parties on the Service List maintained in these proceedings, for a final order approving the Arrangement (the "**Final Order**") on December 6, 2016 at 10:00 a.m. (Calgary time) or as soon thereafter as counsel may be heard.

39.   The distribution of the Notice of Application and the Interim Order in the Information Circular, when sent in accordance with this Order shall constitute good and sufficient service of the Notice of Application and this Interim Order and no other form of service need be effected and no other material need be served unless a Notice of Intention to Appear is served in accordance with paragraph 40 of this Interim Order.

40.   Any Noteholder (other than the Initial Supporting Noteholders, the Ad Hoc Committee of Secured Debtholders and Catalyst), RSAC Shareholder or any other interested party (each an "**Interested Party**") desiring to appear and make submissions at the application for the Final Order is required to file with this Court and serve upon Tervita on or before 5:00 p.m. (Calgary time) on November 18, 2016, a Notice of Intention to Appear including the Interested Party's address for service (or alternatively, a facsimile number for service by facsimile or an email address for service by electronic mail), indicating whether such Interested Party intends to support or oppose the application or make submissions at the application, together with a detailed summary of the position such Interested Party intends to advocate before the Court, and any evidence or materials which are to be presented to the Court. Service of this notice on Tervita shall be effected by service upon the solicitors for the Tervita Group, such service to be effected by delivery to the address below:

Osler, Hoskin & Harcourt LLP
Suite 2500, TransCanada Tower
450 – 1st Street SW
Calgary, AB T2P 5H1

Solicitor:      Colin Feasby / Marc Wasserman / Michael De Lellis
Telephone:   (403) 260-7067 / (416) 862-4908 / (416) 862-5997
Facsimile:    (403) 260-7024 / (416) 862-6666
Email:         cfeasby@osler.com / mwasserman@osler.com / mdelellis@osler.com

with a copy to:

> Bennett Jones LLP
> 3400 One First Canada Place
> P.O. Box 130,
> Toronto ON M5X 1A4
>
> Solicitor:  Kevin J. Zych & Sean H. Zweig
> Telephone: (416) 777-5738 / (416) 777-6254
> Facsimile: (416) 863-1716
> Email: zychk@bennettjones.com / zweigs@bennettjones.com

41.     In the event that the application for the Final Order is adjourned, only those parties appearing before this Court for the Final Order, and those Interested Parties serving a Notice of Intention to Appear in accordance with paragraph 40 of this Interim Order, shall be given notice of the adjourned date.

**Stay of Proceedings**

42.     Subject to the terms of the Accommodation Agreement, the Revolving Credit Facilities Lenders shall be treated as unaffected in any Plan of Arrangement filed by the Applicants in the within proceedings and shall not be subject to any stay of proceedings in the within proceedings, and nothing in this Interim Order shall prevent the filing of any registration to preserve or perfect any security interest.

43.     From 12:01 a.m. on the date of this Interim Order until and including the earlier of: (a) the Effective Date; (b) seven days after the termination of the Unsecured Noteholder Support Agreement; or (c) seven days after the termination of the Backstop Commitment Letter, no person, including, without limitation, the Noteholders, the trustees under the Indentures, the Term Loan Administrative Agent, the Term Loan Lenders or any other administrative agent, collateral agent, indenture trustee or similar person, (i) shall have any right to terminate, accelerate, amend or declare a default or event of default or make any demand or take any step to enforce any guarantee or any security interest granted by any member of the Tervita Group in respect of the Notes, the Term Loan Facility, or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor, and (ii) may refer to, rely on or otherwise claim any rights against any member of the Tervita Group under any contract, debt instrument or any other agreement with any member of the Tervita Group in respect of any alleged breach, default or event of default under the Notes, the Term Loan Facility or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor; in each case, by reason of: (A) the Applicants having commenced this proceeding, (B) any member of the Tervita Group taking any steps in furtherance thereof, (C) any of member of the Tervita Group being a party to these proceedings or being party to an

Arrangement, or (D) any default or cross-default arising under any of the Notes or the Term Loan Credit Agreement, without further order of this Honourable Court.

**Other Matters**

44. Any amendment, modification, supplement or restatement to the Arrangement or the Plan of Arrangement: (i) if made prior to the Meetings, will be delivered to the Ad Hoc Committee of Secured Debtholders, Catalyst, the Secured Notes U.S. Trustee (the "**U.S. Secured Trustee**") and the Secured Notes Canadian Trustee (the "**Canadian Secured Trustee**" and together with the U.S. Secured Trustee, the "**Secured Trustees**") no later than one (1) Business Day after the issuance of a press release (pursuant to paragraph 12(a)(i) herein) in connection with same; and (ii) if made at or following the Meetings in circumstances where the Arrangement Resolutions have passed, will be delivered to the Ad Hoc Committee of Secured Debtholders, Catalyst and the Secured Trustees as soon as is practicable after such amendment, modification, supplement or restatement is made or no later than one (1) Business Day thereafter.

45. Subject to paragraph 43 herein, nothing in this Order shall affect the rights and obligations of the Secured Trustees, including but not limited to, any rights in respect of any lien or other priority of payment under the Secured Notes Indenture.

46. To the extent of any inconsistency or discrepancy between this Interim Order and the terms of any of the Debt Instruments (excluding the Secured Notes, the Secured Notes Indenture and the Term Loan Credit Agreement), the terms of any instrument creating, governing or collateral to the Debt Instruments (excluding the Secured Notes, the Secured Notes Indenture and the Term Loan Credit Agreement), any guarantees, security agreements or other documents related thereto or any of the articles or by-laws of any of the Tervita Group, this Interim Order shall govern.

47. The Applicants are entitled at any time to seek leave to vary this Interim Order upon such terms and the giving of such notice as this Court may direct.

48. Leave is granted to file this Interim Order, the Second Kersley Affidavit, the Application, and the bench brief in support of this Application on the same day.

49. This Interim Order shall have full force and effect in all other Provinces and Territories of Canada and shall be enforced in the courts of each of the Provinces and Territories of Canada in the same manner in all respects as if this Interim Order had been made by the Court enforcing it.

50.   This Court requests the aid and recognition of any court or any judicial, regulatory or administrative body in any province in Canada and any judicial, regulatory or administrative tribunal or body or other court constituted pursuant to the Parliament of Canada, the legislature of any province and any court or any judicial, regulatory or administrative body of the United States, any state thereof or any other country in the aid of and to assist this Court in carrying out the terms of this Interim Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants as may be necessary or desirable to give effect to this Interim Order or to assist the Tervita Group and their respective agents in carrying out the terms of this Interim Order.

51.   A senior officer of one or more of the Applicants is hereby authorized, as necessary, to act as the representative or foreign representative (the "**Foreign Representative**") of any of the Applicants or other member of the Tervita Group in connection with these proceedings and with carrying out the terms of this Interim Order, for, among other things, the purpose of having these proceedings recognized in any other jurisdiction whether in or outside of Canada, as necessary. The Foreign Representative is hereby authorized to apply for foreign recognition of these proceedings, as necessary, in any jurisdiction outside of Canada.

**[The remainder of this page has been left intentionally blank]**

- 20 -

**Justice of the Court of Queen's
Bench of Alberta**

## SCHEDULE "A"

9894942 Canada Ltd.
Red Sky Holdings 1 Inc.
Red Sky Holdings 2 Inc.
Red Sky Holdings 3 Inc.
Hazco Industrial Services Ltd.
CCS International Holdings Inc.
Tervita Production Services Ltd.
Tervita Waste Processing Ltd.
Tervita Environmental Services Ltd.
Tervita Equipment Rentals Ltd.
Tervita Metal Services Ltd.
CCS Canada (Canadian Holdings) Inc.
Red Sky Finance LP
ARKLA Disposal Services, Inc.

# **EXHIBIT D**

**Second Kersley Affidavit**

Clerk's Stamp

| COURT FILE NUMBER | 1601 – 12176 |
|---|---|
| COURT | COURT OF QUEEN'S BENCH OF ALBERTA |
| JUDICIAL CENTRE | CALGARY |
| MATTER | IN THE MATTER OF SECTION 192 OF THE *CANADA BUSINESS CORPORATIONS ACT*, R.S.C. 1985, C. C-44, AS AMENDED |

AND IN THE MATTER OF A PROPOSED ARRANGEMENT IN RESPECT OF TERVITA CORPORATION, 9894942 CANADA LTD., RED SKY HOLDINGS 1 INC., RED SKY HOLDINGS 2 INC., RED SKY HOLDINGS 3 INC., CCS CANADA (CANADIAN HOLDINGS) INC., CCS INTERNATIONAL HOLDINGS INC., HAZCO INDUSTRIAL SERVICES LTD., TERVITA EQUIPMENT RENTALS LTD., TERVITA ENVIRONMENTAL SERVICES LTD., TERVITA METAL SERVICES LTD., TERVITA PRODUCTION SERVICES LTD., TERVITA WASTE PROCESSING LTD., AND ARKLA DISPOSAL SERVICES, INC.

| APPLICANTS | 9894942 CANADA LTD. AND TERVITA CORPORATION |
|---|---|
| RESPONDENT | Not Applicable |
| DOCUMENT | **AFFIDAVIT** |
| ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT | **OSLER, HOSKIN & HARCOURT LLP** |

Suite 2500, TransCanada Tower
450 – 1st Street SW
Calgary, AB T2P 5H1

| Solicitor: | Colin Feasby / Marc Wasserman / Michael De Lellis |
|---|---|
| Telephone: | (403) 260-7067 / (416) 862-4908 / (416) 862-5997 |
| Facsimile: | (403) 260-7024 / (416) 862-6666 |
| Email: | cfeasby@osler.com / mwasserman@osler.com / mdelellis@osler.com |
| File Number: | 1172771 |

**FASKEN MARTINEAU DUMOULIN LLP**

First Canadian Centre
350 7th Avenue SW, Suite 3400
Calgary, AB T2P 3N9

| Solicitor: | John Grieve / Travis Lysak |
|---|---|
| Telephone: | 403-261-5350 |
| Facsimile: | 403-261-5351 |
| Email: | jgrieve@fasken.com / tlysak@fasken.com |
| File Number: | 285302.00311 |

**AFFIDAVIT OF STEPHEN KERSLEY**

Affirmed on October 7, 2016

I, Stephen Kersley, of the City of Calgary, in the Province of Alberta, SWEAR AND SAY THAT:

1.          I am the Chief Financial Officer of Tervita Corporation ("**Tervita**"), a position that I have held since August 2015.  I swear this Affidavit in my capacity as an officer of Tervita.  Except as otherwise expressly stated, I have personal knowledge of the matters to which I depose in this Affidavit.  Where facts deposed to are stated to be based on information and belief, I believe such information to be true.  I am authorized to swear this Affidavit on behalf of Tervita and 9894942 Canada Ltd. ("**ArrangeCo**" and, together with Tervita, the "**Applicants**").  In preparing this Affidavit, I have reviewed the records, press releases, and public filings of the Applicants and have relied on various advisors of Tervita and other members of senior management of Tervita as necessary, and where I relied upon such information, I do believe such information to be true.  Neither the Applicants nor I intend to waive privilege by the affirming and filing of this Affidavit.

2.          This Affidavit is sworn in support of an application for: (i) an order (the "**Interim Order**") in substantially the same form as the draft Interim Order attached as **Exhibit "A"** to this Affidavit; and (ii) an order (the "**Secured Notes Hearing Order**") in substantially the same form as the draft Order (Secured Notes Hearing) attached as **Exhibit "B"** to this Affidavit.  This Affidavit is supplemental to my affidavit affirmed on September 14, 2016 (the "**First Kersley Affidavit**").

3.          Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the First Kersley Affidavit and in the draft management information circular of Tervita (the "**Information Circular**").

4.          Attached and collectively marked as **Exhibit "C"** to this Affidavit, are drafts of:

    (a)     the Information Circular (Exhibit "**C-1**");

    (b)     the Notices of Meetings of the Unsecured Noteholders, the Subordinated Noteholders, and the RSAC Shareholders, included in the Information Circular;

    (c)     the Unsecured Noteholders' Arrangement Resolution, the Subordinated Noteholders' Arrangement Resolution, and the RSAC Shareholders'' Arrangement Resolution, included in Appendix "A" to the Information Circular;

    (d)     the letter of transmittal for Unsecured Noteholders and Subordinated Noteholders;

(e)    the letter of transmittal for Secured Noteholders;

(f)    the Participation Form for Unsecured Noteholders;

(g)    the forms of proxy for use by registered the Unsecured Noteholders, the Subordinated Noteholders, and the RSAC Shareholders; and

(h)    the Plan of Arrangement, included in Appendix "C" to the Information Circular.

(collectively subparagraphs (a) – (h), the "**Meeting Materials**").

5.    This Affidavit will review the following matters:

(a)    Overview;

(b)    Background to the Arrangement

(c)    The Recapitalization and the Arrangement; and

(d)    The Interim Order, the Secured Notes Hearing Order, and the Relief Requested.

## I.    OVERVIEW

6.    This application is brought in support of an arrangement (the "**Arrangement**") pursuant to section 192 of the *Canada Business Corporations Act*, RSC 1985, c C-44, as amended (the "**CBCA**") involving the Tervita Group, the holders (the "**Unsecured Noteholders**") of Tervita's 9.75% senior unsecured notes due 2019 (the "**9.75% Unsecured Notes**") and 10.875% senior unsecured notes due 2018 (the "**10.875% Unsecured Notes**" and together with the 9.75% Unsecured Notes, the "**Unsecured Notes**"), the Unsecured Notes Trustee (as defined below), the holders (the "**Subordinated Noteholders**") of Tervita's 11.875% senior unsecured subordinated notes due 2018 (the "**Subordinated Notes**"), the Subordinated Notes Trustee (as defined below), the holders (the "**Secured Noteholders**") of Tervita's 8.00% senior secured notes due 2018 (the "**8.00% Secured Notes**") and 9.00% senior secured notes due 2018 (the "**9.00% Secured Notes**" and together with the 8.00% Secured Notes, the "**Secured Notes**", and together with the Unsecured Notes and the Subordinated Notes, the "**Notes**"), the Secured Notes US Trustee (as defined below), the Secured Notes Canadian Trustee (as defined below), Tervita's lenders (the "**Term Loan Lenders**") of its term loan facility due 2018 (the "**Term Loan Facility**" and together with the Secured Notes, the "**Secured Debt**"), the Term Loan Administrative Agent (as defined below), and the Existing Equity Holders (as defined below).  The Notes and the Term Loan Facility, together, are the "**Debt**".

7.          The Arrangement is part of a proposed recapitalization of Tervita's capital structure, as described below (the "**Recapitalization**"), and is structured to significantly reduce Tervita's debt load and accompanying annual interest payments.

8.          If so approved by the Court, Tervita will call, hold, and conduct meetings of the Unsecured Noteholders (the "**Unsecured Noteholders' Meeting**"), of the Subordinated Noteholders (the "**Subordinated Noteholders' Meeting**"), and of the holders (the "**RSAC Shareholders**") of the common shares (the "**RSAC Common Shares**") of Red Sky Acquisition Corp. ("**RSAC**") (the "**RSAC Shareholders' Meeting**" and together with the Unsecured Noteholders' Meeting and the Subordinated Noteholders' Meeting, the "**Meetings**"), all on or about November 30, 2016. The primary purpose of the Meetings is to provide the Unsecured Noteholders, the Subordinated Noteholders, and the RSAC Shareholders with the opportunity to consider and, if deemed advisable, to pass resolutions (the "**Unsecured Noteholders' Arrangement Resolution**", the "**Subordinated Noteholders' Arrangement Resolution**", and the "**RSAC Shareholders' Arrangement Resolution**", respectively) approving the Arrangement.    Copies of the Unsecured Noteholders' Arrangement Resolution, the Subordinated Noteholders' Arrangement Resolution, and the RSAC Shareholders' Arrangement Resolution are attached to the Information Circular at Appendix "A".    A copy of the plan of arrangement (the "**Plan of Arrangement**") is attached to the Information Circular at Appendix "C" and is attached as **Exhibit "D"**.

9.          Tervita has experienced a number of challenges over the past few years.    These challenges and Tervita's efforts to address those challenges are described in greater detail at paragraphs 111 to 141 of the First Kersley Affidavit.    In particular, because it serves the oil and gas industry, the decline in oil and gas prices and the resulting slowdown in the industry has materially reduced Tervita's revenues.

10.          Tervita's revenue was approximately CAD $5.527 billion in 2013 and approximately CAD $5.757 billion in 2014. Revenue fell to approximately CAD $2.823 billion in 2015 and is projected to fall to approximately CAD $2.040 billion in 2016. Despite Tervita's efforts to cut costs, its EBITDA has also fallen approximately three-fold since 2014, and Tervita has suffered losses of more than CAD $482 million since the start of 2014, after taking into account interest on long-term debt and depreciation. Tervita estimates that, by the end of 2016, it will have suffered losses of approximately CAD $550 million since the start of 2014. For 2014, Tervita's reported EBITDA was approximately CAD $292 million. For 2015, Tervita's reported EBITDA was approximately CAD $178 million. For 2016, Tervita's EBITDA is anticipated to be approximately CAD $110 million.

11.          As the slowdown increased, Tervita sought to cut costs through a material downsizing and centralization of its business, including significant workforce reductions and other cost-cutting measures. Although Tervita has significantly decreased its operating expenditures, the immediate problem is that its reduced revenue cannot support its long-term debt obligations of approximately CAD $2.5 billion.

## II.     BACKGROUND TO THE ARRANGEMENT

### A.     *Preliminary Interim Order*

12.          On September 14, 2016, the Applicants sought and received an order (the "**Preliminary Interim Order**") which, among other things, stayed any person from (i) terminating, accelerating, amending, or declaring in default or making any demand or taking any other enforcement steps under any guarantee or any security interest granted by any member of the Tervita Group in respect of the Notes, the Term Loan Facility, or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor, or (ii) referring to, relying on, or otherwise claiming any rights against any member of the Tervita Group under any contract, debt instrument or any other agreement with any member of the Tervita Group in respect of any alleged breach, default or event of default under the Notes, the Term Loan Facility, or any contract or other agreement to which any member of the Tervita Group is a party, borrower, or guarantor due to, among other things, the making of this Application pursuant to section 192 of the CBCA, taking any step in furtherance thereof, any member of the Tervita Group being a party to these proceedings or being party to the Arrangement, or any default or cross-default arising under the Notes or the Term Loan Credit Agreement (the "**Stay of Proceedings**").

13.          The Stay of Proceedings currently expires on October 14, 2016. A copy of the Preliminary Interim Order is attached as **Exhibit "E"**.

### B.     *Addition of ARKLA as a Party*

14.          As noted in the First Kersley Affidavit and in Exhibit "B" of the First Kersley Affidavit, ARKLA is an Arkansas corporation and is an indirect wholly-owned subsidiary of Tervita.

15.          ARKLA operates in the states of Arkansas and Louisiana and has its registered office at 300 Spring Building, Suite 900, Little Rock, Arkansas. ARKLA is a guarantor under the Credit Agreements and the Indentures. Given that the Plan of Arrangement involves and/or affects all of the Tervita Group's obligations under the Credit Agreements and Indentures, it is requested that ARKLA be added to these CBCA proceedings to ensure consistent treatment among the Tervita Group and finality for the entire Tervita Group with respect to the debt involved in the Plan of Arrangement. As used herein, "Tervita Group" shall be defined to include ARKLA.

- 6 -

C.    *Accommodation and Support Agreements*

16.        In order to finance Tervita's working capital requirements and other general corporate purposes and capital expenditures throughout these CBCA proceedings, Tervita and the Toronto-Dominion Bank, in its capacity as administrative agent under the Revolving Credit Agreement (the "**Revolver Administrative Agent**") have entered into an Accommodation Agreement (the "**Accommodation Agreement**"). The Accommodation Agreement will provide Tervita with continued availability to letters of credit under the Revolving Credit Facility, including the issuance and renewal thereof.

17.        Due to the commercially sensitive nature of the Accommodation Agreement, certain portions of the document have been redacted for confidentiality.  A redacted copy of the Accommodation Agreement is attached as **Exhibit "F"**.

18.        In September 2016, Tervita negotiated a transaction term sheet (the "**Term Sheet**") with certain holders that hold: (i) a material portion of the Term Loan Facility debt; (ii) a material portion of the Secured Notes; (iii) a material portion of the Unsecured Notes; and (iv) a material portion of the Subordinated Notes.  Certain of these holders, which hold Term Loan Facility debt, Secured Notes, and Unsecured Notes have agreed to provide additional capital to Tervita pursuant to the Term Sheet (collectively, the "**Plan Sponsors**") together with another holder of Unsecured Notes and Subordinated Notes (the "**Additional Backstop Party**") who has signed the Backstop Commitment Letter (as defined below).  A copy of the Term Sheet is attached as **Exhibit "G"**.

19.        As of October 7, 2016, Unsecured Noteholders (including the Plan Sponsors) holding approximately 67% of the aggregate outstanding principal amount of the Unsecured Notes, have entered into a support agreement (the "**Unsecured Noteholders Support Agreement**") pursuant to which they have agreed, subject to the terms and conditions thereof, to support the Recapitalization and vote all of their respective Unsecured Notes in favour of the Unsecured Noteholders' Arrangement Resolution at the Unsecured Noteholders' Meeting.

20.        As of October 7, 2016, Subordinated Noteholders (including the Plan Sponsors) holding approximately 90% of the aggregate outstanding principal amount of the Subordinated Notes, have entered into a support agreement (the "**Subordinated Noteholders Support Agreement**") pursuant to which they have agreed, subject to the terms and conditions thereof, to support the Recapitalization and vote all of their respective Subordinated Notes in favour of the Subordinated Noteholders' Arrangement Resolution at the Subordinated Noteholders' Meeting.

21.        In addition, as of October 7, 2016, RSAC Shareholders holding approximately 69% of the RSAC Shares, have entered into consent and support agreements (the "**Securityholders Consent and Support Agreements**" and collectively with the Unsecured Noteholders Support Agreement and the Subordinated Noteholders Support Agreement, the "**Support Agreements**") pursuant to which they have agreed, subject to the terms and conditions thereof, to support the Recapitalization and vote all of their respective RSAC Common Shares in favour of the Recapitalization to the extent that any such vote is required.

22.        Due to the commercially sensitive nature of the Support Agreements, certain portions of the documents have been redacted for confidentiality. Redacted copies of the Unsecured Noteholders Support Agreement, the Subordinated Noteholder Support Agreement, and the Securityholder Consent and Support Agreements are attached to the Information Circular at Appendix "B" and are **Exhibits "H", "I",** and **"J"**, respectively.

23.        As is described below, as part of the Recapitalization, Tervita will complete an offering (the "**New Investment**") of new common shares (the "**New Investment Shares**") for aggregate gross proceeds to Tervita of, up to, CAD $372 million.  The New Investment is fully-backstopped by the Plan Sponsors and the Additional Backstop Party, pursuant to the terms and conditions of a backstop commitment letter among Tervita, the Plan Sponsors and the Additional Backstop Party (the "**Backstop Commitment Letter**").  A copy of the Backstop Commitment Letter is attached to the Information Circular at Appendix "B" and is attached as **Exhibit "K"**.

## III.    THE RECAPITALIZATION AND THE ARRANGEMENT

### A.    *Summary of the Recapitalization*

24.        Tervita's debt obligations, which are described in greater detail at paragraphs 81 to 110 of the First Kersley Affidavit, currently consists of the following:

| | Maturity Date | Interest Rate | Approximate Balance Owing |
|---|---|---|---|
| **Secured Debt** | | | |
| Revolving Credit Facility | February 14, 2018 | 4.25% (LCS 4.5%) | CAD $144.7 million USD $9.0 million |

| Term Loan Facility* | May 15, 2018 | L+5% (1.25% floor) | USD $247 million |
|---|---|---|---|
| Secured Notes | November 15, 2018 | 8% | USD $665.2 million |
| | November 15, 2018 | 9% | CAD $205.3 million |
| **Unsecured Debt** | | | |
| 10.875% Unsecured Notes† | February 15, 2018 | 10.875% | USD $354.7 million |
| 9.75% Unsecured Notes | November 1, 2019 | 9.75% | USD $299.3 million |
| 11.875% Subordinated Notes | November 15, 2018 | 11.875% | USD $328.5 million |
| Intercompany Loan ("**PIK Debt**") | November 14, 2022 | 13% | CAD $1.1 billion |

25.         The Recapitalization contemplates that, in addition to the Arrangement described below, Tervita's Term Loan Facility and Secured Notes (other than such debt held by the Plan Sponsors as of the date of the Term Sheet) will be paid in full (without any early redemption payment or similar payments) and the Revolving Credit Facility will be refinanced on the effective date of the Arrangement (the "**Effective Date**").

26.         The Recapitalization is expected to substantially improve the capital structure and liquidity of Tervita by reducing the total amount of debt by approximately CAD $2.1 billion through the combination of the irrevocable exchange and cancellation of the Notes under the Arrangement and by providing approximately CAD $372 million (net of transaction costs), subject to the New Investment Adjustment, of new funds by virtue of the aggregate gross proceeds raised from the New Investment under the Arrangement.

27.         With a rebalanced capital structure, Tervita will benefit from a reduction of the annual cash interest expense of approximately CAD $200 million.  The debt reduction is also expected to improve

---

*          The debt owing under the Term Loan Facility and Secured Notes ranks *pari passu*.
†          The debt owing under the 10.875% Unsecured Notes and the 9.75% Unsecured Notes ranks *pari passu*.

Tervita's ability to access capital markets in the future. Accordingly, the Recapitalization will provide Tervita with increased liquidity, reduced financial risk and a more sustainable capital structure, thereby improving Tervita's overall financial strength and flexibility. The successful implementation of the Recapitalization is expected to be a significant positive step for Tervita in (i) improving its ability to manage the effects of the continuing low oil and natural gas price environment; and (ii) providing flexibility and working capital necessary to take advantage of future growth opportunities.

28.        The Recapitalization will result in a number of significant changes to the capital structure of Tervita and will be effected by way of the Arrangement pursuant to the steps outlined in the Plan of Arrangement.

## B.    *Summary of the Arrangement*

29.        The following will occur in relation to the Noteholders on the Effective Date:

(a)    The court-approved Plan of Arrangement under Section 192 of the CBCA pursuant to which, among other things, the following steps will occur:

(i)    the Secured Debt Instruments (other than Secured Debt Instruments held by Plan Sponsors as of September 14, 2016), will be repaid in full without any early redemption payments or similar payments. Accrued interest up to but excluding the Effective Date on the Secured Debt Instruments will be paid in cash except that accrued interest on the Secured Debt Instruments held by the Plan Sponsors as at September 14, 2016 shall be paid by the issuance of notes ("**Secured Interest Notes**");

(ii)    the creation of the following new classes of shares of Tervita (collectively, the "**New Shares**"):

A.    Class A voting preferred shares ("**New Class A Voting Preferred Shares**");

B.    Class B non-voting preferred shares ("**New Class B Non-Voting Preferred Shares**", and together with the New Class A Voting Preferred Shares, the "**New Preferred Shares**");

C.    Class A voting common shares ("**New Class A Voting Common Shares**"); and

- 10 -

   D.  Class B non-voting common shares ("**New Class B Non-Voting Common Shares**" and collectively with the New Class A Voting Common Shares, the "**New Common Shares**").

(iii)  Tervita, as consideration for the purchase for cancellation of the voting common shares of Tervita immediately prior to the Effective Time, will grant RSH3 the right to receive 20% of the net proceeds actually received by Tervita from the full and final determination or settlement from the litigation commenced by Tervita against Secure Energy Services Inc., among others, in Alberta Court of Queen's Bench Action No, 0701-13328 (the "**Secure Energy Litigation**") following the deduction of (i) all costs and expenses incurred by or on behalf of Tervita relating to the Secured Energy Litigation, including without limitation, all fees and expenses of legal counsel, advisors, and experts, and all out-of-pocket travel, filing, reproduction, and other costs, whenever incurred, (ii) any cash taxes payable in respect of such proceeds (or that would have been payable but for available sheltering as a result of Tervita's tax pools at the relevant time), and (iii) any amounts that may be payable by Tervita to any other party as a result of a counterclaim or otherwise in the Secure Energy Litigation;

(iv)  a fully-backstopped offering of up to 46,500,000 New Preferred Shares minus the number of any New Investment Adjustment Shares (as such term is defined in the Information Circular) (in consideration for aggregate gross proceeds of up to CAD $372 million minus any New Investment Adjustment to Unsecured Noteholders that are Eligible Unsecured Noteholders (the "**New Investment Offering**");

(v)  the issuance of 47,283,277 New Preferred Shares and the Additional Secured Exchange Shares (as defined in the Information Circular) by Tervita in consideration for the irrevocable exchange and transfer of all the Secured Debt (including any Secured Interest Notes issuable pursuant to (i) above) held by the Plan Sponsors as of September 14, 2016;

(vi)  the issuance of the number of New Common Shares required to be issued such that such New Common Shares will represent 80% of the New Common Shares (which will represent 2.0% of the New Shares) as at the Effective Date by Tervita in consideration for the irrevocable exchange and transfer of all of the Unsecured Notes. In addition, Unsecured Noteholders that are Eligible Unsecured

Noteholders will be entitled to subscribe for New Investment Shares (as set out in the Information Circular);

(vii)    as additional consideration for the irrevocable exchange and transfer of all of the Unsecured Notes, Tervita will also issue the number of New Common Shares required to be issued such that such New Common Shares will represent 20% of the New Common Shares (which will represent 0.5% of the New Shares) as at the Effective Date to Unsecured Noteholders that execute the Unsecured Noteholder Support Agreement on or before October 14, 2016;

(viii)    the payment of $20 million by Tervita to the Subordinated Noteholders in consideration for the irrevocable exchange and transfer of all of the Subordinated Notes;

(ix)    as additional consideration for the irrevocable exchange and transfer of all of the Subordinated Notes, Tervita will also pay $5 million to Subordinated Noteholders that execute the Subordinated Noteholder Support Agreement on or before October 14, 2016;

(x)    except for the purpose of facilitating the distributions under the Plan of Arrangement, the cancellation of the Secured Notes, the Unsecured Notes, Subordinated Notes, the Indentures,   and the Term Loan Facility and the irrevocable extinguishment and elimination of all of the debtholders' entitlements with respect to the Secured Notes, the Unsecured Notes, Subordinated Notes, the Indentures, and the Term Loan Facility;

(xi)    all Affected Existing Equity shall be terminated and cancelled and shall be deemed to be terminated and cancelled without the need for any repayment of capital thereof or any other liability, payment or compensation thereof and, for greater certainty, no Affected Existing Equity Holders shall be entitled to receive any interest, dividends, premium or other payment in connection therewith;

(xii)    the board of directors of Tervita (the "**Board**") upon implementation of the Recapitalization will be comprised of up to seven directors, one of which will be the Chief Executive Officer of Tervita. Each of the directors will be acceptable to the Plan Sponsors;

(xiii)    Tervita (or a subsidiary of Tervita) and ArrangeCo shall be amalgamated;

(xiv)    the issuance of new debt in an amount of $475 million on terms and conditions acceptable to Tervita and the Plan Sponsors;

(xv)    the Revolving Credit Facilities will be unaffected by the Arrangement; however, it is a condition to the Recapitalization that the Revolving Credit Agreement be either reinstated or replaced on terms acceptable to Tervita and the Majority Initial Supporting Parties (as defined in the Information Circular), each acting reasonably; and

(xvi)    the PIK Debt held by Red Sky Finance LP under the Subordinated Note dated November 14, 2007, as amended, will be transferred to a subsidiary of Tervita for nominal consideration, as more fully described in the Plan of Arrangement.

30.        Pursuant to the Arrangement, all obligations under the Notes and the Indentures will be discharged in full on the Effective Date.

<u>Treatment of Other Obligations</u>

31.        Tervita's trade debt generally will all continue to be paid or satisfied in the ordinary course.

**C.    *The Secured Notes Redemption Payment***

32.        Consistent with the Term Sheet, the Plan of Arrangement contemplates the Secured Noteholders being paid principal and interest in full, but not any early redemption payments or similar payments.

33.        On September 29, 2016, counsel for certain Secured Noteholders wrote to counsel for Tervita asking questions regarding the Plan of Arrangement, including with respect to the treatment of Secured Noteholders, whether Secured Noteholders would be entitled to vote on the Plan of Arrangement, and the manner in which any early redemption payments or similar payments potentially owing under the Secured Notes will be treated (the "**Secured Noteholder Letter**").  The Secured Noteholder Letter is attached as **Exhibit "L"**.  On October 5, 2016, counsel for Tervita responded to the Secured Noteholder Letter, a copy of which response is attached as **Exhibit "M"**.

34.             Tervita has reserved time on November 29, 2016 on the Commercial List for the matter of the redemption payment to be considered by way of a summary hearing. The question that Tervita will ask the Court to decide is as follows:

(a)    On the Effective Date (as defined in the Plan of Arrangement), may Tervita satisfy all obligations owing pursuant to the Secured Indenture and all obligations owing to the Secured Note Trustees and the Secured Noteholders by paying the full principal amount of the Secured Notes plus accrued and unpaid interest to the Effective Date without paying an additional redemption payment or similar payment (the "**Secured Notes Order**")?

35.             Tervita will ask the Court for the Secured Notes Hearing Order which provides for the following terms:

(a)    The hearing shall proceed on the basis of affidavit evidence only and no *viva voce* evidence shall be permitted without a further order of this Court;

(b)    Tervita shall file any additional affidavit evidence, including affidavits by experts, that it intends to rely upon beyond the First Kersley Affidavit and Second Kersley Affidavit on or before November 4, 2016;

(c)    Tervita shall provide notice of the hearing by delivering an electronic copy of the Interim Order to Equity Financial Trust Company, in its capacity as Canadian trustee under the Secured Notes Indenture (the "**Secured Notes Canadian Trustee**"), Wells Fargo Bank, National Association, in its capacity as U.S. trustee under the Secured Notes Indenture (the "**Secured Notes US Trustee**") and to any other party who requests to receive notice;

(d)    Any parties who support Tervita on the hearing shall file materials by November 10, 2016;

(e)    The Secured Notes Canadian Trustee and the Secured Notes US Trustee (collectively, the "**Secured Notes Trustees**") shall file any affidavit evidence, including affidavits by experts, upon which they intend to rely on or before November 10, 2016;

(f)    Tervita shall file rebuttal affidavit evidence upon which it intends to rely on or before November 17, 2016;

(g)    Parties filing affidavit evidence shall make affiants available on 72 hours' notice for questioning on affidavit at such place as the Applicants may agree. Any questioning on

affidavit shall be completed no later than November 15, 2016. The cost of such witnesses' travel and accommodation expenses shall be initially borne by the party producing such witness for questioning, subject to this Court's ultimate discretion to award costs at the conclusion of the hearing for the Secured Notes Order;

(h)     Each affiant may be questioned on affidavit for a maximum of three (3) hours;

(i)     Tervita and the Secured Notes Trustees shall file any written argument upon which they intend to rely on or before November 23, 2016; and

(j)     Any interested parties shall file any written argument supportive of either position upon which they intend to rely on or before November 24, 2016.

**D.     *The Support Agreements***

Unsecured Noteholders Support Agreement

36.     Pursuant to the Unsecured Noteholders Support Agreement, each Unsecured Noteholder Support Group Member (including the Plan Sponsors) has agreed, among other things:

(a)     to vote all of its Debt (as defined in the Unsecured Noteholders Support Agreement) and Relevant Equity Securities (if any) in favour of the Recapitalization and the Plan of Arrangement;

(b)     to affirmatively support Tervita, if necessary, in obtaining from the Court the approval of the Plan of Arrangement and the Final Order in respect thereof;

(c)     not to accelerate or enforce or take any action or initiate any proceeding to accelerate or enforce the payment or repayment of its Debt (including for greater certainty any due and unpaid interest on its Relevant Debt Instruments), whether against any Tervita Entity or any property of any of them, other than filing claims in the Proceedings; and

(d)     not to sell, assign, pledge, hypothecate or otherwise transfer (in each case, a "**Transfer**") any Relevant Debt Instruments or Relevant Equity Securities (if any), as applicable.

37.     Support pursuant to the Unsecured Noteholders Agreement is conditional on, among other things:

(a)     Tervita pursuing the completion of the Recapitalization through the Plan of Arrangement in good faith and using commercially reasonable efforts;

(b)     the Subordinated Noteholders Support Agreement, the Securityholders Consent and Support Agreement and the Backstop Commitment Letter continuing to be in full force and effect and not having been terminated;

(c)     there being no Material Adverse Effect; and

(d)     Tervita obtaining the Secured Notes Order and the Final Order by December 15, 2016 and the Recapitalization being completed by December 31, 2016 (unless extended).

Subordinated Noteholders Support Agreement

38.     Pursuant to the Subordinated Noteholders Support Agreement, each Subordinated Noteholder Support Group Member has agreed, among other things:

(a)     to consent to the Recapitalization substantially on the terms set out in the Term Sheet;

(b)     to vote (or cause to be voted) all of its Subordinated Notes and Relevant Equity Securities (if any), in favour of the approval, consent, ratification and adoption of the Recapitalization and the Plan of Arrangement;

(c)     to support Tervita in obtaining approval of the Recapitalization and the Plan of Arrangement by the Court; and

(d)     not to sell, transfer or assign any of its Subordinated Notes or Relevant Equity Securities (if any) or any interest therein.

39.     Support pursuant to the Subordinated Noteholders Agreement is conditional on, among other things, the Recapitalization and the Plan of Arrangement providing for the releases contemplated in the Term Sheet, the cash payment of $20 million, and early consent cash payment of $5 million to certain Subordinated Noteholders who execute the Subordinated Noteholders Agreement on or before October 14, 2016.

Securityholders Consent and Support Agreement

40.          Pursuant to the Securityholders Consent and Support Agreement, each Securityholder Consent and Support Group Member has agreed, among other things:

(a)          to consent to the Recapitalization substantially on the terms set out in the Term Sheet;

(b)          to vote (or cause to be voted) all of its RSAC Common Shares, in the event a vote of the RSAC Shareholders is required or to vote (or cause to be voted) all of its Red Sky Holdings LP Interests, in the event a vote of the limited partners of RSH LP is required in connection with the Recapitalization or the Plan of Arrangement, in favour of the approval, consent, ratification and adoption of the Recapitalization and the Plan of Arrangement;

(c)          to support Tervita and its affiliates in obtaining approval of the Recapitalization and the Plan of Arrangement by the Court and all other applicable orders in connection therewith on terms consistent with the Recapitalization Term Sheet;

(d)          not to sell, transfer or assign any of its RSAC Shares or RSH LP Interests or any interest therein.

Backstop Commitment Letter

41.          As contemplated by the Unsecured Noteholders Support Agreement and pursuant to the Backstop Commitment Letter, each Plan Sponsor has agreed to purchase its Backstop Pro Rata Share of the Backstopped Shares and the Additional Backstop Party has agreed to purchase the Additional Backstop Commitment (collectively, the "**Primary Backstop Commitment**").

42.          In consideration of the Backstop Commitment Letter, Tervita has agreed to pay to the Backstop Parties, a non-refundable cash commitment fee ("**Commitment Fee**") in an amount equal to the New Investment Share Subscription Price for 1,860,000 New Preferred Shares, payable on the Effective Time.  The Commitment Fee is not payable if the Recapitalization is not completed.

43.          Pursuant to the terms of the Backstop Commitment Letter, if any member of the Tervita Group accepts, enters into or files a pleading seeking approval of a Superior Proposal (as defined in the Unsecured Noteholders Support Agreement), Tervita has agreed to pay (or cause the third party making such Superior Proposal to pay) to the Backstop Parties (other than any defaulting Backstop Parties) a "**Break Fee**".  The Break Fee is to be calculated in accordance with the terms set forth in the Backstop Commitment Letter.

44.        The Backstop Commitment Letter shall automatically terminate on the earliest of (a) 12:01 a.m. (Calgary time) (the "**Effective Time**") on the Effective Date, (b) termination of the Unsecured Noteholders Support Agreement, and (c) December 31, 2016 (the "**Outside Date**").

Conditions Precedent

45.        The implementation of the Plan of Arrangement is conditional upon the following, among other things:

(a)    The approval of the Plan of Arrangement and the Arrangement Resolutions at the Meetings in accordance with the Interim Order;

(b)    The granting of a final order (the "**Final Order**") in this Application by December 15, 2016 and the Final Order being recognized in a recognition proceedings pursuant to applicable law in the United States (Tervita intends to commence these recognition proceedings in the near term);

(c)    The granting of the Secured Notes Order by December 15, 2016, confirming that no early redemption payment or similar payment is payable to the Secured Noteholders;

(d)    All conditions set out in the Unsecured Noteholders Support Agreement having been satisfied or waived, and the Unsecured Noteholders Support Agreement not having been terminated;

(e)    All conditions set out in the Backstop Commitment Letter having been satisfied or waived, including the requirement that the results of any due diligence in respect of the Tervita Group (including business, financial and tax due diligence) be satisfied by October 13, 2016 and the Backstop Commitment Letter not having been terminated; and

(f)    There being no material claims against ArrangeCo.

Employee Equity Plans

46.        In 2007, in order to enable Tervita employees to participate in owning equity in Tervita, Tervita established two employee equity plans, the CCS Employee Unit Ownership Plan (the "**EUOP**") and the CCS Enhanced Return Employee Unit Ownership Plan (the "**EERUOP**" and, together with the EUOP, the "**Employee Equity Plans**").

47.         Under the Employee Equity Plans, employees could elect to invest in units ("**Trust Units**")
of the CCS Employee Trust (the "**Trust**"), which in turn would invest the proceeds received in shares of a
holding company of Tervita. The Trust Units could be redeemed in whole or in part at the request of an
employee or former employee (collectively, "**participants**") up to once annually. Redemptions would be
effected at the current value at the date of the request for redemption.

48.         Certain Tervita holding companies and the Trust have the right (but not the obligation) to
redeem the participants' Trust Units for cash at the value ascribed to the Trust Units. Funding for these cash
redemptions was provided to the Tervita holding companies by Tervita. However, over time, redemption
requests were made in excess of certain limitations contained in the Employee Equity Plans, and a list of
unsatisfied requests as of the dates thereof has been maintained.

49.         At a meeting of the Board on May 27, 2016, all funding for redemptions was suspended in
order to avoid violating corporate law restrictions, as contemplated by the terms of the Employee Equity
Plans, and to preserve Tervita's assets in the best interests of Tervita, including having regard to its
obligations to its lenders. Tervita is in early stage discussions with the Plan Sponsors to consider alternative
arrangements for employees and former employees who hold Trust Units, given the contemplated treatment
of equity in the Plan of Arrangement. The Plan Sponsors have to date made no assurances in this regard.

50.         Pursuant to the terms of certain unanimous shareholders agreements and trust agreements,
Tervita has been delegated the authority to support the Plan of Arrangement on behalf of the Trust.

## E.    *Approval of the Arrangement and Recapitalization*

51.         The Board has determined that the Arrangement and the Recapitalization are in the best
interests of Tervita and has passed a resolution approving the Arrangement (the "**Board Resolution**") on
October 6, 2016.

52.         In passing the Board Resolution, the Board was provided with, and relied on, a CBCA
Opinion and a Fairness Opinion (collectively, the "**Barclays Opinions**") issued by Barclays Capital Canada
Inc. ("**Barclays**"). The Barclays Opinions were provided orally at the meeting of the Board held on
September 14, 2016 and, subsequently confirmed in writing effective on October 6, 2016.

53.         The Barclays Opinions state that:

(a)      the Unsecured Noteholders, the Subordinated Noteholders and the holders (the "**Existing
         Shareholders**") of Existing Common Shares would each be in a better financial position

under the Recapitalization than if Tervita were liquidated, as in each case, the estimated aggregate value of the consideration available to the Unsecured Noteholders, the Subordinated Noteholders and the Existing Shareholders, respectively, pursuant to the Recapitalization would, in the opinion of Barclays exceed the estimated value such Unsecured Noteholders, Subordinated Noteholders and Existing Shareholders would receive in a liquidation, respectively; and

(b)     Barclays is of the opinion that the Recapitalization, if implemented, would be fair, from a financial point of view, to Tervita.

54.     Copies of the Barclays Opinions are appended to the Information Circular.

55.     In deciding to approve the Board Resolution, the Board also considered other factors, including, among other things:

(a)     the challenging set of circumstances that Tervita has been faced with over the past several years;

(b)     the challenges faced by Tervita to service and repay existing debt considering the reduction of available credit;

(c)     the various alternatives Tervita has explored to address its financial situation, including a sale of some or all of the company's assets, additional capital raising opportunities, other accretive transactions and a restructuring under the *Companies' Creditors Arrangement Act* ("**CCAA**");

(d)     the fact that the terms of the Recapitalization are the result of arm's length negotiations among management and the Board with support from their professional advisors, the Debtholder Support Group and Plan Sponsors;

(e)     the likely consequences of a failure to pursue the Recapitalization;

(f)     the strategic significance and benefits of the Recapitalization, including the reduction of Tervita's net debt and annual cash debt service costs and the commitment of additional capital to enable the company to invest in and maintain its ongoing operations;

(g)     the advice Tervita has received from Barclays;

(h)      the Barclays Opinions;

(i)      the fact that the Recapitalization will not directly affect any of Tervita's employees or trade
obligations;

(j)      the fact that holders of more than 63% of the principal amount of the Unsecured Notes,
69% of the equity holders of Tervita, and 90% of the principal amount of the Subordinated
Notes have indicated they are supportive of the Recapitalization;

(k)      the fact that Tervita's secured debtholders will be paid all principal and interest owing to
them;

(l)      the fact that that a restructuring under the CCAA would likely result in worse recoveries
for all of Tervita's stakeholders than under this consensual restructuring proceeding and
would involve considerable time and expense; and

(m)      the fact that the Recapitalization represents the best going concern solution available to
Tervita.

56.      The Board reviewed the terms of the Recapitalization with Tervita's management and
considered the views of management and Barclays as to the anticipated financial conditions of Tervita both
with and without giving effect to the proposed Recapitalization.

57.      The Board also received, and considered, advice from Tervita's legal counsel, Fasken
Martineau DuMoulin LLP and Osler, Hoskin & Harcourt LLP, and the Board's legal counsel, Stikeman
Elliott LLP, and from Tervita's financial advisor, Barclays.

**F.**      *Arrangement within the Meaning of s. 192 of the CBCA*

58.      I am advised by counsel for the Applicants, and do believe, that, as CBCA incorporated
companies, Tervita and ArrangeCo are permitted to apply to this Court under section 192 of the CBCA for
an order approving an arrangement and that the Arrangement qualifies as an "arrangement" within the
meaning of subsection 192(1)(c) of the CBCA as it: (a) involves the amalgamation of a CBCA incorporated
company with another company incorporated under the CBCA or under another corporate statute; (b)
involves the exchange of securities for cash and/or other securities.

## G.    *Practicability*

59.         The Arrangement is to be effected in conjunction with a number of interrelated steps, including the simultaneous cancellation and extinguishment of the Notes for either cash or a combination of securities and cash.

60.         For the reasons set out below, amongst others, and based on the advice of Tervita's counsel, I believe that it is impracticable for the Arrangement to be effected under any other provision of the CBCA:

(a)    the particular steps set forth in the Arrangement (including the specified sequence thereof) are required to achieve certain objectives that cannot practicably be achieved through other transaction structures with the degree of certainty required by Tervita. The Arrangement will ensure that the Existing Equity and the Notes will be dealt with finally and conclusively. Without that certainty, there can be no assurance that Tervita would be able to carry out the Recapitalization on terms comparable to those offered under the Arrangement;

(b)    the Recapitalization, and in particular the cancellation of the Notes contemplated in the Recapitalization, cannot be achieved without the Honourable Court's order approving the Arrangement unless Tervita has the unanimous support of all the holders of Notes. It is impractical and likely impossible in the circumstances to otherwise obtain unanimous support to the Recapitalization in the timeframe necessary;

(c)    while it may be technically possible for certain steps of the Recapitalization set forth in the Arrangement to be effected otherwise than pursuant to an arrangement under Section 192 of the CBCA, no alternative structure affords the ability to execute the varied steps provided thereunder among and between multiple parties and in a pre-determined sequence without incurring significant uncertainty, commercial risk and logistical complication. Moreover, it is necessary to complete the Recapitalization in a short period of time, which is only possible if the Recapitalization is effected through an Arrangement; and

(d)    the implementation of the Recapitalization by way of Arrangement allows for transactional efficiency through a Court-supervised single step transaction that avoids additional time and steps that would be required were the transaction to proceed in another manner.

61.         I am informed by Latham & Watkins LLP ("**Latham**"), U.S. counsel to Tervita, that the Securities Act of 1933, as amended, of the United States of America (the "**1933 Act**"), provides, in Section

3(a)(10) thereof, an exemption from registration under the 1933 Act for "any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests…where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court…expressly authorized by law to grant such approval".

62.        I am informed by Latham that Tervita intends to use the Final Order of this Honourable Court approving the Arrangement, if granted, as the basis for an exemption from the registration requirements of the 1933 Act, pursuant to Section 3(a)(10), with respect to the distribution of New Shares in exchange for Unsecured Notes.

**H.    *Solvency***

63.        As detailed in the First Kersley Affidavit, Tervita has a viable business, significant cash reserves and a significant asset base. Tervita is able to pay its regular operating costs as they become due.

64.        Tervita, however, cannot service its capital structure and if repayment of all, or a significant portion, of its capital structure becomes immediately due and payable without the benefit of a stay of proceedings, Tervita will be unable to meet its obligations.  Further, a liquidation of Tervita's assets will not generate sufficient proceeds to satisfy all amounts owing to the members of Tervita's capital structure. Accordingly, if the Arrangement or another alternative transaction to address Tervita's capital structure is not completed and repayment of all debts owing under the capital structure become immediately payable without the benefit of a stay of proceedings, Tervita will be unable to service its obligations as they become due.

65.        The successful implementation of the Arrangement is expected to be a significant positive step in assisting Tervita in restructuring its capital structure and stabilizing its financial position.  But for its capital structure, Tervita is well-positioned to succeed going forward.  Upon completion of the Plan of Arrangement and the Recapitalization, Tervita will be able to pay its liabilities as they become due, its realizable value will be greater than the aggregate of its liabilities and stated capital, and Tervita will be a solvent entity.  Furthermore, ArrangeCo is, and will continue to be, solvent.

**I.    *Notice to the Director***

66.        I am advised by counsel for the Applicants that, in accordance with s. 192(5) of the CBCA, the CBCA Director has been given notice of the within application for the Interim Order, and has been provided with draft copies of the Information Circular, Plan of Arrangement, Interim Order, the Secured

Notes Hearing Order, and this Affidavit. Attached as **Exhibit "N"** is a copy of the email to the CBCA Director sent on October 6, 2016.

### J.    *Key Dates and Events*

67.         The key dates in connection with the Arrangement and the Recapitalization and their proposed dates are summarized in the table below:

| Event | Date |
|-------|------|
| Interim Order for advice and directions regarding the Plan of Arrangement | October 14, 2016 |
| Record date to establish right to vote at the Meetings | October 14, 2016 |
| Mailing of Meeting materials | October 24, 2016 |
| Proxy voting cut-off date | November 28, 2016 |
| Secured Notes Order hearing date | November 29, 2016 |
| Meetings | November 30, 2016 |
| Final Order hearing date | December 6, 2016 |
| Implementation of the Arrangement | As soon as practicable after Final Order, but in any event on or before December 31, 2016 |

### IV.    THE INTERIM ORDER

68.         The Interim Order sought in this application is based on the Alberta Template Interim Order. A copy of the draft Interim Order is found at Exhibit "A" to this Affidavit and a blackline to the Alberta Template Interim Order is found at **Exhibit "O"** to this Affidavit.

### A.    *The Meetings*

69.         The Applicants propose that the record date for determining the Unsecured Noteholders, the Subordinated Noteholders, and the RSAC Shareholders entitled to receive the Meeting Materials be 5:00 p.m. (Calgary time) on October 14, 2016 (the "**Voting Record Date**").

70.         Notice of the Meetings will be effected by Tervita sending the Meeting Materials to the registered Unsecured Noteholders, Subordinated Noteholders and RSAC Shareholders by pre-paid first class or ordinary mail, by courier or by delivery in person, addressed to each such holder at his, her or its

address as shown on the books and records of Unsecured Notes Trustee, Subordinated Notes Trustee or the Tervita Group, respectively, as of the Record Date, not later than 21 days prior to the date of the Meetings.

71.        Quorum for the Meetings is proposed as follows:

(a)    The Unsecured Noteholders' Meeting: Two or more Unsecured Noteholders present in person or represented by proxy and representing at least 25% of the principal amount of the outstanding Unsecured Notes entitled to vote at the Unsecured Noteholders' Meeting;

(b)    The Subordinated Noteholders' Meeting: Two or more Subordinated Noteholders present in person or represented by proxy and representing at least 25% of the principal amount of the outstanding Subordinated Notes entitled to vote at the Subordinated Noteholders' Meeting; and

(c)    The RSAC Shareholders' Meeting: Two or more RSAC Shareholders present in person or represented by proxy and holding over 50% of the RSAC Shares entitled to vote at the RSAC Shareholders' Meeting.

72.        Approval requirements of the Arrangement Resolutions are proposed as follows:

(a)    The Unsecured Noteholders' Meeting: the Unsecured Noteholders' Resolution must be passed by the affirmative vote of Unsecured Noteholders representing at least 66⅔% of the value of the Unsecured Notes held by the Unsecured Noteholders present in person or represented by proxy and voting at the Unsecured Noteholders' Meeting;

(b)    The Subordinated Noteholders' Meeting: the Subordinated Noteholders' Resolution must be passed by the affirmative vote of Unsecured Noteholders representing at least 66⅔% of the value of the Subordinated Notes held by the Subordinated Noteholders present in person or represented by proxy and voting at the Subordinated Noteholders' Meeting; and

(c)    The RSAC Shareholders' Meeting: the Shareholders' Resolution must be passed by the affirmative vote of RSAC Shareholders, present in person or represented by proxy and voting at the RSAC Shareholders' Meeting, representing at least 53.6% of the RSAC Shares. Pursuant to the terms of the Unanimous Security Holders' Agreement (appended as Exhibit "W" to the First Kersley Affidavit), the Recapitalization requires Special Security Holder Approval (as defined in the Unanimous Security Holders' Agreement) at the RSAC Shareholders' Meeting, Special Security Holder Approval under the Unanimous

Security Holders' Agreement requires approval of at least 53.6% of the outstanding shares of Red Sky Acquisition Corp.

73.        The draft forms of proxy to be sent to the eligible Unsecured/Subordinated Noteholders and the RSAC Shareholders are included in the Information Circular.

**B.    *Stay of Proceedings***

74.        The Interim Order includes a provision extending the Stay of Proceedings until and including the earlier of: (a) the Effective Date; (b) seven days after the termination of the Unsecured Noteholders Support Agreement; or (c) seven days after the termination of the Backstop Commitment Letter, which will ensure that the Stay of Proceedings is in place through the Meetings.

75.        The proposed Stay of Proceedings is necessary to permit Tervita to complete the Recapitalization and the Arrangement without any risk that any party will frustrate the Recapitalization by purporting to take any enforcement action with respect to any of the Notes, or any other contract that may include an "Event of Default" provision related to the Notes. The proposed Stay of Proceedings is intended to have the minimum impact on others' rights as is necessary to permit the Recapitalization to be completed.

76.        The extension of the Stay of Proceedings provides Tervita with the stability needed to finalize the Arrangement and the Recapitalization on terms that are fair and reasonable to Tervita and its stakeholders and is necessary in order to complete the Arrangement.

**V.    OTHER MATTERS**

77.        If Tervita is unable to obtain the requisite votes and approvals in favour of the Arrangement or the applicable orders of this Honourable Court by the deadlines set forth in the Support Agreements and the Backstop Commitment Letter or is unable to complete the Recapitalization through a plan of arrangement under the CBCA process, Tervita may have no choice but to seek relief under the CCAA (or any such other proceeding under any corporate arrangement, reorganization, restructuring, insolvency or similar law of any jurisdiction now or hereafter in effect, for the relief from or otherwise affecting creditors, including without limitation, under the *Bankruptcy and Insolvency Act* or the United States Bankruptcy Code) in order to implement the Recapitalization.

AFFIRMED BEFORE ME at Calgary, Alberta )
this 7th day of October, 2016. )
                                )
**Nathan A. White** )
Student-at-Law )
_____ )
A Commissioner for Oaths in and for Alberta )    Stephen Kersley

**Exhibit A to the Second Kersley Affidavit**

**Interim CBCA Order**

*See Exhibit C of this Foreign Representative Declaration*

## Exhibit B to the Second Kersley Affidavit

### Secured Notes Hearing Order

*This Exhibit is Omitted, but Available Upon Request*

## **Exhibit C to the Second Kersley Affidavit**

### **Information Circular**

OSLER DRAFT: OCTOBER 7, 2016



**NOTICE OF MEETING OF HOLDERS OF**

**9.75% SENIOR UNSECURED NOTES DUE 2019**
**10.875% SENIOR UNSECURED NOTES DUE 2018**

and

**NOTICE OF MEETING OF HOLDERS OF**

**11.875% SENIOR UNSECURED SUBORDINATED NOTES DUE 2018**

**OF**

**TERVITA CORPORATION**

**AND NOTICE OF MEETING OF SHAREHOLDERS OF**

**RED SKY ACQUISITION CORP.**

**and**

**MANAGEMENT INFORMATION CIRCULAR**

**With Respect to a Proposed**

**PLAN OF ARRANGEMENT**

**and**

**RECAPITALIZATION**

**OCTOBER 14, 2016**

**These materials are important and require your immediate attention. They require Tervita Corporation's unsecured noteholders and unsecured subordinated noteholders and Red Sky Acquisition Corp.'s shareholders to make important decisions. If you are in doubt as to how to make such decisions, please contact your financial, legal or other professional advisors. If you have any questions or require more information with regards to voting your notes or your shares, please contact our information agent, Kingsdale Shareholder Services by telephone at 1-866-851-2484 (toll-free within Canada or the United States) or 1-416-867-2272 (for calls outside Canada and the United States) or by email at contactus@kingsdaleshareholder.com.**

The New Investment Shares (as defined herein) have not been registered under the U.S. Securities Act of 1933, as amended (the "**U.S. Securities Act**"), or any state securities laws and may not be offered or sold in the United States or to, or for the account or the benefit of, U.S. Persons (as defined in Regulation S under the U.S. Securities Act) unless pursuant to an exemption from the registration requirements of such laws.  Hedging transactions with respect to such New Investment Shares may not be conducted unless in compliance  with the U.S. Securities Act.



October 14, 2016

**To the Holders of:**       **9.75% Senior Unsecured Notes due 2019**
**10.875% Senior Unsecured Notes due 2018**
**11.875% Senior Unsecured Subordinated Notes due 2018**
**of Tervita Corporation ("Tervita")**

**And to the Holders of:**   **Common Shares of Red Sky Acquisition Corp. ("RSAC")**

In response to the low commodity price environment, Tervita has been focused on improving operations and efficiencies and has made significant cost cuts throughout the organization. However, Tervita's significant debt burden and debt service costs have continued to put pressure on Tervita's business. A reduction in outstanding indebtedness and corresponding interest expense is necessary in order to preserve Tervita's assets and operations and position Tervita to take advantage of future growth opportunities.

Over the past several months, Tervita has participated in extensive discussions with certain holders of its 8.00% senior secured notes due 2018 (the "**8.00% Secured Notes**"), 9.00% senior secured notes due 2018 (the "**9.00% Secured Notes**" and together with the 8.00% Secured Notes, the "**Secured Notes**"), 9.75% senior unsecured notes due 2019 (the "**9.75% Unsecured Notes**"), 10.875% senior unsecured notes due 2018 (the "**10.875% Unsecured Notes**" and together with the 9.75% Unsecured Notes, the "**Unsecured Notes**") and 11.875% senior unsecured subordinated notes due 2018 (the "**Subordinated Notes**" and together with the Unsecured Notes, the "**Unsecured/Subordinated Notes**") and its lenders under its term loan facility due 2018 (the "**Term Loan Facility**" and together with the Secured Notes, the "**Secured Debt**") and revolving credit facilities due 2018 (the "**Revolving Credit Facilities**") with a view to structuring a series of transactions (the "**Recapitalization**") as a means by which Tervita can substantially reduce its debt and the costs associated with servicing its debt, while improving its available liquidity in a consensual process. The proposed Recapitalization, as more particularly described in the accompanying management information circular (the "**Information Circular**"), has evolved from those discussions. Management and the board of directors of Tervita believe that the Recapitalization is in the best interest of Tervita.

The Recapitalization contemplates the following key elements:

(a)     a court-approved plan of arrangement (the "**Plan of Arrangement**") under Section 192 of the *Canada Business Corporations Act* (the "**CBCA**") pursuant to which, among other things, the following steps will occur:

(i)      the Secured Debt Instruments (other than Secured Debt Instruments held by Plan Sponsors (as defined below) as of September 14, 2016, will be repaid in full without any early redemption payments or similar payments. Accrued and unpaid interest up to and including the Effective Date on the Secured Debt Instruments will be paid in cash except that accrued and unpaid interest on the Secured Debt Instruments held by the Plan Sponsors will be paid by the issuance of notes ("**Secured Interest Notes**");

(ii)     the creation of the following new classes of shares of Tervita (collectively, the "**New Shares**"):

(A)    Class A voting preferred shares ("**New Class A Voting Preferred Shares**");

(B)    Class B non-voting preferred shares ("**New Class B Non-Voting Preferred Shares**", and together with the New Class A Voting Preferred Shares, the "**New Preferred Shares**");

(C)    Class A voting common shares ("**New Class A Voting Common Shares**"); and

(D)    Class B non-voting common shares ("**New Class B Non-Voting Common Shares**" and collectively with the New Class A Voting Common Shares, the "**New Common Shares**").

(iii)    the irrevocable exchange and cancellation of all existing equity of Tervita, including any options, securities or other rights that are convertible or exchangeable into shares in the capital of Tervita (the "**Existing Tervita Equity**").  As more particularly described in the Information Circular, Tervita, as consideration of the cancellation of the common shares of Tervita, will grant the holder of its common shares, the right to receive 20% of the net proceeds actually received by Tervita from the full and final determination or settlement from Tervita's litigation claim against Secure Energy Services Inc. after deduction of all costs, taxes and any amounts that may be payable by Tervita to any other party as a result of a counterclaim or otherwise in the Secure Energy Services Inc. litigation;

(iv)    a fully-backstopped offering of up to 46,500,000 New Preferred Shares minus the number of any New Investment Adjustment Shares and Additional Backstop Commitment Shares (as such terms are defined in the Information Circular) (in consideration for aggregate gross proceeds of up to $372 million minus any New Investment Adjustment and Additional Backstop Commitment Amount, as such terms are defined in the Information Circular) to holders of Unsecured Notes ("**Unsecured Noteholders**" or individually an "**Unsecured Noteholder**") that are Eligible Unsecured Noteholders (as defined below) (the "**New Investment Offering**");

(v)    the issuance of 47,293,553 New Preferred Shares and the Additional Secured Exchange Shares (as defined in the Information Circular) by Tervita in consideration for the irrevocable exchange and transfer of all the Secured Debt (including any Secured Interest Notes issuable pursuant to (i) above) held by the Plan Sponsors as of September 14, 2016;

(vi)    the issuance of the number of New Common Shares required to be issued such that such New Common Shares will represent 80% of the New Common Shares (which will represent 2.0% of the New Shares) as at the Effective Date by Tervita in consideration for the irrevocable exchange and transfer of all of the Unsecured Notes. In addition, holders of Unsecured Notes will be entitled to subscribe for New Investment Shares (as set out in the Information Circular);

(vii)    as additional consideration for the irrevocable exchange and transfer of all of the Unsecured Notes, Tervita will also issue the number of New Common Shares required to be issued such that such New Common Shares will represent 20% of the New Common Shares (which will represent 0.5% of the New Shares) as at the Effective Date to Unsecured Noteholders that execute the Unsecured Noteholder Support Agreement (as defined below) on or before October 14, 2016;

(viii)    the payment of $20 million by Tervita to the holders of Subordinated Notes (the "**Subordinated Noteholders**" or individually, a "**Subordinated Noteholder**") in consideration for the irrevocable exchange and transfer of all of the Subordinated Notes;

(ix)    as additional consideration for the irrevocable exchange and transfer of all of the Subordinated Notes, Tervita will also pay $5 million to Subordinated Noteholders that

Draft

execute the Subordinated Noteholder Support Agreement (as defined below) on or before October 14, 2016;

(x)     except for the purpose of facilitating the distributions under the Plan of Arrangement, the cancellation of the Existing Tervita Equity, the Secured Notes, the Unsecured Notes, the Subordinated Notes, the indentures governing such notes and the Term Loan Facility and the irrevocable extinguishment and elimination of all of the debtholders' entitlements with respect to the Secured Notes, the Unsecured Notes, the Subordinated Notes, the indentures governing such notes, and the Term Loan Facility;

(xi)    the board of directors of Tervita upon implementation of the Recapitalization will be comprised of seven directors, one of which will be the Chief Executive Officer of Tervita and each of which will be acceptable to the Plan Sponsors; and

(xii)   Tervita or a subsidiary of Tervita and 9894942 Canada Ltd. shall be amalgamated and continued as one corporation;

(b)     the issuance of new second lien notes (the "**New Second Lien Notes**") in an amount of $475 million on terms and conditions acceptable to Tervita and certain of the Plan Sponsors;

(c)     the Revolving Credit Facilities will be unaffected by the Plan of Arrangement; however, it is a condition to the Recapitalization that the Revolving Credit Agreement be either reinstated or replaced on terms acceptable to Tervita and the Majority Initial Supporting Parties (as defined in the Information Circular), each acting reasonably; and

(d)     the intercompany loan held by Red Sky Finance LP under the Subordinated Note dated November 14, 2007, as amended (the "**Intercompany Loan**"), will be transferred to a subsidiary of Tervita for nominal consideration.

For Unsecured Noteholders, enclosed with the Information Circular is a participation form (the "**Participation Form**") for use by non-registered beneficial Unsecured Noteholders, if such noteholders are eligible to participate in the New Investment Offering, to make their commitments to purchase their respective pro rata share of the New Investment. Unsecured Noteholders must read this Information Circular and Participation Form to determine if they are eligible to participate in the New Investment. To be eligible to participate in the New Investment, a person must: (i) be an Unsecured Noteholder on the Voting Record Date or is a transferee of Unsecured Notes prior to the Participation Deadline that has submitted a completed transfer certificate included in the Participation Form; (ii) be an "accredited investor" within the meaning of applicable Canadian securities laws; (iii) be either (a) a Person in the United States, or a U.S. Person within the meaning of Regulation S under the U.S. Securities Act outside the United States, in each case, that is a "qualified institutional buyer" within the meaning of Rule 144A under the United States Securities Act of 1933, as amended (the "**U.S. Securities Act**"), or (b) outside the United States and not a U.S. Person within the meaning of Regulation S under the U.S. Securities Act; and (iv) if such Person is resident outside of Canada and the United States, be qualified to participate in the New Investment Offering in accordance with the Laws of its jurisdiction of residence without obliging Tervita to register the New Investment Shares or file a prospectus or other disclosure document or to make any other filings or become subject to any reporting or disclosure obligations that Tervita is not already obligated to make, and (if required by Tervita), has delivered to Tervita evidence satisfactory to Tervita to such effect (an "**Eligible Unsecured Noteholder**").

Each Eligible Unsecured Noteholder shall have the right, but not the obligation, to participate in its pro rata share of the New Investment based on each holder's respective share of the accrued principal and unpaid interest on the Unsecured Notes as of October 14, 2016.

If you are an Unsecured Noteholder who is eligible to participate in the New Investment and wish to participate in the New Investment, since your Unsecured Notes are held by an intermediary or a custodial entity, such as a bank, broker, investment dealer, trust company or other nominee (an "**Intermediary**"), you and your Intermediary must complete the Participation Form in accordance with the instructions therein, sign and return the medallion/stamp guaranteed Participation Form to Tervita at c/o Osler, Hoskin & Harcourt LLP, Suite 2500, TransCanada Tower, 450 - 1st Street S.W., Calgary, Alberta T2P 5H1 (Attention: Justin Sherman) by no later than 5:00 p.m. (Calgary time) on November

28, 2016 (the "**Participation Deadline**"). Eligible Unsecured Noteholders who do not submit a validly completed Participation Form by the Participation Deadline will be deemed to have elected not to participate in the New Investment. Eligible Unsecured Noteholders may transfer their Unsecured Notes and accompanying participation rights to a transferee by completing the transfer form attached to the Participation Form.

As described in greater detail in the Information Circular, the Recapitalization will be implemented by way of the Plan of Arrangement either through proceedings solely under the CBCA or, if necessary, the Companies' Creditors Arrangement Act (the "**CCAA**") (or any such other proceeding under any corporate arrangement, reorganization, restructuring, insolvency or similar law of any jurisdiction now or hereafter in effect, for the relief from or otherwise affecting creditors, including without limitation under the *Bankruptcy and Insolvency Act* (Canada) or the *United States Bankruptcy Code* (an "**Alternative Proceeding**")). Unsecured Noteholders will be asked to consider and vote upon, as a single class, a resolution (the "**Unsecured Noteholders Arrangement Resolution**") approving the Plan of Arrangement at a meeting of such noteholders (the "**Unsecured Noteholders' Meeting**") scheduled to be held at 10:00 a.m. (Calgary time) on November 30, 2016 at the offices of Osler, Hoskin & Harcourt LLP located at Suite 2500, TransCanada Tower, 450 – 1st Street S.W., Calgary, Alberta. The full text of the Unsecured Noteholders Arrangement Resolution is set forth in Appendix "A" to the Information Circular. Subordinated Noteholders will be asked to consider and vote upon a resolution (the "**Subordinated Noteholders Arrangement Resolution**") approving the Plan of Arrangement at a meeting of such noteholders (the "**Subordinated Noteholders' Meeting**") scheduled to be held at 10:30 a.m. (Calgary time) on November 30, 2016 at the offices of Osler, Hoskin & Harcourt LLP located at Suite 2500, TransCanada Tower, 450 – 1st Street S.W., Calgary, Alberta. The full text of the Subordinated Noteholders Arrangement Resolution is set forth in Appendix "A" to the Information Circular. In addition, holders ("**RSAC Shareholders**") of common shares of RSAC ("**RSAC Shares**") will be asked to consider and vote upon a resolution (the "**Shareholders Arrangement Resolution**") approving the Plan of Arrangement at a meeting of RSAC Shareholders (the "**Shareholders' Meeting**") scheduled to be held at scheduled to be held at 11:00 a.m. (Calgary time) on November 30, 2016 at the offices of Osler, Hoskin & Harcourt LLP located at Suite 2500, TransCanada Tower, 450 – 1st Street S.W., Calgary, Alberta. The full text of the Shareholders Arrangement Resolution is set forth in Appendix "A" to the Information Circular.

Management of Tervita and Tervita's board of directors believe that in light of the challenges posed by Tervita's existing capital structure, the Recapitalization represents the best alternative available to address Tervita's capital structure and liquidity needs. Unsecured Noteholders will have an opportunity to participate in the continued development of Tervita's business through their ownership of New Common Shares and, at their election, participation in the New Investment and ownership of New Preferred Shares. The Recapitalization will improve Tervita's financial strength and reduce its financial risk by:

(a)    retiring approximately $2.1 billion of debt and accrued interest, thereby reducing leverage and the cost of capital;

(b)    decreasing annual cash interest expense by approximately $200 million;

(c)    improving the liquidity of Tervita by virtue of the aggregate gross proceeds raised from the New Investment and New Second Lien Notes;

(d)    improving Tervita's ability to manage the effects of the continuing low oil and natural gas price environment; and

(e)    providing Tervita with flexibility and working capital necessary to take advantage of future growth opportunities.

The board of directors of Tervita received written opinions dated October 6, 2016 (collectively, the "**Barclays Opinions**") from Tervita's financial advisor, Barclays Capital Inc. ("**Barclays**"), addressed to the board of directors of Tervita, which conclude that, as of the date thereof, and based on, and subject to, the various assumptions, limitations and qualifications set out therein:

(a)    the Unsecured Noteholders, the Subordinated Noteholders and the holders of the existing common shares of Tervita ("**Existing Common Shareholders**") would be in a better financial position, respectively, under the Recapitalization than if Tervita were liquidated as, in each case, the estimated

Draft

iv

aggregate value of the consideration made available to the Unsecured Noteholders, Subordinated Noteholders, and the Existing Common Shareholders, respectively, pursuant to the Recapitalization would, in the opinion of Barclays, exceed the estimated value Unsecured Noteholders, Subordinated Noteholders and Existing Common Shareholders would receive in a liquidation, respectively; and

(b)     Barclays is of the opinion that, the Recapitalization, if implemented, would be fair, from a financial point of view, to Tervita.

All Unsecured Noteholders, Subordinated Noteholders and RSAC Shareholders are encouraged to read the Barclays Opinions carefully in their entirety, which are set forth in Appendix "F" and Appendix "G", respectively, to the Information Circular.  After careful consideration of these and other factors, and following consultation with Barclays and outside legal counsel, the board of directors of Tervita has unanimously (subject to the abstentions of Messrs. David Werklund and John Gibson as interested directors) determined to recommend to Unsecured Noteholders and Subordinated Noteholders that they **VOTE FOR** the Unsecured Noteholders Arrangement Resolution and Subordinated Noteholders Arrangement Resolution, respectively, at the Unsecured Noteholders' Meeting and Subordinated Noteholders' Meeting, respectively.

In order for the Recapitalization to be implemented:

(a)     the Unsecured Noteholders Arrangement Resolution must be approved by the affirmative vote of Unsecured Noteholders representing at least 66⅔% of the votes cast by Unsecured Noteholders present in person or represented by proxy and voting at the Unsecured Noteholders' Meeting;

(b)     the Subordinated Noteholders Arrangement Resolution must be approved by the affirmative vote of Subordinated Noteholders representing at least 66⅔% of the votes cast by Subordinated Noteholders present in person or represented by proxy and voting at the Subordinated Noteholders' Meeting; and

(c)     the Shareholders Arrangement Resolution must be approved by the affirmative vote of RSAC Shareholders, present in person or represented by proxy and voting at the Shareholders' Meeting, holding 53.6% of the RSAC Shares.

Each Unsecured Noteholder and Subordinated Noteholder will have one vote for each U.S.$1,000 principal amount of Unsecured Note and Subordinated Notes held by such noteholder as at the close of business on October 14, 2016, with no fractional votes permitted.

At the Shareholders' Meeting, each RSAC Shareholder will have one vote for each RSAC Share held as of the Voting Record Date, with no fractional votes permitted.

**Non-registered or beneficial Unsecured Noteholders, Subordinated Noteholders and RSAC Shareholders who do not hold Unsecured Notes, Subordinated Notes or RSAC Shares in their own name but rather through an Intermediary must complete and return the voting instruction form provided to them or follow the telephone or internet-based voting procedures described therein in advance of the deadline set forth in the voting instruction form in order to have such notes or shares voted at the meetings, as applicable, on their behalf.**

As of ●, 2016, Unsecured Noteholders (including the Plan Sponsors) holding approximately **[63%]** of the aggregate outstanding principal amount of the Unsecured Notes, have entered into a support agreement (the "**Unsecured Noteholder Support Agreement**") pursuant to which they have agreed, subject to the terms and conditions thereof, to support the Recapitalization and vote all of their respective Unsecured Notes in favour of the Unsecured Noteholders Arrangement Resolution at the Unsecured Noteholders' Meeting.

As of ●, 2016, Subordinated Noteholders (including the Plan Sponsors) holding approximately **[90%]** of the aggregate outstanding principal amount of the Subordinated Notes, have entered into a support agreement (the "**Subordinated Noteholder Support Agreement**") pursuant to which they have agreed, subject to the terms and conditions thereof, to support the Recapitalization and vote all of their respective Subordinated Notes in favour of the Subordinated Noteholders Arrangement Resolution at the Subordinated Noteholders' Meeting.

LEGAL_1:40709104.10

In addition, as of ●, 2016, RSAC Shareholders (including the Plan Sponsors) holding approximately **[69%]** of the RSAC Shares, have entered into consent and support agreements (the "**Securityholder Consent and Support Agreements**" and collectively with the Unsecured Noteholder Support Agreement and the Subordinated Noteholder Support Agreement, the "**Support Agreements**") pursuant to which they have agreed, subject to the terms and conditions thereof, to support the Recapitalization and vote all of their respective RSAC Shares in favour of the Recapitalization to the extent that any such vote is required. Pursuant to the terms of the Unanimous Shareholders Agreement dated November 14, 2007 among RSAC and RSH1 and the Interim Order, the Securityholder Consent and Support Agreements are sufficient to obtain 100% approval from RSAC Shareholders.

The New Investment is fully-backstopped by certain of the Unsecured Noteholders (the "**Plan Sponsors**" or individually a "**Plan Sponsor**"), pursuant to the terms and conditions of a backstop commitment letter among Tervita and each of the Plan Sponsors (the "**Backstop Commitment Letter**").

If Tervita is unable to achieve a reduction in outstanding indebtedness and infusion of new capital in the manner contemplated under the Recapitalization exclusively through proceedings under the CBCA, the Support Agreements and the Backstop Commitment Letter provide that Tervita shall apply to the court for an order to convert the proceedings under the CBCA relating to the Plan of Arrangement into an Alternative Proceeding in order to implement the Recapitalization.

**If you have any questions, please contact our information agent, Kingsdale Shareholder Services by telephone at 1-866-851-2484 (toll-free within Canada or the United States) or 1-416-867-2272 (for calls outside Canada and the United States) or by email at contactus@kingsdaleshareholder.com.**

Management and the board of directors of Tervita believe that it is extremely important that the Recapitalization be approved and implemented.  The Recapitalization is integral to the objectives of improving Tervita's financial performance, reducing leverage and enhancing liquidity and positioning Tervita to take advantage of opportunities for growth in a depressed commodity price environment.  We urge you to give serious attention to the Recapitalization and to support it in person or by proxy at the Unsecured Noteholders' Meeting, Subordinated Noteholders' Meeting or Shareholders' Meeting on November 30, 2016. We hope that we will receive your support.

Yours very truly,

(signed) "●".

Chris Synek
President and Chief Executive Officer
Tervita Corporation

**This material is important and requires your immediate attention.  The transactions contemplated in the Recapitalization are complex.  The accompanying Information Circular contains a description of, and a copy of, the Plan of Arrangement and other information concerning Tervita to assist you in considering this matter.  You are urged to review this information carefully.  Should you have any questions or require assistance in understanding and evaluating how you will be affected by the proposed Recapitalization, please consult your legal, tax or other professional advisors.**

LEGAL_1:40709104.10



**TERVITA CORPORATION**
**(THE "CORPORATION" OR "TERVITA")**

**NOTICE OF MEETING OF UNSECURED NOTEHOLDERS**

To the holders of:     **9.75% SENIOR UNSECURED NOTES DUE 2019**
                       **10.875% SENIOR UNSECURED NOTES DUE 2018**
                       **OF TERVITA CORPORATION**

NOTICE IS HEREBY GIVEN that, pursuant to an order (the "**Interim Order**") of the Court of Queen's Bench of Alberta (the "**Court**") dated October 14, 2016, a meeting (the "**Unsecured Noteholders' Meeting**") of the holders (collectively, the "**Unsecured Noteholders**") of the 9.75% senior unsecured notes due 2019 ("**9.75% Unsecured Notes**"), 10.875% senior unsecured notes due 2018 ("**10.875% Unsecured Notes**" and together with the 9.75% Unsecured Notes, the "**Unsecured Notes**") of Tervita will be held at the offices of Osler, Hoskin & Harcourt LLP located at Suite 2500, TransCanada Tower, 450 – 1st Street S.W., Calgary, Alberta on the 30th day of November, 2016 at 10:00 a.m. (Calgary time) for the following purposes:

1.      to consider, and if deemed advisable, to pass, with or without variation, a resolution (the "**Unsecured Noteholders Arrangement Resolution**"), the full text of which is set out in Appendix "A" to the accompanying management information circular (the "**Information Circular**"), approving, among other things, an arrangement (the "**Arrangement**") pursuant to Section 192 of the *Canada Business Corporations Act*, which Arrangement is more particularly described in the Information Circular; and

2.      to transact such other business as may properly come before the Unsecured Noteholders' Meeting or any adjournment or postponement thereof.

The record date (the "**Voting Record Date**") for entitlement to notice of the Unsecured Noteholders' Meeting has been set by the Court, subject to any further order of the Court, as October 14, 2016. At the Unsecured Noteholders' Meeting, each Unsecured Noteholder will have one vote for each U.S.$1,000 principal amount of Unsecured Notes held by such noteholder as of the Voting Record Date, with no fractional votes permitted. The Unsecured Noteholders will vote together as a single class.

**Unsecured Noteholders who hold their Unsecured Notes through a broker, investment dealer, bank, trust company or other intermediary (an "Intermediary") should contact such Intermediary through which such notes are held in order to obtain a voting instruction card or valid proxy.**

Subject to any further order of the Court, pursuant to the Interim Order, the Court has set the quorum for the Unsecured Noteholders' Meeting as Unsecured Noteholders present in person or represented by proxy and representing at least 25% of the principal amount of the outstanding Unsecured Notes entitled to vote at the Unsecured Noteholders' Meeting.

An Unsecured Noteholder may attend the Unsecured Noteholders' Meeting in person or may appoint another person as proxyholder. The form of proxy to be delivered by or on behalf of the Unsecured Noteholders nominates Chris Synek, President and Chief Executive Officer, Stephen Kersley, Chief Financial Officer and Rob Van Walleghem, Executive Vice-President, Health, Safety and Environment and General Counsel of the Corporation and any one of them with full power of substitution as proxyholders. An Unsecured Noteholder may appoint another person as his, her or its proxyholder by crossing out the names and inserting the name of such person in the blank space provided in the applicable form of proxy or voting instruction card received from his, her or its Intermediary. Persons appointed as proxyholders need not be Unsecured Noteholders.

LEGAL_1:40709104.10

Subject to any further order of the Court, pursuant to the Interim Order, the vote required to pass the Unsecured Noteholders Arrangement Resolution is the affirmative vote of Unsecured Noteholders representing at least 66⅔% of votes cast by the Unsecured Noteholders present in person or represented by proxy and voting at the Unsecured Noteholders' Meeting.  Illegible votes, spoiled votes, defective votes and abstentions shall be deemed to be votes not cast.

DATED at Calgary, Alberta this 14th day of October, 2016.

By order of the Board of Directors of Tervita Corporation

(signed) "●"

Chris Synek
President and Chief Executive Officer
Tervita Corporation

Whether or not Unsecured Noteholders are able to be present at the Unsecured Noteholders' Meeting, you are requested to vote following the instructions provided on the appropriate voting instruction card or form of proxy using one of the available methods.  In order to be effective, proxies must be received no later than 5:00 p.m. (Calgary time) on the day that is two business days  before the Unsecured Noteholders' Meeting (or, with the consent of the chair of the Unsecured Noteholders' Meeting, at any time prior to the commencement of the Unsecured Noteholders' Meeting) or two business days preceding the date of any adjournment or postponement of the Unsecured Noteholders' Meeting (or, with the consent of the chair of the Unsecured Noteholders' Meeting, at any time prior to the commencement of the adjourned Unsecured Noteholders' Meeting) using one of the following methods, as applicable. Notwithstanding the foregoing, the time limit for deposit of proxies may be waived or extended by the chair of the Unsecured Noteholders' Meeting at his or her discretion without notice.

Addressed to TSX Trust Company and using any one of the below methods:

| **By Mail, Hand Delivery or Overnight Courier:** | **By Fax:** | **By Internet:** |
|---|---|---|
| TSX Trust Company<br>200 University Avenue, Suite 300,<br>Toronto, Ontario, M5H 4H1 | (416) 595-9593 | Go to www.voteproxyonline.com<br>and enter the 12 digit control<br>number |

If any Unsecured Noteholder has any questions about obtaining and completing proxies, it should contact our information agent, Kingsdale Shareholder Services by telephone at 1-866-851-2484 (toll-free within Canada or the United States) or 1-416-867-2272 (for calls outside Canada and the United States) or by email at contactus@kingsdaleshareholder.com.

Draft

LEGAL_1:40709104.10



**TERVITA CORPORATION**
**(THE "CORPORATION" OR "TERVITA")**

**NOTICE OF MEETING OF SUBORDINATED NOTEHOLDERS**

To the holders of:    **11.875% SENIOR UNSECURED SUBORDINATED NOTES DUE 2018**
**OF TERVITA CORPORATION**

NOTICE IS HEREBY GIVEN that, pursuant to an order (the "**Interim Order**") of the Court of Queen's Bench of Alberta (the "**Court**") dated October 14, 2016, a meeting (the "**Subordinated Noteholders' Meeting**") of the holders (the "**Subordinated Noteholders**") of the 11.875% senior unsecured subordinated notes due 2018 ("**Subordinated Notes**") of Tervita will be held at Osler, Hoskin & Harcourt LLP located at Suite 2500, TransCanada Tower, 450 – 1st Street S.W., Calgary, Alberta on the 30th day of November, 2016 at 10:30 a.m. (Calgary time) for the following purposes:

1.    to consider, and if deemed advisable, to pass, with or without variation, a resolution (the "**Subordinated Noteholders Arrangement Resolution**"), the full text of which is set out in Appendix "A" to the accompanying management information circular (the "**Information Circular**"), approving, among other things, an arrangement (the "**Arrangement**") pursuant to Section 192 of the *Canada Business Corporations Act*, which Arrangement is more particularly described in the Information Circular; and

2.    to transact such other business as may properly come before the Subordinated Noteholders' Meeting or any adjournment or postponement thereof.

The record date (the "**Voting Record Date**") for entitlement to notice of the Subordinated Noteholders' Meeting has been set by the Court, subject to any further order of the Court, as October 14, 2016.  At the Subordinated Noteholders' Meeting, each Subordinated Noteholder will have one vote for each U.S.$1,000 principal amount of Subordinated Notes held by such noteholder as of the Voting Record Date, with no fractional votes permitted.

**Subordinated Noteholders who hold their Subordinated Notes through a broker, investment dealer, bank, trust company or other intermediary (an "Intermediary") should contact such Intermediary through which such notes are held in order to obtain a voting instruction card or valid proxy.**

Subject to any further order of the Court, pursuant to the Interim Order, the Court has set the quorum for the Subordinated Noteholders' Meeting as Subordinated Noteholders present in person or represented by proxy and representing at least 25% of the principal amount of the outstanding Subordinated Notes entitled to vote at the Subordinated Noteholders' Meeting.

A Subordinated Noteholder may attend the Subordinated Noteholders' Meeting in person or may appoint another person as proxyholder.  The form of proxy to be delivered by or on behalf of the Subordinated Noteholders nominates Chris Synek, President and Chief Executive Officer, Stephen Kersley, Chief Financial Officer and Rob Van Walleghem, Executive Vice-President, Health, Safety and Environment and General Counsel of the Corporation and any one of them with full power of substitution as proxyholders.  A Subordinated Noteholder may appoint another person as his, her or its proxyholder by crossing out the names and inserting the name of such person in the blank space provided in the applicable form of proxy or voting instruction card received from his, her or its Intermediary. Persons appointed as proxyholders need not be Subordinated Noteholders.

Subject to any further order of the Court, the vote required to pass the Subordinated Noteholders Arrangement Resolution is the affirmative vote of Subordinated Noteholders representing at least 66⅔% of  the votes cast by the

Subordinated Noteholders present in person or represented by proxy and voting at the Subordinated Noteholders' Meeting.  Illegible votes, spoiled votes, defective votes and abstentions shall be deemed to be votes not cast.

DATED at Calgary, Alberta this 14th day of October, 2016.

By order of the Board of Directors of Tervita Corporation

(signed) "●"

Chris Synek
President and Chief Executive Officer
Tervita Corporation

Whether or not Subordinated Noteholders are able to be present at the Subordinated Noteholders' Meeting, you are requested to vote following the instructions provided on the appropriate voting instruction card or form of proxy using one of the available methods.  In order to be effective, proxies must be received no later than 5:00 p.m. (Calgary time) on the day that is two business days before the Subordinated Noteholders' Meeting (or, with the consent of the chair of the Subordinated Noteholders' Meeting, at any time prior to the commencement of the Subordinated Noteholders' Meeting) or two business days preceding the date of any adjournment or postponement of the Subordinated Noteholders' Meeting (or, with the consent of the chair of the Subordinated Noteholders' Meeting, any time prior to the commencement of the adjourned Subordinated Noteholders' Meeting) using one of the following methods, as applicable. Notwithstanding the foregoing, the time limit for deposit of proxies may be waived or extended by the chair of the Subordinated Noteholders' Meeting at his or her discretion without notice.

Addressed to TSX Trust Company and using any one of the below methods:

| **By Mail, Hand Delivery or Overnight Courier:** | **By Fax:** | **By Internet:** |
|---|---|---|
| TSX Trust Company | (416) 595-9593 | Go to www.voteproxyonline.com |
| 200 University Avenue, Suite 300, | | and enter the 12 digit control |
| Toronto, Ontario, M5H 4H1 | | number |

If any Subordinated Noteholder has any questions about obtaining and completing proxies, it should contact our information agent, Kingsdale Shareholder Services by telephone at 1-866-851-2484 (toll-free within Canada or the United States) or 1-416-867-2272 (for calls outside Canada and the United States) or by email at contactus@kingsdaleshareholder.com.

Draft

LEGAL_1:40709104.10



**RED SKY ACQUISITION CORP.**
**("RSAC")**

**NOTICE OF MEETING OF SHAREHOLDERS OF RED SKY ACQUISITION CORP.**

**To the holders of:**        **Common Shares of Red Sky Acquisition Corp.**

NOTICE IS HEREBY GIVEN that, pursuant to an order (the "**Interim Order**") of the Court of Queen's Bench of Alberta (the "**Court**") dated October 14, 2016, a meeting (the "**Shareholders' Meeting**") of the holders  (the "**RSAC Shareholders**" or individually, a "**RSAC Shareholder**") of the common shares ("**RSAC Shares**") of RSAC will be held at Osler, Hoskin & Harcourt LLP located at Suite 2500, TransCanada Tower, 450 – 1st Street S.W., Calgary, Alberta on the 30th day of November, 2016 at 11:00 a.m. (Calgary time) for the following purposes:

1.        to consider, and if deemed advisable, to pass, with or without variation, a resolution (the "**Shareholders Arrangement Resolution**"), the full text of which is set out in Appendix "A" to the accompanying management information circular (the "**Information Circular**"), approving, among other things, an arrangement (the "**Arrangement**") pursuant to Section 192 of the *Canada Business Corporations Act* ("**CBCA**"), which Arrangement is more particularly described in the Information Circular; and

2.        to transact such other business as may properly come before the Shareholders' Meeting or any adjournment or postponement thereof.

The record date (the "**Voting Record Date**") for entitlement to notice of the Shareholders' Meeting has been set by the Court, subject to any further order of the Court, as October 14, 2016.  At the Shareholders' Meeting, each RSAC Shareholder will have one vote for each RSAC Share held as of the Voting Record Date, with no fractional votes permitted.

**RSAC Shareholders who hold their RSAC Shares through a broker, investment dealer, bank, trust company or other intermediary (an "Intermediary") should contact such Intermediary through which such notes are held in order to obtain a voting instruction card or valid proxy.**

Subject to any further order of the Court, the Court has set the quorum for the Shareholders' Meeting as RSAC Shareholders present in person or represented by proxy and holding over 50% of the RSAC Shares entitled to vote at the Shareholders' Meeting. Despite the previous sentence, if proper notice of the Shareholders' Meeting is given and a quorum of RSAC Shareholders is not present, a second RSAC Shareholders' Meeting may be held on 48 hours written notice to transact the business specified in the original notice. Subject to the CBCA, any RSAC Shareholders present at the second meeting constitute a quorum and the business specified in the original notice may be transacted by a majority vote of RSAC Shares represented at the second meeting.

A RSAC Shareholder may attend the Shareholders' Meeting in person or may appoint another person as proxyholder. The form of proxy to be delivered by or on behalf of the RSAC Shareholders nominates Chris Synek, President and Chief Executive Officer, Stephen Kersley, Chief Financial Officer and Rob Van Walleghem, Executive Vice-President, Health, Safety and Environment and General Counsel of Tervita Corporation and any one of them with full power of substitution as proxyholders.  A RSAC Shareholder may appoint another person as his, her or its proxyholder by crossing out the names and inserting the name of such person in the blank space provided in the applicable form of proxy or voting instruction card received from his, her or its Intermediary. Persons appointed as proxyholders need not be RSAC Shareholders.

LEGAL_1:40709104.10

Subject to any further order of the Court, the vote required to pass the Shareholders Arrangement Resolution is the affirmative vote of RSAC Shareholders, present in person or represented by proxy and voting at the Shareholders' Meeting, representing at least 53.6% of the RSAC Shares.  Illegible votes, spoiled votes, defective votes and abstentions shall be deemed to be votes not cast.

DATED at Calgary, Alberta this 14th day of October, 2016.

> By order of the Board of Directors of Red Sky Acquisition Corp.
>
> (signed) "●"
>
> Chris Synek
> President and Chief Executive Officer
> Tervita Corporation

Whether or not RSAC Shareholders are able to be present at the Shareholders' Meeting, you are requested to vote following the instructions provided on the appropriate voting instruction card or form of proxy using one of the available methods.  In order to be effective, proxies must be received no later than 5:00 p.m. (Calgary time) on the day that is two business days before the Shareholders' Meeting (or, with the consent of the chair of the Shareholders' Meeting, at any time prior to the commencement of the Shareholders' Meeting) or two business days preceding the date of any adjournment or postponement of the Shareholders' Meeting (or, with the consent of the chair of the Shareholders' Meeting, at any time prior to the commencement of the adjourned Shareholders' Meeting ) using one of the following methods, as applicable. Notwithstanding the foregoing, the time limit for deposit of proxies may be waived or extended by the chair of the Subordinated Noteholders' Meeting at his or her discretion without notice.

Addressed to TSX Trust Company and using any one of the below methods:

| By Mail, Hand Delivery or Overnight Courier: | By Fax: | By Internet: |
|---|---|---|
| TSX Trust Company<br>200 University Avenue, Suite 300,<br>Toronto, Ontario, M5H 4H1 | (416) 595-9593 | Go to www.voteproxyonline.com<br>and enter the 12 digit control<br>number |

If any RSAC Shareholder has any questions about obtaining and completing proxies, it should contact our information agent, Kingsdale Shareholder Services by telephone at 1-866-851-2484 (toll-free within Canada or the United States) or 1-416-867-2272 (for calls outside Canada and the United States) or by email at contactus@kingsdaleshareholder.com.

Draft

xii

LEGAL_1:40709104.10

**This material is important and requires your immediate attention. The transactions contemplated in the Recapitalization are complex. The accompanying Information Circular contains a description of, and a copy of, the Plan of Arrangement and other information concerning Tervita to assist you in considering this matter. You are urged to review this information carefully. Should you have any questions or require assistance in understanding and evaluating how you will be affected by the proposed Recapitalization, please consult your legal, tax or other professional advisors.**

**IMPORTANT INFORMATION**

**THIS MANAGEMENT INFORMATION CIRCULAR CONTAINS IMPORTANT INFORMATION THAT SHOULD BE READ BEFORE ANY DECISION IS MADE WITH RESPECT TO THE MATTERS REFERRED TO HEREIN.**

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED IN THIS CIRCULAR, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION SHOULD NOT BE RELIED UPON. THIS CIRCULAR DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO PURCHASE, THE SECURITIES DESCRIBED IN THIS CIRCULAR, OR THE SOLICITATION OF A PROXY, IN ANY JURISDICTION, TO OR FROM ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OF AN OFFER OR PROXY SOLICITATION IN SUCH JURISDICTION. NEITHER THE DELIVERY OF THIS CIRCULAR NOR ANY DISTRIBUTION OF THE SECURITIES OFFERED PURSUANT TO THE PLAN OF ARRANGEMENT REFERRED TO IN THIS CIRCULAR SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE OF THIS CIRCULAR.**

Unless otherwise indicated or the context otherwise requires, the terms "Tervita", "the Corporation", "we", "us" and "our" refer to Tervita Corporation, a corporation continued under the CBCA, and its direct and indirect subsidiaries on a consolidated basis. Capitalized terms used herein but not otherwise defined herein have the respective meanings ascribed to them in the "*Glossary of Terms*", which begins on page vi.

All information in this Information Circular is given as of October 14, 2016 unless otherwise indicated.

Unsecured/Subordinated Noteholders should carefully consider the income tax consequences of the proposed Plan of Arrangement described herein. See "*Certain Income Tax Considerations – Certain Canadian Federal Income Tax Considerations*" and "*Certain Income Tax Considerations – Certain United States Federal Income Tax Considerations*".

Unsecured/Subordinated Noteholders and RSAC Shareholders should not construe the contents of this Information Circular as investment, legal or tax advice. Unsecured/Subordinated Noteholders and RSAC Shareholders should consult their own counsel, accountants and other advisors as to legal, tax, business, financial and related aspects of the proposed Recapitalization. In making a decision regarding the Recapitalization, Unsecured/Subordinated Noteholders and RSAC Shareholders must rely on their own examination of the Corporation and the advice of their own advisors.

You should rely only on the information contained in this Information Circular or incorporated by reference herein. We have not authorized any person (including any dealer, salesman or broker) to provide you with different information. The information contained in this Information Circular may only be accurate on the date hereof. You should not assume that the information contained in this Information Circular is accurate as of any other date.

Any statement contained in a document referred to in this Information Circular or any amendment hereof or supplement hereto is to be considered modified or replaced to the extent that a statement contained herein or in any amendment or supplement modifies or replaces such statement. Any statement so modified or replaced is not considered, except as so modified or replaced, to be a part of this Information Circular.

**Information for United States Unsecured/Subordinated Noteholders and RSAC Shareholders**

**THE SECURITIES ISSUABLE IN CONNECTION WITH THE ARRANGEMENT (INCLUDING THE NEW INVESTMENT) HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION ("SEC") OR SECURITIES REGULATORY AUTHORITIES IN ANY STATE OF THE UNITED STATES; NOR HAS THE SEC OR ANY SUCH STATE REGULATORY AUTHORITY PASSED UPON THE ADEQUACY OR ACCURACY OF THIS CIRCULAR. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

The New Shares to be issued under the Arrangement in exchange for Notes, as applicable, have not been, and will not be, registered under the United States Securities Act of 1933, as amended (the "**U.S. Securities Act**"), or any state securities laws, and are being issued pursuant to the exemption from registration set forth in Section 3(a)(10) of the U.S. Securities Act on the basis of the approval by the Court, which will consider, among other things, the fairness of the Arrangement to the Noteholders. Section 3(a)(10) of the U.S. Securities Act exempts the issuance of any securities issued in exchange for one or more *bona fide* outstanding securities from the general requirement of registration where the terms and conditions of the issuance and exchange of such securities have been approved by a court of competent jurisdiction that is expressly authorized by law to grant such approval, after a hearing upon the fairness of the terms and conditions of such issuance and exchange at which all persons to whom it is proposed to issue the securities have the right to appear and receive timely and adequate notice thereof. The Court is authorized to conduct a hearing at which the fairness of the terms and conditions of the Arrangement will be considered. The Court issued the Interim Order on October 14, 2016 and, subject to the approval of the Arrangement by the Unsecured/Subordinated Noteholders, a hearing on the Arrangement will be held sometime during the week of December 5th, 2016. All Unsecured/Subordinated Noteholders are entitled to appear and be heard at this hearing. The Final Order will constitute a basis for the exemption from the registration requirements of the U.S. Securities Act provided by Section 3(a)(10) thereof with respect to the New Shares to be issued to the Noteholders in exchange for their Notes, as applicable, pursuant to the Arrangement. Prior to the hearing on the Final Order, the Court will be informed of the Final Order. See "*Certain Regulatory and Other Matters Relating to the Recapitalization – Issuance and Resale of Securities Received in the Recapitalization – United States*" for additional information. Section 3(a)(10) is a non-exclusive exemption from registration under the U.S. Securities Act, and does not preclude reliance on any other available exemption from registration under the U.S. Securities Act.

**Unsecured Noteholders should be aware that the acquisition of New Investment Shares and New Common Shares, as a result of the implementation of the Arrangement described herein may have tax consequences both in the United States and in Canada. U.S. Unsecured Noteholders should consult their own tax advisors with respect to their own particular circumstances. See "*Certain Income Tax Considerations – Certain United States Federal Income Tax Considerations*" for more information.**

The solicitation of proxies hereby is not subject to the proxy requirements of Section 14(a) of the United States *Securities Exchange Act of 1934*, as amended (the "**U.S. Exchange Act**"). This Information Circular has been prepared in accordance with the applicable disclosure requirements in Canada. Unsecured/Subordinated Noteholders and RSAC Shareholders in the United States should be aware that such requirements are different than those of the U.S. Exchange Act.

Financial statements included herein have been prepared in accordance and comply with IFRS, as issued by the International Accounting Standards Board, and are subject to Canadian auditing and auditor independence standards. These financial statements may not be comparable to financial statements of U.S. companies, and auditing and auditor independence standards may be different.

The enforcement by investors of civil liabilities under the U.S. federal securities laws may be affected adversely by the fact that Tervita and certain of its subsidiaries are incorporated or organized outside the United States, that some or all of the officers and directors of such persons and the experts named herein are residents of a foreign country, and that all or a substantial portion of the assets of Tervita and said persons are located outside the United States. As a result, it may be difficult or impossible for holders of Tervita's securities in the United States to effect service of process within the United States upon Tervita, its subsidiaries and their officers and directors and the experts named herein, or to realize against them upon judgments of courts of the United States predicated upon civil liabilities under the federal securities laws of the United States or "blue sky" laws of any state within the United States. In addition, holders of Tervita's securities in the United States should not assume that the courts of Canada: (a) would enforce

judgments of United States courts obtained in actions against such persons predicated upon civil liabilities under the federal securities laws of the United States or "blue sky" laws of any state within the United States; or (b) would enforce, in original actions, liabilities against such persons predicated upon civil liabilities under the federal securities laws of the United States or "blue sky" laws of any state within the United States.  See "*Risk Factors – Risks Relating to the Recapitalization*".

### New Investment Shares Purchased in New Investment

The New Investment Shares purchased for cash in the New Investment have not and will not be registered under the U.S. Securities Act or any state securities laws and may not be offered or sold in the United States or to, or for the account or benefit of, U.S. persons, except pursuant to an exemption from the registration requirements of the U.S. Securities Act and applicable state securities laws.  Accordingly, such New Investment Shares are only being offered and sold in the United States to, and to U.S. persons outside the United States to, institutions that are, "qualified institutional buyers" within the meaning of Rule 144A under the U.S. Securities Act. In addition, the New Investment Shares will be offered and sold outside the United States to non-U.S. persons in reliance on Regulation S. The New Investment Shares will be "restricted securities" as defined in Rule 144(a)(3) under the U.S. Securities Act.  See "*Description of the Recapitalization –New Investment – Eligible Unsecured Noteholders and Transfer Restrictions*."

Draft

LEGAL_1:40709104.10

# TABLE OF CONTENTS

**Page**

NOTICE OF MEETING OF UNSECURED NOTEHOLDERS .............................................................................. vii

NOTICE OF MEETING OF SUBORDINATED NOTEHOLDERS .................................................................. ix

NOTICE OF MEETING OF SHAREHOLDERS OF RED SKY ACQUISITION CORP. ...................................... xi

NOTE REGARDING FORWARD-LOOKING INFORMATION AND STATEMENTS.......................................... i

PRESENTATION OF FINANCIAL INFORMATION ...................................................................................... iii
    Non-IFRS Financial Measures ................................................................................................................ iii

EXCHANGE RATES................................................................................................................................ iv

GLOSSARY OF TERMS .......................................................................................................................... v

SUMMARY ........................................................................................................................................... 1

INFORMATION CONCERNING THE MEETINGS .................................................................................... 15
    General ............................................................................................................................................... 15
    Meetings ............................................................................................................................................. 15
    Solicitation of Proxies ......................................................................................................................... 15
    Entitlement to Vote and Attend............................................................................................................ 16
    Revocation of Proxies ......................................................................................................................... 17
    Voting of Proxies ................................................................................................................................ 17
    Non-Registered Unsecured/Subordinated Noteholders........................................................................... 17
    Voting Requirements ........................................................................................................................... 19
    Quorum .............................................................................................................................................. 19
    Approval Requirements........................................................................................................................ 20
    Interest of Management and Others ....................................................................................................... 21

BACKGROUND TO AND REASONS FOR THE RECAPITALIZATION.......................................................... 21

EFFECT OF THE RECAPITALIZATION ..................................................................................................... 23

DESCRIPTION OF THE RECAPITALIZATION ........................................................................................... 24
    General ............................................................................................................................................... 24
    The Arrangement................................................................................................................................. 25
    Description of the New Shares .............................................................................................................. 27
    New Investment Offering ..................................................................................................................... 28
    New Revolving Credit Facility ............................................................................................................. 30
    New Second Lien Notes ....................................................................................................................... 30
    Pre- and Post-Arrangement Transactions ............................................................................................... 30
    Alternative Proceeding ........................................................................................................................ 31
    Court Approval and Completion of the Plan of Arrangement.................................................................... 31
    Conditions to the Recapitalization Becoming Effective............................................................................ 32
    Steps of the Plan of Arrangement.......................................................................................................... 33
    Barclays Opinions ............................................................................................................................... 36
    Recommendation of the Board of Directors............................................................................................ 39

# TABLE OF CONTENTS
(continued)

Page

PROCEDURES RELATING TO THE ARRANGEMENT AND NEW INVESTMENT OFFERING .................... 41
    Participation Form and Participation Deadline ........................................................................... 41
    Exchange of Notes for New Shares or Cash .............................................................................. 42
    General ....................................................................................................................................... 43
    Fractional Shares ....................................................................................................................... 43

SUPPORT AGREEMENTS ................................................................................................................ 44
    Unsecured Noteholder Support Agreement ............................................................................... 44
    Subordinated Noteholder Support Agreement .......................................................................... 50
    Securityholder Consent and Support Agreement ...................................................................... 51

BACKSTOP COMMITMENT ............................................................................................................ 52

OVERVIEW OF NEW SHARES DOCUMENTATION ..................................................................... 55
    Amended Articles ...................................................................................................................... 55
    New By-laws .............................................................................................................................. 55
    Shareholders Agreement ........................................................................................................... 55
    Registration Rights Agreement ................................................................................................. 56

DESCRIPTION OF CERTAIN INDEBTEDNESS ............................................................................. 56
    General ....................................................................................................................................... 56
    Description of the Subordinated Notes ...................................................................................... 56
    Description of the Unsecured Notes .......................................................................................... 58
    Description of the Secured Notes .............................................................................................. 59
    Description of the Senior Secured Credit Facilities .................................................................. 60
    Description of the Intercompany Loan ...................................................................................... 65
    Preliminary Interim Order and Interim Order ........................................................................... 65

DESCRIPTION OF THE NEW REVOLVING CREDIT FACILITY .................................................. 65

DESCRIPTION OF THE NEW SECOND LIEN NOTES ................................................................... 65

CERTAIN REGULATORY AND OTHER MATTERS RELATING TO THE RECAPITALIZATION ............... 66
    Issuance and Resale of Securities Received in the Recapitalization ......................................... 66
    Expenses .................................................................................................................................... 67

INFORMATION WITH RESPECT TO TERVITA ............................................................................. 67

INFORMATION WITH RESPECT TO RED SKY ACQUISITION CORP. ........................................ 68

TERVITA AFTER THE RECAPITALIZATION ................................................................................ 68
    Corporate Structure ................................................................................................................... 68
    Share Capital ............................................................................................................................. 68
    Principal Shareholders .............................................................................................................. 68

LEGAL PROCEEDINGS .................................................................................................................... 68

CERTAIN INCOME TAX CONSIDERATIONS ............................................................................... 69
    Certain Canadian Federal Income Tax Considerations ............................................................. 69
    Certain United States Federal Income Tax Considerations ....................................................... 73

RISK FACTORS ................................................................................................................................. 79
    Risks Relating to the Recapitalization ...................................................................................... 79

LEGAL_1:40709104.10

**TABLE OF CONTENTS**

(continued)

Risks Relating to the Non-Implementation of the Recapitalization ............................................................ 81
Risks Relating to the New Investment Offering ........................................................................................... 82
Risks Relating to the Corporation's Equity Securities ................................................................................ 83
Tax Risks ...................................................................................................................................................... 84
Risks Related to Tervita's Liquidity ............................................................................................................ 84
Risks Related to Tervita's Business ............................................................................................................. 86

AUDITORS, TRANSFER AGENT, REGISTRAR AND TRUSTEE ................................................... 96

INTERESTS OF EXPERTS ................................................................................................................... 96

LEGAL MATTERS ................................................................................................................................ 96

QUESTIONS AND FURTHER ASSISTANCE ..................................................................................... 97

APPROVAL OF THE CIRCULAR BY THE BOARD OF DIRECTORS ............................................ 98

CONSENT OF BARCLAYS ................................................................................................................... 99

APPENDIX "A" UNSECURED NOTEHOLDERS ARRANGEMENT RESOLUTION,
        SUBORDINATED NOTEHOLDERS ARRANGEMENT RESOLUTION AND
        SHAREHOLDERS ARRANGEMENT RESOLUTION .......................................................... A-1

APPENDIX "B" SUPPORT AGREEMENTS AND BACKSTOP COMMITMENT LETTER ............. B-1

APPENDIX "C" PLAN OF ARRANGEMENT ...................................................................................... C-1

APPENDIX "D" INTERIM ORDER ...................................................................................................... D-1

APPENDIX "E" ORIGINATING APPLICATION ................................................................................ E-1

APPENDIX "F" FAIRNESS OPINION .................................................................................................. F-1

APPENDIX "G" OPINION REQUIRED BY CBCA POLICY 15.1 ...................................................... G-1

APPENDIX "H" INFORMATION WITH RESPECT TO TERVITA CORPORATION ........................ H-1

## NOTE REGARDING FORWARD-LOOKING INFORMATION AND STATEMENTS

Certain statements in this Information Circular that are not current statements or historical facts constitute "forward-looking information" within the meaning of applicable Canadian securities laws and "forward-looking statements" within the meaning of Section 27A of the U.S. Securities Act and Section 21E of the U.S. Exchange Act.  Forward-looking information and statements involve risks, uncertainties and other factors that could cause actual results to differ materially from those expressed or implied by them.  Sentences and phrases containing words such as "believe", "estimate", "anticipate", "plan", "predict", "outlook", "goals", "targets", "projects", "may", "hope", "can", "could", "will", "shall", "should", "expect", "intend", "is designed to", "continues", "with the intent", "potential", "strategy", and the negative of any of these words, or variations of them, or comparable terminology that does not relate strictly to current or historical facts, are all indicative of forward-looking information or statements.  Discussions containing forward-looking statements may be found, among other places, in the "*Effect of the Recapitalization*" and "*Risk Factors*" sections herein and the "*General Development of the Business*" and "*Narrative Description of the Business*" sections of Appendix "H" to this Information Circular. Examples of forward-looking information and statements in this Information Circular include, but are not limited to:

- the Recapitalization (including the New Investment);

- timing of the closing of the Recapitalization (including the New Investment);

- **[the eligibility of the New Common Shares issuable under the Plan of Arrangement for transfer and registration in DTC or CDS;]**

- the terms of the Revolving Credit Agreement as may be amended in connection with the Recapitalization;

- volatility of oil and gas prices;

- cash flow, liquidity and financial condition;

- business and financial strategy;

- amount, nature, focus and timing of capital expenditures;

- availability and terms of capital;

- availability of labor and other services;

- competition in the environmental solutions industry;

- impact of weather and the occurrence of natural disasters such as fires;

- governmental regulation of the gas industry, permitting and other legal requirements, including Tervita's expectations with respect to permits;

- developments in gas-producing countries;

- expansion and other development trends in the environmental solutions industry;

- future debt levels and annual interest costs;

- the Corporation's growth strategy, the criteria to be considered in connection therewith and the benefits to be derived therefrom;

- the emergence of growth opportunities; and

i

- the Corporation's ability to take advantage of future growth opportunities and the ability to grow through the capital markets.

Such forward-looking statements or information, including future oriented financial information, are necessarily based on a number of factors and assumptions that, while considered reasonable by management, are inherently subject to significant business, economic and competitive uncertainties and contingencies and which may prove to be incorrect. In addition to any other factors and assumptions identified in this Information Circular, assumptions have been made regarding, among other things:

- the ability of Tervita to satisfy the conditions to the Recapitalization and the subsequent consummation of the Recapitalization (including the New Investment);

- the ability of Tervita to obtain equipment, services and supplies in a timely manner to carry out its activities;

- the entering into of the New Revolving Credit Facility;

- the timely receipt of required regulatory approvals;

- the ability of Tervita to obtain financing on acceptable terms;

- currency, exchange and interest rates; and

- future natural oil and gas prices.

Forward-looking statements or information are based on current expectations, estimates and projections that involve a number of risks and uncertainties which could cause actual results to differ materially from those anticipated by Tervita and those described in the forward-looking statements. Although the Corporation believes that the expectations reflected in the forward-looking statements and information are reasonable, there can be no assurance that such expectations will prove to be correct. The Corporation cannot guarantee future results, levels of activity, performance, or achievements. Moreover, neither Tervita nor any other person assumes responsibility for the accuracy and completeness of the forward-looking statements or information. Some of the risks and other factors, certain of which are beyond the Corporation's control, that could cause results to differ materially from those expressed in the forward-looking statements contained in this Information Circular include, but are not limited to:

- the completion of the Recapitalization may not occur;

- if the Recapitalization is not implemented, the ability of the Corporation to continue as a going concern;

- the ability of the Corporation to obtain substantial additional financing necessary to fund both short-term and long-term operations and capital expenditure requirements;

- the ability of management to execute its business plan;

- the risks of the environmental solutions industry, such as operational risks and market demand;

- risks inherent in Tervita's marketing operations, including credit risk;

- the uncertainty of estimates and projections relating to revenues, costs and expenses;

- fluctuations in oil and natural gas prices, foreign currency exchange rates and interest rates;

- health, safety and environmental risks;

- uncertainties as to the availability and cost of financing;

- general economic conditions in Canada, the United States and globally;

LEGAL_1:40709104.10

- industry conditions;

- the possibility that government policies or laws may change or governmental approvals may be delayed or withheld;

- governmental regulation of the environmental solutions industry, including environmental regulation;

- unanticipated operating events;

- failure to obtain third party consents and approvals, when required;

- risks associated with existing and potential future lawsuits and regulatory actions against Tervita; and

- other risks and uncertainties described elsewhere in this Information Circular.

Readers are cautioned that the foregoing list of factors is not exhaustive. The forward-looking information and statements contained in this Information Circular: (a) were made as of the dates stated herein and have not been updated; (b) represent the Corporation's views as of such dates and should not be relied upon as representing the Corporation's views as of any subsequent date; and (c) are expressly qualified by this cautionary statement. While the Corporation anticipates that subsequent events and developments may cause its views to change, the Corporation specifically disclaims any intention or obligation to update forward-looking information and statements, whether as a result of new information, future events or otherwise, except to the extent required by applicable securities laws.

Forward-looking information and statements contained in this Information Circular about prospective results of operations, financial position or cash flows that are based upon assumptions about future economic conditions and courses of action are presented for the purpose of assisting Unsecured/Subordinated Noteholders and RSAC Shareholders in understanding management's current views regarding those future outcomes, and may not be appropriate for other purposes.

There can be no assurance that the forward-looking information and statements will prove to be accurate, and actual results and future events could vary or differ materially from those anticipated by them. Accordingly undue reliance should not be placed on forward-looking information and statements. Forward-looking information and statements for time periods subsequent to 2016 involve greater risks and require longer term assumptions and estimates from those for 2016, and are consequently subject to greater uncertainty. Therefore, special caution should be taken in terms of placing reliance on such long-term forward-looking information and statements.

## PRESENTATION OF FINANCIAL INFORMATION

The condensed consolidated financial statements of Tervita for the three and six month periods ended June 30, 2016 and the consolidated financial statements of Tervita for the years ended December 31, 2015, December 31, 2014 and December 31, 2013 have been prepared in accordance with IFRS. The functional and reporting currency of Tervita is the Canadian dollar. Unless otherwise indicated, all financial information contained in this Information Circular is that of Tervita on a consolidated basis and has been prepared in accordance with IFRS.

Unless otherwise specified, in this Information Circular, references to "$" and "dollars" are to Canadian dollars.

**Non-IFRS Financial Measures**

In addition to the results prepared in accordance with IFRS, Tervita uses certain non-IFRS financial measures and ratios which it believes provide useful information to both management and the readers of this Information Circular in measuring the consolidated financial performance and condition of Tervita. See "*Non-IFRS Financial Measures*" in Tervita's management's discussion and analysis of Tervita's consolidated financial condition and results of operations for the three and six month periods ended June 30, 2016 and for the years ended December 31, 2015 and December 31, 2014, attached as Schedule "A" to Appendix "B" to this Information Circular.

LEGAL_1:40709104.10

**EXCHANGE RATES**

The following table sets forth, for each of the years indicated, the year-end noon exchange rate, the average noon exchange rate and the high and low noon exchange rates of one Canadian dollar in exchange for U.S. dollars using information provided by the Bank of Canada.  The noon exchange rate on October ●, 2016, using information provided by the Bank of Canada for the conversion of Canadian dollars into United States dollars or vice versa, was $1.00 equals U.S.$●.

|  | **Year Ended December 31,** | | **6 Months Ended June 30,** | |
|  | 2015 | 2014 | 2016 | 2015 |
|---|---|---|---|---|
| High | 0.8527 | 0.9422 | 0.7972 | 0.8527 |
| Low | 0.7148 | 0.8589 | 0.6854 | 0.7811 |
| Average | 0.7833 | 0.9058 | 0.7530 | 0.8098 |
| End of Period | 0.7225 | 0.8620 | 0.7687 | 0.8017 |

Draft

LEGAL_1:40709104.10

## GLOSSARY OF TERMS

Unless the context otherwise requires, when used in this Information Circular the following terms shall have the meanings set forth below.  Words importing the singular number shall include the plural and vice versa where the context requires, and words importing any gender shall include all genders.

"**8.00% Secured Notes**" means the 8.00% senior secured notes issued by Tervita pursuant to the Secured Notes Indenture in an aggregate principal amount of U.S.$650 million and due November 15, 2018.

"**8% Secured Noteholders**" means the holders of the 8% Secured Notes.

"**9.00% Secured Notes**" means the 9.00% senior secured notes issued by Tervita pursuant to the Secured Notes Indenture in an aggregate principal amount of $200 million and due November 15, 2018.

"**9% Secured Noteholders**" means the holders of the 9% Secured Notes.

"**9.75% Unsecured Notes**" means the 9.75% senior unsecured notes issued by Tervita pursuant to the 9.75% Unsecured Notes Indenture in an aggregate principal amount of U.S.$290 million and due November 1, 2019.

"**9.75% Unsecured Notes Indenture**" means the indenture dated as of October 24, 2012, among Tervita, the guarantors from time to time party thereto and the Unsecured Notes Trustee, governing the 9.75% Unsecured Notes, as amended, modified, restated or supplemented from time to time.

"**10.875% Unsecured Notes**" means the 10.875% senior unsecured notes issued by Tervita pursuant to the 10.875% Unsecured Notes Indenture in an aggregate principal amount of U.S.$335 million and due February 15, 2018.

"**10.875% Unsecured Notes Indenture**" means the indenture dated as of December 3, 2013, among Tervita, the guarantors from time to time party thereto and the Unsecured Notes Trustee, governing the 10.875% Unsecured Notes, as amended, modified, restated or supplemented from time to time.

"**ABCA**" means the *Business Corporations Act* (Alberta) and the regulations thereto, as now in effect and as it may be amended from time to time prior to the Effective Date.

"**Accommodation Agreement**" means the fourth amending and accommodation agreement among the Revolving Credit Facilities Lenders party thereto, Tervita and the Guarantors, dated September 14, 2016.

"**Accommodation Period**" has the meaning given to it under the heading "*Description of Certain Indebtedness – Description of the Senior Secured Credit Facilities – Accommodation Agreement*".

"**Additional Backstop Commitment Amount**" means $26.7 million.

"**Additional Backstop Commitment Shares**" means that number of New Investment Shares obtained by dividing: (i) the Additional Backstop Commitment Amount, by (ii) the Subscription Price.

"**Additional Backstop Initial Commitment Amount**" means the amount of the Additional Backstop Initial Commitment Shares, if any, multiplied by the Subscription Price.

"**Additional Backstop Initial Commitment Shares**" means the number of New Investment Shares equal to the Additional Backstop Party's Share Subscription Commitment, if any.

"**Additional Backstop Party**" means that certain Unsecured Noteholder that entered into the Backstop Commitment Letter as of September 14, 2016, as the "Additional Backstop Party" thereunder, any Joining Backstop Party that accepts and assumes all of the rights and obligations of such Unsecured Noteholder and becomes party to the Backstop Commitment Letter in accordance therewith as an "Additional Backstop Party", and each of their respective permitted assigns.

v

"**Additional Secured Exchange Shares**" means the number of New Preferred Shares, rounded down to the nearest whole number, calculated by multiplying: (i) the number that is equal to the Initial Supporting Parties' Secured Debtholder Claims for accrued and unpaid interest from and after September 15, 2016, to the Effective Date (including, for greater certainty, the Secured Interest Payments Returned Amount) divided by $1,000,000, by (ii) 125,000.

"**Affected Existing Equity**" means all of the Existing Equity, except for the voting common shares and the non-voting common shares of RSH3.

"**Affected Existing Equity Holders**" means, collectively, the holders of Affected Existing Equity.

"**Affiliate**" has the meaning set out in the *Securities Act* (Alberta).

"**allowable capital loss**" has the meaning given to it under the heading "*Certain Income Tax Considerations – Certain Canadian Federal Income Tax Considerations – Holders Resident in Canada – Taxation of Capital Gains and Capital Losses*".

"**Alternative Proceeding**" has the meaning given to it under the heading "*Description of the Recapitalization – Alternative Proceeding*".

"**Applicants**" means, collectively, Tervita and ArrangeCo.

"**Approved EIP**" has the meaning given to it under the heading *Overview of New Shares Documentation – Amended Articles – Consent Rights of New Shareholders.*

"**ArrangeCo**" means 9894942 Canada Ltd., a corporation incorporated pursuant to the CBCA and a wholly-owned subsidiary of Tervita.

"**Arrangement**" means an arrangement under section 192 of the CBCA on the terms and subject to the conditions set out in the Plan, subject to any amendments or variations thereto made in accordance with the Plan or made at the direction of the Court in the Interim Order, the Final Order or otherwise in each case with the consent of Tervita and the Majority Initial Supporting Parties, each acting reasonably.

"**Articles of Arrangement**" means the articles of arrangement of the Applicants in respect of the Arrangement that are required by the CBCA to be filed with the Director after the Final Order has been made in order for the Arrangement to become effective on the Effective Date.

"**August 2016 Interest Payment**" has the meaning set out under the heading "*Description of Certain Indebtedness – Description of the Unsecured Notes*".

"**Backstop Commitment Letter**" means the backstop commitment letter dated as of September 14, 2016, among Tervita, the Initial Backstop Parties, the Additional Backstop Party and any Joining Backstop Parties that execute a Backstop Joinder Agreement from time to time in accordance with the terms of the Backstop Commitment Letter, a copy of which is attached hereto as Appendix "B".

"**Backstop Consideration**" means the non-refundable cash commitment fee in the amount equal to the Subscription Price multiplied by the Backstop Consideration Shares.

"**Backstop Consideration Shares**" means 1,860,000 New Preferred Shares to be issued, in the aggregate, to the Initial Backstop Parties and the Additional Backstop Party on the Effective Date in accordance with the Plan.

"**Backstop Joinder Agreement**" means an agreement substantially in the form of Schedule G to the Backstop Commitment Letter.

"**Backstop Parties**" means, collectively, each Initial Backstop Party and the Additional Backstop Party, and their respective permitted assigns.

"**Backstop Record Date**" means September 14, 2016.

"**Backstopped Shares**" means the aggregate number of New Investment Shares to be issued under the New Investment, minus the sum of the aggregate Share Subscription Commitment of all of the Initial Backstop Parties, the aggregate Share Subscription Commitment of all of the Unsecured Noteholders (other than the Backstop Parties) and the Additional Backstop Commitment.

"**Bankruptcy Law**" has the meaning set out under the heading "*Description of Certain Indebtedness – Description of the Subordinated Notes*".

"**Barclays**" means Barclays Capital Inc.

"**Barclays Opinions**" means, collectively, the CBCA Opinion and the Fairness Opinion.

"**beneficial owner**" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the U.S. Securities Exchange Act of 1934, as amended, and the rules promulgated thereunder. The terms "beneficially owns," "beneficial ownership" and "beneficially owned" have a corresponding meaning.

"**BEO Participants**" has the meaning set out under the heading "*Procedures relating to the Arrangement and New Investment*".

"**BIA**" means the *Bankruptcy and Insolvency Act* (Canada), R.S.C. 1985, c. B-3, as amended.

"**Board**" or "**Board of Directors**" means the board of directors of the Corporation immediately prior to the Effective Time.

"**Break Fee**" means (i) a fee in an amount equal to (A) 0.05 multiplied by the sum of $372 million and the Secured Debt, including accrued and unpaid interest, held by the Plan Sponsors to be exchanged for the 47,293,553 New Preferred Shares, minus (B) the Break Fee Pro Rata Share (as defined in the Backstop Commitment Letter) of any defaulting Backstop Party.

"**Broadridge**" has the meaning set out under the heading "*Information Concerning the Meetings – Non-Registered Unsecured/Subordinated Noteholders*".

"**Business Day**" means any day, other than a Saturday, a Sunday or a statutory or civic holiday, on which commercial banks are generally open for business in Calgary, Alberta and New York, New York.

"**Canada-U.S. Tax Treaty**" has the meaning given to it under the heading "Certain Income Tax Considerations – Certain Canadian Federal Income Tax Considerations – Holders Not Resident in Canada – Dividends on New Common Shares".

"**Cash Payment**" means $20 million.

"**CBCA**" means the *Canada Business Corporations Act,* R.S.C. 1985, c. C-44, as amended, and the regulations thereto, as now in effect and as may be amended from time to time prior to the Effective Date.

"**CBCA Opinion**" means the opinion dated effective October 6, 2016 provided by Barclays to the Board of Directors in the form described in paragraph 4.03 of Corporations Canada Policy Statement 15.1 and attached as Appendix "G" to this Information Circular.

"**CBCA Proceeding**" means the proceedings commenced by the Applicants under the CBCA in connection with the Plan of Arrangement under Court Action No. 1601-12176.

"**CCAA**" means the *Companies' Creditors Arrangement Act* (Canada), R.S.C. 1985, c. C-36, as amended.

"**CDS**" means CDS Clearing and Depository Services Inc. and its successors and assigns.

LEGAL_1:40709104.10

"**Certificate of Arrangement**" means the certificate giving effect to the Arrangement to be issued by the Director pursuant to section 192(7) of the CBCA upon receipt of the Articles of Arrangement in accordance with section 262 of the CBCA.

"**Claim**" means any right or claim of any Person that may be asserted or made, in whole or in part, in any capacity, whether or not asserted or made, in connection with any indebtedness, liability or obligation of any kind whatsoever, and any interest accrued thereon or costs payable in respect thereof, whether at law or in equity, including by reason of the commission of a tort (intentional or unintentional), by reason of any breach of contract or other agreement (oral or written), by reason of any breach of duty (including, any legal, statutory, equitable or fiduciary duty) or by reason of any equity interest, right of ownership of or title to property or assets or right to a trust or deemed trust (statutory, express, implied, resulting, constructive or otherwise), and together with any security enforcement costs or legal costs associated with any such claim, and any right or entitlement to the issuance of new notes, shares or securities in whatever form, and whether or not any indebtedness, liability or obligation is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, perfected, unperfected, present or future, known or unknown, by guarantee, warranty, surety or otherwise, and whether or not any right or claim is executory or anticipatory in nature, any claim, or any right or ability of any Person to advance a claim for an accounting, reconciliation, contribution, indemnity, restitution or otherwise with respect to any matter, grievance, action (including any class action or proceeding before an administrative tribunal), cause or chose in action, whether existing at present or commenced in the future, including, without limiting the generality of any of the foregoing, any make-whole, redemption premium, change of control payment, security interest, charge, mortgage or other encumbrance in connection with any of the foregoing.

"**Collateral Trust Agreement**" means that certain collateral trust agreement dated as of February 14, 2013, among Tervita, the guarantors from time to time party thereto, the Revolver Administrative Agent, the Term Loan Administrative Agent, the Secured Notes U.S. Trustee, the Secured Notes Canadian Trustee and the Collateral Trustee.

"**Collateral Trustee**" means Wilmington Trust, National Association, in its capacity as Canadian collateral trustee and U.S. collateral trustee under the Collateral Trust Agreement.

"**Commitment Fee**" has the meaning given to it under the heading Backstop Commitment.

"**Commitment Pro Rata Share**" means, as to any Backstop Party, the percentage, obtained by dividing: (i) (A) in the case of an Initial Backstop Party, the result obtained by multiplying $345.3 million by such Initial Backstop Party's Initial Backstop Pro Rata Share, or (B) in the case of the Additional Backstop Party, $26.7 million, by (ii) $372 million.

"**Committed Pro Rata Share**" means, with respect to an Unsecured Noteholder (including Plan Sponsors), the percentage, obtained by dividing (i) the Unsecured Noteholder's Share Subscription Commitment, by (ii) $372 million minus any New Investment Adjustment.

"**Company Entities**" means, collectively, ArrangeCo, CCS Sulphur Projects Ltd., 1495741 Alberta Ltd., Alberta Sulphur Terminals Inc., CCS Canada (Canadian Holdings) Inc., CCS International Holdings Inc., Hazco Industrial Services Ltd., Tervita Equipment Rentals Ltd., Tervita Environmental Services Ltd., Tervita Metal Services Ltd., Tervita Production Services Ltd., Tervita Norm Services Ltd, Tervita Waste Processing Ltd., Babkirk Land Services Inc., CRE – Tervita Corporation, Tervita (USA Holdings) LLC, Westmoreland Sanitary Landfill LLC, PennOhio Waste LLC, Tervita (US Operations LLC), ARKLA Disposal Services, Inc., American Process Group Inc. and CCS Energy & Environment S.A.P.I. de C.V.  and "Company Entity" means any one of them.

"**Corporation**" or "**Tervita**" means Tervita Corporation.

"**Corporations Canada Policy Statement 15.1**" means Corporations Canada Policy Statement 15.1 – *Policy of the Director concerning Arrangements under Section 192 of the CBCA*.

"**Court**" means the Alberta Court of Queen's Bench.

"**Data Room**" means, collectively, (i) the virtual data room established through the facilities of Intralinks by Tervita; (ii) minute books made available to the Plan Sponsor Legal Advisors; (iii) employment agreements provided to the Noteholder Legal Advisors; (iv) any other documents provided to the Plan Sponsor Legal Advisors.

"**Debt Instruments**" means,  collectively, the Term Loan Credit Agreement, the Notes and the Indentures.

"**Deemed Liquidation Event**" means a change of control transaction, recapitalization, sale of all or substantially all of the assets, liquidation event or similar transaction.

"**Defaulting Noteholder**" has the meaning set out under the heading "*Backstop Commitment*".

"**Definitive Notes**" means "Definitive Notes" under and as defined in the Secured Notes Indenture.

"**Depositary**" means TSX Trust Company.

"**Director**" means the Director appointed under section 260 of the CBCA.

"**DTC**" means the Depository Trust & Clearing Corporation and its successors and assigns.

"**Early Consent Cash Payment**" means $5 million.

"**Early Consent Deadline**" means 5:00 p.m. (Calgary time) on October 14, 2016

"**Early Consent Shares**" means the number of New Common Shares calculated by multiplying the aggregate number of New Shares to be issued pursuant to the Plan of Arrangement  by 0.5%, which New Common Shares shall be issued to Early Consenting Unsecured Noteholders on the Effective Date in accordance with the steps set forth in section 4.4 of the Plan.

"**Early Consenting Subordinated Noteholder Pro Rata Share**" means, as to any Early Consenting Subordinated Noteholder, the percentage, obtained by dividing: (i) the aggregate principal amount of all outstanding Subordinated Notes held by such Early Consenting Subordinated Noteholder on the Voting Record Date and any accrued and unpaid interest thereon, by (ii) the aggregate principal amount of all outstanding Subordinated Notes held by all Early Consenting Subordinated Noteholders on the Voting Record Date and any accrued and unpaid interest thereon.

"**Early Consenting Subordinated Noteholders**" means those Subordinated Noteholders that enter into the Subordinated Noteholder Support Agreement on or before the Early Consent Deadline.

"**Early Consenting Unsecured Noteholder Pro Rata Share**" means, as to any Early Consenting Unsecured Noteholder, the percentage, obtained by dividing: (i) the aggregate principal amount of all outstanding Unsecured Notes held by such Early Consenting Unsecured Noteholder on the Voting Record Date and any accrued and unpaid interest thereon, by (ii) the aggregate principal amount of all outstanding Unsecured Notes held by all Early Consenting Unsecured Noteholders on the Voting Record Date and any accrued and unpaid interest thereon.

"**Early Consenting Unsecured Noteholders**" means the Initial Supporting Parties and those other Unsecured Noteholders that enter into the Unsecured Noteholder Support Agreement on or before the Early Consent Deadline.

"**Effective Date**" means the date shown on the Certificate of Arrangement issued by the Director under the CBCA and giving effect to the Arrangement.

"**Effective Time**" means a time on the Effective Date as Tervita and the Majority Initial Supporting Parties may agree, each acting reasonably.

"**Electing Eligible Other Unsecured Noteholder**" means an Eligible Unsecured Noteholder that is an Other Unsecured Noteholder or an Additional Backstop Party and who has duly completed and submitted a Participation Form in accordance with the terms thereof.

"**Electing Eligible Other Unsecured Noteholder Commitment Amount**" means, as to any Electing Eligible Other Unsecured Noteholder, the amount equal to such Electing Eligible Other Unsecured Noteholder's Electing Eligible Other Unsecured Noteholder Commitment Shares multiplied by the Subscription Price.

"**Electing Eligible Other Unsecured Noteholder Commitment Shares**" means, as to any Electing Eligible Other Unsecured Noteholder, the amount equal to such Electing Eligible Other Unsecured Noteholder's Share Subscription Commitment.

"**Eligible Unsecured Noteholder**" means a Person that: (i) is an Unsecured Noteholder on the Voting Record Date (or a transferee of such Person prior to the Participation Deadline that has submitted a completed transfer certificate included in the Participation Form); (ii) is an "accredited investor" within the meaning of applicable Canadian securities laws; (iii) is either (a) a Person in the United States, or a U.S. Person within the meaning of Regulation S under the U.S. Securities Act outside the United States, in each case, that is a "qualified institutional buyer" within the meaning of Rule 144A under the U.S. Securities Act, or (b) outside the United States and is not a U.S. Person within the meaning of Regulation S under the U.S. Securities Act; and (iv) if such Person is resident outside of Canada and the United States, it is qualified to participate in the New Investment Offering in accordance with the Laws of its jurisdiction of residence without obliging Tervita to register the New Investment Shares or file a prospectus or other disclosure document or to make any other filings or become subject to any reporting or disclosure obligations that Tervita is not already obligated to make, and (if required by Tervita), has delivered to Tervita evidence satisfactory to Tervita to such effect.

"**Escrow Account**" means the separate account at a banking institution in Canada established by the Escrow Agent for purposes of funding of the Electing Eligible Other Unsecured Noteholder Commitment Amounts.

"**Escrow Agent**" means TSX Trust Company.

"**Escrow Agreement**" means the escrow agreement to be entered into by Tervita and the Escrow Agent for the purposes of the Escrow Agent receiving the Electing Eligible Other Unsecured Noteholder Commitment Amounts.

"**Exchanged Secured Debt**" means the aggregate principal amount of Secured Debtholder Claims held by the Initial Supporting Parties as of the Backstop Record Date, being principal amounts of US$15,908,738 under the Term Loan Credit Agreement, US$219,111,000 of 8% Secured Notes and $49,032,000 of 9.00% Secured Notes, plus accrued and unpaid interest owing on such amounts up to and including the Effective Date (including, for greater certainty, the Secured Interest Payments Returned Amount).

"**Executive Committee**" means Chris Synek, President and Chief Executive Officer; Stephen Kersley, Chief Financial Officer; Rob Van Walleghem, Executive Vice President, Health, Safety and Environment and General Counsel, Steve Foster, Executive Vice President, Corporate Services; and Brad Dlouhy, President of the Midstream Services Division.

"**Existing Common Shareholders**" means holders of the Existing Common Shares prior to the Effective Date.

"**Existing Common Shares**" means all issued and outstanding common shares and Class B Non-Voting Common Shares in the capital of Tervita.

"**Existing Directors**" means the directors of Tervita immediately prior to the Effective Time.

"**Existing Equity**" means, collectively, the Existing RSH3 Equity and the Existing Tervita Equity.

"**Existing Equity Holders**" means, collectively, the holders of Existing Equity.

"**Existing RSH3 Equity**" means all of the equity of RSH3 existing immediately prior to the Effective Time, including, without limitation, (i) all of the voting and non-voting common shares of RSH3, (ii) any preferred shares or other classes of shares of RSH3, and (iii) any options, warrants, conversion privileges, rights to receive cash payments in respect of any employee equity plan, calls, subscriptions, exchangeable securities or other rights, agreements, arrangements or commitments (pre-emptive, contingent or otherwise) obligating RSH3 to issue or sell shares in the capital of RSH3 or any securities or obligations of any kind convertible into or exchangeable for such shares.

"**Existing Tervita Equity**" means all of the equity of Tervita existing immediately prior to the Effective Time, including, without limitation, (i) all of the common shares of Tervita, (ii) any preferred shares or other classes of shares of Tervita, and (iii) any options, warrants, conversion privileges, calls, subscriptions, exchangeable securities or other rights, agreements, arrangements or commitments (pre-emptive, contingent or otherwise) obligating Tervita

x

to issue or sell shares in the capital of Tervita or any securities or obligations of any kind convertible into or exchangeable for such shares.

"**Extension Period**" has the meaning set out under the heading "*Description of Certain Indebtedness - Description of the Subordinated Notes*".

"**Fairness Opinion**" means the fairness opinion dated October 6, 2016 provided by Barclays to the Board of Directors and attached as Appendix "F" to this Information Circular.

"**Final Order**" means the final order of the Court approving the Arrangement under to section 192(4) of the CBCA, which shall include such terms as may be necessary or appropriate to give effect to the Arrangement and the Plan, in form and substance satisfactory to Tervita and the Majority Initial Supporting Parties, each acting reasonably.

"**Finance LP**" means Red Sky Finance LP.

"**First Out Debt**" means indebtedness secured by first priority liens that have "first out" status under the Collateral Trust Agreement.

"**Forbearing Noteholders**" means the Subordinated Noteholders that are party to the Interest Payment Default Agreement.

"**Funding Deadline**" means 5:00 p.m. (Calgary time) on the date that is three (3) Business Days prior to the Effective Date.

"**Funds**" means immediately available funds in Canadian dollars.

"**Global Notes**" means "Global Notes" under and as defined in the Secured Notes Indenture.

"**Governmental Entity**" means any government, regulatory authority, governmental department, agency, commission, bureau, official, minister, Crown corporation, court, board, tribunal or dispute settlement panel or other law, rule or regulation-making organization or entity: (i) having or purporting to have jurisdiction on behalf of any nation, province, territory or state or any other geographic or political subdivision of any of them; or (ii) exercising, or entitled or purporting to exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power.

"**Guarantors**" means, collectively, RSH 1, RSH 2, RSH 3, Finance LP, Holdings LP, CCS Canada (Canadian Holdings) Inc., CCS International Holdings Inc., HAZCO Industrial Services Ltd., Tervita Equipment Rentals Ltd., Tervita Environmental Services Ltd., Tervita Metal Services Ltd., Tervita Production Services Ltd., and Tervita Waste Processing Ltd.

"**Holder**" has the meaning given to it under the heading "Certain Income Tax Considerations – Certain Canadian Federal Income Tax Considerations".

"**Holdings LP**" means Red Sky Holdings LP, an Alberta limited partnership.

"**IFRS**" means International Financial Reporting Standards.

"**Incremental Revolving Facility**" has the meaning set out under the heading "*Description of Certain Indebtedness – Description of the Senior Second Credit Facilities – Amounts and Final Maturities*"

"**Incremental Term Loans**" has the meaning set out under the heading "*Description of Certain Indebtedness – Description of the Senior Second Credit Facilities – Amounts and Final Maturities*".

"**Indentures**" means, collectively, the Secured Notes Indenture, the 9.75% Unsecured Notes Indenture, the 10.875% Unsecured Notes Indenture and the Subordinated Notes Indenture.

xi

"**Indirect Equity Interests**" means the common shares and/or limited partnership interests in those entities which hold, directly or indirectly, 100% of the voting common shares of Tervita.

"**Information**" has the meaning given to it under the heading "Barclays Opinions – Assumptions and Limitations".

"**Information Circular**" means the Notices of Meeting and this management information circular, together with all appendices hereto.

"**Information Supplement**" means the provision of additional information or documents by way of press release or posting through a portal on Tervita's  website or otherwise which Tervita and the Plan Sponsors may consider appropriate or necessary for purposes of the Meetings and voting on the Plan of Arrangement.

"**Initial Backstop Party Backstop Commitment Amount**" means the amount of Initial Backstop Party Backstop Commitment Shares multiplied by the Subscription Price.

"**Initial Backstop Party Backstop Commitment Shares**" means the aggregate number of New Investment Shares to be issued under the New Investment Offering, less the sum of: (i) the aggregate of the Initial Backstop Party Initial Commitment Shares, (ii) the aggregate of the Electing Eligible Other Unsecured Noteholder Commitment Shares actually purchased on the Effective Date, and (iii) the Additional Backstop Initial Commitment Shares and the Additional Backstop Commitment Shares actually purchased on the Effective Date.

"**Initial Backstop Party Initial Commitment Amount**" means the amount of Initial Backstop Party Initial Commitment Shares multiplied by the Subscription Price.

"**Initial Backstop Party Initial Commitment Shares**" means as to each Initial Backstop Party, the amount of New Investment Shares equal to such Initial Backstop Party's Share Subscription Commitment.

"**Initial Backstop Parties**" means, collectively, those certain Unsecured Noteholders that entered into the Backstop Commitment Letter as of September 14, 2016, as "Initial Backstop Parties" thereunder, each Joining Backstop Party that becomes a party to the Backstop Commitment Letter in accordance therewith as an "Initial Backstop Party", and each of their respective permitted assigns.

"**Initial Backstop Pro Rata Share**" means, as to any Initial Backstop Party, the percentage, obtained by dividing: (i) the aggregate principal amount of all outstanding Unsecured Notes held by such Initial Backstop Party on the Backstop Record Date, and any accrued and unpaid interest thereon, by (ii) the aggregate principal amount of all outstanding Unsecured Notes held by all Initial Backstop Parties on the Backstop Record Date, and any accrued and unpaid interest thereon.

"**Initial Supporting Parties**" means those certain noteholders that entered into the Unsecured Noteholder Support Agreement as of September 14, 2016, as "Initial Supporting Parties" thereunder, and each of their respective permitted assigns.

"**Initial Supporting Party Advisors**" means Bennett Jones LLP, Davis Polk & Wardwell LLP, Moelis & Company LLC and Peters & Co. Limited.

"**Initial Supporting Party Pro Rata Share**" means, as to any Initial Supporting Party, the percentage, obtained by dividing: (i) the aggregate principal amount of the outstanding Secured Debtholder Claims held by such Initial Supporting Party on the Backstop Record Date and any accrued and unpaid interest thereon to and including the Effective Date, by (ii) the aggregate principal amount of all outstanding Secured Debtholder Claims held by all Initial Supporting Parties on the Backstop Record Date and any accrued and unpaid interest thereon to and including the Effective Date.

"**Intercompany Loan**" has the meaning set out under the heading "*Description of Certain Indebtedness – Description of the Intercompany Loan*".

"**Interest Payment Default Agreement**" has the meaning set out under the heading "*Description of Certain Indebtedness – Description of the Subordinated Notes*".

"**Interim Order**" means the interim order of the Court dated October 14, 2016 containing declarations and directions with respect to the Arrangement and the Unsecured Noteholders' Meeting, Subordinated Noteholders' Meeting and Shareholders' Meeting, issued pursuant to the application of the Applicants, a copy of which as attached as Appendix "D" to this Information Circular.

"**Intermediary**" means a broker, investment dealer, bank, trust company or other intermediary through which a Noteholder's Notes are held.

"**Joining Backstop Parties**" means those Persons that execute a joinder agreement in accordance with the terms of the Backstop Commitment Letter, and their permitted assigns.

"**Law**" means any law, statute, order, decree, consent decree, judgment, rule, regulation, ordinance or other pronouncement having the effect of law, whether in Canada, the United States, or any other country, or any domestic or foreign state, county, province, city or other political subdivision or of any Governmental Entity.

"**Liquidation Analysis**" has the meaning given to it under the heading "Barclays Opinions – Assumptions and Limitations".

"**Majority Initial Supporting Parties**" has the meaning set out under the heading "*Support Agreements – Unsecured Noteholder Support Agreement – Alternative Proceeding*".

"**Material Adverse Effect**" means any fact or state of facts, circumstance, change, effect, occurrence or event that is, or could reasonably be expected to be, material and adverse to the business, operations, results of operations, assets (tangible or intangible), properties, capitalization, condition (financial or otherwise) or liabilities (contingent or otherwise) of the Company Entities (taken as a whole) , except to the extent of any fact, state of facts, circumstance, change, effect, occurrence or event resulting from or arising in connection with:

(a)    the announcement of the execution of the Unsecured Noteholder Support Agreement or the transactions contemplated hereby;

(b)    any change in commodity prices or in currency exchange rates;

(c)    any adoption, proposal, implementation or change in applicable laws or any interpretation thereof by any Governmental Entity; or

(d)    any change in global, national or regional political conditions (including the outbreak of war, acts of terrorism or natural disasters) or in general economic, business, regulatory, political or market conditions or in national or global financial or capital markets,

provided that in the case of (b), (c) and (d) above, such conditions do not have a materially disproportionate effect on the applicable Company Entity relative to other companies in the industry.

"**May 2016 Interest Payment**" has the meaning set out under the heading "*Description of Certain Indebtedness - Description of the Subordinated Notes*".

"**Meeting Materials**" means, collectively, the Notices of Meeting, the Information Circular, letters of transmittal, the forms of proxy and the Participation Form.

"**Meetings**" means collectively, the Unsecured Noteholders' Meeting, the Subordinated Noteholders' Meeting, and the Shareholders' Meeting.

"**New Directors**" means the individuals appointed to the board of directors of Tervita on the Effective Date in accordance with the Unsecured Noteholder Support Agreement and the New Shares Documentation.

"**New Class A Voting Common Shares**" means the class A voting common shares of Tervita, to be created on the Effective Date.

"**New Class A Voting Preferred Shares**" means the class A voting preferred shares of Tervita, to be created on the Effective Date.

"**New Class B Non-Voting Common Shares**" means the class B non-voting common shares of Tervita, to be created on the Effective Date.

"**New Class B Non-Voting Preferred Shares**" means the class B non-voting preferred shares of Tervita, to be created on the Effective Date.

"**New Common Shares**" means, collectively the New Class A Voting Common Shares and New Class B Non-Voting Common Shares.

"**New Investment Adjustment**" has the meaning set out under the heading "*Description of the Recapitalization – New Investment*".

"**New Investment Adjustment Shares**" means the number of New Investment Shares, rounded down to the nearest whole number, calculated by multiplying: (i) the number that is equal to the New Investment Adjustment divided by $1,000,000 by (ii) 125,000.

"**New Investment Offering**" means the offering of New Investment Shares to Eligible Unsecured Noteholders.

"**New Investment Shares**" means 46,500,000 New Preferred Shares minus the number of any New Investment Adjustment Shares and the Additional Backstop Commitment Shares to be issued, in the aggregate, in accordance with the Plan of Arrangement pursuant to the New Investment Offering.

"**New Non-Voting Shares**" means, collectively, the New Class B Non-Voting Common Shares and New Class B Non-Voting Preferred Shares.

"**New Preferred Shares**" means, collectively, the New Class A Voting Preferred Shares and New Class B Non-Voting Preferred Shares.

"**New Revolving Credit Facility**" means the Revolving Credit Agreement dated as of February 14, 2013, as amended, providing for the revolving credit facilities, reinstated or replaced on market terms acceptable to Tervita and the Majority Initial Supporting Parties.

"**New Second Lien Notes**" means the new $475 million principal amount senior second lien notes to be issued by Tervita and on terms and conditions acceptable to Tervita and the Majority Initial Supporting Parties.

"**New Shares**" means, collectively, the New Common Shares and the New Preferred Shares.

"**New Shareholder**" means a holder of New Shares.

"**New Shares Documentation**" means, collectively, the amended articles of incorporation of Tervita, by-laws of Tervita, the Shareholders Agreement, the Registration Rights Agreement, other agreements or instruments executed or delivered in connection therewith and such other documentation necessary, expedient or proper to effectuate the issuance of the New Shares and the rights of the holders of the New Shares from and after the Effective Date.

"**New Voting Shares**" means, collectively, the New Class A Voting Common Shares and New Class A Voting Preferred Shares.

"**Newco**" has the meaning given to it under the heading "*Description of the Recapitalization – Pre- and Post-Arrangement Transactions*".

"**NI 45-102**" has the meaning set out under the heading "*Description of the Recapitalization – New Investment Offering – Transfer Restrictions*".

"**NI 51-102**" means National Instrument 51-102 *Continuous Disclosure Obligations* of the Canadian Securities Administrators.

"**Non-Registered Unsecured/Subordinated Noteholder**" means the beneficial owner of Unsecured/Subordinated Notes that are registered in the name of an Intermediary that the Non-Registered Unsecured/Subordinated Noteholder deals with in respect of the Unsecured/Subordinated Notes or in the name of a depository such as DTC or CDS.

"**Non-Resident Holder**" has the meaning given to it under the heading "*Certain Income Tax Considerations – Certain Canadian Federal Income Tax Considerations – Holders Not Resident in Canada*".

"**Noteholders**" means, collectively, the Secured Noteholders, the Unsecured Noteholders and the Subordinated Noteholders.

"**Notes**" means, collectively, the Secured Notes, the Unsecured Notes and the Subordinated Notes.

"**Notice of Intention to Appear**" means a notice by an Unsecured/Subordinated Noteholder, RSAC Shareholder or any other interested party that it intends to appear at the hearing of the Final Order, which notice must be delivered in accordance with the terms of the Interim Order.

"**Notices of Meeting**" means collectively the Unsecured Noteholders' Notice, Subordinated Noteholders' Notice and Shareholders' Notice accompanying this Information Circular.

"**Obligations**" means all obligations, liabilities and indebtedness of the Corporation and its subsidiaries or affiliates with respect to or arising out of, or in connection with, the Notes, the Indentures (including any guarantees granted in respect of, or pursuant to, the foregoing and the Term Loan Facility) but, for greater certainty, shall not include any obligations or liabilities of the Corporation and its subsidiaries or affiliates with respect to or arising out of, or in connection with, the Support Agreements or the Backstop Commitment Letter.

"**Officers' Certificate**" has the meaning given to it under the heading "*Barclays Opinions – Assumptions and Limitations*".

"**Order**" means any order of the Court in the CBCA Proceedings.

"**Other Unsecured Noteholders**" means the Unsecured Noteholders that are not the Initial Supporting Parties.

"**Other Subordinated Noteholders**" has the meaning set out under the heading "*Description of Certain Indebtedness – Description of the Subordinated Notes*".

"**Other Transactions**" has the meaning given to it under the heading "*Support Agreements  – Subordinated Noteholder Support Agreement*".

"**Outside Date**" means December 31, 2016, or such later date as agreed to in writing by Tervita and the Majority Initial Supporting Parties.

"**Parity Debt**" means indebtedness secured by first priority liens on the collateral that does not have "first out" status under the Collateral Trust Agreement.

"**Participation Deadline**" means 5:00 p.m. (Calgary time) on November 28, 2016 or such later date as Tervita and the Majority Initial Supporting Parties may determine in writing.

"**Participation Form**" means the certification and participation form, substantially in the form accompanying this Information Circular, to be circulated to Unsecured Noteholders pursuant to the Interim Order and completed and delivered in accordance with the instructions contained therein by such Eligible Unsecured Noteholders who wish to participate in the New Investment Offering in advance of the Participation Deadline in order to make certain acknowledgments, agreements and certifications (including as to status as an Eligible Unsecured Noteholder) and to participate in the New Investment Offering.

"**Pembina**" has the meaning given to it under the heading "*The Arrangement – Treatment of the Existing Equity Holders – Secure Litigation*".

"**Person**" is to be broadly interpreted and includes any individual, firm, corporation, limited or unlimited liability company, general or limited partnership, association, trust, unincorporated organization, joint venture, Governmental Entity or any agency, officer or instrumentality thereof or any other entity, wherever situate or domiciled, and whether or not having legal status.

"**Plan of Arrangement**" or "**Plan**" means the plan of arrangement attached as Appendix "C" to this Information Circular and any amendments, modifications or supplements thereto made in accordance with the terms of the Plan of Arrangement or made at the direction of the Court in the Final Order with the consent of Tervita and the Majority Initial Supporting Parties.

"**Plan Sponsor Legal Advisors**" means Bennett Jones LLP and Davis Polk & Wardwell LLP, as counsel to the Plan Sponsors.

"**Plan Sponsors**" means, collectively, Alliance Bernstein L.P., on behalf of its discretionary accounts, Fidelity Management & Research Company, on behalf of funds that it manages, and Solus Alternative Asset Management LP, as investment adviser and on behalf of Sola Ltd, Ultra Master Ltd and Solus Opportunities Fund 5 LP.

"**Preliminary Interim Order**" means the preliminary interim order of the Court dated September 14, 2016 containing declarations and directions with respect to the Arrangement and the Meetings, issued pursuant to the application of the Applicants, a copy of which is attached as Appendix "●" to this Information Circular.

"**Primary Backstop Commitment**" has the meaning given to it under the heading "*Backstop Commitment.*

"**Proceedings**" means the proceedings commenced by, *inter alia*, Tervita before the Court under the CBCA or in connection with an Alternative Proceeding, as applicable.

"**Projections**" has the meaning given to it under the heading "*Backstop Commitment*".

"**Proposed Amendments**" has the meaning given to it under the heading "*Certain Income Tax Considerations – Certain Canadian Federal Income Tax Considerations*".

"**Qualified Public Offering**" means a public offering or listing of Tervita's equity securities on a nationally recognized exchange in Canada or the U.S.

"**Recapitalization**" means (i) the transactions contemplated by the Plan of Arrangement; (ii) the entering into of the New Revolving Credit Facility; (iii) the issuance of the New Second Lien Notes; and (iv) the transfer and possible elimination of the Intercompany Loan.

"**Recapitalization Term Sheet**" means the term sheet in respect of the Recapitalization, a copy of which is included in Schedule "C" to Appendix "B" of this Information Circular.

"**Registered Holder**" means, (i) in respect of the Secured Notes, the holder or holders of such Secured Notes as recorded on the books and records of the Secured Notes U.S. Trustee and/or the Secured Notes Canadian Trustee, as applicable, (ii) in respect of the Unsecured Notes, the holder or holders of such Unsecured Notes as recorded on the books and records of the Unsecured Notes Trustee, (iii) in respect of the Subordinated Notes, the holder or holders of such Subordinated Notes as recorded on the books and records of the Subordinated Notes Trustee, and (iv) in respect of the RSAC Shares, the holder or holders of such RSAC Shares as recorded on the books and records RSAC.

"**Registration Rights Agreement**" means the registration rights agreement to be entered into on the Effective Date between Tervita and the Initial Backstop Parties providing for the qualification for sale of the shares of Tervita in Canada and/or the United States.

"**Registered RSAC Shareholder**" means, RSAC Shareholders as recorded on the share register of RSAC.

"**Registered Unsecured/Subordinated Noteholder**" means, with respect to the Unsecured/Subordinated Notes, the holder of Unsecured/Subordinated Notes as recorded on the books and records of the Unsecured/Subordinated Note trustee (currently DTC).

"**Regulation S**" means Regulation S promulgated by the SEC under the U.S. Securities Act.

"**Relevant Debt Instruments**" means the principal amount of the debt under the Term Loan Credit Agreement or the Notes as set forth on a Noteholder's signature page to the Support Agreements.

"**Relevant Defaults**" has the meaning given to it under the heading "*Description of Certain Indebtedness – Description of the Senior Secured Credit Facilities – Accommodation Agreement*".

"**Relevant Equity Securities**" means the number of RSAC Shares and RSH LP Interests, if any, that each Noteholder or RSAC Shareholder or holder of RSH LP Interests that is a signatory to the Support Agreements is the sole legal and beneficial owner of, or has sole investment and voting discretion with respect to, as of September 14, 2016.

"**Resident Holder**" has the meaning given to it under the heading "Certain Income Tax Considerations – Certain Canadian Federal Income Tax Considerations – Holders Resident in Canada".

"**Return Date**" has the meaning set out under the heading "*Summary – The Meetings – Court Approved and Completion of the Plan of Arrangement*".

"**Revolver Administrative Agent**" means The Toronto-Dominion Bank, in its capacity as administrative agent under the Revolving Credit Agreement.

"**Revolver Maturity Date**" has the meaning set out under the heading "*Description of Certain Indebtedness – Description of the Senior Secured Credit Facilities – Amount and Final Maturity*".

"**Revolving Credit Agreement**" means that certain credit agreement dated as of February 14, 2013, among Tervita, as borrower, the loan guarantors from time to time party thereto, the lenders from time to time party thereto and the Revolver Administrative Agent, as amended, modified, restated or supplemented from time to time.

"**Revolving Credit Facilities**" means, collectively, the $325 million revolving credit facility and $25 million swingline credit facility extended to the Corporation and, as borrower, pursuant to the Revolving Credit Agreement.

"**Revolving Credit Facilities Lenders**" means "Lenders" under and as defined in the Revolving Credit Agreement.

"**Revolving Credit Waiver (10.875% Unsecured Notes)**" means the waiver dated August 15, 2016, between Tervita and the Revolver Administrative Agent (for the Required Lenders, as defined in the Revolving Credit Agreement). See "*Description of Certain Indebtedness – Senior Secured Credit Facilities – Waiver of Events of Default*".

"**Revolving Credit Waiver (Subordinated Notes)**" means the waiver dated May 13, 2016 between Tervita and the Revolver Administrative Agent (for the Required Lenders, as defined in the Revolving Credit Agreement). See "*Description of Certain Indebtedness – Description of the Senior Secured Credit Facilities – Waiver of Events of Default*".

"**Revolving Facility**" has the meaning set out under the heading "*Description of Certain Indebtedness – Description of the Senior Secured Credit Facilities – Amount and Final Maturities*".

"**RIFs**" has the meaning given to it under the heading "*Background to and Reasons for the Recapitalization*".

"**RSAC**" means Red Sky Acquisition Corp., the general partner of Holdings LP.

"**RSAC Shareholders**" means holders of RSAC Shares.

"**RSAC Shares**" means the common shares of RSAC.

Draft

"**RSH 1**" means Red Sky Holdings 1 Inc., the immediate parent company of RSH 2.

"**RSH 2**" means Red Sky Holdings 2 Inc., the immediate parent company of RSH 3.

"**RSH 3**" means Red Sky holdings 3 Inc., the immediate parent company of Tervita.

"**RSH LP Interests**" means limited partnership interests in Holdings LP.

"**Rule 144A**" means Rule 144A promulgated by the SEC under the U.S. Securities Act.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Secondary Backstop Commitment**" has the meaning given to it under the heading "*Backstop Commitment*".

"**Secure**" has the meaning given to it under the heading "*The Arrangement – Treatment of the Existing Equity Holders – Secure Litigation*".

"**Secure Litigation**" means the litigation commenced by Tervita against Secure Energy Services Inc., among others, under the Court Action No. 0701-13328.

"**Secure Litigation Recovery**" means 20% of the net proceeds actually received by Tervita from the full and final determination or settlement of the Secure Litigation following the deduction of: (i) all costs and expenses incurred by or on behalf of Tervita relating to the Secure Litigation, including, without limitation, all fees and expenses of legal counsel, advisors, and experts, and all out-of-pocket travel, filing, reproduction, and other costs, whenever incurred, (ii) any cash taxes payable in respect of such proceeds (or that would have been payable but for available sheltering as a result of Tervita's tax pools at the relevant time), and (iii) any amounts that may be payable by Tervita to any other party as a result of a counterclaim or otherwise in the Secure Litigation.

"**Secured Debt**" means, collectively, the Term Loan Facility and the Secured Notes.

"**Secured Debt Instruments**" means, collectively, the Term Loan Credit Agreement, the Secured Notes and the Secured Notes Indenture.

"**Secured Debtholder Claim**" means, as of the Effective Date, the Claims of a Secured Debtholder pursuant to the Secured Debt Instruments.

"**Secured Debtholders**" means, collectively, the Term Loan Lenders and the Secured Noteholders.

"**Secured Exchange Shares**" means the sum of (i) 47,293,566  New Preferred Shares, and (ii) the Additional Secured Exchange Shares, which sum shall be issued to the Initial Supporting Parties on the Effective Date in accordance with the steps set forth in section 4.4 of the Plan.

"**Secured Interest Notes**" means the non-interest bearing demand notes to be issued to the Initial Supporting Parties in accordance with the steps set forth in section 4.4 of the Plan of Arrangement, each with a principal amount equal to the amount of accrued and unpaid interest owing to an Initial Supporting Party on account of each of the Secured Debt Instruments held by such Initial Supporting Party as at September 14, 2016, with each such note being denominated in the currency in which the accrued interest is payable and providing for a default rate of interest of 10% per annum commencing two (2) days after a demand is made.

"**Secured Interest Payments**" means, collectively, the interest payments made by Tervita, from September 14, 2016 to and including the Effective Date, to (i) the Term Loan Lenders pursuant to the Term Loan Credit Agreement, and (ii) the Secured Noteholders pursuant to the Secured Notes and the Secured Notes Indenture.

"**Secured Interest Payments Returned Amount**" means the Secured Interest Payments paid to the Initial Supporting Parties in connection with the Exchanged Secured Debt.

"**Secured Notes**" means, collectively, the 8.00% Secured Notes and the 9.00% Secured Notes.

"**Secured Notes Canadian Trustee**" means TSX Trust Company (as successor to Equity Financial Trust Company) in its capacity as Canadian trustee under the Secured Notes Indenture.

"**Secured Notes Indenture**" means the indenture dated as of February 14, 2013, among Tervita, the guarantors from time to time party thereto, the Secured Notes U.S. Trustee and the Secured Notes Canadian Trustee, governing the Secured Notes, as amended, modified, restated or supplemented from time to time.

"**Secured Notes Order**" has the meaning given to it under the heading "*Description of the Recapitalization – Alternative Proceeding*".

"**Secured Notes U.S. Trustee**" means Wells Fargo Bank, National Association, in its capacity as U.S. trustee under the Secured Notes Indenture.

"**Secured Noteholders**" means, collectively, the Registered Holders or beneficial holders of the Secured Notes.

"**Senior Secured Credit Facilities**" means, collectively, the Revolving Credit Facilities and the Term Loan Facility.

"**Securityholder Consent and Support Agreement**" means, collectively, the consent and support agreements among Tervita and certain RSAC Shareholders and certain holders of RSH LP Interests dated as of September 14, 2016 (including the term sheet appended thereto), along with any joinders thereto, as may be amended from time to time in accordance with its terms.

"**Share Subscription Commitment**" means (i) in the case of an Initial Backstop Party, that number of New Investment Shares obtained by multiplying (A) the aggregate number of New Investment Shares to be issued under the New Investment Offering by (B) such Initial Backstop Party's Unsecured Noteholder Subscription Pro Rata Share, (ii) in the case of the Additional Backstop Party, that number of New Investment Shares equal to the lower of (A) the aggregate number of New Investment Shares, if any, that the Additional Backstop Party has duly committed to purchase under the New Investment Offering (excluding, for greater certainty, the Additional Backstop Commitment Shares), and (B) that number of New Investment Shares equal to (x) the number of New Investment Shares obtained by multiplying the aggregate number of New Investment Shares to be issued under the New Investment Offering by the Additional Backstop Party's Unsecured Noteholder Subscription Pro Rata Share, less (y) the Additional Backstop Commitment Shares; provided that such number shall not be less than zero, and (iii) in the case of any Electing Eligible Other Unsecured Noteholder, that number of New Investment Shares equal to the lower of (A) the aggregate number of New Investment Shares, if any, that such Other Unsecured Noteholder has duly committed to purchase pursuant the New Investment Offering, and (B) that number of New Investment Shares obtained by multiplying the aggregate number of New Investment Shares to be issued under the New Investment Offering by such Other Unsecured Noteholder's Unsecured Noteholder Subscription Pro Rata Share.

"**Shareholders Agreement**" means the unanimous shareholders agreement to be deemed pursuant to the Final Order to be effective on the Effective Date and binding on Tervita and all holders of New Shares.

"**Shareholders' Meeting**" means the meeting of RSAC Shareholders to be held on November 30, 2016 pursuant to the Interim Order to consider, and if deemed advisable, approve, the Shareholders Arrangement Resolution and to consider such other matters as may properly come before such meeting, as set out in the Shareholders' Notice, and any adjournments or postponements thereof.

"**Shareholders' Notice**" means the notice of the Shareholders' Meeting.

"**Shareholders Arrangement Resolution**" means the resolution of the RSAC Shareholders approving the Arrangement and the Plan of Arrangement, in form and substance reasonably acceptable to the Corporation, to be considered and passed by the requisite number of affirmative votes of the RSAC Shareholders at the Shareholders' Meeting, the full text of which is set out as Appendix "A" to this Information Circular.

"**Subco**" has the meaning given to it under the heading "Description of the Recapitalization – Pre- and Post-Arrangement Transactions".

"**Subordinated Note Interest Payment Default**" has the meaning set out under the heading "*Description of Certain Indebtedness - Description of the Subordinated Notes*".

"**Subordinated Noteholder Advisors**" means Davies Ward Phillips & Vineberg LLP, Fried, Frank, Harris, Shriver & Jacobson LLP and PJT Partners, Inc.

"**Subordinated Noteholder Support Agreement**" means the support agreement among Tervita and the Supporting Subordinated Noteholders dated as of September 14, 2016 (including the term sheet appended thereto), along with any joinders thereto, as may be amended from time to time in accordance with its terms.

"**Subordinated Noteholders**" means the Registered Holders or beneficial holders of the Subordinated Notes.

"**Subordinated Noteholders' Meeting**" means the meeting of the Subordinated Noteholders as of the Voting Record Date to be called and held pursuant to the Interim Order for the purpose of considering and voting on the Subordinated Noteholders Arrangement Resolution and to consider such other matters as may properly come before such meeting, and any adjournment(s) or postponement(s) thereof.

"**Subordinated Noteholders' Notice**" means the notice of the Subordinated Noteholders' Meeting.

"**Subordinated Noteholders Arrangement Resolution**" means the resolution of the Subordinated Noteholders relating to the Arrangement considered at the Subordinated Noteholders' Meeting, substantially in the form set out as Appendix "A" to this Information Circular.

"**Subordinated Noteholder Claims**" means, as of the Effective Date, the Claims of a Subordinated Noteholder pursuant to the Subordinated Notes and the Subordinated Notes Indenture.

"**Subordinated Notes**" means the 11.875% senior subordinated notes due 2018 issued pursuant to the Subordinated Notes Indenture.

"**Subordinated Notes Indenture**" means the indenture dated as of May 9, 2008, as amended by the first supplemental indenture dated as of February 1, 2010, and by the second supplemental indenture dated as of February 14, 2013, among Tervita, the guarantors from time to time party thereto and the Subordinated Notes Trustee, governing the Subordinated Notes, as amended, modified, restated or supplemented from time to time.

"**Subordinated Notes Trustee**" means Wilmington Savings Fund Society, FSB (as successor to Wells Fargo Bank, National Association), in its capacity as trustee under the Subordinated Notes Indenture.

"**Subordinated Pro Rata Share**" means, as to any Subordinated Noteholder, the percentage obtained by dividing: (i) the aggregate principal amount of all outstanding Subordinated Notes held by such Subordinated Noteholder on the Effective Date and any accrued and unpaid interest thereon, by (ii) the aggregate principal amount of all outstanding Subordinated Notes held by all Subordinated Noteholders on the Effective Date and any accrued and unpaid interest thereon.

"**Subscription Price**" means $8.00.

"**Superior Proposa**l" has the meaning set out under the heading "*Support Agreements – Unsecured Noteholder Support Agreement – Superior Proposal*".

"**Support Agreements**" means, collectively, the Unsecured Noteholder Support Agreement, the Subordinated Noteholder Support Agreement and the Securityholder Consent and Support Agreement.

"**Supporting RSAC Securityholder**" means, collectively, those RSAC Shareholder and holders of RSH LP Interests that are party to the Securityholder Consent and Support Agreement (including by way of a joinder agreement with Tervita).

"**Supporting Subordinated Noteholders**" means, collectively, those Subordinated Noteholders that are party to the Subordinated Noteholder Support Agreement (including by way of a joinder agreement with Tervita).

"**Supporting Unsecured Noteholders**" means, collectively, those Unsecured Noteholders that are party to the Unsecured Noteholder Support Agreement (including by way of a joinder agreement with Tervita).

"**taxable capital gain**" has the meaning given to it under the heading "Certain Income Tax Considerations – Certain Canadian Federal Income Tax Considerations – Holders Resident in Canada – Taxation of Capital Gains and Capital Losses".

"**Tax**" or "**Taxes**" means any and all taxes, duties, fees, premiums, assessments, imposts, levies and other charges of any kind whatsoever, including all interest, penalties, fines, additions to tax or other additional amounts in respect thereof, and including those levied on, or measured by, or referred to as, income, gross receipts, profits, capital, transfer, land transfer, sales, goods and services, harmonized sales, use, value-added, excise, stamp, withholding, business, franchising, property, development, occupancy, employer health, payroll, employment, health, social services, education and social security taxes, all surtaxes, all customs duties and import and export taxes, countervail and anti-dumping, all licence, franchise and registration fees and all employment insurance, health insurance and Canada, Quebec and other government pension plan premiums or contributions.

"**Tax Act**" means the *Income Tax Act* (Canada), R.S.C., 1985, c. 1 (5th Supp.) and the regulations thereto, as amended.

"**Term Loan**" has the meaning set out under the heading "*Description of Certain Indebtedness – Description of the Senior Secured Credit Facilities – Amounts and Final Maturities*".

"**Term Loan Administrative Agent**" means Cortland Capital Market Services LLC (as successor to Royal Bank of Canada), in its capacity as administrative agent under the Term Loan Credit Agreement.

"**Term Loan Credit Agreement**" means that certain amended and restated credit agreement dated as of February 14, 2013, among Tervita, as borrower, the loan guarantors from time to time party thereto, the lenders from time to time party thereto and the Term Loan Administrative Agent, as amended, modified, restated or supplemented from time to time.

"**Term Loan Facility**" means the U.S.$750 million facility made available under the Term Loan Credit Agreement.

"**Term Loan Lenders**" means "Lenders" under and as defined in the Term Loan Credit Agreement.

"**Term Loan Waiver (Subordinated Notes)**" means the waiver dated June 13, 2016 between Tervita and the Term Loan Administrative Agent (for the Required Lenders, as defined in the Term Loan Credit Agreement). See "*Description of Certain Indebtedness – Description of the Senior Secured Credit Facilities – Waiver of Events of Default*".

"**Term Maturity Date**" has the meaning Set out under the heading "Description of Certain Indebtedness – Senior Secured Credit Facilities – Amounts and Final Maturities".

"**Termination Event**" has the meaning given to it under the heading "Description of Certain Indebtedness – Description of the Senior Secured Credit Facilities– Accommodation Agreement".

"**Termination Notice**" has the meaning given to it under the heading "*Description of Certain Indebtedness – Description of the Senior Secured Credit Facilities – Accommodation Agreement*".

"**Tervita Entities**" means each of  the affiliates and subsidiaries of Tervita, as set forth in Schedule "B" to the Unsecured Noteholder Support Agreement and "Tervita Entity" means any one of them.

"**Tervita Group**" means, collectively, Tervita, ArrangeCo, RSH1, RSH2, RSH3, Hazco Industrial Services Ltd., CCS International Holdings Inc., Tervita Production Services Ltd., Tervita Waste Processing Ltd., Tervita Environmental Services Ltd., Tervita Equipment Rentals Ltd., Tervita Metal Services Ltd., CCS Canada (Canadian Holdings) Inc., ARKLA Disposal Services, Inc. and Finance LP.

"**Tervita Group Advisors**" means Osler, Hoskin & Harcourt LLP, Fasken Martineau DuMoulin LLP, Lathan and Watkins LLP and Barclays Capital Inc., as well as Stikeman Elliott LLP, as legal counsel to Tervita's board of directors.

"**Transfer**" has the meaning given to it under the heading "Support Agreements – Unsecured Noteholder Support Agreement".

"**Triumph**" has the meaning given to it under the heading "*The Arrangement – Treatment of the Existing Equity Holders – Secure Litigation*".

"**Trustee Fees and Expenses**" means the reasonable and documented fees and expenses (including attorneys' fees) of each of the Trustees (other than the Secured Notes U.S. Trustee and the Secured Notes Canadian Trustee) outstanding on the Effective Date.

"**Trustees**" means, collectively, the Secured Notes U.S. Trustee, the Secured Notes Canadian Trustee, the Collateral Trustee, the Unsecured Notes Trustee and the Subordinated Notes Trustee.

"**Unpurchased Share Subscription Commitment**" means the aggregate amount of the unfunded Share Subscription Commitments of all Electing Eligible Other Unsecured Noteholder.

"**Unsecured Exchange Shares**" means the number of New Common Shares calculated by multiplying the aggregate number of New Shares to be issued pursuant to the Plan by 2.0%, which New Common Shares shall be issued to Unsecured Noteholders on the Effective Date in accordance with the steps set forth in section 4.4 of the Plan.

"**Unsecured Noteholder Claim**" means, as of the Effective Date, the Claims of an Unsecured Noteholder pursuant to the Unsecured Notes and the Unsecured Notes Indenture.

"**Unsecured Noteholder Pro Rata Share**" means, as to any Unsecured Noteholder, the percentage, obtained by dividing: (i) the aggregate principal amount of all outstanding Unsecured Notes held by such Unsecured Noteholder on the Effective Date and any accrued and unpaid interest thereon, by (ii) the aggregate principal amount of all outstanding Unsecured Notes held by all Unsecured Noteholders on the Effective Date and any accrued and unpaid interest thereon.

"**Unsecured Noteholder Subscription Pro Rata Share**" means, as to any Unsecured Noteholder, the percentage, obtained by dividing: (i) the aggregate principal amount of all outstanding Unsecured Notes held by such Unsecured Noteholder on the Voting Record Date and any accrued and unpaid interest thereon, by (ii) the aggregate principal amount of all outstanding Unsecured Notes held by all Unsecured Noteholders on the Voting Record Date and any accrued and unpaid interest thereon.

"**Unsecured Noteholder Support Agreement**" means the support agreement among Tervita and the Supporting Unsecured Noteholders dated as of September 14, 2016 (including the term sheet appended thereto), along with any joinders thereto, as may be amended from time to time in accordance with its terms.

"**Unsecured Noteholders**" means, collectively, the Registered Holders or beneficial holders of the Unsecured Notes.

"**Unsecured Noteholders Arrangement Resolution**" means the resolution of the Unsecured Noteholders relating to the Arrangement considered at the Unsecured Noteholders' Meeting, substantially in the form attached as Appendix "A" to this Information Circular.

"**Unsecured Noteholders' Notice**" means the notice of the Unsecured Noteholders' Meeting.

"**Unsecured Noteholders' Meeting**" means the meeting of the Unsecured Noteholders as of the Voting Record Date to be called and held pursuant to the Interim Order for the purpose of considering and voting on the Unsecured Noteholders Arrangement Resolution and to consider such other matters as may properly come before such meeting, and any adjournment(s) or postponement(s) thereof.

"**Unsecured Notes**" means, collectively, the 9.75% Unsecured Notes, and the 10.875% Unsecured Notes.

LEGAL_1:40709104.10

"**Unsecured Notes Indentures**" means, collectively, the 9.75% Unsecured Notes Indenture, and the 10.875% Unsecured Notes Indenture.

"**Unsecured Notes Trustee**" means Delaware Trust Company (as successor to Wells Fargo Bank, National Association), in its capacity as trustee under the Unsecured Notes Indenture.

"**Unsecured/Subordinated Notes**" means, collectively, the Unsecured Notes and the Subordinated Notes.

"**Unsecured/Subordinated Noteholders**" means, collectively, the Unsecured Noteholders and the Subordinated Noteholders.

"**U.S.**" or "**United States**" means the United States of America, its territories and possessions, any state of the United States, and the District of Columbia.

"**U.S. Exchange Act**" means the United States *Securities Exchange Act of 1934*, as amended, and the rules and regulations promulgated thereunder.

"**U.S. GAAP**" means U.S. generally accepted accounting principles.

"**U.S. person**" has the meaning given to such term in Regulation S.

"**U.S. Securities Act**" means the United States *Securities Act of 1933*, as amended from time to time, and the rules and regulations promulgated thereunder, or any successor statute.

"**U.S.$**" or "**U.S. dollars**" means the lawful currency of the United States of America.

"**Voting Record Date**" means 5:00 p.m. (Calgary time) on October 14, 2016.

"**Voting Threshold**" means beneficial ownership of 49.90% of the New Voting Shares.

Draft

LEGAL_1:40709104.10

# SUMMARY

*This summary highlights selected information from this Information Circular to help Unsecured/Subordinated Noteholders and RSAC Shareholders understand the Recapitalization. Unsecured/Subordinated Noteholders and RSAC Shareholders should read this Information Circular carefully in its entirety to understand the terms of the Recapitalization as well as tax and other considerations that may be important to them in deciding whether to approve the Recapitalization. Unsecured/Subordinated Noteholders and RSAC Shareholders should pay special attention to the "Risk Factors" section of this Information Circular. The following summary is qualified in its entirety by reference to the detailed information contained in this Information Circular. Capitalized terms used herein, and not otherwise defined, have the meanings ascribed to them in the "Glossary of Terms" which begins on page vi.*

## TERVITA CORPORATION

Tervita is a leading, environmentally focused mid-stream and waste management service provider, primarily servicing the oil and gas industry, as well as the industrial and natural resource sectors. Tervita provides a broad and integrated array of services and environmental management solutions for its customers including, among other things, treatment, recovery and disposal of materials, landfill construction, well servicing, waste management, oil terminalling, energy marketing, metals recycling, equipment rental, demolition, and decommissioning.

Tervita is a corporation continued under the CBCA. The head and principal office of Tervita is located at Suite 500, 140 10 Ave SE, Calgary, AB T2G 0R1. The registered office of the Corporation is located at Suite 3400, 350 – 7th Avenue SW, Calgary, AB T2P 3N9.

See "*Information With Respect To Tervita Corporation*" attached as Appendix "H" to this Information Circular.

## RED SKY ACQUISITION CORP.

RSAC is the general partner of Holdings LP. Holdings LP is the indirect holder of all of the voting shares of Tervita.

See "*Information With Respect To Red Sky Acquisition Corp.*".

## THE RECAPITALIZATION

This Information Circular describes the proposed Recapitalization. The Recapitalization will be considered by the Unsecured Noteholders, Subordinated Noteholders and the RSAC Shareholders at their respective Meetings, each which are being called for the purpose of approving the Plan of Arrangement. If completed as contemplated herein, the Recapitalization will result in a number of significant changes to the capital structure of the Corporation, as more particularly described in this Information Circular. See "*Description of the Recapitalization*".

## BACKGROUND TO AND REASONS FOR THE RECAPITALIZATION

The deterioration of, and the continuing significant weakness in commodity prices has resulted in Tervita facing a number of challenges, including operating in an environment where many of its oil and gas exploration and production customers have ceased or materially reduced operations. This has resulted in decreased revenue for Tervita at reduced margins.

In 2014, Tervita began implementing a reduction in force initiative ("**RIFs**") aimed at centralizing internal services and minimizing redundancies in its operations. The RIFs primarily focused on overhead and general and administrative positions across the organization and resulted in a significant reduction in the number of Tervita employees from approximately 3,250 employees in January 2014 to a current amount of approximately 1,270 (including employees that have departed as a result of the sales of non-core assets).

In February 2015, Tervita disposed of its interest in Tervita LLC, resulting in the sale of most of its U.S. based operations for U.S.$473 million (U.S.$469 million after working capital adjustments).

In the latter half of 2015, despite the sale of Tervita LLC and the significant cost reductions from the RIFs, the Board determined that it was unlikely Tervita could continue to indefinitely service its significant debt obligations and

comply with certain of the financial covenants contained in the Revolving Credit Agreement over the long term under current market conditions.

In the fall of 2015, Tervita engaged Barclays as its financial advisor to consider strategic alternatives.  Some of the alternatives considered were, paying down some or all of the debt, obtaining covenant relief, raising new financing, unwinding Tervita's hedges and other liability management alternatives.  Barclays also analyzed, among other things, the potential sale of a portion of Tervita. Barclays contacted 16 potentially interested parties regarding a sale of Tervita or its assets.  One party signed a confidentiality agreement and made an indicative proposal.

In December 2015, Barclays began to assist Tervita in considering the possibility of a consensual restructuring.  From January 2016 onwards, Tervita and its advisors were in contact with various debtholders to discuss possible covenant relief and other possible solutions.

During March and April of 2016, Tervita and Barclays engaged with the Secured Debtholders, the Unsecured Noteholders and the Subordinated Noteholders and their respective advisors.

During this period, Tervita was also exploring options to address its liquidity problem and ways to mitigate the risk of a breach of the Term Loan debt ratio covenants.  With the assistance of Barclays, Tervita unwound certain "in the money" currency hedges and was able to monetize its secured and unsecured swaps which resulted in  gross proceeds of approximately U.S.$174 million and U.S.$52 million, respectively.

On May 15, 2016, and after extensive consultation with its Board and advisors, Tervita elected not to make the U.S.$18.3 million interest payment due on the Subordinated Notes, which resulted in a default under the Subordinated Notes Indenture.  Under the Subordinated Notes Indenture, Tervita had a 30-day grace period.

On June 15, 2016, the 30-day grace period expired without Tervita making the missed interest payment. However, Tervita was able to obtain (i) a waiver from the Revolving Credit Facilities Lenders for the missed interest payment on the Subordinated Notes; (ii) the Term Loan Waiver (Subordinated Notes); and (iii) the Interest Payment Default Agreement, whereby the Subordinated Noteholders agreed to forbear from enforcement of the interest payment default under the Subordinated Notes Indenture.

On August 15, 2016, Tervita elected not to make the U.S.$18.2 million interest payment on its 10.875% Unsecured Notes Indenture.  Under the Unsecured Notes Indenture, Tervita had a 30-day grace period.

In August 2016, Tervita completed the sale of its non-core production services business to High Arctic Energy Services Inc. for gross proceeds of $42.75 million.

The following is a summary of the factors, among others, which the Board reviewed and considered in relation to the Recapitalization:

- the challenging set of circumstances that Tervita has been faced with over the past several years;

- the challenges faced by Tervita to service and repay existing debt considering the reduction of available credit;

- the various alternatives that Tervita has explored to address its financial situation, including a sale of some or all of the company's assets, additional capital raising opportunities, other accretive transactions and a restructuring under the CCAA;

- the fact that the terms of the Recapitalization are the result of arm's length negotiations among management and the Board with support from their professional advisors, the Supporting Unsecured Noteholders, the Supporting Subordinated Noteholders and the Plan Sponsors;

- the likely consequences of a failure to pursue the Recapitalization;

2

LEGAL_1:40709104.10

- the strategic significance and benefits of the Recapitalization, including the reduction of Tervita's net debt and annual cash debt service costs and the commitment of additional capital to enable the company to invest in and maintain its ongoing operations;

- the advice Tervita has received from Barclays;

- the Barclays Opinions;

- the Recapitalization will not directly affect any of Tervita's trade obligations;

- that the Revolving Credit Facilities Lenders were supportive of a recapitalization that involves the complete equitization of the Unsecured/Subordinated Notes and repayment of Secured Debt;

- the fact that holders of more than 63% of the principal amount of the Unsecured Notes,  90% of the principal amount of the Subordinated Notes and 69% of RSAC Shareholders have indicated they are supportive of the Recapitalization;

- that a restructuring pursuant to an Alternative Proceeding would likely result in worse recoveries for all of Tervita's stakeholders than a consensual restructuring under the CBCA proceedings and involve considerable time and expense; and

- the Recapitalization represents the best going concern solution available to Tervita.

The foregoing discussion of the information and factors considered by the Board is not intended to be exhaustive, but includes certain of the material factors considered by the Board. In view of the variety of factors considered in connection with its evaluation of the Recapitalization, the Board did not find it practicable to, and did not, quantify or otherwise assign relative weights to the specific factors considered in reaching its recommendation. In addition, individual members of the Board may have given differing weights to different factors.

After careful consideration of the above-noted factors and other factors and following consultation with its financial advisor and outside legal counsel, the Board concluded that the Recapitalization, if implemented, would be better than the preceding alternatives because:

- total debt will be reduced by approximately $2.1 billion and annual cash interest expense reduced by $200 million;

- the improvement in liquidity through new debt in the amount of $475 million and the reinstatement or replacement of Tervita's Revolving Credit Facility;

- improving Tervita's capital structure and liquidity to enable it to take advantage of future growth opportunities and sustain operations in a depressed commodity price environment; and

- the reduction of the risk of continuing default under the Revolving Credit Facilities and other indebtedness.

See "*Background to and Reasons for the Recapitalization*".

## EFFECT OF THE RECAPITALIZATION

**Effect of the Recapitalization on Tervita**

The Recapitalization is expected to substantially improve the capital structure and liquidity of  Tervita by reducing the total amount of debt by approximately $2.1 billion through the combination of the irrevocable exchange and cancellation of the Notes under the Arrangement and by providing approximately $372 million minus any New Investment Adjustment (net of transaction costs) of new funds by virtue of the aggregate gross proceeds raised from the New Investment Offering under the Arrangement.  With a rebalanced capital structure, Tervita will benefit from a reduction of the annual cash interest expense of approximately $200 million.  The debt reduction is also expected to

improve Tervita's ability to access capital markets in the future. Accordingly, management believes that the Recapitalization will provide Tervita with increased liquidity, reduced financial risk and a more sustainable capital structure, thereby improving Tervita's overall financial strength and flexibility. The successful implementation of the Recapitalization is expected by management to be a significant positive step for Tervita in pursuing its business plan.

The following table sets forth the *pro forma* capitalization of Tervita (on a consolidated basis) as at June 30, 2016, assuming the completion of the Recapitalization.

| | | **As at June 30, 2016** | | |
|---|---|---|---|---|
| | | **Actual** | | **Pro Forma** |
| | | **(in millions)** | | |
| Long-term debt (including current portion): | | | | |
|     Existing Notes | $ | 2,235 | $ | - |
|     New Second Lien Notes | | - | | 475 |
|     Term Loan Facility | | 315 | | - |
|     Revolving Credit Facilities | $ | - | $ | ● |
|     Intercompany Loan | $ | 1,068 | $ | - |
|     Accrued Interest | $ | 60 | $ | - |
|     Working Capital | $ | 321 | $ | ● |
|     Total long-term debt (including current portion) | $ | 3,297 | $ | ● |
| Shareholders' equity (deficit): | | | | |
|     Shareholders' equity (deficit) | $ | ● | $ | ● |
|     Total capitalization | $ | ● | $ | ● |
|     Shares (actual): | | ● | | ● |

**Effect of the Recapitalization on Unsecured/Subordinated Noteholders**

The Recapitalization will result in (assuming an Effective Date of December 31, 2016):

(a)      assuming that each Unsecured Noteholder is an Eligible Unsecured Noteholder and purchases its Unsecured Noteholder Pro Rata Share of the New Investment Offering, Unsecured Noteholders (excluding Plan Sponsors that are Unsecured Noteholders) holding 27.5% of the New Shares (assuming a New Investment Offering of $372 million and all Unsecured Noteholders subscribe for all of their Unsecured Noteholder Subscription Pro Rata Share);

(b)      Subordinated Noteholders receiving an aggregate payment of $20 million (plus the Early Consent Cash Payment to the Early Consenting Subordinated Noteholders); and

(c)      the Plan Sponsors holding 72.5% of the New Shares (assuming a New Investment Offering of $372 million and all Unsecured Noteholders subscribe for all of their Unsecured Noteholder Subscription Pro Rata Share) after the irrevocable exchange and cancellation of all the Secured Debt Instruments held by them as of September 14, 2016.

**Effect of the Recapitalization on RSAC Shareholders**

RSAC Shareholders will continue to be shareholders of RSAC after the Effective Date. RSAC will indirectly hold all of the voting shares of RSH 3. RSH 3 is entitled to receive the Secure Litigation Recovery.

<div align="center">

**DESCRIPTION OF THE RECAPITALIZATION**

</div>

The Recapitalization will be effected by way of the Arrangement pursuant to the steps outlined in the Plan of Arrangement.

**The Arrangement**

*Treatment of Noteholders*

Under the Arrangement, the following steps will occur in relation to the Noteholders on the Effective Date:

    (a)        the Secured Debt Instruments (other than Secured Debt Instruments held by the Plan Sponsors as of September 14, 2016) will be repaid in full without any early redemption payments or similar payments. Accrued and unpaid interest up to and including the Effective Date on the Secured Debt Instruments shall be paid in cash except that accrued and unpaid interest on the Secured Debt Instruments held by the Plan Sponsors shall be paid in Secured Interest Notes;

    (b)        the irrevocable exchange and cancellation of the Unsecured Notes in consideration for such number of New Common Shares (which will represent 2.0% of the New Shares) and the right to participate in the New Investment Offering, to be allocated to Unsecured Noteholders based on their Unsecured Noteholder Pro Rata Share plus the Early Consent Shares (which will represent 0.5% of the New Shares) issuable to Early Consenting Unsecured Noteholders, to be allocated to Early Consenting Unsecured Noteholders based on their Early Consenting Unsecured Noteholder Subscription Pro Rata Share;

    (c)        the irrevocable exchange and cancellation of the Subordinated Notes in consideration for an aggregate cash payment of $20 million, to be allocated to Subordinated Noteholders based on their Subordinated Pro Rata Share plus a $5 million payment to Early Consenting Subordinated Noteholders, to be allocated to Early Consenting Subordinated Noteholders based on their Early Consenting Pro Rata Share;

    (d)        the irrevocable exchange and cancellation of all the Secured Debt Instruments held by the Plan Sponsors as of September 14, 2016 in consideration for the issuance of an aggregate of 47,293,553 New Preferred Shares and the Additional Secured Exchange Shares by Tervita to the Plan Sponsors.

For greater certainty, under the Arrangement, all obligations under the Notes and the Indentures will be discharged in full on the Effective Date pursuant to the Arrangement.

See "*Description of the Recapitalization – The Arrangement – Treatment of Noteholders*".

*Treatment of the Term Loan Facility*

Under the Arrangement, debt under the Term Loan Credit Agreement held by Persons other than the Plan Sponsors will be repaid in full. Debt under the Term Loan Credit Agreement held by Plan Sponsors will be irrevocably exchanged and cancelled in consideration for New Preferred Shares (a total of 47,293,553 New Preferred Shares and the Additional Secured Exchange Shares will be issued in exchange for all Secured Debt Instruments held by the Plan Sponsors as of September 14, 2016).

See "*Description of the Recapitalization – The Arrangement – Treatment of the Term Loan Facility*".

*Treatment of the Revolving Credit Facility*

The Revolving Credit Facilities will be unaffected by the Arrangement; however, it is a condition to the Recapitalization that the Revolving Credit Agreement be either reinstated or replaced on terms acceptable to Tervita and the Majority Initial Supporting Parties, each acting reasonably.

See "*Description of the Recapitalization – The Arrangement – Treatment of the Revolving Credit Facilities*".

### Treatment of Intercompany Loan

The Intercompany Loan will be transferred to a subsidiary of Tervita for nominal consideration.

See "*Description of the Recapitalization – The Arrangement – Treatment of  Intercompany Loan*".

### Treatment of Other Obligations

If the Recapitalization is completed under the CBCA, Tervita's trade debt and obligations to employees generally will all continue to be paid or satisfied in the ordinary course.

See "*Description of the Recapitalization – The Arrangement – Treatment of Other Obligations*".

### Treatment of the Existing Equity Holders

Under the Plan of Arrangement, all Affected Existing Equity will be cancelled and extinguished.  Tervita shall grant RSH 3 the right to receive the Secured Litigation Recovery in return for the cancellation of its common shares of Tervita.

See "*Description of the Recapitalization – The Arrangement – Treatment of the Existing Equity Holders*".

### Implementation of the New Shares Documentation

The authorized capital of the Corporation described under the heading "*Description of Capital Structure*" in Appendix "H" to this Information Circular will be amended such that the authorized share capital of the Corporation after giving effect to the Arrangement will be comprised of an unlimited number of New Shares having the terms and being subject to the conditions set out in the New Shares Documentation.

The Plan of Arrangement also provides that the existing articles of Tervita will be amended and replaced in their entirety with amended articles, the existing by-laws of Tervita will be repealed and replaced in their entirety with new by-laws the Registration Rights Agreements will become effective and the Shareholders Agreement will become effective, with each holder of New Shares being deemed to be a party to such agreement.  The general terms of the New Organizational Documents are described below under the heading "Overview of New Shares Documentation" and the specific terms will be described in the Information Supplement to be issued in advance of the Meetings in accordance with the terms of the Interim Order.  Along with the amended articles and new by-laws of Tervita, the Shareholders Agreement will govern the conduct of the business and affairs of the Corporation, the relationship between the shareholders of Tervita, their respective rights and obligations as shareholders of Tervita and certain other related matters, after giving effect to the Arrangement.

See "*Description of the Recapitalization – The Arrangement – Implementation of the New Shares Documentation*".

### Appointment of the New Directors

The Board as of the Effective Date will be comprised of seven directors, one of which will be the Chief Executive Officer of Tervita and each of which will be acceptable to the Plan Sponsors.

On or before the Effective Date, the Corporation, together with the Plan Sponsors, will announce by way of press release, the proposed New Directors.  The New Directors will be appointed pursuant to the Plan of Arrangement.

See "*Description of the Recapitalization – The Arrangement – Appointment of the New Directors*".

**Description of the New Shares**

The New Shares will be created on the Effective Date. Subject to the right of the New Preferred Shares to receive a liquidation preference of $0.001 per New Preferred Share upon a Deemed Liquidation Event, the holders of the New Shares will be entitled to receive, on a pro rata, as-converted basis, all proceeds available for distribution to the New Shareholders.

A New Shareholder may convert Voting Shares to Non-Voting Shares at any time. A New Shareholder may convert Non-Voting Shares to Voting Shares at any time that it can certify to Tervita that after giving effect to such conversion such New Shareholder's beneficial ownership of Voting Shares does not exceed the Voting Threshold.

The general terms of the New Voting Shares are described below under the heading "*Description of the Recapitalization – Description of the New Shares*" and the specific terms will be described in the Information Supplement to be issued in advance of the Meetings in accordance with the terms of the Interim Order.

*Description of the New Voting Shares*

Each of the New Voting Shares has one vote per share and, except for matters which require a class vote under the CBCA, vote on all matters together as a single class on an as-converted basis.

All or any portion of the Class A Voting Preferred Shares are convertible into New Class A Voting Common Shares at any time at the New Shareholder's option.

The general terms of the New Voting Shares are described below under the heading "*Description of the Recapitalization – Description of the New Shares - Description of the New Voting Shares*" and the specific terms will be described in the Information Supplement to be issued in advance of the Meetings in accordance with the terms of the Interim Order.

*Description of the New Non-Voting Shares*

Each of the Non-Voting Shares is only entitled to vote on matters specific to such class of shares or as otherwise required by law.

All or any portion of the Class B Non-Voting Preferred Shares are convertible into New Class B Non-Voting Common Shares at any time at the New Shareholder's option.

The general terms of the New Preferred Shares are described below under the heading "*Description of the Recapitalization – Description of the New Shares - Description of the New Preferred Shares*" and the specific terms will be described in the Information Supplement to be issued in advance of the Meetings in accordance with the terms of the Interim Order.

**New Investment Offering**

As part of the Recapitalization, the Corporation will complete the New Investment Offering of up to 46,500,000 New Investment Shares, minus the number of any New Investment Adjustment Shares and Additional Backstop Commitment Shares to be issued, at the Subscription Price for aggregate gross proceeds to the Corporation of $372 million minus any New Investment Adjustment and the Additional Backstop Commitment Amount.  Pursuant to the Plan of Arrangement, the New Investment Offering is open to all Unsecured Noteholders that are Eligible Unsecured Noteholders.  Each Eligible Unsecured Noteholder shall have the right, but not the obligation, to participate in the New Investment Offering for up to its Unsecured Noteholder Subscription Pro Rata Share of the New Investment Offering.  The Plan Sponsors have agreed under the Support Agreements to purchase their pro rata share of the New Investment Offering. The Initial Backstop Parties have agreed (severally, and not jointly) to subscribe for and purchase its Initial Backstop Pro Rata Share of the Backstopped Shares and any Unpurchased Share Subscription Commitment. See "*Backstop Commitment*".

LEGAL_1:40709104.10

Eligible Unsecured Noteholders who wish to participate in the New Investment Offering are required to duly execute and submit a Participation Form in advance of the Participation Deadline and must provide their Funds for their Unsecured Noteholder Pro Rata Share of the New Investment Offering by the Funding Deadline.

Holders of the New Investment Shares issued pursuant to the New Investment Offering will be deemed to be a party to, and subject to the terms and conditions of, the Shareholders Agreement.

See "*Description of the Recapitalization – New Investment Offering*" and "*Procedures Relating to the Arrangement and New Investment Offering*".

**New Revolving Credit Facility**

It is a condition to the Recapitalization that the Revolving Credit Agreement be either reinstated or replaced on terms acceptable to Tervita and the Majority Initial Supporting Parties, each acting reasonably.

Tervita intends to disclose the principal terms of the New Revolving Credit Facility when available, through the Information Supplement.

See "*Description of the Recapitalization – New Revolving Credit Facility*".

**New Second Lien Notes**

It is a condition to the Recapitalization that the New Second Lien Notes be made available to Tervita on such terms and conditions that Tervita and the Majority Initial Supporting Parties agree to, each acting reasonably.

Tervita intends to disclose the principal terms of the New Second Lien Notes when available, through the Information Supplement.

See "*Description of the Recapitalization – New Second Lien Notes*".

**Pre- and Post-Arrangement Transactions**

On September 6, 2016, the Corporation was continued from the ABCA to the CBCA.

Prior to the implementation of the Arrangement, certain of the Tervita Entities intend to undertake certain re-organization transactions.

See "*Description of the Recapitalization – Pre- and Post-Arrangement Transactions*".

**Early Consent Consideration**

Early Consenting Unsecured Noteholders will be entitled to receive, in addition to New Preferred Shares otherwise issuable to them pursuant to the Arrangement, their Early Consenting Unsecured Noteholder Subscription Pro Rata Share of the Early Consent Shares. Early Consenting Subordinated Noteholders will be entitled to receive, in addition to the $20 million otherwise issuable to them pursuant to the Arrangement, their Early Consenting Subordinated Pro Rata Share of the Early Consent Cash.

See "*Description of the Recapitalization – Early Consent Consideration*".

**Alternative Proceeding**

If (a) determined necessary or advisable by Tervita, or (b) Tervita has not obtained the Secured Notes Order by December 15, 2016, then, in either case, with the consent of the Majority Initial Supporting Parties, acting reasonably, Tervita will forthwith convert the CBCA proceeding to an Alternative Proceeding.

See "*Description of the Recapitalization – Alternative Proceeding*".

8

## SUPPORT AGREEMENTS

Unsecured Noteholders (including the Plan Sponsors) holding approximately **[63%]** of the aggregate principal amount of the Unsecured Notes, have signed the Unsecured Noteholder Support Agreements in which they have each agreed to support the Recapitalization and vote in favour of the Unsecured Noteholders Arrangement Resolution at the Unsecured Noteholders' Meeting, subject to the terms and conditions set forth in the Unsecured Noteholder Support Agreement.

Subordinated Noteholders holding approximately **[90%]** of the aggregate principal amount of the Subordinated Notes, have signed the Subordinated Noteholder Support Agreements in which they have each agreed to support the Recapitalization and vote in favour of the Subordinated Noteholders Arrangement Resolution at the Subordinated Noteholders' Meeting, subject to the terms and conditions set forth in the Subordinated Noteholder Support Agreement.

In addition, as of September 14, 2016, RSAC Shareholders holding approximately **[69%]** of the RSAC Shares, have entered into Securityholder Consent and Support Agreements in which they have agreed to support the Recapitalization and vote all of their respective RSAC Shares in favour of the Recapitalization to the extent that any such vote is required. Pursuant to the terms of the Unanimous Shareholders Agreement dated November 14, 2007 among RSAC and RSH1 and the Interim Order, the Securityholder Consent and Support Agreements are sufficient to obtain 100% approval from RSAC Shareholders.

Tervita intends to continue to solicit additional support for the Recapitalization.

For a summary of the terms of each of the Support Agreements, see "*Support Agreements*".

## BACKSTOP COMMITMENT

The Initial Backstop Parties have entered into a Backstop Commitment Letter with Tervita, pursuant to which the Initial Backstop Parties have severally (and not jointly) committed to purchase or fund the purchase of their Initial Backstop Pro Rata Share of: (i) the Backstopped Shares; and (ii) the New Investment Shares in respect of the Unpurchased Share Subscription Commitment of each Defaulting Noteholder, upon the terms and subject to the conditions set forth or referred to in the Backstop Commitment Letter and to be set for or referred to in the Plan of Arrangement and the New Shares Documentation.

For a summary of the terms of the Backstop Commitment Letter, see "*Backstop Commitment*".

## OVERVIEW OF NEW ORGANIZATIONAL DOCUMENTS

In accordance with the Recapitalization Term Sheet, on the Effective Date the articles and by-laws of Tervita will be amended and the Shareholders Agreement will be deemed effective.

The general terms of the New Organizational Documents are described below under the heading "*Overview of New Shares Documentation*" and the specific terms will be described in the Information Supplement to be issued in advance of the Meetings in accordance with the terms of the Interim Order.

See "*Overview of New Shares Documentation*".

## DESCRIPTION OF CERTAIN INDEBTEDNESS

Tervita's primary secured obligations are the Revolving Credit Facilities, Term Loan Facility and Secured Notes. As at September 30, 2016 the total amount owing under the Revolving Credit Facilities, Term Loan Facility and Secured Notes was approximately, nil, $325.7 million and $1,084.9 million, respectively.

See "*Description of Certain Indebtedness – Description of the Senior Secured Credit Facilities*" and "*Description of Certain Indebtedness – Description of the Secured Notes*".

9

Tervita's primary unsecured obligations are the Unsecured Notes and Subordinated Notes. As at September 30, 2016, 2016, the total amount owing under the Unsecured Notes and Subordinated Notes was approximately $865.00 million and $434.90 million.

The Indentures governing the Notes contain customary covenants that, among other things, limit Tervita's ability, and the ability of certain of its subsidiaries, to incur additional indebtedness, pay dividends or make distributions or certain other restricted payments, purchase or redeem capital stock, make investments or extend credit, engage in certain transactions with affiliates, consummate certain asset sales, effect a consolidation or merger, or sell, transfer, lease or otherwise dispose of all or substantially all assets, or create certain liens and other encumbrances on assets. The Indentures contain events of default customary for agreements of their type (with customary grace periods, as applicable).

See "*Description of Certain Indebtedness – Description of the Subordinated Notes*" and "*Description of Certain Indebtedness – Description of the Unsecured Notes*".

**Accommodation Agreement**

Prior to Tervita applying for the Preliminary Interim Order, Tervita and certain of the Revolving Credit Facilities Lenders entered into the Accommodation Agreement. Under the Accommodation Agreement, the Revolving Credit Facilities Lenders agreed to consent to the Recapitalization under a CBCA Proceeding or CCAA Proceeding.  The Revolving Credit Facilities Lenders also agreed in the Accommodation Agreement to waive the Relevant Defaults. The Revolving Credit Facilities Lenders consent to the Recapitalization and waiver of defaults, as discussed above extend throughout the Accommodation Period.

Under the Accommodation Agreement, if any Termination Event occurs and is continuing, the Revolver Administrative Agent may, and at the request of the Required Lenders under the Revolving Credit Agreement shall, upon seven days' prior written notice to the Borrower, declare the Accommodation Period to be terminated either with immediate effect or at such later date as may be specified by the Revolver Administrative Agent in such notice.

See "*Description of Certain Indebtedness – Accommodation Agreement*".

**Preliminary Interim Order and Interim Order**

Under the Preliminary Order (until and including October 14, 2016) and under the Interim Order (from 12:01 a.m. on the date of this Interim Order until and including the earlier of: (a) the Effective Date; (b) seven days after the termination of the Unsecured Noteholders Support Agreement; or (c) seven days after the termination of the Backstop Commitment Letter), no person, including, without limitation, the Noteholders, the trustees under the Indentures, the Term Loan Administrative Agent, the Term Loan Facility Lenders or any other administrative agent, collateral agent, indenture trustee or similar person, (i) shall have any right to terminate, accelerate, amend or declare a default or event of default or make any demand or take any step to enforce any guarantee or any security interest granted by any member of the Tervita Group in respect of the Notes, the Term Loan Facility, or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor, and (ii) may refer to, rely on or otherwise claim any rights against any member of the Tervita Group under any contract, debt instrument or any other agreement with any member of the Tervita Group in respect of any alleged breach, default or event of default under the Notes, the Term Loan Facility or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor; in each case, by reason of: (A) the Applicants having commenced this proceeding, (B) any member of the Tervita Group taking any steps in furtherance thereof, (C) any of member of the Tervita Group being a party to these proceedings or being party to an Arrangement, or (D) any default or cross-default arising under any of the Notes or the Term Loan Credit Agreement, without further order of this Court.

Under the Preliminary Interim Order and Interim Order, but subject to the terms of the Accommodation Agreement the Revolving Credit Facilities Lenders are treated as unaffected in any plan of arrangement filed by Tervita in the CBCA Proceeding and are not subject to any stay of proceedings in the CBCA Proceeding, and nothing in the Preliminary Interim Order and Interim Order prevents the filing by the Revolving Credit Facilities Lenders of any registration to preserve or perfect any security interest.

See "*Description of Certain Indebtedness – Preliminary Interim Order and Interim Order*".

10

## THE MEETINGS

Pursuant to the Interim Order, subject to any Order, the Unsecured Noteholders' Meeting has been called by the Corporation to consider and, if deemed advisable, to pass the Unsecured Noteholders Arrangement Resolution approving the Arrangement, the Subordinated Noteholders' Meeting has been called by the Corporation to consider and, if deemed advisable, to pass the Subordinated Noteholders Arrangement Resolution approving the Arrangement and the Shareholders' Meeting has been called by the Corporation to consider and, if deemed advisable, to pass the Shareholders Arrangement Resolution approving the Arrangement. The Unsecured Noteholders' Meeting will be held at the offices of Osler, Hoskin & Harcourt LLP located at Suite 2500, TransCanada Tower, 450 – 1st Street S.W., Calgary, Alberta on November 30, 2016 at 10:00 a.m. (Calgary time), the Subordinated Noteholders' Meeting will be held at the offices of Osler, Hoskin & Harcourt LLP located at Suite 2500, TransCanada Tower, 450 – 1st Street S.W., Calgary, Alberta on November 30, 2016 at 10:30 a.m. (Calgary time) and the Shareholders' Meeting will be held at the offices of Osler, Hoskin & Harcourt LLP located at Suite 2500, TransCanada Tower, 450 – 1st Street S.W., Calgary, Alberta on November 30, 2016 at 11:00 a.m. (Calgary time).

The Voting Record Date for determining the Unsecured Noteholders, Subordinated Noteholders and RSAC Shareholders eligible to receive notice of and to vote at the Unsecured Noteholders' Meeting, Subordinated Noteholders' Meeting and the Shareholders' Meeting, respectively, is 5:00 p.m. (Calgary time) on October 14, 2016.

Subject to any Order, pursuant to the Interim Order, the Court has set the quorum for the Unsecured Noteholders' Meeting as Unsecured Noteholders present in person or represented by proxy and representing at least 25% of the principal amount of the outstanding Unsecured Notes entitled to vote at the Unsecured Noteholders' Meeting.

Subject to any Order, pursuant to the Interim Order, the Court has set the quorum for the Subordinated Noteholders' Meeting as Subordinated Noteholders present in person or represented by proxy and representing at least 25% of the principal amount of the outstanding Subordinated Notes entitled to vote at the Subordinated Noteholders' Meeting.

Subject to any Order, pursuant to the Interim Order, the Court has set the quorum for the Shareholders' Meeting as RSAC Shareholders present in person or represented by proxy and holding over 50% of the RSAC Shares entitled to vote at the Shareholders' Meeting. Despite the previous sentence, if proper notice of the Shareholders' Meeting is given and a quorum of RSAC Shareholders is not present, a second RSAC Shareholders' meeting may be held on 48 hours written notice to transact the business specified in the original notice. Subject to the CBCA, any RSAC Shareholders present at the second meeting constitute a quorum and the business specified in the original notice may be transacted by a majority vote of RSAC Shares represented at the second meeting.

**Unsecured Noteholder, Subordinated Noteholder and RSAC Shareholder Approvals**

Subject to any Order, pursuant to the Interim Order, at the Unsecured Noteholders' Meeting, each Unsecured Noteholder will have one vote for each U.S.$1,000 principal amount of Unsecured Notes held by such noteholder as of the Voting Record Date, with no fractional votes permitted. The Unsecured Noteholders will vote together as a single class.

Subject to any Order, pursuant to the Interim Order, at the Subordinated Noteholders' Meeting, each Subordinated Noteholder will have one vote for each U.S.$1,000 principal amount of Subordinated Notes held by such noteholder as of the Voting Record Date, with no fractional votes permitted. The Subordinated Noteholders will vote as a single class.

 See "*Information Concerning the Meetings – Voting Requirements*".

The Interim Order provides that, in order for the Unsecured Noteholders Arrangement Resolution (the full text of which is set out in Appendix "A" to this Information Circular) to be passed by Unsecured Noteholders at the Unsecured Noteholders' Meeting, the Unsecured Noteholders Arrangement Resolution must be passed by the affirmative vote of at least 66⅔% of the votes cast by the Unsecured Noteholders present in person or represented by proxy and voting at the Unsecured Noteholders' Meeting. Illegible votes, spoiled votes, defective votes and abstentions shall be deemed to be votes not cast.

11

The Interim Order provides that, in order for the Subordinated Noteholders Arrangement Resolution (the full text of which is set out in Appendix "A" to this Information Circular) to be passed by Subordinated Noteholders at the Subordinated Noteholders' Meeting, the Subordinated Noteholders Arrangement Resolution must be passed by the affirmative vote of at least 66⅔% of the votes cast by the Subordinated Noteholders present in person or represented by proxy and voting at the Subordinated Noteholders' Meeting.  Illegible votes, spoiled votes, defective votes and abstentions shall be deemed to be votes not cast.

The Interim Order provides that, in order for the Shareholders Arrangement Resolution (the full text of which is set out in Appendix "A" to this Information Circular) to be passed by RSAC Shareholders at the Shareholders' Meeting, the Shareholders Arrangement Resolution must be passed by the affirmative vote of RSAC Shareholders present in person or represented by proxy and voting at the Shareholders' Meeting representing at least 53.6% of the RSAC Shares.  Illegible votes, spoiled votes, defective votes and abstentions shall be deemed to be votes not cast.

See "*Information Concerning the Meetings – Approval Requirements*".

If any Unsecured/Subordinated Noteholder or RSAC Shareholder has any questions about obtaining and completing proxies, it should contact Kingsdale Shareholder Services by telephone at 1-866-851-2484 (toll-free within Canada or the United States) or 1-416-867-2272 (for calls outside Canada and the United States) or by email at contactus@kingsdaleshareholder.com.

**Court Approval and Completion of the Plan of Arrangement**

The implementation of the Plan of Arrangement is subject, among other things, to approval by the Court.  Prior to the mailing of this Information Circular, the Corporation obtained the Interim Order providing for the calling and holding of the Unsecured Noteholders' Meeting, Subordinated Noteholders' Meeting and Shareholders' Meeting and other procedural matters. A copy of the Interim Order is attached hereto as Appendix "D". The originating application applying for the Final Order also appears in Appendix "E" and forms part of this Information Circular.

Subject to the approval of the Plan of Arrangement by the Unsecured Noteholders and Subordinated Noteholders at the Unsecured Noteholders' Meeting and Subordinated Noteholders' Meeting, respectively, and the Shareholders Arrangement Resolution at the Shareholders' Meeting, the hearing in respect of the Final Order is scheduled to take place sometime during the week of December 5th at Calgary Courts Centre.   At the hearing, any Unsecured/Subordinated Noteholder, RSAC Shareholder or other interested party who wishes to appear, or be represented or to present evidence or argument, may do so, subject to filing with the Court and serving upon the solicitors for the Corporation, a Notice of Intention to Appear and satisfying any other requirements of the Court as provided in the Interim Order or otherwise.  At the hearing for the Final Order, the Court will consider, among other things, the fairness and reasonableness of the Arrangement, the approval of the Unsecured Noteholders Arrangement Resolution by the Unsecured Noteholders at the Unsecured Noteholders' Meeting, the approval of the Subordinated Noteholders Arrangement Resolution by the Subordinated Noteholders at the Subordinated Noteholders' Meeting and the approval of the Shareholders Arrangement Resolution at the Shareholders' Meeting.  The Court will be advised prior to the hearing of the application for the Final Order that if the terms and conditions of the Arrangement, and the fairness thereof, are approved by the Court, the New Shares to be issued to the Noteholders, as applicable, pursuant to the Arrangement (other than the New Investment Shares offered and sold for cash to Eligible Unsecured Noteholders pursuant to the New Investment Offering), as applicable, will not require registration under the U.S. Securities Act in reliance upon the registration exemption in Section 3(a)(10) of the U.S. Securities Act.

See "*Description of the Recapitalization – Court Approval and Completion of the Arrangement*".

<div align="center">

**CONDITIONS TO THE RECAPITALIZATION BECOMING EFFECTIVE**

</div>

The implementation of the Plan of Arrangement is conditional upon the fulfillment, satisfaction or waiver of a number of conditions precedent, in each case in accordance with the terms thereof and/or the Backstop Commitment Letter and Unsecured Noteholder Support Agreement, as applicable. Notwithstanding any provision of the Plan of Arrangement, subject to the Backstop Commitment Letter and the Unsecured Noteholder Support Agreement, the transactions and steps described herein may be amended, varied or waived prior to the implementation of the Plan of Arrangement with the consent of the Corporation. See "*Description of the Recapitalization — Conditions to the Recapitalization Becoming Effective*" for a list of the conditions.

## BARCLAYS OPINIONS

In connection with the Arrangement, the Board of Directors received written opinions from Barclays to the effect that, as of the date thereof, and based on, and subject to, the various assumptions, limitations and qualifications set out therein: (i) the Unsecured Noteholders, the Subordinated Noteholders and the Existing Common Shareholders would each be in a better financial position, respectively, under the Recapitalization than if the Corporation were liquidated, as in each case, the estimated aggregate value of the consideration made available to the Unsecured Noteholders, the Subordinated Noteholders and the Existing Common Shareholders, respectively, pursuant to the Recapitalization would, in the opinion of Barclays exceed the estimated value such Unsecured Noteholders, Subordinated Noteholders and Existing Common Shareholders  would receive in a liquidation, respectively; and (ii) Barclays is of the opinion that the Recapitalization, if implemented, would be fair, from a financial point of view, to the Corporation.

The full text of the Barclays Opinions are attached hereto as Appendix "F" and "G" to this Information Circular and should be read in their entirety for a description of the assumptions made, matters considered and limitations and qualifications on the review undertaken by Barclays in providing its opinions.

See "*Description of the Recapitalization – Barclays Opinions*".

## RECOMMENDATION OF THE BOARD OF DIRECTORS

The Recapitalization is expected to substantially improve the capital structure and financial position of the Corporation by de-leveraging its balance sheet, substantially reducing its debt and the costs associated with servicing its debt and providing it with improved liquidity and improved access to capital. The Board and management of the Corporation believe that the Arrangement will provide the necessary financial flexibility and capital resources to manage the business in the current economic environment and enable the Corporation to continue to pursue its business plan, without having to pursue non-consensual proceedings under creditor protection legislation.

In connection with the Arrangement, the Board of Directors received the Barclays Opinions. The full text of the Barclays Opinions are attached hereto as Appendix "F" and "G" to this Information Circular and should be read in their entirety for a description of the assumptions made, matters considered and limitations and qualifications on the review undertaken by Barclays in providing its opinions.

The Board of Directors, after careful consideration of a number of factors, including the factors discussed in the foregoing section entitled "*Background to and Reasons for the Recapitalization*" and the Barclays Opinions, and upon consultation with its financial advisor and outside legal counsel, determined unanimously (subject to the abstentions of Messrs. David Werklund and John Gibson as interested directors) that the Recapitalization is in the best interests of the Corporation and the Board of Directors has unanimously (subject to the abstentions of Messrs. David Werklund and John Gibson as interested directors) determined to recommend to the Unsecured Noteholders and Subordinated Noteholders that they **VOTE FOR** the Unsecured Noteholders Arrangement Resolution and Subordinated Noteholders Arrangement Resolution at the Unsecured Noteholders' Meeting and Subordinated Noteholders' Meeting, respectively.  In making their determination and recommendation, the Board of Directors relied upon legal, tax and other advice and information received during the course of its deliberations.

See "*Description of the Recapitalization – Recommendation of the Board of Directors*".

13

## INCOME TAX CONSIDERATIONS

**Canadian Federal Income Tax Considerations**

For a description of the Canadian federal income tax consequences resulting from the Recapitalization, please refer to "*Certain Income Tax Considerations – Certain Canadian Federal Income Tax Considerations*".

**United States Federal Income Tax Considerations**

For a description of the United States federal income tax consequences resulting from the Recapitalization, please refer to "*Certain Income Tax Considerations – Certain United States Federal Income Tax Considerations*".

## RISK FACTORS

Unsecured/Subordinated Noteholders should carefully consider the risk factors concerning implementation and non-implementation, respectively, of the Recapitalization, the liquidity of the Corporation and its affiliates and subsidiaries and the business of the Corporation described under "*Risk Factors*".

14

## INFORMATION CONCERNING THE MEETINGS

**General**

This Information Circular is furnished in connection with the solicitation of proxies by and on behalf of management of Tervita. No person has been authorized to give any information or to make any representations in connection with the Recapitalization other than those contained in this Information Circular and, if given or made, any such other information or representation should be considered as not having been authorized.

**Meetings**

The Unsecured Noteholders' Meeting will be held at the offices of Osler, Hoskin & Harcourt LLP located at Suite 2500, TransCanada Tower, 450 – 1st Street S.W., Calgary, Alberta on November 30, 2016 at 10:00 a.m. (Calgary time), as set forth in the Unsecured Noteholders' Notice. The Subordinated Noteholders' Meeting will be held at the offices of Osler, Hoskin & Harcourt LLP located at Suite 2500, TransCanada Tower, 450 – 1st Street S.W., Calgary, Alberta on November 30, 2016 at 10:30 a.m. (Calgary time), as set forth in the Subordinated Noteholders' Notice. The Shareholders' Meeting will be held at the offices of Osler, Hoskin & Harcourt LLP located at Suite 2500, TransCanada Tower, 450 – 1st Street S.W., Calgary, Alberta on November 30, 2016 at 11:00 a.m. (Calgary time), as set forth in the Shareholders' Notice.

**Solicitation of Proxies**

**Management of the Corporation and RSAC, as applicable, is soliciting proxies for use at the Meetings and has designated the individuals named on the enclosed forms of proxy as persons whom Unsecured Noteholders, Subordinated Noteholders and RSAC Shareholders may appoint as their proxyholders. If an Unsecured Noteholder, Subordinated Noteholder or RSAC Shareholder wishes to appoint an individual not named on the enclosed forms of proxy to represent him or her at the Unsecured Noteholders' Meeting, Subordinated Noteholders' Meeting or Shareholders' Meeting, as the case may be, the Unsecured Noteholder, Subordinated Noteholder or RSAC Shareholder may do so either: (i) by crossing out the names on the applicable enclosed form of proxy and inserting the name of that other individual in the blank space provided on the applicable enclosed form of proxy; or (ii) by completing another valid form of proxy. A proxyholder need not be an Unsecured Noteholder, Subordinated Noteholder or RSAC Shareholder. If the Unsecured Noteholder, Subordinated Noteholder or RSAC Shareholder is a corporation, its proxy must be executed by a duly authorized officer or properly appointed attorney.**

The Corporation is paying for this solicitation, which is being made by mail, with possible supplemental telephone or other personal solicitations by employees or agents of the Corporation. Tervita has engaged Kingsdale Shareholder Services as proxy solicitation and information agent and will pay fees of approximately $40,000 for these services in addition to certain out-of-pocket expenses. Tervita may also reimburse brokers and other Persons holding securities in their name or in the name of nominees for their costs incurred in sending proxy material to their principals in order to obtain their proxies. The cost of solicitation will be borne by Tervita.

The Corporation has requested brokers, nominees and other Intermediaries who hold Unsecured/Subordinated Notes in their names to furnish the Information Circular and accompanying materials to the beneficial holders of the Unsecured/Subordinated Notes and to request authority to deliver a proxy.

In order to be effective, proxies must be received no later than 5:00 p.m. (Calgary time) on the day that is two Business Days before the Unsecured Noteholders' Meeting, Subordinated Noteholders' Meeting or Shareholders' Meeting (or, with the consent of the chair of the Unsecured Noteholders' Meeting, Subordinated Noteholders' Meeting or Shareholders' Meeting, at any time prior to the commencement of the applicable Meeting) or two Business Days preceding the date of any adjournment of the Unsecured Noteholders' Meeting, Subordinated Noteholders' Meeting or Shareholders' Meeting (or, with the consent of the chair of the Unsecured Noteholders' Meeting, Subordinated Noteholders' Meeting or Shareholders' Meeting, at any time prior to the commencement of the applicable adjourned Meeting) using one of the following methods, as applicable. Notwithstanding the foregoing, the chair of the Unsecured Noteholders' Meeting, Subordinated Noteholders' Meeting or Shareholders' Meeting may waive or extend the time limit for the deposit of proxies at his or her discretion, without notice.

15

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

Proxies may be submitted by using any one of the below methods:

**For Unsecured/Subordinated Noteholders:**

| By Mail, Hand Delivery or Overnight Courier: | By Fax: | By Internet: |
|---|---|---|
| TSX Trust Company<br>200 University Avenue, Suite 300,<br>Toronto, Ontario, M5H 4H1 | (416) 595-9593 | Go to www.voteproxyonline.com<br>and enter the 12 digit control<br>number |

**For RSAC Shareholders:**

| By Mail, Hand Delivery or Overnight Courier: | By Fax: | By Internet: |
|---|---|---|
| TSX Trust Company<br>200 University Avenue, Suite 300,<br>Toronto, Ontario, M5H 4H1 | (416) 595-9593 | Go to www.voteproxyonline.com<br>and enter the 12 digit control<br>number |

**If Unsecured/Subordinated Noteholder or RSAC Shareholders have any questions about obtaining and completing proxies, it should contact our information agent, Kingsdale Shareholder Services by telephone at 1-866-851-2484 (toll-free within Canada or the United States) or 1-416-867-2272 (for calls outside Canada and the United States) or by email at contactus@kingsdaleshareholder.com.**

**Entitlement to Vote and Attend**

Those persons who are Registered Unsecured Noteholders on the Voting Record Date will be entitled to attend and vote at the Unsecured Noteholders' Meeting. At the Unsecured Noteholders' Meeting, each Unsecured Noteholder will have one vote for each U.S.$1,000 principal amount of Unsecured Notes held by such noteholder as of the Voting Record Date, with no fractional votes permitted. The Unsecured Noteholders will vote together as a single class.

Those persons who are Registered Subordinated Noteholders on the Voting Record Date will be entitled to attend and vote at the Subordinated Noteholders' Meeting. At the Subordinated Noteholders' Meeting, each Subordinated Noteholder will have one vote for each U.S.$1,000 principal amount of Subordinated Notes held by such noteholder as of the Voting Record Date, with no fractional votes permitted. The Subordinated Noteholders will vote as a single class.

Only the Registered Unsecured Noteholders and Registered Subordinated Noteholders as at the close of business on the Voting Record Date will be entitled to receive notice of and vote at the Unsecured Noteholders' Meeting and Subordinated Noteholders' Meeting, respectively.

Those persons who are Registered RSAC Shareholders on the Voting Record Date will be entitled to attend and vote at the Shareholders' Meeting. RSAC Shareholders will be entitled to one vote for each RSAC Share held by such RSAC Shareholder as of the Voting Record Date, with no fractional votes permitted.

Only the Registered RSAC Shareholders as at the close of business on the Voting Record Date will be entitled to receive notice of and vote at the Shareholders' Meeting provided that, if an RSAC Shareholder transfers the ownership of any RSAC Shares after the Voting Record Date, and the transferee of those RSAC Shares produces properly endorsed RSAC Share certificates or otherwise establishes ownership of such RSAC Shares, as the case may be, and demands, not later than 5:00 p.m. (Calgary time) on the 10th Business Day before the Shareholders' Meeting, to be included on the list of  RSAC Shareholders' entitled to vote at the Shareholders' Meeting (a "**Recognized RSAC Share Transferee**"),  such Recognized RSAC Share Transferee will be entitled to vote the RSAC Shares at the Shareholders' Meeting.

See "*Information Concerning the Meetings – Voting Requirements*".

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

**Revocation of Proxies**

Unsecured Noteholders, Subordinated Noteholders or RSAC Shareholders will be entitled to revoke a proxy at any time prior to the exercise thereof at the Unsecured Noteholders' Meeting, Subordinated Noteholders' Meeting or Shareholders' Meeting, as applicable, by:

(a)     depositing with TSX Trust Company (in the same manner as it may deposit a proxy) an instrument in writing executed by such party or by an attorney authorized in writing, or, if the party is a corporation, by a duly authorized officer or attorney thereof, at any time up to and including the last Business Day preceding the date of the Unsecured Noteholders' Meeting, Subordinated Noteholders' Meeting or Shareholders' Meeting or Shareholders' Meeting, or with the scrutineer(s) or chair of the Unsecured Noteholders' Meeting, Subordinated Noteholders' Meeting or Shareholders' Meeting or Shareholders' Meeting on the day of the Unsecured Noteholders' Meeting, Subordinated Noteholders' Meeting or Shareholders' Meeting or Shareholders' Meeting, as applicable; or

(b)     depositing with TSX Trust Company a further proxy which is dated subsequent to the date of the original proxy; or

(c)     in any manner permitted by law.

**Voting of Proxies**

On any matter, the individuals named as proxyholders in the enclosed forms of proxy will vote the Unsecured Notes, Subordinated Notes and RSAC Shares represented by a proxy in accordance with the instructions of the Unsecured Noteholder, Subordinated Noteholder and RSAC Shareholder as applicable, who appointed them. **If there are no instructions on a returned proxy or the instructions are not certain on any poll, the individuals named as proxyholders will vote the Unsecured Notes, Subordinated Notes or RSAC Shares as recommended by management in FAVOUR of the Unsecured Noteholders Arrangement Resolution, Subordinated Noteholders Arrangement Resolution or Shareholders Arrangement Resolution, respectively. The enclosed forms of proxy, when properly completed and signed, confer discretionary authority on the appointed individuals to vote as they see fit on any amendment or variation to any of the matters identified in the Unsecured Noteholders' Notice, Subordinated Noteholders' Notice or Shareholders' Notice, as applicable, and on any other matter that may properly be brought before the Unsecured Noteholders' Meeting, Subordinated Noteholders' Meeting or Shareholders' Meeting. As at the date hereof, management is not aware of any variation, amendment or other matter to be presented for a vote at the Unsecured Noteholders' Meeting, Subordinated Noteholders' Meeting or Shareholders' Meeting.**

**Non-Registered Unsecured/Subordinated Noteholders**

Only Registered Unsecured Noteholders and Subordinated Noteholders on the Voting Record Date, or the persons they appoint as their proxies, are permitted to attend and vote at the Unsecured Noteholders' Meeting and Subordinated Noteholders' Meeting, respectively. However, in many cases, Unsecured Notes and/or Subordinated Notes beneficially owned by a holder are registered either:

•     in the name of an Intermediary that the Non-Registered Unsecured/Subordinated Noteholder deals with in respect of the Unsecured/Subordinated Notes; or

•     in the name of a depository such as DTC or CDS.

Intermediaries are required to seek instructions from the Non-Registered Unsecured/Subordinated Noteholders on behalf of whom they hold any Unsecured/Subordinated Notes as to how to vote such Notes. For that reason, Non-Registered Unsecured/Subordinated Noteholders will have received this Information Circular from their respective Intermediaries together with a voting instruction form. **Each Intermediary has its own signing and return instructions, which Non-Registered Unsecured/Subordinated Noteholders should follow carefully to ensure**

LEGAL_1:40709104.10

**that their Unsecured/Subordinated Notes will be voted.  If you are a Non-Registered Unsecured/Subordinated Noteholder who has voted and you want to change your mind and vote in person, contact your Intermediary to discuss whether this is possible and what procedure to follow.**

Tervita has distributed copies of the Meeting Materials to DTC and Intermediaries for onward distribution to Non-Registered Unsecured/Subordinated Noteholders.  Intermediaries are required to forward the Meeting Materials to Non-Registered Unsecured/Subordinated Noteholders unless a Non-Registered Unsecured/Subordinated Noteholder has waived the right to receive them. Typically, Intermediaries will use a service company to forward the Meeting Materials to Non-Registered Unsecured/Subordinated Noteholders.  Generally, Non-Registered Unsecured/Subordinated Noteholders who have not waived the right to receive Meeting Materials will receive either a voting instruction form or, less frequently, a form of proxy.  The purpose of these forms is to permit Non-Registered Unsecured/Subordinated Noteholders to direct the voting of the Unsecured/Subordinated Notes they beneficially own. Non-Registered Unsecured/Subordinated Noteholders should follow the procedures set out below, depending on which type of form they receive:

(a)    <u>Voting Instruction Form</u>.  In most cases, a Non-Registered Unsecured/Subordinated Noteholder will receive, as part of the Meeting Materials, a voting instruction form. If the Non-Registered Unsecured/Subordinated Noteholder does not wish to attend and vote at the Unsecured Noteholders' Meeting or Subordinated Noteholders' Meeting, as applicable, in person (or have another person attend and vote on the Non-Registered Unsecured/Subordinated Noteholder's behalf, as applicable), the voting instruction form must be completed, signed and returned in accordance with the directions on the form. If a Non-Registered Unsecured/Subordinated Noteholder wishes to attend and vote at the Unsecured Noteholders' Meeting or Subordinated Noteholders' Meeting, as applicable, in person (or have another person attend and vote on the Non-Registered Unsecured/Subordinated Noteholder's behalf), the Non-Registered Unsecured/Subordinated Noteholder must complete, sign and return the voting instruction form in accordance with the directions provided for purposes of attending and voting at the Unsecured Noteholders' Meeting or Subordinated Noteholders' Meeting, as applicable in person and a form of proxy, giving the right to attend and vote, will be forwarded to the Non-Registered Unsecured/Subordinated Noteholder.  The majority of Intermediaries now delegate the responsibility for obtaining voting instructions to a third party called Broadridge Financial Solutions, Inc. ("**Broadridge**").  The voting instruction form from Broadridge allows voting by mail, telephone and internet.  Additionally, Tervita may utilize Broadridge's QuickVote™ service to assist Non-Registered Unsecured/Subordinated Noteholders with voting their Unsecured/Subordinated Notes.

or

(b)    <u>Form of Proxy</u>.  Less frequently, a Non-Registered Unsecured/Subordinated Noteholder will receive, as part of the Meeting Materials, a form of proxy that has already been signed by the Intermediary (typically by a facsimile, stamped signature) which is restricted as to the number of Unsecured/Subordinated Notes beneficially owned by the Non-Registered Unsecured/Subordinated Noteholder but which is otherwise uncompleted. If the Non-Registered Unsecured/Subordinated Noteholder does not wish to attend and vote at the Unsecured Noteholders' Meeting or Subordinated Noteholders' Meeting, as applicable, in person (or have another person attend and vote on the Non-Registered Unsecured/Subordinated Noteholder's behalf), the Non-Registered Unsecured/Subordinated Noteholder must complete the form of proxy and deposit it in accordance with the directions on the proxy. If a Non-Registered Unsecured/Subordinated Noteholder wishes to attend and vote at the Unsecured Noteholders' Meeting or Subordinated Noteholders' Meeting, as applicable, in person (or have another person attend and vote on the Non-Registered Unsecured/Subordinated Noteholder's behalf), the Non-Registered Unsecured/Subordinated Noteholder must strike out the names of the persons named in the proxy and insert the Non-Registered Unsecured/Subordinated Noteholder's (or such other person's) name in the blank space provided.

**Non-Registered Unsecured/Subordinated Noteholders should follow the instructions on the forms they receive and contact their Intermediaries promptly if they need assistance.**

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

**Voting Requirements**

As of the Voting Record Date, the total aggregate principal amount of the Unsecured Notes and Subordinated Notes was U.S.$625.00 million and U.S.$307.56 million, respectively.

Subject to any Order, pursuant to the Interim Order, each Unsecured/Subordinated Noteholder will be permitted to one vote for each U.S.$1,000 principal amount of Unsecured/Subordinated Notes held by such Unsecured/Subordinated Noteholder as of the Voting Record Date, with no fractional votes permitted. The Unsecured/Subordinated Noteholders will vote as two separate classes.

Subject to any Order, pursuant to the Interim Order, each RSAC Shareholder will be permitted to one vote for each one RSAC Share held by such RSAC Shareholder as of the Voting Record Date, with no fractional votes permitted.

Each Supporting Unsecured Noteholder has signed the Unsecured Noteholder Support Agreement in its capacity as an Unsecured Noteholder pursuant to which it has each agreed to support the Recapitalization and vote in support of the Unsecured Noteholders Arrangement Resolution at the Unsecured Noteholders' Meeting, subject to the terms and conditions set forth in the Unsecured Noteholder Support Agreement. Each Supporting Subordinated Noteholders has signed the Subordinated Noteholder Support Agreement in its capacity as a Subordinated Noteholder pursuant to which it has agreed to support the Recapitalization and vote in support of the Subordinated Noteholders Arrangement Resolution at the Subordinated Noteholders' Meeting, subject to the terms and conditions set forth in the Subordinated Noteholder Support Agreement.

Each Supporting RSAC Securityholder has signed the Securityholder Consent and Support Agreement in its capacity as an RSAC Shareholder and holder of RSH LP Interest pursuant to which it has agreed to support the Recapitalization and vote in support of the Shareholders Arrangement Resolution at the Shareholders' Meeting, subject to the terms and conditions set forth in the Securityholder Consent and Support Agreement.

See "*Support Agreements*".

**Quorum**

Subject to any Order, pursuant to the Interim Order, the Court has set the quorum for the Unsecured Noteholders' Meeting as Unsecured Noteholders present in person or represented by proxy and representing at least 25% of the principal amount of the outstanding Unsecured Notes entitled to vote at the Unsecured Noteholders' Meeting.

If a quorum shall not be present within 30 minutes from the time fixed for holding the Unsecured Noteholders' Meeting, the Unsecured Noteholders' Meeting shall be adjourned to the same day in the next week (unless such day is not a Business Day in which case it shall be adjourned to the next following Business Day thereafter) at the same time and place and no notice shall be required to be given in respect of such adjourned meeting. At the adjourned meeting, the Unsecured Noteholders present in person or represented by proxy shall constitute a quorum and may transact the business for which the meeting was originally convened notwithstanding that the Unsecured Noteholders may not represent 25% of the principal amount of the Unsecured Notes present in person or represented by proxy.

Subject to any Order, pursuant to the Interim Order, the Court has set the quorum for the Subordinated Noteholders' Meeting as Subordinated Noteholders present in person or represented by proxy and representing at least 25% of the principal amount of the outstanding Subordinated Notes entitled to vote at the Subordinated Noteholders' Meeting.

If a quorum shall not be present within 30 minutes from the time fixed for holding the Subordinated Noteholders' Meeting, the Subordinated Noteholders' Meeting shall be adjourned to the same day in the next week (unless such day is not a Business Day in which case it shall be adjourned to the next following Business Day thereafter) at the same time and place and no notice shall be required to be given in respect of such adjourned meeting. At the adjourned meeting, the Subordinated Noteholders present in person or represented by proxy shall constitute a quorum and may transact the business for which the meeting was originally convened notwithstanding that the Subordinated Noteholders may not represent 25% of the principal amount of the Subordinated Notes present in person or represented by proxy.

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

Subject to any Order, pursuant to the Interim Order, the Court has set the quorum for the Shareholders' Meeting as RSAC Shareholders present in person or represented by proxy and holding over 50% of the RSAC Shares entitled to vote at the Shareholders' Meeting. Despite the previous sentence, if proper notice of the Shareholders' Meeting is given and a quorum of RSAC Shareholders is not present, a second RSAC Shareholders' meeting may be held on 48 hours written notice to transact the business specified in the original Shareholders' Notice. Subject to the CBCA, any RSAC Shareholders present at the second meeting constitute a quorum and the business specified in the original notice may be transacted by a majority vote of RSAC Shares represented at the second meeting of RSAC Shareholders.

**Approval Requirements**

The Interim Order provides that, in order for the Unsecured Noteholders Arrangement Resolution to be passed by Unsecured Noteholders at the Unsecured Noteholders' Meeting, the Unsecured Noteholders Arrangement Resolution must be passed by the affirmative vote of Unsecured Noteholders representing at least 66⅔% of the votes cast by the Unsecured Noteholders present in person or represented by proxy and voting at the Unsecured Noteholders' Meeting. Illegible votes, spoiled votes, defective votes and abstentions shall be deemed to be votes not cast.

The Interim Order provides that, in order for the Subordinated Noteholders Arrangement Resolution to be passed by Subordinated Noteholders at the Subordinated Noteholders' Meeting, the Subordinated Noteholders Arrangement Resolution must be passed by the affirmative vote of Unsecured Noteholders representing at least 66⅔% of the votes cast by the Subordinated Noteholders present in person or represented by proxy and voting at the Subordinated Noteholders' Meeting. Illegible votes, spoiled votes, defective votes and abstentions shall be deemed to be votes not cast.

The Interim Order provides that, in order for the Shareholders Arrangement Resolution (the full text of which is set out in Appendix "A" to this Information Circular) to be passed by RSAC Shareholders at the Shareholders' Meeting, the Shareholders Arrangement Resolution must be passed by the affirmative vote of RSAC Shareholders, present in person or represented by proxy and voting at the Shareholders' Meeting, representing at least 53.6% of the RSAC Shares. Illegible votes, spoiled votes, defective votes and abstentions shall be deemed to be votes not cast.

The Interim Order also provides that, subject to the terms of the Unsecured Noteholder Support Agreement, any votes cast in favour of the Unsecured Noteholders Arrangement Resolution, Subordinated Noteholders Arrangement Resolution and/or Shareholders Arrangement Resolution (whether in person or by proxy) may be counted as votes in favour a plan of compromise or arrangement of the Applicants in a proceeding under the CCAA, as amended.

As of the date hereof, (i) Unsecured Noteholders holding approximately **[63%]** of the aggregate principal amount of the Unsecured Notes have agreed to support the Recapitalization and vote in favour of the approval, consent, ratification and adoption of the Recapitalization and the Plan of Arrangement (and any actions in furtherance thereof), including the Unsecured Noteholders Arrangement Resolution, subject to the terms and conditions of the Unsecured Noteholder Support Agreement; (ii) Subordinated Noteholders holding approximately **[90%]** of the aggregate principal amount of the Subordinated Notes have agreed to support the Recapitalization and vote in favour of the approval, consent, ratification and adoption of the Recapitalization and the Plan of Arrangement (and any actions in furtherance thereof), including the Subordinated Noteholders Arrangement Resolution, subject to the terms and conditions of the Subordinated Noteholder Support Agreement ; and (iii) RSAC Shareholders (including the Plan Sponsors) holding approximately **[69%]** of the RSAC Shares have agreed to support the Recapitalization and vote in favour of the approval, consent, ratification and adoption of the Recapitalization and the Plan of Arrangement (and any actions in furtherance thereof), including the Shareholders Arrangement Resolution, subject to the terms and conditions of the Securityholder Consent and Support Agreement.

Pursuant to the terms of the Unanimous Shareholders Agreement dated November 14, 2007 among RSAC and RSH1 and the Interim Order, the Securityholder Consent and Support Agreements are sufficient to obtain 100% approval from RSAC Shareholders.

For a summary of the terms of the Unsecured Noteholder Support Agreement, Subordinated Noteholder Support Agreement and Securityholder Consent and Support Agreement, see "*Support Agreements*".

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

**Interest of Management and Others**

Except as otherwise described in this Information Circular, management is unaware of any material interest of any director or officer of Tervita, any associate or affiliate of any such individual, or of Tervita in any transaction since the beginning of the last completed financial year of Tervita or in any proposed transaction or in connection with the Recapitalization that has materially affected or will materially affect Tervita or any of its Affiliates.  Except as otherwise described in the Information Circular, there are no agreements or arrangements between Tervita and any director, officer or employee of Tervita and its subsidiaries in respect of the Recapitalization.

## BACKGROUND TO AND REASONS FOR THE RECAPITALIZATION

The deterioration of, and the continuing significant weakness in commodity prices has resulted in Tervita facing a number of challenges, including operating in an environment where many of its oil and gas exploration and production customers have ceased or materially reduced operations.  This has resulted in decreased revenue for Tervita at reduced margins.

In 2014, Tervita began implementing a reduction in force initiative ("**RIFs**") aimed at centralizing internal services and minimizing redundancies in its operations.  The RIFs primarily focused on overhead and general and administrative positions across the organization and resulted in a significant reduction in the number of Tervita employees from approximately 3,250 employees in January 2014 to approximately 1,270  employees (including employees that have departed as a result of the sales of non-core assets).

In February 2015, Tervita disposed of its interest in Tervita LLC, resulting in the sale of most of its U.S. based operations for U.S.$473 million (U.S.$469 million after working capital adjustments).

In the latter half of 2015, despite the sale of Tervita LLC and the significant cost reductions from the RIFs, the Board determined that it was unlikely Tervita could continue to indefinitely service its significant debt obligations and comply with certain of the financial covenants contained in the Revolving Credit Agreement over the long term under current market conditions.

In the fall of 2015, Tervita engaged Barclays as its financial advisor to consider strategic alternatives.  Some of the alternatives considered were paying down some or all of the debt, obtaining covenant relief, raising new financing, unwinding Tervita's hedges and other liability management alternatives.  Barclays also analyzed, among other things, the potential sale of all or a portion of Tervita. Barclays contacted 16 potentially interested parties regarding a sale of Tervita or its assets.  One party signed a confidentiality agreement and made an indicative proposal.

In December 2015, Barclays began to assist Tervita in considering the possibility of a consensual restructuring.  From January 2016 onwards, Tervita and its advisors were in contact with various debtholders to discuss possible covenant relief and other possible solutions.

During March and April of 2016, Tervita and Barclays engaged with the Secured Debtholders, the Unsecured Noteholders and the Subordinated Noteholders and their respective advisors.

During this period, Tervita was also exploring options to address its liquidity problem and ways to mitigate the risk of a breach of the Term Loan debt ratio covenants.  With the assistance of Barclays, Tervita unwound certain "in the money" currency hedges and was able to monetize its secured and unsecured swaps which resulted in  gross proceeds of approximately U.S.$174 million and U.S.$52 million, respectively.

On May 15, 2016, and after extensive consultation with its Board and advisors, Tervita elected not to make the U.S.$18.3 million interest payment due on the Subordinated Notes, which resulted in a default under the Subordinated Notes Indenture.  Under the Subordinated Notes Indenture, Tervita had a 30-day grace period.

On June 15, 2016, the 30-day grace period expired without Tervita making the missed interest payment. However, Tervita was able to obtain (i) a waiver from the Revolving Credit Facilities Lenders for the missed interest payment on the Subordinated Notes; (ii) the Term Loan Waiver (Subordinated Notes); and (iii) the Interest Payment Default

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

Agreement, whereby the Subordinated Noteholders agreed to forbear from enforcement of the interest payment default under the Subordinated Notes Indenture.

On August 15, 2016, Tervita elected not to make the U.S.$18.2 million interest payment on its 10.875% Unsecured Notes Indenture.  Under the Unsecured Notes Indenture, Tervita had a 30-day grace period.

In August 2016, Tervita completed the sale of its non-core production services business to High Arctic Energy Services Inc. for gross proceeds of $42.75 million.

The following is a summary of the factors, among others, which the Board reviewed and considered in relation to the Recapitalization:

- the challenging set of circumstances that Tervita has been faced with over the past several years;

- the challenges faced by Tervita to service and repay existing debt considering the reduction of available credit;

- the various alternatives that Tervita has explored to address its financial situation, including a sale of some or all of the company's assets, additional capital raising opportunities, other accretive transactions and a restructuring under the CCAA;

- the fact that the terms of the Recapitalization are the result of arm's length negotiations among management and the Board with support from their professional advisors, the Supporting Unsecured Noteholders, the Supporting Subordinated Noteholders and the Plan Sponsors;

- the likely consequences of a failure to pursue the Recapitalization;

- the strategic significance and benefits of the Recapitalization, including the reduction of Tervita's net debt and annual cash debt service costs and the commitment of additional capital to enable the company to invest in and maintain its ongoing operations;

- the advice Tervita has received from Barclays;

- the Barclays Opinions;

- the Recapitalization will not directly affect any of Tervita's trade obligations;

- that Tervita's Revolving Credit Facilities Lenders were supportive of a recapitalization that involves the complete equitization of the Unsecured/Subordinated Notes and repayment of Secured Debt;

- the fact that holders of more than 63% of the principal amount of the Unsecured Notes,  90% of the principal amount of the Subordinated Notes and 69% of RSAC Shareholders have indicated they are supportive of the Recapitalization;

- that a restructuring pursuant to an Alternative Proceeding would likely result in worse recoveries for all of Tervita's stakeholders than a consensual restructuring outside of creditor protection proceedings and involve considerable time and expense; and

- the Recapitalization represents the best going concern solution available to Tervita.

The foregoing discussion of the information and factors considered by the Board is not intended to be exhaustive, but includes certain of the material factors considered by the Board. In view of the variety of factors considered in connection with its evaluation of the Recapitalization, the Board did not find it practicable to, and did not, quantify or

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

otherwise assign relative weights to the specific factors considered in reaching its recommendation. In addition, individual members of the Board may have given differing weights to different factors.

After careful consideration of the above-noted factors and other factors and following consultation with its financial advisor and outside legal counsel, the Board concluded that the Recapitalization, if implemented, would be better than the preceding alternatives because:

- total debt will be reduced by approximately $2.1 billion and annual cash interest expense reduced by $200 million;

- the improvement in liquidity through new debt in the amount of $475 million and the reinstatement or replacement of Tervita's Revolving Credit Facility;

- improving Tervita's capital structure and liquidity to enable it to take advantage of future growth opportunities and sustain operations in a depressed commodity price environment; and

- the reduction of the risk of continuing default under the Revolving Credit Facilities and other indebtedness.

## EFFECT OF THE RECAPITALIZATION

**Effect of the Recapitalization on Tervita**

The Recapitalization is expected to substantially improve the capital structure and liquidity of Tervita by reducing the total amount of debt by approximately $2.1 billion through the combination of the irrevocable exchange and cancellation of the Notes under the Arrangement and by providing approximately $372 million (net of transaction costs) minus any New Investment Adjustment, of new funds by virtue of the aggregate gross proceeds raised from the New Investment Offering under the Arrangement. With a rebalanced capital structure, Tervita will benefit from a reduction of the annual cash interest expense of approximately $200 million. The debt reduction is also expected to improve Tervita's ability to access capital markets in the future. Accordingly, management believes that the Recapitalization will provide Tervita with increased liquidity, reduced financial risk and a more sustainable capital structure, thereby improving Tervita's overall financial strength and flexibility. The successful implementation of the Recapitalization is expected by management to be a significant positive step for Tervita in pursuing its business plan.

The following table sets forth the *pro forma* capitalization of Tervita (on a consolidated basis) as at June 30, 2016, assuming the completion of the Recapitalization.

| | As at June 30, 2016 | | | |
|---|---|---|---|---|
| | **Actual** | | **Pro Forma** | |
| | (in millions) | | | |
| Long-term debt (including current portion): | | | | |
| Existing Notes ......................................... | $ | 2,235 | $ | - |
| New Second Lien Notes……………….. | | - | | 475 |
| Term Loan Facility................................. | | 315 | | - |
| Revolving Credit Facilities..................... | $ | - | $ | ● |
| Intercompany Loan ................................ | $ | 1,068 | $ | - |
| Accrued Interest ..................................... | $ | 60 | $ | - |
| Working Capital ..................................... | $ | 321 | $ | ● |
| Total long-term debt (including current portion)............................................... | $ | 3,297 | $ | ● |

23

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

| | As at June 30, 2016 | | | |
|---|---|---|---|---|
| Shareholders' equity (deficit): | | | | |
| Shareholders' equity (deficit)................... | $ | ● | $ | ● |
| Total capitalization............................ | $ | ● | $ | ● |
| Shares (actual): | | ● | | ● |

**Effect of the Recapitalization on Unsecured/Subordinated Noteholders**

The Recapitalization will result in (assuming an Effective Date of December 31, 2016):

(a) assuming that each Unsecured Noteholder is an Eligible Unsecured Noteholder and purchases its Unsecured Noteholder Subscription Pro Rata Share of the New Investment Offering, Unsecured Noteholders (excluding Plan Sponsors that are Unsecured Noteholders) holding 27.5% of the New Shares (assuming a New Investment Offering of $372 million and all Unsecured Noteholders subscribe for all of their Unsecured Noteholder Subscription Pro Rata Share);

(b) Subordinated Noteholders receiving an aggregate payment of $20 million (plus the Early Consent Cash Payment to the Early Consenting Subordinated Noteholders); and

(c) the Plan Sponsors holding 72.5% of the New Shares  (assuming a New Investment Offering of $372 million and all Unsecured Noteholders subscribe for all of their Unsecured Noteholder Subscription Pro Rata Share) after the irrevocable exchange and cancellation of all the Secured Debt Instruments held by them as of September 14, 2016.

**Effect of the Recapitalization on RSAC Shareholders**

RSAC Shareholders will continue to be shareholders of RSAC after the Effective Date. RSAC will indirectly hold all of the voting shares of RSH 3.  RSH 3 is entitled to receive the Secure Litigation Recovery.

## DESCRIPTION OF THE RECAPITALIZATION

*The following is a summary only of the Recapitalization, including the Plan of Arrangement. This summary is qualified in its entirety by the full text of the Plan of Arrangement. For complete details, reference should be made to the Plan of Arrangement, a copy of which is attached as Appendix "C" to this Information Circular.*

**General**

If completed as contemplated herein, the Recapitalization will result in a number of significant changes to the capital structure of the Corporation.  The Recapitalization will be effected by way of the Arrangement pursuant to the steps outlined in the Plan of Arrangement.  Details of the Arrangement are described below.

Assuming that the Recapitalization is completed, it will, on the Effective Date, result in the irrevocable exchange by the Noteholders of all of their respective Notes for the applicable consideration as set out below and the repayment of the Term Loan Facility.

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

**The Arrangement**

*Treatment of Noteholders*

Under the Arrangement, the following steps will occur in relation to the Noteholders on the Effective Date:

(a)    the Secured Debt Instruments (other than Secured Debt Instruments held by Plan Sponsors as of September 14, 2016) will be repaid in full without any early redemption payments or similar payments.  Accrued and unpaid interest up to and including the Effective Date on the Secured Debt Instruments will be paid in cash except that accrued and unpaid interest on the Secured Debt Instruments held by the Plan Sponsors will be paid by the issuance of the Secured Interest Notes;

(b)    the irrevocable exchange and cancellation of the Unsecured Notes in consideration for a number of New Common Shares (which will represent 2.0% of the New Shares) and the right to participate in the New Investment Offering, to be allocated to Unsecured Noteholders based on their Unsecured Noteholder Pro Rata Share plus the Early Consent Shares (which will represent 0.5% of the New Shares) issuable to Early Consenting Unsecured Noteholders, to be allocated to Early Consenting Unsecured Noteholders based on their Early Consenting Unsecured Pro Rata Share;

(c)    the irrevocable exchange and cancellation of the Subordinated Notes in consideration for an aggregate cash payment of $20 million, to be allocated to Subordinated Noteholders based on their Subordinated Pro Rata Share plus a $5 million payment to Early Consenting Subordinated Noteholders, to be allocated to Early Consenting Subordinated Noteholders based on their Early Consenting Pro Rata Share;

(d)    the irrevocable exchange and cancellation of all the Secured Debt Instruments held by the Plan Sponsors as of September 14, 2016 in consideration for the issuance of the Secured Exchange Shares.

For greater certainty, under the Arrangement, all Obligations under the Notes and the Indentures will be discharged in full on the Effective Date pursuant to the Arrangement.

*Treatment of the Term Loan Facility*

Under the Arrangement, debt under the Term Loan Credit Agreement held by Persons other than the Plan Sponsors will be repaid in full. Debt under the Term Loan Credit Agreement held by Plan Sponsors as at September 14, 2016 will be irrevocably exchanged and cancelled in consideration for New Preferred Shares.

*Treatment of the Revolving Credit Facilities*

The Revolving Credit Facilities will be unaffected by the Arrangement; however, it is a condition to the Recapitalization that the Revolving Credit Agreement be either reinstated or replaced on terms acceptable to Tervita and the Majority Initial Supporting Parties, each acting reasonably.

*Treatment of Intercompany Loan*

The Intercompany Loan will be transferred to a subsidiary of Tervita for nominal consideration.

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

*Treatment of Other Obligations*

If the Recapitalization is completed under the CBCA, Tervita's trade debt and obligations to employees generally will all continue to be paid or satisfied in the ordinary course.

*Treatment of the Existing Equity Holders*

Under the Plan of Arrangement, all Affected Existing Equity will be cancelled and extinguished. Tervita shall grant RSH 3 the right to receive the Secured Litigation Recovery in return for the cancellation of its common shares of Tervita.

*Secure Litigation*

On December 21, 2007, the Corporation commenced the Secure Litigation in the Court with a claim for damages including, but not limited to, $110 million against Secure Energy Services Inc. ("**Secure**"), and several of its personnel who were formerly Tervita employees. Pembina Pipeline Corporation ("**Pembina**") and Triumph EPCM Ltd. ("**Triumph**") were also named as defendants. The claim alleges that, among other things, the former employees breached their employment contracts and fiduciary duties, and engaged in other unlawful conduct by improperly taking confidential Tervita information and using it to enable Secure, Pembina and Triumph to continue Secure's business in direct competition with Tervita's business.

At the direction of the case management judge, the parties were required to particularize the damages claimed in the pleadings. Pembina and Secure have opposed Tervita's claim that particularizes the damages, which matter continues to be before the case management judge. Tervita has settled the claim with Triumph in exchange for Triumph's agreement to provide a more complete and accurate evidence, notwithstanding any prior evidence provided by Triumph.

Tervita will have complete and unfettered control over the carriage, investigation, prosecution, abandonment and settlement of the Secure Litigation as it determines in its business judgment and in the sole interest of Tervita. Without limiting the generality of the foregoing, Tervita will not be required to consult with or provide any information in respect of the Secure Litigation or its status to any holder of Existing Equity or holder of any equity of RSH3 or any representative thereof, nor shall Tervita owe any duty whatsoever to any such persons with respect to the Secure Litigation.

*Implementation of the New Shares Documentation*

The authorized capital of the Corporation described under the heading "*Description of Capital Structure*" in Appendix "H" to this Information Circular will be amended such that the authorized share capital of the Corporation after giving effect to the Arrangement will be comprised of an unlimited number of New Shares having the terms and being subject to the conditions set out in the New Shares Documentation, the full text of which will be appended to the Information Supplement.

The Plan of Arrangement also provides that the existing articles of Tervita will be amended and replaced in their entirety with amended articles, the existing by-laws of Tervita will be repealed and replaced in their entirety with new by-laws the Registration Rights Agreements will become effective and the Shareholders Agreement will become effective, with each holder of New Shares being deemed to be a party to such agreement. The general terms of the New Organizational Documents are described below under the heading "Overview of New Shares Documentation" and the specific terms will be described in the Information Supplement to be issued in advance of the Meetings in accordance with the terms of the Interim Order. Along with the amended articles and new by-laws of Tervita, the Shareholders Agreement will govern the conduct of the business and affairs of the Corporation, the relationship between the shareholders of Tervita, their respective rights and obligations as shareholders of Tervita and certain other related matters, after giving effect to the Arrangement.

*Appointment of the New Directors*

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

The Board as of the Effective Date will be comprised of seven directors, one of which will be the Chief Executive Officer of Tervita and each of which will be acceptable to the Plan Sponsors.

On or before the Effective Date, the Corporation, together with the Plan Sponsors, will announce by way of press release, the proposed New Directors.  The New Directors will be appointed pursuant to the Plan of Arrangement.

**Description of the New Shares**

The New Shares will be created on the Effective Date. Subject to the right of the New Preferred Shares to receive a liquidation preference of $0.001 per New Preferred Share upon a Deemed Liquidation Event, the holders of the New Class A Voting Preferred Shares and the New Class A Voting Common Shares will be entitled to receive, on a pro rata, as-converted basis, all proceeds available for distribution to the New Shareholders.

The specific terms of the New Shares will be described in the Information Supplement to be issued in advance of the Meetings in accordance with the terms of the Interim Order.

Under the New Shares Documentation, Tervita will have the right prior to any event that reduces the number of outstanding Voting Shares, such as a repurchase or redemption of New Voting Shares by Tervita, to require the conversion of the minimum number of a New Shareholder's New Voting Shares to New Non-Voting Shares such that no New Shareholder has beneficial ownership of New Voting Shares that exceeds the Voting Threshold.

A New Shareholder may convert New Voting Shares to New Non-Voting Shares at any time. A New Shareholder may convert New Non-Voting Shares to Voting Shares at any time that it can certify to Tervita that after giving effect to such conversion such New Shareholder's beneficial ownership of New Voting Shares does not exceed the Voting Threshold.

*Description of the New Voting Shares*

Each of the New Voting Shares has one vote per share and, except for matters which require a class vote under the CBCA, vote on all matters together as a single class on an as-converted basis.

All or any portion of the New Class A Voting Preferred Shares are convertible into New Class A Voting Common Shares at any time at the New Shareholder's option.

The New Shares Documentation will provide for transfer restrictions preventing any New Shareholder from acquiring additional New Voting Shares if after giving effect to such transfer its beneficial ownership of New Voting Shares would exceed the Voting Threshold. Such transfers will be permitted only after the conversion of New Voting Shares to New Non-Voting Shares. Any transfer that does not comply with these restrictions shall be null and void ab initio.

The specific terms of the New Voting Shares will be described in the Information Supplement to be issued in advance of the Meetings in accordance with the terms of the Interim Order.

*Description of the New Non-Voting Shares*

Each of the New Non-Voting Shares is only entitled to vote on matters specific to such class of shares or as otherwise required by law.

All or any portion of the New Class B Non-Voting Preferred Shares are convertible into New Class B Non-Voting Common Shares at any time at the New Shareholder's option.

 The specific terms of the New Non-Voting Shares will be described in the Information Supplement to be issued in advance of the Meetings in accordance with the terms of the Interim Order.

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

**New Investment Offering**

As part of the Recapitalization, the Corporation will complete the New Investment Offering of up to 46,500,000 New Investment Shares, minus the number of any New Investment Adjustment Shares and Additional Backstop Commitment Shares to be issued at the Subscription Price per New Investment Share for aggregate gross proceeds to the Corporation of $372 million minus the Additional Backstop Commitment Amount, and the amount, if any, in order for Tervita to maintain a cash balance of no more than $75 million on the Effective Date, as determined by Tervita 10 Business Days prior to the Effective Date, acting reasonably and in consultation with the Majority Initial Supporting Parties. (the "**New Investment Adjustment**").  Pursuant to the Plan of Arrangement, the New Investment Offering is open to all Unsecured Noteholders that are Eligible Unsecured Noteholders.  Each Eligible Unsecured Noteholder shall have the right, but not the obligation, to participate in the New Investment Offering for up to its Unsecured Noteholder Subscription Pro Rata Share of the New Investment Offering.  The Plan Sponsors have agreed under the Support Agreements to purchase their pro rata share of the New Investment Offering. The Initial Backstop Parties have agreed (severally, and not jointly) to subscribe for and purchase its Initial Backstop Pro Rata Share of the Backstopped Shares and any Unpurchased Share Subscription Commitment.  See "*Backstop Commitment*".

Eligible Unsecured Noteholders who wish to participate in the New Investment Offering are required to duly execute and submit a Participation Form by the Participation Deadline. The Participation Form will include: (a) confirmation by the Eligible Unsecured Noteholder  of its interest in participating in the New Investment Offering by subscribing for and purchasing all or a portion of its Unsecured Noteholder Subscription Pro Rata Share of the New Investment Shares; (b) representations and warranties, or other satisfactory evidence as determined by Tervita and its representatives in their sole discretion, that such Unsecured Noteholder meets the requirements of an Eligible Unsecured Noteholder for the purpose of such participation; and (c) directions as to registration and delivery of the New Investment Shares to be received by the Eligible Unsecured Noteholder in connection with its participation in the New Investment Offering.

On or prior to the fifth Business Days before the anticipated Effective Date, each Eligible Unsecured Noteholder that submitted a Participation Form (or other acceptable form of instruction) will receive, directly or indirectly, a confirmation from the Corporation as to: (a) the anticipated Effective Date; (b) the acceptance of the participation in the New Investment Offering by such Eligible Unsecured Noteholder; (c) such Eligible Unsecured Noteholder's Committed Pro Rata Share of the New Investment Shares and the amount of Funds required to be paid in respect of such New Investment Shares; (d) instructions and directions regarding payment of its Funds for its Eligible Unsecured Noteholder's Committed Pro Rata Share; and (e) the Funding Deadline. Each Eligible Unsecured Noteholder will be required to forward Funds to the Escrow Account by wire transfer or such other method as the Corporation may agree in the amount as directed by the Corporation pursuant to and in accordance with the terms of the Participation Form, on or prior to the Funding Deadline, failing which the participation of such Eligible Unsecured Noteholder in the New Investment Offering will be deemed to be null and void.

For further information regarding the New Investment Offering or to obtain or for assistance in completing the Participation Form (or other acceptable form of instruction), please contact Osler, Hoskin & Harcourt LLP Attention: Justin Sherman at jsherman@osler.com or 403.260.7008. See "*Procedures Relating to the Arrangement and New Investment Offering – Participation Form and Participation Deadline*".

***Eligible Unsecured Noteholders and Transfer Restrictions***

*Canada*

The issuance of the New Investment Shares pursuant to the Recapitalization will be exempt from the prospectus and registration requirements under Canadian securities legislation.  Accordingly, the New Investment Shares are only being offered and sold to or for the account or benefit of Eligible Unsecured Noteholders. As a consequence of these exemptions, certain protections, rights and remedies provided by Canadian securities legislation, including statutory rights of rescission or damages, will not be available in respect of such new securities to be issued under the Recapitalization.  See "*Certain Regulatory and Other Matters Relating to the Recapitalization – Issuance and Resale of Securities Received in the Recapitalization - Canada*".

*United States*

LEGAL_1:40709104.10

The New Investment Shares have not been, and will not be registered, under the U.S. Securities Act or any state securities laws, and may not be offered or sold in the United States or to, or for the account or benefit of, U.S. persons outside the United States, absent registration or an applicable exemption from the registration requirements of the U.S. Securities Act. Accordingly, the New Investment Shares are only being offered and sold in the United States to, or to, or for the account or benefit of U.S. persons that are, "qualified institutional buyers" within the meaning of Rule 144A under the U.S. Securities Act. The New Investment Shares will also be offered and sold outside the United States to non-U.S. persons in reliance on Regulation S. Investors in the New Investment Shares must also meet the other requirements of an "Eligible Unsecured Noteholder" as defined in this Information Circular.  The New Investment Shares will be "restricted securities" within the meaning of Rule 144(a)(3) under the U.S. Securities Act.

Each Eligible Unsecured Noteholder who is purchasing the New Investment Shares for cash will, prior to the purchase, be required to sign and deliver the Participation Form in which it will make certain representations and warranties and agree to certain restrictions on the transfer of the New Investment Shares.

The Corporation may require additional information from Eligible Unsecured Noteholders in the United States or that are U.S. persons as may be reasonably necessary to confirm their status as a "qualified institutional buyer" or a non-"U.S. Person" within the meaning of the rules of the United States Securities and Exchange Commission under the U.S. Securities Act, including Rule 144A and Regulation S.

*Non-Canadian and Non-U.S. Eligible Unsecured Noteholders*

Each Eligible Unsecured Noteholder that is resident outside of Canada or the United States and that wishes to participate in the New Investment Offering must satisfy the Corporation that such Eligible Unsecured Noteholder is entitled to participate in the New Investment Offering in accordance with the laws of such jurisdiction without obliging the Corporation to register the New Investment Shares or file a prospectus or other disclosure document or to make any other filings or become subject to any reporting or disclosure obligations that the Corporation is not already obligated to make, and the Corporation may require evidence satisfactory to the Corporation to such effect.

*Shareholders Agreement*

Holders of the New Investment Shares issued under the New Investment Offering will be deemed to be a party to, and subject to the terms and conditions of, the Shareholders Agreement under the Plan of Arrangement.

**Transfer Restrictions**

The New Investment Shares issued in connection with the New Investment Offering will not be "freely tradeable" under applicable Canadian securities laws unless the following conditions (as specified in National Instrument 45-102 *Resale of Securities*) ("**NI 45-102**")) are satisfied: (i) Tervita is and has been a reporting issuer in a jurisdiction of Canada for the four months immediately preceding the trade; (ii) the trade is not a control distribution (as defined in NI 45-102); (iii) no unusual effort is made to prepare the market or to create a demand for the shares that are the subject of the trade; (iv) no extraordinary commission or consideration is paid to a person or company in respect of the trade; and (v) if the selling shareholder is an insider or officer of Tervita, the selling shareholder has no reasonable grounds to believe that Tervita is in default of securities legislation. Eligible Unsecured Noteholders are advised to seek legal advice prior to any resale of these securities. See "*Certain Regulatory and Other Matters Relating to the Recapitalization – Issuance and Resale of Securities Received in the Recapitalization – Canada*". The New Investment Shares issued in connection with the New Investment Offering will be "restricted securities" within the meaning of Rule 144(a)(3) of the U.S. Securities Act and may not be resold unless pursuant to an exemption or exclusion from the registration requirements of the U.S. Securities Act.

For a discussion of applicable restrictions on the transfer of New Common Shares other than those issued under the New Investment Offering, see "*Certain Regulatory and Other Matters Relating to the Recapitalization – Issuance and Resale of Securities Received in the Recapitalization – United States*".

**New Revolving Credit Facility**

It is a condition to the Recapitalization that the Revolving Credit Agreement be either reinstated or replaced on terms acceptable to Tervita and the Majority Initial Supporting Parties, each acting reasonably.

Tervita intends to disclose the principal terms of the New Revolving Credit Facility when available, through the Information Supplement.

See "*Description of Certain indebtedness – Description of the Senior Secured Credit Facilities*".

**New Second Lien Notes**

It is a condition to the Recapitalization that the New Second Lien Notes be made available to Tervita on such terms and conditions that Tervita and the Majority Initial Supporting Parties agree to, each acting reasonably.

Tervita intends to disclose the principal terms of the New Second Lien Notes when available, through the Information Supplement.

**Pre- and Post-Arrangement Transactions**

On September 6, 2016, the Corporation was continued from the ABCA to the CBCA.

Prior to the Effective Time, the following events or transactions will have occurred, or be deemed to have occurred and be taken as effected, consecutively, in the following order:

(a)    The Intercompany Loan shall have been transferred to a newly formed wholly-owned subsidiary of Tervita incorporated under the ABCA ("**Subco**") in the following order:

    (i)    Holdings LP shall have incorporated a new corporation under the CABCA ("**Newco**");

    (ii)    Holdings  LP shall have transferred all of its shares of RSH 1 to Newco in consideration for shares of Newco;

    (iii)    Holding LP and Newco shall have filed elections under subsection 85(2) of the Income Tax Act in respect of the transfer contemplated by paragraph (a)(ii) above and elect at $1, being the fair market value of the shares of RSH1;

    (iv)    Holdings LP shall have transferred all of its limited partnership units of Finance LP to Newco in consideration for shares of Newco; and

    (v)    Finance LP shall have transferred the Intercompany Loan to Subco in consideration for a nominal amount of cash; and

(b)    The Secured Notes U.S. Trustee and the Secured Notes Canadian Trustee shall have exchanged each Initial Supporting Party's interest in the applicable Global Notes that represent the applicable Secured Notes of each such Initial Supporting Party for Definitive Notes and evidence thereof shall have been provided to Tervita.

**Early Consent Consideration**

Early Consenting Unsecured Noteholders will be entitled to receive, in addition to New Preferred Shares otherwise issuable to them pursuant to the Arrangement, their Early Consenting Unsecured Noteholder Subscription Pro Rata Share of the Early Consent Shares.  Early Consenting Subordinated Noteholders will be entitled to receive, in addition to the $20 million otherwise issuable to them pursuant to the Arrangement, their Early Consenting Subordinated Pro Rata Share of the Early Consent Cash.

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

**Alternative Proceeding**

If (a) determined necessary or advisable by Tervita, or (b) Tervita has not obtained a final order from the Court in form and substance satisfactory to Tervita and the Majority Initial Supporting Parties that confirms that no early payment premium (or similar type of payment) is payable in connection with the Recapitalization (the "**Secured Notes Order**") by December 15, 2016, then, in either case, with the consent of the Majority Initial Supporting Parties, acting reasonably, Tervita will forthwith convert the CBCA proceeding to a proceeding under the CCAA (or any such other proceeding under any corporate arrangement, reorganization, restructuring, insolvency or similar law of any jurisdiction now or hereafter in effect, for the relief from or otherwise affecting creditors, including without limitation, under the BIA or the United States Bankruptcy Code) in order to implement the Recapitalization (an "**Alternative Proceeding**").

**Court Approval and Completion of the Plan of Arrangement**

The implementation of the Plan of Arrangement is subject, among other things, to approval by the Court.  Prior to the mailing of this Information Circular, the Corporation obtained the Interim Order providing for the calling and holding of the Unsecured Noteholders' Meeting, Subordinated Noteholders' Meeting, Shareholders' Meeting and other procedural matters. A copy of the Interim Order is attached hereto as Appendix "D". The originating application applying for the Final Order also appears in Appendix "E" and forms part of this Information Circular.

Under the Interim Order, from 12:01 a.m. on the date of this Interim Order until and including the earlier of: (a) the Effective Date; (b) seven days after the termination of the Unsecured Noteholders Support Agreement; or (c) seven days after the termination of the Backstop Commitment Letter, no person, including, without limitation, the Noteholders, the trustees under the Indentures, the Term Loan Administrative Agent, the Term Loan Facility Lenders or any other administrative agent, collateral agent, indenture trustee or similar person, (i) shall have any right to terminate, accelerate, amend or declare a default or event of default or make any demand or take any step to enforce any guarantee or any security interest granted by any member of the Tervita Group in respect of the Notes, the Term Loan Facility, or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor, and (ii) may refer to, rely on or otherwise claim any rights against any member of the Tervita Group under any contract, debt instrument or any other agreement with any member of the Tervita Group in respect of any alleged breach, default or event of default under the Notes, the Term Loan Facility or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor; in each case, by reason of: (A) the Applicants having commenced this proceeding, (B) any member of the Tervita Group taking any steps in furtherance thereof, (C) any of member of the Tervita Group being a party to these proceedings or being party to an Arrangement, or (D) any default or cross-default arising under any of the Notes or the Term Loan Credit Agreement, without further order of the Court.

Subject to the approval of the Plan of Arrangement by the Unsecured Noteholders at the Unsecured Noteholders' Meeting, by the Subordinated Noteholders at the Subordinated Noteholders' Meeting and by the RSAC Shareholders at the Shareholders' Meeting, the hearing in respect of the Final Order is scheduled to take place sometime during the week of December 5, 2016 at Calgary Courts Centre (the "**Return Date**").    At the hearing, any Unsecured/Subordinated Noteholder, RSAC Shareholder or other interested party who wishes to appear, or be represented or to present evidence or argument, may do so, subject to filing with the Court and serving upon the solicitors for the Corporation a Notice of Intention to Appear and satisfying any other requirements of the Court as provided in the Interim Order or otherwise.  At the hearing for the Final Order, the Court will consider, among other things, the fairness and reasonableness of the Arrangement, the approval of the Unsecured Noteholders Arrangement Resolution, the Subordinated Noteholders Arrangement Resolution and the Shareholders Arrangement Resolution. The Court will be advised prior to the hearing of the application for the Final Order that if the terms and conditions of the Arrangement, and the fairness thereof, are approved by the Court, the New Shares to be issued to the Noteholders pursuant to the Arrangement (other than the New Investment Shares offered and sold for cash to Eligible Unsecured Noteholders pursuant to the New Investment Offering), as applicable, will not require registration under the U.S. Securities Act pursuant to the registration exemption in Section 3(a)(10) of the U.S. Securities Act.

The Court may approve the Arrangement in any manner the Court may direct, subject to compliance with such terms and conditions, if any, as the Court deems fit.

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

Provided that: (i) the Unsecured Noteholders Arrangement Resolution is passed by the affirmative vote of Unsecured Noteholders representing at least 66⅔% of the votes cast by Unsecured Noteholders present in person or represented by proxy and voting at the Unsecured Noteholders' Meeting; (ii) the Subordinated Noteholders Arrangement Resolution is passed by the affirmative vote of Subordinated Noteholders representing at least 66⅔% of the votes cast by Subordinated Noteholders present in person or represented by proxy and voting at the Subordinated Noteholders' Meeting; and (iii), the Shareholders Arrangement Resolution is passed by the affirmative vote of RSAC Shareholders, present in person or represented by proxy and voting at the Shareholders' Meeting, holding at least 53.6% of the RSAC Shares and the Plan of Arrangement is approved by the Court and implemented in accordance with its terms, the Noteholders will have waived any action or proceeding relating to the Notes. Illegible votes, spoiled votes, defective votes and abstentions shall be deemed to be votes not cast. If the Arrangement is completed, all rights and obligations under and in connection with the Notes, the Indentures and the Term Loan Facility will be extinguished by Order of the Court in connection with the approval of the Arrangement.

Assuming the Final Order is granted and the other conditions to closing contained in the Plan of Arrangement are satisfied or waived, it is anticipated that the following will occur substantially simultaneously: (a) the various documents necessary to consummate the Recapitalization will be executed and delivered; (b) Articles of Arrangement will be filed with the Director under the CBCA to give effect to the Arrangement; and (c) the transactions provided for in the Plan of Arrangement and the Recapitalization will occur in the order indicated.

Subject to the foregoing, it is expected that the Effective Time will occur as soon as practicable after the requisite approvals have been obtained, which is expected to occur on or about ●, 2016.

**Conditions to the Recapitalization Becoming Effective**

The implementation of the Plan of Arrangement is conditional upon the fulfilment, satisfaction or waiver of the following conditions precedent, in each case in accordance with the terms thereof and/or the Backstop Commitment Letter and the Support Agreements, if applicable (provided that no condition in favour of the Noteholders may be waived, subject to the Backstop Commitment Letter and the Support Agreements, without the prior written consent of the Plan Sponsors):

(a)     Tervita shall have not less than $75 million, or such lesser amount as Tervita and the Majority Initial Supporting Parties consent to, each acting reasonably, in cash on hand immediately following the Effective Date;

(b)     the Plan of Arrangement, the Secured Notes Order, the Preliminary Interim Order, the Interim Order, the Final Order, all other material orders filed by or on behalf of the Tervita Entities in the Proceedings and all definitive legal documentation in connection with all of the foregoing (including all corporate governance agreements and shareholder agreements) shall be in form and substance acceptable to Tervita and the Majority Initial Supporting Parties, each acting reasonably, when filed, and with respect to any and all material orders, shall have been entered in form and substance acceptable to Tervita and the Majority Initial Supporting Parties, each acting reasonably;

(c)     there shall not exist or have occurred any Material Adverse Effect since the date of Unsecured Noteholder Support Agreement;

(d)     all of the reasonable and documented fees and expenses of Tervita's legal and financial advisors, including Osler, Hoskin & Harcourt LLP, Fasken Martineau DuMoulin LLP, Latham & Watkins LLP, and Barclays Capital Inc. and Stikeman Elliot LLP as counsel to the Board, shall have been paid by Tervita;

(e)     all of the reasonable and documented fees and expenses of the Plan Sponsor Legal Advisors, Moelis & Company LLC and Peters & Co. Limited. shall have been paid by Tervita;

(f)     all of the reasonable and documented fees and expenses of the Subordinated Noteholder Advisors shall have been paid by Tervita;

32

LEGAL_1:40709104.10

(g)       timely satisfaction by the Tervita Entities in all material respects of each obligation referred to in the Recapitalization Term Sheet and in the Unsecured Noteholder Support Agreement that is to be performed on or before the Effective Date; and

(h)       the Plan of Arrangement shall have been approved by (i) the Court; and (ii) the requisite majority of affected creditors and RSAC Shareholders and holders of RSH LP Interests, in conformity with the CBCA as and to the extent required by the Court.

For greater certainty, approval by the Unsecured/Subordinated Noteholders of the Plan of Arrangement shall also constitute approval by the Unsecured/Subordinated Noteholders of all of the preliminary steps described above and all other steps and transactions set out in or contemplated by the Plan of Arrangement. Notwithstanding any provision of the Plan of Arrangement, subject to the Backstop Commitment Letter and the Support Agreements, the transactions and steps described above may be amended, varied or waived prior to the implementation of the Plan of Arrangement with the consent of the Corporation and the Plan Sponsors.

**Steps of the Plan of Arrangement**

Commencing at the Effective Time, the following events or transactions will occur sequentially on the Effective Date in the order set out below unless otherwise noted and will be deemed to occur without any further act or formality required on the part of any Person, except as expressly provided in the Plan of Arrangement:

(a)       The following shall occur simultaneously:

  (i)       Tervita shall distribute in the manner described in sections 3.5 and 3.6 of the Plan, to:

    (A)       each Trustee, cash for all outstanding Trustee Fees and Expenses;

    (B)       except in respect of the Exchanged Secured Debt, each Term Loan Lender as of the Effective Date, cash for any accrued and unpaid interest owing to such Term Loan Lender up to and including the Effective Date pursuant to the Term Loan Credit Agreement;

    (C)       except in respect of the Exchanged Secured Debt, each 8% Secured Noteholder as of the Effective Date, cash for any accrued and unpaid interest owing to such 8% Secured Noteholder up to and including the Effective Date pursuant to the 8% Secured Notes and the Secured Notes Indenture; and

    (D)       except in respect of the Exchanged Secured Debt, each 9% Secured Noteholder as of the Effective Date, cash for any accrued and unpaid interest owing to such 9% Secured Noteholder up to and including the Effective Date pursuant to the 9% Secured Notes and the Secured Notes Indenture;

  (ii)      Tervita shall issue to each Initial Supporting Party, Secured Interest Notes each in an amount equal to the accrued interest owed to each Initial Supporting Party in respect of the Term Loan Credit Agreement, the 8% Secured Notes and the 9% Secured Notes in full satisfaction of such accrued interest amount; and

  (iii)     Tervita shall pay in cash all fees and expenses of the Initial Supporting Party Advisors, the Subordinated Noteholder Advisors and the Tervita Group Advisors.

(b)       The following shall occur simultaneously:

  (i)       in exchange for, and in full and final settlement of, the Subordinated Noteholder Claims, Tervita shall distribute in the manner described in section 3.4 of the Plan, to:

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale
Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

(A)      each Subordinated Noteholder as of the Effective Date, its Subordinated Noteholder Pro Rata Share of the Cash Payment; and

(B)      each Early Consenting Subordinated Noteholder as of the Effective Date, its Early Consenting Subordinated Noteholder Pro Rata Share of the Early Consent Cash Payment.

Upon the distribution of the Cash Payment and the Early Consent Cash Payment, the Subordinated Noteholder Claims shall, and shall be deemed to be, irrevocably and finally extinguished and Subordinated Noteholders shall have no further right, title or interest in and to the Subordinated Notes or the Subordinated Noteholder Claims; and

(ii)      the Subordinated Notes and the Subordinated Notes Indenture shall be cancelled, provided that the Subordinated Notes Indenture shall remain in effect solely to allow the Depositary and the Subordinated Notes Trustee, as applicable, to make the distributions set forth in the Plan.

(c)      The Existing Directors shall be deemed to have resigned.

(d)      (i) All of the preferred shares issued by Tervita shall be purchased for cancellation for the aggregate consideration of $1; and (ii) all of the preferred shares issued by RSH3 shall be purchased for cancellation for the aggregate consideration of $1.

(e)      The following shall occur simultaneously:

(i)      RSH 3 shall receive the right to receive the Secure Litigation Recovery, as consideration for the purchase for cancellation of 100% of the common shares of Tervita immediately prior to the Effective Time;

(ii)      All of the Affected Existing Equity shall be terminated and cancelled and shall be deemed to be terminated and cancelled without the need for any repayment of capital thereof or any other liability, payment or compensation therefor; and

(iii)      articles of continuance of Tervita shall be amended to confirm the cancellation of the Existing Tervita Equity and to create: (i) a new class of voting common shares, the New Class A Voting Common Shares, (ii) a new class of voting preferred shares, the New Class A Voting Preferred Shares (iii) a new class of non-voting common shares, the New Class B Non-Voting Common Shares, and (iv) a new class of non-voting preferred shares, the New Class B Non-Voting Preferred Shares.

(f)      The following shall occur simultaneously:

(i)      in exchange for and in addition to the right to participate in the New Investment Offering, and in full and final settlement of, the Unsecured Noteholder Claims, Tervita shall issue in the manner described in section 3.2 of the Plan, to:

(A)      each Unsecured Noteholder as of the Effective Date, its Unsecured Noteholder Pro Rata Share of the Unsecured Exchange Shares; and

(B)      each Early Consenting Unsecured Noteholder as of the Voting Record Date, its Early Consenting Unsecured Noteholder Pro Rata Share of the Early Consent Shares.

Upon the distribution of the Unsecured Exchange Shares and the Early Consent Shares, the Unsecured Noteholder Claims shall, and shall be deemed to be, irrevocably and finally

34

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

extinguished and Unsecured Noteholders shall have no further right, title or interest in and to the Unsecured Notes or the Unsecured Noteholder Claims; and

(ii)     the Unsecured Notes and the Unsecured Notes Indenture shall be cancelled, provided that the Unsecured Notes Indenture shall remain in effect solely to allow the Depositary and the Unsecured Notes Trustee, as applicable, to make the distributions set forth in the Plan.

(g)     The following shall occur simultaneously:

(i)     Tervita shall:

(A)     (x) become entitled to the aggregate Electing Eligible Other Unsecured Noteholder Commitment Amounts deposited with the Escrow Agent, and (y) the Escrow Agent shall be deemed instructed to release to Tervita and Tervita shall be in receipt of the aggregate Electing Eligible Other Unsecured Noteholder Commitment Amounts held by such Escrow Agent;

(B)     be in receipt of the Additional Backstop Initial Commitment Amount and the Additional Backstop Commitment Amount; and

(C)     be in receipt of the Initial Backstop Party Initial Commitment Amount, the Initial Backstop Party Backstop Commitment Amount and the Secured Interest Payments Returned Amount;

(ii)     the following payments and acquisitions shall be made:

(A)     Tervita shall pay to each non-defaulting Backstop Party its Commitment Pro Rata Share of the Backstop Consideration which shall be applied to acquire such Backstop Party's Commitment Pro Rata Share of the Backstop Consideration Shares; and

(iii)    Tervita shall issue in the manner described in section 3.3 of the Plan, to:

(A)     each Electing Eligible Other Unsecured Noteholder, its Electing Eligible Other Unsecured Noteholder Commitment Shares in consideration for its Electing Eligible Other Unsecured Noteholder Commitment Amount;

(B)     the Additional Backstop Party, its Additional Backstop Initial Commitment Shares and its Additional Backstop Commitment Shares in consideration for its Additional Backstop Initial Commitment Amount and its Additional Backstop Commitment Amount; and

(C)     each Initial Backstop Party, its Initial Backstop Party Initial Commitment Shares and its Initial Backstop Pro Rata Share of the Initial Backstop Party Backstop Commitment Shares in consideration for its Initial Backstop Party Initial Commitment Amount and its Initial Backstop Pro Rata Share of the Initial Backstop Party Backstop Commitment Amount.

(h)     The following steps shall occur simultaneously:

(i)     in exchange for, and in full and final settlement of, the Secured Debtholder Claims in respect of the remaining portion of the Exchanged Secured Debt, the Secured Interest Notes and the Secured Interest Payments Returned Amount, Tervita shall issue in the manner described in section 3.5 of the Plan, to each Initial Supporting Party as of the Effective Date its Initial Supporting Party Pro Rata Share of the Secured Exchange Shares;

35

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

(ii) in exchange for, and in full and final settlement of, the Secured Debtholder Claims (other than Secured Debtholder Claims in respect of the Exchanged Secured Debt) held by the Term Loan Lenders, the 8% Secured Noteholders and the 9% Secured Noteholders, Tervita shall distribute in the manner described in section 3.5 of the Plan, to:

 (A) each Term Loan Lender as of the Effective Date, cash for the principal amount owing to such Term Loan Lender up to and including the Effective Date pursuant to the Term Loan Credit Agreement;

 (B) each 8% Secured Noteholder as of the Effective Date, cash for the principal amount but not any early redemption payments or similar payments owing to such 8% Secured Noteholder up to and including the Effective Date pursuant to the 8% Secured Notes and the Secured Notes Indenture; and

 (C) each 9% Secured Noteholder as of the Effective Date, cash for the principal amount but not any early redemption payments or similar payments owing to such 9% Secured Noteholder up to and including the Effective Date pursuant to the 9% Secured Notes and the Secured Notes Indenture;

(iii) upon the distributions contemplated in section 4.4(g) of the Plan, the Secured Debtholder Claims shall, and shall be deemed to be, irrevocably and finally extinguished and Secured Debtholders shall have no further right, title or interest in and to the Secured Debt Instruments or the Secured Debtholder Claims; and

(iv) the Secured Debt Instruments shall be cancelled, provided that the Term Loan Credit Agreement and the Secured Notes Indenture shall remain in effect solely to allow the Depositary, the Term Loan Administrative Agent, the Secured Notes U.S. Trustee and the Secured Notes Canadian Trustee, as applicable, to make the distributions set forth in the Plan.

(v) pursuant to the direction of the Final Order, the Collateral Trustee shall release and discharge all security held in connection with the Secured Debt Instruments pursuant to the Collateral Trust Agreement and the Secured Debtholders, the Term Loan Administrative Agent, the Secured Notes US Trustee, the Secured Notes Canadian Trustee, as applicable, shall be deemed to have consented to such release and discharge.

(i) The stated capital account maintained in respect of each class of shares of Tervita shall be increased by an amount equal to the aggregate fair market value of the consideration received for the issuance of all shares of such class issued pursuant to the Plan.

(j) The releases referred to in section 5.1 of the Plan become effective.

(k) Each holder of New Shares shall be deemed to be a party to and bound by the New Shares Documentation, including the Shareholders Agreement.

(l) The New Directors shall be deemed to have been appointed.

(m) Tervita or a subsidiary of Tervita and ArrangeCo shall be amalgamated and continued as one (1) corporation on terms as agreed by Tervita and the Majority Initial Supporting Parties, each acting reasonably.

**Barclays Opinions**

At the meeting of the Board of Directors on September 14, 2016, Barclays informed the Board of Directors that it would be able to render the Barclays Opinions and rendered such written opinions on October 6, 2016 and provided

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

to the Board of Directors that, as of the date thereof, and based on, and subject to, the assumptions, limitations and qualifications set out therein: (i) the Unsecured Noteholders, the Subordinated Noteholders and the Existing Common Shareholders would be in a better financial position, respectively, under the Recapitalization than if the Corporation were liquidated, as in each case, the estimated aggregate value of the consideration made available to the Unsecured Noteholders, the Subordinated Noteholders and the Existing Common Shareholders, respectively, pursuant to the Recapitalization would, in the opinion of Barclays exceed the estimated value Unsecured Noteholders, Subordinated Noteholders and Existing Common Shareholders would receive in a liquidation, respectively; and (ii) Barclays is of the opinion that the Recapitalization, if implemented, would be fair, from a financial point of view, to the Corporation.

The full text of the Barclays Opinions are attached as Appendix "F" and Appendix "G" to this Information Circular and Unsecured Noteholders and Subordinated Noteholders are encouraged to read each of the Barclays Opinions carefully and in its entirety. The Barclays Opinions describe the scope of the review undertaken by Barclays, the matters considered by Barclays, the assumptions made by Barclays, the limitations and qualifications on the review undertaken in connection with the Barclays Opinions, and the approach to fairness for the purposes of the Barclays Opinions, among other matters. The summary of the Barclays Opinions set forth in this Information Circular is qualified in its entirety by reference to the full text of the Barclays Opinions. Barclays has provided its written consent to the inclusion of the Barclays Opinions in this Information Circular. The Barclays Opinions were one of a number of factors taken into account by the Board of Directors in making its unanimous (subject to the abstentions of Messrs. David Werklund and John Gibson as interested directors) decision to recommend to Unsecured Noteholders and Subordinated Noteholders that they **VOTE FOR** the Unsecured Noteholders Arrangement Resolution and Subordinated Noteholders Arrangement Resolution, respectively, at the Unsecured Noteholders' Meeting and Subordinated Noteholders' Meeting, respectively. The Barclays Opinions may not be used or relied upon by any person or entity other than the Board of Directors or for any other purpose without the express prior written consent of Barclays.

### Assumptions and Limitations

The Barclays Opinions are based on, and subject to, various assumptions, qualifications and limitations including, without limitation, the following:

- the completeness, accuracy and fair presentation of all financial and other information, data, advice, opinions, representations and other material (financial and otherwise) obtained by Barclays from public sources or provided to Barclays by or on behalf of the Corporation or otherwise obtained by Barclays in connection with its engagement, including, among other information, the Corporation's liquidation analysis (the "**Liquidation Analysis**") as of September 27, 2016 (collectively, the "**Information**");

- the representations of senior officers of the Corporation in a certificate (the "**Officers' Certificate**") dated as of the date of the Barclays Opinions that:

  - the Information provided to Barclays, either orally or in writing by, or on behalf of the Corporation or any of its subsidiaries (as defined in National Instrument 45- 106 – *Prospectus Exemptions*) or affiliates or any of its or their agents or representatives in connection with Barclays' engagement relating to the Recapitalization, other than forecasts, projections, and other forward-looking information, was, at the date the Information was provided to Barclays, and is, as of the date hereof, or in the case of historical information was at the date of preparation, complete, true and correct in all material respects, and did not and does not contain a misrepresentation (as defined in the *Securities Act* (Ontario)) and is not misleading in light of the circumstances under which the Information was provided;

  - with respect to financial forecasts, projections, budgets and the Liquidation Analysis provided to Barclays, they have been reasonably prepared on bases reflecting the best currently available estimates and judgments of management of the Corporation or its associates and affiliates as to the matters covered thereby and such financial forecasts, projections, budgets and the Liquidation Analysis reasonably represent the views of management on the financial prospects and forecasted performance of the Corporation; and

37

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

- o   since the dates on which the Information was provided to Barclays, there has been no material change, financial or otherwise, in the financial condition, assets, liabilities (contingent or otherwise), business, operations or prospects of the Corporation or any of its subsidiaries, and no material change has occurred in the Information or any part thereof which would have or which could reasonably be expected to have a material effect on the Barclays Opinions, having regard to the definition of fairness described in the Barclays Opinions;

- all draft documents referred to in the Barclays Opinions will not differ in any material respect from the drafts that Barclays reviewed, and all conditions precedent to the completion of the Recapitalization can be satisfied in the time required and all financings, consents, permissions, exemptions or orders of third parties and relevant authorities will be obtained, without material adverse condition or qualification, and the Recapitalization can proceed as scheduled and without material additional cost to Tervita or liability of Tervita to third parties;

- the description of the Recapitalization in the Support Agreements describes all material terms of agreements that relate to the Recapitalization that are to be drafted subsequent to the announcement of the Recapitalization;

- the Barclays Opinions are rendered on the basis of the Liquidation Analysis, securities markets, economic, financial and general business conditions prevailing as of the date of the Barclays Opinions and the condition and prospects, financial and otherwise, of the Corporation as they are reflected in the Information and as they have been represented to Barclays in discussions with management of the Corporation and its representatives and the accuracy of the Officers' Certificate; and

- in Barclays' analyses and in preparing the Barclays Opinions, Barclays made numerous judgments and assumptions with respect to industry performance, general business, market and economic conditions and other matters, many of which are beyond Barclays' control or that of any party involved in the Recapitalization.

### Engagement of Barclays

Barclays was engaged by Tervita pursuant to a letter agreement dated December 23, 2015, which was amended and restated on August 23, 2016, to act as financial advisor to Tervita and the Board to render various advisory services to the Corporation in connection with, among other things, the Recapitalization. Services to be provided relating to the Recapitalization include, among other services, the provision of the Barclays Opinions to the Board of Directors.

Barclays is paid a monthly work fee, a fee for providing the Barclays Opinions and an additional fee for its advisory services to be paid upon the closing of the Recapitalization. The Corporation has also agreed to pay Barclays a financing fee if Barclays arranges, places or underwrites a financing as part of, or related to, a restructuring transaction. In addition, Barclays is to be reimbursed for its reasonable out-of-pocket expenses and is to be indemnified by the Corporation.

### Scope of Review

In preparing the Barclays Opinions, Barclays has relied upon the discussions, documents and materials referred to in the Barclays Opinions.

### Approach to Fairness

For the purposes of the Fairness Opinion, Barclays considered that the Arrangement would be fair, from a financial point of view, to the Corporation if, on a pro forma basis, the Recapitalization:

- provides the Corporation with an improved capital structure, by reducing the total amount of debt outstanding and providing new liquidity;

- reduces the risk that the Corporation's cash flow from operations and available liquidity would be insufficient to provide adequate funds to finance the operating and capital expenditures necessary to execute its operating strategy and service its debt; and

- is better than other feasible alternative transactions known to us, based on the above criteria.

In preparing the Fairness Opinion, Barclays relied upon the discussions, documents and materials referred to in the Fairness Opinion, reviewed with Tervita's management feasible alternative transactions available to the Corporation and known to Barclays, and considered, among other things, the following matters:

- the Corporation, with its current capital structure, is unable to execute its business plan and at the same time service its debt;

- in the event the Corporation has insufficient liquidity to continue to operate the business or the Corporation is unable to service its debt and refinance its debt as it matures, a likely result, in the absence of implementing the Recapitalization, is an insolvency process which would be expected to have a negative impact on the overall enterprise value of the Corporation;

- the Recapitalization would substantially reduce Tervita's outstanding funded debt from $2,575,000,000 to $475,000,000;

- the Recapitalization would substantially reduce Tervita's annual net interest expense from $246,000,000 to approximately $44,000,000;

- the Corporation has the opportunity, at this time, to effect a Recapitalization with the approval of certain Unsecured Noteholders, Subordinated Noteholders and the Existing Common Shareholders in accordance with applicable law; and

- Barclays and the Corporation are not aware of any feasible alternative transactions that are better than the Recapitalization.

For the purposes of the CBCA Opinion, Barclays considered that the Unsecured Noteholders and the Subordinated Noteholders would be in a better financial position under the Recapitalization than if the Corporation were liquidated if the estimated aggregate value of the consideration made available to the Unsecured Noteholders and the Subordinated Noteholders pursuant to the Recapitalization exceeds the estimated value such holders would receive if the Corporation were liquidated, in each case solely in their capacity as the Unsecured Noteholders and the Subordinated Noteholders.  For the purposes of the CBCA Opinion, Barclays considered that the Existing Common Shareholders would be in a better financial position under the Recapitalization than if the Corporation were liquidated if the estimated aggregate value of the consideration made available to the Existing Common Shareholders pursuant to the Recapitalization exceeds the estimated value such holders would receive if the Corporation were liquidated. Barclays has also assumed that a liquidation in an insolvency process will, for the reasons outlined in the CBCA Opinion, have a material negative impact on the value of the Corporation and its business.

**Recommendation of the Board of Directors**

The Recapitalization is expected to substantially improve the capital structure and financial position of the Corporation by de-leveraging its balance sheet, substantially reducing its debt and the costs associated with servicing its debt and providing it with improved liquidity and improved access to capital. The Board and management of the Corporation believe that the Arrangement will provide the necessary financial flexibility and capital resources to manage the business in the current economic environment and enable the Corporation to continue to pursue its business plan, without having to pursue non-consensual proceedings under creditor protection legislation.

The Board met frequently to consider the terms of the proposed Recapitalization. It received advice from Tervita's legal counsel, Fasken Martineau DuMoulin LLP and Osler, Hoskin & Harcourt LLP, and from Tervita's financial advisor, Barclays.  The Board reviewed the terms of the Recapitalization with management of Tervita and considered

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

the views of management and Barclays as to the anticipated financial conditions of Tervita both with and without giving effect to the proposed Recapitalization. See "*Background to and Reasons for the Recapitalization*".

In connection with the Arrangement, the Board of Directors received the Barclays Opinions to the effect that, as of the date thereof, and subject to the various assumptions, limitations and other matters set out therein: (a) the Unsecured Noteholders, the Subordinated Noteholders and the Existing Common Shareholders would each be in a better financial position, respectively, under the Recapitalization than if the Corporation were liquidated, as in each case, the estimated aggregate value of the consideration available to the Unsecured Noteholders, the Subordinated Noteholders and the Existing Common Shareholders, respectively, pursuant to the Recapitalization would exceed the estimated value that such noteholders and the Existing Common Shareholders would receive in a liquidation, respectively; and (b) the Recapitalization, if implemented, would be fair, from a financial point of view, to the Corporation. See "*Description of the Recapitalization – Barclays Opinions*". The full texts of the Barclays Opinions are attached hereto as Appendix "F" and "G" to this Information Circular and should be read in their entirety for a description of the assumptions made, matters considered and limitations and qualifications on the review undertaken by Barclays in providing its opinions.

The following is a summary of the factors, among others, which the Board reviewed and considered in relation to the Recapitalization:

- the challenging set of circumstances that Tervita has been faced with over the past several years;

- the challenges faced by Tervita to service and repay existing debt considering the reduction of available credit;

- the various alternatives that Tervita has explored to address its financial situation, including a sale of some or all of the company's assets, additional capital raising opportunities, other accretive transactions and a restructuring under the CCAA;

- the fact that the terms of the Recapitalization are the result of arm's length negotiations among management and the Board with support from their professional advisors, the Supporting Unsecured Noteholders, the Supporting Subordinated Noteholders and the Plan Sponsors;

- the likely consequences of a failure to pursue the Recapitalization;

- the strategic significance and benefits of the Recapitalization, including the reduction of Tervita's net debt and annual cash debt service costs and the commitment of additional capital to enable the company to invest in and maintain its ongoing operations;

- the advice Tervita has received from Barclays;

- the Barclays Opinions;

- the Recapitalization will not directly affect any of Tervita's trade obligations;

- that Tervita's Revolving Credit Facilities Lenders were supportive of a recapitalization that involves the complete equitization of the Unsecured/Subordinated Notes and repayment of Secured Debt;

- the fact that holders of more than 63% of the principal amount of the Unsecured Notes, 90% of the principal amount of the Subordinated Notes and 69% of RSAC Shareholders have indicated they are supportive of the Recapitalization;

- that a restructuring pursuant to an Alternative Proceeding would likely result in worse recoveries for all of Tervita's stakeholders than a consensual restructuring under the CBCA proceedings and involve considerable time and expense; and

- the Recapitalization represents the best going concern solution available to Tervita.

40

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

The foregoing discussion of the information and factors considered by the Board is not intended to be exhaustive, but includes the material factors considered by the Board. In view of the variety of factors considered in connection with its evaluation of the Recapitalization, the Board did not find it practicable to, and did not, quantify or otherwise assign relative weights to the specific factors considered in reaching their recommendation. In addition, individual members of the Board may have given differing weights to different factors.

The Board of Directors, after careful consideration of a number of factors, including the factors discussed in the foregoing section entitled "*Background to and Reasons for the Recapitalization*" and the Barclays Opinions, and upon consultation with its financial advisor and outside legal counsel, determined unanimously (subject to the abstentions of Messrs. David Werklund and John Gibson as interested directors) that the Recapitalization is in the best interests of the Corporation and the Board of Directors has unanimously (subject to the abstentions of Messrs. David Werklund and John Gibson as interested directors) determined to recommend to Unsecured Noteholders and Subordinated Noteholders that they **VOTE FOR** the Unsecured Noteholders Arrangement Resolution and Subordinated Noteholders Arrangement Resolution, respectively, at the Unsecured Noteholders' Meeting and Subordinated Noteholders' Meeting, respectively. In making their determination and recommendation, the Board of Directors relied upon legal, tax and other advice and information received during the course of its deliberations.

### PROCEDURES RELATING TO THE ARRANGEMENT AND NEW INVESTMENT OFFERING

#### Participation Form and Participation Deadline

For Unsecured Noteholders, enclosed with this Information Circular is a Participation Form for use by Unsecured Noteholders, with respect to the New Investment Offering, if such Unsecured Noteholders are eligible to participate in the New Investment Offering, to make their commitments to purchase their respective pro rata share of the New Investment Shares.

Each Eligible Unsecured Noteholder shall have the right, but not the obligation, to participate in its Unsecured Noteholder Subscription Pro Rata Share of the New Investment Offering.

Any Eligible Unsecured Noteholder may participate in the New Investment Offering as to all or any portion (constituting a multiple of U.S.S$1,000 principal amount) of Unsecured Notes held by such Eligible Unsecured Noteholder on the Voting Record Date. Thus, any principal amount of Unsecured/Subordinated Notes specified by an Eligible Unsecured Noteholder on a Participation Form in excess of the aggregate principal amount of Unsecured Notes held by such Eligible Unsecured Noteholder on the Voting Record Date will be disregarded.

Eligible Unsecured Noteholders who wish to participate in the New Investment Offering are required to duly execute and submit a Participation Form by the Participation Deadline. The Participation Form will include: (a) confirmation by the Eligible Unsecured Noteholder of its interest in participating in the New Investment Offering by subscribing for and purchasing all or a portion of its Unsecured Noteholder Pro Rata Share of the New Investment Shares; (b) representations and warranties, or other satisfactory evidence as determined by Tervita and its representatives in their sole discretion, that such Unsecured Noteholder meets the requirements of an Eligible Unsecured Noteholder for the purpose of such participation; and (c) directions as to registration and delivery of the New Investment Shares to be received by the Eligible Unsecured Noteholder in connection with its participation in the New Investment Offering.

In addition, Eligible Unsecured Noteholders who wish to participate in the New Investment Offering will be required to: (a) if applicable, co-ordinate with your Intermediary to ensure that the information required to be completed by the Intermediary is properly completed and that the Intermediary signature guarantees the Participation Form by affixing its medallion signature guarantee stamp to the Participation Form; and (b) forward their properly completed, duly executed and medallion signature guaranteed Participation Form (or other acceptable form of instruction) to Tervita at c/o Osler, Hoskin & Harcourt LLP, 2500 – 450 1st Street S.W., Calgary, Alberta T2P 5H1 (Attention: Justin Sherman), on or prior to the Participation Deadline.

Eligible Unsecured Noteholders intending to participate in the New Investment Offering will not be accepted if the Corporation, or such other Persons as may be designated by the Corporation, has not received the Participation Form (or other acceptable form of instruction), properly completed, duly executed and medallion signature guaranteed, in

41

LEGAL_1:40709104.10

advance of the Participation Deadline and any other documentation that may be requested by the Corporation to confirm the status of Eligible Unsecured Noteholders.

On or prior to the fifth Business Days before the anticipated Effective Date, each Eligible Unsecured Noteholder that submitted a Participation Form (or other acceptable form of instruction) will receive, directly or indirectly, a confirmation from the Corporation as to: (a) the anticipated Effective Date; (b) the acceptance of the participation in the New Investment Offering by such Eligible Unsecured Noteholder; (c) such Eligible Unsecured Noteholder's Committed Pro Rata Share of the New Investment Shares and the amount of Funds required to be paid in respect of such New Investment Shares; (d) instructions and directions regarding payment of its Funds for its New Investor's Committed Pro Rata Share; and (e) the Funding Deadline. Each Eligible Unsecured Noteholder will be required to forward Funds to the Escrow Account by wire transfer or such other method as the Corporation may agree in in the amount as directed by the Corporation pursuant to and in accordance with the terms of the Participation Form, on or prior to the Funding Deadline, failing which the participation of such Eligible Unsecured Noteholder in the New Investment Offering will be deemed to be null and void.

To the extent there is a New Investment Adjustment after the determination of an Eligible Unsecured Noteholder's Committed Pro Rata Share, a portion of the Funds equal to the Eligible Unsecured Noteholder's Unsecured Noteholder Subscription Pro Rata Share of the amount of such New Investment Adjustment will be returned to such Eligible Unsecured Noteholder.

For further information regarding the New Investment Offering or to obtain or for assistance in completing the Participation Form (or other acceptable form of instruction), please contact Osler, Hoskin & Harcourt LLP Attention: Justin Sherman at jsherman@osler.com or 403.260.7008. See also "*Description of the Recapitalization – New Investment Offering*" and "*Procedures Relating to the Arrangement and New Investment Offering*".

### Determination of Validity

All questions as to the validity, form, eligibility, correctness, completeness, accuracy and timely delivery of any elections pursuant to the Participation Form and any of the procedures described above, will be determined by the Corporation in its sole discretion, which determination will be final and binding. The Corporation reserves the absolute right to reject any Participation Form determined not to be in proper form, incomplete or containing errors and/or inaccuracies as well as to reject any subscriptions made pursuant to such Participation Form determined by the Corporation not to be validly made.

Commitments to purchase New Investment Shares will not be deemed to have been validly made until all defects or irregularities in the election have been cured or waived. Neither the Corporation, the Intermediary nor any other person or entity is under any duty to give notification of incorrect, incomplete or inaccurate Participation Forms or any other defects or irregularities in any election, or will incur any liability for failure to give any such notification.

**Exchange of Notes for New Shares or Cash**

DTC, as the sole registered holder of the Unsecured/Subordinated Notes on behalf of the Unsecured/Subordinated Noteholders, will surrender for exchange and cancellation the certificates representing the Notes to the Depositary. Delivery of the New Shares issuable to the Unsecured Noteholders under the Arrangement will be made through the facilities of DTC to DTC participants and held by DTC as custodian for institutions which participate directly or indirectly in DTC's book-entry only registration system ("**BEO Participants**") who in turn will deliver the New Shares to the Unsecured Noteholders pursuant to standing instructions and customary practices. Delivery of the Cash Payment to Subordinated Noteholders under the Arrangement will be made through the facilities of DTC to DTC and held by DTC as custodian for BEO Participants.

However, because of the transfer restrictions applicable to the New Shares under the Shareholders Agreement, Tervita expects that the New Shares issuable under the Arrangement will not qualify for eligibility for transfer and registration in DTC and, following the issuance of such New Shares through DTC, such securities will be re-issued in fully registered form to the BEO Participants. If desired, Unsecured Noteholders and their Intermediaries, which are BEO Participants, will need to make arrangements with TSX Trust Company, as registrar and transfer agent of the New Shares to re-register such securities.

42

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

*Procedures for Registered Holders of Unsecured/Subordinated Notes*

Provided that a Registered Holder of Unsecured/Subordinated has delivered and surrendered to the Depositary for cancellation the certificates representing such holder's Unsecured/Subordinated Notes and the letter of transmittal duly completed and executed in accordance with the instructions contained in this Information Circular and in the letter of transmittal or in otherwise acceptable form, as soon as practicable after the Arrangement, Tervita will cause the Depositary to: (i) forward to the holder at the address specified in the letter of transmittal by insured first class mail; or (ii) make available at the offices of the Depositary for pick-up by the holder as requested by the holder in the letter of transmittal, certificates representing the New Shares or payment of the Cash Payment, as applicable.

Only Registered Holders of Unsecured/Subordinated Notes are required to submit a letter of transmittal. A beneficial Unsecured/Subordinated Noteholder holding Unsecured/Subordinated Notes through an Intermediary, should contact that Intermediary for instructions and assistance in depositing certificates representing the Unsecured/Subordinated Notes and carefully follow any instructions provided by such Intermediary.

Until surrendered as contemplated by the Arrangement, each certificate, which immediately prior to the Effective Date represented one or more outstanding Notes, will be deemed at all times after the Effective Date to represent only the right to receive, upon such surrender, the New Shares or Cash Payment, as applicable.

If an Unsecured/Subordinated Note certificate has been lost, stolen or destroyed, the letter of transmittal should be completed as fully as possible and forwarded, together with a letter describing the loss, to the Depositary. The Depositary will respond with its Unsecured/Subordinated Note certificate replacement requirements, which must be properly completed and submitted in good order to the Depositary.

Under no circumstances will interest on the issuance of the New Shares or payment of cash consideration, as applicable, in respect of the transmitted Unsecured/Subordinated Notes accrue or be paid to Unsecured/Subordinated Noteholders, regardless of any delay in making such payment. The Depositary will act as the agent of persons who have deposited their Unsecured/Subordinated Notes pursuant to the Arrangement for the purpose of receiving and transmitting the New Shares or cash consideration to such persons, and receipt of the New Shares and cash consideration by the Depositary will be deemed to constitute receipt of payment by persons depositing their Unsecured/Subordinated Notes.

**General**

Any use of the mail to transmit a Participation Form or certificates representing Unsecured/Subordinated Notes is at the risk of the Unsecured Noteholder. If the Participation Form is mailed, it is recommended that registered mail with (if applicable) return receipt requested, properly insured, be used. If the Unsecured Noteholders Arrangement Resolution or Subordinated Noteholders Arrangement Resolution is not adopted at the Unsecured Noteholders' Meeting or Subordinated Noteholders' Meeting by the Unsecured Noteholders or Subordinated Noteholders, respectively, or if the Recapitalization is not otherwise completed, the certificates representing the Unsecured/Subordinated Notes, as applicable, received by the Depositary will be returned to the appropriate Unsecured/Subordinated Noteholders, as applicable.

**Noteholders whose Unsecured Notes are registered in the name of a broker, investment dealer, bank, trust company or other Intermediary should contact that Intermediary for instructions and assistance in providing details of registration and delivery of their New Shares.**

*Strict compliance with the requirements set forth above concerning deposit and delivery of securities and related required documents will be necessary.*

**Fractional Shares**

No fractional New Share will be issued in connection with the Plan of Arrangement. With respect to fractional shares that would otherwise be issuable to an Unsecured Noteholder, the entitlement of such Unsecured Noteholder will be reduced to the next lowest whole number of New Share.

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

## SUPPORT AGREEMENTS

In connection with the Recapitalization:

- Unsecured Noteholders (including the Plan Sponsors) holding approximately **[63%]** of the aggregate principal amount of the Unsecured Notes, have signed the Unsecured Noteholder Support Agreement;

- Subordinated Noteholders holding approximately **[90%]** of the aggregate principal amount of the Subordinated Notes, have entered into Unsecured Noteholder Support Agreements (in respect of their Subordinated Notes) or Subordinated Noteholder Support Agreement; and

- RSAC Shareholders holding approximately **[69%]** of the RSAC Shares and RSH LP Interests, have entered into the Securityholder Consent and Support Agreement or an Unsecured Noteholder Support Agreement or Subordinated Noteholder Support Agreement (in respect of their Relevant Equity Securities).

As a result of the voting commitments contained in the Support Agreements, the Unsecured Noteholders Arrangement Resolution, the Subordinated Noteholders Arrangement Resolution and the Shareholders Arrangement Resolution are all expected to be approved at the Unsecured Noteholders' Meeting, Subordinated Noteholders' Meeting and Shareholders' Meeting, respectively.

The following is a summary of the principal terms of the Support Agreements. This summary does not purport to be complete and is qualified in its entirety by reference to, as applicable, the Unsecured Noteholder Support Agreement set forth in Appendix "B", the Subordinated Noteholder Support Agreement set forth in Appendix "B" and the Securityholder Consent and Support Agreement set forth in Appendix "B".

### Unsecured Noteholder Support Agreement

*Covenants*

Pursuant to the Unsecured Noteholder Support Agreement, each Supporting Unsecured Noteholder (including the Plan Sponsors) has agreed, subject to the terms and conditions of the Unsecured Noteholder Support Agreement, among other things:

- to vote all of its Debt (as defined in the Unsecured Noteholder Support Agreement) and Relevant Equity Securities (if any) in favour of the Recapitalization and the Plan of Arrangement and against any action that would result in any breach of any representation, warranty, covenant or agreement or any other obligation of the Unsecured Noteholder Support Agreement, the Recapitalization Term Sheet or the Plan of Arrangement;

- if requested by Tervita, to affirmatively support Tervita (at Tervita's sole expense) in obtaining from the Court the approval of the Plan of Arrangement and the Final Order in respect thereof, and, except with respect to certain funds signatory to the Unsecured Noteholder Support Agreement, if requested by Tervita, to provide commercially reasonable assistance to Tervita (at Tervita's sole expense) in obtaining required regulatory approvals to effect the Recapitalization;

- not to accelerate or enforce or take any action or initiate any proceeding to accelerate or enforce the payment or repayment of its Debt (including for greater certainty any due and unpaid interest on its Relevant Debt Instruments), whether against any Tervita Entity or any property of any of them, other than filing claims in the Proceedings;

- subject to any document to be executed being satisfactory to the Supporting Unsecured Noteholders, acting reasonably, to forbear from exercising, and direct the trustee or agent (if any) to forebear from exercising, any default related rights, remedies, powers or privileges, or from instituting any enforcement actions or collection actions with respect to any obligations under the Indentures and the Term Loan Credit Agreement, as applicable, whether against a Tervita Entity or any property of any of them, other than filing claims in the Proceedings;

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

- to waive, now and in the future, any default or event of default under the Indentures and the Term Loan Credit Agreement, as applicable, that may occur as a result of (i) the commencement and/or continuation of the Proceedings in conformity with the Unsecured Noteholder Support Agreement; and (ii) the pursuit of the Recapitalization, including the entering into of any related documents, in conformity with the Unsecured Noteholder Support Agreement;

- subject to certain exceptions, not to sell, assign, pledge, hypothecate (except with respect to security generally applying to its investments which does not adversely affect the Supporting Unsecured Noteholders's ability to perform its obligations under the Unsecured Noteholder Support Agreement) or otherwise transfer (in each case, a "**Transfer**") any Relevant Debt Instruments or Relevant Equity Securities (if any), as applicable;

- to the extent a Transfer is consummated according to the Unsecured Noteholder Support Agreement, that a transferee is deemed to make all the representations and warranties and to agree to all of the covenants that the transferring Supporting Unsecured Noteholder made and agreed pursuant to the Unsecured Noteholder Support Agreement and to the extent a Transfer is affected after 5:00 p.m. Calgary time on the record date set forth in the Interim Order, the transferring Supporting Unsecured Noteholder agrees to vote their Unsecured Notes on behalf of the transferee in favour of the Recapitalization and the Plan of Arrangement; and

- except as contemplated by the Unsecured Noteholder Support Agreement, between September 14, 2016 and the date on which the Unsecured Noteholder Support Agreement is terminated in accordance with the provisions thereon, not to deposit any of its Relevant Debt Instruments or Relevant Equity Securities (if any) into a voting trust, or grant (or permit to be granted) any proxies or powers of attorney or attorney in fact, or enter into a voting agreement, understanding or arrangement, with respect to the voting of any of its Relevant Debt Instruments or Relevant Equity Securities (if any) if such trust, grant, agreement, understanding or arrangement would in any manner restrict the ability of the Supporting Unsecured Noteholder to comply with its obligations under the Unsecured Noteholder Support Agreement.

Tervita on its own behalf and on behalf of the Company Entities has agreed, subject to the terms of the Unsecured Noteholder Support Agreement, among other things:

- to pursue the completion of the Recapitalization in good faith by way of the Plan of Arrangement, to use commercially reasonable efforts to obtain the Final Order by December 15, 2016 and complete the Recapitalization prior to the Outside Date and to make all such filings and seek all such consents, approvals, permits and authorizations with any Governmental Entities or third parties whose consent is required in connection with the Recapitalization;

- to indemnify each Supporting Unsecured Noteholder and their respective subsidiaries and affiliates and their respective shareholders, officers, directors, partners, employees, advisors, legal counsel and agents (each, an "**Indemnified Party**") against certain liabilities or claims they may incur in connection with the Plan of Arrangement, the Recapitalization or any proceedings commenced with respect to the Plan of Arrangement and the Recapitalization and any other claim, litigation, investigation, actions or matters related directly or indirectly to the Plan of Arrangement or the Recapitalization, regardless of whether any Indemnified Party is a party thereto and  whether or not the transactions contemplated by the Unsecured Noteholder Support Agreement are consummated, and to reimburse each Indemnified Party promptly upon demand for all legal and other expenses reasonably incurred by it in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including, without limitation, in connection with the enforcement of the indemnification obligations set forth in the Unsecured Noteholder Support Agreement);

- to comply with the terms and covenants of the Secured Notes Indenture, the Unsecured Notes Indentures and the Term Loan Credit Agreement, other than any terms and covenants that may be breached as a result of the commencement and/or continuation of the Proceedings in conformity with the Unsecured Noteholder

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

Support Agreement, the pursuit of the Recapitalization, the non-payment of interest on any Notes and the breach of any financial covenants contained in the Term Loan Credit Agreement and the Indentures;

- to operate their business in the ordinary course and consistent with past practice, to continue to maintain appropriate insurance coverage in amounts and on terms that are customary in the industry of the Company Entities and to promptly notify the Supporting Unsecured Noteholders and Plan Sponsor Legal Advisors of certain specified events such as resignation or leave of absence of directors and officers and governmental investigations or any claims threatened or brought against Tervita or any of the other Company Entities; and

- to provide, upon reasonable request and with reasonable prior notice, the Plan Sponsor Legal Advisors or the Supporting Unsecured Noteholders that have entered into confidentiality agreements with Tervita with (i) reasonable access to the books, records, documents, materials and any other information of the Company Entities (other than books, records, documents, materials and any other information that are subject to solicitor-client privilege) for review in connection with the Recapitalization, (ii) reasonable access to the management and advisors of the Company Entities for purposes of evaluating the Company Entities' assets, liabilities, operations, businesses, finances, strategies, prospects and affairs, (iii) reasonably timely responses to all reasonable diligence requests and (iv) reasonable information with respect to all material executory contracts and unexpired leases of the Company Entities, subject to any confidentiality restrictions.

*Representations and Warranties*

In the Unsecured Noteholder Support Agreement, Tervita, on the one hand, and the Supporting Unsecured Noteholders, on the other hand, make a number of representations and warranties to each other regarding themselves, the Unsecured Noteholder Support Agreement and the Recapitalization. Tervita has represented and warranted to each Supporting Unsecured Noteholder, among other things, that:

- complete copies of Tervita's audited combined consolidated financial statements in each of the years 2015 and 2014 and the related statement of comprehensive loss, statement of equity, statement of cash flow and management's discussion and analysis for the years then ended and unaudited interim condensed combined consolidated financial statements consisting of the condensed combined consolidated statements of financial position as at June 30, 2016 and the related statement of comprehensive income (loss), statement of equity, statement of cash flow and management's discussion and analysis for the six-month period then ended are included in the Data Room;

- all forward looking information and future oriented financial information and all other financial projections that has been or will be provided or made available to any Supporting Unsecured Noteholders and/or the Plan Sponsor Legal Advisors by or on behalf of Tervita, or any of its representatives, has been or will be, when furnished, prepared in good faith and based upon assumptions that management of Tervita believe to be reasonable;

- there are no undisclosed liabilities except those that are adequately reflected or reserved against in the statement of financial position of Tervita as of December 31, 2015 (the "**Balance Sheet Date**"), incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and that are not, individually or in the aggregate, material in amount and those that have been disclosed in the Data Room;

- except as disclosed in the Data Room, there is not, with respect to Tervita or any Company Entity, any intercompany indebtedness owing by Tervita or any Company Entity to any of its affiliates or to Tervita or any Company Entity by any of its affiliates and certain other changes, events and conditions;

- the Data Room contains each Material Contract (as defined in the Unsecured Noteholder Support Agreement) of Tervita and each Company Entity, and each Material Contract is valid, binding and in full force and effect;

- Tervita and each Company Entity has good and valid title to, or a valid leasehold interest in, all real property and personal property and other assets reflected in the audited financial statements or acquired since the

46

LEGAL_1:40709104.10

Balance Sheet Date which are free and clear of all encumbrances, except for certain permitted encumbrances as provided in the Unsecured Noteholder Support Agreement;

- Tervita's material assets and property have been operated, prior to the date of the Unsecured Noteholder Support Agreement, in a manner materially consistent with customary industry practices in Canada and are sufficient to operate the business of Tervita as currently conducted; and

- since the Balance Sheet Date, there has not occurred any Material Adverse Effect.

*Alternative Proceeding*

If determined necessary or advisable by Tervita, or if Tervita has not obtained the Secured Notes Order in form and substance satisfactory to Tervita and the Plan Sponsors holding not less than 66 2/3% of the principal amount of the Debt Instruments (other than Subordinated Notes) held by all Plan Sponsors (the "**Majority Initial Supporting Parties**"), then, in either case, with the consent of the Majority Initial Supporting Parties, acting reasonably, Tervita will forthwith convert the CBCA proceeding to a proceeding under the CCAA (or any such other proceeding under any corporate arrangement, reorganization, restructuring, insolvency or similar law of any jurisdiction now or hereafter in effect, for the relief from or otherwise affecting creditors, including without limitation, under the BIA or the United States Bankruptcy Code) in order to implement the Recapitalization (an "**Alternative Proceeding**").

The terms of and obligations under the Unsecured Noteholder Support Agreement, including the Recapitalization Term Sheet, shall apply to the Alternative Proceeding, with any necessary amendments as the structure and implementation of the Alternative Proceeding may reasonably require.

*Superior Proposal*

The Unsecured Noteholder Support Agreement prohibits Tervita from negotiating or entering into any transaction that is an alternative to the Recapitalization unless the Board, on advice of its outside legal counsel and its independent financial advisors, determines that such proposal could reasonably be expected to result in a transaction that is more favourable to Tervita and its stakeholders (a "**Superior Proposal**").

Financing for such a Superior Proposal should be fully committed or reasonably determined to be available by the Board and if Tervita is unable to fund the payment of the Break Fee, such Superior Proposal should provide for payment of the Break Fee in cash by the third party making such proposal, in accordance with the Backstop Commitment Letter.  The parties to the Unsecured Noteholder Support Agreement have a five Business Day right to match any Superior Proposal and during such period, Tervita must negotiate in good faith with such parties to make such adjustments to the terms and conditions of the Unsecured Noteholder Support Agreement, the Recapitalization, the Recapitalization Term Sheet and the Plan of Arrangement as would permit the Board not to pursue such action or terminate the Unsecured Noteholder Support Agreement.

*Conditions*

The Unsecured Noteholder Support Agreement provide that the Recapitalization is subject to the satisfaction or waiver, prior to or at the Effective Time, of a number of conditions for the mutual benefit of Tervita, on the one hand, and Supporting Unsecured Noteholders, on the other hand, including:

- any amendments to the structure of the Recapitalization and the steps required to complete the Recapitalization from that which is provided in the Recapitalization Term Sheet shall be in form and in substance satisfactory to Tervita and the Majority Initial Supporting Parties, each acting reasonably;

- the Plan of Arrangement shall have been approved by the Court and the requisite majority of affected creditors and holders of RSAC Shares and RSH LP Interests, in conformity with the CBCA as and to the extent required by the Court;

47

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

- all filings that are required under applicable laws in connection with the Recapitalization shall have been made and any material regulatory consents or approvals, including consents or approvals pursuant to the *Investment Canada Act* (Canada) or the *Competition Act* (Canada), that are required in connection with the Recapitalization shall have been obtained and, in the case or waiting or suspensory periods, such waiting or suspensory periods have expired or been terminated;

- all required stakeholder, regulatory, Court approvals, consents, waivers and filings shall have been obtained or made, as applicable, on terms satisfactory to Tervita and the Majority Initial Supporting Parties, each acting reasonably, and copies of any and all such approvals, consents and/or waivers shall have been provided to the Plan Sponsor Legal Advisors;

- the absence of any (i) preliminary or final decisions, orders or decrees by any Governmental Entity, (ii) applications to any Governmental Entity and (iii) announced, threatened or commenced actions or investigations by any Governmental Entity in consequence of or in connection with the Recapitalization that restrains or impedes in any material respect or prohibits (or if granted could reasonably be expected to  restrain or impede, in any material respect, or prohibit) the Recapitalization or any part thereof or require a material variation of the Recapitalization;

- the Subordinated Noteholder Support Agreement, the Securityholder Consent and Support Agreement and the Backstop Commitment Letter shall be in full force and effect and shall not have been terminated;

- the Effective Date shall have occurred no later than the Outside Date;

- the Revolving Credit Agreement shall be either reinstated or replaced on terms acceptable to Tervita and the Majority Initial Supporting Parties, each acting reasonably;

- the New Revolving Credit Facility shall be available to Tervita; and

- all securities of Tervita and any affiliated or related entities that are to be formed in connection with the Recapitalization, when issued and delivered, shall be duly authorized, validly issued and, if applicable, be fully paid and non-assessable, and the issuance thereof shall be exempt from all prospectus and registration requirements of applicable securities laws in the United States and Canada.

Tervita's obligations to complete the Recapitalization are also subject to the satisfaction or waiver by Tervita, prior to or at the Effective Date, of a number of conditions including:

- each Supporting Unsecured Noteholder shall have complied in all material respects with each covenant and obligation in the Unsecured Noteholder Support Agreement that is to be performed by it on or before the Effective Time; and

- the representations and warranties of each Supporting Unsecured Noteholder shall be true and correct in all material respects as of the Effective Date.

The obligations of the Supporting Unsecured Noteholders to complete the Recapitalization are also subject to the satisfaction or waiver by the Supporting Unsecured Noteholders prior to or at the Effective Date, of a number of conditions including:

- Tervita and each of the Company Entities shall have complied in all material respects with each covenant and obligation in the Unsecured Noteholder Support Agreement that is to be performed by it on or before the Effective Time;

- the representations and warranties of Tervita set forth in the Unsecured Noteholder Support Agreement shall be true and correct in all material respects as of the Effective Date;

- the absence of any Material Adverse Effect;

48

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

- Tervita shall have executed and delivered the Shareholders Agreement and the Registration Rights Agreement in form and substance acceptable to the Majority Initial Supporting Parties, acting reasonably; and

- all of the reasonable and documented fees and expenses of the Plan Sponsor Legal Advisors, Moelis & Company LLC and Peters & Co. Limited shall have been paid by Tervita.

In addition to the above conditions, the support obligations of the Supporting Unsecured Noteholders (those under Section 5.2 and Section 13 of the Unsecured Noteholder Support Agreement) are specifically and expressly subject to a number of conditions, including:

- the Plan of Arrangement and all material agreements, consents and other documents relating to the Recapitalization and the Plan of Arrangement shall be in form and content satisfactory to the Majority Initial Supporting Parties, acting reasonably;

- all rulings and decrees of any competent regulatory body, agent or official in relation to the Proceedings and the Recapitalization shall be satisfactory to the Majority Initial Supporting Parties; and

- the absence of any Material Adverse Effect.

*Termination*

The Unsecured Noteholder Support Agreement will terminate automatically at the Effective Time and may be terminated at any time by mutual agreement in writing among Tervita and the Majority Initial Supporting Parties.

The Unsecured Noteholder Support Agreement may be terminated by the Majority Initial Supporting Parties in certain circumstances, including if:

- Tervita fails to meet any of the milestones for the Recapitalization set in the Unsecured Noteholder Support Agreement within the times set forth therein;

- any of the Tervita Entities publicly recommends, enters into or directly or indirectly proposes, supports, assists, solicits or files a pleading seeking approval of, or seeking to pursue, a Superior Proposal;

- if any of the representations or warranties of Tervita made in the Unsecured Noteholder Support Agreement shall be untrue or incorrect in any material respect;

- Tervita has failed to comply with, or defaulted in the performance or observance of, any covenant or agreement in any material respect set forth in the Unsecured Noteholder Support Agreement that, if capable of being cured, is not cured within three Business Days after receipt of written notice of such failure or default;

- upon the issuance of any preliminary or final decision, order or decree by a Governmental Entity, the making of an application to any Governmental Entity, or the commencement of an action or investigation by any Governmental Entity, in consequence of or in connection with the Recapitalization or the Plan of Arrangement, which restrains or impedes, in any material respect, or prohibits the Recapitalization, the Plan of Arrangement or the Unsecured Noteholder Support Agreement or has a Material Adverse Effect;

- the Backstop Commitment Letter has been terminated;

- the Subordinated Noteholder Support Agreement or the Securityholder Consent and Support Agreement has been terminated or amended, modified or waived without the consent of the Majority Initial Supporting Parties, acting reasonably;

49

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

- any of the conditions to be met by Tervita are not waived, or satisfied and discharged in accordance with the terms of the Unsecured Noteholder Support Agreement; or

- the conversion of Proceedings under the CBCA to a case under the BIA.

The Unsecured Noteholder Support Agreement may be terminated by Tervita in certain circumstances, including if:

- at any time following the Interim Order, the Supporting Unsecured Noteholders or Unsecured Noteholders that have otherwise agreed to support the Recapitalization, hold in the aggregate less than 60% of the principal amount of the Unsecured Notes;

- the Board decides to proceed with a Superior Proposal after complying with the terms of the Unsecured Noteholder Support Agreement and the Backstop Commitment Letter;

- the Backstop Commitment Letter, the Subordinated Noteholder Support Agreement or the Securityholder Consent and Support Agreement have been terminated;

- the issuance of any final decision, order or decree by a Governmental Entity, in consequence of or in connection with the Recapitalization or the Plan of Arrangement, restrains or prohibits the Recapitalization or the Plan of Arrangement or the Unsecured Noteholder Support Agreement;

- any of the conditions to be met by Supporting Unsecured Noteholders are not waived, or satisfied and discharged in accordance with the terms of the Unsecured Noteholder Support Agreement; or

- the Effective Date has not occurred by the Outside Date.

The Unsecured Noteholder Support Agreement may also be terminated by Tervita as to a breaching Supporting Unsecured Noteholder only, by providing written notice to such Supporting Unsecured Noteholder if:

- such breaching Supporting Unsecured Noteholder has taken any action inconsistent with the Unsecured Noteholder Support Agreement or failed to comply with, or defaulted in the performance or observance of, any material term, condition, covenant or agreement set forth in the Unsecured Noteholder Support Agreement that, if capable of being cured, is not cured within three Business Days after receipt of written notice of such failure or default; or

- any representation, warranty or acknowledgement of such breaching Supporting Unsecured Noteholder made in the Unsecured Noteholder Support Agreement shall prove untrue in any material respect as of the date when made.

**Subordinated Noteholder Support Agreement**

*Covenants*

Pursuant to the Subordinated Noteholder Support Agreement, each Supporting Subordinated Noteholder has agreed, subject to the terms and conditions of the Subordinated Noteholder Support Agreement, among other things:

- to consent to the Recapitalization substantially on the terms set out in the Recapitalization Term Sheet and to any amendments, modifications and/or supplements to the Recapitalization and Recapitalization Term Sheet, provided the Recapitalization will provide for the releases, the Cash Payment and Early Consent Cash Payment to certain Subordinated Noteholders (each as contemplated in the Recapitalization Term Sheet), and to consent to such other transactions in connection therewith as may be approved by the Board (collectively, "**Other Transactions**");

- to vote (or cause to be voted) all of its Subordinated Notes and Relevant Equity Securities (if any), in favour of the approval, consent, ratification and adoption of the Recapitalization, the Plan of Arrangement or Other

50

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

Transaction, provided the Recapitalization, the Plan of Arrangement or Other Transaction will provide for the releases, the Cash Payment and Early Consent Cash Payment to certain Subordinated Noteholders (each as contemplated in the Recapitalization Term Sheet);

- to support Tervita in obtaining approval of the Recapitalization and the Plan of Arrangement by the Court and all other applicable orders in connection therewith on terms consistent with the Recapitalization Term Sheet;

- subject to certain exceptions, not to sell, transfer or assign any of its Subordinated Notes or Relevant Equity Securities (if any) or any interest therein;

- to the extent that any Supporting Subordinated Noteholder acquires additional Subordinated Notes, RSAC Shares or RSH LP Interests, such securities shall be subject to the Subordinated Noteholder Support Agreement and such Supporting Subordinated Noteholder shall vote (or cause to be voted) such additional securities in a manner consistent with the Subordinated Noteholder Support Agreement;

- not to, directly or indirectly, object to, delay or take any other action to interfere with the consideration, acceptance or implementation of the Recapitalization, the Plan of Arrangement and any Other Transaction, provided the Recapitalization, the Plan of Arrangement or Other Transaction will provide for the releases, the Cash Payment and Early Consent Cash Payment to certain Subordinated Noteholders (each as contemplated in the Recapitalization Term Sheet); and

- not to, directly or indirectly, exercise any rights of dissent or appraisal with respect to the Recapitalization, the Plan of Arrangement or any Other Transaction, provided the Recapitalization, the Plan of Arrangement or Other Transaction will provide for the releases, the Cash Payment and Early Consent Cash Payment to certain Subordinated Noteholders (each as contemplated in the Recapitalization Term Sheet).

*Representations and Warranties*

In the Subordinated Noteholder Support Agreement, Tervita, on the one hand, and the Supporting Subordinated Noteholders, on the other hand, make a number of customary representations and warranties to each other regarding themselves, the Unsecured Noteholder Support Agreement and the Recapitalization.

*Termination*

The Subordinated Noteholder Support Agreement terminates on the earlier of (a) the Effective Date, (b) the Outside Date and (c) the termination of the Unsecured Noteholder Support Agreement.

**Securityholder Consent and Support Agreement**

*Covenants*

Pursuant to the Securityholder Consent and Support Agreement, each Supporting RSAC Securityholder has agreed, subject to the terms and conditions of the Securityholder Consent and Support Agreement, among other things:

- to consent to the Recapitalization substantially on the terms set out in the Recapitalization Term Sheet and to any amendments, modifications and/or supplements to the Recapitalization and Recapitalization Term Sheet, provided the Recapitalization will provide for the releases and the recovery for the existing equity of Tervita held by such Securityholder Consent and Support Agreement Member (each as contemplated in the Recapitalization Term Sheet), and to consent to any Other Transaction;

- to vote (or cause to be voted) all of its RSAC Shares, in the event a vote of the RSAC Shareholders is required or to vote (or cause to be voted) all of its RSH LP Interests, in the event a vote of the limited partners of Holding LP is required, in connection with the Recapitalization, the Plan of Arrangement or an Other

51

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

Transaction for any reason, in favour of the approval, consent, ratification and adoption of the Recapitalization, the Plan of Arrangement or Other Transaction;

- to support, at the expense of Tervita, Tervita and its affiliates in obtaining approval of the Recapitalization and the Plan of Arrangement by the Court and all other applicable orders in connection therewith on terms consistent with the Recapitalization Term Sheet;

- subject to certain exceptions, not to sell, transfer or assign any of its RSAC Shares or RSH LP Interests or any interest therein;

- to the extent that any Supporting RSAC Securityholder acquires additional RSAC Shares or RSH LP Interests, such additional securities shall be subject to the Securityholder Consent and Support Agreement and it shall vote (or cause to be voted) such additional securities in a manner consistent with the Securityholder Consent and Support Agreement;

- not to, directly or indirectly, object to, delay or take any other action to interfere with the consideration, acceptance or implementation of the Recapitalization, the Plan of Arrangement or any Other Transaction; and

- not to, directly or indirectly, exercise any rights of dissent or appraisal with respect to the Recapitalization, the Plan of Arrangement or any Other Transaction.

*Representations and Warranties*

In the Securityholder Consent and Support Agreement, Tervita, on the one hand, and the Supporting RSAC Securityholders, on the other hand, make a number of customary representations and warranties to each other regarding themselves, the Securityholder Consent and Support Agreement and the Recapitalization.

*Structuring*

Pursuant to the Securityholder Consent and Support Agreement, Tervita is required to use reasonable commercial efforts to co-operate with the Supporting RSAC Securityholders in structuring, planning and implementing the Recapitalization in a tax efficient manner for all parties.

*Termination*

The Securityholder Consent and Support Agreement terminates on the earlier of (a) the Effective Date and (b) the Outside Date.

## BACKSTOP COMMITMENT

In connection with the Recapitalization, Tervita entered into the Backstop Commitment Letter with the Backstop Parties.

The following is a summary of the principal terms of the Backstop Commitment Letter. This summary does not purport to be complete and is qualified in its entirety by reference to the Backstop Commitment Letter, set forth in Appendix "B".

Pursuant to the Backstop Commitment Letter, each Initial Backstop Party has agreed to purchase its Initial Backstop Pro Rata Share of the Backstopped Shares and the Additional Backstop Party has agreed to purchase the Additional Backstop Commitment (collectively, the "**Primary Backstop Commitment**"). In the event that any one or more Unsecured Noteholders (other than the Backstop Parties) that have committed to purchase New Investment Shares shall fail to purchase any portion of such New Investment Shares or the Additional Backstop Party shall fail to purchase any portion of the New Investment Shares pursuant to the Additional Backstop Commitment (each such Noteholder, a "**Defaulting Noteholder**"), each Initial Backstop Party has agreed to purchase, without duplication, its

52

LEGAL_1:40709104.10

Initial Backstop Pro Rata Share of such unpurchased New Investment Shares in respect of each such Defaulting Noteholder (the "**Secondary Backstop Commitment**").

In consideration of the commitment of the Backstop Parties, Tervita has agreed to pay to the Backstop Parties, in the aggregate, a non-refundable cash commitment fee ("**Commitment Fee**") in an amount equal to the Subscription Price for 1,860,000 New Preferred Shares, which fee shall be fully earned on September 14, 2016 and payable on the Effective Time, provided, that, no Commitment Fee shall be payable unless the Recapitalization is completed.

If any of the Tervita Entities accepts, enters into or files a pleading seeking approval of a Superior Proposal, Tervita has agreed to pay (or cause the third party making such Superior Proposal to pay) to the Backstop Parties (other than any defaulting Backstop Parties) the Break Fee. Tervita has also agreed to pay the reasonable fees, costs and expenses of each Initial Backstop Party in connection with the transactions contemplated by the Backstop Commitment Letter, including, without limitation, the reasonable and documented fees and expenses of the Plan Sponsor Legal Advisors, Moelis & Company LLC and Peters & Co. Limited.

The Backstop Commitment Letter shall automatically terminate on the earliest of (a) the Effective Time, (b) termination of the Unsecured Noteholder Support Agreement and (c) the Outside Date. The Backstop Commitment Letter may also be terminated by the Backstop Parties in circumstances that are substantially similar to the circumstances in which the Unsecured Noteholders may terminate the Unsecured Noteholder Support Agreement.

*Covenants*

In addition to the covenants in connection with the Unsecured Noteholder Support Agreement, Tervita has agreed, subject to the terms of the Backstop Commitment Letter, to the following additional covenants:

- not to, and not to permit the other Tervita Entities to, directly or indirectly, do any of the following, other than as required by the Recapitalization or the Plan of Arrangement or as consented to by the Majority Initial Supporting Parties:

  - materially amend, materially modify, replace, terminate, repudiate, disclaim, waive any material right under or take any other material steps or actions (other than as expressly required by such Material Contracts or in the ordinary course of performing its obligations under such Material Contracts) under or in respect of such Material Contracts in any manner unless it has provided five Business Days' notice of same to the Plan Sponsor Legal Advisors and has not received an objection to same;

  - enter into any material agreement, unless it has provided five Business Days' notice of same to the Plan Sponsor Legal Advisors and has not received an objection to same;

  - materially increase compensation or severance entitlements or other benefits payable to directors, officers or employees of Tervita or any of the other Tervita Entities, including by way of a key employee incentive plan, or pay any bonuses whatsoever, other than as required by law;

  - amalgamate, consolidate with or merge into or sell all or substantially all of its assets to another entity, or change the nature of its business or its corporate or capital structure;

  - (i) prepay, redeem prior to maturity, defease, repurchase or make other prepayments in respect of any non-revolving indebtedness, (ii) directly or indirectly, create, incur, assume, guarantee or otherwise become directly or indirectly liable with respect to any indebtedness of any kind whatsoever, or (iii) create, incur, assume or otherwise cause or suffer to exist or become effective any lien, charge, mortgage, hypothec or security interest of any kind whatsoever on, over or against any of its assets or property;

  - transfer, lease, license or otherwise dispose of all or any part of its property, assets or undertaking outside the ordinary course consistent with past practice;

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

- o  issue, sell, grant, pledge, assign, dispose of, encumber or agree to issue, sell, grant, pledge, assign, dispose of or encumber any shares or other securities of, or any options, warrants, calls, conversion privileges or rights of any kind to acquire any securities of Tervita or any of the Tervita Entities;

- o  amend or propose to amend its certificate of incorporation, articles, by-laws or other constating documents;

- o  declare, set aside or pay any dividend or other distribution payable in cash, stock, property or otherwise with respect to any of its shares;

- o  redeem, purchase or offer to purchase any of its securities or reduce its capital or the stated capital;

- o  (i) acquire or agree to acquire (by merger, amalgamation, acquisition of securities or assets or otherwise) any Person or (ii) make any investment either by purchase of securities, contributions of capital, property transfer or purchase of any property or assets of any other Person;

- o  make any changes in accounting methods, principles, policies or practices, except insofar as may be required by generally accepted accounting principles as in effect from time to time in Canada or applicable laws; or

- o  abandon or fail to diligently pursue any application for any material licenses.

- •  if at any time during the term of the Backstop Commitment Letter Tervita has knowledge of the fact that any of the material assumptions upon which all forward looking information and future oriented financial information and all other financial projections (collectively, the "**Projections**") are based are no longer reasonable if they were being furnished at such time, to promptly supplement, or cause to be supplemented, the Projections; and

- •  to pay no later than five Business Days following receipt of an invoice the reasonable fees, costs and expenses of each Plan Sponsor in connection with the transactions contemplated by the Backstop Commitment Letter, including, without limitation, the reasonable and documented fees and expenses of the Plan Sponsor Legal Advisors, Moelis & Company LLC and Peters & Co. Limited.

*Conditions*

In addition to being subject to all conditions and conditions precedent in the Unsecured Noteholder Support Agreement, the commitments and agreements of each Backstop Party as contained in the Backstop Commitment Letter are subject to the following additional conditions:

- •  the Recapitalization shall be structured, including as to tax matters, in a manner satisfactory to the Plan Sponsors;

- •  all actions taken by the Tervita Entities in furtherance of the Recapitalization and the Plan of Arrangement shall be consistent in all material respects with the Backstop Commitment Letter and the Unsecured Noteholder Support Agreement;

- •  Tervita and each of the other Tervita Entities shall be in material compliance with all of its covenants and obligations under or in respect of the Backstop Commitment Letter and the Unsecured Noteholder Support Agreement;

- •  the execution and delivery of definitive agreements, and the satisfaction of all conditions to the effectiveness thereof, with respect to the issuance and subscription of the New Investment Shares, in each case substantially on terms contemplated in the Backstop Commitment Letter and in the Unsecured Noteholder Support Agreement and the Plan of Arrangement;

54

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

- the New Preferred Shares, the New Common Shares and all other shares to be issued, or that are issuable, pursuant to the Plan of Arrangement shall be, when issued, validly issued, fully paid and non-assessable;

- the receipt by the Plan Sponsors of satisfactory and customary opinions of the Tervita's legal counsel and certificates of officers of the Corporation with respect to matters relevant to the Recapitalization; and

- the Recapitalization being effected in compliance with all applicable laws, in all material respects, including Canadian provincial, United States federal and state securities laws, and receipt of all required regulatory approvals and consents.

*Representations and Warranties*

In the Backstop Commitment Letter, Tervita, on the one hand, and the Backstop Parties, on the other hand, make a number of representations and warranties and covenants to each other regarding themselves, the Backstop Commitment Letter and the Recapitalization that are substantially similar to the representations and warranties made by the parties in the Unsecured Noteholder Support Agreement.

In addition, each Backstop Party represents and warrants in the Backstop Commitment Letter that it has, and on the Effective Date will have, regardless of the number of New Investment Shares that are subscribed for pursuant to the New Investment Offering, the financial ability and sufficient funds to make and complete the payment for all of the New Investment Shares that it has committed to purchase pursuant to the Backstop Commitment Letter and the availability of such funds will not be subject to the consent, approval or authorization of any Person or the availability of any financing.

See "*Support Agreements – Unsecured Noteholder Support Agreement*".

### OVERVIEW OF NEW SHARES DOCUMENTATION

*The following is a summary only of the New Shares Documentation of the Corporation and is qualified in its entirety by the full text of the New Shares Documentation, copies of which will be provided with the Information Supplement.*

**Amended Articles**

Pursuant to the amended articles of the Corporation, the Corporation is authorized to issue an unlimited number of New Common Shares and an unlimited number of New Preferred Shares. The Corporation may not have less than one, and not more than ● directors.

For a summary of the terms of the New Shares under the amended articles of the Corporation, see "*Description of the Recapitalization - Description of the New Common Shares*" and "*Description of the Recapitalization – Description of the New Preferred Shares*".

**New By-laws**

The new by-laws of the Corporation provide provisions relating generally to the transaction of the business and affairs of the Corporation including, among other things, provisions relating to borrowing and banking arrangements, directors, officers, committees, meeting of shareholders of the Corporation, shares, dividends and rights, and notice requirements.

Additional information regarding the amended by-laws will be provided in the Information Supplement to be issued in advance of the Meetings in accordance with the terms of the Interim Order.

**Shareholders Agreement**

Under the Plan of Arrangement, the Corporation will become a party to the Shareholders Agreement by which all of the holders of New Shares, from time to time, are deemed to be a party and bound.  The Shareholders Agreement

governs the conduct of the business and affairs of the Corporation, the relationship between the shareholders of the Corporation, their respective rights and obligations as shareholders of Tervita and certain other related matters. The Shareholders Agreement must be acceptable to Tervita and the Initial Backstop Parties, each acting reasonably.

Additional information regarding the Shareholders Agreement will be provided in the Information Supplement to be issued in advance of the Meetings in accordance with the terms of the Interim Order.

**Registration Rights Agreement**

Registration rights will be set forth in the customary Registration Rights Agreement, which will provide for the qualification for sale of the shares of Tervita in Canada and/or the United Sates. Additional information regarding the Registration Rights Agreement will be provided in the Information Supplement to be issued in advance of the Meetings in accordance with the terms of the Interim Order.

## DESCRIPTION OF CERTAIN INDEBTEDNESS

**General**

Tervita's primary secured obligations are the Revolving Credit Facilities, Term Loan Facility and Secured Notes. As at September 30, 2016 the total amount owing under the Revolving Credit Facilities, Term Loan Facility and Secured Notes was approximately, nil, $325.7 million and $1,084.9 million, respectively.

Tervita's primary unsecured obligations are the Unsecured Notes and Subordinated Notes. As at September 30, 2016, 2016, the total amount owing under the Unsecured Notes and Subordinated Notes was approximately $865.00 million and $434.90 million.

The Indentures governing the Notes contain customary covenants that, among other things, limit Tervita's ability, and the ability of certain of its subsidiaries, to incur additional indebtedness, pay dividends or make distributions or certain other restricted payments, purchase or redeem capital stock, make investments or extend credit, engage in certain transactions with affiliates, consummate certain asset sales, effect a consolidation or merger, or sell, transfer, lease or otherwise dispose of all or substantially all assets, or create certain liens and other encumbrances on assets. The Indentures contain events of default customary for agreements of their type (with customary grace periods, as applicable).

**Description of the Subordinated Notes**

On May 9, 2008, Tervita issued the Subordinated Notes in an aggregate principal amount of U.S.$307.56 million. The Subordinated Notes are governed by the Subordinated Notes Indenture. Each Subordinated Note has a face value of U.S.$1,000 and bears interest at the rate of 11.875% per annum payable semi-annually on May 15 and November 15 of each year. The Subordinated Notes mature on November 15, 2018. As discussed in this Information Circular, Tervita elected not to make the interest payment that was due on May 15, 2016.

The Guarantors have jointly and severally guaranteed all of Tervita's obligations under the Subordinated Notes Indenture; however, no security has been granted by Tervita with respect to these obligations.

Pursuant to the terms of the Subordinated Notes Indenture, repayment of the Subordinated Notes is subordinate to repayment of the Unsecured Notes and other senior indebtedness including, the Senior Secured Credit Facilities and Secured Notes.

On or after November 15, 2015, the Subordinated Notes may be redeemed in part or in full at 105.93750% of the principal amount outstanding of the Subordinated Notes, plus all accrued and unpaid interest. The redemption percentage decreases to 102.96875% if redeemed after November 1, 2016 and to 100% if redeemed any time after November 1, 2017.

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

Under the Subordinated Notes Indenture, default for 30 days or more in the payment when due of interest on or with respect to the Subordinated Notes issued under the indenture whether or not such payment is prohibited by the subordination provisions of the Subordinated Notes Indenture, shall constitute an "Event of Default" under and as defined in the Subordinated Notes Indenture. On May 15, 2016, Tervita did not make the interest payment due on such date on the Subordinated Notes (the "**May 2016 Interest Payment**"), and as of June 15, 2016, had not made such May 2016 Interest Payment. Accordingly, an "Event of Default" under and as defined in the Subordinated Notes Indenture has occurred and is continuing as of the date of this Information Circular (the "**Subordinated Note Interest Payment Default**").

On June 15, 2016, certain of the Subordinated Noteholders representing a majority of the aggregate principal amount of the outstanding Notes (representing approximately 96.5% of the aggregate principal amount of the outstanding Subordinated Notes as at June 15, 2016) (the "**Forbearing Noteholders**") agreed to forbear from accelerating the payment of all amounts owing under or pursuant to the Subordinated Notes and the Subordinated Notes Indenture and entered into an agreement regarding interest payment default dated June 15, 2016 among the Corporation and the Forbearing Noteholders (the "**Interest Payment Default Agreement**"). The Forbearing Noteholders covenanted to forbear from accelerating payment of amounts owing survives until the earlier of: (i) 11:59 p.m. (Calgary time) on September 15, 2016; and (ii) the Termination Event Time (as defined below), as may be extended (A) through November 15, 2016, by the Company upon exercise of the option to extend that is discussed below and (B) after November 15, 2016, by written consent of both the Corporation and the Unsecured Noteholders signatory to the Interest Payment Default Agreement that hold two-thirds of the aggregate principal amount of Unsecured Notes held by all signatories to the agreement (the "**Extension Period**").

Under the Interest Payment Default Agreement, Tervita made a payment to each Forbearing Noteholder equal to each such Forbearing Noteholder's pro rata share (based on the principal amount of the Subordinated Notes held by such Forbearing Noteholders over the total aggregate principal amount of the Subordinated Notes outstanding) of U.S.$8 million. Tervita also paid Subordinated Noteholders, other than the Forbearing Noteholders, that delivered a notice to Tervita as required under the Interest Payment Default Agreement (the "**Other Subordinated Noteholders**"), their pro rata share (based on the principal amount of the Subordinated Notes held by such Other Subordinated Noteholders over the total aggregate principal amount of the Subordinated Notes outstanding) of U.S.$8 million.

Tervita had the option to extend the Extension Period through November 15, 2016 by providing notice to the Forbearing Noteholders by August 31, 2016 and paying U.S.$1 million to the Forbearing Noteholders and the Other Subordinated Noteholders, allocated in accordance with the Forbearing Noteholders and Other Subordinated Noteholders pro rata amount of Subordinated Notes (based on the principal amount of the Subordinated Notes held by such Forbearing Noteholders or Other Subordinated Noteholder over the total aggregate principal amount of the Subordinated Notes outstanding) held. As discussed in this Information Circular under the heading " - *Description of the Senior Secured Credit Facilities – Preliminary Interim Order and Interim Order*" on September 14, 2016 the Preliminary Interim Order was granted and on October 14, 2016 the Interim Order was granted, which provide that, among other things, the Subordinated Noteholders will not have any right to terminate, accelerate, amend or declare a default or event of default or make any demand or take any step to enforce any guarantee or any security interest granted by any member of the Tervita Group in respect of the Subordinated Notes as a result of the commencement of the CBCA Proceedings and non-payment of the May 2016 Interest Payment.

Under the Interest Payment Default Agreement, an "Extension Default" occurs if:

(a)     the Corporation or any of the Guarantors fails to comply in all material respects with, or defaults in the performance or observance of, any term, condition, covenant or agreement set forth in the Interest Payment Default Agreement;

(b)     any representation, warranty or other statement of the Corporation (on its own behalf or on behalf of any of the Guarantors) made in the Interest Payment Default Agreement shall prove untrue in any material respect as of the date when made;

(c)     the occurrence of any Default or Event of Default, as such terms are defined in the Subordinated Notes Indenture, other than Subordinated Note Interest Payment Default;

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

(d)      the Corporation or any Guarantor contests or denies in any manner the legality, validity, binding nature or enforceability of the Interest Payment Default Agreement, the indebtedness under the Subordinated Notes Indenture, the Subordinated Notes or any guarantee in respect thereof;

(e)      the commencement of any action, application, petition, suit or other proceeding under any bankruptcy, arrangement, reorganization, dissolution, liquidation, insolvency, winding-up or similar law of any jurisdiction now or hereafter in effect, for the relief from or otherwise affecting creditors of the Corporation or any of the Guarantors, including without limitation, Title 11 of the United States Code, the BIA, the CCAA, the *Winding-Up and Restructuring Act* (Canada), and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, winding-up, restructuring, examinership or similar debtor relief laws of the United States or Canada or other insolvency law in the applicable jurisdictions from time to time in effect and affecting the rights of creditors generally (collectively "**Bankruptcy Law**"), against or in respect of the Corporation or any of the Guarantors;

(f)      any receiver, receiver-manager, interim receiver, monitor, liquidator, assignee, custodian, trustee, sequestrator or other similar entity shall be appointed in respect of the Corporation or any of the Guarantors or all or any part of their respective property, assets or undertaking; or

(g)      the Corporation or any of the Guarantors: (i) makes a general assignment for the benefit of its creditors, including without limitation, any assignment made pursuant to any Bankruptcy Law; (ii) acknowledges its insolvency or is declared or becomes bankrupt or insolvent; (iii) fails to meet its liabilities generally as they become due; or (iv) commits an act of bankruptcy under any Bankruptcy Law or any similar law of any jurisdiction, provided that, for greater certainty, for so long as the Extension Period remains in effect, the Subordinated Note Interest Payment Default and resulting events of default under the Revolving Credit Agreement and the Term Loan Credit Agreement, or any acknowledgment thereof, shall not, in and of themselves, constitute an Extension Default for the purposes of the Interest Payment Default Agreement.

The Interest Payment Default Agreement shall immediately terminate at the earliest of the following times (the "**Termination Event Time**"): (i) automatically and immediately upon the occurrence of an Extension Default described in paragraphs (d), (e), (f) or (g) above; and (ii) 5:00 p.m. (Calgary time) on the fifth Business Day after the day on which the Forbearing Noteholders' advisors have delivered written notice of any other Extension Default unless otherwise cured.

Pursuant to the Recapitalization, all accrued and unpaid interest due in respect of the Subordinated Notes (including the May 2016 Interest Payment) and all Obligations under the Notes shall be discharged in full on the Effective Date. See "*Details of the Recapitalization – The Arrangement – Treatment of Noteholders*".

**Description of the Unsecured Notes**

On October 24, 2012, Tervita issued the 9.75% Unsecured Notes in an aggregate principal amount of U.S.$290 million. The 9.75% Unsecured Notes are governed by the 9.75% Unsecured Notes Indenture. Each 9.75% Unsecured Note has a face value of U.S.$1,000 and bears interest at the rate of 9.75% per annum payable semi-annually on May 1 and November 1 of each year. The 9.75% Unsecured Notes mature on November 1, 2019.

On December 3, 2013, Tervita issued the 10.875% Unsecured Notes in an aggregate principal amount of U.S.$335 million. The 10.875% Unsecured Notes are governed by the 10.875% Unsecured Notes Indenture. Each 10.875% Unsecured Note has a face value of U.S.$1,000 and bears interest at the rate of 10.875% per annum payable semi-annually on February 15 and August 15 of each year. The 10.875% Unsecured Notes mature on February 15, 2018. As described in this Information Circular, Tervita elected not to make the interest payment on the 10.875% Unsecured Notes that was due on August 15, 2016.

The Guarantors have jointly and severally guaranteed all of Tervita's obligations under the Unsecured Notes Indentures; however, no security has been granted by Tervita with respect to these obligations.

58

LEGAL_1:40709104.10

On or after November 1, 2015, the 9.75% Unsecured Notes may be redeemed in part or in full at 107.313% of the principal amount outstanding of the 9.75% Unsecured Notes, plus all accrued and unpaid interest. The redemption percentage decreases to 104.875% if redeemed after November 1, 2016, 102.438% if redeemed after November 1, 2017 and to 100.0% if redeemed any time after November 1, 2018.

On or after November 15, 2015, the 10.875% Unsecured Notes may be redeemed in part or in full at 108.156% of the principal amount outstanding of the 10.875% Unsecured Notes, plus all accrued and unpaid interest. The redemption percentage decreases to 104.078% if redeemed after November 15, 2016 and to 100.0% if redeemed any time after November 15, 2017.

Under the 10.875% Unsecured Notes Indenture, default for 30 days or more in the payment when due of interest on or with respect to the 10.875% Unsecured Notes issued under the indenture whether or not such payment is prohibited by the subordination provisions of the 10.875% Unsecured Notes Indenture, shall constitute an "Event of Default" under and as defined in the 10.875% Unsecured Notes Indenture. On August 15, 2016, Tervita did not make the interest payment due on such date on the 10.875% Unsecured Notes (the "**August 2016 Interest Payment**"). As discussed in this Information Circular under the heading " - *Description of the Senior Secured Credit Facilities – Preliminary Interim Order and Interim Order*" on September 14, 2016 the Preliminary Interim Order was granted and on October 14, 2016 the Interim Order was granted, which provide that, among other things, the Unsecured Noteholders will not have any right to terminate, accelerate, amend or declare a default or event of default or make any demand or take any step to enforce any guarantee or any security interest granted by any member of the Tervita Group in respect of the Unsecured Notes as a result of the commencement of the CBCA Proceedings and non-payment of the August 2016 Interest Payment.

The Unsecured Notes are *pari passu* in right of payment with all existing and future senior unsecured indebtedness of the Corporation, including under the Senior Secured Credit Facilities and the Secured Notes, and senior in right of payment to all existing and future subordinated indebtedness of the Corporation. However, the Unsecured Notes are effectively subordinated to all secured indebtedness of Tervita, including under the Senior Secured Credit Facilities and Secured Notes, to the extent of the collateral securing such indebtedness.

Pursuant to the Recapitalization, all accrued and unpaid interest due in respect of the Subordinated Notes (including the May 2016 Interest Payment) and all Obligations under the Notes shall be discharged in full on the Effective Date. See "*Description of the Recapitalization – The Arrangement – Treatment of Noteholders*".

**Description of the Secured Notes**

On February 14, 2013, Tervita issued the 8.00% Secured Notes in an aggregate principal amount of U.S.$650 million and the 9.00% Secured Notes in an aggregate principal amount of $200 million. The Secured Notes are governed by the Secured Notes Indenture. Each Secured Note has a face value of U.S.$1,000, in respect of the 8.00% Secured Notes, and $1,000 in respect of the 9.00% Secured Notes and bears interest at the rate of 8.00% per annum, in respect of the 8.00% Secured Notes, and 9.00%, in respect of the 9.00% Secured Notes, in each case payable semi-annually on May 15 and November 15 of each year. The Secured Notes mature on November 15, 2018.

The Guarantors have jointly and severally guaranteed all of Tervita's obligations under the Secured Notes Indenture. The Secured Notes and related guarantees are secured on a first lien basis by substantially all of Tervita's and each of the Guarantors' assets. The Secured Notes and related guarantees are Tervita's and each of the Guarantor's senior secured obligations are *pari passu* in right of payment with all existing and future first priority senior secured indebtedness of the Corporation and each of the Guarantors and effectively senior in right of payment to all existing and future senior secured indebtedness of the Corporation and each of the Guarantors to the extent of the value of the collateral securing the Secured Notes. To the extent the value of the collateral securing the Secured Notes is less than or equal to the existing First Out Debt of the Company and the Guarantors, including the Revolving Credit Facilities, the Secured Notes and the related guarantees will be effectively junior to such obligations.

On or after November 15, 2015, the 8.00% Secured Notes may be redeemed in part or in full at 104.000% of the principal amount outstanding of the 8.00% Secured Notes, plus all accrued and unpaid interest. The redemption percentage decreases to 102.000% if redeemed on or after November 15, 2016 and to 100.000% if redeemed any time after November 15, 2017.

59

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

On or after November 15, 2015, the 9.00% Secured Notes may be redeemed in part or in full at 104.500% of the principal amount outstanding of the 9.00% Secured Notes, plus all accrued and unpaid interest. The redemption percentage decreases to 102.250% if redeemed on or after November 15, 2016 and to 100.000% if redeemed any time after November 15, 2017.

**Description of the Senior Secured Credit Facilities**

Tervita entered into the Revolving Credit Agreement on February 14, 2013 with a syndicate of financial institutions led by The Toronto-Dominion Bank as administrative agent, co-lead arranger and joint bookrunner.

Tervita entered into the Term Loan Credit Agreement on February 14, 2013 with a syndicate of financial institutions led by Royal Bank of Canada, as the administrative agent.

The following provisions describe certain provisions of the Revolving Credit Agreement and the Term Loan Credit Agreement.

*Amounts and Final Maturities*

The Revolving Credit Facilities provide for First Out Debt of up to $350 million maturing on or about February 14, 2018 (the "**Revolver Maturity Date**"), consisting of:

- a $325 million multi-currency committed revolving credit facility (the "**Revolving Facility**"); and

- a $25 million multi-currency uncommitted incremental revolving credit facilities (the "**Incremental Revolving Facility**").

The Revolving Facility is available in Canadian dollars and U.S. dollars, as letters of credit and standby letters of guarantee (subject to an aggregate sublimit of $200 million) and for swing-line loans up to $25 million.

The Incremental Revolving Facility is subject to the satisfaction of certain conditions, including customary requirements such as arranging new commitments and providing corporate authorizations and guarantor acknowledgements, among others. Additionally, any such conditions may be limited by the indenture governing the Notes and certain other conditions. The Incremental Revolving Facility may be structured as one, or a combination of, an increase in the Revolving Facility, a fully amortizing term loan with a maturity date on or after the Revolver Maturity Date or a minimally amortizing term loan facility with a maturity date at least six months after the Revolver Maturity Date.

The Term Loan Credit Agreement consists of Parity Debt of up to U.S.$950 million maturing on or about May 15, 2018 (the "**Term Maturity Date**"), consisting of:

- a U.S.$750 million committed term loan (the "**Term Loan**"); and

- U.S.$200 million uncommitted incremental term loan facilities (the "**Incremental Term Loans**").

The Incremental Term Loans must have a maturity date that is no earlier than the Term Maturity Date and a weighted average life to maturity that is no shorter than that of the Term Loan.

*Payments and Prepayments*

The Term Loan Credit Agreement requires quarterly principal payments in the amount of 1.00% per annum of the original aggregate principal amount of the Term Loan.

Subject to certain exceptions, the Term Loan Credit Agreement is subject to mandatory prepayment in an amount equal to:

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

- 100% of the net cash proceeds of certain asset sales, including casualty and condemnation events;

- 100% of the net cash proceeds of certain incurrences or offerings of debt; and

- 50% (subject to step-downs) of annual excess cash flow for any fiscal year.

For optional and certain mandatory prepayments related to the incurrence of indebtedness, the Term Loan Credit Agreement is subject to prepayment premiums for certain optional or mandatory prepayments of 1.00% on or prior to the first anniversary of the closing of the Term Loan.

The Revolving Credit Facilities are not subject to mandatory prepayments or prepayment penalties or premiums.

### Guarantees; security

Tervita's obligations under the Senior Secured Credit Facilities are guaranteed by the Guarantors. The Senior Secured Credit Facilities and the guarantees thereof are secured by: (i) all of Tervita's capital stock; (ii) all of the capital stock owned by us or any of Tervita's subsidiary guarantors in any Canadian and U.S. material subsidiaries; (iii) the subordinated shareholder loan from Holdings LP to us; and (iv) substantially all other tangible and intangible assets owned by Tervita and each Guarantor, in each case to the extent permitted by applicable law and subject to certain exceptions.

### Interest

Certain borrowings under the Revolving Credit Facilities, including financial letters of credit, LIBOR (as defined in the Revolving Credit Agreement) loans and bankers' acceptances, bear interest at a rate per annum equal to an applicable margin of 2.25% to 4.25% subject to changes based on the achievement of certain leverage ratios. Certain other borrowings under the Revolving Credit Facilities, including Canadian prime rate loans, bear interest at a rate per annum equal to an applicable margin of 1.25% to 3.25%. We are also required to pay a commitment fee to the lenders in respect of unutilized loan commitments under the Revolving Credit Facilities.

Borrowings under the Term Loan Agreement bear interest at a rate per annum equal to an applicable margin of 4.00%, plus an alternative base rate, subject to a floor of 2.25%, or an applicable margin of 5.00% plus an adjusted LIBOR, subject to a floor of 1.25%. We also paid upfront fees in an amount equal to 1.00%, structured as original issue discount.

The Incremental Term Loans are subject to a "most favoured nation" pricing provision that ensures that the initial "yield" on Incremental Term Loans does not exceed the "yield" at such time on the Term Loan by more than 0.50%. "Yield" will be determined by the Term Loan Administrative Agent taking into account the applicable margin, upfront fees, any original issue discount and any LIBOR (as defined in the Term Loan Agreement) or alternative base rate floors, and will exclude arrangement or similar fees not paid to all lenders under the Incremental Term Loans, with such original issue discount or upfront fees being equated to interest based on an assumed four-year life to maturity.

### Fees

Tervita pays customary fees in respect of the Senior Secured Credit Facilities.

### Covenants

The Senior Secured Credit Facilities contain a number of negative covenants (and are subject to customary exceptions) that, among other things, limit or restrict the ability of us, our restricted subsidiaries and the Guarantors to:

- dispose of assets, provided that amendments to the Revolving Credit Agreement and Term Loan Credit Agreement were made to allow for the sale of certain U.S. assets of Tervita;

61

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

- incur additional indebtedness (including guarantees of additional indebtedness) or issue disqualified stock or preferred stock;

- prepay other indebtedness (including the Notes) or amend other debt instruments;

- pay dividends and make certain other payments;

- create liens on assets;

- enter into sale and leaseback transactions;

- engage in certain asset sales, mergers, acquisitions, consolidations or sales of all or substantially all of our assets;

- engage in certain transactions with affiliates;

- permit restrictions on our restricted subsidiaries' ability to pay dividends;

- fundamentally and/or substantially alter the characteristics of our business;

- make investments (including joint ventures);

- designate our subsidiaries as unrestricted subsidiaries;

- dispose of subsidiary interests, provided that amendments to the Revolving Credit Agreement and Term Loan Credit Agreement allowed for the sale of certain U.S. assets of Tervita; and

- amend the terms of our permitted subordinated shareholder loans.

The Revolving Credit Agreement contain a financial covenant that requires us to maintain a specified consolidated senior secured net debt ratio, as determined as of the last day of each fiscal quarter, of not more than 5.75 to 1.0 on or before the end of the fiscal quarter ending March 31, 2015 and 5.25 to 1.00 thereafter.

The Term Loan Credit Agreement contains a financial covenant that requires us to maintain a specified consolidated senior secured net debt ratio of not more than 5.75 to 1.0, but a default under this ratio can be cured in certain instances by cash equity contributions.

The Senior Secured Credit Facilities contain customary affirmative covenants, including financial and other reporting requirements.

### Events of default

The Senior Secured Credit Facilities provide for customary events of default, including but not limited to non-payment of principal, interest or fees, violation of covenants, material inaccuracy of representations or warranties, cross-default to other material indebtedness, certain bankruptcy events, certain ERISA (as defined in the Senior Secured Credit Facilities) events, material invalidity of guarantees or security interests, material judgments, change of control (excluding an initial public offering) and subordination provisions of permitted subordinated shareholder loans ceasing to be binding. Some of these events of default allow for grace periods.

### Waiver of Events of Default

*Subordinated Note Event of Default*

The missed May 2016 Interest Payment would have resulted in a "Default" or "Event of Default" under the Revolving Credit Agreement and Term Loan Credit Agreement and would have given the Revolving Credit Facilities Lenders

LEGAL_1:40709104.10

and the Term Loan Lenders the right to accelerate their indebtedness. Prior to the expiry of the 30 day grace period for the missed May 2016 Interest Payment, Tervita entered into the Revolving Credit Waiver (Subordinated Notes) and Term Loan Waiver (Subordinated Notes) with each of the Revolver Administrative Agent (on the authorization of the Required Lenders, as defined in the Revolving Credit Agreement) and the Term Loan Administrative Agent (on the authorization of the Required Lenders, as defined in the Term Loan Credit Agreement), respectively. The Revolving Credit Waiver (Subordinated Notes) and Term Loan Waiver (Subordinated Notes) each provide for, among other things, waiver of the Subordinated Note Interest Payment Default as a "Default" or "Event of Default" under the Revolving Credit Agreement and Term Loan Credit Agreement, respectively.

In the Revolving Credit Waiver (Subordinated Notes), the requisite majority of the Revolving Credit Facilities Lenders waived the "Defaults" and "Events of Default" under the Revolving Credit Agreement relating to the missed interest payment on the Subordinated Notes. Under this agreement, Tervita also agreed to restrictions on the amount that it could borrow, including, inter alia, that, except for the issuance of letters of credit, Tervita would not request any borrowings from the Revolving Credit Facilities unless the aggregate amount of cash and cash equivalents then held by Tervita and certain other parties is less than $100 million. In addition, and except for the issuance of letters of credit, Tervita may not borrow more than $50 million in a single borrowing or a series of borrowings under the Revolving Credit Agreement for the purpose of accumulating, maintaining or increasing cash or cash equivalents in one or more depository or investment accounts maintained by any of them as a cash reserve and not for any other business purposes. In connection with entering into the Revolving Credit Waiver (Subordinated Notes) and Term Loan Waiver (Subordinated Notes), Tervita confirmed to the Revolver Administrative Agent and Term Loan Administrative Agent that, other than as a result of the missed May 2016 Interest Payment, no event, act or condition has occurred or was continuing which constituted a "Default" or an "Event of Default" under the Revolving Credit Agreement or Term Loan Credit Agreement, respectively.

A condition subsequent to the Revolving Credit Waiver was that Tervita obtain a waiver from the Required Lenders (as defined in the Term Loan Credit Agreement) under the Term Loan Facility which is substantially similar to the waiver provided in the Revolving Credit Waiver. Accordingly, Tervita entered into the Term Loan Waiver (Subordinated Notes) with the Term Loan Administrative Agent on June 13, 2016. In the Term Loan Waiver (Subordinated Notes), the requisite majority of the Term Loan Lenders waived the "Defaults" and "Events of Default" under the Term Loan Credit Agreement relating to the missed May 2016 Interest Payment. The Term Loan Waiver (Subordinated Notes) terminates upon termination of the Revolving Credit Waiver. Under the Term Loan Waiver (Subordinated Notes), Tervita agreed to pay certain fees and expenses of certain of the Term Loan Lender's legal counsel and advisors.

*10.875% Unsecured Note Default*

The missed August 2016 Interest Payment may result in "Default" or "Event of Default" under the Revolving Credit Agreement and Term Loan Credit Agreement and would have given the Revolving Credit Facilities Lenders and the Term Loan Lenders the right to accelerate their indebtedness. On August 15, 2016, the Corporation entered into the Revolving Credit Waiver (10.875% Unsecured Notes) with the Revolver Administrative Agent (on the authorization of the Required Lenders, as defined in the Revolving Credit Agreement), that provides, among other things, waiver of any "Default" or "Event of Default" under the Revolving Credit Agreement that may arise if the August 2016 Interest Payment is not made.

**Accommodation Agreement**

Prior to Tervita applying for the Preliminary Interim Order, Tervita and certain of the Revolving Credit Facilities Lenders entered into the Accommodation Agreement. Under the Accommodation Agreement, the Revolving Credit Facilities Lenders agreed to consent to the Recapitalization under a CBCA Proceeding or CCAA Proceeding. The Revolving Credit Facilities Lenders also agreed in the Accommodation Agreement to waive any "Events of Default" or "Default" caused by (A) the commencement or continuation of the CBCA Proceeding or a CCAA Proceeding; (B) the non-payment of interest in respect of the 10.875% Subordinated Unsecured Notes due 2018 on the August 15, 2016 and February 1, 2017 interest payment dates; (C) the non-payment of interest in respect of the 9.75% Senior Notes due 2019 on the November 1, 2016 interest payment date; or (D) the non-payment of interest in respect of the 11.875% Subordinated Unsecured Notes due 2018 on the November 15, 2016 interest payment date (collectively, the "**Relevant Defaults**"). The Revolving Credit Facilities Lenders consent to the Recapitalization and waiver of defaults,

63

LEGAL_1:40709104.10

as discussed above will terminate on the earliest of: (A) the date on which a Termination Notice (as defined below) is given by the Revolver Administrative Agent pursuant to the Accommodation Agreement (or such later date as may be specified in such notice), (B) the Effective Date and (C) the Outside Date; provided that if the Outside Date is extended (on one or more occasions) to a later date in accordance with the Unsecured Noteholder Support Agreement as a result of the failure to obtain required consents or approvals pursuant to the *Investment Canada Act* (Canada) or the *Competition Act* (Canada) by such date, then such date shall be extended to such later date, provided that in aggregate such extensions shall not extend beyond March 31, 2017 (the "**Accommodation Period**").

Under the Accommodation Agreement, if any Termination Event (as defined below) occurs and is continuing, the Revolver Administrative Agent may, and at the request of the Required Lenders under the Revolving Credit Agreement shall, upon seven days' prior written notice to the Borrower (a "**Termination Notice**"), declare the Accommodation Period to be terminated either with immediate effect or at such later date as may be specified by the Revolver Administrative Agent in such Termination Notice.

A "**Termination Event**" is defined in the Accommodation Agreement as the occurrence of any of the following: (A) any breach or default of any term, covenant or agreement contained in the Accommodation Agreement and expressed to be applicable to any Tervita Entity, (B) any of the accommodation conditions in the Accommodation Agreement are not or cease to be true and correct in all material respects, (C) an Event of Default (other than the Relevant Defaults) (as defined in the Accommodation Agreement) or (D) any Support Agreement terminates or becomes void or otherwise unenforceable.

Tervita paid, for and on behalf of the Lenders, a customary accommodation fee to the Revolver Administrative Agent in accordance with the Accommodation Agreement.

The Accommodation Agreement also provides for certain amendments to the Revolving Credit Agreement including:

- anti-hoarding provisions that provide that except for the issuance of letters of credit to facilitate business operations, (i) Tervita will not request any borrowings under the Revolving Credit Agreement unless the aggregate amount of cash and cash equivalents then held by Tervita on a consolidated basis is less than $75,000,000, and (ii) will not borrow more than $50,000,000 in a single borrowing or a series of borrowings under the Revolving Credit Agreement for the purpose of accumulating, maintaining or increasing cash or cash equivalents in one or more depository or investment accounts maintained by any of them as a cash reserve and not for any other business purpose;
- negative covenants with respect to preservation of the Revolving Credit Facilities Lenders first priority lien;
- provisions restricting Tervita from depositing funds with financial institutions other than the Revolving Credit Facilities Lenders (subject to limited exceptions); and
- the Tervita Group shall maintain a Consolidated Secured Net Debt Ratio (as defined in the Accommodation Agreement), as determined as of the last day of each fiscal quarter, of not more than (a) 7.00:1.00, for the fiscal quarter ended September 30, 2016 and (b) 5.75:1.00, for each fiscal quarter thereafter.

### *Effect of the Recapitalization on the Senior Secured Credit Facilities*

Under the Recapitalization, the amounts owing under the Term Loan Facility, except for amounts owing to the Plan Sponsors, will be repaid in full on the Effective Date. Any amounts owing to the Plan Sponsors under the Term Loan Facility will be irrevocably exchanged for New Preferred Shares.

See "*Description of the Recapitalization – The Arrangement – Treatment of the Revolving Credit Facilities*" and "*Description of the Recapitalization – The Arrangement – Treatment of the Term Loan Facility*".

The Recapitalization does not impact the Revolving Credit Facilities; however, it is anticipated that the Corporation and Revolving Credit Facilities Lenders will enter into the New Revolving Credit Facilities. See "*Description of the Recapitalization – New Revolving Credit Facilities*".

**Description of the Intercompany Loan**

Tervita obtained a shareholder loan from Finance LP in the form of a 13% subordinated note dated as of November 14, 2007, as amended (the "**Intercompany Loan**"). The principal amount of this loan at September 30, 2013 was $1,067.9 million. The loan bears interest at 13% per annum of which an applicable percentage is paid in cash and the remainder in shares and payment in kind. RS LP has currently waived interest on the loan until October 2016. The applicable percentage payable in cash is, at any time, the Canadian withholding tax rate that would be applicable to a payment of interest by a resident of Canada to a person who is a resident of Luxembourg; however, in no event may it exceed 15% before the Senior Secured Credit Facilities and any other senior debt (including the Notes) are repaid in full. The applicable percentage is currently approximately 10%. The payment in kind portion of the interest payment includes a payment in debt (67%) and a payment in equity (33% in newly issued preferred shares). Tervita's obligations with respect to this loan, including the payment of principal and interest thereon, is subordinated and junior in right of payment to all amounts owing under the Senior Secured Credit Facilities, including any refinancing or replacement thereof, and is subordinate and junior in right of payment to all amounts owing under the Notes. The loan has a maturity date of November 14, 2022, which can be extended, at Tervita's option, to November 14, 2037. The loan is unsecured and does not contain any financial covenants nor does it contain cross-default or cross-acceleration provisions related to the Senior Secured Credit Facilities or the Notes.

**Preliminary Interim Order and Interim Order**

Under the Preliminary Order (until and including October 14, 2016) and under the Interim Order (from 12:01 a.m. on the date of this Interim Order until and including the earlier of: (a) the Effective Date; (b) seven days after the termination of the Unsecured Noteholders Support Agreement; or (c) seven days after the termination of the Backstop Commitment Letter), no person, including, without limitation, the Noteholders, the trustees under the Indentures, the Term Loan Administrative Agent, the Term Loan Facility Lenders or any other administrative agent, collateral agent, indenture trustee or similar person, (i) shall have any right to terminate, accelerate, amend or declare a default or event of default or make any demand or take any step to enforce any guarantee or any security interest granted by any member of the Tervita Group in respect of the Notes, the Term Loan Facility, or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor, and (ii) may refer to, rely on or otherwise claim any rights against any member of the Tervita Group under any contract, debt instrument or any other agreement with any member of the Tervita Group in respect of any alleged breach, default or event of default under the Notes, the Term Loan Facility or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor; in each case, by reason of: (A) the Applicants having commenced this proceeding, (B) any member of the Tervita Group taking any steps in furtherance thereof, (C) any of member of the Tervita Group being a party to these proceedings or being party to an Arrangement, or (D) any default or cross-default arising under any of the Notes or the Term Loan Credit Agreement, without further order of this Court.

Under the Preliminary Interim Order and Interim Order, but subject to the terms of the Accommodation Agreement the Revolving Credit Facilities Lenders are treated as unaffected in any plan of arrangement filed by Tervita in the CBCA Proceeding and are not subject to any stay of proceedings in the CBCA Proceeding, and nothing in the Preliminary Interim Order and Interim Order prevents the filing by the Revolving Credit Facilities Lenders of any registration to preserve or perfect any security interest.

## DESCRIPTION OF THE NEW REVOLVING CREDIT FACILITY

It is a condition to the Recapitalization that the Revolving Credit Agreement be either reinstated or replaced on terms acceptable to Tervita and the Majority Initial Supporting Parties, each acting reasonably.

Tervita intends to disclose the principal terms of the New Revolving Credit Facility when available, through the Information Supplement.

## DESCRIPTION OF THE NEW SECOND LIEN NOTES

It is a condition to the Recapitalization that the New Second Lien Notes be made available to Tervita on such terms and conditions that Tervita and the Majority Initial Supporting Parties agree to, each acting reasonably.

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

Tervita intends to disclose the principal terms of the New Second Lien Notes when available, through the Information Supplement.

## CERTAIN REGULATORY AND OTHER MATTERS RELATING TO THE RECAPITALIZATION

**Issuance and Resale of Securities Received in the Recapitalization**

### *Canada*

The issuance of the New Shares (including New Investment Shares) pursuant to the Arrangement will be exempt from the prospectus and registration requirements under applicable Canadian securities laws. As a consequence of these exemptions, certain protections, rights and remedies provided by Canadian securities legislation, including statutory rights of rescission or damages, will not be available in respect of such New Shares. The New Shares (including New Investment Shares) issued pursuant to the Recapitalization will not be "freely tradeable" under applicable Canadian securities laws unless the following conditions (as specified in NI 45-102) are satisfied: (i) Tervita is and has been a reporting issuer in a jurisdiction of Canada for the four months immediately preceding the trade; (ii) the trade is not a control distribution (as defined in NI 45-102); (iii) no unusual effort is made to prepare the market or to create a demand for the shares that are the subject of the trade; (iv) no extraordinary commission or consideration is paid to a person or company in respect of the trade; and (v) if the selling shareholder is an insider or officer of Tervita, the selling shareholder has no reasonable grounds to believe that Tervita is in default of securities legislation.

### *United States*

Issuance and Resale of New Shares under U.S. Securities Laws

The following discussion is a general overview of certain requirements of U.S. federal securities laws that may be applicable to holders of New Shares (including New Investment Shares) in the United States. All Unsecured/Subordinated Noteholders are urged to consult with their own legal counsel to ensure that any subsequent resale of New Shares (including New Investment Shares) in the United States issued to them under the Arrangement complies with applicable securities legislation.

The following discussion does not address the Canadian securities laws that will apply to the issue of the New Common Shares or the resale of the New Common Shares by U.S. Unsecured/Subordinated Noteholders within Canada. U.S. Unsecured/Subordinated Noteholders reselling their New Shares in Canada must comply with Canadian securities laws, as outlined above under "Canada".

Exemption from the Registration Requirements of the U.S. Securities Act

*New Shares Issued in Exchange for Notes*

The New Shares to be issued pursuant to the Arrangement in exchange for Notes have not been and will not be registered under the U.S. Securities Act or any state securities laws, and are being issued pursuant to the exemption from registration set forth in Section 3(a)(10) of the U.S. Securities Act and similar exemptions under the applicable state securities laws. Section 3(a)(10) of the U.S. Securities Act exempts from registration the issuance of a security in exchange for one or more *bona fide* outstanding securities where the terms and conditions of such issuance and exchange are approved by a court of competent jurisdiction that is expressly authorized by law to grant such approval after a hearing upon the fairness of the terms and conditions of such issuance and exchange at which all persons to whom it is proposed to issue securities in such exchange have the right to appear and receive timely and adequate notice thereof. Accordingly, the Final Order will, if granted, constitute a basis for the exemption from the registration requirements of the U.S. Securities Act pursuant to Section 3(a)(10) thereof with respect to the New Shares issued in exchange for Notes in connection with the Arrangement.

LEGAL_1:40709104.10

*New Investment Shares*

The New Investment Shares offered and sold pursuant to the New Investment Offering have not and will not be registered under the U.S. Securities Act or any state securities laws and are being offered and sold in the United States to, and to U.S. persons outside of the United States that are, "qualified institutional buyers" within the meaning of Rule 144A under the U.S. Securities Act. New Investment Shares will also be offered and sold outside the United States to non-U.S. persons pursuant to Regulation S.

Resales of New Shares within the United States after the Completion of the Arrangement

*New Shares Issued in Exchange for Notes*

Persons who are not affiliates of Tervita after the Arrangement may resell the New Shares that they receive in exchange for the Notes in connection with the Arrangement in the United States without restriction under the U.S. Securities Act. Such New Shares received by a holder who will be an "affiliate" of Tervita after the Arrangement, or who was an affiliate of Tervita within three months before the Effective Date will be subject to certain restrictions on resale imposed by the U.S. Securities Act. As defined in Rule 144 under the U.S. Securities Act, an "affiliate" of an issuer is a person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the issuer and may include certain officers and directors of such issuer, as well as principal shareholders of such issuer.

Persons who are affiliates of Tervita may not sell their New Shares that they receive in connection with the Arrangement in the absence of registration under the U.S. Securities Act, unless an exemption from registration is available, such as the exemptions contained in Rule 144A, Rule 144 or Rule 903 of Regulation S under the U.S. Securities Act.

*New Investment Shares*

The New Investment Shares sold pursuant to the New Investment Offering will be "restricted securities" as defined in Rule 144(a)(3) under the U.S. Securities Act. Such New Investment Shares may be offered, sold, pledged or otherwise transferred only: (A) to the Corporation; (B) outside the United States to non-U.S. persons in accordance with Regulation S; (C) in accordance with (1) Rule 144A under the U.S. Securities Act to a person who the seller reasonably believes is a Qualified Institutional Buyer that is purchasing for its own account or for the account of one or more Qualified Institutional Buyers and to whom notice is given that the offer, sale, pledge or transfer is being made in reliance on Rule 144A; or (2) the exemption from registration under the U.S. Securities Act provided by Rule 144 thereunder, if available; (D) pursuant to an effective registration statement under the U.S. Securities Act; or (E) in another transaction that does not require registration under the U.S. Securities Act, and in each case in accordance with any applicable securities laws of any state of the United States, and in the case of (C)(2) or (E) above, upon the provision of evidence satisfactory to the Corporation, acting reasonably, to the effect that the sale of such New Investment Shares is not required to be registered under the U.S. Securities Act. See "*Description of the Recapitalization – New Investment Offering – Eligible Unsecured Noteholders and Transfer Restrictions – United States.*"

Purchasers of New Investment Shares may not engage in hedging transaction with regard to such New Investment Shares unless in compliance with the U.S. Securities Act.

**Expenses**

The estimated fees, costs and expenses payable by Tervita in connection with the completion of the Recapitalization including, without limitation, financial advisory fees, filing fees, legal and accounting fees and printing and mailing costs are anticipated to be approximately $● million.

## INFORMATION WITH RESPECT TO TERVITA

Tervita is a leading, environmentally focused mid-stream and waste management service provider, primarily servicing the oil and gas industry, as well as the industrial and natural resource sectors. Tervita provides a broad and integrated

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

array of services and environmental management solutions for its customers including, among other things, treatment, recovery and disposal of materials, landfill construction, well servicing, waste management, oil terminalling, energy marketing, metals recycling, equipment rental, demolition, and decommissioning.

Tervita is a corporation continued under the CBCA. The head and principal office of Tervita is located at Suite 500, 140 10 Ave SE, Calgary, AB T2G 0R1. The registered office of the Corporation is located at Suite 3400, 350 – 7th Avenue SW, Calgary, AB T2P 3N9.

For additional information regarding Tervita, please see Appendix "H" to this Information Circular.

### INFORMATION WITH RESPECT TO RED SKY ACQUISITION CORP.

RSAC is the general partner of Holdings LP. Holdings LP is the indirect holder of all of the voting shares of Tervita.

RSAC is a corporation existing under the ABCA.

### TERVITA AFTER THE RECAPITALIZATION

**Corporate Structure**

After giving effect to the completion of the Recapitalization, none of the subsidiaries of Tervita would have had total assets that exceeded 10% of Tervita's consolidated assets as at December 31, 2015 or annual revenues that exceeded 10% of Tervita's consolidated annual revenues for the year ended December 31, 2015.

After giving effect to the completion of the Recapitalization, the total assets and annual revenues of Tervita's subsidiaries in aggregate would not have exceeded 20% of Tervita's consolidated assets as at December 31, 2015 or consolidated annual revenues for the year ended December 31, 2015, respectively.

**Share Capital**

After the Recapitalization is implemented, the authorized capital of Tervita will consist of an unlimited number of New Shares. On the Effective Date (assuming an Effective Date of December 31, 2016 and a New Investment Offering of $372 million), after giving effect to the Recapitalization, 99,191,948 New Shares will be outstanding. For a description of the rights, privileges, restrictions and conditions attaching to the New Shares, see "*Description of the Recapitalization – The Arrangement*" and "*Overview of New Shares Documentation*".

**Principal Shareholders**

It is anticipated that 99,191,948 New Shares assuming an Effective Date of December 31, 2016 and a New Investment Offering of $372 million) would be issued in connection with the Arrangement and the New Investment Offering. Assuming each Unsecured/Subordinated Noteholder is an Eligible Unsecured Noteholder and exercises its rights under the New Investment Offering to purchase New Investment Shares, after giving effect to the Recapitalization (including the New Investment Offering), the Unsecured Noteholders would hold, in aggregate, approximately 27.5% of the outstanding New Shares (excluding the New Shares received by the Plan Sponsors and assuming a New Investment Offering of $372 million and all Unsecured Noteholders subscribe for all of their Unsecured Noteholder Subscription Pro Rata Share) and, after giving effect to the Recapitalization, the Plan Sponsors would hold, in aggregate, approximately 72.5% of the outstanding New Shares (assuming a New Investment Offering of $372 million and all Unsecured Noteholders subscribe for all of their Unsecured Noteholder Subscription Pro Rata Share). See "*Description of the Recapitalization – The Arrangement*".

### LEGAL PROCEEDINGS

In the ordinary course of business activities, Tervita may be contingently liable for litigation and claims with customers, suppliers and former employees. Management believes that adequate provisions have been recorded in the accounts where required. Although it is not possible to estimate the potential costs and losses, if any, management

68

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

believes that the ultimate resolution of such contingencies will not have a material adverse effect on the consolidated financial position of Tervita.

## CERTAIN INCOME TAX CONSIDERATIONS

The following summaries are of a general nature only and are not intended to be, nor should they be construed to be, legal or tax advice to any particular Unsecured/Subordinated Noteholder. Consequently, Unsecured/Subordinated Noteholders are urged to consult their own tax advisors for advice as to the tax considerations in respect of the Recapitalization having regard to their particular circumstances.

### Certain Canadian Federal Income Tax Considerations

The following summary describes the principal Canadian federal income tax considerations arising in connection with the Recapitalization as set forth in the Plan of Arrangement generally applicable to Unsecured Noteholders and Subordinated Noteholders who, at all relevant times, for purposes of the Tax Act, (1) deal at arm's length, and are not affiliated, with Tervita; (2) hold their Unsecured Notes and/or Subordinated Notes, and will hold their New Common Shares and New Preferred Shares, as capital property; (3) beneficially own any such Notes, and will beneficially own such New Common Shares and New Preferred Shares, including entitlements to all payments thereunder (a "**Holder**" ). Generally, the Unsecured Notes, Subordinated Notes, New Common Shares and New Preferred Shares will be capital property to a Holder unless the Holder holds such Notes or will hold such New Common Shares and New Preferred Shares in the course of carrying on a business or the Holder acquired such Notes or acquires such New Common Shares and New Preferred Shares as part of an adventure or concern in the nature of trade. Certain Holders may be entitled to make or may have already made the irrevocable election permitted by subsection 39(4) of the Tax Act the effect of which may  be to deem to be capital property any Notes, New Common Shares and New Preferred Shares (and all other "Canadian securities", as defined in the Tax Act) owned by such Holder in the taxation year in which the election is made and in all subsequent taxation years.  Holders whose Notes, New Common Shares or New Preferred Shares might not otherwise be considered to be capital property should consult their own tax advisors concerning this election.

This summary is based on the current provisions of the Tax Act, and an understanding of the current administrative policies and assessing practices and policies of the Canada Revenue Agency published in writing prior to the date hereof. This summary takes into account all specific proposals to amend the Tax Act publicly announced by or on behalf of the Minister of Finance (Canada) prior to the date hereof (the "**Proposed Amendments**") and assumes that all Proposed Amendments will be enacted in the form proposed. However, no assurances can be given that the Proposed Amendments will be enacted as proposed, or at all. This summary does not otherwise take into account or anticipate any changes in law or administrative policy or assessing practice whether by legislative, administrative or judicial action nor does it take into account tax legislation or considerations of any province, territory or foreign jurisdiction, which may differ from those discussed herein.

This summary is not applicable to a Holder: (i) that is, for purposes of certain rules (referred to as the mark-to-market rules) applicable to securities held by financial institutions, a "financial institution" (as defined in the Tax Act), (ii) an interest in which is a "tax shelter investment" (as defined in the Tax Act), or (iii) that reports its "Canadian tax results" in a currency other than Canadian currency, or (iv) that has entered into, or will enter into, with respect to their Notes, New Common Shares or New Preferred Shares, a "derivative forward agreement" as that term is defined in the Tax Act. Such Holders should consult their own tax advisors.

This summary is of a general nature only and is not, and is not intended to be, legal or tax advice to any particular Holder. This summary is not exhaustive of all Canadian federal income tax considerations. Accordingly, Holders should consult their own tax advisors having regard to their own particular circumstances.

For purposes of the Tax Act, all amounts relating to the acquisition, holding or disposition of the Notes New Common Shares and New Preferred Shares must be determined in Canadian dollars based on exchange rates as determined in accordance with the Tax Act. *Holders Resident in Canada*

This portion of the summary is generally applicable to a Holder who, at all relevant times, for purposes of the Tax Act, is, or is deemed to be, resident in Canada (a "**Resident Holder**").

69

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

*Settlement of Subordinated Notes*

A Resident Holder of Subordinated Notes will be considered to have disposed of its Subordinated Notes in consideration for a cash payment on the Effective Date. A Resident Holder that is a corporation, partnership, unit trust or any trust of which a corporation or partnership is a beneficiary will generally be required to include in its income the amount of interest accrued or deemed to accrue on the Subordinated Notes up to the Effective Date (except to the extent that such interest was otherwise included in computing income for the year or a preceding year). Any other Resident Holder (including an individual) will be required to include in income for a taxation year any interest on the Subordinated Notes received or receivable by such Resident Holder in the year (depending upon the method regularly followed by the Resident Holder in computing income) except to the extent that such interest was otherwise included in its income for the year or a preceding year. Where a Resident Holder is required to include an amount in income on account of interest on the Subordinated Notes that accrues in respect of the period prior to the date of acquisition by such Resident Holder, the Resident Holder should be entitled to a deduction of an equivalent amount in computing income. Where a Resident Holder is required to include an amount in income on account of interest on Subordinated Notes, the Resident Holder should be entitled to a deduction of an equivalent amount in computing income to the extent that such amount is not paid.

A Resident Holder's proceeds of disposition of Subordinated Notes upon their settlement for a cash payment will be an amount equal to the cash payment received on the settlement, less any amount received or deemed to be received on account of interest. In general terms, a Resident Holder will realize a capital gain (or capital loss) on the settlement of the Subordinated Notes for cash equal to the amount by which the proceeds of disposition, net of any reasonable costs of disposition, exceed (or are less than) the adjusted cost base to the Resident Holder of such Subordinated Notes. The income tax treatment of any such capital gain (or capital loss) is described below under "Taxation of Capital Gains and Capital Losses".

*Exchange of Unsecured Notes*

A Resident Holder of Unsecured Notes will be considered to have disposed of its Unsecured Notes in consideration for New Common Shares upon the exchange of such Unsecured Notes for New Common Shares on the Effective Date. A Resident Holder that is a corporation, partnership, unit trust or any trust of which a corporation or partnership is a beneficiary will generally be required to include in its income the amount of interest accrued or deemed to accrue on the Unsecured Notes up to the Effective Date (except to the extent that such interest was otherwise included in computing income for the year or a preceding year). Any other Resident Holder (including an individual) will be required to include in income for a taxation year any interest on the Unsecured Notes received or receivable by such Resident Holder in the year (depending upon the method regularly followed by the Resident Holder in computing income) except to the extent that such interest was otherwise included in its income for the year or a preceding year. Where a Resident Holder is required to include an amount in income on account of interest on the Unsecured Notes that accrues in respect of the period prior to the date of acquisition by such Resident Holder, the Resident Holder should be entitled to a deduction of an equivalent amount in computing income. Where a Resident Holder is required to include an amount in income on account of interest on the Subordinated Notes, the Resident Holder should be entitled to a deduction of an equivalent amount in computing income to the extent that such amount is not paid.

A Resident Holder's proceeds of disposition of Unsecured Notes upon their exchange for New Common Shares will be an amount equal to the fair market value (at the time of the exchange) of the New Common Shares received on the exchange, less the fair market value of any New Common Shares received or deemed to be received in respect of the payment of interest. In general terms, a Resident Holder will realize a capital gain (or capital loss) on the exchange of the Unsecured Notes for New Common Shares equal to the amount by which the proceeds of disposition, net of any reasonable costs of disposition, exceed (or are less than) the adjusted cost base to the Resident Holder of such Unsecured Notes. The income tax treatment of any such capital gain (or capital loss) is described below under "Taxation of Capital Gains and Capital Losses".

A Resident Holder will be considered to have acquired the New Common Shares received on the exchange at a cost equal to the fair market value of such New Common Shares at the time of the exchange.

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

*Dividends on New Common Shares and New Preferred Shares*

A Resident Holder will be required to include in computing its income for a taxation year any dividends received (or deemed to be received) on the New Common Shares and New Preferred Shares. In the case of a Resident Holder that is an individual (other than certain trusts), such dividends will be subject to the gross-up and dividend tax credit rules applicable to taxable dividends received from taxable Canadian corporations. A dividend received by a Resident Holder that is a corporation will generally be deductible in computing the corporation's taxable income. In certain circumstances, however, a dividend received (or deemed to be received) by a Resident Holder that is a corporation will be deemed to be proceeds of a disposition or a capital gain. Resident Holders that are corporations should consult their own tax advisors having regard to their own particular circumstances.

A Resident Holder that is a "private corporation" as defined in the Tax Act, or any other corporation controlled, whether because of a beneficial interest in one or more trusts or otherwise, by or for the benefit of an individual (other than a trust) or a related group of individuals (other than trusts) will generally be liable to pay a refundable tax of 38 1/3% under Part IV of the Tax Act on dividends received (or deemed to be received) on the New Common Shares and New Preferred Shares to the extent such dividends are deductible in computing the Resident Holder's taxable income for the taxation year.

*Disposition of New Common Shares and New Preferred Shares*

Generally, on a disposition or deemed disposition of a New Common Share or New Preferred Share, a Resident Holder will realize a capital gain (or capital loss) equal to the amount, if any, by which the proceeds of disposition, net of any reasonable costs of disposition, exceed (or are less than) the adjusted cost base to the Resident Holder of the New Common Shares or New Preferred Shares, as applicable, immediately before the disposition or deemed disposition. The adjusted cost base to a Resident Holder of a New Common Share or New Preferred Share will be determined by averaging the cost of such share with the adjusted cost base of all other New Common Shares or New Preferred Shares, as applicable, owned by the Resident Holder as capital property at that time, if any.The tax treatment of any such capital gain (or capital loss) is described below under "Taxation of Capital Gains and Capital Losses".

*Taxation of Capital Gains and Capital Losses*

Generally, a Resident Holder is required to include in computing its income for a taxation year one-half of the amount of any capital gain (a "**taxable capital gain**") realized in the year. Subject to and in accordance with the provisions of the Tax Act, a Resident Holder is required to deduct one-half of the amount of any capital loss (an "allowable capital loss") realized in a taxation year from taxable capital gains realized by the Resident Holder in the year, and allowable capital losses in excess of taxable capital gains for the year may be carried back and deducted in any of the three preceding taxation years or carried forward and deducted in any subsequent taxation year against net taxable capital gains realized in such years.

The amount of any capital loss realized by a Resident Holder that is a corporation on the disposition of a New Common Share or New Preferred Share may be reduced by the amount of any dividends received (or deemed to be received) by the Resident Holder on such New Common Share or New Preferred Share, as applicable, to the extent and under the circumstances prescribed by the Tax Act. Similar rules may apply where a New Common Share or New Preferred Share is owned by a partnership or trust of which a corporation, trust or partnership is a member or beneficiary. Such Resident Holders should consult their own tax advisors.

*Additional Refundable Tax on Canadian-Controlled Private Corporations*

A Resident Holder that is throughout the taxation year a "Canadian-controlled private corporation", as defined in the Tax Act, is liable for tax, a portion of which may be refundable, on investment income, including taxable capital gains realized and dividends received (or deemed to be received) in respect of the New Common Shares and New Preferred Shares (but not dividends or deemed dividends that are deductible in computing taxable income).

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale
Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

**Holders Not Resident in Canada**

This portion of the summary is generally applicable to a Holder who, at all relevant times, for purposes of the Tax Act, (i) is not, and is not deemed to be, resident in Canada, (ii) does not use or hold any Unsecured Notes or Subordinated Notes, and will not use or hold any New Common Shares or New Preferred Shares, in a business carried on in Canada, (iii) is not a "specified non-resident shareholder" of the Corporation for purposes of the Tax Act or a non-resident person not dealing at arm's length with a "specified shareholder" (within the meaning of Subsection 18(5) of the Tax Act) of the Corporation, and (iv) is not an insurer that carries on an insurance business in Canada and elsewhere or an "authorized foreign bank" as defined in the Tax Act (a "**Non-Resident Holder**"). This summary assumes that no interest paid on the Notes will be in respect of a debt or other obligation to pay an amount to a person with whom the Corporation does not deal at arm's length within the meaning of the Tax Act.

*Settlement of Subordinated Notes*

A Non-Resident Holder will be considered to have disposed of its Subordinated Notes in consideration for a cash payment on the Effective Date. A Non-Resident Holder will not be subject to tax under the Tax Act in respect of any capital gain realized on the settlement of Subordinated Notes for cash.

No Canadian withholding tax will apply in respect of the payment of any accrued and unpaid interest or the principal amount in respect of the Subordinated Notes.

*Exchange of Unsecured Notes*

A Non-Resident Holder will be considered to have disposed of its Unsecured Notes upon the exchange of such Unsecured Notes for New Common Shares on the Effective Date. A Non-Resident Holder will not be subject to tax under the Tax Act in respect of any capital gain realized on the exchange of Unsecured Notes for New Common Shares.

No Canadian withholding tax will apply in respect of New Common Shares delivered to a Non-Resident Holder in satisfaction of accrued and unpaid interest of or the principal amount on the Unsecured Notes.

A Non-Resident Holder will be considered to have acquired the New Common Shares received on the exchange at a cost equal to the fair market value of such New Common Shares at the time of the exchange.

*Dividends on New Common Shares and New Preferred Shares*

Dividends paid or credited, or deemed to be paid or credited, on New Common Shares and New Preferred Shares to a Non-Resident Holder will generally be subject to Canadian withholding tax at the rate of 25%, subject to any reduction in the rate of withholding to which the Non-Resident Holder is entitled under any applicable income tax convention. For example, under the Canada-United States Income Tax Convention, (1980), as amended (the "**Canada-U.S. Tax Treaty**"), where dividends on the New Common Shares and New Preferred Shares are considered to be paid to or derived by a Non-Resident Holder that is the beneficial owner of the dividends and is a U.S. resident for the purposes of, and is entitled to the benefits of, the Canada-U.S. Tax Treaty, the applicable rate of Canadian withholding tax applicable to dividends is generally reduced to 15%.

*Disposition of New Common Shares and New Preferred Shares*

A Non-Resident Holder will not be subject to tax under the Tax Act on any capital gain realized on a disposition or deemed disposition of New Common Shares or New Preferred Shares, unless the New Common Shares  or New Preferred Shares, as applicable, are "taxable Canadian property" to the Non-Resident Holder for purposes of the Tax Act and the Non-Resident Holder is not entitled to relief under an applicable income tax convention between Canada and the country in which the Non-Resident Holder is resident.

Generally, the New Common Shares and New Preferred Shares will not constitute taxable Canadian property to a Non-Resident Holder at a particular time unless, at any particular time during the 60-month period immediately

72

LEGAL_1:40709104.10

preceding that time, more than 50% of the fair market value of the New Common Shares or New Preferred Shares, as applicable, was derived directly or indirectly from one or any combination of (A) real or immovable property situated in Canada, (B) Canadian resource properties, (C) timber resource properties, or (D) options in respect of, interests in, or for civil law rights in, any of the foregoing properties whether or not such property exists. Notwithstanding the foregoing, in certain circumstances set out in the Tax Act, New Common Shares and New Preferred Shares could be deemed to be taxable Canadian property. Non-Resident Holders should consult their own tax advisors.

Even if the New Common Shares or New Preferred Shares are taxable Canadian property of a Non-Resident Holder, a taxable capital gain resulting from the disposition of New Common Shares or New Preferred Shares will not be included in computing the Non-Resident Holder's income for the purposes of the Tax Act if the New Common Shares or New Preferred Shares, as applicable, are "treaty-protected property" (as defined in the Tax Act). New Common Shares and New Preferred Shares owned by a Non-Resident Holder will generally be treaty-protected property if the gain from the disposition of such shares would, because of an applicable income tax treaty or convention, be exempt from tax under the Tax Act. In the event that New Common Shares or New Preferred Shares are taxable Canadian property but not treaty-protected property of a Non-Resident Holder, then (a) the Non-Resident Holder will be subject to income tax under the Tax Act in respect of any capital gain realized on a disposition of New Common Shares or New Preferred Shares, subject to any relief under an applicable income tax convention between Canada and the country in which the Non-Resident Holder is resident; (b) the Non-Resident Holder will be required to file a tax return in Canada reporting any disposition of New Common Shares or New Preferred Shares; and (c) the notification and withholding provisions of section 116 of the Tax Act will apply to the Non-Resident Holder, such that a purchaser will be entitled, pursuant to the Tax Act, to deduct or withhold an amount from any payment made to the Non-Resident Holder in respect of a purchase of New Common Shares or New Preferred Shares from the Non-Resident Holder unless an acceptable certificate under section 116 of the Tax Act is obtained.

**Certain United States Federal Income Tax Considerations**

The following discussion summarizes certain U.S. federal income tax considerations generally applicable to U.S. Holders (as defined below) of Unsecured Notes or Subordinated Notes relating to the Recapitalization as set forth in the Plan of Arrangement and to the ownership and disposition of New Shares received in exchange for Unsecured Notes pursuant to the Recapitalization. This summary is based upon the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), the U.S. Treasury Regulations promulgated thereunder (the "**Treasury Regulations**"), judicial authorities, published positions of the Internal Revenue Service (the "**IRS**"), and other applicable authorities, all as in effect on the date hereof. Any of the authorities on which this summary is based could be changed in a material and adverse manner at any time, and any such change could be applied on a retroactive basis.

There can be no assurance that the IRS will not challenge any of the tax considerations described in this summary, and no opinion from U.S. legal counsel or ruling from the IRS has been requested, or will be obtained, regarding the U.S. federal income tax consequences of the Recapitalization or the ownership and disposition of New Shares received pursuant to the Recapitalization. This summary addresses only certain considerations arising under U.S. federal income tax law, and it does not address any other federal tax considerations such as estate or gift tax consideration, or any tax considerations arising under the laws of any state, locality or non-U.S. taxing jurisdiction.

This summary does not address the U.S. federal income tax consequences of other transactions effected prior or subsequent to, or concurrently with, the Recapitalization (whether or not any such transactions are undertaken in connection with the Recapitalization).

This summary is of a general nature only and does not address all of the U.S. federal income tax considerations that may be relevant to a U.S. Holder in light of such U.S. Holder's circumstances. In particular, this discussion only deals with U.S. Holders that hold Unsecured Notes, Subordinated Notes or New Shares as "capital assets" within the meaning of section 1221 of the Code (generally, property held for investment purposes), and does not address the special tax rules that may apply to special classes of taxpayers, such as: securities broker-dealers; persons that hold Unsecured Notes, Subordinated Notes,  or New Shares as part of a hedging or integrated financial transaction or a straddle; U.S. Holders whose functional currency is not the U.S. dollar; U.S. expatriates; persons that are owners of an interest in a partnership or other pass-through entity or arrangement that is a holder of Unsecured Notes, Subordinated Notes or New Shares; partnerships or other pass-through entities or arrangements; regulated investment companies; banks thrifts, mutual funds and other financial institutions; insurance companies; traders that have

73

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale
Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

elected a mark-to-market method of accounting; tax-exempt organizations and pension funds; persons that own, or have owned, or who will own immediately following the Recapitalization, directly, indirectly or by attribution, 5% or more of the Corporation (except as indicated otherwise); passive foreign investment companies; controlled foreign corporations; and U.S. Holders liable for alternative minimum tax or the Medicare contribution tax on net investment income.

For purposes of this summary, a "**U.S. Holder**" means a beneficial owner of Unsecured Notes, Subordinated Notes or New Shares, as the case may be, who is: a citizen or individual resident of the United States as determined for U.S. federal income tax purposes; a corporation, or other entity classified as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia; an estate the income of which is subject to U.S. federal income taxation regardless of its source; or a trust (i) that validly elects to be treated as a U.S. person for U.S. federal income tax purposes or (ii) the administration over which a U.S. court can exercise primary supervision and all of the substantial decisions of which one or more U.S. persons have the authority to control.

If an entity or arrangement classified as a partnership for U.S. federal income tax purposes holds Unsecured Notes, Subordinated Notes or New Shares, the tax treatment of a partner of such partnership generally will depend upon the status of such partner and the activities of the partnership. Partners of partnerships holding Unsecured Notes, Subordinated Notes or New Shares are urged to consult their own tax advisers regarding the specific tax consequences of the Recapitalization and of the ownership and disposition of New Shares.

U.S. Holders who hold both Unsecured Notes and Subordinated Notes may be subject to different consequences than those discussed below.

**U.S. Holders of Unsecured Notes, Subordinated Notes or New Shares are urged to consult their own tax advisers regarding the tax consequences of the Recapitalization and of the ownership and disposition of New Shares received in exchange for Unsecured Notes pursuant to the Recapitalization in light of their particular circumstances, as well as the tax consequences under state, local, and non-U.S. tax law and the possible effect of changes in tax law.**

### *Tax Consequences to Subordinated Noteholders*

#### *Exchange of Subordinated Notes for Cash*

Subject to the uncertain treatment of the Early Consent Cash Payment discussed below, a U.S. Holder exchanging Subordinated Notes for cash will generally recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between the amount of cash received (other than cash attributable to accrued and unpaid stated interest on Subordinated Notes, which will be taxable as foreign source ordinary income) and its adjusted tax basis in the Subordinated Notes surrendered. A U.S. Holder's adjusted tax basis in its Subordinated Notes surrendered will generally be equal to the amount deemed paid therefor, increased by any accrued original issue discount ("**OID**") and any market discount previously included in income, and reduced by any bond premium previously amortized. Subject to special rules governing market discount, such gain or loss will generally be capital gain or loss, will be long-term capital gain or loss if the U.S. Holder held the Subordinated Notes for more than one year, and will generally be considered U.S. source. However, if a Subordinated Note was acquired with market discount (which generally means that its principal amount or, if the Subordinated Note was issued with OID, its revised issue price exceeded its tax basis immediately after its acquisition by the U.S. Holder by at least a statutorily defined *de minimis* amount), any gain would be treated as ordinary income to the extent of any previously accrued market discount that has not yet been taken into account as income. Long-term capital gains of non-corporate U.S. Holders are generally eligible for preferential rates of taxation. The deductibility of capital losses is subject to limitations.

Amounts received in non-U.S. currency with respect to an exchange of Unsubordinated Notes will be translated into U.S. dollars at the spot rate of exchange on the date of receipt, whether or not converted into U.S. dollars at that time. Any further gain or loss upon the subsequent sale or disposition of such currency for a different U.S. dollar amount will generally be treated as ordinary income or loss. If the Subordinated Notes are treated as traded on an established securities market and the U.S. Holder is either a cash basis taxpayer or an accrual basis taxpayer who has

74

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale
Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

made a special election, such holder will determine the U.S. dollar value of the amount realized in foreign currency with respect to a taxable disposition by translating the amount received at the spot rate of exchange on the settlement date of the disposition.

*Treatment of Early Consent Cash Payment*

The U.S. federal income tax treatment of Early Consent Cash Payment is unclear. Early Consent Cash Payment could be treated as part of the amount realized in an exchange of Subordinated Notes for cash. Alternatively, it could be treated as a separate fee for execution of the Junior Support Agreement on or before the Early Consent Deadline, which would be treated as ordinary income. U.S. Holders should consult their own tax advisors regarding the proper treatment of Early Consent Cash Payment for U.S. federal income tax purposes.

### Tax Consequences to Unsecured Noteholders

The following discussion assumes that Unsecured Noteholders' rights to subscribe for New Preferred Shares in the Recapitalization will not be treated as separate consideration in return for Unsecured Notes exchanged or as a payment under the Unsecured Notes. The tax treatment of the rights are subject to substantial uncertainty, and other characterizations of the receipt of the rights may also be possible. U.S. Holders of Unsecured Notes are urged to consult their own tax advisers regarding the possible tax consequences to them if the rights are treated as separate consideration.

The U.S. federal income tax consequences of the Recapitalization to a U.S. Holder of Unsecured Notes will depend, in part, on whether the applicable Unsecured Notes constitute "securities" for U.S. federal income tax purposes. If the applicable Unsecured Notes do not constitute "securities," a U.S. Holder's receipt of New Common Shares in exchange therefor should generally be treated as a taxable transaction as further described below under the heading "*Taxable Exchange Treatment*." If, on the other hand, the applicable Unsecured Notes are treated as "securities," the receipt of New Common Shares in exchange therefor should generally be treated as a tax-deferred transaction, as further described below under the heading "*Tax-Deferred Exchange Treatment*."

*Taxable Exchange Treatment*

Subject to the uncertain treatment of Early Consent Shares discussed below, a U.S. Holder exchanging Unsecured Notes for New Common Shares generally would realize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between the amount realized by the U.S. Holder in the exchange and its adjusted tax basis in the Unsecured Notes surrendered in the exchange. Such gain or loss would be recognized, unless the exchange qualifies as a tax-deferred transaction as described below under "*—Tax-Deferred Exchange Treatment*." The amount that such U.S. Holder will realize in the exchange will equal the fair market value of New Common Shares it receives at the time of the exchange (other than New Common Shares attributable to accrued and unpaid stated interest on Unsecured Notes, which will be taxable as described under "*Payment for Accrued and Unpaid Interest*" below). A U.S. Holder's adjusted tax basis in its Unsecured Notes surrendered in the exchange will generally be equal to the amount paid therefor, increased by any accrued OID and any market discount previously included in income, and reduced by any bond premium previously amortized. Subject to special rules governing market discount discussed below, such gain or loss, if recognized, will generally be U.S. source capital gain or loss and will be long-term capital gain or loss if the U.S. Holder's holding period in the Unsecured Notes at the time of the exchange exceeds one year. However, if an Unsecured Note was acquired with market discount (which generally means that its principal amount or, if the Unsecured Notes were issued with OID, its revised issue price) exceeded its tax basis immediately after its acquisition by the U.S. Holder by at least a statutorily defined *de minimis* amount), any gain would be treated as ordinary income to the extent of any previously accrued market discount that has not yet been taken into account as income. Long-term capital gains of non-corporate U.S. Holders are generally eligible for preferential rates of taxation. The deductibility of capital losses is subject to limitations. A U.S. Holder's adjusted tax basis in its New Common Shares received (including New Common Shares attributable to accrued and unpaid stated interest on Unsecured Notes, if any, as discussed below) will equal the fair market value of such shares, and its holding period in the New Common Shares will begin on the day after the day of the exchange.

75

LEGAL_1:40709104.10

*Tax-Deferred Exchange Treatment*

Alternatively, an exchange of Unsecured Notes for New Common Shares could be treated as a tax-deferred "recapitalization" as described in Section 368(a)(1)(E) of the Code and, potentially, also a tax-deferred transaction under Section 351 of the Code, in each case, so long as the Unsecured Notes are properly treated as "securities" for such purposes, and, in the case of a Section 351 transaction, certain other conditions are met. The term "securities" is not defined in the Code or in applicable Treasury Regulations, and it has not been clearly defined by judicial decisions. The classification of a debt instrument as a security is a determination based on all facts and circumstances, including, but not limited to: (1) the term (i.e., duration) of the instrument, (ii) whether or not the instrument is secured, (iii) the degree of subordination of the debt instrument, (iv) the ratio of debt to equity of the issuer, and (v) the riskiness of the business of the issuer.  Most authorities have held that the term to maturity of a debt instrument is one of the most significant factors in determining whether it qualifies as a security.  A debt instrument with a term of more than ten years generally is treated as a security while a debt instrument with a term of five years or less generally is not treated as a security. If the exchange qualifies as a tax-deferred transaction under both Section 368(a)(1)(E) and Section 351, it is not entirely clear whether certain rules that require recognition of gain in transfers of property to a foreign corporation in a Section 351 transaction could become applicable to Unsecured Noteholders. U.S. Holders of Unsecured Notes are urged to consult their own tax advisers regarding the tax consequences of the exchange qualifying under both Section 351 and Section 368(a)(1)(E).

Subject to the uncertain treatment of Early Consent Shares discussed below, if 10.875% Unsecured Notes and/or 9.75% Unsecured Notes constitutes securities and an exchange of Unsecured Notes for New Common Shares qualifies as a tax-deferred transaction under Section 351 or Section 368(a)(1)(E) of the Code, a U.S. Holder generally would not recognize any gain or loss on the exchange except to the extent of any consideration in respect of accrued and unpaid interest, which would be taxable as ordinary income (as discussed under "*Payment for Accrued and Unpaid Interest*" below). If an Unsecured Note was acquired with market discount (described above under "*—Taxable Exchange Treatment*"), the previously accrued and unpaid market discount will generally carry over to the New Common Shares to the extent it has not yet been taken into account as income. Any gain recognized by a U.S. Holder upon a subsequent disposition of such New Common Shares would be treated as ordinary income to the extent of any accrued market discount not previously included in income (as described under "*Tax Consequences to U.S. Holders of New Shares— Sale or Other Taxable Disposition of New Shares*" below). A U.S. Holder's adjusted tax basis in its New Common Shares (other than New Common Shares received as consideration for accrued and unpaid interest, if any) should be equal to its adjusted tax basis in Unsecured Notes exchanged. A U.S. Holder's holding period in New Common Shares (other than New Common Shares received as consideration for accrued and unpaid interest) should include its holding period in Unsecured Notes exchanged.

*Treatment of the Receipt of Early Consent Shares*

The U.S. federal income tax treatment of the receipt of Early Consent Shares is unclear. Early Consent Shares could be treated as part of the amount realized in an exchange of Unsecured Notes for New Common Shares. Alternatively, they could be treated as a separate fee for execution of the Unsecured Noteholder Support Agreement on or before the Early Consent Deadline, which could be subject to U.S. federal income tax as ordinary income and result in Early Consent Shares having a tax basis equal to their fair market value, and a holding period beginning the day after the Recapitalization (regardless of whether the exchange is treated as tax-deferred for U.S. federal income tax purposes). U.S. Holders should consult their own tax advisors regarding the proper treatment of Early Consent Shares for U.S. federal income tax purposes.

*Payment for Accrued and Unpaid Interest*

Regardless of whether the exchange pursuant to the Recapitalization is treated as a taxable exchange or a tax-deferred exchange, the fair market value of New Common Shares, if any, received in exchange for Unsecured Notes in respect of accrued and unpaid interest will be taxed as foreign source ordinary interest income to the extent such interest was not previously included in income. Such New Common Shares will have an initial tax basis equal to their fair market value on the date acquired, and a holding period that begins the following day.

76

LEGAL_1:40709104.10

*Tax Consequences to U.S. Holders of New Shares*

*Distributions on New Shares*

Subject to the discussion under *"Passive Foreign Investment Company Considerations"* below, the gross amount of any distribution paid on New Shares by the Corporation (if paid in foreign currency, translated into US dollars when paid, as discussed below) will generally be subject to U.S. federal income tax as dividend income to the extent paid out of the Corporation's current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Such amount will be translated into U.S. dollars at the spot rate of exchange and includable in gross income on the date the U.S. Holder actually or constructively receives the distribution, whether or not converted into U.S. dollars at that time. Any further gain or loss upon the subsequent sale or disposition of such currency for a different U.S. dollar amount will generally be treated as ordinary income or loss.  Because the Corporation does not intend to maintain calculations of earnings and profits in accordance with U.S. federal income tax principles, each U.S. Holder should assume that any distribution by the Corporation with respect to the New Shares will constitute dividend income. Dividends paid by the Corporation will not be eligible for the dividends received deduction generally allowed to corporations.

Dividends received by non-corporate U.S. Holders may be "qualified dividend income," which is taxed at the lower applicable capital gains rate, provided that (1) the Corporation is eligible for the benefits of the Canada-U.S. Tax Treaty, (2) the Corporation is not a passive foreign investment company (as discussed below) (a "**PFIC**") with respect to the U.S. Holder for either the taxable year in which the dividend was paid or the preceding taxable year, (3) the U.S. Holder satisfies certain holding period requirements and (4) the U.S. Holder is not under an obligation to make related payments with respect to positions in substantially similar or related property.

*Sale or Other Taxable Disposition of New Shares*

A U.S. Holder that sells or otherwise disposes of New Shares in a sale or other taxable disposition (including a redemption) generally will recognize gain or loss in an amount equal to the difference, if any, between the U.S. dollar value of the amount realized on such sale or other taxable disposition and the U.S. Holder's adjusted tax basis in the shares. A U.S. Holder's initial tax basis in New Common Shares will be determined as described above under *"Tax Consequences to Unsecured Noteholders."* Any such gain or loss generally will generally be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder's holding period for the New Shares is more than one year at the time of the sale or other taxable disposition. Preferential tax rates for long-term capital gains are generally applicable to a U.S. Holder that is an individual, estate or trust. Deductions for capital losses are subject to significant limitations.  Any such gain or loss on the sale or other taxable disposition of a New Common Share will be ordinary income to the extent of accrued market discount carried over from Unsecured Notes in a tax-deferred transaction as described under *"Tax Consequences to Unsecured Noteholders— Tax-Deferred Exchange Treatment"* above.

Amounts received on the taxable disposition of New Shares in non-U.S. currency will be translated into U.S. dollars at the spot rate of exchange on the date of receipt of the applicable amounts, whether or not converted into U.S. dollars at that time. Any further gain or loss upon the subsequent sale or disposition of such currency for a different U.S. dollar amount will generally be treated as ordinary income or loss. A U.S. Holder's initial tax basis in New Preferred Shares purchased with non-U.S. currency generally will be translated into U.S. dollars on the date of acquisition. If the New Preferred Shares or the New Common Shares, as applicable, are treated as traded on an established securities market and the relevant U.S. Holder is either a cash basis taxpayer or an accrual basis taxpayer who has made the  special election described above, the U.S. Holder generally will determine the U.S. dollar value of the cost of such New Preferred Shares (or the U.S. dollar value of the amount realized in non-U.S. currency with respect to a taxable disposition of the New Preferred Shares or New Common Shares, as the case may be) by translating the amount paid at the spot rate of exchange on the settlement date of the acquisition or disposition.

*Conversion of New Preferred Shares into New Common Shares*

Generally, a U.S. Holder will not recognize any gain or loss in respect of the receipt of New Common Shares upon conversion of New Preferred Shares except with respect to any cash received in lieu of a fractional New Common

77

LEGAL_1:40709104.10

Share, as discussed below. The adjusted tax basis of New Common Shares received will equal the adjusted tax basis of the New Preferred Shares converted, reduced by any cash received in lieu of a fractional New Common Share, and the holding period of the New Common Shares received will include the holding period of the New Preferred Shares converted.

Cash received in lieu of a fractional New Common Share will be treated as received in a taxable disposition of the fractional New Common Share for cash. A U.S. Holder will recognize capital gain or loss equal to the difference between the amount of cash received and the U.S. Holder's adjusted tax basis in New Preferred Shares treated as converted into such fractional New Common Share. Such capital gain or loss generally will be long-term capital gain or loss if the U.S. Holder's holding period for the New Preferred Shares is more than one year at the time of the conversion.

*Passive Foreign Investment Company Considerations*

Based on current business plans and financial projections, the Corporation does not expect to be classified as a PFIC. If the Corporation is considered a PFIC at any time during a U.S. Holder's holding period for its New Shares, then certain different and potentially adverse tax consequences would apply to such U.S. Holder's ownership and disposition of New Shares. There can be no assurance that the IRS will not challenge any determination made by the Corporation (or any subsidiary) concerning its PFIC status or that the Corporation (or any subsidiary) was not, or will not be, a PFIC for any tax year. U.S. Holders are urged to consult their own tax advisors regarding the PFIC status of the Corporation and any subsidiary of the Corporation. If the Company is considered a PFIC, a U.S. Holder of New Shares will also be subject to annual information reporting requirements. U.S. Holders should consult their tax advisors about the potential application of the PFIC rules to an investment in New Shares.

*Controlled Foreign Corporation Considerations*

If, after the Recapitalization, United States persons that own directly, indirectly or constructively 10% or more of the total combined voting power of all classes of the Corporation's outstanding shares entitled to vote ("**CFC Shareholders**") own directly, indirectly or constructively more than 50% of either the total combined voting power of all classes of the Corporation's outstanding shares entitled to vote or the total value of all of the Corporation's outstanding shares, the Corporation generally would be treated as a controlled foreign corporation (a "**CFC**"). In such case, CFC Shareholders would be treated as receiving current distributions of their respective share of certain income of the CFC without regard to any actual distributions. In addition, CFC Shareholders would be subject to certain burdensome U.S. federal income tax and administrative requirements but generally would not also subject to the requirements generally applicable to shareholders of a PFIC (as discussed above). Furthermore, a person who is or has been a CFC Shareholder may recognize ordinary income on the disposition of shares of the CFC. We do not currently know whether the Corporation will be a CFC after the Recapitalization. U.S. Holders who may obtain a substantial interest in the Corporation should consider the potential implications of the Corporation being treated as a CFC and the consequences of the U.S. Holder being a CFC Shareholder of the Corporation.

*Foreign Tax Credit*

Generally, dividends paid on New Shares will constitute foreign source income and generally will be considered "passive category income" or, in the case of certain U.S. Holders, "general category income" for purposes of the U.S. foreign tax credit limitation. Generally, gains or losses (other than amounts treated as market discount) recognized on a disposition or exchange of New Shares will constitute U.S. source income or loss for this purpose. Subject to certain complex conditions and limitations, Canadian taxes withheld on any distributions may be eligible for credit against a U.S. Holder's federal income tax liability. If a refund of the tax withheld is available under the laws of Canada or under the Canada-U.S. Tax Treaty, the amount of tax withheld that is refundable will not be eligible for such credit or deduction. If dividends paid by the Corporation constitute qualified dividend income as discussed under "*Tax Consequences to U.S. Holders of New Shares—Distributions on New Shares*" above, the amount of the dividend taken into account for purposes of calculating the foreign tax credit limitation will generally be limited to the gross amount of the dividend, multiplied by the reduced rate applicable to the qualified dividend income, divided by the highest rate of tax normally applicable to dividends.

78

LEGAL_1:40709104.10

*Information Reporting and Backup Withholding*

Payments of distributions on, or the proceeds from a sale or other disposition of, Unsecured Notes, Subordinated Notes or New Shares paid within the United States may be subject to information reporting and backup withholding. Payments of distributions on, or the proceeds from the sale or other disposition of, Unsecured Notes, Subordinated Notes or New Shares to or through a foreign office of a broker generally will not be subject to backup withholding, although information reporting may apply to those payments in certain circumstances.

Backup withholding generally will not apply, however, to a U.S. Holder who furnishes a correct taxpayer identification number and certifies that he, she or it is not subject to backup withholding on IRS Form W-9 (or substitute form), or is otherwise exempt from backup withholding.

Backup withholding is not an additional tax. Any amounts withheld from a payment to a U.S. Holder under the backup withholding rules may be credited against the U.S. Holder's U.S. federal income tax liability, and such U.S. Holder may obtain a refund of any excess amounts withheld by filing the appropriate claim for refund with the IRS in a timely manner and furnishing any required information. Each U.S. Holder is urged to consult its own tax advisor regarding the information reporting and backup withholding rules in their particular circumstances and the availability of and procedures for obtaining an exemption from backup withholding

*Information with Respect to Foreign Financial Assets*

Certain U.S. Holders that are individuals (and certain entities) may be required to report information relating to an interest in New Shares, subject to certain exceptions (including an exception for New Shares held in accounts maintained by certain financial institutions). Penalties can apply if U.S. Holders fail to satisfy such reporting requirements. U.S. Holders should consult their tax advisors regarding the applicability of these requirements to their investment in New Shares.

*Transfer Reporting Requirements*

Subject to certain exceptions, a U.S. Holder (including a U.S. tax-exempt entity) that transfers cash or property to the Corporation may be required to file IRS Form 926 or a similar form with the IRS if (i) such person owned, directly or by attribution, immediately after the transfer at least 10% by vote or value of the Corporation or (ii) if the value of the transferred cash or property, when aggregated with all transfers made by such person (or any related person) within the preceding 12 month period, exceeds U.S.$100,000. U.S. Holders should consult their tax advisors regarding the applicability of this requirement to their participation in the Recapitalization and acquisition of New Shares.

## RISK FACTORS

In addition to the other information set forth in this Information Circular, Unsecured/Subordinated Noteholders should carefully review the following risk factors before deciding whether to approve the Recapitalization.

**Risks Relating to the Recapitalization**

*The consummation of the Recapitalization may not occur*

Tervita will not complete the Recapitalization unless and until all conditions precedent to the Recapitalization are satisfied or waived, some of which may not be under the Corporation's control, including, without limitation, the requisite approvals of the Unsecured/Subordinated Noteholders and the receipt of the Final Order. See "*Description of the Recapitalization – Conditions to the Recapitalization Becoming Effective*". There can be no assurance that all of the conditions precedent will be satisfied or waived or that the Recapitalization will be completed as currently contemplated or at all. Even if the Recapitalization is completed, it may not be completed on the schedule described in this Information Circular. Accordingly, Unsecured Noteholders participating in the Recapitalization may have to wait longer than expected to receive their New Shares, as applicable. In addition, if the Recapitalization is not completed on the schedule described in this Information Circular, Tervita may incur additional expenses.

79

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

### Potential effect of the Recapitalization

There can be no assurance as to the effect of the announcement of the Recapitalization on Tervita's relationships with its suppliers, customers, purchasers or manufacturers, nor can there be any assurance as to the effect on such relationships of any delay in the completion of the Recapitalization, or the effect of whether the Recapitalization is completed under the CBCA or pursuant to another statutory procedure. To the extent that any of these events result in the tightening of payment or credit terms, increases in the price of supplied goods, or the loss of a major supplier, customer, purchaser or manufacturer or of multiple other suppliers, customers, purchasers or manufacturers, this could have a material adverse effect on Tervita's business, financial condition, liquidity and results of operations.

### The Recapitalization may not improve the financial condition of the Corporation's business

The Recapitalization is expected to improve the capital structure and financial position of the Corporation by substantially deleveraging its balance sheet and enhancing the Corporation's liquidity.  In addition, the Board and management believe that the Recapitalization will provide the necessary operating and financial flexibility and capital resources to manage the Corporation's business in the current economic environment and enable the Corporation to continue to pursue its business plan.  However, the foregoing is contingent on a number of assumptions, including, without limitation, that the ability of the Corporation to succeed in continuing to implement its business plan and assumptions with respect to the risk factors described under "*Risk Factors – Risks Related to Tervita's Business*".  Should any of those assumptions prove false, the Recapitalization may not have the effect of providing the Corporation with such anticipated benefits, the financial position of the Corporation may be materially adversely affected and the Corporation may not be able to pay its debts as they become due.

### After the Recapitalization, certain holders of the Notes including the Plan Sponsors may own a significant number of the New Shares and their interests may conflict with the interests of other holders of New Shares

Following the completion of the Recapitalization, certain holders of the Notes including the Plan Sponsors may hold a significant percentage of the New Shares.  As a result, one or more of those parties may have the ability to control all matters submitted to the holders of New Shares for approval, including, without limitation, the election and removal of directors, amendments to the Corporation's articles and by-laws and certain fundamental transactions. The interests of such parties in the Corporation's business, operations and financial condition from time to time may not be aligned with, or may conflict with, the interests of other holders of New Shares.

The interests of these equity holders might conflict with your interests as a holder of New Shares and they may also have an interest in pursuing acquisitions, divestitures, financings or other transactions that, in their judgment, could enhance their equity investments, and such transactions might involve risks to you as a holder of New Shares. In addition, the Plan Sponsors may in the future own businesses that directly or indirectly compete with ours or are suppliers or customers of ours.

### Potential effect of the Recapitalization or failure to complete the Recapitalization on the Corporation's relationships with its service providers, employees or contractors

There can be no assurance as to the effect that the Recapitalization or delay or failure to complete the Recapitalization will have on the Corporation's relationships with its service providers, employees or contractors, or as to the effect of completing the Recapitalization under the CBCA or pursuant to another statutory procedure. To the extent that any of these events result in more restrictive payment or credit terms or the loss of a service provider, employee or contractor, or of multiple other service providers, employees or contractors, this could have a material adverse effect on the Corporation's business, financial condition, liquidity and results of operations.

### Investors might have difficulty enforcing civil liabilities against the Corporation in the United States

The enforcement by investors of civil liabilities under the United States federal securities laws may be affected adversely by the fact that Tervita and the majority of its subsidiaries are incorporated or organized outside the United States, that some or all of the officers and directors of such persons and the experts named herein are residents of a foreign country, and that all or a substantial portion of the assets of the Corporation and said persons are located outside the United States. As a result, it may be difficult or impossible for holders of Tervita's securities in the United

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale
Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

States to effect service of process within the United States upon Tervita, most of its subsidiaries and their officers and directors and the experts named herein, or to realize, against them, upon judgments of courts of the United States predicated upon civil liabilities under the federal securities laws of the United States or "blue sky" laws of any state within the United States. In addition, holders of Tervita's securities in the United States should not assume that the courts of Canada: (a) would enforce judgments of United States courts obtained in actions against such persons predicated upon civil liabilities under the federal securities laws of the United States or "blue sky" laws of any state within the United States; or (b) would enforce, in original actions, liabilities against such persons predicated upon civil liabilities under the federal securities laws of the United States or "blue sky" laws of any state within the United States.

**Risks Relating to the Non-Implementation of the Recapitalization**

*The Corporation may be unable to continue as a going concern*

Given the decreased level of activity in the oil and gas industry and the drastically reduced commodities pricing, in the latter half of 2015, management and the Board determined that it was unlikely the Tervita Group could continue to indefinitely service its significant debt obligations.

Tervita had sufficient cash hand to make the interest payments that was owning on September 15, 2016, but it does not have sufficient cash to pay out the term loan if, for example, its debt obligations are accelerated. Even if making the interest payments on September 16, 2016 were a viable solution in the short-term – and, based on discussions with the lenders and noteholders, Tervita does not believe that it is – there does not appear to be an end in sight, as Tervita will be subject to significant interest payments on all of the debt instruments in the next several months. In the current market, the aggregate liabilities of Tervita and the Guarantors are greater than the value of their aggregate assets. Further, if repayment of Tervita's obligations are accelerated, Tervita will be unable to meet its obligations as they become due and Tervita would not be able to continue as a going concern.

The financial statements of the Corporation attached as Schedule "A" to Appendix "H" of this Information Circular are presented on the assumption that the Corporation will continue as a going concern in accordance with IFRS. The going concern basis of presentation assumes that the Corporation will continue operations for the foreseeable future and will be able to realize assets and discharge liabilities and commitments in the normal course of business. If this assumption is not appropriate, adjustments will have to be made to the carrying value of the Corporation's assets and liabilities, reported revenues and expenses and balance sheet classifications.

*The Corporation may be required to pursue other alternatives that could have a more negative effect on the Corporation and its stakeholders, including non-consensual proceedings under creditor protection legislation and a shut-down of operations*

In the event that the Recapitalization is not implemented then:

(a)     the Corporation's total debt and accrued interest will not be reduced by approximately $2.1 billion and the reduction in annual cash interest costs of approximately $200 million would not be achieved;

(b)     the approximately $847 million (minus any New Investment Adjustment) of new liquidity pursuant to the New Investment Offering and New Second Lien Notes that is to be completed as part of the Recapitalization would not be available to the Corporation and replacement financing may not be available; and

(c)     the Corporation's cash flow from operations and available liquidity would be insufficient to provide adequate funds to finance operations and the Corporation would be unable to meet its obligations as they become due.

In the event that the Recapitalization is not implemented, the Corporation may be required to pursue other alternatives that could have a more negative effect on the Corporation and its stakeholders, including non-consensual proceedings under creditor protection legislation such as the CCAA and the Corporation may be required to develop plans for the

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

safe, orderly shut-down of operations in the event there is not a timely resolution of the Corporation's liquidity issues to provide for the longer term care and operation of its assets.

**Risks Relating to the New Investment Offering**

*Subscription Price is not an indication of value*

The Subscription Price is $8.00 per New Investment Share. The Subscription Price was determined as part of the Recapitalization negotiations and may not reflect the value of the New Investment Shares following the implementation of the Recapitalization. Unsecured Noteholders should not consider the Subscription Price as an indication of the Corporation's value. After the Effective Date, the New Investment Shares may trade at prices above or below the Subscription Price.

*Loss of entire investment*

An investment in the New Investment Shares is highly speculative and may result in the loss of an investor's entire investment. Only potential investors who are experienced in high risk investments and who can afford to lose their entire investment should consider an investment in the Corporation.

*Decline in the trading price of the New Investment Shares may occur*

The trading price of the New Investment Shares in the future may decline below the Subscription Price. The Corporation can make no assurance that the Subscription Price will remain below any future trading price for the New Investment Shares. Future prices of the New Investment Shares may adjust positively or negatively depending on various factors including the Corporation's future revenues, the Corporation's operations, and overall conditions affecting the Corporation's businesses, economic trends and the securities markets. See "*Risks Factors – Risks Relating to the Corporation's Equity Securities – If an active trading market does not develop for the New Shares, holders of New Shares may not be able to resell their New Shares*" and "*Risk Factors – Risks Relating to the Corporations Equity Securities – Sales of a significant number of New Shares, or the perception of such sales, could depress the price of the New Shares*" below.

*Participation in the New Investment Offering*

Unsecured Noteholders participating in the New Investment Offering must act promptly to ensure that all required forms and payments are actually received by the Corporation or such other Persons as may be designated by the Corporation on or prior to the applicable deadlines in accordance with the procedures established by the Corporation. If you are a beneficial owner of an Unsecured Note, you must act promptly to ensure that your broker, custodian bank or other nominee acts for you and that all required forms and payments are actually received by the Corporation or such other Persons as may be designated by the Corporation on or prior to the applicable deadlines in accordance with the procedure established by the Corporation. See "*Description of the Recapitalization – New Investment Offering*". The Corporation will not be responsible if your broker, custodian or nominee fails to ensure that all required forms and payments are actually received by Corporation or such other Persons as may be designated by the Corporation on or prior to the applicable deadlines in accordance with the procedure established by the Corporation. If you fail to complete and sign the subscription forms, send an incorrect payment amount or otherwise fail to follow the subscription procedures that apply to your exercise in the New Investment Offering, the Corporation may, depending on the circumstances, reject your subscription or accept it only to the extent of the payment received. Neither the Corporation nor such other Persons as may be designated by the Corporation in connection with the New Investment Offering undertakes to contact you concerning an incomplete or incorrect subscription form or payment, nor are we under any obligation to correct such forms or payment. The Corporation has the sole discretion to determine whether a subscription exercise properly follows the subscription procedures.

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

**Risks Relating to the Corporation's Equity Securities**

*Exchange of Debt for Equity*

By exchanging or converting the Unsecured Notes for New Common Shares pursuant to the Recapitalization, Unsecured Noteholders will be changing the nature of their investment from debt to securities convertible into equity. Equity carries certain risks that are not applicable to debt. The Unsecured Notes Indentures provide a variety of contractual rights and remedies to the Unsecured Noteholders, including the right to receive interest and repayment of the Unsecured Notes upon maturity. These rights will not be available to Unsecured Noteholders that become holders of New Common Shares pursuant to the Recapitalization. Claims of shareholders of the Corporation will be subordinated in priority to the claims of creditors in the event of an insolvency, winding up or other distribution of assets of the Corporation.

*There are restrictions on the resale of the New Shares*

The distribution of the New Shares has not been registered under the U.S. Securities Act, any state securities laws or any Canadian securities laws. The Corporation does not intend to file a registration statement with the SEC or a prospectus with any Canadian provincial securities commission relating to the New Shares (unless and until required pursuant to the Registration Rights Agreement). Accordingly, the New Shares may not be reoffered, resold, pledged or otherwise transferred except pursuant to an exemption from the registration requirements of the U.S. Securities Act or an exemption from the prospectus requirements under Canadian securities laws. See "*Certain Regulatory and Other Matters Relating to the Recapitalization – Issuance and Resale of Securities Received in the Recapitalization*".

*If an active trading market does not develop for the New Shares, holders of New Shares may not be able to resell their New Shares*

Currently, there is no public market for the New Shares, and if no active trading market develops, holders of New Shares may not be able to resell their New Shares at their fair market value or at all. Future trading prices of the New Shares will depend on many events and factors, including, among other things, the price of oil and gas, the Corporation's financial condition, financial performance and future prospects, changes in general economic conditions and the overall condition of the financial markets, the market for similar securities, the arrival or departure of key personnel, acquisitions, strategic alliances or joint ventures involving the Corporation or its competitors and the factors listed under the heading "*Note Regarding Forward-Looking Information and Statements*". The Corporation does not intend to apply for listing of the New Shares on any securities exchange. If a shareholder that is not a resident of Canada were to dispose of New Shares that constitute "taxable Canadian property" at the time of disposition, such holder could be subject to Canadian federal income tax liability and filing obligations as a result of such disposition. See "Certain Income Tax Considerations – Certain Canadian Federal Income Tax Considerations – Holders Not Resident in Canada – Disposition of New Common Shares and New Preferred Shares. Generally, a determination of whether the New Shares will constitute "taxable Canadian property" at a particular time is dependent, in part, on whether more than 50% of the fair market value of such shares was derived directly or indirectly from Canadian real property at any time in the 60 month period immediately preceding the particular time. There can be no assurance that the New Shares will not constitute "taxable Canadian property" of a shareholder at a particular time.

*A U.S. investor of Unsecured Notes may not be able to recognize loss, if any, as a result of the Recapitalization for U.S. federal income tax purposes.*

The exchange of the Unsecured Notes for New Shares pursuant to the Recapitalization may be treated as a tax-deferred transaction for U.S. federal income tax purposes. In such case, a U.S. investor generally may not recognize any loss (or gain) on exchange of its Unsecured Notes for New Shares. Alternatively, it is also possible that the Recapitalization is treated as a taxable transaction, in which case a U.S. investor may be required to recognize gain (or loss). See "Certain United States Federal Income Tax Considerations."

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

***Sales of a significant number of New Shares, or the perception of such sales, could depress the price of the New Shares***

Sales of a significant number of New Shares or other equity-related securities by the Corporation or by the Corporation's significant shareholders, including sales of New Shares to satisfy withholding tax requirements in respect of Non-Resident Holders, could depress the price of the New Shares. In addition, with any sale or issuance of equity securities by the Corporation, investors will suffer dilution of their voting power and the Corporation may experience dilution in its earnings per share. The Corporation cannot predict the effect that future sales of the New Shares or other equity-related securities would have on the price of the New Shares. The price of the New Shares could be affected by possible sales of New Shares or by hedging or arbitrage trading activity.

**Tax Risks**

The tax laws of any applicable country, province, state or territory (including Canadian and United States federal income tax laws), and the administrative application and interpretation of such laws, are subject to change. Any change in the tax laws that are applicable to Tervita or the interests held by a securityholder in Tervita, or the administrative application or interpretation of such laws, could have an adverse impact on such securityholder's interests in Tervita.

While Tervita is confident in its tax filing positions in connection with the Recapitalization, such positions may be successfully challenged by the Canada Revenue Agency, which could result in materially different tax consequences than anticipated.

**Risks Related to Tervita's Liquidity**

***Tervita has substantial indebtedness that is currently affecting and may to continue to affect, its financial position and operational flexibility***

Tervita has a significant amount of indebtedness. As of June 30, 2016, Tervita, on a consolidated basis, had outstanding total debt and accrued interest of approximately $2.6 billion, of which approximately $1.36 billion was secured debt, representing the principal outstanding from the Revolving Credit Facilities, Term Loan Facility and the Notes. Tervita's substantial amount of debt and accrued interest could, if the Recapitalization is not completed, have important negative consequences, such as:

- limiting its ability to obtain additional financing, if needed, or refinancing, when needed, for debt service requirements, working capital, capital expenditures or other purposes;

- increasing its vulnerability to current and future adverse economic and industry conditions;

- requiring Tervita to dedicate a substantial portion of its cash flows from operations to make payments on its debt;

- causing Tervita to monetize assets on terms that may be unfavourable to Tervita;

- causing Tervita to offer debt or equity securities on terms that may not be favourable to Tervita or its securityholders;

- reducing funds available for operations, future business opportunities or other purposes;

- limiting Tervita's flexibility in planning for, or reacting to, changes and opportunities in its business and its industry;

- increasing employee turnover and uncertainty, diverting management's attention from routine business and hindering its ability to recruit qualified employees; and

- placing Tervita at a competitive disadvantage compared to its competitors that have less debt.

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

Tervita's Senior Secured Credit Facilities and the terms and conditions of its other indebtedness may permit Tervita to incur or guarantee additional indebtedness, including secured indebtedness in some circumstances. To the extent Tervita incurs additional indebtedness, some or all of the risks discussed above will increase. The terms of this indebtedness restrict Tervita's ability to sell assets, apply the proceeds of such sales, and reinvest in its business. As a result, some or all of the risks discussed above may increase.

***Restrictive covenants in agreements governing Tervita's indebtedness may reduce Tervita's operational and financial flexibility, which may prevent Tervita from capitalizing on business opportunities***

The terms of the agreements governing Tervita's indebtedness will contain a number of operating and financial covenants which may, among other things, restrict its ability to:

- incur additional debt;

- create liens on assets;

- pay dividends or distributions on, or redeem or repurchase, its capital stock;

- make investments;

- engage in sale and leaseback transactions;

- engage in transactions with affiliates;

- transfer or sell assets;

- issue and sell equity interests in Tervita's wholly-owned subsidiaries;

- guarantee debt;

- restrict dividends and other payments to Tervita;

- consolidate, merge or transfer all or substantially all of its assets and the assets of its subsidiaries; and

- engage in unrelated businesses.

In addition, Tervita's ability to comply with such covenants and those contained in the agreements governing other debt to which Tervita is or may become a party may be affected by events beyond its control, including prevailing economic, financial and industry conditions. Its failure to comply with these covenants could result in an event of default which, if not cured or waived, could result in an acceleration of its debt and cross-defaults under its other debt. This could require Tervita to repay or repurchase debt prior to the date it would otherwise be due, which could adversely affect its financial condition. Even if Tervita is able to comply with all applicable covenants, the restrictions on its ability to manage its business in its sole discretion could adversely affect its business by, among other things, limiting its ability to take advantage of financings, mergers, acquisitions and other corporate opportunities that Tervita believes would be beneficial to it.

***Indebtedness of Tervita***

The ability of Tervita to make certain payments or advances will be subject to applicable laws and contractual restrictions in the instruments governing any indebtedness of Tervita (including the Revolving Credit Agreement, Term Loan Credit Agreement and the Indentures if the Recapitalization is not completed). The degree to which Tervita is leveraged could have important consequences, including: (a) Tervita's ability to obtain additional financing for working capital, capital expenditures, or acquisitions may be limited; (b) all or part of Tervita's cash flow from operations may be dedicated to the payment of the principal of and interest on Tervita's indebtedness, thereby reducing

funds available for operations; and (c) certain of Tervita's borrowings will be at variable rates of interest, which exposes Tervita to the risk of increased interest rates. These factors may adversely affect Tervita's cash flow.

The New Revolving Credit Facility will contain a number of financial covenants that require Tervita to meet certain financial ratios and financial condition tests. A failure to comply with the obligations in the New Revolving Credit Facility could result in a default, which, if not cured or waived, could permit acceleration of the relevant indebtedness.

**Risks Related to Tervita's Business**

***The demand for services in all of Tervita's divisions can be adversely impacted by general economic conditions and Tervita is dependent on exploration and production activity levels in the markets where Tervita offers its services, as a result, any decrease in demand may have a material adverse impact on its financial position, results of operations, cash flows or ability to make required payments on debt outstanding.***

Demand for Tervita's services in all of its divisions depends, in large part, on the level of exploration and production of oil and gas and the oil and natural gas industry's willingness to purchase its services. This willingness depends on oil and gas prices, expectations about future prices, the cost of the services Tervita offers, the cost of the services its competitors offer, the cost of exploring for, producing and delivering oil and gas, regulatory charges and requirements, the discovery rate of new oil and gas reserves, the ability of oil and gas companies to raise capital and various other economic and industry factors beyond its control. Domestic and international political, regulatory, military and general economic conditions beyond its control also affect the oil and natural gas industry.

Prices for oil and gas have historically been volatile and have reacted to changes in the supply and demand for oil and gas, domestic and worldwide economic conditions and political instability in oil-producing countries. These changes have historically significantly affected Tervita's customers and, consequently, Tervita. No assurance can be given on current and future production levels of oil and natural gas, that demand for its services will reflect the level of such activities, that prices for oil and gas will improve or stabilize, that exploration and development expenditures will continue to result in the discovery of reserves that are commensurate with capital invested, or that initiatives designed to combat climate change or reduce oil and gas consumption generally, including carbon taxes and alternative energy development, will not adversely affect the oil and gas industry generally. Tervita expects the prices for oil and natural gas to continue to be volatile and affect the demand for Tervita's services. Either a material decline in general economic conditions or a material decline or continued volatility in the price of oil or natural gas could materially affect the demand for Tervita's services and have a material adverse impact on Tervita's financial position, results of operations, cash flows or Tervita's ability to make required payments on debt outstanding.

Tervita is particularly reliant on oil and gas exploration and production in the western Canada sedimentary basin. Any decline in oil and gas exploration and production in this region could have a material adverse impact on Tervita's results of operations.

***Tervita's business is dependent upon the willingness of its customers to outsource their waste management and other environmental services activities.***

Tervita's business is largely dependent on the willingness of its customers to outsource their waste management activities generally, and to Tervita, rather than to its competitors. Currently, numerous internal waste treatment, recovery and disposal options are available to oil and gas companies, such as internally created facilities and disposal options. In addition, most oilfield operators, including many of Tervita's customers, have numerous abandoned wells that could be licensed for use in the disposition of internally generated waste and third-party waste in competition with Tervita and batteries that could be used to recover oil through oilfield waste processing. Tervita provides the majority of its waste treatment, processing and disposal services through its Fluids and Solids Services divisions, with those divisions accounting for approximately ●% of its operating margin for the twelve months ended June 30, 2016. Production companies in the industries Tervita services, including its current customers, could decide to process and dispose of their waste internally for any reason, and this could have a material adverse effect on Tervita's financial position, results of operations, cash flows or its ability to make required payments on debt outstanding.

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

***Tervita's markets are highly competitive, and competition could adversely impact Tervita's financial position, results of operations, demand for services, cash flows or its ability to make required payments on debt outstanding.***

Tervita has many competitors in all of its businesses, including waste treatment, recovery and disposal, environmental site remediation and contracting and well servicing businesses. Other companies offer similar third-party services in Tervita's primary markets. In addition, many of Tervita's customers manage a portion of their own waste internally without the use of a third-party service provider and some of Tervita's customers also compete with Tervita in the treatment and disposal sector by offering such services to other oil and gas companies. Many of Tervita's customer relationships can be short-term in nature, its customers are generally not bound by long-term contracts or service agreements, and many of its relationships are subject to cancellation by its customers upon short notice with limited or no damages payable to Tervita. In addition, there is no certainty that the backlog of orders for Tervita's services will in fact result in actual sales at the times or in the amounts estimated at any time. Tervita's customers regularly evaluate the best combination of value and price from competing alternatives and/or new technologies and can move between alternatives or, in some cases, develop their own alternatives with relative ease. This competition influences the prices Tervita charges and requires Tervita to control its costs aggressively and maximize efficiency in order to maintain acceptable operating margins; however, Tervita may be unable to do so and remain competitive on a cost-for-service basis. In addition, existing and future competitors may develop or offer services and/or new technologies that have price, location or other advantages over the services it provides. If Tervita is unable to retain its customers, develop new customers or maintain the prices it charges due to any of the foregoing factors, Tervita's financial position, results of operations, cash flows or its ability to make required payments on debt outstanding could be materially adversely affected.

***Global financial conditions are subject to increased volatility. This may impact Tervita's ability to obtain equity, debt or bank financing in the future on terms commercially reasonable to it or at all and may adversely impact its operations.***

Global financial conditions are subject to increased volatility, which may impact Tervita's ability to obtain equity, debt or bank financing on terms commercially reasonable to Tervita, if at all. Additionally, these factors, as well as other related factors, may cause decreases in asset values that are deemed to be other than temporary, which may result in impairment losses. Continued volatility and market turmoil could adversely impact Tervita's operations and the value of the Notes. In addition, certain of Tervita's customers could experience an inability to pay, in the event they are unable to access the capital markets to fund their business operations, which would have an adverse effect on Tervita's revenue and cash flow.

***The cost of complying with environmental laws and regulations is significant, and because environmental compliance is central to Tervita's operations, any liabilities or obligations imposed under them or delays resulting from such compliance, could directly, or indirectly through Tervita's customers, adversely affect its financial position, results of operations, cash flows or its ability to make required payments on debt outstanding.***

Tervita's business is subject to extensive Canadian and U.S. federal, provincial, territorial, state, local and foreign environmental laws and regulations, including those governing the use, discharge, management, transportation, treatment, processing, storage and disposal of hazardous, toxic and other regulated materials, land use and reclamation, the establishment, operation, decommissioning, closure, abandonment and restoration of facilities or of natural resources, worker and public health and safety and the investigation and remediation of releases of, and exposure to, regulated substances. Tervita's failure to comply with such laws and regulations or to obtain or comply with environmental permits or its incurrence of environmental investigation or remediation costs or liabilities could result in the imposition of fines and penalties, some of which may be material, the suspension or revocation of regulatory permits, or otherwise have materially adverse effects on its on-going operations, financial position, results of operations, cash flows or its ability to make required payments on debt outstanding. Environmental laws and regulations and their enforcement are subject to frequent change and have tended to become more stringent over time. Changes in environmental regulation can result in increased operating or capital expenditures that could have a material adverse effect on Tervita's ability to comply with such regulations, its financial position, results of operations, cash flows or ability to make required payments on debt outstanding, or affect Tervita's reputation or customer demand for its services. Tervita is currently investigating, remediating and monitoring contamination at several sites at which soil or groundwater contamination is known to exist. Some environmental laws and regulations can impose liability for damages without regard to negligence or fault, and in some cases damages may be joint and several. Tervita owns,

87

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

operates or manages 28 landfills, 12 salt water disposal wells, three cavern disposal facilities, 24 treatment, recovery and disposal facilities and a number of deep underground injections wells that handle a broad variety of wastes and releases from any of these treatment or disposal units or any other operated facility could result in significant liability. Contamination identified at, or migrating from, any of its current or former sites, or at third-party or customer sites, whether currently known or unknown, may cause Tervita to incur liabilities or require it to investigate or undertake remedial action pursuant to applicable environmental laws and regulations or orders or other actions by governmental authorities. Moreover, current and future remedial obligations and environmental claims could materially adversely affect its reputation, ability to retain or attract customers, on-going operations, financial position, results of operations, cash flows or its ability to make required payments on debt outstanding.

Several of Tervita's operations require complex and detailed environmental and other permits and authorizations to establish, operate, expand and ultimately decommission its sites, including its engineered landfill and water treatment businesses. For certain of its sites, Tervita is required under applicable laws, regulations, and/or permits to conduct periodic monitoring, and internal and third-party testing. Such permits involve significant uncertainties and Tervita may experience a delay in obtaining, be unable to obtain or renew, or suffer the suspension or revocation of required permits or regulatory authorizations. Regulatory agencies may also impose more stringent or burdensome restrictions or obligations on operations when Tervita seeks to renew or amend its permits. For example, permit conditions may limit the amount or types of waste Tervita can accept, require it to make material expenditures to upgrade its facilities, implement more burdensome and expensive monitoring programs or increase the amount of financial assurance that Tervita provides to cover future facility closure costs. Any delay or inability to acquire such permits or authorizations, or renew them in a timely fashion on substantially similar terms, could have a material adverse effect on Tervita's financial position, results of operations, cash flows or its ability to make required payments on debt outstanding. In addition, governmental authorities or other third parties may bring claims against Tervita if it fails to comply with environmental laws, regulations or permits or cause environmental damage, which may result in suspension or revocation of necessary permits and authorizations, civil or criminal liability and imposition of fines or penalties.

While environmental laws and regulations impose costs on Tervita's business, it also depends on the environmental requirements and compliance obligations established by such laws and regulations for its business. Tervita's ability to manage environmental risks and compliance obligations is part of the fundamental services that Tervita offers to its customers. Any relaxation in environmental laws and regulations, or their enforcement, could make its services less valuable and could have an adverse impact on its business.

Increasing concerns about greenhouse gas concentrations and climate change may affect Tervita's business due to both increased regulation of Tervita's, or its customers', operations. Additionally, changing weather patterns may also affect Tervita's operations. Implementation of strategies for reducing greenhouse gases or other new environmental regulations could have a material impact on the nature and extent of oil and gas operations. Given the evolving nature of regulations related to climate change and the control of greenhouse gases, it is not possible to predict either the nature or timing of those requirements or the impact on Tervita's operations and financial condition. The cost of complying with current and future environmental and safety laws and regulations, and any liability or obligation imposed under them or delays resulting from such compliance could directly, or indirectly through impacts on Tervita's customers, adversely affect its financial position, results of operations, cash flows or its ability to make payments on debt outstanding. In addition, many climate change models predict less stable weather patterns and more extreme weather events. Increased rainfall or warmer weather patterns could curtail oilfield activity in western Canada or elsewhere, increase its operating costs and seasonally affect its operations at certain locations.

Canada has committed to reduce greenhouse gas ("**GHG**") emissions by 30% below 2005 levels by 2030 as part of the Paris Agreement that was entered into at the United Nations Framework Convention on Climate Change Conference of the Parties held in Paris, France in December 2015. Such Paris Agreement includes non-binding pledges from 195 countries including all major emitters globally to reduce emissions such that temperature increases are limited to "well below 2 °C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5 °C." There is a binding commitment to review and increase pledges every 5 years under the Paris Agreement. Following the Paris Agreement, the Canadian federal government announced its intention to set a revised national target that is more stringent than the target presented in Paris. This revised target will be developed as part of a federal climate plan that is expected to be finalized in 2016.

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

To date, the Government of Canada has pursued a sector-by-sector regulatory approach, focusing first on the transportation and coal-fired electricity sectors. The government has imposed fuel efficiency standards for light duty vehicles and has passed regulations for coal-fired electricity generation facilities which will apply a stringent performance standard to new coal-fired electricity generation units and those coal-fired units that have reached the end of their economic life. The Canadian federal government continues to engage with the Canadian oil and gas industry on proposed regulations for this sector, however to date no federal legislation or regulations have been passed that target this sector.

On July 1, 2007, the Specified Gas Emitters Regulation ("**SGER**") came into force under Alberta's *Climate Change and Emissions Management Amendment Act*, requiring Alberta facilities which emit more than 100,000 tonnes of GHGs annually ("**Regulated Emitters**") to reduce their GHG emissions intensity by 12% (from average 2003-2005 levels) by their ninth year of operations. On June 25, 2015, the Government of Alberta renewed the SGER for a period of two years with significant amendments while Alberta's newly formed Climate Advisory Panel conducted a comprehensive review of the province's climate change policy. The revised SGER requires that Regulated Emitters in their ninth or subsequent years of commercial operation must reduce their emissions intensity from their baseline by 15% in 2016 and 20% starting in 2017.

On November 22, 2015, as a result of the Climate Advisory Panel's Climate Leadership report, the Government of Alberta announced its Climate Leadership Plan. The Climate Leadership Plan includes a number of GHG reduction initiatives that will affect the oil and gas industry. First, the Plan introduced an economy-wide carbon levy for all emitters in the province, starting in January 2017 at $20 per tonne of GHG emissions, and increasing to $30 per tonne in January 2018. This price will increase in real terms each year after that. On-site combustion in conventional oil and H-24 gas will be levied starting January 1, 2023 to allow time for that sector to reduce emissions. Second, a 100 megatonne per year limit for GHG emissions was proposed for oil sands operations, which currently emit roughly 70 megatonnes per year. Third, the existing SGER will be replaced for large industrial facilities with a Carbon Competitiveness Regulation, in which sector specific output-based carbon allocations will be used to ensure competitiveness. Finally, the Plan announced that Alberta will reduce methane emissions from oil and gas operations by 45% by 2025 through applying new emissions design standards to new facilities and initiating a 5-year voluntary Joint Initiative on Methane Reduction and Verification to address venting and fugitive emissions from existing facilities. Regulatory mandated standards will be implemented starting in 2020 to ensure the methane reduction target is met.

On December 2, 2010, the Government of Alberta passed the *Carbon Capture and Storage Statutes Amendment Act, 2010*, which deemed the pore space underlying all land in Alberta to be, and to have always been, the property of the Crown and provided for the assumption of long-term liability for carbon sequestration projects by the Crown, subject to the satisfaction of certain conditions. This legislation is intended to encourage new carbon capture and storage projects in Alberta.

GHG legislation is in early stages of evolution in Canada, and it is relatively early to determine the impact of potential GHG reduction requirements.  It is possible that broader national or regional GHG reduction requirements may directly or indirectly impact natural gas or other fuel markets. Given the evolving nature of the debate related to climate change and the regulation of GHGs, it is not currently possible to predict either the nature of anticipated requirements or the impact on Tervita's operations and financial condition at this time.

***Legislative and regulatory initiatives in the United States and Canada relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays as well as adversely affect Tervita's support services.***

Many of Tervita's customers are heavily reliant on hydraulic fracturing and other enhanced recovery techniques, a practice that involves the pressurized injection of water, chemicals and other substances into tight rock formations to stimulate hydrocarbon production by creating fractures extending from the well bore through the rock formation to enable natural gas or oil to move more easily through the rock pores to a production well. Various Canadian and U.S. federal, provincial, territorial and state regulatory and legislative initiatives are underway to regulate, or further

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

investigate, the environmental impacts of hydraulic fracturing. Hydraulic fracturing has also generated increased public interest in the United States and Canada regarding its potential environmental impacts.

In September 2012, the Government of Quebec announced the prohibition of hydraulic fracturing. The adoption of Canadian federal or provincial, laws or regulations imposing additional permitting, disclosure or regulatory obligations related to, or otherwise limiting, the hydraulic fracturing process could make it more difficult or expensive for Tervita's customers to complete oil and natural gas wells. Increased compliance costs and reduced drilling activity could adversely impact demand for Tervita's services and thereby have a material adverse effect on its business, financial condition, results of operations and cash flows.

***Changes in laws may adversely affect Tervita and its future expansion phases.***

Most of Tervita's revenue is derived from customers in the oil and gas industry. Income tax laws or government incentive programs relating to the oil and gas industry may in the future be changed or interpreted in a manner that adversely affects the demand for Tervita's services or its operations and future expansion plans.

***Tervita's growth depends, in part, on the successful implementation of its investment and acquisition strategy.***

Tervita's growth strategy depends, in part, on identifying and implementing internal investment projects and acquiring other businesses with complementary and/or differentiated services, which Tervita may be unable to do profitably or at all. The success of Tervita's internal investment and acquisition strategy will depend, in part, on Tervita's ability to:

- identify suitable investment projects or acquisition targets;

- negotiate such acquisitions on terms acceptable to Tervita;

- complete the investment projects or acquisitions within the expected time frame and budget;

- fund the investment projects or acquisitions;

- integrate acquired businesses;

- generate meaningful returns on the investment projects that Tervita implements and improve the results of operations of the businesses that Tervita acquires; and

- obtain necessary permits and avoid or overcome any concerns expressed by regulators, including anti-trust, solvency and competition law concerns.

Tervita may fail to properly complete any or all of these steps and may also experience other impediments to Tervita's investment and acquisition strategy or the ongoing success of investments or acquisitions Tervita completes, if any.

Other companies in the industries in which Tervita competes, including companies that have greater financial resources than Tervita, may also be seeking to acquire similar businesses. Increased competition may reduce the number of acquisition targets available to Tervita and may lead to acquisitions being completed on unfavourable terms, including high purchase prices, or not at all. If acquisition candidates are unavailable or too costly, Tervita may need to change its business strategy.

Regulatory requirements or market capacity restraints could also limit Tervita's ability to grow its business through internal investments. If Tervita is unsuccessful in implementing its investment and acquisition strategy for any of the reasons discussed above or otherwise, Tervita's financial position, results of operation, cash flows or its ability to make required payments on debt outstanding could be materially adversely affected. In addition, if Tervita fails to generate positive returns on investments, its growth may slow or decline.

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

***Tervita may have difficulty identifying and executing acquisitions on favourable terms, it may be unable to successfully integrate businesses it acquires, and it may face significant exposure from unknown liabilities in connection with its acquisitions.***

Tervita has grown its business in recent years, and intends to continue to grow its business, in part, through selective acquisitions. Through such acquisitions, Tervita has expanded its operations, increased the range of services it offers to its customers and deepened its penetration in its markets. Future acquisitions may not be completed on acceptable terms and acquired assets, facilities or businesses may not be successfully integrated into Tervita's operations. From time to time Tervita considers opportunistic acquisition and combination opportunities. Some acquisition opportunities may be material. Tervita could also be subject to one or more acquisition or combination transactions including, but not limited to, transactions with other related portfolio companies, affected by its controlling shareholders. Any such acquisition or combination transactions or any other investments will be accompanied by the risks commonly encountered in connection with such transactions. Such risks include, among other things:

- a failure to discover material liabilities during the due diligence process, including the failure of prior owners of any acquired or combined businesses or their employees to comply with applicable laws or regulations, such as health, safety and environmental laws, to prevent releases of hazardous substances or wastes or their failure to fulfill their contractual obligations to their customers;

- paying more than fair market value for an acquired or combined company or assets;

- failing to implement or remediate controls, procedures and policies at acquired or combined companies that, prior to the transaction, lacked or had inadequate controls, procedures and policies;

- failing to keep existing or acquired licenses and permits;

- failing to integrate the operations and personnel of the acquired or combined businesses in an efficient, timely manner;

- assuming potential liabilities arising from the products or services of an acquired or combined company;

- managing the potential disruption to Tervita's ongoing business;

- distracting management focus from its core business; and

- impairing relationships with employees, customers, and strategic partners.

Tervita's business, financial condition and future prospects could be materially and adversely affected as a result of any of the foregoing.

In addition, the anticipated benefit of many of its acquisitions or any combination transaction may not materialize. Future acquisitions, combinations or dispositions could result in the incurrence of debt, contingent liabilities or amortization expenses, or write-offs of goodwill and other intangible assets, any of which could harm its financial condition. Future acquisitions or combination transactions may require Tervita to obtain additional financing, which may not be available on favourable terms or at all. A failure to execute Tervita's acquisition strategy could have a material adverse effect on Tervita's business, financial condition and future prospects.

***Tervita is susceptible to seasonal volatility in its operating and financial results due to weather conditions.***

Tervita's financial results are directly affected by the seasonal nature of the North American oil and natural gas industry. The first quarter incorporates the winter drilling season when a disproportionate amount of the activity takes place in western Canada. During the second quarter, soft ground conditions typically curtail oilfield activity in western Canada such that many operators are unable to transport equipment due to road bans. Consequently, this is generally Tervita's weakest three-month revenue period. Additionally, if an unseasonably warm winter prevents sufficient freezing, Tervita may not be able to access well sites and its operating results and financial condition may therefore

91

LEGAL_1:40709104.10

be adversely affected. In addition, during excessively rainy periods in any of its operating areas, equipment moves may be delayed, thereby adversely affecting revenues. The volatility in the weather and temperature can therefore create unpredictability in activity and utilization rates, which can have a material adverse effect on Tervita's business, financial condition, results of operations and cash flows.

The volatility in North American weather patterns can create unpredictability in activity and utilization rates, which can have a material adverse effect on Tervita's financial position, results of operations, cash flows or its ability to make required payments on debt outstanding.

***Tervita's Energy Marketing business is subject to various risks, including changes in industry practices related to crude oil equalization and declines in oil prices, all of which are beyond its control and could have a material adverse effect on its operations.***

Tervita's Energy Marketing division derives a material portion of its revenue from the collection of Canadian industry mandated equalization penalties applicable to crude oil with a density outside of the required band of the oil and gas industry crude oil equalization scale. The crude oil equalization scale is determined twice annually by the Crude Oil Logistics Committee (the "**COLC**"). The COLC is a Canadian oil and gas industry committee comprised of members drawn from oil and gas producers, crude oil pipeline companies, terminal operators, industry associations and regulators. Changes to the equalization scale, and specifically the amount of the equalization penalty or the widening of the required band, or changes to the industry practice related to crude oil equalization generally, all of which are beyond Tervita's control, could have a material adverse effect on its results of operations.

The division's marketing practices result in exposure to market price risk for crude oil and condensate, volume and basis exposure on marketing transactions and counterparty credit risk of non-performance. Tervita's risk management policies for this division may not be effective in mitigating these risks. Its failure to effectively mitigate these risks could result in losses for Tervita, and any such losses could be material.

Competitors of Tervita's Energy Marketing division include companies that own pipelines. These competitors could impede Tervita's access to the pipelines they control, which could have a material adverse effect on Tervita's business.

***Tervita's operations are subject to risks associated with natural disasters and operating hazards and there is no assurance that such events would be covered by insurance or whether any such insurance coverage would be adequate.***

Tervita's operations are subject to many hazards inherent in all of its businesses, including its treatment, recovery and disposal services, environmental site remediation and contracting and well services businesses. Such hazards include equipment defects, malfunction and failures, explosions, fires, damage or loss from inclement weather, earthquakes, environmental contamination and natural disasters. Any of these hazards could result in personal injury or death, damage to or destruction of equipment and facilities, suspension of operations, suspension or revocation of regulatory permits, environmental contamination and damage to the property of others, and Tervita's insurance coverage may not cover or be adequate to cover all losses or claims involving its assets or operations. For example, wildfires in northern Alberta, including Fort McMurray, in 2016 impacted Tervita's customers' exploration and production activities and therefore affected Tervita's ability to provide its services. The amount of insurance Tervita is required to maintain for environmental liability with respect to its business is governed by statutory requirements and contractual obligations. Tervita's insurance coverage in Canada and the United States is generally maintained at levels which management, in consultation with expert advisors, deems prudent, meeting or exceeding the minimum statutorily required levels, if any, and contractual obligations for the activities of its relevant divisions. Tervita cannot assure that insurance will be available on a consistent or economically feasible basis or at all. Increases in insurance costs would reduce its operating margins. Increases in insurance costs and changes in the insurance markets may limit the coverage that Tervita is able to maintain or prevent it from insuring against certain risks. Changes in Tervita's operating experience, such as an increase in accidents or lawsuits or a catastrophic loss, could cause its insurance costs to increase significantly or could cause it to be unable to obtain certain insurance. Changes in Tervita's industry and perceived risks in its business by current or prospective insurers could have a similar effect.

Liability for uninsured risks could significantly increase Tervita's expenses, and the occurrence of a significant event against which Tervita is not fully insured could have a material adverse effect on its financial position, results of

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

operations, cash flows or its ability to make required payments on debt outstanding. Large or unexpected losses may exceed Tervita's policy limits and may result in the termination or limitation of coverage, exposing it to uninsured losses, thereby adversely affecting Tervita's financial position, results of operations, cash flows or its ability to make required payments on debt outstanding. In addition, to the extent Tervita's insurers are unable to meet their obligations in full or in part, or their own obligations for claims are more than Tervita estimates, there could be a material adverse effect on Tervita's financial position, results of operations, cash flows or its ability to make required payments on debt outstanding.

***Tervita may experience impairment losses in respect of its physical assets as a result of reduced industry activity and a sustained decline in demand for services involving such assets.***

Tervita has significant investments in physical assets. Reduced industry activity could result in a material and sustained decrease in the demand for its services utilizing such assets, such as service rigs. Tervita may be required to record an impairment loss in respect of such assets. If Tervita decided to sell such assets, it may receive substantially less in consideration than the carrying book value for such assets. Tervita's decision to sell such assets would likely coincide with reduced industry activity, which could materially and adversely affect the price at which Tervita may be able to sell such assets and significantly prolong the time it takes to consummate a sale for such illiquid assets.

***Tervita's future success depends on its ability to attract and retain qualified workers.***

Tervita's future success and financial performance depends substantially on its ability to attract and retain qualified and experienced people to manage and operate its businesses. In particular, the success of each of Tervita's divisions is significantly dependent upon attracting and retaining key personnel having skills specific to each such division. There is demand for such highly skilled personnel in Tervita's main markets and it may be unable to obtain and retain appropriate levels of skilled labour. In the event of a labour shortage, Tervita could experience difficulty delivering its services in a high-quality or timely manner and could be forced to increase wages in order to attract and retain employees, which would result in higher operating costs and reduced profitability.

***Tervita depends on the services of its senior management, the loss of any members of which could materially harm its business.***

Tervita's senior management is important to its success because they have been instrumental in setting Tervita's strategic direction, operating its business, setting and managing regulatory compliance and governance standards and performance, providing technical expertise, identifying, recruiting and training key personnel, identifying expansion opportunities and arranging necessary financing. There is no assurance that Tervita will be successful in retaining such personnel or attracting qualified replacements should any such personnel leave. The loss of the services of any member of senior management could materially adversely affect Tervita's financial condition, results of operation, cash flows or its ability to make required payments on debt outstanding.

***Tervita must comply with health and safety laws and regulations at its facilities and in connection with its operations and failure to do so could result in significant liability and/or fines and penalties.***

Tervita's activities are subject to a wide range of national, provincial, federal, state and local occupational health and safety laws and regulations. These health and safety laws are subject to frequent change, as are the priorities of those who enforce them. Failure to comply with these health and safety laws and regulations could lead to third-party claims, criminal and regulatory violations, civil fines, revocation or suspension of regulatory permits and changes in the way Tervita operates its facilities and operations, which could increase the cost of operating its business and have a material adverse effect on its financial position, results of operations and cash flows.

***A failure by Tervita's employees to follow applicable procedures and guidelines or on-site accidents could have a material adverse effect on its business.***

Tervita requires its employees to comply with various internal procedures and guidelines, including an environmental management program, health and safety guidelines, and risk management and credit policies. The failure by Tervita's employees to comply with its internal environmental, health and safety guidelines could result in personal injuries, property damage or non-compliance with applicable governmental laws and regulations, which may lead to fines,

93

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

remediation obligations, revocation or suspension of regulatory permits, or third-party claims. Tervita's safety record is important in its customers' selecting Tervita for their jobs and an increase in accidents may result in Tervita losing contracts or not winning additional contracts. The failure by Tervita's employees to comply with Tervita's risk management and credit policies could result in increased exposure to fluctuations in oil and other commodities prices and potential losses resulting therefrom. Any such fines, remediation obligations, revocation or suspension of regulatory permits, third-party claims or losses could have a material adverse effect on Tervita's financial position, results of operations and cash flows. In addition, on-site accidents can result in injury or death to Tervita's or other contractors' employees or damage to Tervita's or other contractors' equipment and facilities. Any fines or third-party claims resulting from any such on-site accidents could have a material adverse effect on Tervita's business.

***A deterioration in Tervita's safety record would harm its relationships with customers, make it less likely for customers to contract for its services and subject Tervita to penalties and fines and revocation or suspension of regulatory permits, which could adversely affect its business, operating results and financial condition.***

Tervita's ability to retain existing customers and attract new business is dependent on many factors, including its ability to demonstrate that Tervita can reliably and safely operate its business. Existing and potential customers consider the safety record of their service providers to be of high importance in their decision to engage third-party servicers. If one or more accidents were to occur at a site, the affected customer may seek to terminate or cancel Tervita's contract and may be less likely to continue to use Tervita's services. In addition, it is possible that Tervita will experience numerous or particularly severe accidents in the future, causing its safety record to deteriorate. This may be more likely as Tervita continues to grow, if it experiences high employee turnover or labour shortage, or adds personnel who may not be very experienced. In addition, Tervita could be subject to liability for damages as a result of such accidents and could incur penalties or fines for violations of applicable safety laws and regulations.

***Fluctuations in exchange rates may adversely affect Tervita's financial condition.***

Although Tervita's financial results are reported in Canadian dollars, a portion of Tervita's activities and indebtedness, including portions of the Senior Secured Credit Facilities and the Notes are transacted or denominated in or referenced to U.S. dollars. Revenues, expenses and capital expenditures of Tervita's oil and gas operations outside of Canada are primarily U.S. dollar-denominated. Fluctuations in exchange rates between the U.S. and Canadian dollar, and between the U.S. or Canadian dollar and other foreign currencies, could have a material adverse effect on Tervita's financial position, results of operations, cash flows or its ability to make payments on its indebtedness. Since Tervita presents its combined consolidated financial statements in Canadian dollars, any change in the value of the Canadian dollar relative to the U.S. dollar during a given financial reporting period would result in a foreign currency loss or gain on the translation of its U.S. dollar assets into Canadian dollars. Consequently, Tervita's reported earnings could fluctuate materially as a result of foreign exchange translation gains or losses. In addition, as world oil prices are quoted in U.S. dollars, fluctuations in the Canada/U.S. dollar exchange rate could also have an impact on its customers, which could affect the demand for its services and have a material adverse impact on Tervita.

***The inability of counterparties or customers to fulfill their obligation to Tervita subjects Tervita to credit risk and could adversely impact its results of operations.***

Most of Tervita's revenue is derived from customers in the oil and gas industry. As a result, Tervita has a concentration of industry credit risk. Tervita generally extends unsecured credit to its customers whose revenues may be impacted by, among other things, fluctuations in commodity prices and general changes in economic conditions. In addition, Tervita's Energy Marketing division buys crude oil and condensate from third parties and, in turn, sells that crude oil and condensate to customers on the open market. Tervita bears the risk of loss if a buyer fails to perform its obligations in connection with its sale of crude oil and condensate to it. A significant decline or volatility in the oil and gas industry may increase its credit risk and such a decline or any failure by its customers to fulfill their obligations generally could materially adversely impact Tervita's financial position, results of operations, cash flows or its ability to make required payments on debt outstanding.

***Technology Tervita uses in its business is increasingly subject to protection by intellectual property rights.***

Tervita has invested a significant amount of capital over a number of years into the engineering and development of its various facilities. The proprietary information attached to this development has been protected by the prudent use

94

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale
Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

of confidentiality agreements to supplement the general protection afforded these trade secrets under common law. In general, the technology Tervita uses in its business has not been protected by registered intellectual property rights. Increasingly, technology used in its business is being protected by intellectual property rights and some of these rights may be owned by third parties, which may lead to increased expenses to gain or maintain the right to use such rights or may lead to litigation.

***Tervita's TRD, cavern and engineered landfill operations could be adversely affected by more stringent closure and post-closure obligations and a variety of other risks.***

Operating and maintaining TRDs, caverns and engineered landfills are capital-intensive activities and generally require performance bonds, letters of credit or other forms of financial assurance to secure performance, closure, post-closure and financial obligations. In particular, the regulatory agencies of many of the provinces and states in which Tervita operates require it to post closure bonds in connection with the operation of its waste management facilities. As Tervita acquires additional facilities or expands its existing facilities, these obligations will increase. Additionally, regulatory agencies may require Tervita to post closure bonds in increased amounts as a prerequisite to the modification of its existing permits. Tervita has material financial obligations to pay closure and post-closure costs in respect of its TRDs, engineered landfills and caverns and injection wells. Tervita has estimated these costs and made provisions for them, but these costs could exceed Tervita's current provisions as a result of, among other things, any Canadian and U.S. federal, provincial, territorial, state or local government regulatory action including, but not limited to, unanticipated closure and post-closure obligations or government-forced closure of Tervita's facilities on an expedited basis. More stringent closure and post-closure obligations due to changes in law or otherwise could substantially increase its operating costs and cause its net income to decline.

Tervita cannot ensure that it will maintain its relationships with or continue to provide services to any particular customer at current levels, or that customers will continue to utilize its TRDs, caverns and engineered landfills and pay rates that generate acceptable margins for Tervita.  Tervita's margins could decrease if the volume of waste processed and disposed of by these customers' decreases or if Tervita is unable to increase the rates charged to correspond with increasing costs of operations. In addition, new agreements for processing or disposal services entered into by Tervita may not be obtainable on terms acceptable to Tervita or, if obtained, may not be obtained on terms consistent with current practices, in which case Tervita's revenue and profitability could decline. Tervita also cannot ensure that the parties from whom it leases, licenses or otherwise occupies the land on which certain of its facilities are situated will honor the terms of those leases, licenses or other occupancy agreements or renew its current leases, licenses or other occupancy agreements upon their expiration on commercially reasonable terms or at all. Any such failure to honor the terms of the leases, licenses or occupancy agreements or renew its current leases, licenses or occupancy agreements could have a material adverse effect on Tervita's financial position, results of operations and cash flows.

A steady volume of waste is required in order for a TRD, cavern or engineered landfill to maintain profitable operations. Any change in law or to its regulatory permits could potentially modify, reduce or eliminate the type or amount of waste that requires processing or disposal or modify the processing or disposal requirements. A decrease in the amount of waste processed and disposed of or a decrease in the prices charged by Tervita for processing or disposal could have a material adverse effect on Tervita's financial position, results of operations, cash flows or its ability to make required payments on debts outstanding.

***High fuel costs may adversely affect Tervita's business.***

The price and supply of fuel is unpredictable and fluctuates based on events outside of Tervita's control, including geopolitical developments, supply and demand for oil and gas, actions by the Organization of the Petroleum Exporting Countries and other oil and gas producers, war and unrest in oil producing countries, regional production patterns, weather events and environmental concerns. Tervita needs a significant amount of fuel to run its operations and any price escalations or reductions in supply could materially reduce its profit margins if Tervita is unable to correspondingly increase the price of its services. Tervita does not hedge or otherwise financially mitigate its exposure to fluctuations in fuel costs.

If you have any questions or need assistance completing your proxy or voting instruction form, please call Kingsdale Shareholder Services at 1-866-851-2484 or email contactus@kingsdaleshareholder.com

LEGAL_1:40709104.10

*Operational dependence on certain of Tervita's joint venture arrangements.*

Tervita participates in various joint venture arrangements with other companies operating some of the assets. As a result, Tervita has limited ability to exercise influence over the operation of those assets or their associated costs, which could adversely affect its financial performance. Tervita's return on assets operated by others depends upon a number of factors that may be outside of its control, including the timing and amount of capital expenditures, the operator's expertise and financial resources, the selection of technology and risk management practices.

*Some of Tervita's engineered landfills are owned by third parties.*

Some of the engineered landfills Tervita operates are owned by third parties but operated by Tervita under contract. If Tervita breaches the terms of such contracts, they could be terminated or Tervita could be subject to penalties. Tervita also cannot ensure that the parties for whom it contracts will honor the terms of their contracts or that they will renew Tervita's current contracts upon their expiry on commercially reasonable terms or at all. Any default by Tervita under such contracts or any failure by the third parties to honor or renew Tervita's current contracts could have a material adverse effect on Tervita's financial position, results of operations and cash flow.

*Increases in inflation could adversely affect Tervita's cash flows, liquidity and results of operations.*

The construction costs and the increased cost of raw and finished materials are the primary inflation factors facing us. Moreover, certain of Tervita's other operating expenses are expected to increase with inflation, including wages and benefits paid to employees. Inflationary pressures could adversely affect Tervita's cash flows, liquidity and results of operations.

## AUDITORS, TRANSFER AGENT, REGISTRAR AND TRUSTEE

The auditors of the Corporation are Ernst & Young LLP, Chartered Professional Accountants, Suite 2200, 215 – 2nd Street S.W., Calgary, Alberta, T2P 1M4.  Ernst & Young LLP has confirmed it is independent of the Corporation within the meaning of the Rules of Professional Conduct of the Institute of Chartered Accountants of Alberta.  Ernst & Young LLP is registered with the Public Company Accounting Oversight Board. The annual consolidated financial statements and the annual operating statements of the Corporation have been audited by Ernst & Young LLP and are attached hereto as Schedule "A" to Appendix "H" in reliance on the authority of said firm as experts in auditing and accounting.

The registrar and trustee for the Unsecured Notes is Delaware Trust Company at its principal office in New York, New York.

The registrar and trustee for the Subordinated Notes is Wilmington Savings Fund Society, FSB, as successor trustee at its principal office in **[New York, New York.]**

The transfer agent and registrar for the New Shares will be TSX Trust Company at its principal office in Calgary, Alberta.

## INTERESTS OF EXPERTS

The partners and associates of each of Fasken Martineau DuMoulin LLP and Osler, Hoskin & Harcourt LLP, as a group, owned, directly or indirectly, less than 1% of the outstanding Notes.

Ernst & Young LLP has confirmed it is independent of the Corporation within the meaning of the Rules of Professional Conduct of the Institute of Chartered Accountants of Alberta.

## LEGAL MATTERS

Certain legal matters in connection with the Recapitalization will be passed upon on behalf of Tervita by Fasken Martineau DuMoulin LLP and Osler, Hoskin & Harcourt LLP.

96

LEGAL_1:40709104.10

### QUESTIONS AND FURTHER ASSISTANCE

If you have any questions about the information contained in this Information Circular or require assistance in completing your form of proxy, please contact the following:



The Exchange Tower
130 King Street West, Suite 2950, P.O. Box 361
Toronto, Ontario
M5X 1E2
www.kingsdaleshareholder.com

**North American Toll Free Phone:**

# 1-866-851-2484

**Email: contactus@kingsdaleshareholder.com**

**Facsimile: 416-867-2271**

**Toll Free Facsimile: 1-866-545-5580**

**Outside North America, Banks and Brokers Call Collect: 416-867-2272**

LEGAL_1:40709104.10

**APPROVAL OF THE CIRCULAR BY THE BOARD OF DIRECTORS**

The contents of this Information Circular and the sending thereof to the Unsecured/Subordinated Noteholders and RSAC Shareholders have been approved by the Board of Directors and the board of directors of RSAC.

DATED at Calgary, Alberta this 14th day of October, 2016

**By Order of the Board of Directors of**
**Tervita Corporation and Red Sky Acquisition Corp.**

(signed) "●"

Chris Synek
President and Chief Executive Officer
Tervita Corporation

Draft

98

**CONSENT OF BARCLAYS**

We hereby consent to the inclusion of our firm's name and to the references to our firm's Fairness Opinion dated October ●, 2016 and our CBCA Opinion dated October ●, 2016 under *"Summary", "Background to and Reasons for the Recapitalization", "Description of the Recapitalization – Barclays Opinions" and "Description of the Recapitalization – Recommendation of the Board of Directors"* in the Information Circular and to the inclusion of the text of the Fairness Opinion and CBCA Opinion in the Information Circular. The Barclays Opinions were given as at October ●, 2016 and remain subject to the assumptions, qualifications and limitations contained therein. In providing our consent, we do not intend that any person other than the Board of Directors of Tervita Corporation shall be entitled to rely upon the Barclays Opinions.

(signed) "●"

●, 2016

**<u>Exhibit D to the Second Kersley Affidavit</u>**

**Plan of Arrangement as Filed on October 7, 2016**

THIS IS EXHIBIT "**D**"

Referred to in the Affidavit of

**Stephen Kersley**

Affirmed before me this 7th

day of October A.D. 2016

_____
A COMMISSIONER FOR OATHS
IN AND FOR ALBERTA

Nathan A. White
Student-at-Law

**Court File No. 1601-12176**

*ALBERTA*
**COURT OF QUEEN'S BENCH**

**IN THE MATTER OF AN APPLICATION UNDER SECTION 192
OF THE CANADA BUSINESS CORPORATIONS ACT, R.S.C. 1985,
c. C-44, AS AMENDED**

AND IN THE MATTER OF A PROPOSED ARRANGEMENT IN RESPECT OF TERVITA
CORPORATION, 9894942 CANADA LTD., RED SKY HOLDINGS 1 INC., RED SKY
HOLDINGS 2 INC., RED SKY HOLDINGS 3 INC., CCS CANADA (CANADIAN
HOLDINGS) INC., CCS INTERNATIONAL HOLDINGS INC., HAZCO INDUSTRIAL
SERVICES LTD., TERVITA EQUIPMENT RENTALS LTD., TERVITA ENVIRONMENTAL
SERVICES LTD., TERVITA METAL SERVICES LTD., TERVITA PRODUCTION
SERVICES LTD., TERVITA WASTE PROCESSING LTD., AND ARKLA DISPOSAL
SERVICES, INC.

---

**PLAN OF ARRANGEMENT**

---

**Article 1 DEFINITIONS AND INTERPRETATION**.................................................................1

1.1    Definitions ...................................................................................................................1

1.2    Rules of Interpretation................................................................................................18

1.3    Currency ....................................................................................................................19

1.4    Date for Any Action...................................................................................................19

1.5    Time ...........................................................................................................................19

1.6    Governing Law ..........................................................................................................19

1.7    Paramountcy ..............................................................................................................20

1.8    Successors and Assigns .............................................................................................20

**Article 2 ARRANGEMENT** ...............................................................................................**20**

2.1    Persons Affected and Unaffected ..............................................................................20

2.2    Treatment of Secured Debtholders ............................................................................20

2.3    Treatment of Unsecured Noteholders ........................................................................21

2.4    Treatment of Subordinated Noteholders ....................................................................22

2.5    Treatment of Electing Eligible Other Unsecured Noteholders and Backstop Parties ....22

2.6    Treatment of Existing Equity Holders .......................................................................23

**Article 3 ISSUANCES, DISTRIBUTIONS AND PAYMENTS** .......................................**23**

3.1    Issuance of New Shares..............................................................................................23

3.2    Delivery of New Common Shares to Unsecured Noteholders ....................................24

3.3    Delivery of New Preferred Shares to New Investment Participants and the Backstop Parties ..............................................................................................................................24

3.4    Delivery of Cash Payment and Early Consent Cash Payment ....................................25

3.5    Delivery and Payments to Secured Debtholders .........................................................26

3.6    Payment of Trustee Fees and Expenses .....................................................................27

3.7    Application of Plan Distributions ..............................................................................27

**Article 4 IMPLEMENTATION**............................................................................................**27**

4.1    Corporate Authorizations ..........................................................................................27

4.2    Fractional Interests ....................................................................................................28

4.3    Pre-Effective Date Transaction..................................................................................28

4.4    Effective Date Transactions .......................................................................................28

4.5    Effective Time Procedures .........................................................................................33

4.6    Release of Funds from Escrow ...................................................................................33

4.7    Calculations ...............................................................................................................33

4.8    Transfers Free and Clear ............................................................................................33

4.9    Capacity of Backstop Parties......................................................................................34

4.10    Withholding ......................................................................................................34

**Article 5 RELEASES ........................................................................................................34**

5.1    Release of Released Parties ..........................................................................34

**Article 6 CONDITIONS PRECEDENT AND EFFECTIVENESS ...................................34**

6.1    Conditions to Plan Implementation .............................................................34

6.2    Waiver of Conditions ...................................................................................35

6.3    Effectiveness.................................................................................................35

**Article 7 GENERAL .........................................................................................................36**

7.1    Waiver of Defaults .......................................................................................36

7.2    Deeming Provisions .....................................................................................36

7.3    Modifications to Plan ...................................................................................36

7.4    Different Capacities .....................................................................................37

7.5    Consent of the Majority Initial Supporting Parties .....................................37

7.6    Notices..........................................................................................................37

7.7    Further Assurances.......................................................................................39

# PLAN OF ARRANGEMENT

## ARTICLE 1
## DEFINITIONS AND INTERPRETATION

### 1.1    Definitions

In this Plan, unless otherwise stated, the following words and terms will have the following meanings:

"**8% Secured Notes**" means the 8% senior secured notes due 2018 issued pursuant to the Secured Notes Indenture.

"**8% Secured Noteholders**" means the holders of the 8% Secured Notes.

"**9% Secured Notes**" means the 9% senior secured notes due 2018 issued pursuant to the Secured Notes Indenture.

"**9% Secured Noteholders**" means the holders of the 9% Secured Notes.

"**9.75% Unsecured Notes**" means the 9.75% senior unsecured notes due 2019 issued pursuant to the 9.75% Unsecured Notes Indenture.

"**9.75% Unsecured Notes Indenture**" means the indenture dated as of October 24, 2012, among Tervita, the guarantors from time to time party thereto and the Unsecured Notes Trustee, governing the 9.75% Unsecured Notes, as amended, modified, restated or supplemented from time to time.

"**10.875% Unsecured Notes**" means the 10.875% senior unsecured notes due 2018 issued pursuant to the 10.875% Unsecured Notes Indenture.

"**10.875% Unsecured Notes Indenture**" means the indenture dated as of December 3, 2013, among Tervita, the guarantors from time to time party thereto and the Unsecured Notes Trustee, governing the 10.875% Unsecured Notes, as amended, modified, restated or supplemented from time to time.

"**ABCA**" means the *Business Corporations Act* (Alberta) and the regulations thereto, as now in effect and as it may be amended from time to time prior to the Effective Date.

"**Additional Backstop Commitment Amount**" means C$26.7 million.

"**Additional Backstop Commitment Shares**" means that number of New Investment Shares obtained by dividing: (i) the Additional Backstop Commitment Amount, by (ii) the Subscription Price.

"**Additional Backstop Initial Commitment Amount**" means the amount of the Additional Backstop Initial Commitment Shares, if any, multiplied by the Subscription Price.

- 2 -

"**Additional Backstop Initial Commitment Shares**" means the amount of New Investment Shares equal to the Additional Backstop Party's Share Subscription Commitment, if any.

"**Additional Backstop Party**" means that certain Unsecured Noteholder that entered into the Backstop Commitment Letter as of September 14, 2016, as the "Additional Backstop Party" thereunder, any Joining Backstop Party that accepts and assumes all of the rights and obligations of such Unsecured Noteholder and becomes party to the Backstop Commitment Letter in accordance therewith as an "Additional Backstop Party", and each of their respective permitted assigns.

"**Additional Secured Exchange Shares**" means the number of New Preferred Shares, rounded down to the nearest whole number, calculated by multiplying: (i) the number that is equal to the Initial Supporting Parties' Secured Debtholder Claims for accrued and unpaid interest from and after September 15, 2016 to the Effective Date (including, for greater certainty, the Secured Interest Payments Returned Amount) divided by $1,000,000, by (ii) 125,000.

"**Affected Existing Equity**" means all of the Existing Equity, except for the rights attributed to the voting common shares and the non-voting common shares issued by RSH3 as set out in the articles of RSH3.

"**Affected Existing Equity Holders**" means, collectively, the holders of Affected Existing Equity.

"**Applicants**" means, collectively, Tervita and ArrangeCo.

"**ArrangeCo**" means 9894942 Canada Ltd., a corporation incorporated pursuant to the CBCA and a wholly-owned subsidiary of Tervita.

"**Arrangement**" means an arrangement under section 192 of the CBCA on the terms and subject to the conditions set out in this Plan, subject to any amendments or variations thereto made in accordance with this Plan or made at the direction of the Court in the Interim Order, the Final Order or otherwise in each case with the consent of Tervita and the Majority Initial Supporting Parties, each acting reasonably.

"**Articles of Arrangement**" means the articles of arrangement of the Applicants in respect of the Arrangement that are required by the CBCA to be filed with the Director after the Final Order has been made in order for the Arrangement to become effective on the Effective Date.

"**Backstop Commitment Letter**" means the backstop commitment letter dated as of September 14, 2016, among Tervita, the Initial Backstop Parties, the Additional Backstop Party and any Joining Backstop Parties that execute a Backstop Joinder Agreement from time to time in accordance with the terms of the Backstop Commitment Letter.

"**Backstop Consideration**" means the non-refundable cash commitment fee in the amount equal to the Subscription Price multiplied by the Backstop Consideration Shares.

"**Backstop Consideration Shares**" means 1,860,000 New Preferred Shares to be issued, in the aggregate, to the Initial Backstop Parties and the Additional Backstop Party on the Effective Date in accordance with this Plan.

"**Backstop Joinder Agreement**" means an agreement substantially in the form of Schedule G to the Backstop Commitment Letter.

"**Backstop Parties**" means, collectively, each Initial Backstop Party and the Additional Backstop Party, and their respective permitted assigns.

"**Backstop Record Date**" means September 14, 2016.

"**beneficial owner**" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act. The terms "beneficially owns," "beneficial ownership" and "beneficially owned" have a corresponding meaning.

"**Business Day**" means any day, other than a Saturday, a Sunday or a statutory or civic holiday, on which commercial banks are generally open for business in Calgary, Alberta and New York, New York.

"**Canadian Dollars**" or "**C$**" means the lawful currency of Canada.

"**Cash Payment**" means C$20 million.

"**CBCA**" means the *Canada Business Corporations Act,* R.S.C. 1985, c. C-44, as amended, and the regulations thereto, as now in effect and as may be amended from time to time prior to the Effective Date.

"**CBCA Proceeding**" means the proceedings commenced by the Applicants under the CBCA in connection with the Plan under Court Action No. 1601-12176.

"**CDS**" means the CDS Clearing and Depository Services Inc. and its successors and assigns.

"**Certificate of Arrangement**" means the certificate giving effect to the Arrangement to be issued by the Director pursuant to section 192(7) of the CBCA upon receipt of the Articles of Arrangement in accordance with section 262 of the CBCA.

"**Claim**" means any right or claim of any Person that may be asserted or made, in whole or in part, in any capacity, whether or not asserted or made, in connection with any indebtedness, liability or obligation of any kind whatsoever, and any interest accrued thereon or costs payable in respect thereof, whether at law or in equity, including by reason of the commission of a tort (intentional or unintentional), by reason of any breach of contract or other agreement (oral or written), by reason of any breach of duty (including, any legal, statutory, equitable or fiduciary duty) or by reason of any equity interest, right of ownership of or title to property or assets or right to a trust or deemed trust (statutory, express, implied, resulting, constructive or otherwise), and together with any security enforcement costs or legal costs associated with any such claim, and any right or entitlement to the issuance of new notes, shares or securities in whatever form, and whether or not any indebtedness, liability or obligation is reduced to judgment,

liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, perfected, unperfected, present or future, known or unknown, by guarantee, warranty, surety or otherwise, and whether or not any right or claim is executory or anticipatory in nature, any claim, or any right or ability of any Person to advance a claim for an accounting, reconciliation, contribution, indemnity, restitution or otherwise with respect to any matter, grievance, action (including any class action or proceeding before an administrative tribunal), cause or chose in action, whether existing at present or commenced in the future, including, without limiting the generality of any of the foregoing, any make-whole, redemption premium, change of control payment, security interest, charge, mortgage or other encumbrance in connection with any of the foregoing.

"**Collateral Trust Agreement**" means that certain collateral trust agreement dated as of February 14, 2013, among Tervita, the guarantors from time to time party thereto, the Revolver Administrative Agent, the Term Loan Administrative Agent, the Secured Notes US Trustee, the Secured Notes Canadian Trustee and the Collateral Trustee.

"**Collateral Trustee**" means Wilmington Trust, National Association, in its capacity as Canadian collateral trustee and U.S. collateral trustee under the Collateral Trust Agreement.

"**Commitment Pro Rata Share**" means, as to any Backstop Party, the percentage obtained by dividing: (i) (A) in the case of an Initial Backstop Party, the result obtained by multiplying C$345.3 million by such Initial Backstop Party's Initial Backstop Pro Rata Share, or (B) in the case of the Additional Backstop Party, C$26.7 million, by (ii) C$372 million.

"**Court**" means the Alberta Court of Queen's Bench.

"**Debt Instrumentholder**" means the Registered Holder or beneficial holder of any Debt Instrument.

"**Debt Instrumentholder Claims**" means, collectively, the Secured Debtholder Claims, the Unsecured Noteholder Claims and the Subordinated Noteholder Claims.

"**Debt Instrumentholder Released Parties**" means, collectively, (i) the Initial Supporting Parties, the Supporting Unsecured Noteholders, the Supporting Subordinated Noteholders, the Unsecured Notes Trustee and the Subordinated Notes Trustee, and (ii) each of their respective current and former officers, directors, employees, auditors, financial advisors, legal counsel and agents.

"**Debt Instruments**" means, collectively, the Term Loan Credit Agreement, the Notes and the Indentures.

"**Definitive Notes**" means "Definitive Notes" under and as defined in the Secured Notes Indenture.

"**Depositary**" means TSX Trust Company.

"**Director**" means the Director appointed under section 260 of the CBCA.

"**DTC**" means the Depository Trust & Clearing Corporation and its successors and assigns.

"**Early Consent Cash Payment**" means C$5 million.

"**Early Consent Shares**" means the number of New Common Shares calculated by multiplying the aggregate number of New Shares to be issued pursuant to the Plan by 0.5%, which New Common Shares shall be issued to Early Consenting Unsecured Noteholders on the Effective Date in accordance with the steps set forth in Section 4.4.

"**Early Consenting Subordinated Noteholder Pro Rata Share**" means, as to any Early Consenting Subordinated Noteholder, the percentage, obtained by dividing: (i) the aggregate principal amount of all outstanding Subordinated Notes held by such Early Consenting Subordinated Noteholder on the Voting Record Date and any accrued and unpaid interest thereon, by (ii) the aggregate principal amount of all outstanding Subordinated Notes held by all Early Consenting Subordinated Noteholders on the Voting Record Date and any accrued and unpaid interest thereon.

"**Early Consenting Subordinated Noteholders**" means those Subordinated Noteholders that enter into the Subordinated Noteholder Support Agreement on or before October 14, 2016.

"**Early Consenting Unsecured Noteholder Pro Rata Share**" means, as to any Early Consenting Unsecured Noteholder, the percentage obtained by dividing: (i) the aggregate principal amount of all outstanding Unsecured Notes held by such Early Consenting Unsecured Noteholder on the Voting Record Date and any accrued and unpaid interest thereon, by (ii) the aggregate principal amount of all outstanding Unsecured Notes held by all Early Consenting Unsecured Noteholders on the Voting Record Date and any accrued and unpaid interest thereon.

"**Early Consenting Unsecured Noteholders**" means the Initial Supporting Parties and those other Unsecured Noteholders that enter into the Unsecured Noteholder Support Agreement on or before October 14, 2016.

"**Effective Date**" means the date shown on the Certificate of Arrangement issued by the Director under the CBCA and giving effect to the Arrangement.

"**Effective Time**" means a time on the Effective Date as Tervita and the Majority Initial Supporting Parties may agree, each acting reasonably.

"**Electing Eligible Other Unsecured Noteholder**" means an Eligible Unsecured Noteholder that is an Other Unsecured Noteholder or an Additional Backstop Party and who has duly completed and submitted a Participation Form in accordance with the terms thereof.

"**Electing Eligible Other Unsecured Noteholder Commitment Amount**" means, as to any Electing Eligible Other Unsecured Noteholder, the amount equal to such Electing

Eligible Other Unsecured Noteholder's Electing Eligible Other Unsecured Noteholder Commitment Shares multiplied by the Subscription Price.

"**Electing Eligible Other Unsecured Noteholder Commitment Shares**" means, as to any Electing Eligible Other Unsecured Noteholder, the amount equal to such Electing Eligible Other Unsecured Noteholder's Share Subscription Commitment.

"**Eligible Unsecured Noteholder**" means a Person that: (i) is an Unsecured Noteholder on the Voting Record Date (or a transferee of such Person prior to the Participation Deadline that has submitted a completed transfer certificate included in the Participation Form); (ii) is an "accredited investor" within the meaning of applicable Canadian securities laws; (iii) is either (a) a Person in the United States, or a U.S. Person within the meaning of Regulation S under the US Securities Act outside the United States, in each case, that is a "qualified institutional buyer" within the meaning of Rule 144A under the US Securities Act, or (b) is outside the United States and is not a U.S. Person within the meaning of Regulation S under the US Securities Act; and (iv) if such Person is resident outside of Canada and the United States, it is qualified to participate in the New Investment Offering in accordance with the Laws of its jurisdiction of residence without obliging Tervita to register the New Investment Shares or file a prospectus or other disclosure document or to make any other filings or become subject to any reporting or disclosure obligations that Tervita is not already obligated to make, and (if required by Tervita), has delivered to Tervita evidence satisfactory to Tervita.

"**Escrow Agent**" means TSX Trust Company.

"**Escrow Agreement**" means the escrow agreement to be entered into by Tervita and the Escrow Agent for the purposes of the Escrow Agent receiving the Electing Eligible Other Unsecured Noteholder Commitment Amounts.

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended, and the rules promulgated thereunder.

"**Exchanged Secured Debt**" means the aggregate principal amount of Secured Debtholder Claims held by the Initial Supporting Parties as of the Backstop Record Date, being principal amounts of US$15,908,738 under the Term Loan Credit Agreement, US$219,111,000 of 8% Secured Notes and CDN49,032,000 of 9.00% Secured Notes, plus accrued and unpaid interest owing on such amounts up to the Effective Date (including, for greater certainty, the Secured Interest Payments Returned Amount).

"**Existing Directors**" means the directors of Tervita immediately prior to the Effective Time.

"**Existing Equity**" means, collectively, the Existing RSH3 Equity and the Existing Tervita Equity.

"**Existing Equity Holders**" means, collectively, the holders of Existing Equity.

"**Existing RSH3 Equity**" means all of the equity of RSH3 existing immediately prior to the Effective Time, including, without limitation, (i) all of the voting and non-voting

common shares of RSH3, (ii) any preferred shares or other classes of shares of RSH3, and (iii) any options, warrants, conversion privileges, rights to receive cash payments in respect of any employee equity plan, calls, subscriptions, exchangeable securities or other rights, agreements, arrangements or commitments (pre-emptive, contingent or otherwise) obligating RSH3 to issue or sell shares in the capital of RSH3 or any securities or obligations of any kind convertible into or exchangeable for such shares.

"**Existing Tervita Equity**" means all of the equity of Tervita existing immediately prior to the Effective Time, including, without limitation, (i) all of the voting and non-voting common shares of Tervita, (ii) any preferred shares or other classes of shares of Tervita, and (iii) any options, warrants, conversion privileges, rights to receive cash payments in respect of any employee equity plan, calls, subscriptions, exchangeable securities or other rights, agreements, arrangements or commitments (pre-emptive, contingent or otherwise) obligating Tervita to issue or sell shares in the capital of Tervita or any securities or obligations of any kind convertible into or exchangeable for such shares.

"**Final Order**" means the final order of the Court approving the Arrangement under to section 192(4) of the CBCA, which shall include such terms as may be necessary or appropriate to give effect to the Arrangement and this Plan, in form and substance satisfactory to Tervita and the Majority Initial Supporting Parties, each acting reasonably.

"**Finance LP**" means Red Sky Finance LP.

"**Funding Deadline**" means 5:00 p.m. (Calgary time) on the date that is three (3) Business Days prior to the Effective Date.

"**Global Notes**" means "Global Notes" under and as defined in the Secured Notes Indenture.

"**Governmental Entity**" means any government, regulatory authority, governmental department, agency, commission, bureau, official, minister, Crown corporation, court, board, tribunal or dispute settlement panel or other law, rule or regulation-making organization or entity: (i) having or purporting to have jurisdiction on behalf of any nation, province, territory or state or any other geographic or political subdivision of any of them, or (ii) exercising, or entitled or purporting to exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power.

"**Group Members**" means, with respect to any holder of New Shares, all other Persons who may form a "group" (within the meaning of Rule 13d-5(b)(1) under the Exchange Act) with such holder with respect to beneficial ownership of any New Shares.

"**Holdings LP**" means Red Sky Holdings LP.

"**Income Tax Act**" means the *Income Tax Act* (Canada), R.S.C., 1985, c. 1 (5th Supp.), as amended, and the regulations thereto, as now in effect and as may be amended from time to time prior to the Effective Date.

"**Indentures**" means, collectively, the Secured Notes Indenture, the 9.75% Unsecured Notes Indenture, the 10.875% Unsecured Notes Indenture and the Subordinated Notes Indenture.

"**Indirect Securityholders**" means, collectively, the RSAC Shareholders and the holders of RSH LP Interests.

"**Information Circular**" means the management information circular of Tervita dated October 14, 2016.

"**Initial Backstop Parties**" means, collectively, those certain Unsecured Noteholders that entered into the Backstop Commitment Letter as of September 14, 2016, as "Initial Backstop Parties" thereunder, each Joining Backstop Party that becomes a party to the Backstop Commitment Letter in accordance therewith as an "Initial Backstop Party", and each of their respective permitted assigns.

"**Initial Backstop Party Backstop Commitment Amount**" means the amount of Initial Backstop Party Backstop Commitment Shares multiplied by the Subscription Price.

"**Initial Backstop Party Backstop Commitment Shares**" means the aggregate number of New Investment Shares to be issued under the New Investment Offering, less the sum of: (i) the aggregate of the Initial Backstop Party Initial Commitment Shares, (ii) the aggregate of the Electing Eligible Other Unsecured Noteholder Commitment Shares actually purchased on the Effective Date, and (iii) the Additional Backstop Initial Commitment Shares and the Additional Backstop Commitment Shares actually purchased on the Effective Date.

"**Initial Backstop Party Initial Commitment Amount**" means the amount of Initial Backstop Party Initial Commitment Shares multiplied by the Subscription Price.

"**Initial Backstop Party Initial Commitment Shares**" means as to each Initial Backstop Party, the amount of New Investment Shares equal to such Initial Backstop Party's Share Subscription Commitment.

"**Initial Backstop Pro Rata Share**" means, as to any Initial Backstop Party, the percentage, obtained by dividing: (i) the aggregate principal amount of all outstanding Unsecured Notes held by such Initial Backstop Party on the Backstop Record Date, and any accrued and unpaid interest thereon, by (ii) the aggregate principal amount of all outstanding Unsecured Notes held by all Initial Backstop Parties on the Backstop Record Date, and any accrued and unpaid interest thereon.

"**Initial Supporting Parties**" means those certain noteholders that entered into the Unsecured Noteholder Support Agreement as of September 14, 2016, as "Initial Supporting Parties" thereunder, and each of their respective permitted assigns.

"**Initial Supporting Party Advisors**" means Bennett Jones LLP, Davis Polk & Wardwell LLP, Moelis & Company LLC and Peters & Co. Limited.

"**Initial Supporting Party Pro Rata Share**" means, as to any Initial Supporting Party, the percentage, obtained by dividing: (i) the aggregate principal amount of the outstanding Secured Debtholder Claims held by such Initial Supporting Party on the Backstop Record Date and any accrued and unpaid interest thereon to the Effective Date, by (ii) the aggregate principal amount of all outstanding Secured Debtholder Claims held by all Initial Supporting Parties on the Backstop Record Date and any accrued and unpaid interest thereon to the Effective Date.

"**Intercompany Note**" means the 13% subordinated note dated as of November 14, 2007, issued by Tervita to Finance LP, as amended, modified, restated or supplemented from time to time.

"**Interim Order**" means the interim order of the Court pursuant to the CBCA, in form and substance satisfactory to Tervita and the Majority Initial Supporting Parties, each acting reasonably, which, among other things, calls and sets the date for the Meetings, as such order may be amended from time to time by the Court with the consent of Tervita and the Majority Initial Supporting Parties.

"**Joining Backstop Parties**" means those Persons that execute a joinder agreement in accordance with the terms of the Backstop Commitment Letter, and their permitted assigns.

"**Law**" means any law, statute, order, decree, consent decree, judgment, rule, regulation, ordinance or other pronouncement having the effect of law, whether in Canada, the United States, or any other country, or any domestic or foreign state, county, province, city or other political subdivision or of any Governmental Entity.

"**Majority Initial Supporting Parties**" means Initial Supporting Parties holding not less than 66-2/3% of the aggregate principal amount outstanding pursuant to the Debt Instruments (other than Subordinated Notes) held by all Initial Supporting Parties.

"**Meetings**" means, collectively, the Unsecured Noteholders' Meeting, the Subordinated Noteholders' Meeting, and the RSAC Shareholders' Meeting.

"**New Class A Voting Common Shares**" means the new class of voting common shares of Tervita issued pursuant to this Plan and having the terms as agreed by Tervita and the Majority Initial Supporting Parties, each acting reasonably.

"**New Class A Voting Preferred Shares**" means the new class of voting preferred shares of Tervita issued pursuant to this Plan and having the terms as agreed by Tervita and the Majority Initial Supporting Parties, each acting reasonably.

"**New Class B Non-Voting Common Shares**" means the new class of non-voting common shares of Tervita issued pursuant to this Plan and having the terms as agreed by Tervita and the Majority Initial Supporting Parties, each acting reasonably.

"**New Class B Non-Voting Preferred Shares**" means the new class of non-voting preferred shares of Tervita issued pursuant to this Plan and having the terms as agreed by Tervita and the Majority Initial Supporting Parties, each acting reasonably.

"**New Common Shares**" means the New Class A Voting Common Shares and New Class B Non-Voting Common Shares.

"**New Directors**" means the individuals appointed to the board of directors of Tervita on the Effective Date in accordance with the Unsecured Noteholder Support Agreement.

"**New Investment Adjustment**" means the amount, if any, of the reduction in the New Investment Offering Amount in order for Tervita to maintain a cash balance of no more than C$75 million on the Effective Date, as determined by Tervita 10 Business Days prior to the Effective Date, acting reasonably and in consultation with the Majority Initial Supporting Parties.

"**New Investment Adjustment Shares**" means the number of New Investment Shares, rounded down to the nearest whole number, calculated by multiplying: (i) the number that is equal to the New Investment Adjustment divided by $1,000,000, by (ii) 125,000.

"**New Investment Offering**" means the offering of New Investment Shares to Eligible Unsecured Noteholders.

"**New Investment Offering Amount**" means the aggregate amount of C$372 million minus any New Investment Adjustment and the Additional Backstop Commitment Amount.

"**New Investment Shares**" means 46,500,000 New Preferred Shares minus the number of any New Investment Adjustment Shares and the Additional Backstop Commitment Shares, to be issued, in the aggregate, in accordance with this Plan pursuant to the New Investment Offering.

"**New Preferred Shares**" means the New Class A Voting Preferred Shares and New Class B Non-Voting Preferred Shares.

"**New Shares**" means, collectively, the New Common Shares and the New Preferred Shares.

"**New Shares Documentation**" means the amended articles of incorporation of Tervita, by-laws of Tervita, the Registration Rights Agreement, the Shareholders Agreement, other agreements or instruments executed or delivered in connection therewith and such other documentation necessary, expedient or proper to effectuate the issuance of the New Shares and the rights of the holders of the New Shares from and after the Effective Date.

"**New Voting Shares**" means the New Class A Voting Common Shares and New Class A Preferred Voting Shares.

"**Newco**" has the meaning set forth in Section 4.3.

"**Noteholders**" means, collectively, the Secured Noteholders, the Unsecured Noteholders and the Subordinated Noteholders.

"**Notes**" means, collectively, the Secured Notes, the Unsecured Notes and the Subordinated Notes.

"**Order**" means any order of the Court in the CBCA Proceedings.

"**Other Unsecured Noteholders**" means the Unsecured Noteholders that are not the Initial Supporting Parties.

"**Participation Deadline**" means 5:00 p.m. (Calgary time) on November 28, 2016, or such other date as Tervita and the Majority Initial Supporting Parties may agree, each acting reasonably.

"**Participation Form**" means the certification and participation form, substantially in the form accompanying the Information Circular, to be circulated to Unsecured Noteholders pursuant to the Interim Order and completed and delivered in accordance with the instructions contained therein by such Eligible Unsecured Noteholders who wish to participate in the New Investment Offering in advance of the Participation Deadline in order to make certain acknowledgments, agreements and certifications (including as to status as an Eligible Unsecured Noteholder) and to participate in the New Investment Offering.

"**Person**" is to be broadly interpreted and includes any individual, firm, corporation, limited or unlimited liability company, general or limited partnership, association, trust, unincorporated organization, joint venture, Governmental Entity or any agency, officer or instrumentality thereof or any other entity, wherever situate or domiciled, and whether or not having legal status.

"**Plan**" means this plan of arrangement and any amendments, modifications or supplements hereto made in accordance with the terms hereof or made at the direction of the Court in the Final Order with the consent of Tervita and the Majority Initial Supporting Parties.

"**Registered Holder**" means, (i) in respect of the Secured Notes, the holder or holders of such Secured Notes as recorded on the books and records of the Secured Notes US Trustee and/or the Secured Notes Canadian Trustee, as applicable, (ii) in respect of the Unsecured Notes, the holder or holders of such Unsecured Notes as recorded on the books and records of the Unsecured Notes Trustee, (iii) in respect of the Subordinated Notes, the holder or holders of such Subordinated Notes as recorded on the books and records of the Subordinated Notes Trustee, and (iv) in respect of the RSAC Shares, the holder or holders of such RSAC Shares as recorded on the books and records of RSAC.

"**Registration Rights Agreement**" means the registration rights agreement to be entered into on the Effective Date between Tervita and the Initial Backstop Parties providing for the qualification for sale of the shares of Tervita in Canada and/or the United States. The Registration Rights Agreement shall be acceptable to Tervita and the Initial Backstop parties, each acting reasonably.

"**Released Parties**" means, collectively, the Tervita Released Parties and the Debt Instrumentholder Released Parties.

"**Revolver Administrative Agent**" means The Toronto-Dominion Bank, in its capacity as administrative agent under the Revolver Credit Agreement

"**Revolver Credit Agreement**" means that certain credit agreement dated as of February 14, 2013, among Tervita, as borrower, the loan guarantors from time to time party thereto, the lenders from time to time party thereto and the Revolver Administrative Agent, as amended, modified, restated or supplemented from time to time.

"**Revolver Lenders**" means "Lenders" under and as defined in the Revolver Credit Agreement.

"**RSAC**" means Red Sky Acquisition Corp., the general partner of Holdings LP.

"**RSAC Shareholders**" means, collectively, the Registered Holders or beneficial holders of RSAC Shares.

"**RSAC Shareholders Arrangement Resolution**" means the resolution of the RSAC Shareholders relating to the Arrangement, substantially in the form attached as an appendix to the Information Circular.

"**RSAC Shareholders' Meeting**" means the meeting of the RSAC Shareholders as of the Voting Record Date to be called and held pursuant to the Interim Order for the purpose of considering and voting on the RSAC Shareholders Arrangement Resolution and to consider such other matters as may properly come before such meeting, and any adjournment(s) or postponement(s) thereof.

"**RSAC Shares**" means the common shares of RSAC.

"**RSH LP Interests**" means limited partnership interests in Holdings LP.

"**RSH1**" means Red Sky Holdings 1 Inc.

"**RSH2**" means Red Sky Holdings 2 Inc.

"**RSH3**" means Red Sky Holdings 3 Inc.

"**Secure Litigation**" means the litigation commenced by Tervita against Secure Energy Services Inc., among others, under the Court Action No. 0701-13328.

"**Secure Litigation Recovery**" means 20% of the net proceeds actually received by Tervita from the full and final determination or settlement of the Secure Litigation following the deduction of: (i) all costs and expenses incurred by or on behalf of Tervita relating to the Secure Litigation, including, without limitation, all fees and expenses of legal counsel, advisors, and experts, and all out-of-pocket travel, filing, reproduction, and other costs, whenever incurred, (ii) any cash taxes payable in respect of such proceeds (or that would have been payable but for available sheltering as a result of Tervita's tax pools at the relevant time), and (iii) any amounts that may be payable by Tervita to any other party as a result of a counterclaim or otherwise in the Secure Litigation.

"**Secured Debt Instruments**" means, collectively, the Term Loan Credit Agreement, the Secured Notes and the Secured Notes Indenture.

"**Secured Debtholder Claim**" means, as of the Effective Date, the Claims of a Secured Debtholder pursuant to the Secured Debt Instruments.

"**Secured Debtholders**" means, collectively, the Term Loan Lenders and the Secured Noteholders.

"**Secured Exchange Shares**" means the sum of (i) 47,293,553 New Preferred Shares, and (ii) the Additional Secured Exchange Shares, which sum shall be issued to the Initial Supporting Parties on the Effective Date in accordance with the steps set forth in Section 4.4.

"**Secured Interest Notes**" means the non-interest bearing demand notes to be issued to the Initial Supporting Parties in accordance with the steps set forth in Section 4.4, each with a principal amount equal to the amount of accrued and unpaid interest owing to an Initial Supporting Party on account of each of the Secured Debt Instruments held by such Initial Supporting Party as at the Backstop Record Date, with each such note being denominated in the currency in which the accrued interest is payable and providing for a default rate of interest of 10% per annum commencing two (2) days after a demand is made.

"**Secured Interest Payments**" means, collectively, the interest payments made by Tervita, from September 14, 2016 to the Effective Date, to (i) the Term Loan Lenders pursuant to the Term Loan Credit Agreement, and (ii) the Secured Noteholders pursuant to the Secured Notes and the Secured Notes Indenture.

"**Secured Interest Payments Returned Amount**" means the Secured Interest Payments paid to the Initial Supporting Parties in connection with the Exchanged Secured Debt.

"**Secured Noteholder Letter of Transmittal**" means the letter of transmittal to be completed by Registered Holders of Secured Notes.

"**Secured Noteholders**" means, collectively, the Registered Holders or beneficial holders of the Secured Notes.

"**Secured Notes**" means, collectively, the 8% Secured Notes, and the 9% Secured Notes.

"**Secured Notes Canadian Trustee**" means TSX Trust Company (as successor to Equity Financial Trust Company), in its capacity as Canadian trustee under the Secured Notes Indenture.

"**Secured Notes Indenture**" means the indenture dated as of February 14, 2013, among Tervita, the guarantors from time to time party thereto, the Secured Notes US Trustee and the Secured Notes Canadian Trustee, governing the Secured Notes, as amended, modified, restated or supplemented from time to time.

"**Secured Notes US Trustee**" means Wells Fargo Bank, National Association, in its capacity as U.S. trustee under the Secured Notes Indenture.

"**Securityholder Consent and Support Agreement**" means, collectively, the consent and support agreements among Tervita and certain RSAC Shareholders and certain

holders of RSH LP Interests dated as of September 14, 2016 (including the term sheet appended thereto), along with any joinders thereto, as may be amended from time to time in accordance with its terms.

"**Share Subscription Commitment**" means (i) in the case of an Initial Backstop Party, that number of New Investment Shares obtained by multiplying (A) the aggregate number of New Investment Shares to be issued under the New Investment Offering by (B) such Initial Backstop Party's Unsecured Noteholder Subscription Pro Rata Share, (ii) in the case of the Additional Backstop Party, that number of New Investment Shares equal to the lower of (A) the aggregate number of New Investment Shares, if any, that the Additional Backstop Party has duly committed to purchase under the New Investment Offering (excluding, for greater certainty, the Additional Backstop Commitment Shares), and (B) that number of New Investment Shares equal to (x) the number of New Investment Shares obtained by multiplying the aggregate number of New Investment Shares to be issued under the New Investment Offering by the Additional Backstop Party's Unsecured Noteholder Subscription Pro Rata Share, less (y) the Additional Backstop Commitment Shares; provided that such number shall not be less than zero, and (iii) in the case of any Electing Eligible Other Unsecured Noteholder, that number of New Investment Shares equal to the lower of (A) the aggregate number of New Investment Shares, if any, that such Other Unsecured Noteholder has duly committed to purchase pursuant the New Investment Offering, and (B) that number of New Investment Shares obtained by multiplying the aggregate number of New Investment Shares to be issued under the New Investment Offering by such Other Unsecured Noteholder's Unsecured Noteholder Subscription Pro Rata Share.

"**Shareholders Agreement**" means the unanimous shareholders agreement to be deemed pursuant to the Final Order to be effective on the Effective Date and binding on Tervita and all holders of New Shares. The Shareholders Agreement shall be acceptable to Tervita and the Initial Backstop parties, each acting reasonably.

"**Subco**" has the meaning set forth in Section 4.3.

"**Subordinated Noteholder Advisors**" means Davies Ward Phillips & Vineberg LLP, Fried, Frank, Harris, Shriver & Jacobson LLP and PJT Partners, Inc.

"**Subordinated Noteholder Claim**" means, as of the Effective Date, the Claims of a Subordinated Noteholder pursuant to the Subordinated Notes and the Subordinated Notes Indenture.

"**Subordinated Noteholder Letter of Transmittal**" means the letter of transmittal to be completed by Registered Holders of Subordinated Notes.

"**Subordinated Noteholder Pro Rata Share**" means, as to any Subordinated Noteholder, the percentage, obtained by dividing: (i) the aggregate principal amount of all outstanding Subordinated Notes held by such Subordinated Noteholder on the Effective Date and any accrued and unpaid interest thereon, by (ii) the aggregate principal amount of all outstanding Subordinated Notes held by all Subordinated Noteholders on the Effective Date and any accrued and unpaid interest thereon.

"**Subordinated Noteholder Support Agreement**" means the support agreement among Tervita and the Supporting Subordinated Noteholders dated as of September 14, 2016 (including the term sheet appended thereto), along with any joinders thereto, as may be amended from time to time in accordance with its terms.

"**Subordinated Noteholders**" means, collectively, the Registered Holders or beneficial holders of the Subordinated Notes.

"**Subordinated Noteholders Arrangement Resolution**" means the resolution of the Subordinated Noteholders relating to the Arrangement considered at the Subordinated Noteholders' Meeting, substantially in the form attached as an appendix to the Information Circular.

"**Subordinated Noteholders' Meeting**" means the meeting of the Subordinated Noteholders as of the Voting Record Date to be called and held pursuant to the Interim Order for the purpose of considering and voting on the Subordinated Noteholders Arrangement Resolution and to consider such other matters as may properly come before such meeting, and any adjournment(s) or postponement(s) thereof.

"**Subordinated Notes**" means the 11.875% senior subordinated notes due 2018 issued pursuant to the Subordinated Notes Indenture.

"**Subordinated Notes Indenture**" means the indenture dated as of May 9, 2008, as amended by the first supplemental indenture dated as of February 1, 2010, and by the second supplemental indenture dated as of February 14, 2013, among Tervita, the guarantors from time to time party thereto and the Subordinated Notes Trustee, governing the Subordinated Notes, as amended, modified, restated or supplemented from time to time.

"**Subordinated Notes Trustee**" means Wilmington Savings Fund Society, FSB (as successor to Wells Fargo Bank, National Association), in its capacity as trustee under the Subordinated Notes Indenture.

"**Subscription Price**" means C$8.00.

"**Subscription Privilege**" means the right of an Eligible Unsecured Noteholder to participate in the New Investment Offering by electing, in accordance with the provisions of the New Investment Offering Participation Form, to subscribe for and purchase from Tervita up to its pro rata share of the New Investment Shares calculated as a percentage, obtained by dividing: (i) the aggregate principal amount of all Unsecured Notes held by an Eligible Unsecured Noteholder on the Voting Record Date by (ii) the aggregate principal amount of all Unsecured Notes on the Voting Record Date.

"**Subscription Record Date**" means 5:00 p.m. (Calgary time) on October 14, 2016.

"**Support Agreements**" means, collectively, the Unsecured Noteholder Support Agreement, the Subordinated Noteholder Support Agreement and the Securityholder Consent and Support Agreement.

"**Supporting Subordinated Noteholders**" means, collectively, those Subordinated Noteholders that are party to the Subordinated Noteholder Support Agreement (including by way of a joinder agreement with Tervita).

"**Supporting Unsecured Noteholders**" means, collectively, those Unsecured Noteholders that are party to the Unsecured Noteholder Support Agreement (including by way of a joinder agreement with Tervita).

"**Tax**" or "**Taxes**" means any and all taxes, duties, fees, premiums, assessments, imposts, levies and other charges of any kind whatsoever, including all interest, penalties, fines, additions to tax or other additional amounts in respect thereof, and including those levied on, or measured by, or referred to as, income, gross receipts, profits, capital, transfer, land transfer, sales, goods and services, harmonized sales, use, value-added, excise, stamp, withholding, business, franchising, property, development, occupancy, employer health, payroll, employment, health, social services, education and social security taxes, all surtaxes, all customs duties and import and export taxes, countervail and anti-dumping, all licence, franchise and registration fees and all employment insurance, health insurance and Canada, Quebec and other government pension plan premiums or contributions.

"**Term Loan Administrative Agent**" means Cortland Capital Market Services LLC (as successor to Royal Bank of Canada), in its capacity as administrative agent under the Term Loan Credit Agreement.

"**Term Loan Credit Agreement**" means that certain amended and restated credit agreement dated as of February 14, 2013, among Tervita, as borrower, the loan guarantors from time to time party thereto, the lenders from time to time party thereto and the Term Loan Administrative Agent, as amended, modified, restated or supplemented from time to time.

"**Term Loan Lenders**" means "Lenders" under and as defined in the Term Loan Credit Agreement.

"**Tervita**" means Tervita Corporation, a corporation continued pursuant to the CBCA.

"**Tervita Group**" means, collectively, Tervita, ArrangeCo, RSH1, RSH2, RSH3, Hazco Industrial Services Ltd., CCS International Holdings Inc., Tervita Production Services Ltd., Tervita Waste Processing Ltd., Tervita Environmental Services Ltd., Tervita Equipment Rentals Ltd., Tervita Metal Services Ltd., CCS Canada (Canadian Holdings) Inc., ARKLA Disposal Services, Inc. and Finance LP.

"**Tervita Group Advisors**" means Osler, Hoskin & Harcourt LLP, Fasken Martineau DuMoulin LLP, Lathan and Watkins LLP and Barclays Capital Inc., as well as Stikeman Elliott LLP, as legal counsel to Tervita's board of directors.

"**Tervita Released Parties**" means, collectively, each member of the Tervita Group and the Indirect Securityholders that are party to a Securityholder Consent and Support Agreement, and each of their respective current and former officers, directors, employees, auditors, financial advisors, legal counsel and agents; provided that the foregoing shall not include David P. Werklund and John W. Gibson Jr.

"**Transfer Agent**" means TSX Trust Company.

"**Trustee Fees and Expenses**" means the reasonable and documented fees and expenses (including attorneys' fees) of each of the Trustees (other than the Secured Notes US Trustee and the Secured Notes Canadian Trustee) outstanding on the Effective Date.

"**Trustees**" means, collectively, the Secured Notes US Trustee, the Secured Notes Canadian Trustee, the Collateral Trustee, the Unsecured Notes Trustee and the Subordinated Notes Trustee.

"**Unsecured Exchange Shares**" means the number of New Common Shares calculated by multiplying the aggregate number of New Shares to be issued pursuant to the Plan by 2.0%, which New Common Shares shall be issued to Unsecured Noteholders on the Effective Date in accordance with the steps set forth in Section 4.4.

"**Unsecured Noteholder Claim**" means, as of the Effective Date, the Claims of an Unsecured Noteholder pursuant to the Unsecured Notes and the Unsecured Notes Indenture.

"**Unsecured Noteholder Letter of Transmittal**" means the letter of transmittal to be completed by Registered Holders of Unsecured Notes.

"**Unsecured Noteholder Pro Rata Share**" means, as to any Unsecured Noteholder, the percentage, obtained by dividing: (i) the aggregate principal amount of all outstanding Unsecured Notes held by such Unsecured Noteholder on the Effective Date and any accrued and unpaid interest thereon, by (ii) the aggregate principal amount of all outstanding Unsecured Notes held by all Unsecured Noteholders on the Effective Date and any accrued and unpaid interest thereon.

"**Unsecured Noteholder Subscription Pro Rata Share**" means, as to any Unsecured Noteholder, the percentage, obtained by dividing: (i) the aggregate principal amount of all outstanding Unsecured Notes held by such Unsecured Noteholder on the Subscription Record Date and any accrued and unpaid interest thereon, by (ii) the aggregate principal amount of all outstanding Unsecured Notes held by all Unsecured Noteholders on the Subscription Record Date and any accrued and unpaid interest thereon.

"**Unsecured Noteholder Support Agreement**" means the support agreement among Tervita and the Supporting Unsecured Noteholders dated as of September 14, 2016 (including the term sheet appended thereto), along with any joinders thereto, as may be amended from time to time in accordance with its terms.

"**Unsecured Noteholders**" means, collectively, the Registered Holders or beneficial holders of the Unsecured Notes.

"**Unsecured Noteholders Arrangement Resolution**" means the resolution of the Unsecured Noteholders relating to the Arrangement considered at the Unsecured Noteholders' Meeting, substantially in the form attached as an appendix to the Information Circular.

"**Unsecured Noteholders' Meeting**" means the meeting of the Unsecured Noteholders as of the Voting Record Date to be called and held pursuant to the Interim Order for the purpose of considering and voting on the Unsecured Noteholders Arrangement Resolution and to consider such other matters as may properly come before such meeting, and any adjournment(s) or postponement(s) thereof.

"**Unsecured Notes**" means, collectively, the 9.75% Unsecured Notes, and the 10.875% Unsecured Notes.

"**Unsecured Notes Indentures**" means, collectively, the 9.75% Unsecured Notes Indenture, and the 10.875% Unsecured Notes Indenture.

"**Unsecured Notes Trustee**" means Delaware Trust Company (as successor to Wells Fargo Bank, National Association), in its capacity as trustee under the Unsecured Notes Indenture.

"**US Dollars**" or "**US$**" means the lawful currency of the United States of America.

"**US Securities Act**" means the United States Securities Act of 1933, as amended from time to time, and the rules and regulations promulgated thereunder, or any successor statute.

"**Voting Record Date**" means 5:00 p.m. (Calgary time) on October 14, 2016.

"**Voting Threshold**" means 49.90% of the New Voting Shares.

**1.2    Rules of Interpretation**

For the purposes of this Plan:

(a)    Unless otherwise expressly provided herein, any reference in this Plan to an instrument, agreement or an Order or an existing document or exhibit filed or to be filed means such instrument, agreement, Order, document or exhibit as it may have been or may be amended, modified, or supplemented in accordance with its terms;

(b)    The division of this Plan into articles and sections is for convenience of reference only and does not affect the construction or interpretation of this Plan, nor are the descriptive headings of articles and sections intended as complete or accurate descriptions of the content thereof;

(c)    The use of words in the singular or plural, or with a particular gender, including a definition, shall not limit the scope or exclude the application of any provision of this Plan to such Person (or Persons) or circumstances as the context otherwise permits;

(d)    The words "includes" and "including" and similar terms of inclusion shall not, unless expressly modified by the words "only" or "solely", be construed as terms of limitation, but rather shall mean "includes but is not limited to" and "including

but not limited to", so that references to included matters shall be regarded as illustrative without being either characterizing or exhaustive;

(e)    Unless otherwise specified, time periods within or following which any payment is to be made or act is to be done shall be calculated by excluding the day on which the period commences and including the day on which the period ends;

(f)    Unless otherwise provided, any reference to a statute or other enactment of parliament, a legislature or other Governmental Entity includes all regulations made thereunder, all amendments to or re-enactments of such statute or regulations in force from time to time, and, if applicable, any statute or regulation that supplements or supersedes such statute or regulation;

(g)    References to a specific Article or Section shall, unless something in the subject matter or context is inconsistent therewith, be construed as references to that specific Article or Section of this Plan, whereas the terms "this Plan", "hereof", "herein", "hereto", "hereunder" and similar expressions shall be deemed to refer generally to this Plan and not to any particular Article, Section or other portion of this Plan and include any documents supplemental hereto; and

(h)    The word "or" is not exclusive.

## 1.3    Currency

Unless otherwise stated, all references in this Plan to sums of money are expressed in, and all payments provided for herein shall be made in, Canadian Dollars.

## 1.4    Date for Any Action

If the date on which any action is required to be taken hereunder by a Person is not a Business Day, such action shall be required to be taken on the next succeeding day which is a Business Day.

## 1.5    Time

Time shall be of the essence in this Plan. Unless otherwise specified, all references to time expressed in this Plan and in any document issued in connection with this Plan mean local time in Calgary, Alberta, Canada, and any reference to an event occurring on a Business Day shall mean prior to 5:00 p.m. on such Business Day.

## 1.6    Governing Law

This Plan shall be governed by and construed in accordance with laws of the Province of Alberta and the federal laws of Canada applicable therein. All questions as to interpretation or application of this Plan and all proceedings taken in connection with this Plan shall be subject to the exclusive jurisdiction of the Court.

## 1.7      Paramountcy

From and after the Effective Date, any conflict between this Plan and the covenants, warranties, representations, terms, conditions, provisions or obligations, expressed or implied, of any contract, mortgage, security agreement, indenture, trust indenture, trust agreement, equity instrument, loan agreement, commitment letter, employment agreement, employee equity plan, by-laws or other agreement, in each case, whether written or oral, and any and all amendments or supplements thereto existing between any Person and any member of the Tervita Group as at the Effective Date shall be deemed to be governed by the terms, conditions and provisions of this Plan and the Final Order, which shall take precedence and priority.

## 1.8      Successors and Assigns

This Plan shall be binding upon and shall enure to the benefit of the heirs, administrators, executors, legal personal representatives, successors and assigns of any Person named or referred to in this Plan.

<div align="center">

**ARTICLE 2**
**ARRANGEMENT**

</div>

## 2.1      Persons Affected and Unaffected

The Unsecured Noteholders, the Unsecured Notes Trustee, the Subordinated Noteholders, the Subordinated Notes Trustee, the Indirect Securityholders and Affected Existing Equity Holders shall be affected by this Plan, while the Revolver Lenders, the Revolver Administrative Agent, the Term Loan Lenders, the Term Loan Administrative Agent, the Secured Noteholders, the Secured Notes US Trustee, the Secured Notes Canadian Trustee, the Collateral Trustee and all other Persons shall be unaffected by this Plan.

## 2.2      Treatment of Secured Debtholders

(a)      Each Secured Debtholder as of the Effective Date shall receive in cash the principal and any accrued and unpaid interest owing to such Secured Debtholder up to the Effective Date without any early redemption payments or similar payments; provided that, on the Effective Date, each Initial Supporting Party shall apply its Exchanged Secured Debt in exchange for its Initial Supporting Party Pro Rata Share of the Secured Exchange Shares. Pursuant to the Plan and in accordance with the steps and sequences set forth herein:

(i)      except in respect of the Exchanged Secured Debt, each Term Loan Lender as of the Effective Date shall receive in cash the principal and any accrued and unpaid interest owing to such Term Loan Lender up to the Effective Date pursuant to the Term Loan Credit Agreement;

(ii)      except in respect of the Exchanged Secured Debt, each 8% Secured Noteholder as of the Effective Date shall receive in cash the principal and any accrued and unpaid interest owing to such 8% Secured Noteholder up to the Effective Date pursuant to the 8% Secured Notes and the Secured

Notes Indenture without any early redemption payments or similar payments;

(iii)    except in respect of the Exchanged Secured Debt, each 9% Secured Noteholder as of the Effective Date shall receive in cash the principal and any accrued and unpaid interest owing to such 9% Secured Noteholder up to the Effective Date pursuant to the 9% Secured Notes and the Secured Notes Indenture without any early redemption payments or similar payments; and

(iv)    in exchange for the Exchanged Secured Debt, each Initial Supporting Party as of the Effective Date shall receive its Initial Supporting Party Pro Rata Share of the Secured Exchange Shares.

(b)    After giving effect to the terms of this Section 2.2, on the Effective Date, (i) the obligations of the Tervita Group with respect to the Secured Debt Instruments shall, and shall be deemed to, have been irrevocably and finally extinguished, each Secured Debtholder shall have no further right, title or interest in or to the Secured Debt Instruments or its Secured Debtholder Claim, (ii) the Secured Debt Instruments shall be cancelled, and (iii) pursuant to the direction of the Final Order, the Collateral Trustee shall release and discharge all security held in connection with the Secured Debt Instruments pursuant to the Collateral Trust Agreement and the Secured Debtholders, the Term Loan Administrative Agent, the Secured Notes US Trustee, the Secured Notes Canadian Trustee, as applicable, shall be deemed to have consented to such release and discharge.

## 2.3    Treatment of Unsecured Noteholders

(a)    Pursuant to this Plan and in accordance with the steps and sequences set forth herein,

(i)    each Unsecured Noteholder as of the Effective Date shall receive its Unsecured Noteholder Pro Rata Share of the Unsecured Exchange Shares; and

(ii)    each Early Consenting Unsecured Noteholder as of the Voting Record Date shall receive its Early Consenting Unsecured Noteholder Pro Rata Share of the Early Consent Shares,

in consideration for the irrevocable exchange and transfer of all of the Unsecured Notes and the Unsecured Noteholder Claims and the full and final settlement thereof.

(b)    On the Effective Date, and in accordance with the steps and sequence as set forth in this Plan, Eligible Unsecured Noteholders shall have the right to participate in the New Investment Offering pursuant to their Subscription Privilege.

(c)    After giving effect to the terms of this Section 2.3, on the Effective Date the obligations of the Tervita Group with respect to the Unsecured Notes and the

Unsecured Notes Indentures shall, and shall be deemed to, have been irrevocably and finally extinguished, each Unsecured Noteholder shall have no further right, title or interest in or to the Unsecured Notes or its Unsecured Noteholder Claim, and the Unsecured Notes and the Unsecured Notes Indentures shall be cancelled.

**2.4     Treatment of Subordinated Noteholders**

(a)     Pursuant to this Plan and in accordance with the steps and sequences set forth herein,

(i)     each Subordinated Noteholder as of the Effective Date shall receive its Subordinated Noteholder Pro Rata Share of the Cash Payment; and

(ii)     each Early Consenting Subordinated Noteholder as of the Voting Record Date shall receive its Early Consenting Subordinated Noteholder Pro Rata Share of the Early Consent Cash Payment,

in consideration for the irrevocable exchange and transfer of all of the Subordinated Notes and the Subordinated Noteholder Claims and the full and final settlement thereof.

(b)     After giving effect to the terms of this Section 2.4, on the Effective Date the obligations of the Tervita Group with respect to the Subordinated Notes and the Subordinated Notes Indenture shall, and shall be deemed to, have been irrevocably and finally extinguished, each Subordinated Noteholder shall have no further right, title or interest in or to the Subordinated Notes or its Subordinated Noteholder Claim, and the Subordinated Notes and the Subordinated Notes Indenture shall be cancelled.

**2.5     Treatment of Electing Eligible Other Unsecured Noteholders and Backstop Parties**

(a)     On the Effective Date and in accordance with the steps and sequences set forth herein:

(i)     each Electing Eligible Other Unsecured Noteholder shall receive its Electing Eligible Other Unsecured Noteholder Commitment Shares; provided that, it has deposited in escrow with the Escrow Agent on or before the Funding Deadline its Electing Eligible Other Unsecured Noteholder Commitment Amount;

(ii)     the Additional Backstop Party shall receive its Additional Backstop Initial Commitment Shares and its Additional Backstop Commitment Shares; provided that, it has deposited with Tervita on or before the Effective Date the sum of its Additional Backstop Initial Commitment Amount and its Additional Backstop Commitment Amount; and

(iii)     each Initial Backstop Party shall receive its Initial Backstop Party Initial Commitment Shares and its Initial Backstop Pro Rata Share of the Initial Backstop Party Backstop Commitment Shares; provided that, it has

deposited with Tervita on the Effective Date the sum of its Initial Backstop Party Initial Commitment Amount and its Initial Backstop Pro Rata Share of the Initial Backstop Party Backstop Commitment Amount.

(b)    On the Effective Date and in accordance with the steps and sequence as set forth in Section 4.4, each non-defaulting Initial Backstop Party and the Additional Backstop Party shall receive its Commitment Pro Rata Share of the Backstop Consideration, and such Backstop Consideration shall be, and shall be deemed to be, used by each Initial Backstop Party and the Additional Backstop Party, as applicable, to acquire its Commitment Pro Rata Share of the Backstop Consideration Shares.

**2.6    Treatment of Existing Equity Holders**

(a)    RSH3 shall receive the right to receive, the Secure Litigation Recovery, as consideration for the purchase for cancellation of 100% of the voting common shares of Tervita immediately prior to the Effective Time. Tervita will have complete and unfettered control over the carriage, investigation, prosecution, abandonment and settlement of the Secure Litigation as it determines in its business judgment and in the sole interest of Tervita. Without limiting the generality of the foregoing, Tervita will not be required to consult with or provide any information in respect of the Secure Litigation or its status to any holder of Existing Equity or any representative thereof, nor shall Tervita owe any duty whatsoever to any such persons with respect to the Secure Litigation.

(b)    Pursuant to this Plan and in accordance with the steps and sequences set forth herein, (i) all of the preferred shares issued by Tervita shall be purchased for cancellation for the aggregate consideration of C$1, (ii) all of the preferred shares issued by RSH3 shall be purchased for cancellation for the aggregate consideration of C$1, and (iii) all of the remaining Affected Existing Equity shall be terminated and cancelled and shall be deemed to be terminated and cancelled without the need for any repayment of capital thereof or any other liability, payment or compensation therefor and, for greater certainty, no Affected Existing Equity Holders shall be entitled to receive any interest, dividends, premium or other payment in connection therewith.

**ARTICLE 3**
**ISSUANCES, DISTRIBUTIONS AND PAYMENTS**

**3.1    Issuance of New Shares**

All New Shares issued as part of the implementation of this Plan shall be deemed to be issued and outstanding as fully-paid and non-assessable at the times set out in Section 4.4.

The New Common Shares and New Preferred Shares to be distributed under the Plan will be allocated such that no holder (alone and together with any of its affiliates and Group Members) of the New Shares shall have legal or beneficial ownership of more than the Voting Threshold. To the extent any holder would have beneficial or legal ownership of New Voting Shares above the Voting Threshold, such holder (or, as applicable its affiliates or Group Members) shall be

allocated New Class B Non-Voting Common Shares or New Class B Non-Voting Preferred Shares instead of New Class A Voting Common Shares or New Class A Voting Preferred Shares respectively to the extent necessary to provide that no holder (alone and together with any of its affiliates and Group Members) shall have legal or beneficial ownership of the New Voting Shares in excess of the Voting Threshold.

**3.2    Delivery of New Common Shares to Unsecured Noteholders**

(a)     The delivery of the Unsecured Exchange Shares and the Early Consent Shares to be distributed under this Plan will be made no later than the Effective Date (or such other date as Tervita and the Majority Initial Supporting Parties may agree, each acting reasonably).

(b)     DTC (as sole registered holder of the Unsecured Notes on behalf of the Unsecured Noteholders) through its nominee company CEDE & Co., will surrender, or will cause the surrender of, the certificates representing the Unsecured Notes together with the Unsecured Noteholder Letter of Transmittal to the Depositary.

(c)     On the Effective Date, Tervita will deliver a treasury direction to the Transfer Agent that directs the Transfer Agent to deliver the Unsecured Exchange Shares and Early Consent Shares to the Depositary.

(d)     The delivery of: (i) the Unsecured Exchange Shares to the Unsecured Noteholders as contemplated in this Plan in exchange for the Unsecured Notes will be made by the Depositary through the facilities of DTC to DTC participants who, in turn will make delivery of the Unsecured Exchange Shares to the beneficial holders of such Unsecured Notes, and (ii) the Early Consent Shares to the Early Consenting Unsecured Noteholders as contemplated in this Plan in exchange for the Unsecured Notes will be made by the Depositary on behalf of Tervita to the Early Consenting Unsecured Noteholders in accordance with delivery instructions to be provided by such Early Consenting Unsecured Noteholders.

(e)     None of the Tervita Group, the Depositary, the Transfer Agent, the Escrow Agent, nor the Unsecured Notes Trustee will have any liability or obligation in respect of any deliveries referenced in this Section 3.2.

**3.3    Delivery of New Preferred Shares to New Investment Participants and the Backstop Parties**

(a)     The delivery of the Electing Eligible Other Unsecured Noteholder Commitment Shares, the Additional Backstop Initial Commitment Shares, the Additional Backstop Commitment Shares, the Initial Backstop Party Initial Commitment Shares, the Initial Backstop Party Backstop Commitment Shares and the Backstop Consideration Shares under this Plan will be made no later than the Effective Date (or such other date as Tervita and the Majority Initial Supporting Parties may agree, each acting reasonably).

(b)     On the Effective Date, Tervita will deliver a treasury direction to the Transfer Agent that directs the Transfer Agent to deliver the Electing Eligible Other Unsecured Noteholder Commitment Shares, the Additional Backstop Initial Commitment Shares, the Additional Backstop Commitment Shares, the Initial Backstop Party Initial Commitment Shares, the Initial Backstop Party Backstop Commitment Shares and the Backstop Consideration Shares to the Depositary.

(c)     The delivery of: (i) the Electing Eligible Other Unsecured Noteholder Commitment Shares to Electing Eligible Other Unsecured Noteholders, (ii) the Additional Backstop Initial Commitment Shares and the Additional Backstop Commitment Shares to the Additional Backstop Party, (iii) the Initial Backstop Party Initial Commitment Shares and the Initial Backstop Party Backstop Commitment Shares to the Initial Backstop Parties, and (iv) the Backstop Consideration Shares to the Backstop Parties, in each case as contemplated in this Plan, will be made by the Depositary on behalf of Tervita to the applicable Noteholders or Backstop Parties in accordance with delivery instructions to be provided by each such Noteholder or Backstop Party on its Participation Form or otherwise.

(d)     None of the Tervita Group, the Depositary, the Transfer Agent, the Escrow Agent, nor the Unsecured Notes Trustee will have any liability or obligation in respect of any deliveries referenced in this Section 3.3.

**3.4     Delivery of Cash Payment and Early Consent Cash Payment**

(a)     The delivery of the Cash Payment and the Early Consent Cash Payment to be distributed under this Plan will be made no later than the Effective Date (or such other date as Tervita and the Majority Initial Supporting Parties may agree, each acting reasonably).

(b)     DTC (as sole registered holder of the Subordinated Notes on behalf of the Subordinated Noteholders) through its nominee company CEDE & Co., will surrender, or will cause the surrender of, the certificates representing the Subordinated Notes together with the Subordinated Noteholder Letter of Transmittal to the Depositary.

(c)     On the Effective Date, Tervita will deposit the Cash Payment and Early Consent Cash Payment with the Depositary.

(d)     The delivery of: (i) the Cash Payment to the Subordinated Noteholders as contemplated in this Plan in exchange for the Subordinated Notes will be made by the Depositary through the facilities of DTC to DTC participants who, in turn will make delivery of the Cash Payment to the beneficial holders of such Subordinated Notes, and (ii) the Early Consent Cash Payment to the Early Consenting Subordinated Noteholders as contemplated in this Plan in exchange for the Subordinated Notes will be made by the Depositary on behalf of Tervita to the Early Consenting Subordinated Noteholders in accordance with delivery instructions to be provided by the such Early Consenting Subordinated Noteholders.

(e)    None of the Tervita Group, the Depositary, the Transfer Agent, the Escrow Agent, nor the Subordinated Notes Trustee shall have any liability or obligation in respect of any distributions or deliveries of payments referenced in this Section 3.4.

**3.5    Delivery and Payments to Secured Debtholders**

(a)    On the Effective Date, Tervita will deliver the cash payable under Sections 3.5(b) and 3.5(c) hereof to the Depositary, together with a direction to the Depositary, to release such cash to DTC and CDS, respectively.

(b)    The payment in cash by Tervita on the Effective Date of the principal and any accrued and unpaid interest but not any early redemption payments or similar payments owing up to the Effective Date to the 8% Secured Noteholders in respect of the 8% Secured Notes and the Secured Notes Indenture in accordance with this Plan, shall be made by the Depositary on behalf of Tervita (upon receipt of cash as contemplated in Section 3.5(a)) through the facilities of DTC to DTC participants who, in turn will make delivery of such cash payment to the beneficial holders of such 8% Secured Notes; provided that, no cash payments shall be made in respect of the Exchanged Secured Debt.

(c)    The payment in cash by Tervita on the Effective Date of the principal and any accrued and unpaid interest but not any early redemption payments or similar payments owing up to the Effective Date to the 9% Secured Noteholders in respect of the 9% Secured Notes and the Secured Notes Indenture in accordance with this Plan, shall be made by the Depositary on behalf of Tervita (upon receipt of cash as contemplated in Section 3.5(a)) through the facilities of CDS to CDS participants who, in turn will make delivery of such cash payment to the beneficial holders of such 9% Secured Notes; provided that, no cash payments shall be made in respect of the Exchanged Secured Debt.

(d)    The payment in cash by Tervita on the Effective Date of the principal and any accrued and unpaid interest owing up to the Effective Date to the Term Loan Lenders pursuant to the Term Loan Credit Agreement in accordance with this Plan, shall be effected through the delivery by Tervita of such amounts to the Term Loan Administrative Agent for distribution to the Term Loan Lenders in accordance with the Term Loan Credit Agreement and customary practices; provided that, no cash payments shall be made in respect of the Exchanged Secured Debt.

(e)    The delivery of the Secured Exchange Shares to the Initial Supporting Parties under this Plan will be made no later than the Effective Date or the date the Initial Supporting Parties surrender certificates representing their Secured Notes together with the Secured Noteholder Letter of Transmittal to the Depositary (or such other date as Tervita and the Majority Initial Supporting Parties may agree, each acting reasonably).

(f)    The delivery of the Secured Exchange Shares to the Initial Supporting Parties as contemplated in this Plan, in exchange for the Exchanged Secured Debt, as

contemplated herein, will, be made by the Depositary on behalf of Tervita to the Initial Supporting Parties in accordance with delivery instructions to be provided by the Initial Supporting Parties.

(g) DTC (as sole registered holder of the 8% Secured Notes held by Secured Noteholders, other than the Exchanged Secured Debt, on behalf of the 8% Secured Noteholders) through its nominee company CEDE & Co., and CDS (as sole registered holder of the 9% Secured Notes held by Secured Noteholders, other than the Exchanged Secured Debt, on behalf of the 9% Secured Noteholders) through its nominee company CDS & Co., in each case, will surrender, or will cause the surrender of, the certificates representing the Secured Notes together with Secured Noteholder Letter of Transmittal to the Depositary.

(h) The Tervita Group, the Depositary, the Transfer Agent, the Escrow Agent, the Term Loan Administrative Agent, the Secured Notes US Trustee, the Secured Notes Canadian Trustee, nor the Collateral Trustee shall have no liability or obligation in respect of any distributions or deliveries of payments referenced in this Section 3.5.

## 3.6   Payment of Trustee Fees and Expenses

On the Effective Date, Tervita shall pay in cash all outstanding Trustee Fees and Expenses, and after the Effective Date, Tervita shall pay in cash Trustee Fees and Expenses upon presentation of an invoice with respect thereto.

## 3.7   Application of Plan Distributions

Unless specified otherwise, all amounts paid or payable hereunder on account of the Debt Instrumentholder Claims (including, for greater certainty, any securities received hereunder) shall be applied as follows: (i) first, in respect of the principal amount of such obligations, and (ii) second, in respect of any accrued but unpaid interest on such obligations to which such Debt Instrumentholder Claims relate.

## ARTICLE 4
## IMPLEMENTATION

## 4.1   Corporate Authorizations

The adoption, execution, delivery, implementation and consummation of all matters contemplated under this Plan involving corporate action of any members of the Tervita Group shall occur and be effective as of the Effective Date, and will be authorized and approved under this Plan and by the Court, where appropriate, as part of the Final Order, in all respects and for all purposes without any requirement of further action by Indirect Securityholders, directors or officers of Tervita. All necessary approvals to take actions shall be deemed to have been obtained from the directors or the Indirect Securityholders of Tervita, as applicable.

**4.2      Fractional Interests**

No certificates representing fractional New Shares shall be allocated under this Plan, and fractional share interests shall not entitle the owner thereof to vote or to any rights of a shareholder. Any legal, equitable, contractual and any other rights or Claims (whether actual or contingent, and whether or not previously asserted) of any Person with respect to fractional New Shares pursuant to this Plan shall be rounded down to the nearest whole number without compensation therefor.

**4.3      Pre-Effective Date Transaction**

The following events or transactions will have occurred, or be deemed to have occurred and be taken as effected on or before the Effective Time:

(a)      The Intercompany Note shall have been transferred to a newly formed wholly-owned subsidiary of Tervita incorporated under the ABCA ("**Subco**") in the following order:

(i)      Holdings LP shall have incorporated a new corporation under the ABCA ("**Newco**");

(ii)      Holdings LP shall have transferred all of its shares of RSH1 to Newco in consideration for shares of Newco;

(iii)      Holdings LP and Newco shall have filed elections under subsection 85(2) of the Income Tax Act in respect of the transfer contemplated by Section 4.3(a)(ii) above and elect at C$1, being the fair market value of the shares of RSH1;

(iv)      Holdings LP shall have transferred all of its limited partnership units of Finance LP to Newco in consideration for shares of Newco; and

(v)      Finance LP shall have transferred the Intercompany Note to Subco in consideration for a nominal amount of cash.

(b)      The Secured Notes US Trustee and the Secured Notes Canadian Trustee shall have exchanged each Initial Supporting Party's beneficial interest in the applicable Global Notes that represent the applicable Secured Notes of each such Initial Supporting Party for Definitive Notes and evidence thereof shall have been provided to Tervita.

**4.4      Effective Date Transactions**

Notwithstanding any other provision of the Plan, commencing at the Effective Time, the following events or transactions will occur, or be deemed to have occurred and be taken as effected, in the following order in five (5) minute increments (unless otherwise indicated) and at the time set out in this Section 4.4 (or in such other manner or order or at such other time or times as Tervita and the Majority Initial Supporting Parties may agree, each acting reasonably), without any further act or formality required on the part of any Person, except as expressly provided herein:

(a)    The following shall occur simultaneously:

    (i)    Tervita shall distribute in the manner described in Sections 3.5 and 3.6 hereof, to:

        (A)    each Trustee, cash for all outstanding Trustee Fees and Expenses;

        (B)    except in respect of the Exchanged Secured Debt, each Term Loan Lender as of the Effective Date, cash for any accrued and unpaid interest owing to such Term Loan Lender up to the Effective Date pursuant to the Term Loan Credit Agreement;

        (C)    except in respect of the Exchanged Secured Debt, each 8% Secured Noteholder as of the Effective Date, cash for any accrued and unpaid interest owing to such 8% Secured Noteholder up to the Effective Date pursuant to the 8% Secured Notes and the Secured Notes Indenture; and

        (D)    except in respect of the Exchanged Secured Debt, each 9% Secured Noteholder as of the Effective Date, cash for any accrued and unpaid interest owing to such 9% Secured Noteholder up to the Effective Date pursuant to the 9% Secured Notes and the Secured Notes Indenture;

    (ii)    Tervita shall issue to each Initial Supporting Party, Secured Interest Notes each in an amount equal to the accrued interest owed to each Initial Supporting Party in respect of the Term Loan Credit Agreement, the 8% Secured Notes and the 9% Secured Notes in full satisfaction of such accrued interest amount; and

    (iii)    Tervita shall pay in cash all fees and expenses of the Initial Supporting Party Advisors, the Subordinated Noteholder Advisors and the Tervita Group Advisors.

(b)    The following shall occur simultaneously:

    (i)    in exchange for, and in full and final settlement of, the Subordinated Noteholder Claims, Tervita shall distribute in the manner described in Section 3.4 hereof, to:

        (A)    each Subordinated Noteholder as of the Effective Date, its Subordinated Noteholder Pro Rata Share of the Cash Payment; and

        (B)    each Early Consenting Subordinated Noteholder as of the Voting Record Date, its Early Consenting Subordinated Noteholder Pro Rata Share of the Early Consent Cash Payment.

        Upon the distribution of the Cash Payment and the Early Consent Cash Payment, the Subordinated Noteholder Claims shall, and shall be deemed to be, irrevocably and finally extinguished and Subordinated Noteholders

shall have no further right, title or interest in and to the Subordinated Notes or the Subordinated Noteholder Claims; and

(ii)    the Subordinated Notes and the Subordinated Notes Indenture shall be cancelled, provided that the Subordinated Notes Indenture shall remain in effect solely to allow the Depositary and the Subordinated Notes Trustee, as applicable, to make the distributions set forth in this Plan.

(c)    The Existing Directors shall be deemed to have resigned.

(d)    (i) All of the preferred shares issued by Tervita shall be purchased for cancellation for the aggregate consideration of C$1; and (ii) all of the preferred shares issued by RSH3 shall be purchased for cancellation for the aggregate consideration of C$1.

(e)    The following shall occur simultaneously:

(i)    RSH3 shall receive the right to receive the Secure Litigation Recovery, as consideration for the purchase for cancellation of 100% of the voting common shares of Tervita immediately prior to the Effective Time;

(ii)    All of the Affected Existing Equity shall be terminated and cancelled and shall be deemed to be terminated and cancelled without the need for any repayment of capital thereof or any other liability, payment or compensation therefor; and

(iii)    articles of continuance of Tervita shall be amended to confirm the cancellation of the Existing Tervita Equity and to create: (A) a new class of voting common shares, the New Class A Voting Common Shares, (B) a new class of voting preferred shares, the New Class A Voting Preferred Shares, (C) a new class of non-voting common shares, the New Class B Non-Voting Common Shares, and (D) a new class of non-voting preferred shares, the New Class B Non-Voting Preferred Shares.

(f)    The following shall occur simultaneously:

(i)    in exchange for and in addition to the right to participate in the New Investment Offering, and in full and final settlement of, the Unsecured Noteholder Claims, Tervita shall issue in the manner described in Section 3.2 hereof, to:

(A)    each Unsecured Noteholder as of the Effective Date, its Unsecured Noteholder Pro Rata Share of the Unsecured Exchange Shares; and

(B)    each Early Consenting Unsecured Noteholder as of the Voting Record Date, its Early Consenting Unsecured Noteholder Pro Rata Share of the Early Consent Shares.

Upon the distribution of the Unsecured Exchange Shares and the Early Consent Shares, the Unsecured Noteholder Claims shall, and shall be

deemed to be, irrevocably and finally extinguished and Unsecured Noteholders shall have no further right, title or interest in and to the Unsecured Notes or the Unsecured Noteholder Claims; and

(ii)     the Unsecured Notes and the Unsecured Notes Indenture shall be cancelled, provided that the Unsecured Notes Indenture shall remain in effect solely to allow the Depositary and the Unsecured Notes Trustee, as applicable, to make the distributions set forth in this Plan.

(g)     The following shall occur simultaneously:

(i)     Tervita shall:

(A)     (x) become entitled to the aggregate Electing Eligible Other Unsecured Noteholder Commitment Amounts deposited with the Escrow Agent, and (y) the Escrow Agent shall be deemed instructed to release to Tervita and Tervita shall be in receipt of the aggregate Electing Eligible Other Unsecured Noteholder Commitment Amounts held by such Escrow Agent;

(B)     be in receipt of the Additional Backstop Initial Commitment Amount and the Additional Backstop Commitment Amount; and

(C)     be in receipt of the Initial Backstop Party Initial Commitment Amount, the Initial Backstop Party Backstop Commitment Amount and the Secured Interest Payments Returned Amount;

(ii)     the following payments and acquisitions shall be made:

(A)     Tervita shall pay to each non-defaulting Backstop Party its Commitment Pro Rata Share of the Backstop Consideration which shall be applied to acquire such Backstop Party's Commitment Pro Rata Share of the Backstop Consideration Shares; and

(iii)     Tervita shall issue in the manner described in Section 3.3 hereof, to:

(A)     each Electing Eligible Other Unsecured Noteholder, its Electing Eligible Other Unsecured Noteholder Commitment Shares in consideration for its Electing Eligible Other Unsecured Noteholder Commitment Amount;

(B)     the Additional Backstop Party, its Additional Backstop Initial Commitment Shares and its Additional Backstop Commitment Shares in consideration for its Additional Backstop Initial Commitment Amount and its Additional Backstop Commitment Amount; and

(C)     each Initial Backstop Party, its Initial Backstop Party Initial Commitment Shares and its Initial Backstop Pro Rata Share of the Initial Backstop Party Backstop Commitment Shares in

consideration for its Initial Backstop Party Initial Commitment Amount and its Initial Backstop Pro Rata Share of the Initial Backstop Party Backstop Commitment Amount.

(h)    The following steps shall occur simultaneously:

(i)    in exchange for, and in full and final settlement of, the Secured Debtholder Claims in respect of the remaining portion of the Exchanged Secured Debt, the Secured Interest Notes and the Secured Interest Payments Returned Amount, Tervita shall issue in the manner described in Section 3.5 hereof, to each Initial Supporting Party as of the Effective Date its Initial Supporting Party Pro Rata Share of the Secured Exchange Shares;

(ii)    in exchange for, and in full and final settlement of, the Secured Debtholder Claims (other than Secured Debtholder Claims in respect of the Exchanged Secured Debt) held by the Term Loan Lenders, the 8% Secured Noteholders and the 9% Secured Noteholders, Tervita shall distribute in the manner described in Section 3.5 hereof, to:

(A)    each Term Loan Lender as of the Effective Date, cash for the principal amount owing to such Term Loan Lender up to the Effective Date pursuant to the Term Loan Credit Agreement;

(B)    each 8% Secured Noteholder as of the Effective Date, cash for the principal amount but not any early redemption payments or similar payments owing to such 8% Secured Noteholder up to the Effective Date pursuant to the 8% Secured Notes and the Secured Notes Indenture; and

(C)    each 9% Secured Noteholder as of the Effective Date, cash for the principal amount but not any early redemption payments or similar payments owing to such 9% Secured Noteholder up to the Effective Date pursuant to the 9% Secured Notes and the Secured Notes Indenture;

(iii)    upon the distributions contemplated in this Section 4.4(h), the Secured Debtholder Claims shall, and shall be deemed to be, irrevocably and finally extinguished and Secured Debtholders shall have no further right, title or interest in and to the Secured Debt Instruments or the Secured Debtholder Claims;

(iv)    the Secured Debt Instruments shall be cancelled, provided that the Term Loan Credit Agreement and the Secured Notes Indenture shall remain in effect solely to allow the Depositary, the Term Loan Administrative Agent, the Secured Notes US Trustee and the Secured Notes Canadian Trustee, as applicable, to make the distributions set forth in this Plan; and

(v)    pursuant to the direction of the Final Order, the Collateral Trustee shall release and discharge all security held in connection with the Secured

Debt Instruments pursuant to the Collateral Trust Agreement and the Secured Debtholders, the Term Loan Administrative Agent, the Secured Notes US Trustee, the Secured Notes Canadian Trustee, as applicable, shall be deemed to have consented to such release and discharge.

(i)     The stated capital account maintained in respect of each class of shares of Tervita shall be increased by an amount equal to the aggregate fair market value of the consideration received for the issuance of all shares of such class issued pursuant to this Plan.

(j)     The releases referred to in Section 5.1 become effective.

(k)     Each holder of New Shares shall be deemed to be a party to and bound by the New Shares Documentation, including the Shareholders Agreement.

(l)     The New Directors shall be deemed to have been appointed.

(m)    Tervita or a subsidiary of Tervita and ArrangeCo shall be amalgamated and continued as one (1) corporation on terms as agreed by Tervita and the Majority Initial Supporting Parties, each acting reasonably.

## 4.5     Effective Time Procedures

The Tervita Group will perform all other actions and steps required by or as contemplated by this Plan.

## 4.6     Release of Funds from Escrow

On the Effective Date, in accordance with the terms of the Escrow Agreement, the Escrow Agent shall release from escrow to Tervita, at the applicable time, the aggregate Electing Eligible Other Unsecured Noteholder Commitment Amounts, together with all interest accrued thereon, pursuant to and in accordance with Section 4.4.

## 4.7     Calculations

Unless otherwise specified herein, all amounts of consideration to be received under this Plan will be calculated and rounded up to the nearest cent ($0.01). All conversions of Canadian Dollars into US Dollars or of US Dollars into Canadian Dollars shall be based, as applicable, on the average noon spot rate of the Bank of Canada on the Business Day immediately preceding the Effective Date or such other date as agreed by Tervita and the Majority Initial Supporting Parties, each acting reasonably.

## 4.8     Transfers Free and Clear

Any transfer of any securities pursuant to the Arrangement will be free and clear of any hypothecs, liens, claims, encumbrances, charges, adverse interests or security interests.

**4.9      Capacity of Backstop Parties**

For greater certainty, all rights and obligations given by, to or among the Backstop Parties shall be deemed to arise in their capacity as creditors of Tervita.

**4.10      Withholding**

Tervita and the Depositary, as applicable, shall be entitled to deduct and withhold from any consideration otherwise payable under the Plan such amounts as Tervita and the Depositary, as applicable, are required to deduct and withhold from such consideration with respect to Taxes in accordance with applicable Laws. Any such amounts so deducted and withheld shall be remitted to the appropriate Governmental Entity on a timely basis in accordance with applicable Laws. Any such amounts so deducted and withheld from the consideration payable pursuant to the Plan shall be treated for all purposes under the Plan as having been paid to the person in respect of which such deduction, withholding and remittance was made.

## ARTICLE 5
## RELEASES

**5.1      Release of Released Parties**

At the Effective Time, each of the Released Parties shall be released and discharged from all present and future actions, causes of action, damages, judgements, executions, obligations, liabilities and Claims of any kind or nature whatsoever (other than liabilities or claims attributable to any of Released Party's gross negligence, fraud or wilful misconduct as determined by the final, non-appealable judgment of a court of competent jurisdiction) arising on or prior to the Effective Date in connection with the Affected Existing Equity, the RSAC Shares, the RSH LP Interests, Debt Instruments, any documents or agreements related to any of the foregoing, the Support Agreements, the New Investment Offering, the Backstop Commitment Letter, the CBCA Proceedings, this Plan, the transactions contemplated hereunder and any proceedings commenced with respect to or in connection with this Plan, any claim that any director of a member of the Tervita Group may have against any member of the Tervita Group solely in respect of any diminution in value or any other loss suffered (a) by such director in respect of any equity they own (directly or indirectly) in a member of the Tervita Group, or (b) by the shareholder that appointed such director, and any other actions or matters related directly or indirectly to the foregoing, provided that nothing in this paragraph shall release or discharge any of the Released Parties from or in respect of its obligations under this Plan, the Support Agreements, the Backstop Commitment Letter, the New Investment Offering or under any Order, or any document ancillary to the foregoing.

## ARTICLE 6
## CONDITIONS PRECEDENT AND EFFECTIVENESS

**6.1      Conditions to Plan Implementation**

The implementation of this Plan shall be conditional upon the fulfillment, satisfaction or waiver of the following conditions:

(a)     the Plan shall have been approved at the Meetings in accordance with the terms of the Interim Order;

(b)     the Court shall have granted the Final Order, the operation and effect of which shall not have been stayed, reversed or amended, and in the event of an appeal or application for leave to appeal, final determination shall have been made by the applicable appellate court;

(c)     no Law shall have been passed and becomes effective, the effect of which makes the consummation of this Plan illegal or otherwise prohibited;

(d)     all conditions to implementation of this Plan set out in the Unsecured Noteholder Support Agreement shall have been satisfied or waived in accordance with their terms, and the Unsecured Noteholder Support Agreement shall not have been terminated;

(e)     all conditions to implementation of this Plan set out in the Backstop Commitment Letter shall have been satisfied or waived in accordance with their terms, and the Backstop Commitment Letter shall not have been terminated;

(f)     the Final Order shall have been recognized in recognition proceedings pursuant to applicable Law in the United States and all court materials (including any recognition order granted) in connection with the recognition proceedings shall be in form and substance acceptable to the Majority Initial Supporting Parties;

(g)     there shall be no material Claims against ArrangeCo;

(h)     all outstanding Trustee Fees and Expenses on the Effective Date shall have been paid; and

(i)     all fees and expenses of the Initial Supporting Party Advisors, the Subordinated Noteholder Advisors and the Tervita Group Advisors shall be been paid.

## 6.2    Waiver of Conditions

Tervita and the Majority Initial Supporting Parties may at any time and from time to time waive the fulfillment or satisfaction, in whole or in part, of the conditions set out herein, to the extent and on such terms as such parties may agree.

## 6.3    Effectiveness

This Plan will become effective in the sequence described in Section 4.4 on the filing of the Articles of Arrangement and the issuance of the Certificate of Arrangement, and shall be binding on and enure to the benefit of the Tervita Group, the Indirect Securityholders, the Existing Equity Holders, the Trustees, the Term Loan Administrative Agent, the Released Parties, the Depositary, the Escrow Agent, the current and former directors and officers of Tervita, and any and all other Persons named or referred to in, or subject to, this Plan and each of their respective heirs, executors, administrators and other legal representatives, successors and assigns. The Articles of Arrangement shall be filed and the Certificate of Arrangement shall be issued in each case with respect to the Arrangement in its entirety. The Certificate of Arrangement shall be

conclusive evidence that the Arrangement has become effective and that each of the provisions in Section 4.4 has become effective in the sequence set forth therein. No portion of this Plan shall take effect with respect to any party or Person until the Effective Time. As soon as practicable after the satisfaction or waiver of the conditions set forth in Section 6.1 (excluding conditions that, by their terms, cannot be satisfied until the Effective Date, but subject to the satisfaction of those conditions as of the Effective Date), unless another time or date is agreed in writing between Tervita and the Majority Initial Supporting Parties, the Articles of Arrangement shall be filed by Tervita with the Director.

<div align="center">

**ARTICLE 7**
**GENERAL**

</div>

**7.1    Waiver of Defaults**

From and after the Effective Time, all Persons shall be deemed to have consented and agreed to all of the provisions of this Plan in its entirety. Without limiting the foregoing, all Persons shall be deemed to have:

> (a)    waived any and all defaults or events of default or any non-compliance with any covenant, warranty, representation, term, provision, condition or obligation, expressed or implied, in any contract, instrument, credit document, lease, licence, guarantee, agreement for sale or other agreement, written or oral, in each case relating to, arising out of, or in connection with, the Debt Instruments, the Support Agreements, the Backstop Commitment Letter, the Arrangement, this Plan and any and all amendments and supplements thereto, the transactions contemplated hereunder and any proceedings commenced with respect to or in connection with this Plan. Any and all notices of default and demands for payment or any step or proceeding taken or commenced in connection with any of the foregoing shall be deemed to have been rescinded and of no further force or effect, provided that nothing shall be deemed to excuse any member of the Tervita Group and their respective successors from performing their obligations under this Plan; and

> (b)    agreed that, if there is any conflict between the provisions of any agreement or other arrangement, written or oral, existing between such Person and any member of the Tervita Group and the provisions of this Plan, then the provisions of this Plan take precedence and priority and the provisions of such agreement or other arrangement are deemed to be amended accordingly.

**7.2    Deeming Provisions**

In this Plan, the deeming provisions are not rebuttable and are conclusive and irrevocable.

**7.3    Modifications to Plan**

Subject to the terms and conditions of the Support Agreements and the Backstop Commitment Letter:

> (a)    the Applicants reserve the right to amend, restate, modify and/or supplement this Plan at any time and from time to time, provided that (except as provided in

Section 7.3(c) below) any such amendment, restatement, modification or supplement must be contained in a written document that is (i) filed with the Court and, if made following the Meetings, approved by the Court, and (ii) communicated to the Debt Instrumentholders and the Indirect Securityholders in the manner required by the Court (if so required);

(b)     any amendment, modification or supplement to this Plan may be proposed by the Applicants at any time prior to or at the Meetings, with or without any prior notice or communication (other than as may be required under the Interim Order), and if so proposed and accepted at the Meetings, shall become part of this Plan for all purposes; and

(c)     any amendment, modification or supplement to this Plan may be made following the Meetings by the Applicants, without requiring filing with, or approval of, the Court, provided that it concerns a matter which is of an administrative nature and is required to better give effect to the implementation of this Plan and is not materially adverse to the financial or economic interests of any Person affected by this Plan.

## 7.4     Different Capacities

Subject to the Support Agreements and the Interim Order, if any Person holds more than one (1) type, series or class of debt or equity instrument affected by this Plan, as the case may be, such Person shall have all of the rights given to a holder of each particular type, series or class of debt or equity instrument so held. Subject to the Support Agreements and the Interim Order, nothing done by a Person acting in its capacity as a holder of a particular type, series or class of debt or equity instrument, as the case may be, affects such Person's rights as a holder of another type, series or class of debt or equity instrument.

## 7.5     Consent of the Majority Initial Supporting Parties

For the purposes of this Plan, any matter requiring the agreement, waiver, consent or approval of the Majority Initial Supporting Parties shall be deemed to have been agreed to, waived, consented to or approved by such Majority Initial Supporting Parties if such matter is agreed to, waived, consented to or approved in writing by either of the Initial Supporting Party Advisors, provided that, either such Initial Supporting Party Advisor confirms in writing (which can be by way of e-mail) that it is providing such agreement, consent, waiver or approval on behalf of the Majority Initial Supporting Parties.

## 7.6     Notices

Any notice or other communication to be delivered hereunder must be in writing and refer to this Plan and may, as hereinafter provided, be made or given by personal delivery, ordinary mail, email or by facsimile addressed to the respective Persons as follows:

(i)     If to the Applicants, at:

Tervita Corporation

Suite 500, 140 – 10th Avenue SW
Calgary, Alberta  T2G 0R1

Attention:        Contracts Manager
Facsimile:       (403) 231-8445
E-mail:          notices@tervita.com / asphillips@tervita.com

with a required copy (which shall not be deemed notice) to:

Osler, Hoskin & Harcourt LLP
Suite 2500, TransCanada Tower
450 – 1st Street S.W.
Calgary, Alberta  T2P 5H1

Attention:        Andrea Whyte & Marc Wasserman & Michael De Lellis
Facsimile:       (403) 260-7024 / (416) 862-6666
E-mail:          awhyte@osler.com / mwasserman@osler.com /
                 mdelellis@osler.com

and to:

Fasken Martineau DuMoulin LLP
3400 First Canadian Centre
350 – 7th Avenue SW
Calgary, Alberta  T2P 3N9

Attention:        John Grieve & Travis Lysak
Facsimile:       (403) 261-5351
E-mail:          jgrieve@fasken.com / tlysak@fasken.com

(ii)     If to any of the Initial Supporting Parties or any of the Initial Backstop Parties, to:

Bennett Jones LLP
100 King Street West, Suite 3400
Toronto, Ontario  M5X 1A4

Attention:        Kevin Zych & Sean Zweig
Facsimile:       (416) 863-1716
E-mail:          zychk@bennettjones.com / zweigs@bennettjones.com

and to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY  10017

Attention:        Damian Schaible & Steven Z. Szanzer
Facsimile:       (212) 701-5800
Email:           damian.schaible@davispolk.com / steven.szanzer@davispolk.com

or to such other address as any party above may from time to time notify the others in accordance with this Section 7.6. In the event of any strike, lock-out or other event which interrupts postal service in any part of Canada or the United States, all notices and communications during such interruption may only be given or made by personal delivery or by email and any notice or other communication given or made by prepaid mail within the five (5) Business Day period immediately preceding the commencement of such interruption, unless actually received, shall be deemed not to have been given or made. Any such notices and communications so given or made shall be deemed to have been given or made and to have been received on the day of delivery if delivered, or on the day of emailing, provided that such day in either event is a Business Day and the communication is so delivered or emailed before 5:00 p.m. on such day. Otherwise, such communication shall be deemed to have been given and made and to have been received on the next following Business Day. The unintentional failure by the Applicants to give a notice contemplated hereunder to any particular Person shall not invalidate this Plan or any action taken by any Person pursuant to this Plan.

## 7.7    Further Assurances

Notwithstanding that the transactions and events set out herein will occur and be deemed to occur in the order set out in this Plan without any further act or formality, each of the Persons named or referred to in, affected by or subject to, this Plan, will make, do and execute, or cause to be made, done and executed, all such further acts, deeds, agreements, transfers, assurances, instruments or documents as may reasonably be required by any of them to carry out the full intent and meaning of this Plan and to give effect to the transactions or events contemplated herein.

## **<u>Exhibit E to the Second Kersley Affidavit</u>**

### **Preliminary Interim CBCA Order**

*See Exhibit A of this Foreign Representative Declaration*

## Exhibit G to the Second Kersley Affidavit

## Term Sheet

*This Exhibit is Omitted, but Available Upon Request*

**<u>Exhibit H to the Second Kersley Affidavit</u>**

**Unsecured Noteholders Support Agreement**

*This Exhibit is Omitted, but Available Upon Request*

## <u>Exhibit I to the Second Kersley Affidavit</u>

### Subordinated Noteholders Support Agreement

*This Exhibit is Omitted, but Available Upon Request*

## **Exhibit J to the Second Kersley Affidavit**

### **Securityholder Consent and Support Agreement**

*This Exhibit is Omitted, but Available Upon Request*

## **Exhibit K to the Second Kersley Affidavit**

### **Backstop Commitment Letter**

*This Exhibit is Omitted, but Available Upon Request*

## Exhibit L to the Second Kersley Affidavit

**Secured Noteholder Letter**

*This Exhibit is Omitted, but Available Upon Request*

**<u>Exhibit M to the Second Kersley Affidavit</u>**

**Tervita Response to Secured Noteholder Letter**

*This Exhibit is Omitted, but Available Upon Request*

## <u>Exhibit N to the Second Kersley Affidavit</u>

**Email to CBCA Director dated October 6, 2016**

*This Exhibit is Omitted, but Available Upon Request*

## <u>Exhibit O to the Second Kersley Affidavit</u>

**Blackline of Interim Order to Alberta Template Order**

*This Exhibit is Omitted, but Available Upon Request*

## <u>EXHIBIT E</u>

**Names and Addresses of Parties to Litigation in United States**

## Pending Litigation Parties

### *Caddo-Bossier Parishes Port Commission v. ARKLA Disposal et al; CCS Energy Services LLC; John Tuma; American International Specialty Lines Insurance Company*, Case No. 509, 871-A

Caddo-Bossier Parishes Port Commission, as Plaintiff

Plaintiff's Counsel:

Timothy W. Hardy
V. Joyce Matthews
Carlton Jones, III
Johanna A. Posada
Roedel Parsons Koch Blance Balhoff & McCollister, A.L.C.
8440 Jefferson Hwy., Suite 301
Baton Rouge, LA 70809
Tel: 225-929-7033
Facsimile: 225-928-4925

Ansel M. Stroud, III
Barham, Warner, Stroud Carmouche, L.L.C.
920 Pierremont Rd., Suite 412
Shreveport, LA 71106
Tel: 318-868-6633
Facsimile: 318-868-5006

AIG Specialty Insurance Company, as Co-Defendant

Counsel for AIG Specialty Insurance Company

Erin Fury Parkinson
McGlinchey Stafford, PLLC
643 Magazine Street, New Orleans, LA 70130
Tel: 504-596-2814
Facsimile: 504-596-0336

### City of Shreveport v. ARKLA Disposal et al; Specialty Lines Insurance Company, and CCS Energy Services LLC, Case No. 509, 862-A

City of Shreveport, as Plaintiff

Counsel to City of Shreveport

John S. Odom, Jr.
J. Marshall Jones, Jr.
Jones, Odom, Davie & Politz, L.L.P.
2124 Fairfield Avenue
Shreveport, LA 71104

AIG Specialty Insurance Company, as Co-Defendant

<u>Counsel for AIG Specialty Insurance Company</u>

> Erin Fury Parkinson
> McGlinchey Stafford, PLLC
> 643 Magazine Street
> New Orleans, LA 70130
> Tel: 504-596-2814
> Facsimile: 504-596-0336

> Richard W. Bryan, Paul D. Smolinsky
> Jackson & Campbell, P.C.
> One Lafayette Center
> 1120 20th Street, N.W.
> 300 South Tower
> Washington, D.C. 20036

## *<u>Franks Investment Company v. ARKLA Disposal et al. and CCS Energy Services LLC</u>, Case No. 509, 860-B*

Franks Investment Company, as Plaintiff

<u>Counsel to Franks Investment Company</u>

> Albert M. Hand, Jr.
> 333 Texas Street, Suite 1700
> Shreveport, LA 71101
> Tel: 318-221-6277
> Facsimile: 318-227-7850
> Email: al.hand@cookyancey.com

## *<u>Mike Sanders v. ARKLA Disposal et al. and the City of Shreveport</u>, Case No. 509, 126-A*

City of Shreveport, as Plaintiff

<u>Counsel to City of Shreveport</u>

> John S. Odom, Jr.
> J. Marshall Jones, Jr.
> Jones, Odom, Davie & Politz, L.L.P.
> 2124 Fairfield Avenue
> Shreveport, LA 71104

> James G. Bethard
> Bethard & Bethard, L.L.P.
> 1519 Ringgold Avenue
> P.O. Box 1362
> Coushatta, LA 71019-1362

## EXHIBIT F

**Names and Addresses of Provisional Relief Parties**

<u>**Provisional Relief Parties**</u>

<u>**Revolving Credit Facility Agent**</u>

John McPherson
The Toronto-Dominion Bank
77 King Street West, 18th Floor
Toronto, Ontario M5K 1A2
Canada
Attention: Vice President, Loan Syndications – Agency
Email: John.McPherson@tdsecurities.com

<u>Counsel to the Toronto-Dominion Bank, as Revolving Credit Facility Agent</u>

*Norton Rose Fulbright US LLP*

Howard A. Gorman
Richard P. Borden
Roberta Savard
Norton Rose Fulbright US LLP
Suite 3700, 400 3rd Avenue SW
Calgary, Alberta T2P 4H2
Canada
Email: howard.gorman@nortonrosefulbright.com
Email: rick.borden@nortonrosefulbright.com
Email: roberta.savard@nortonrosefulbright.com

<u>**Secured Creditor Ad Hoc Committee**</u>

<u>Counsel to the Secured Creditor Ad Hoc Committee</u>

*Goodmans LLP*

Robert Chadwick
Chris Armstrong
Goodmans LLP
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7
Canada
Email: rchadwick@goodmans.ca
Email: carmstrong@goodmans.ca

*Paul, Weiss, Rifkind, Wharton & Garrison LLP*

Andrew N. Rosenberg
Alice Belisle Eaton
Paul, Weiss, Rifkind, Wharton & Garrison LLP

1285 Avenue of the Americas
New York, NY 10019
Kevin O'Neill
Email: arosenberg@paulweiss.com
Email: aeaton@paulweiss.com
Email: koneill@paulweiss.com

## Unsecured Noteholder Ad Hoc Committee

Counsel to the Unsecured Noteholder Ad Hoc Committee

***Bennett Jones LLP***

Kevin J. Zych
Sean Zweig
Kristopher R. Hanc
Chris D. Simard
Bennet Jones LLP
3400 One First Canadian Place
P.O. Box 130
Toronto, Ontario M5X 1A4
Canada
Email: zychk@bennettjones.com
Email: zweigs@bennettjones.com
Email: HancK@bennettjones.com

Chris D. Simard
Bennett Jones LLP
4500 Bankers Hall East
855 2nd Street SW
Calgary, Alberta T2P 4K7
Canada
Email: SimardC@bennettjones.com

***Davis Polk & Wardwell LLP***

Damian Schaible
Steven Szanzer
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Email: damian.schaible@davispolk.com
Email: steven.szanzer@davispolk.com

## Subordinated Noteholder Ad Hoc Committee

Counsel to the Subordinated Noteholder Ad Hoc Committee

*Davies Ward Phillips & Vineberg LLP*

Jay Swartz
Robin Schwill
Davies Ward Phillips & Vineberg LLP
155 Wellington Street West
Toronto, Ontario M5V 3J7
Canada
Email: jswartz@dwpv.com
Email: rschwill@dwpv.com

*Fried, Frank, Harris, Shriver & Jacobson LLP*

Gary Kaplan
Cedrick Mendoza-Tolentino
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
Email: cedrick.mendoza-tolentino@friedfrank.com
Email: gary.kaplan@friedfrank.com

## Term Loan Administrative Agent

Joanna Anderson
Ryan Morick
Cortland Capital Market Services LLC
225 W. Washington Street, Suite 2100
Chicago, Illinois 60606
Email: joanna.anderson@cortlandglobal.com
Email: ryan.morick@cortlandglobal.com
Email: legal@cortlandglobal.com

Counsel to Cortland Capital Market Services LLC, as Term Loan Administrative Agent

*Kaye Scholer LLP*

Seth J. Kleinman
Kaye Scholer LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602
Email: seth.kleinman@kayescholer.com

## Secured Notes U.S. Trustee

James Lewis
Wells Fargo Bank, National Association
Email: james.r.lewis@wellsfargo.com

<u>Counsel to Wells Fargo Bank, National Association, as Secured Notes U.S. Trustee</u>

### *Reed Smith LLP*

Eric Schaffer
Luke Sizemore
Reed Smith LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
Email: ESchaffer@ReedSmith.com
Email: LSizemore@ReedSmith.com

### *McCarthy Tétrault LLP*

Sean Collins
McCarthy Tétrault LLP
Suite 4000, 421 7th Avenue SW
Calgary, Alberta T2P 4K9
Canada
Email: scollins@mccarthy.ca

## **Secured Notes Canadian Trustee**

Shelley Martin
TSX Trust Company
TMX Equity Transfer Services
200 University Avenue, Suite 300
Toronto, Ontario M5H 4HI
Email: Shelley.Martin@tmx.com

## **Unsecured Notes Trustee**

Sandra Horwitz
Delaware Trust Company
2711 Centerville Road
Wilmington, Delaware 19808
Attention: Trust Administration
Email: shorwitz@delawaretrust.com

<u>Counsel to Delaware Trust Company, as Unsecured Notes Trustee</u>

### *Ropes & Gray LLP*

Mark Somerstein
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036

Email: mark.somerstein@ropesgray.com

Patricia Chen
Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Email: patricia.chen@ropesgray.com

***Cassels Brock & Blackwell LLP***

Ryan Jacobs
Cassels Brock & Blackwell LLP
Suite 2100, Scotia Plaza
40 King Street West
Toronto, Ontario M5H 3C2
Email: rjacobs@casselsbrock.com

## Subordinated Notes Trustee

Patrick J. Healy
Wilmington Savings Fund Society, FSB
500 Delaware Avenue, 11th Floor
P.O. Box 957
Wilmington, DE 19899
Facsimile: (302) 421-9137

Counsel to Wilmington Savings Fund Society, FSB, as Subordinated Notes Trustee

***Willkie Farr & Gallagher LLP***

John Longmire
Gabriel Brunswick
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Email: jlongmire@willkie.com
Email: gbrunswick@willkie.com

## Catalyst Capital Group Inc.

Counsel to Catalyst Capital Group Inc.

***McMillan LLP***

Andrew F. Kent
Caitlin Fell
McMillan LLP

181 Bay Street
Toronto, Ontario M5J 2T3
Canada
Email: andrew.kent@mcmillan.ca
Email: caitlin.Fell@mcmillan.ca

Caireen Hanert
McMillan LLP
421 7th Avenue SW
Calgary, Alberta T2P 4K9
Canada
Email: caireen.hanert@mcmillan.ca

**Red Sky Holdings LP (in its capacity as shareholders of Red Sky Finance LP)**

4300 Bankers Hall West,
888 – 3rd Street SW
Calgary, Alberta T2P 5C5
Canada