Mark A. Broude
Annemarie V. Reilly
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Tervita Corporation, *et al.*,[1] | Case No. 16-12920 |
| Debtors in a Foreign Proceeding | (Joint Administration Requested) |

## MOTION FOR PROVISIONAL RELIEF PURSUANT TO
## SECTION 1519 OF THE BANKRUPTCY CODE

Rob Van Walleghem, the Executive Vice President, Health, Safety and Environment, and General Counsel and Corporate Secretary of Tervita Corporation ("**Tervita**"), and the Executive Vice President, Legal and Corporate Secretary of ARKLA Disposal Services, Inc., is the authorized foreign representative (the "**Foreign Representative**") of the above-captioned debtors (the "**Debtors**"), which are the subject of jointly-administered proceedings under the Canada Business Corporations Acts, R.S.C. 1985, c. C-44 (as amended, the "**CBCA**") in the Alberta Court of Queen's Bench, in Alberta, Canada (the "**Canadian Proceedings**" and such court, the "**Canadian Court**").  The Foreign Representative, having commenced the above-

---

[1]    The Debtors in this and the Canadian Proceedings, together with the last four digits of each Debtor's United States Tax Identification Number or Canadian Business Number, are as follows: ARKLA Disposal Services, Inc. (1990); Tervita Corporation (9886 USA/5469 Canada); CCS Canada (Canadian Holdings) Inc. (8811); CCS International Holdings Inc. (2967); HAZCO Industrial Services Ltd. (4059); Red Sky Holdings 1 Inc. (2758); Red Sky Holdings 2 Inc. (4419); Red Sky Holdings 3 Inc. (0417); Tervita Environmental Services Ltd. (1079); Tervita Equipment Rentals Ltd. (1611); Tervita Metal Services Ltd. (7725); Tervita Production Services Ltd. (7956); and Tervita Waste Processing Ltd. (6510).  The location of Tervita Corporation's corporate headquarters is 500, 140-10th Avenue SE, Calgary, Alberta.  The service address for the Debtors is 3400, 350-7th Avenue SW, Calgary, Alberta.

captioned chapter 15 cases (the "**Chapter 15 Cases**") in respect of the Debtors by filing forms of petition for recognition (collectively, the "**Forms of Petition**") together with a *Verified Petition for Entry of Order Recognizing Foreign Main Proceeding and Granting Additional Relief* (the "**Verified Petition**" and, together with the Forms of Petition, the "**Petitions**")[2] concurrently herewith, by and through his undersigned counsel, respectfully submits this motion (the "**Motion**") pursuant to Section 1519 of Title 11 of the United States Code (the "**Bankruptcy Code**") for an order granting provisional relief (the "**Provisional Relief Order**") making Section 362 of the Bankruptcy Code applicable on a limited basis with respect to the Debtors and their property that is within the territorial jurisdiction of the United States pending chapter 15 recognition of the Canadian Proceedings.  In support of the requested relief, the Foreign Representative respectfully refers the Court to the Petitions and the statements contained in the (a) *Declaration of Rob Van Walleghem in Support of Verified Petition for Entry of an Order Recognizing Foreign Main Proceedings and Granting Additional Relief* (the "**Van Walleghem Declaration**") and (b) *Declaration of Marc Wasserman in Support of Verified Petition for Recognition and Chapter 15 Relief* (the "**Wasserman Declaration**"), which were filed concurrently herewith and are incorporated herein by reference as if fully set forth herein.  The Foreign Representative further represents to the Court as follows:

## PRELIMINARY STATEMENT

1.     As described in the Verified Petition, the Tervita Group[3] is a substantially Canadian enterprise—all but one of its members are incorporated in Canada and its operations, corporate headquarters, management, and employees, as well as the vast majority of its assets

---

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Verified Petition.

[3]     Each of the Debtors are members of the Tervita Group.  The Tervita Group also includes 9894942 Canada Ltd., a subsidiary of Tervita and Red Sky Finance LP, a non-Debtor parent of Tervita.

(and substantially all of the Debtors' properties with any realizable value), are all located in Canada.

2.      The Tervita Group commenced the Canadian Proceedings in order to effectuate a recapitalization transaction through the implementation of a plan of arrangement under the CBCA.  As set forth in the Wasserman Declaration, the CBCA is a Canadian statute governing federally incorporated businesses, not including banks, insurance, and trust and loan companies. Section 192 of the CBCA provides a mechanism whereby a troubled company can effect fundamental changes referred to as an "arrangement," through which corporate reorganization and acquisition transactions may be implemented.  An arrangement under the CBCA is a court-supervised process that ensures a controlled restructuring or recapitalization procedure.  Indeed, all of the Debtors' assets and affairs are subject to the supervision of the Canadian Court during the pendency of the Canadian Proceedings.  The only creditors affected by the Canadian Proceedings are the Unsecured Noteholders and the Subordinated Noteholders.

3.      The Canadian Proceedings and these Chapter 15 Cases involve a proposed arrangement under the CBCA, pursuant to which the Tervita Group addresses approximately $2 billion of total indebtedness, through, among other things, the recapitalization of approximately USD $990.0 million of Unsecured Notes and Subordinated Notes through the implementation of a Plan of Arrangement.  The Plan is designed to implement a comprehensive recapitalization of Tervita's balance sheet whereby Tervita's (i) Term Loan Lenders and Secured Noteholders will be repaid their outstanding principal and accrued and unpaid interest in cash (with the exception of Secured Debt held by the Plan Sponsors as of September 14, 2016 and accrued and unpaid interest thereon, which will be equitized), (ii) lenders under the Revolving Credit Facility, trade creditors, and other non-financial creditors will be unimpaired, (iii) Unsecured Noteholders will be equitized, and (iv) Subordinated Noteholders will be paid cash consideration.  Tervita has

entered into plan support agreements with the majority of each class of affected stakeholders. In particular, approximately 74% of the Unsecured Noteholders, approximately 98% of the Subordinated Noteholders, and approximately 69% of the shareholders of Tervita's indirect parent corporation, Red Sky Acquisition Corp. (the "**RSAC Shareholders**"), have agreed to support the recapitalization transaction and vote in favor of the Plan of Arrangement. The Tervita Group will not solicit votes from any other classes of stakeholders because no other class will be affected by the Plan of Arrangement.

4.     The Debtors have only limited connections to the United States, including (i) an undrawn retainer for each of the Debtors (the "**Retainer Account**") held by Davis Polk & Wardwell LLP ("**DPW**"), as counsel to the Unsecured Noteholders Ad Hoc Committee, in the amount of USD $250,000 in a non-interest bearing account located with JPMorgan Chase Bank in New York, New York, which funds remain in the Retainer Account as of the date hereof and are the Debtors' property (subject to DPW's rights under its fee letter and the Initial CBCA Order), (ii) the incorporation of ARKLA, a single indirect subsidiary of Tervita, in Arkansas, which is a guarantor on Tervita's Term Loan Facility, Revolving Credit Facility, Secured Notes, Unsecured Notes, and Subordinated Notes, and (iii) the fact that each of the Term Loan Facility, the Secured Notes, the Unsecured Notes, and the Subordinated Notes were issued under instruments governed by New York law and which contain provisions submitting the parties thereto to the jurisdiction of the courts located in New York.

5.     The Foreign Representative commenced these Chapter 15 Cases in order to prevent the Debtors' stakeholders, many of whom have contacts with the United States and are subject to personal jurisdiction of this Court, from commencing actions in the United States that are more properly the subject of the Canadian Proceedings.

6.     To prevent such actions and to maintain the *status quo* pending the Court's

recognition of the Canadian Proceedings, the Foreign Representative seeks certain provisional relief (the "**Provisional Relief**"), including the limited application of the automatic stay under Section 362 of the Bankruptcy Code within the territorial jurisdiction of the United States to the following parties: (i) the Term Loan Lenders, (ii) Cortland Capital Market Services LLC (in its capacity as administrative agent under the Term Loan Facility), (iii) the Secured Noteholders, (iv) the Unsecured Noteholders, (v) the Subordinated Noteholders, (vi) Wells Fargo (in its capacity as trustee in connection with the Secured Notes and the Subordinated Notes), (vii) TSX Trust Company (in its capacity as Canadian trustee in connection with the Secured Notes), (viii) Red Sky Holdings LP (in its capacity as shareholder of Red Sky Finance LP), (ix) Delaware Trust (in its capacity as trustee in connection with the Unsecured Notes), and any other administrative agent, collateral agent, indenture trustee, or similar person in connection with the Term Loan Facility, the Secured Notes, the Unsecured Notes, and/or the Subordinated Notes (collectively, the "**Provisional Relief Parties**").[4]

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, as well as the *Amended Standing Order of Reference* dated January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.) (the "**Amended Standing Order**").   This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).  As set forth in the Verified Petition, venue is proper in this district pursuant to 28 U.S.C. § 1410(1).

8.    The statutory bases for the relief requested herein are Sections 105(a), 1519 and 1521(a) of the Bankruptcy Code.

---

[4]    To the extent the Foreign Representative identifies additional parties to whom the Provisional Relief should apply, the Foreign Representative reserves the right to seek application of the Provisional Relief to such additional parties.

## BACKGROUND

I.    **The Debtors' Business and Corporate Structure**

9.    As provided in the Verified Petition and the Van Walleghem Declaration, Tervita is an environmentally focused company based in Calgary that primarily serves the oil and gas industry and natural resource sectors in Western Canada.  The Tervita Group's largest line of business is "midstream services."  The Tervita Group delivers waste processing and management solutions for fluids and solid waste used in and generated by oil and gas drilling and production.  This includes, among many other services: (i) processing and disposing of waste by-products created by resource extraction and (ii) managing the sale of oil and condensate processed and recovered through the Tervita Group's waste processing facilities.  The Tervita Group also has other lines of business, including environmental services.  The Tervita Group performs complex projects such as remediation, environmental construction and de-commissioning projects, and other services such as bioremediation and water management services.  The Tervita Group has a diversified customer base of more than 1,500 clients, including many of Canada's largest oil and gas companies.

10.    Tervita is a private company continued under the laws of Canada with its registered office and head office located in Calgary, Alberta.  Alberta is Tervita's principal place of business.  The vast majority of the Tervita Group's approximately 1,270 current employees work in Alberta, with the remainder working in other Canadian provinces.  All five of Tervita's senior executives, and all ten of the members of Tervita's upper management work in Alberta.  The vast majority of Tervita's assets are located in Alberta, the vast majority of Tervita's revenues are earned in Alberta, and the vast majority of Tervita's operations are undertaken in Alberta (although Tervita also operates throughout the other Western Canadian provinces, Ontario, and Nova Scotia, and is registered to carry on business in all Canadian provinces and

territories, except Quebec).

11.     Tervita owns one hundred percent (100%) of the equity of its Canadian subsidiary Debtors.  Each of the Canadian Debtors is incorporated pursuant to the laws of Alberta and has its registered office in Calgary.  Substantially all (if not all) of the Canadian Debtors' operations are located in Canada.  Tervita also indirectly owns one hundred percent (100%) of a Debtor organized under U.S. law, ARKLA, which is a guarantor on Tervita's Term Loan Facility, Revolving Credit Facility, Secured Notes, Unsecured Notes, and Subordinated Notes (each as defined below).  ARKLA maintains no operations or business in the United States and holds no property of realizable value.

12.     Four of Tervita's direct and indirect parent companies—Debtors Red Sky Holdings 1 Inc. ("**RSH 1**"), Red Sky Holdings 2 Inc. ("**RSH 2**"), and Red Sky Holdings 3 ("**RSH 3**"), and non-Debtor Red Sky Finance LP ("**Finance LP**")—are also guarantors on Tervita's Term Loan Facility, Revolving Credit Facility, Secured Notes, Unsecured Notes, and Subordinated Notes (each as defined below) (collectively, the "**Parent Guarantors**" and, together with the other Debtors, the "**Guarantors**").   Red Sky Holdings LP, a limited partnership, is the direct parent and owner of one hundred percent (100%) of the limited partnership interests of Finance LP and one hundred percent (100%) of the common stock of RSH 1.  Finance LP, a limited partnership, owns percent (100%) of the preferred shares of RSH 3 and one hundred percent (100%) of the preferred shares of Tervita.  RSH 1 is the owner of one hundred percent (100%) of the common stock of RSH 2.  RSH 2, in turn, is the owner of one hundred percent (100%) of the common stock of RSH 3, which is the owner of one hundred percent (100%) of the common stock of Tervita.

13.     As of August 31, 2016, the Tervita Group had total consolidated assets with a net book value of approximately CAD $1.7 billion.  Approximately CAD $26.7 million of such

amount is attributable to the book value of Tervita's wholly-owned non-Debtor U.S. subsidiaries.

## II.    The Debtors' Capital Structure

14.    <u>Revolver</u>.  As of September 14, 2016, (the "**Canadian Commencement Date**"), Tervita was the borrower under, and each Debtor was a guarantor of, a revolving credit facility (the "**Revolving Credit Facility**") under that certain credit agreement, dated as of February 14, 2013 (the "**Revolving Credit Agreement**"), among Tervita, as borrower, the loan guarantors from time to time party thereto, the lenders from time to time party thereto, and the Toronto-Dominion Bank, as administrative agent (as amended, modified, restated or supplemented from time to time) in the principal amount of CAD $325.0 million (plus a swingline facility in the maximum principal amount of CAD $25.0 million).

15.    In order to finance the Tervita Group's working capital requirements and other general corporate purposes and capital expenditures throughout the Canadian Proceedings, Tervita and the Toronto-Dominion Bank executed an accommodation agreement (the "**Accommodation Agreement**").  The Accommodation Agreement provides the Tervita Group with continued availability to letters of credit under the Revolving Credit Facility, including the issuance and renewal thereof.

16.    <u>Secured Debt</u>. As of the Canadian Commencement Date, Tervita was the borrower under, and each Debtor was a guarantor of, the following secured debt facilities (collectively, the "**Secured Debt**"): (i) a term loan (the "**Term Loan Facility**" and the lenders thereunder, the "**Term Loan Lenders**") under that certain amended and restated credit agreement, dated as of February 14, 2013 (the "**Term Loan Credit Agreement**"), among Tervita, as borrower, the loan guarantors from time to time party thereto, the lenders from time to time party thereto, and Cortland Capital Market Services LLC, as successor administrative agent (as amended, modified, restated or supplemented from time to time) in the principal

amount of USD $ 750 million,[5] and (ii) those 8.00% senior secured notes due 2018 (the "**8% Secured Notes**") in an aggregate principal amount of USD $650.0 million and those 9.00% senior secured notes due 2018 (the "**9% Secured Notes**" and, together with the 8% Secured Notes, the "**Secured Notes**" and holders thereof the "**Secured Noteholders**")[6] in an aggregate principal amount of CAD $200.0 million, each issued by Tervita pursuant to a Secured Notes Indenture, dated as of February 14, 2013, among Tervita, the guarantors from time to time party thereto, Wells Fargo Bank, National Association ("**Wells Fargo**"), as the U.S. Trustee, and TSX Trust Company, as the Canadian Trustee.

17.    Tervita's secured obligations under the Revolving Credit Agreement, the Term Loan Credit Agreement, and the Secured Notes are subject to a collateral trust agreement dated February 14, 2013 (the "**Collateral Trust Agreement**")[7], among Tervita, the Guarantors, the administrative agent under the Revolving Credit Agreement, the trustees under the Secured Notes Indenture and Wilmington Trust, National Association as Canadian and U.S. collateral trustee (the "**Collateral Trustee**").    Pursuant to the Collateral Trust Agreement, the security granted under the applicable Security Documents is held by the Collateral Trustee for the benefit

---

[5]    As of August 31, 2016, the balance owing on the Term Loan Facility was approximately USD $247.7 million.

[6]    As of August 31, 2016, the balances outstanding under the Secured Notes were approximately USD $669.0 million and CAD $ 205.3 million, respectively.

[7]    In addition to the Collateral Trust Agreement, the Revolving Credit Agreement, the Term Loan Credit Agreement and the Secured Notes are subject to (i) an amended and restated pledge and security agreement dated as of February 14, 2013, among Tervita, the Guarantors and the Collateral Trustee, whereby each of Tervita and the Guarantors reaffirm and re-grant in favor of the Collateral Trustee a security interest in their respective present and after acquired personal property and a floating charge over their respective real property, (ii) an amended and restated pledge and security agreement dated as of February 14, 2013, among Tervita, Finance LP, RSH 3 and the Collateral Trustee, whereby each of Tervita, Finance LP and RSH 3 reaffirm and re-grant in favor of the Collateral Trustee a security interest in their respective present and after acquired personal property, (iii) a grant of security in patents, dated February 14, 2013, between Tervita and the Collateral Trustee, whereby Tervita grants to the Collateral Trustee a security interest in all of its patents as set forth therein, (iv) an amended and restated intellectual property security agreement, dated February 14, 2013, whereby Tervita grants to the Collateral Trustee a security interest in all of its intellectual property as set forth therein, and (v) certain additional documents relating to the grant of security in the foregoing agreements (collectively, the "**Security Documents**").

of the lenders under the Revolving Credit Agreement, the Term Loan Credit Agreement and the Secured Notes (collectively, the "**Secured Creditors**").  Proceeds realized by the Collateral Trustee with respect to the secured assets are paid (i) first, to satisfy the amounts owing under the Revolving Credit Agreement, including the undrawn amount of letters of credit up to the aggregate principal amount of CAD $400 million, and (ii) second, ratably, to satisfy the amounts owed under the Term Loan Credit Agreement and the Secured Notes.

18.    <u>Unsecured Debt</u>.  As of the Canadian Commencement Date, Tervita was the issuer and each Debtor subsidiary was a guarantor of the following unsecured debt facilities (the "**Unsecured Debt**"): (i) those 9.75% senior unsecured notes due 2019 (the "**9.75% Unsecured Notes**") in an aggregate principal amount of USD $290.0 million,[8] issued by Tervita pursuant to the 9.75% Unsecured Notes Indenture, dated as of October 23, 2012, among Tervita, the guarantors from time to time party thereto, and Delaware Trust Company ("**Delaware Trust**"), as successor trustee, and (ii) those 10.875% senior unsecured notes due 2018 (the "**10.875% Unsecured Notes**" and, together with the 9.75% Unsecured Notes, the "**Unsecured Notes**" and holders thereof the "**Unsecured Noteholders**") in an aggregate principal amount of USD $335.0 million,[9] issued by Tervita pursuant to the 10.875% Unsecured Notes Indenture, dated as of December 3, 2013, among Tervita, the guarantors from time to time party thereto, and Delaware Trust, as successor trustee.

19.    <u>Subordinated Debt</u>.  As of the Canadian Commencement Date, Tervita was the borrower under, and each Debtor subsidiary was a guarantor of, those 11.875% senior unsecured subordinated notes due 2018 (the "**Subordinated Notes**" or "**Subordinated Debt**" and holders

---

[8]    As of August 31, 2016, the balance outstanding under the 9.75% Unsecured Notes was approximately USD $299.4 million.

[9]    As of August 31, 2016, the balance outstanding under the 10.875% Unsecured Notes was approximately USD $354.8 million.

thereof the "**Subordinated Noteholders**") in an aggregate principal amount of USD $307.6 million,[10] issued by Tervita pursuant to the Subordinated Notes Indenture, dated as of May 9, 2008 (as amended), among Tervita, the guarantors from time to time party thereto, and Wilmington Savings Fund Society, FSB, as successor trustee.

20.    Intercompany Note.  On or about November 14, 2007, Tervita issued a note with a principal amount of CAD $849.0 million[11] to Finance LP (the "**Intercompany Note**").  Interest accrues on the Intercompany Note at the rate of 13% per annum.

## III.    Events Preceding Commencement of the Canadian Proceedings

21.    The industry in which the Debtors operate, providing integrated oil and gas environmental services to companies involved in the exploration and production of oil and natural gas, is dependent upon sustained success and growth in the oil and gas exploration and production sector.  In recent years, the oil and gas industry has faced a dramatic drop in commodity prices.  The uncertainty and volatility in the E&P sector resulting from falling oil prices has translated into lower investment, drilling and completions activity by E&P companies, which, consequently, adversely impacted the Tervita Group's revenues and profits.

22.    In response to declining oil prices, from 2014 through the end of 2015, the Debtors implemented certain cost-cutting initiatives and began evaluating strategic alternatives, including a sale of all or a portion of the company, as set forth in further detail in the Verified Petition.

23.    In December 2015, the Debtors and their financial advisor, Barclays Capital Inc. ("**Barclays**") began to analyze the possibility of a consensual restructuring.  From January 2016

---

[10]    As of August 31, 2016, the balance outstanding under the Subordinated Notes was approximately USD $336.6 million.

[11]    As of August 31, 2016, approximately CAD $ 1.1 billion was owing by Tervita under the Intercompany Loan.  Repayment of the amounts owing under the Intercompany Loan are subordinate to the repayment of the Unsecured Notes and the Subordinated Notes.

onwards, Tervita and its advisors were in contact with various debtholders to discuss possible covenant relief and other possible solutions. During March and April of 2016, Tervita and Barclays engaged with the Secured Noteholders, the Unsecured Noteholders and the Subordinated Noteholders and their respective advisors with the goal of entering into a consensual restructuring transaction.

24.     As described in the Verified Petition and the Van Walleghem Declaration, after extensive consultation with its board of directors and its advisors, Tervita elected not to make certain interest payments due on the Subordinated Notes and the Unsecured Notes during the spring and summer of 2016.

25.     Starting in March and April 2016, Tervita and its advisors engaged in negotiations with various ad hoc committees (collectively, the "**Ad Hoc Committees**") and their respective legal counsel and advisors in an effort to negotiate a recapitalization transaction that would recapitalize Tervita's capital structure and allow the business to continue as a going concern. The Ad Hoc Committees include the following: (i) a group of holders that are primarily holding a material portion of the debt under the Term Loan Facility and a material portion of the Secured Notes (the "**Secured Creditor Ad Hoc Committee**"); (ii) a group of holders that are primarily holding a material portion of the Unsecured Notes, as well as a material portion of the debt under the Term Loan Facility and a material portion of the Secured Notes (the "**Unsecured Noteholder Ad Hoc Committee**"); and (iii) a group of holders that are primarily holding a material portion of the Subordinated Notes (the "**Subordinated Noteholder Ad Hoc Committee**").

26.     The negotiations with the Ad Hoc Committees ultimately culminated in the formulation of a term sheet forming the basis of the Plan. On September 14, 2016, Tervita entered into separate Plan support agreements with (i) a material portion of the Unsecured Noteholders (the "**Unsecured Noteholder Support Agreement**"), (ii) a material portion of the

Subordinated Noteholders (the "**Subordinated Noteholder Support Agreement**"), and (iii) the RSAC Shareholders (the "**Shareholder Support Agreement**").    Additionally, Tervita and certain members of the Unsecured Noteholders Ad Hoc Committee (the "**Plan Sponsors**") also reached an agreement in principal on the terms of a backstop commitment in an amount of up to CAD $372.0 million (the "**New Investment**") (which amount may be reduced, such that Tervita's cash balance at closing is CAD $75 million).

## IV.    **The Plan of Arrangement**

27.    The Plan is a traditional debt for equity conversion.  The Plan provides for, among other things:

  a. the payment of the principal outstanding on all of the Secured Debt and accrued and unpaid interest thereon through the effective date of the Plan, other than the Secured Debt held by the Plan Sponsors as of September 14, 2016, and the accrued and unpaid interest thereon;

  b. the creation of a new class of common shares of Tervita (the "**New Common Shares**") and the creation of a new class of preferred shares of Tervita (the "**New Preferred Shares**"), which shares shall have substantially similar rights;

  c. the exchange of all of the existing equity of Tervita in consideration for 20% of the net proceeds actually received by Tervita from the determination or settlement of certain litigation by Tervita against a third party in the Canadian Court;

  d. the issuance of new preferred shares by Tervita to eligible Unsecured Noteholders that have elected to participate in the New Investment on a pro rata basis in accordance with the terms thereof;

  e. the issuance of new preferred shares by Tervita in consideration for the irrevocable exchange and transfer of all of the Secured Debt held by the Plan Sponsors as of September 14, 2016 and the accrued and unpaid interest thereon;

  f. the issuance of new common shares by Tervita that in the aggregate will represent 2.0% of pro forma equity, in consideration for the irrevocable exchange and transfer of all the Unsecured Notes;

  g. the issuance of new common shares by Tervita that in the aggregate will represent 0.5% of pro forma equity to those Unsecured Noteholders that execute the Unsecured Noteholder Support Agreement on or before October 21, 2016;

  h. the irrevocable exchange of all of the Subordinated Notes in consideration for the

payment of CAD $20.0 million by Tervita;

    i.    the further payment of CAD $5.0 million by Tervita to those Subordinated Noteholders that execute the Subordinated Noteholder Support Agreement on or before October 14, 2016;

    j.    the transfer of the Intercompany Loan debt to a subsidiary of Tervita; and

    k.    the funding of a new debt in an amount of CAD $475.0 million and the reinstatement or replacement of the Revolving Credit Facility, each on terms and conditions acceptable to Tervita and the Plan Sponsors.

28.    If the Plan proceeds as expected, the Term Loan Facility and the Secured Notes will be unimpaired by the Plan because the principal and interest on the Term Loan Facility and the Secured Notes will be repaid in full (other than the holdings of such Term Loan Facility and Secured Notes as of the Canadian Commencement Date held by the Plan Sponsors). The Revolving Credit Facility will also be unaffected by the Plan. In addition, Tervita's trade debt, other non-financial claims, and obligations to its employees will generally continue to be paid or otherwise satisfied in the ordinary course of business.

## V.    The Canadian Proceedings

29.    On September 14, 2016, the Tervita Group commenced the Canadian Proceedings with the goal of effecting a recapitalization transaction pursuant to the Plan of Arrangement while continuing normal operations under the protections offered by the CBCA. On that same date, the Canadian Court entered the Preliminary Interim CBCA Order evidencing the commencement of the Canadian Proceedings and granting further related relief. The Preliminary Interim CBCA Order is attached as Exhibit A to the Van Walleghem Declaration.

30.    The Preliminary Interim CBCA Order provides for a limited stay. Section 3 of the Preliminary Interim CBCA Order provides as follows:

From and including the date of this Preliminary Interim Order until and including October 14, 2016 (the "Stay Period"), no person, including, without limitation, the Noteholders, the trustees under the Indentures, the Term Loan Administrative Agent, the Term Loan Facility Lenders or any other administrative agent,

collateral agent, indenture trustee or similar person, (i) shall have any right to terminate, accelerate, amend or declare a default or event of default or make any demand or take any step to enforce any guarantee or any security interest granted by any member of the Tervita Group in respect of the Notes, the Term Loan Facility, or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor, and (ii) may refer to, rely on or otherwise claim any rights against any member of the Tervita Group under any contract, debt instrument or any other agreement with any member of the Tervita Group in respect of any alleged breach, default or event of default under the Notes, the Term Loan Facility or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor; in each case, by reason of: (A) the Applicants having commenced this proceeding, (B) any member of the Tervita Group taking any steps in furtherance thereof, (C) any member of the Tervita Group being a party to these proceedings or being party to an Arrangement, or (D) any default or cross-default arising under any of the Notes or the Term Loan Credit Agreement, without further order of this Honourable Court.

Preliminary Interim CBCA Order, § 3.

31.     Also as noted above, on October 17, 2016, the Canadian Court entered the Interim CBCA Order. The Interim CBCA Order is attached as Exhibit C to the Van Walleghem Declaration. The Interim CBCA Order further provides for a limited stay. Section 43 of the Interim CBCA Order provides as follows.

From 12:01 a.m. on the date of this Interim Order until and including the earlier of: (a) the effective date; (b) seven days after the termination of the Unsecured Noteholders Support Agreement; or (c) seven days after the termination of the Backstop Commitment Letter, no person, including, without limitation, the Noteholders, the trustees under the Indentures, the Term Loan Administrative Agent, the Term Loan Facility Lenders or any other administrative agent, collateral agent, indenture trustee or similar person, (i) shall have any right to terminate, accelerate, amend or declare a default or event of default or make any demand or take any step to enforce any guarantee or any security interest granted by any member of the Tervita Group in respect of the Notes, the Term Loan Facility, or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor, and (ii) may refer to, rely on or otherwise claim any rights against any member of the Tervita Group under any contract, debt instrument or any other agreement with any member of the Tervita Group in respect of any alleged breach, default or event of default under the Notes, the Term Loan Facility or any contract or other agreement to which any member of the Tervita Group is a party, borrower or guarantor; in each case, by reason of: (A) the Applicants having commenced this proceeding, (B) any member of the Tervita Group taking any steps in furtherance thereof, (C) any of member of the Tervita Group being a party to these proceedings or being party to an Arrangement, or (D) any default or cross-default arising under any of the Notes or

the Term Loan Credit Agreement, without further order of this [Honourable] Court.

Interim CBCA Order, § 43.

32.    In addition, the Preliminary Interim CBCA Order and the Interim CBCA Order each expressly requests that courts in the United States recognize the Canadian Proceedings and the Preliminary Interim CBCA Order and the Interim CBCA Order, respectively.  Section 11 of the Preliminary Interim CBCA Order and Section 50 of the Interim CBCA Order provide, in relevant part:

> This [Honourable] Court requests the aid and recognition of  . . . any court or any judicial, regulatory or administrative body of the United States, any state thereof or any other country in the aid of and to assist this [Honourable] Court in carrying out the terms of this Preliminary Interim Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants as may be necessary or desirable to give effect to this Preliminary Interim Order, to grant representative status to the Applicants in any foreign proceedings, or to assist the Applicants and their respective agents in carrying out the terms of this Preliminary Interim Order.

Preliminary Interim CBCA Order, § 11; Interim CBCA Order, § 50.

33.    Finally, the Preliminary Interim CBCA Order and the Interim CBCA Order each appoints a senior officer of Tervita as foreign representative for the express purpose of seeking recognition of the Canadian Proceedings in jurisdictions outside of Canada.  Section 12 of the Preliminary Interim CBCA Order and Section 51 of the Interim CBCA Order each provides:

> A senior officer of one or more of the Applicants, as necessary, is authorized to act as the representative or foreign representative (the "Foreign Representative") of any of the Applicants or any other member of the Tervita Group in connection with these proceedings and with carrying out the terms of this Preliminary Interim Order, for, among other things, the purpose of having these proceedings recognized in any other jurisdiction whether in or outside of Canada, as necessary. The Foreign Representative is hereby authorized to apply for foreign recognition of these proceedings, as necessary, in any jurisdiction outside of Canada.

Preliminary Interim CBCA Order, § 12; Interim CBCA Order, § 51.

34.    In accordance with the Preliminary Interim CBCA Order and the Interim CBCA

Order Rob Van Walleghem, the Executive Vice President, Health, Safety and Environment, and

General Counsel and Corporate Secretary of Tervita, and the Executive Vice President, Legal

and Corporate Secretary of ARKLA, was appointed as Foreign Representative by Tervita.

35.    The Interim CBCA Order sets out a proposed timeline under which the Plan is to

be approved.    Pursuant to the Interim CBCA Order, the Unsecured Noteholders, the

Subordinated Noteholders and the RSAC Shareholders will hold separate meetings to consider

authorizing and approving the Plan of Arrangement, among other things, on November 30, 2016.

Upon approval by the requisite stakeholders (i.e., the Unsecured Noteholders, the Subordinated

Noteholders, and the RSAC Shareholders), the Canadian Court will hold a hearing to consider

entry of a final order approving the Plan on December 6, 2016 at 10:00 a.m. (Calgary time) or

soon thereafter. *See* Interim CBCA Order, § 38.

36.    Although each Debtor's respective management and board of directors remains in

place, each Debtor's assets and affairs are subject to the supervision of the Canadian Court

during the pendency of the Canadian Proceedings.

## RELIEF REQUESTED

37.    Pursuant to Section 1519 of the Bankruptcy Code, the Debtors respectfully

request that the Court enter the Provisional Relief Order, substantially in the form attached

hereto as Exhibit A, granting the following provisional relief pending recognition of the

Canadian Proceedings:

   a.  Section 362 of the Bankruptcy Code shall apply to the Provisional Relief Parties
       with respect to each of the Debtors and the property of each of the Debtors that is
       within the territorial jurisdiction of the United States.  For the avoidance of doubt
       and without limiting the generality of the foregoing, the Provisional Relief Order
       shall impose a stay within the territorial jurisdiction of the United States,
       applicable to the Provisional Relief Parties, of:

       i.   The commencement or continuation, including the issuance or
            employment of process, of a judicial, administrative, or other action or
            proceeding against any of the Debtors that was or could have been

commenced before the commencement of the Debtors' Chapter 15 Cases, or to recover a claim against any of the Debtors that arose before the commencement of the Debtors' Chapter 15 Cases;

ii.   The enforcement, against any of the Debtors or against the property of any of the Debtors, of a judgment obtained before the commencement of the Debtors' Chapter 15 Cases;

iii.   Any act to obtain possession of property of any of the Debtors or of property from any of the Debtors or to exercise control over property of any of the Debtors;

iv.   Any act to create, perfect, or enforce any lien against property of any of the Debtors;

v.   Any act to create, perfect, or enforce against property of any of the Debtors to the extent that such lien secures a claim that arose before the commencement of the Debtors' Chapter 15 Cases;

vi.   Any act to collect, assess, or recover a claim against any of the Debtors that arose before the commencement of the Debtors' Chapter 15 Cases; and

vii.   The setoff of any debt owing to any of the Debtors that arose before the commencement of the Debtors' Chapter 15 Cases against any claim against of the Debtors.

b.   Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") to the contrary, (i) the Provisional Relief Order shall be effective immediately and enforceable upon entry; (ii) the Foreign Representative is not subject to any stay in the implementation, enforcement, or realization of the relief granted in the Provisional Relief Order; and (iii) the Foreign Representative is authorized and empowered, and may, in his discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of the Provisional Relief Order; and

c.   Such other relief as may be just and proper.

## <u>APPLICABLE AUTHORITY</u>

38.   The Foreign Representative has contemporaneously filed the Petitions seeking recognition and a ruling that the Canadian Proceedings are foreign main proceedings under Sections 1517 and 1520 of the Bankruptcy Code. Although a "petition for recognition of a

foreign proceeding shall be decided upon at the earliest possible time,"[12] there is necessarily a gap between the time the petition for recognition is filed and the time the court makes a decision on whether a proceeding should be recognized.  Accordingly, the Foreign Representative seeks emergency provisional relief under Sections 105(a) and 1519 of the Bankruptcy Code.

39.    Section 1519 of the Bankruptcy Code permits the Court "from the time of filing a petition for recognition until [it] rules on the petition" to grant provisional relief pending recognition of the foreign proceeding where such relief is "urgently needed to protect the assets of the debtor or the interests of the creditors."  11 U.S.C. § 1519(a).  The Foreign Representative seeks imposition of the automatic stay under Section 362 of the Bankruptcy Code for the purpose of maintaining the *status quo* until the Court rules on the Petition.  Upon recognition of the Canadian Proceedings as foreign main proceedings, the Section 362 stay will automatically take effect in respect of the Debtors and their property within the United States pursuant to Section 1520(a)(1).[13]

40.    The provisional relief requested here is an "effective mechanism" to implement the chapter 15 policies of promoting cooperation between courts of the United States and courts of foreign countries involved in cross-border insolvency cases, the "fair and efficient administration of cross border insolvencies that protects the interest of all creditors, and other interested entities," including the Debtors, the "protection and maximization of the value of the [Debtors'] assets," and the "facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment."  11 U.S.C. § 1501(a).

41.    Furthermore, the provisional relief sought herein is of a type commonly and

---

[12]    11 U.S.C. § 1517(c).

[13]    To the extent the Court grants foreign non-main recognition with regard to any of the Debtors, the Foreign Representative intends to seek continuation of the stay via Section 1521(a)(1) of the Bankruptcy Code.

frequently granted in chapter 15 cases.    Bankruptcy Courts in the United States have routinely imposed the Section 362 stay or ordered similar relief to maintain the *status quo* pending recognition or disposition of foreign proceedings in ancillary cases under both chapter 15 and form Section 304.    *See, e.g.*, *In re Abengoa, S.A.*, No. 16-10754 (KJC) (Bankr. D. Del. March 31, 2016); *In re SIFCO S.A.*, No. 14-11179 (REG) (Bankr. S.D.N.Y. May 7, 2014); *In re Mt.Gox Co., Ltd. a/k/a K.K. Mt.Gox*, No. 14-31229 (SGJ) Bankr. N.D. Tex. Mar. 10, 2014); *In re Syncapse Corp.*, No. 13-12410 (SMB) (Bankr. S.D.N.Y. July 25, 2013; *STX Pan Ocean Co.*, No. 13-12046(SCC) (Bankr. S.D.N.Y. July 1, 2013); *In re PT Berlian Laju Tanker TBK*, No. 13-10901 (SMB) (Bankr. S.D.N.Y. March 29, 2013); *In re John Forsyth Shirt Co.*, No. 13-10526 (SCC) (Bankr. S.D.N.Y. Feb. 2, 2013); *In re Compania Mexicana de Aviacion, S.A. de C.V.*, No. 10-14182 (MG) (Bankr. S.D.N.Y. Aug. 5, 2010); *In re SIVEC SRL*, No. 11-80799-TRC, 2011 WL 2445754 (Bankr. E.D. Okla. June 15, 2011); *In re Japan Airlines Corp.*, No. 10-10198 (JMP), 2010 WL 1050075 (Bankr. S.D.N.Y. Jan. 28, 2010); *In re Innua Can. Ltd.*, No. 09-16362 (DHS), 2009 WL 1025088 (Bankr. D. N.J. Mar. 25, 2009); *In re Alitalia Linee Aeree italiane S.p.A.*, No. 08-14321 (BRL) (Bankr. S.D.N.Y. Nov. 5, 2008); *In re Pro-Fit Int'l Ltd.*, 391 B.R. 850, 864-65 (Bankr. C.D. Cal. 2008).

## ARGUMENT

I.    **Provisional Relief Is Urgently Needed to Protect the Debtors' Assets and Recapitalization Efforts**

42.    The Provisional Relief is urgently needed here to protect the Debtors' assets and to protect the interests of creditors as a whole.  *See* 11 U.S.C. § 1519(a).  Without the limited application of Section 362 to the Provisional Relief Parties, there is a real and significant risk that certain of the Debtors' stakeholders, many of whom have contacts with the United States and are subject to personal jurisdiction of this Court, may commence actions in the United States that are more properly the subject of the Canadian Proceedings.  In particular, the Foreign

Representative is concerned that creditors may try to take advantage of the Debtors' connections

to the United States to take actions  in the United States to interfere with the Canadian Court's

ability to adjudicate the Plan of Arrangement, which would not only hinder the orderly

administration of the Tervita Group's affairs, but threaten to unravel the majority-supported

recapitalization transaction that the Tervita Group seeks to implement pursuant to the Canadian

Proceedings.  Any disruption in the Canadian Proceedings could delay the implementation of the

recapitalization transaction and cause significant harm to the Debtors, their stakeholders, and

other parties in interest.  This "snowball effect" demonstrates the urgency of the requested relief

and is precisely what provisional relief under Section 1519 is intended to address.  *See, e.g.*, *In re*

*Petition of Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) (finding that, under former

Section 304 of the Bankruptcy Code, irreparable harm would be caused by permitting creditors

to execute judgments against bond proceeds because it would "diminish the recovery available to

other creditors and possibly wreck the reorganization").

## II.     The Provisional Relief Requested is Consistent with the Preliminary Interim CBCA Order and the Interim CBCA Order

43.     The Preliminary Interim CBCA Order and the Interim CBCA Order entered in the

Canadian Proceedings provides for a limited stay of enforcement actions applicable to the

Provisional Relief Parties.  Preliminary Interim CBCA Order; § 3, Interim CBCA Order, § 43.

The Provisional Relief is similar—and, indeed, more narrowly tailored—than the stay already

ordered by the Canadian Court.   In addition, the Canadian Court expressly requested the aid of

foreign courts in giving effect to the Preliminary Interim CBCA Order and the Interim CBCA

Order.  Preliminary Interim CBCA Order, at § 11; Interim CBCA Order, § 50.  Accordingly, the

Provisional Relief should be granted in order to extend the stay issued under the Preliminary

Interim CBCA Order and the Interim CBCA Order specifically to protect the Debtors, their

assets, and their recapitalization efforts in the United States.

## III.    Comity Considerations Weigh In Favor of Provisional Relief

44.    Comity should be extended to the Preliminary Interim CBCA Order and the
Interim CBCA Order.  A central tenet of chapter 15 is the importance of comity in cross-border
insolvency proceedings.  *Ad Hoc Group of Vitro Noteholder v. Vitro SAB de CV (In re Vitro SAB
de CV)*, 701 F.3d 1031, 1053 (5th Cir. 2012).  The Supreme Court defined comity as follows:

> "Comity," in the legal sense, is neither a matter of absolute
> obligation, on the one hand, nor of mere courtesy and good will,
> upon the other.  But it is the recognition which one nation allows
> within its territory to the legislative, executive, or judicial acts of
> another nation, having due regard both to international duty,
> convenience, and to the rights of its own citizens, or of other
> persons who are under the protections of its laws.

*Hilton v. Guyot*, 159 U.S. 113, 143 (1895); *see also In re Vitro SAB De CV*, 701 F.3d at 1043-44.

45.    The exceptions to comity are construed especially narrowly when a court is asked
to recognize judicial acts in Canada, a sister common law jurisdiction with procedures akin to
those in the United States.  *Clarkson Co v. Shaheen*, 544 F.2d 624, 630 (2d Cir. 1976) (holding
that it would contravene the public policy of New York and the doctrine of comity not to
recognize the Canadian judgment); *In re Petition of Davis*, 191 B.R. 577, 587 (Bankr. S.D.N.Y.
1996) (stating that "Courts in the United States uniformly grant comity to Canadian proceedings"
and noting that Canada is a  sister common law jurisdiction with the United States).  Indeed, U.S.
courts routinely extend comity to Canadian orders.  *See, e.g.*, *In re Metcalfe & Mansfield
Alternative Invs.*, 421 B.R. 685, 698-99 (Bankr. S.D.N.Y. 2010) (extending comity to Canadian
CCAA order providing for a third party release and citing numerous cases where U.S. courts
have extended comity to Canadian judgments); *Raymond Chabot, Inc. v. Serge Cote Family
Trust*, 2014 U.S. Dist. LEXIS 117128, *6 (D.S.C. Aug. 22, 2014) (entering temporary restraining
order assisting Canadian bankruptcy receiver and noting "the widely-accepted view that
Canadian judgments are entitled to recognition and enforcement here"); *Collins v. Oilsands*

*Quest, Inc.*, 484 B.R. 593, 597 (S.D.N.Y. 2012) (bankruptcy court enforced Canadian court stay

in CCAA proceeding, noting "the question here is not whether this Court should grant a stay in

the first instance, but whether it should accord comity and deference to the stay orders entered by

the Alberta Court.  The Court concludes that in light of the comity principles laid out above, the

Court must defer to the procedures set forth in the Canadian Proceedings and enforce the stay.")

## IV.    The Automatic Stay and Other Protections Are Likely to Apply Upon Recognition

46.    As set forth in the Petitions and the Van Walleghem Declaration, the Foreign

Representative seeks recognition of the Canadian Proceeding as foreign main proceedings.  If the

Court finds the Canadian Proceedings to be foreign main proceedings, certain relief is automatic.

Upon recognition of a foreign proceeding that is a foreign main proceeding—

(1)    Sections 361 and 362 of the Bankruptcy Code apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States;

(2)    Sections 363, 549, and 552 of the Bankruptcy Code apply to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of an estate;

(3)    Unless the court orders otherwise, the foreign representative may operate the debtor's business and may exercise the rights and powers of a trustee under and to the extent provided by Sections 363 and 552 of the Bankruptcy Code; and

(4)    Section 552 of the Bankruptcy Code applies to property of the debtor that is within the territorial jurisdiction of the United States.

11 U.S.C. § 1520(a).

47.    Accordingly, the Provisional Relief requested is consistent with, and more

narrowly tailored than, the relief that will automatically be granted upon recognition of the

Canadian Proceedings.

## V.    The Requested Relief Meets The Standards for a Preliminary Injunction

48.    As the Foreign Representative seeks only provisional imposition of the stay under

Section 362 (and only in respect of the Debtors), the standards for injunctive relief are arguably

not applicable in these Chapter 15 Cases.  *See In re Pro-Fit Int'l Ltd.*, 391 B.R. 850, 864-65

(Bankr. C.D. Cal. 2008) (satisfaction of the requirements for an injunction unnecessary for

Section 1519 imposition of Section 362 stay because *in rem* nature of stay differentiates it from

injunctive relief, placing it outside the scope of Federal Rule of civil Procedure 65).  However, if

the injunction standards do apply to the relief requested in this Motion, such standards are

satisfied.

49.    A preliminary injunction should be issued where, as here, the following elements

are satisfied: (i) there is a likelihood of successful reorganization; (ii) there is an imminent

irreparable harm to the debtors' assets in the absence of an injunction, (iii) the balance of harms

tips in favor of the moving party, and (iv) the public interest weighs in favor of an injunction.

*See In re Lyondell Chem. Co.*, 402 B.R. 571, 588 (Bankr. S.D.N.Y. 2009) (citing *Calpine Corp.

v. Nev. Power Co. (In re Calpine Corp.)*, 354 B.R. 45 (Bankr. S.D.N.Y. 2006) *aff'd* 365 B.R. 401

(S.D. N.Y. 2007)).  In evaluating these factors, courts take a "flexible approach and no one factor

is determinative."  *In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007) (internal citations

omitted) (citing *Haw. Structural Ironworkers Pension Trust Fund v. Calpine Corp.*, 2006 WL

3755175, at *4 (S.D.N.Y. Dec. 20, 2006)).  All four elements are satisfied here.

A.    <u>The Foreign Representative Is Likely to Succeed on The Merits</u>

50.    The Foreign Representative is likely to succeed on the merits and to obtain

recognition of the Canadian Proceedings as foreign main proceedings.  For the reasons set forth

in the Verified Petition, the Foreign Representative has demonstrated that the Canadian

Proceedings are foreign main proceedings as defined in Section 1502(4) of the Bankruptcy Code

and the Foreign Representative is the proper foreign representative, as defined in Section 101(24)

of the Bankruptcy Code.  *See* Verified Petition, at 43-50.  Indeed, courts have recognized

proceedings under the CBCA, like the Canadian Proceedings here, as foreign main proceedings

under Chapter 15.  *See, e.g.*, *Essar Steel Algoma Inc.*, No. 14-11730 (BLS) (Bankr. D. Del. Aug.

2-, 2014); *In re Mega Brands Inc.*, No. 10-10485 (Bankr. D. Del. Mar. 23, 2010); *In re Tembec*

*Indus. Inc.*, No. 08-13435 (Bankr. S.D.N.Y. Oct. 31, 2008).   Accordingly, there is a substantial

likelihood that mandatory relief under Section 1520 will be ordered, thereby resulting in the

application of the automatic stay under Section 362 of the Bankruptcy Code.   There is also a

substantial likelihood that, with the Provisional Relief granted, the Debtors will successfully

complete a restructuring under the provisions of the CBCA in the Canadian Proceedings, which

the Foreign Representative believes will maximize recoveries for the Debtors' stakeholders.  The

Foreign Representative is, therefore, likely to succeed on the merits.

> B.      The Debtors Will Suffer Irreparable Harm If An Injunction Is Not Issued

51.      As discussed above, without the Provisional Relief, there is a real and significant

risk that certain of the Debtors' stakeholders, many of whom have contacts with the United

States and are subject to personal jurisdiction of this Court, may commence actions in the United

States that are more properly the subject of the Canadian Proceedings, or otherwise seek to

interfere with the Canadian Court's ability to adjudicate the Plan, which is supported by each

voting class.   Allowing such issues to be litigated in the United States would disrupt the

Canadian Proceedings, resulting in unnecessary delay and significant expense to the detriment of

the Debtors' other stakeholders (at best) and the potential unraveling of the entire restructuring

under the Canadian Proceedings (at worst).   Accordingly, the Debtors will suffer irreparable

harm if the Provisional Relief is not granted.

> C.      The Balance of Harms Weighs In Favor of The Debtors

52.      The balance of harms also weighs in favor of granting the Provisional Relief and

imposing the limited stay under Section 362 with respect to the Provisional Relief Parties.  The

Provisional Relief will preserve the assets of the Debtors and allow the Tervita Group to move

forward with the Plan in the Canadian Proceedings pending a determination by this Court of whether the Canadian Proceedings should be recognized. *See In re Innua Canada Ltd.*, No. 09-16362, 2009 WL 1025088, at *4 (Bankr. D.N.J. Mar. 25, 2009) (finding that the temporary maintaining of the *status quo* pending recognition of the foreign proceedings actually served to benefit creditors "by allowing for an orderly administration of the Foreign Debtors' financial affairs under the Canadian Proceeding," tipping the balance of harms in favor of the foreign representative). At this stage (and even after the recognition of the Canadian Proceedings as foreign main proceedings), parties in interest will have an opportunity to participate in the Canadian Proceedings, which are designed to take account of and balance the needs of the various creditor constituencies in a collective, centralized process.

53. Further, the Provisional Relief would cause little, if any, harm to creditors. The Provisional Relief would be temporary, pending the hearing on recognition. The Debtors will continue to operate as a going concern and, as such, their assets will be available for the purpose of making equitable distributions to all creditors in the Canadian Proceedings as provided under an approved plan of arrangement in Canada. The Provisional Relief will not affect the ability of creditors to assert their claims in the Canadian Proceedings. That certain creditors "may be denied an advantage over the debtor's other . . . creditors is not a valid reason to deny relief to the foreign representative." *In re Atlas Shipping A/S*, 404 B.R. 726, 742 (Bankr. S.D.N.Y. 2009). The harm to the Debtors and their assets that would occur absent the Provisional Relief would be far greater than any potential prejudice to stakeholders that might wish to pursue their individual remedies in the United States in disregard for the Canadian Proceedings.

D.    The Public Interest Favors Granting The Requested Injunctive Relief

54. The Provisional Relief will not disserve the public interest. The Provisional Relief is in the public interest as it will facilitate a cross-border reorganization that will provide a

benefit to the estates of the Debtors and, in turn, a benefit to their stakeholders.  The Provisional

Relief is, supported by the principles of comity and will allow the Debtors to implement the

recapitalization transaction.   These goals are consistent with the express objectives of Chapter

15, which include, inter alia, encouraging cooperation between the courts of the United States

and courts of foreign countries, "fair and efficient administration of cross-border insolvencies,"

and "protection and maximization of the value of the debtor's assets."  11 U.S.C. § 1501(a).

55.     In sum, the Provisional Relief is necessary and appropriate, in the interest of the

public and international comity, consistent with United States public policy, and will not cause

any hardship to any party in interest that is not outweighed by the benefits of granting the

Provisional Relief.

## NO SECURITY REQUIRED

56.     No security is required for the  provisional relief requested here.   First, the

standards for preliminary injunction relief do not apply to this Motion.  *See supra* at 48.  Second,

under the Bankruptcy Rules, security is not a prerequisite for the Debtors to obtain injunctive

relief.   Fed. R. Bankr. P. 7065.   In any event, security would be unwarranted under the

circumstances here, where the Debtors' assets are under the jurisdiction of the Canadian Court

and where provisional relief would last only until this Court rules on the Verified Petition.

## MOTION PRACTICE

57.     This Motion includes citations to the applicable rules and statutory provisions

upon which the relief requested herein is predicated and a discussion of their application to this

Motion.  Accordingly, the Foreign Representative submits this Motion satisfies Rule 9013-1(a)

of the Local Bankruptcy Rules for the Southern District of New York.

## NOTICE

58.     Notice of this Motion shall be provided by electronic mail to the extent email

addresses are available and otherwise by United States mail, overnight or first-class postage

prepaid, upon the Notice Parties (as defined in the *Motion for Order Scheduling Recognition*

*Hearing and Specifying Form and Manner of Service of Notice*, filed concurrently herewith), the

Office of the United States Trustee, and such other entities as the Court may direct.  Further,

publication notice of this order will also be provided in the international edition of the Wall

Street Journal.  Such service shall constitute good and sufficient service and adequate notice for

all purposes.

## NO PRIOR REQUEST

59.    No previous request for the relief requested herein has been made to this Court or

any other court.

## CONCLUSION

WHEREFORE the Foreign Representative respectfully requests that this Court enter an

order, substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested

herein and such other and further relief as may be just and proper.


Dated: October 19, 2016
     New York, New York           LATHAM & WATKINS LLP


                                */s/ Mark A. Broude* _____

                                Mark A. Broude
                                Annemarie V. Reilly
                                885 Third Avenue
                                New York, New York 10022-4834
                                Telephone:  212-906-1200
                                Fax:  212-751-4864
                                Email: mark.broude@lw.com
                                       annemarie.reilly@lw.com

                                *Counsel to the Foreign Representative*

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 15 |
| Tervita Corporation, *et al.*,[1] | Case No. 16- 12920 |
| Debtors in a Foreign Proceeding | (Jointly Administered) |

## ORDER GRANTING PROVISIONAL RELIEF PURSUANT TO SECTION 1519 OF THE BANKRUPTCY CODE

Upon the *Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code* (the "**Motion**"),[2] filed on October 19, 2016, by the duly authorized foreign representative (the "**Foreign Representative**") of the above captioned debtors in foreign proceedings (the "**Debtors**"), appointed as foreign representative in the jointly-administered proceedings under the Canada Business Corporations Acts, R.S.C. 1970, c. C-44 (as amended, the "**CBCA**") in the Alberta Court of Queen's Bench, in Alberta, Canada (the "**Canadian Proceedings**"), seeking (a) entry of an order (this "**Order**") granting provisional relief making Section 362 of the Bankruptcy Code applicable on a limited basis with respect to the Debtors and their property that is within the territorial jurisdiction of the United States pending chapter 15 recognition of the Canadian Proceedings and (b) such other relief as may be just and proper; and this Court having considered (i) the Motion, (ii) the Verified Petition, (iii) the Van Walleghem Declaration, (iv) the Wasserman Declaration, and (v) the evidence presented at the hearing before this Court on

---

[1]    The Debtors in this and the Canadian Proceedings, together with the last four digits of each Debtor's United States Tax Identification Number or Canadian Business Number, are as follows: ARKLA Disposal Services, Inc. (1990); Tervita Corporation (9886 USA/5469 Canada); CCS Canada (Canadian Holdings) Inc. (8811); CCS International Holdings Inc. (2967); HAZCO Industrial Services Ltd. (4059); Red Sky Holdings 1 Inc. (2758); Red Sky Holdings 2 Inc. (4419); Red Sky Holdings 3 Inc. (0417); Tervita Environmental Services Ltd. (1079); Tervita Equipment Rentals Ltd. (1611); Tervita Metal Services Ltd. (7725); Tervita Production Services Ltd. (7956); and Tervita Waste Processing Ltd. (6510).  The location of Tervita Corporation's corporate headquarters is 500, 140-10th Avenue SE, Calgary, Alberta.  The service address for the Debtors is 3400, 350-7th Avenue SW, Calgary, Alberta.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

October [__], 2016 (the "**Hearing**"); and appropriate and timely notice of the filing of the Motion and the Hearing having been given; and no other or further notice being necessary or required; and after due deliberation and sufficient cause appearing therefor, the Court makes the following findings of fact and conclusions of law:[3]

a.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order.

b.    All holders of debt under the Term Loan Facility and all Secured Noteholders, Unsecured Noteholders, and Subordinated Noteholders have consented to the personal jurisdiction of all federal and state courts in New York and, therefore, have consented to the personal jurisdiction of this Court pursuant to the Term Loan Credit Agreement and the indentures governing the Secured Notes, the Unsecured Notes, and the Subordinated Notes.

c.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

d.    Venue is proper in this district pursuant to 28 U.S.C. § 1410.

e.    The Canadian Proceedings are pending in Alberta, Canada, and the Foreign Representative has been authorized to act as foreign representative of the Debtors in these Chapter 15 Cases.

f.    Based on the pleadings filed to date, the Court concludes that the Foreign Representative has demonstrated a likelihood of success on the merits of the Petitions.

g.    The relief sought by the Foreign Representative in the Motion is authorized under Section 1519 of the Bankruptcy Code and the Foreign Representative has demonstrated that irreparable harm to the Debtors may occur in the absence of the relief sought in the Motion.

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, or any of the following conclusions of law constitute findings of fact, they are adopted as such.

h.      The relief sought by the Motion will not cause undue hardship to any party in interest and, to the extent that any hardship may result to such parties, it is outweighed by the benefits of the requested relief to the Debtors and all of their creditors.

i.      The relief granted hereby is necessary and appropriate in the interests of the public and international comity and it is consistent with the public policy of the United States.

j.      No security is required for the relief granted herein under Bankruptcy Rule 7065 or otherwise.

k.      All parties in interest will be sufficiently protected by the provisions of Section 362 of the Bankruptcy Code.

Now therefore, it is hereby ORDERED:

1.      Section 362 of the Bankruptcy Code shall apply to the Provisional Relief Parties with respect to each of the Debtors and the property of each of the Debtors that is within the territorial jurisdiction of the United States.  For the avoidance of doubt, and without limiting the generality of the foregoing, the relief granted by this Order shall impose a stay within the territorial jurisdiction of the United States, applicable to the Provisional Relief Parties, of:

    i.      The commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against any of the Debtors that was or could have been commenced before the commencement of the Debtors' Chapter 15 Cases, or to recover a claim against any of the Debtors that arose before the commencement of the Debtors' Chapter 15 Cases;

    ii.     The enforcement, against any of the Debtors or against the property of any of the Debtors, of a judgment obtained before the commencement of the Debtors' Chapter 15 Cases;

    iii.    Any act to obtain possession of property of any of the Debtors or of property from any of the Debtors or to exercise control over property of any of the Debtors;

    iv.     Any act to create, perfect, or enforce any lien against property of any of the Debtors;

v.      Any act to create, perfect, or enforce against property of any of the Debtors to the extent that such lien secures a claim that arose before the commencement of the Debtors' Chapter 15 Cases;

vi.     Any act to collect, assess, or recover a claim against any of the Debtors that arose before the commencement of the Debtors' Chapter 15 Cases; and

vii.    The setoff of any debt owing to any of the Debtors that arose before the commencement of the Debtors' Chapter 15 Cases against any claim against of the Debtors

2.      Notwithstanding any provision in the Bankruptcy Rules to the contrary: (i) this Order shall be effective immediately and enforceable upon entry; (ii) the Foreign Representative is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; (ii) the Foreign Representative is authorized and empowered and may, in his discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

3.      This Court shall retain jurisdiction with respect to: (i) the enforcement, amendment or modification of this Order; (ii) any requests for additional relief or any adversary proceeding brought in or through these Chapter 15 Cases; and (iii) any request by an entity for relief from the provisions of this Order, for cause shown, as to any of the foregoing, and provided the same is properly commenced and within the jurisdiction of this Court.

Dated:   New York, New York
         _____, 2016

         _____
         UNITED STATES BANKRUPTCY JUDGE